LAWRENCE J. HILTON (SBN 156524)
Email: lhilton@onellp.com
TAYLOR C. FOSS (SBN 253486)
Email: tfoss@onellp.com
**ONE LLP**
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
Telephone:   (949) 502-2876
Facsimile:   (949) 258-5081

Attorneys for Plaintiffs and
Counter-Defendants
MEINEKE FRANCHISOR SPV LLC
and MEINEKE REALTY, INC.

JESSICA ROSEN, SBN 294923
jrosen@lewitthackman.com
HEIDY A. NURINDA, SBN 333188
hnurinda@lewitthackman.com
**LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN**
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Telephone:   (818) 990-2120
Fax:             (818) 981-4764

Attorneys for
Defendants/Counterclaimant

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina corporation, <br><br> Plaintiffs, <br><br> v. <br><br> CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual, <br><br> Defendants. | Case No. 2:23-cv-00374-SPG-JC <br> Hon. Sherilyn Peace Garnett <br><br> **JOINT APPENDIX OF EVIDENCE** <br><br> Date:   April 10, 2024 <br> Time: 1:30 p.m. <br> Crtrm: 5C <br><br> Complaint Filed: January 18, 2023 <br> Answer/Counterclaim: March 15, 2023 <br><br> Trial Date: June 18, 2024 |
| AND RELATED COUNTERCLAIMS | |

| TABLE OF CONTENTS | |
|---|---|
| **Exhibit** | **Description** |
| 1. | Excerpts of the Rule 30(b)(6) Deposition Transcript of CJGL, Inc. taken on January 30, 2024 |
| 2. | Declaration of Lawrence J. Hilton |
| 3. | Declaration of Zachary Pfeiffer |
| 4. | Declaration of Joeseph Robinson |
| 5. | Declaration of Darrin Krader |
| 6. | Excerpts of the Rule 30(b)(6) Deposition Transcript of Meineke (Krader portion taken on February 5, 2024) |
| 7. | Excerpts of the Rule 30(b)(6) Deposition Transcript of Meineke (Robinson portion taken on February 6, 2024) |
| 8. | Declaration of Dennis Leone |
| 9. | Declaration of Anthony Winchester |
| 10. | Declaration of Jessica W. Rosen in support of Opposition to Meineke's Motion for Summary Judgment and Cross-Motion for Summary Judgment in Favor of Counterclaimants, and exhibits attached thereto |
| 11. | Declaration of Jan Douma in support of Opposition to Meineke's Motion for Summary Judgment and Cross-Motion for Summary Judgment in Favor of Counterclaimants, and exhibits attached thereto |
| 12. | Declaration of David Holmes in support of Opposition to Meineke's Motion for Summary Judgment and Cross-Motion for Summary Judgment in Favor of Counterclaimants, and exhibits attached thereto |

Dated:  March 13, 2024

ONE LLP
LAWRENCE J. HILTON

By:  */s/ Lawrence J. Hilton*
    Lawrence J. Hilton

Attorneys for Plaintiffs and Counter-Defendants
MEINEKE FRANCHISOR SPV LLC and
MEINEKE REALTY, INC.

Dated: March 13, 2024

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN

By: */s/ Jessica Rosen*
    Jessica W. Rosen

2

**JOINT APPENDIX OF EVIDENCE**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Heidy Nurinda

Attorneys for Defendants and
Counterclaimants

**JOINT APPENDIX OF EVIDENCE**

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
 3                      WESTERN DIVISION
 4                         -oOo-
 5   MEINEKE FRANCHISOR SPV        )
     LLC, a Delaware limited       )
 6   liability company; and        )
     MEINEKE REALTY, INC., a       )
 7   North Carolina corporation,   )
                                   )
 8            Plaintiffs,          )
                                   ) Case No:
 9        v.                       ) 2:23-cv-00374-SPG-JC
                                   )
10   CJGL, INC., a California      )
     corporation; CARL DOUMA, an   )
11   individual; JAN DOUMA, an     )
     individual,                   )
12                                 )
              Defendants.          )
13   _____)
                                   )
14   AND RELATED COUNTERCLAIMS.    )
     _____)
15
16                  REMOTE VIDEO-RECORDED
17          RULE 30(b)(6) DEPOSITION OF CJGL, INC.
18                   BY:  JAN DOUMA
19
20                   Taken via Zoom
21             On Tuesday, January 30, 2024
22                   At 10:52 a.m.
23
24   Reported by:  Emily A. Gibb, RPR, CSR, CCR
     CA CSR #14551, NV CCR #709
25
```

Page 1

1    did insurance defense.  So I did a lot of records

2    summaries.

3         Q.   And was that in the Southern California

4    area?

5         A.   No.  That was in San Francisco.

6         Q.   Okay.  And then your -- your husband, Carl

7    Douma, did you meet him at law school?

8         A.   No.  In college.  Before I graduated from

9    UCSB, I went to -- I spent two years at Cal State

10   Sacramento, and that's where I met him.

11        Q.   Okay.  I just wondered, because I believe he

12   also went there, so I just thought that you may have

13   met, but it sounds like you knew him before you went

14   there.

15        A.   Uh-huh.

16        Q.   Now, I note that you and your husband are

17   both still members of the California bar, although

18   you're -- you're on inactive status.  It looks to me

19   like you did reactivate your -- your bar license

20   between March of 2019 and January of 2021.

21             Was there any reason for that?

22        A.   Yes.

23        Q.   What was the reason?

24        A.   We were sued by O'Reilly Auto Parts for

25   failure to pay, and so I reacted [sic] my -- it was

Page 14

1    in -- in superior court, so I reacted my own license

2    and defended myself.

3         Q.   When -- when you say that you were sued, was

4    that CJGL, Inc., that was sued?

5         A.   Yes.

6         Q.   Okay.  And was that related to the -- the

7    Meineke franchise in Santa Barbara?

8         A.   Yes.

9         Q.   When did -- (audio interruption).

10             (Clarification by the Reporter.)

11             MR. HILTON:  I'm sorry.  Let me try again,

12   and if there's still a problem, I could mute my

13   computer and then just do a different type of audio.

14   BY MR. HILTON:

15        Q.   My question was:  When did you form

16   CJGL, Inc.?

17        A.   Ooh.  I think 20 -- I think the very end of

18   2012.

19        Q.   What -- what was the purpose for your

20   formation of CJGL, Inc.?

21        A.   To -- to find a business to purchase for

22   income.

23        Q.   And the shareholders -- is it accurate that

24   you and your husband, Carl, were the shareholders of

25   CJGL?

                                          Page 15

1      A.   Yes.

2      Q.   Were there any other shareholders?

3      A.   No.

4      Q.   And were you and your husband the officers

5   of CJGL?

6      A.   Yes.

7      Q.   And were you also the directors of CJGL?

8      A.   Yes.

9      Q.   Okay.  And were there any other officers or

10   directors of CJGL other than you and your husband?

11      A.   No.

12           MR. HILTON:  Okay.  Now I'm going to mark

13   our first exhibit.

14           Bear with me.  I don't know -- (audio

15   interruption).

16               (Clarification by the Reporter.)

17           VIDEOGRAPHER:  Would you like me to take us

18   off the record, Mr. Hilton?

19           Mr. Hilton, it looks --

20           MR. HILTON:  Yes.

21           VIDEOGRAPHER:  Okay.  There you go.  Now I

22   can hear you.

23           MR. HILTON:  Let's go off the record.

24           VIDEOGRAPHER:  Let me take us off.

25           This marks the end of Media Unit No. 3.  The

Page 16

```
 1              Okay.  I'm going to try to bring up another
 2     exhibit now.  Let's see if we'll be successful at
 3     that.
 4                   (Exhibit 4 was marked for
 5                   identification.)
 6     BY MR. HILTON:
 7        Q.   Okay.  I'm setting up what's been marked for
 8     identification as Exhibit 4.  Let me know when you
 9     can see it.  It's entitled "Renewal Mutual Release."
10        A.   Okay.  I've got that.
11        Q.   Okay.  Mrs. Douma, do you recognize what's
12     been marked for identification as Exhibit 4?
13        A.   It was a long time ago, but okay.
14        Q.   Okay.  Just to -- if you would scroll to the
15     last page, page 3.
16        A.   Yeah.
17        Q.   It looks like there are electronic
18     signatures by --
19        A.   Yeah.
20        Q.   -- your husband --
21        A.   Yes.
22        Q.   -- your husband on September 29th, and Scott
23     O'Melia from Meineke Franchisor on September 29th,
24     and it looked like then you -- by DocuSign, you
25     executed the document on July 12th of 2021.
```

Page 35

```
 1              Do you see that?
 2       A.   Yes.
 3       Q.   Okay.  And did -- is it your recollection
 4   that you did execute the document that's entitled
 5   "Renewal Mutual Release" marked as Exhibit 4?
 6       A.   That sounds about right, yes.
 7       Q.   Now, if you would go back -- I've got a
 8   couple of questions that I want to go back to on
 9   Exhibit 2.
10       A.   Okay.  What page?
11       Q.   It's -- I'd like you to go to page 4.
12       A.   Okay.
13       Q.   And bear with me for just a minute here.
14       A.   Interrogatory 6?
15       Q.   Yes.  Yes.  Correct.
16            I'm -- I'm still here.  I'm just looking
17   at -- looking at some notes here.  I'll be right back
18   with you.
19            MS. ROSEN:  Larry, just as an FYI, I put in
20   the messages or the chat, the Bates number with
21   respect to the -- the email that Ms. Douma was
22   referencing.
23            MR. HILTON:  Oh, okay.  Great.  Okay.  Thank
24   you.
25            I apologize, it's really slow here, but I'm
```

 1    BY MR. HILTON:
 2        Q.   And, Mrs. Douma, I'm not going to ask you
 3    detailed questions.
 4             I'm just going to ask you generally if it's
 5    consistent with your recollection that on
 6    September 29th of 2021, you -- CJGL, Inc., and
 7    Meineke Franchisor entered into a new franchise
 8    agreement?
 9             MS. ROSEN:   Objection.   The document speaks
10    for itself.
11             But you may answer.
12             THE WITNESS:   Okay.   Yeah, that -- that
13    sounds about right.
14    BY MR. HILTON:
15        Q.   Okay.   And then also, Exhibit 4, which is
16    the Renewal Mutual Release, if you could turn back to
17    that.   I'm just going to --
18        A.   Got it.
19        Q.   -- read the -- the second paragraph on the
20    first -- from the document.   The first "WHEREAS"
21    paragraph.
22        A.   Uh-huh.
23        Q.   Says:
24             "WHEREAS pursuant to that one certain
25             Meineke Franchise and Trademark Agreement

                                          Page 38

1    of that you received that indicated that Meineke

2    would not guarantee a new lease with the landlord?

3         A.   I don't remember.

4         Q.   Did anybody from Meineke assist you in

5    trying to get a new lease with the landlord?

6         A.   Yes.

7         Q.   Who was that?

8         A.   My liaison was Joseph Robinson, but I

9    understood that other people were also talking to the

10   landlord.  I don't know who.

11        Q.   But you were never able to enter into a new

12   lease with the landlord; correct?

13        A.   Correct.

14        Q.   And do you have an understanding of why

15   your -- CJGL and the landlord were not able to enter

16   in a new lease?

17        A.   Because Meineke withdrew its guarantee.

18        Q.   Okay.  All right.  And that was -- you --

19   you learned that through the written correspondence

20   that you mentioned in response to your prior answer?

21        A.   That -- that was the stated reason.

22        Q.   Okay.

23             MR. HILTON:  Why don't we -- can we take

24   about a five-minute break?  I just have a couple of

25   last-minute things I want to look over, and then

Page 44

```
 1        Q.   Okay.  First of all, I'd like to ask, at the
 2   very top of the exhibit, there's a -- em- -- an email
 3   from an individual -- an individual named Jeffery
 4   Haff.
 5            Do you know Mr. Haff?
 6        A.   I -- I hired him.  I've never met him.
 7        Q.   Okay.  He was your -- acting as your
 8   counsel; correct?
 9        A.   Yes.
10        Q.   Okay.  And I'm going to scroll down to --
11   where is it? -- not the last page, but the
12   second-to-last page.  And I think that may be the
13   communication you were referring to.  There's an
14   email from Jeff Haff on September 24th of 2021 to
15   Dennis Leone, and you're copied on it.
16        A.   Yes.
17        Q.   And in the -- in the body of the text, it
18   says:
19        Dear Dennis:
20        I spoke with the landlord's attorney Drew
21        Simons today regarding this matter.  He
22        stated that Meineke "really blew it" by
23        ending the chances of Jan getting a new lease
24        for 7900 a month when Meineke decided it
25        would not guarantee the 7900 a month lease.
```

Page 46

1          Do you see that?

2      A.   Yes.

3      Q.   Okay.  Is that the communication that you

4  were referring to?

5      A.   Yes.

6      Q.   Okay.  Okay.  And Mr. Haff was your --

7  acting as counsel for CJGL, Inc., in its

8  communications with Meineke?  Is that your

9  understanding?

10     A.   Yes.

11     Q.   Okay.

12          MR. HILTON:  I have no further questions,

13  Mrs. Douma.  Thank you.

14          I don't know if Ms. Rosen has any questions,

15  but I appreciate you taking the time.  And thanks for

16  your patience with some of the glitches that we had.

17          MS. ROSEN:  I just -- I just have a few

18  questions, a few clarifying points.  So give me a

19  moment so I can pull up the exhibit and let you know

20  what number it is.

21

22                    EXAMINATION

23  BY MS. ROSEN:

24     Q.   Okay.  Ms. Douma, if you can pull up

25  Exhibit 5, which is Exhibit 2 to Meineke's

                                        Page 47

```
 1                  REPORTER'S CERTIFICATE

 2

 3          I, EMILY A. GIBB, a Certified Shorthand
        Reporter in the State of California No. 14551, and
        Registered Professional Reporter, hereby certify:

 4

 5          THAT I reported the taking of the deposition
        of JAN DOUMA, commencing on January 30, 2024, at
             a.m.                                            10:52

 6

 7          THAT prior to being examined, the witness
        was placed under oath to tell the truth, the whole
        truth, and nothing but the truth; that the

 8      proceedings were taken down by me in shorthand and
        thereafter my notes were transcribed through

 9      computer-aided transcription; and the foregoing
        transcript constitutes a full, true, and accurate

10      record of such testimony adduced and oral proceedings
        had, and of the whole thereof.

11

12          I further certify that I am in no way
        related to any of the parties, nor I am I financially
        interested in the outcome of the case.

13

14          (X) Review and signature was requested.

15          ( ) Review and signature was waived.

16          ( ) Review and signature was not requested.

17

18          IN WITNESS THEREOF, I have subscribed my

19      name on this 2nd day of February, 2024.

20

21

22

23

24          Emily A. Gibb, RPR, CSR, CCR

25
                                               Page 52
```

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 2

LAWRENCE J. HILTON (State Bar No. 156524)
Email: lhilton@onellp.com
TAYLOR C. FOSS (State Bar No. 253486)
Email: tfoss@onellp.com
**ONE LLP**
23 Corporate Plaza
Suite 150-105
Newport Beach California 92660
Telephone:   (949) 502-2876
Facsimile:   (949) 258-5081

Attorneys for Plaintiffs and Counter-Defendants
MEINEKE FRANCHISOR SPV LLC and
MEINEKE REALTY, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina corporation, <br><br> Plaintiffs, <br><br> v. <br><br> CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual, <br><br> Defendants. <br> ——————————————— <br> AND RELATED COUNTERCLAIMS | Case No. 2:23-cv-00374-SPG-JC <br> Hon. Sherilyn Peace Garnett <br><br> **DECLARATION OF LAWRENCE J. HILTON** <br><br> Date:  April 10, 2024 <br> Time: 1:30 p.m. <br> Crtrm: 5C <br><br> Complaint Filed: January 18, 2023 <br> Answer/Counterclaim: March 15, 2023 <br><br> Trial Date: June 18, 2024 |

**DECLARATION OF LAWRENCE J. HILTON**

I, Lawrence J. Hilton, declare as follows:

1.    I am a partner at the law firm of One LLP, counsel for Plaintiffs and Counter-Defendants Meineke Franchisor SPV LLC and Meineke Realty, Inc. in the above-captioned matter.  I have personal knowledge of the facts stated herein and, if called a s witness, I could and would competently testify thereto.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of Defendant CJGL, Inc.'s Responses and Objections to Plaintiff's Interrogatories (Set One) served on September 5, 2023.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of a document produced by Defendants and Counterclaimants on September 11, 2023 with bates numbers CJGL000994-95, which reflects an email exchange between Jan Douma and Meineke employees Emma Coleman and Phil Farenga.

4.    Attached hereto as **Exhibit 3** is a true and correct copy of Defendant CJGL, Inc.'s Responses and Objections to Plaintiff's Requests for Admission (Set One) served on September 5, 2023.

5.    All of the documents attached to Mr. Leone's Declaration filed in support of the Summary Judgment Motion were produced to my office by CJGL's counsel on October 19, 2023.  Of the five exhibits attached to Mr. Leone's Declaration, Jan Douma was a recipient of four of the emails at the time they were sent.  (Exhs. 2, 3, 4, 5.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13th, 2024 at Dallas, Texas.

_____
Lawrence J. Hilton

**DECLARATION OF LAWRENCE J. HILTON**

# EXHIBIT 1

Jessica Rosen, SBN 294923
  jrosen@lewitthackman.com
Heidy Nurinda SBN 333188
  hnurinda@lewitthackman.com
LEWITT, HACKMAN, SHAPIRO,
  MARSHALL & HARLAN
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Phone: (818) 990-2120; Fax: (818) 981-4764

Attorneys for Defendants and Counterclaimants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; AND MEINEKE REALTY, INC., a North Carolina Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br><br>Defendants. | Case No. 2:23-cv-00374-SPG-JC<br>Hon. Sherilyn Peace Garnett<br><br>DEFENDANT CJGL INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES (SET ONE)<br><br><br>Complaint: January 18, 2023<br>Answer/Counterclaim: March 15, 2023<br><br>Trial Date: April 9, 2024 |
| CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br><br>Counterclaimants,<br><br>vs.<br><br>MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; MEINEKE REALTY, INC., a North Carolina Corporation; and ECONO LUBE AND TUNE, INC., an unknown entity,<br><br>Counterdefendants. | |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

- 1 -

**PROPOUNDING PARTY:**      **MEINEKE FRANCHISOR SPV, LLC**

**RESPONDING PARTY:**      **CJGL, INC.**

**SET NO.:**      **ONE (1)**

Defendant CJGL, Inc. responds to Plaintiff Meineke Franchisor SPV, LLC's Interrogatories as follows:

<u>**PRELIMINARY STATEMENT**</u>

Responding Party makes these responses solely for this action. Responding Party has not completed discovery or investigation of facts or preparation for trial. Responding Party provides these responses without prejudice to its right to learn at a later time evidence of subsequently discovered facts or interpretations of those facts.

The information in these responses is subject to all objections of relevancy, materiality, propriety and admissibility. Responding Party reserves the right to assert these objections and other objection not stated that would require exclusion of the information, or any portion, if offered as evidence at any time in this action. Responding Party may make these objections at any time prior to and during trial.

No incidental or implied admissions are intended. Plaintiff shall not construe the response or objection to any Interrogatory as an admission that Responding Party accepts or admits the existence of any facts assumed by the Interrogatories.

- 2 -

DEFENDANT CJGL, INC.'S OBJECTIONS & RESPONSES TO INTEROGATORIES (SET ONE)

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

# INTERROGATORIES

## INTERROGATORY NO. 1:

State the date and amount of each payment YOU made from December 1, 2020 through November 30, 2022 for WEEKLY ROYALTIES.

## RESPONSE TO INTERROGATORY NO. 1:

Responding Party objects to this interrogatory to the extent it is overbroad in time and scope and unduly burdensome. Responding Party objects to this interrogatory to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the objections, Responding Party responds as follows: Responding Party understands Meineke Franchisor ("Franchisor") to have calculated weekly royalties paid by Responding Party. Further, Franchisor billed weekly royalties to and received payment from Responding Party. Therefore, Franchisor has all records and numbers responsive to this Interrogatory. Subject to that, Responding Party provides the following:

| DATE | AMOUNT PAID |
|---|---|
| 12/4/2020 | $433.92 |
| 12/11/2020 | $504.22 |
| 12/18/2020 | $681.83 |
| 12/28/2020 | $688.00 |
| 1/4/2021 | $434.02 |
| 1/8/2021 | $495.45 |
| 1/22/2021 | $433.84 |
| 1/22/2021 | $443.91 |
| 2/5/2021 | $485.89 |
| 2/5/2021 | $434.01 |
| 2/12/2021 | $813.02 |
| 2/19/2021 | $612.28 |
| 2/26/2021 | $742.24 |

| DATE | AMOUNT PAID |
|---|---|
| 3/5/2021 | $583.24 |
| 3/12/2021 | $688.56 |
| 3/19/2021 | $499.99 |
| 3/26/2021 | $1,047.70 |
| 4/2/2021 | $696.53 |
| 4/9/2021 | $626.65 |
| 4/16/2021 | $780.53 |
| 4/23/2021 | $829.82 |
| 4/30/2021 | $507.71 |
| 5/7/2021 | $474.16 |
| 5/14/2021 | $719.33 |
| 5/21/2021 | $511.22 |
| 5/28/2021 | $463.03 |
| 6/11/2021 | $705.78 |
| 6/11/2021 | $808.04 |
| 6/18/2021 | $761.02 |
| 6/25/2021 | $576.84 |
| 7/2/2021 | $518.30 |
| 7/9/2021 | $662.25 |
| 7/16/2021 | $845.53 |
| 7/23/2021 | $926.87 |
| 7/30/2021 | $645.89 |
| 8/6/2021 | $662.96 |
| 8/13/2021 | $1,139.23 |
| 8/20/2021 | $1,086.38 |
| 8/27/2021 | $884.44 |
| 9/3/2021 | $826.85 |
| 9/10/2021 | $513.03 |
| 9/17/2021 | $491.87 |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

| DATE | AMOUNT PAID |
|---|---|
| **9/24/2021** | $647.46 |
| **10/1/2021** | $725.11 |
| **10/8/2021** | $879.22 |
| **10/15/2021** | $720.13 |
| **10/25/2021** | $953.86 |
| **10/29/2021** | $949.09 |
| **11/5/2021** | $743.49 |
| **11/15/2021** | $672.51 |
| **11/19/2021** | $1,053.86 |
| **11/26/2021** | $814.81 |
| **12/3/2021** | $411.51 |
| **12/10/2021** | $825.45 |
| **12/17/2021** | $638.35 |
| **12/24/2021** | $555.88 |
| **12/31/2021** | $443.72 |
| **1/7/2022** | $488.75 |
| **1/14/2022** | $572.36 |
| **1/21/2022** | $968.29 |
| **1/28/2022** | $1,058.51 |
| **2/4/2022** | $674.10 |
| **2/11/2022** | $791.01 |
| **2/22/2022** | $559.99 |
| **2/25/2022** | $701.76 |
| **3/4/2022** | $616.40 |
| **3/11/2022** | $661.93 |
| **3/18/2022** | $657.13 |
| **3/25/2022** | $590.65 |
| **4/1/2022** | $1,264.24 |
| **4/8/2022** | $597.89 |

| DATE | AMOUNT PAID |
|---|---|
| 4/15/2022 | $484.70 |
| 5/2/2022 | $576.52 |
| 5/6/2022 | $794.52 |
| 5/13/2022 | $535.54 |
| 5/13/2022 | $1,132.15 |
| 5/20/2022 | $655.94 |
| 5/27/2022 | $431.66 |
| 6/6/2022 | 1,015.57 |
| 6/10/2022 | $400.00 |
| 6/17/2022 | $678.45 |
| 6/24/2022 | $816.26 |
| 7/1/2022 | $565.02 |
| 7/8/2022 | $727.71 |
| 7/15/2022 | $400.00 |
| 7/18/2022 | $374.50 |
| 7/22/2022 | $458.03 |
| 8/3/2022 | $481.42 |
| 8/5/2022 | $459.16 |
| 8/15/2022 | $435.81 |
| 8/17/2022 | $374.50 |

**INTERROGATORY NO. 2:**

State the date and amount of each payment YOU made from July 25, 2020 through November 30, 2022 for MAF CONTRIBUTIONS.

**RESPONSE TO INTERROGATORY NO. 2:**

Responding Party objects to this interrogatory to the extent it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Without waiving the objections, Responding Party responds as follows: Responding Party understands Meineke Franchisor ("Franchisor") to have calculated MAF contributions paid by Responding Party. Further, Franchisor billed MAF contributions to and received payment from Responding Party. Therefore, Franchisor has all records and numbers responsive to this Interrogatory. Subject to that, Responding Party provides the following:

| DATE | AMOUNT PAID |
| --- | --- |
| 7/31/2020 | $1,151.11 |
| 8/7/2020 | $1,084.78 |
| 8/14/2020 | $1,263.89 |
| 8/21/2020 | $900.64 |
| 8/28/2020 | $1,292.02 |
| 9/4/2020 | $1,303.06 |
| 9/11/2020 | $1,280.44 |
| 9/18/2020 | $1,024.12 |
| 9/25/2020 | $1,320.96 |
| 10/2/2020 | $1,391.22 |
| 10/9/2020 | $965.02 |
| 10/16/2020 | $621.41 |
| 10/23/2020 | $1,093.25 |
| 10/30/2020 | $810.01 |
| 11/6/2020 | $883.73 |
| 11/13/2020 | $1,217.93 |
| 11/20/2020 | $565.31 |
| 11/27/2020 | $1,293.07 |
| 12/4/2020 | $438.29 |
| 12/11/2020 | $734.46 |
| 12/18/2020 | $1,021.83 |
| 12/28/2020 | $1,035.22 |
| 1/4/2021 | $286.94 |
| 1/8/2021 | $686.72 |
| 1/22/2021 | $1,281.23 |
| 2/5/2021 | $701.88 |
| 2/5/2021 | $54.56 |
| 2/12/2021 | $1,136.11 |
| 2/19/2021 | $864.20 |
| 2/26/2021 | $1,035.27 |
| 3/5/2021 | $640.89 |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

| DATE | AMOUNT PAID |
|---|---|
| 3/12/2021 | $758.66 |
| 3/19/2021 | $474.64 |
| 3/26/2021 | $1,133.68 |
| 4/2/2021 | $769.93 |
| 4/9/2021 | $672.97 |
| 4/16/2021 | $726.87 |
| 4/23/2021 | $926.33 |
| 4/30/2021 | $536.81 |
| 5/7/2021 | $510.16 |
| 5/14/2021 | $805.67 |
| 5/21/2021 | $556.04 |
| 5/28/2021 | $488.12 |
| 6/11/2021 | $523.68 |
| 6/11/2021 | $582.18 |
| 6/18/2021 | $829.54 |
| 6/25/2021 | $637.04 |
| 7/2/2021 | $558.46 |
| 7/9/2021 | $711.16 |
| 7/16/2021 | $942.11 |
| 7/23/2021 | $980.68 |
| 7/30/2021 | $650.97 |
| 8/6/2021 | $730.80 |
| 8/13/2021 | $1,275.53 |
| 8/20/2021 | $971.45 |
| 8/27/2021 | $992.14 |
| 9/3/2021 | $925.79 |
| 9/10/2021 | $543.31 |
| 9/17/2021 | $523.08 |
| 9/24/2021 | $729.80 |
| 10/1/2021 | $804.33 |
| 10/8/2021 | $985.87 |
| 10/15/2021 | $830.74 |
| 10/25/2021 | $1,100.61 |
| 10/29/2021 | $1,098.69 |
| 11/5/2021 | $856.39 |
| 11/15/2021 | $672.51 |
| 11/19/2021 | $1,188.28 |
| 11/26/2021 | $881.73 |
| 12/3/2021 | $481.41 |
| 12/10/2021 | $947.54 |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

| DATE | AMOUNT PAID |
|---|---|
| 12/17/2021 | $717.34 |
| 12/24/2021 | $644.00 |
| 12/31/2021 | $506.48 |
| 1/7/2022 | $578.67 |
| 1/14/2022 | $496.36 |
| 1/21/2022 | $1,113.25 |
| 1/28/2022 | $1,253.61 |
| 2/4/2022 | $784.84 |
| 2/11/2022 | $699.28 |
| 2/22/2022 | $622.89 |
| 2/25/2022 | $821.89 |
| 3/4/2022 | $720.65 |
| 3/11/2022 | $577.37 |
| 3/18/2022 | $744.09 |
| 3/25/2022 | $674.14 |
| 4/1/2022 | $1,264.24 |
| 4/8/2022 | $655.00 |
| 4/15/2022 | $568.96 |
| 5/2/2022 | $660.03 |
| 5/6/2022 | $934.86 |
| 5/13/2022 | $987.87 |
| 5/13/2022 | $616.89 |
| 5/20/2022 | $586.06 |
| 5/27/2022 | $506.03 |
| 6/6/2022 | 1,155.02 |
| 6/10/2022 | $377.43 |
| 6/17/2022 | $777.62 |
| 6/24/2022 | $914.65 |
| 7/1/2022 | $648.95 |
| 7/8/2022 | $794.69 |
| 7/15/2022 | $442.34 |
| 7/18/2022 | $198.00 |
| 7/22/2022 | $536.47 |
| 8/3/2022 | $539.86 |
| 8/5/2022 | $511.35 |
| 8/15/2022 | $507.10 |
| 8/17/2022 | $198.00 |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

### INTERROGATORY NO. 3:

State the date and amount of each payment YOU made from May 1, 2020 through November 30, 2022 for obligations due under the SUBLEASE.

### RESPONSE TO INTERROGATORY NO. 3:

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects on the basis that this interrogatory is vague and ambiguous as to the term "obligations."

Without waiving the objections, Responding Party responds as follows: Responding Party understands Meineke Realty ("Realty") to have calculated rent paid by Responding Party. Further, Realty billed rent to and received payment from Responding Party. Therefore, Realty has all records and numbers responsive to this Interrogatory. Subject to that, Responding Party provides the following:

| DATE | AMOUNT PAID |
|---|---|
| 5/4/2020 | $10,014.00 |
| 6/2/2020 | $10,014.00 |
| 7/2/2020 | $10,014.00 |
| 7/21/2020 | $2,000 |
| 8/4/2020 | $10,014.00 |
| 8/21/2020 | $2,000 |
| 9/2/2020 | $10,014.00 |
| 9/22/2020 | $2,000 |
| 10/2/2020 | $10,014.00 |
| 10/20/2020 | $2,000 |
| 11/19/2020 | $10,014.00 |
| 3/23/2021 | $40,000 |
| 4/26/2021 | $8,116.47 |
| 5/11/2021 | $5,157.21 |
| 5/12/2021 | $5,157.21 |
| 5/13/2021 | $5,157.21 |
| 10/4/2021 | $39,620.92 |
| 10/20/2021 | $5,000 |
| 10/21/2021 | $5,314.42 |
| 12/22/2021 | $20,628.84 |

- 10 -

| DATE | AMOUNT PAID |
|---|---|
| 2/25/2022 | $5,157.21 |
| 2/28/2022 | $5,157.21 |
| 3/14/2022 | $20,628.84 |
| 4/4/2022 | $10,314.42 |
| 5/3/2022 | $10,314.42 |
| 6/2/2022 | $10,314.42 |
| 7/5/2022 | $10,314.42 |

## INTERROGATORY NO. 4:

To the extent not included in YOUR responses to Interrogatory Nos. 1 through 3, state the date and amount of each payment YOU made to FRANCHISOR from July 25, 2020 through November 30, 2022.

## RESPONSE TO INTERROGATORY NO. 4:

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to this interrogatory as it fails to identify with reasonable particularity the information requested.

Without waiving the objections, Responding Party responds as follows:

| DATE | AMOUNT PAID |
|---|---|
| 7/9/2020 | $331.50 |
| 7/16/2020 | $222.00 |
| 8/11/2020 | $331.50 |
| 8/18/2020 | $222.00 |
| 9/11/2020 | $331.50 |
| 9/16/2020 | $222 |
| 10/16/2020 | $222.00 |
| 11/10/2020 | $331.50 |
| 11/17/2020 | $222 |
| 12/9/2020 | $331.50 |
| 12/16/2020 | $222 |
| 1/11/2021 | $331.50 |
| 1/19/2021 | $222 |
| 2/12/2021 | $331.50 |
| 2/17/2021 | $222 |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

| DATE | AMOUNT PAID |
|---|---|
| 3/15/2021 | $331.50 |
| 3/16/2021 | $222 |
| 4/13/2021 | $331.50 |
| 4/16/2021 | $222 |
| 5/13/2021 | $331.50 |
| 5/18/2021 | $222 |
| 6/11/2021 | $331.50 |
| 6/16/2021 | $222 |
| 8/11/2021 | $331.50 |
| 8/17/2021 | $222 |
| 9/15/2021 | $331.50 |
| 9/16/2021 | $222 |
| 10/18/2021 | $331.50 |
| 10/19/2021 | $222 |
| 11/15/2021 | $331.50 |
| 11/16/2021 | $222 |
| 12/15/2021 | $331.50 |
| 12/16/2021 | $222 |
| 1/14/2022 | $384.50 |
| 1/19/2022 | $222 |
| 2/16/2022 | $384.50 |
| 2/16/2022 | $222 |
| 3/16/2022 | $374.50 |
| 3/16/2022 | $222 |
| 4/18/2022 | $222 |
| 4/18/2022 | $374.50 |
| 5/18/2022 | $374.50 |
| 5/18/2022 | $198 |
| 6/15/2022 | $374.50 |
| 6/16/2022 | $198 |

**INTERROGATORY NO. 5:**

To the extent not included in YOUR responses to Interrogatory Nos. 1 through 3, state the date and amount of each payment YOU made to ECONO LUBE from May 1, 2020 through November 30, 2022.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Party objects to this interrogatory on the ground that it is

- 12 -

overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to this interrogatory as vague and ambiguous as the term "ECONO LUBE" is not defined.

Without waiving the objections, Responding Party responds as follows:

Responding Party is unable to provide a response. Fees were deducted by Propounding Party from Responding Party's account. Responding Party did not receive a break down as to what amount was apportioned to specific fees. As such, Propounding Party is in a better position to determine how much was paid to Econo Lube.

**INTERROGATORY NO. 6:**

For each of the representations YOU allege in Paragraph 20 of the COUNTERCLAIMS, state with particularity (1) the substance of the representation; (2) the individual or individuals who made the representation; (3) the individual or individuals to whom the representation was made; and (4) the date, time, place and manner of the representation.

**RESPONSE TO INTERROGATORY NO. 6:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to the extent the interrogatory is vague and ambiguous as to the terms "substance" and "representation." Responding Party further objects to this interrogatory to the extent that it fails to identify the information sought with reasonable particularity. Responding Party objects to this request as compound. Propounding Party seeks to evade limits set forth under Rule 33.

Without waiving the objections, Responding Party responds as follows:

1) Counterdefendants by and through various agents and/or representatives,

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

including but not limited to, John Kelly, Darrin Krader, and Joseph Robinson, represented that it would ensure Counterclaimants obtained a new lease for the Franchise Premises, including signing a three-month guaranty, if needed. Responding Party was informed that Franchisor wanted to keep Responding Party's franchise in particular in part because Franchisor had been losing stores/franchises and wanted to keep as many as possible in the franchise system. Based on that representation, Counterclaimants made reasonable efforts to enter into a new lease agreement with the landlord of the FRANCHISE PREMISES.

2) Counterdefendants, by and through various agents and/or representatives, including but not limited to, John Kelly, Darrin Krader, and Joseph Robinson.

3) Representations by Counterdefendants were made to Counterclaimants, Carl and Jan Douma.

4) On January 18, 2018, Counterclaimants found out that Meineke had not renewed its lease in 2016 for the premise while having a telephone conversation with a Meineke representative, John Kelley. Meineke representatives, including Darrin Krader, Joseph Robinson, and/or John Kelley stated that Meineke would ensure the lease was obtained, including signing a three-month guaranty, so that Counterdefendant may continue operating its business.

**INTERROGATORY NO. 7:**

For each of the representations YOU allege in Paragraph 20 of the COUNTERCLAIMS, identify all DOCUMENTS reflecting such representations.

**RESPONSE TO INTERROGATORY NO. 7:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

admissible evidence. Responding Party objects to the extent the interrogatory is vague and ambiguous as to the term "representations." Responding Party further objects to this interrogatory to the extent that it fails to identify the information sought with reasonable particularity.

Without waiving the, Responding Party responds as follows: Conversations were conducted via telephone calls with Meineke representatives. There are also email communications (concurrently served in response to document requests) between Meineke representatives, Responding Party, and the landlord's attorney where Meineke was seemingly assisting in lease negotiations for a lease directly between Responding Party and the landlord. Discovery and investigation are ongoing, and Responding Party reserves the right to supplement its response.

## INTERROGATORY NO. 8:

State the date, amount and purpose of each expense YOU incurred to maintain the FRANCHISE PREMISES in good condition and repair.

## RESPONSE TO INTERROGATORY NO. 8:

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to the extent the interrogatory is vague and ambiguous as to the terms "expense" and "good condition." Responding Party further objects to this interrogatory to the extent that it fails to identify the information sought with reasonable particularity. Responding Party objects to this request as compound. Propounding Party seeks to evade limits set forth under Rule 33.

Without waiving the objections, Responding Party responds as follows:

| DATE | AMOUNT | PURPOSE |
|---|---|---|
| 9/8/2018 | $350.00 | SHOP REPAIR |
| 10/2/2018 | $80.00 | SHOP REPAIR |
| 10/20/2018 | $250.00 | SHOP REPAIR |
| 9/26/2018 | $567.35 | SHOP REPAIR |

- 15 -

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

| DATE | AMOUNT | PURPOSE |
|---|---|---|
| 10/11/2018 | $1,600.00 | SHOP REPAIR |
| 12/18/2018 | $1,813.60 | SHOP REPAIR |
| 12/3/2018 | $2,601.52 | SHOP REPAIR |
| 12/3/2018 | $1,000.00 | SHOP REPAIR |
| 12/8/2018 | $300.00 | SHOP REPAIR |
| 12/10/2018 | $302.50 | SHOP REPAIR |
| 12/12/2018 | $500.00 | SHOP REPAIR |
| 12/13/2018 | $1,500.00 | SHOP REPAIR |
| 12/22/2018 | $1,000.00 | SHOP REPAIR |
| 1/3/2019 | $100.00 | SHOP REPAIR |
| 1/12/2019 | $250.00 | SHOP REPAIR |
| 2/1/2019 | $1,800.00 | SHOP REPAIR |
| 4/16/2019 | $2,763.84 | EQUIPMENT |
| 7/2/2019 | $210.00 | SHOP REPAIR |
| 7/6/2019 | $378.00 | SHOP REPAIR |
| 1/13/2020 | $278.95 | SHOP REPAIR |
| 2/16/2020 | $686.34 | EQUIPMENT SERVICE |
| 3/11/2020 | $723.24 | SHOP REPAIR |
| 6/4/2020 | $3,866.00 | SHOP EQUIPMENT |
| 6/8/2020 | $2,836.55 | SHOP EQUIPMENT |
| 6/11/2020 | $200.00 | EQUIPMENT SERVICE |
| 6/22/2020 | $1,290.48 | EQUIPMENT SERVICE |
| 6/25/2020 | $1,100.00 | EQUIPMENT SERVICE |
| 7/28/2020 | $159.50 | SHOP REPAIR |
| 8/4/2020 | $6600 + tax | SHOP EQUIPMENT |
| 12/11/2020 | $150.00 | SHOP MAINTENANCE |
| 1/11/2022 | $1,249.00 | EQUIPMENT |
| 2/3/2021 | $190.31 | EQUIPMENT |
| 2/8/2021 | $800.00 | SHOP MAINTENANCE |
| 2/22/2022 | $798.00 | SHOP MAINTENANCE |
| 3/26/2022 | $3,110.25 | SMALL TOOLS |
| 4/2/2022 | $2,270.86 | SMALL TOOLS |
| 4/28/2022 | $195.00 | REPAIR |
| 6/2/2022 | $231.25 | EQUIPMENT |
| 7/22/2021 | $500.00 | SHOP EQUIPMENT |

**INTERROGATORY NO. 9:**

- 16 -

For each of the representations YOU allege in Paragraph 25 of the COUNTERCLAIMS, state with particularity (1) the substance of the representation; (2) the individual or individuals who made the representation; (3) the individual or individuals whom the representation was made; and (4) the date, time, place and manner of the representation.

**RESPONSE TO INTERROGATORY NO. 9:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to the extent the interrogatory is vague and ambiguous as to the terms "substance" and "representation." Responding Party further objects to this interrogatory to the extent that it fails to identify the information sought with reasonable particularity. Responding Party objects to this request as compound. Propounding Party seeks to evade limits set forth under Rule 33.

Without waiving the objections, Responding Party responds as follows:

(1) Responding Party was informed that it was Propounding Party's obligation to maintain at least structural repairs of the leased property, while it would be Responding Party's obligation to maintain cosmetic repairs.

(2) Responding Party was informed of this through several other Meineke franchisees; through Responding Party's leasing agent; the landlord's representative, Andrew Simons.

(3) Carl and Jan Douma

(4) Prior and throughout Responding Party's operation of the business it was at least common knowledge that Propounding Party was responsible for structural repairs of the leased premises for its franchisees.

**INTERROGATORY NO. 10:**

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

- 17 -

1    For each of the representations YOU allege in Paragraph 25 of the
2    COUNTERCLAIMS, identify all DOCUMENTS reflecting such representations.
3    **RESPONSE TO INTERROGATORY NO. 10:**

4    Responding Party objects to this interrogatory on the ground that it is
5    overbroad in time and scope and unduly burdensome. Responding Party objects to
6    the extent the interrogatory is not reasonably calculated to lead to the discovery of
7    admissible evidence. Responding Party further objects to this interrogatory to the
8    extent that it fails to identify the information sought with reasonable particularity.

9    Without waiving the objections, Responding Party responds as follows:
10   Representations were generally made orally. Email communications in Responding
11   Party's possession, custody, or control between Meineke representatives and the
12   landlord's attorney concerning Meineke's obligations to maintain the premises
13   (concurrently served in response to document requests). Discovery and investigation
14   are ongoing, and Responding Party reserves the right to supplement its response.

15   **INTERROGATORY NO. 11:**

16   For each of the "assurances" YOU allege in Paragraph 26(a) of the
17   COUNTERCLAIMS, state with particularity (1) the substance of the "assurance;"
18   (2) the individual or individuals who made the "assurance;" (3) the individual or
19   individuals to whom the "assurance" was made; and (4) the date, time, place and
20   manner of the "assurance."

21   **RESPONSE TO INTERROGATORY NO. 11:**

22   Responding Party objects to this interrogatory on the ground that it is
23   overbroad in time and scope and unduly burdensome. Responding Party objects to
24   the extent the interrogatory is not reasonably calculated to lead to the discovery of
25   admissible evidence. Responding Party objects to the extent the interrogatory is
26   vague and ambiguous as to the terms "substance." Responding Party further objects
27   to this interrogatory to the extent that it fails to identify the information sought with
28   reasonable particularity. Responding Party objects to this request as compound.

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Propounding Party seeks to evade limits set forth under Rule 33.

Without waiving the objections, Responding Party responds as follows:

(1) Responding Party was informed that it was Propounding Party's obligation to maintain at least structural repairs of the leased property, while it would be Responding Party's obligation to maintain cosmetic repairs.

(2) Responding Party was informed of this through several other Meineke franchisees; through Responding Party's leasing agent; and the landlord, through Mary Sourmany; the landlord's representative, Andrew Simons.

(3) Carl and Jan Douma

(4) Prior and throughout Responding Party's operation of the business it was at least common knowledge that Propounding Party was responsible for structural repairs of the leased premises for its franchisees.

**INTERROGATORY NO. 12:**

For each of the "assurances" YOU allege in Paragraph 26(a) of the COUNTERCLAIMS, identify all DOCUMENTS reflecting such assurances.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this interrogatory to the extent that it fails to identify the information sought with reasonable particularity.

Without waiving the objections, Responding Party responds as follows: Assurances to Responding Party were generally made orally. Most correspondence and documents re Meineke's obligations to maintain the FRANCHISE PREMISES are between the landlord and tenant to the MASTER LEASE. Email communications in Responding Party's possession, custody, or control between Meineke representatives, Joseph Robinson, and the landlord's attorney , Andrew Simons concerning Meineke's obligations to maintain the premises (concurrently

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

served in response to document requests). Discovery and investigation are ongoing, and Responding Party reserves the right to supplement its response.

**INTERROGATORY NO. 13:**

For each of the "assurances and representations" YOU allege in Paragraph 27 of the COUNTERCLAIMS, state with particularity (1) the substance of the assurance or representation; (2) the individual or individuals who made the assurance or representation; (3) the individual or individuals to whom the assurance or representation was made; and (4) the date, time, place and manner of the assurance or representation.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to the extent the interrogatory is vague and ambiguous as to the terms "substance." Responding Party further objects to this interrogatory to the extent that it fails to identify the information sought with reasonable particularity. Responding Party objects to this request as compound. Propounding Party seeks to evade limits set forth under Rule 33.

Without waiving the objections, Responding Party responds as follows:

(1) In negotiations with the landlord for Responding Party to take over the lease, Responding Party was informed that the landlord was waiting on Propounding Party to make necessary repairs before being executing a lease with Responding Party.

(2) Andrew Simons

(3) Carl and Jan Douma, Jeffery Haff, Dennis Leone

(4) In or about August and September 2021 throughout the lease negotiations Responding Party had telephonic and email conversations demonstrating that the process was being delayed because of Meineke's failure to make

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

- 20 -

necessary repairs.

**INTERROGATORY NO. 14:**

For each of the "assurances and representations" YOU allege in Paragraph 27 of the COUNTERCLAIMS, identify all DOCUMENTS reflecting such assurances and/or representations.

**RESPONSE TO INTERROGATORY NO. 14:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objections, Responding Party refers Propounding Party to documents concurrently produced, including email communications.

**INTERROGATORY NO. 15:**

For each COMMUNICATION YOU had with the LANDLORD regarding a proposed lease of the FRANCHISE PREMISES, state the date and manner of the COMMUNICATION, and identify the individuals who participated in the COMMUNICATION.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Responding Party objects to this interrogatory on the grounds that it is compound and contains subparts.

Without waiving the objections, Responding Party responds as follows: In or about August 2021, Jan Douma and Andrew Simons were engaged in negotiations for the lease. Joseph Robinson was also involved in some of the email communications to the extent that Meineke was needed to facilitate the lease negotiations, including making necessary repairs.

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

**INTERROGATORY NO. 16:**

State all facts supporting YOUR allegation in Paragraph 21 of the COUNTERCLAIMS that Counter-Defendants were responsible for making the repairs disclosed in the "inspection report."

**RESPONSE TO INTERROGATORY NO. 16:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the objections, Responding Party responds as follows: Both Meineke representatives and the landlord's representative referred to Meineke's responsibilities under the MASTER LEASE. Responding Party inadvertently received a letter and one of the inspection reports for Meineke that landlord sent to Propounding Party. The inspection report disclosed repairs that were needed. The letter stated it was Meineke's responsibility. These reports were sent to Propounding Party given that, as landlord stated, it was Propounding Party's obligation to make these repairs.

**INTERROGATORY NO. 17:**

State all facts supporting YOUR allegation in Paragraph 22 of the COUNTERCLAIMS that "[a]ny alleged outstanding balance in 2020 and 2021 that Counter-Defendants allege is due and owing is false."

**RESPONSE TO INTERROGATORY NO. 17:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the objections, Responding Party responds as follows: As described in the Counterclaim, due to the global pandemic in 2020, the county of

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

DEFENDANT CJGL, INC.'S OBJECTIONS & RESPONSES TO INTEROGATORIES (SET ONE)

Santa Barbara instituted a moratorium on rent payments. The parties entered into a payment plan that deferred Responding Party's payment of rent. Pursuant to this agreement, all deferred rents have been paid off by Responding Party prior to the filing of this action, as reflected above in responses to Nos. 1-4.

**INTERROGATORY NO. 18:**

State the date on which YOU learned of Counter-Defendants' failure to renew the Master Lease as alleged in Paragraph 19 of the COUNTERCLAIMS.

**RESPONSE TO INTERROGATORY NO. 18:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the objections, Responding Party responds as follows: January 18, 2018.

**INTERROGATORY NO. 19:**

State all facts supporting YOUR allegation in Paragraph 27 that "Counter-Defendants' assurances and representations were not true."

**RESPONSE TO INTERROGATORY NO. 19:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects is made to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the objections, Responding Party responds as follows: Propounding Party received an email from Meineke expressing that they wanted to finish repairs, and then permit Responding Party to use the Project Constitution funds for upgrades (any remaining balance would be remitted to Responding Party). Yet, Propounding Party failed to make the repairs and ensure that Responding Party would secure a lease, including executing a guaranty. Responding Party did not

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

- 23 -

secure a lease for the FRANCHISE PREMISES. Due to Responding Party's failure to conduct repairs, landlord refused to enter into a new lease agreement with either party.

**INTERROGATORY NO. 20:**

Identify all DOCUMENTS supporting YOUR allegation in Paragraph 27 that "Counterdefendants' assurances and representations were not true."

**RESPONSE TO INTERROGATORY NO. 20:**

Responding Party objects to this interrogatory on the ground that it is overbroad in time and scope and unduly burdensome. Responding Party objects to the extent the interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objections, Responding Party refers Propounding Party to documents concurrently produced, including email communications among Meineke representatives, the landlord's representative, and/or Responding Party; Inspection Reports; and draft lease to Propounding Party.

Dated: September 5, 2023      LEWITT, HACKMAN, SHAPIRO
                                    MARSHALL & HARLAN

By:     /s/ Jessica Rosen
           Jessica W. Rosen
           Heidy Nurinda
           Attorneys for Defendants and Counterclaimants,
           CJGL, Inc., Carl Douma and Jan Douma

DEFENDANT CJGL, INC.'S OBJECTIONS & RESPONSES TO INTEROGATORIES (SET ONE)

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

# PROOF OF SERVICE

STATE OF CALIFORNIA     )
                        ) ss.
COUNTY OF LOS ANGELES )

      I am employed in the County of Los Angeles, State of California.  I am over 18 years of age and am not a party to the within action or proceeding.  My business address is 16633 Ventura Boulevard, 11th Floor, Encino, California 91436-1865.

      On **September 5, 2023**, I served the foregoing document(s) described as: **DEFENDANT CJGL, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES (SET ONE)** on the interested party(ies) in this action at the following address, fax number or email address:

Lawrence J. Hilton
ONE LLP
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
Email: lhilton@onellp.com

Attorneys for Plaintiffs and
Counterdefendants

☒   **(BY EMAIL)**   I caused the documents to be sent to the persons at the email addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒   **(FEDERAL)**   I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

                             /s/ Jessica Rosen
                             Jessica Rosen

# EXHIBIT 2

.

From: Jan Douma <jandouma1@gmail.com>
Date: Sat, Apr 17, 2021 at 8:54 AM
Subject: Re: 4118 Project Constitution Fund
To: Emma Coleman <emma.coleman@meineke.com>

There are still some repairs that the company has to do before we can start PC upgrades, but I hope those will be done soon.

Jan

On Fri, Apr 16, 2021 at 12:51 PM Emma Coleman <emma.coleman@meineke.com> wrote:

Hi Jan,

4118 has $19,911 to use towards PC upgrades. Are you ready to start the PC process? If so, I will send you the proposal to complete.

Thanks,

Emma

From: Phil Farenga <phil.farenga@meineke.com>
Sent: Friday, April 16, 2021 2:49 PM
To: Emma Coleman <emma.coleman@meineke.com>
Cc: Jan Douma <jandouma1@gmail.com>
Subject: 4118 Project Constitution Fund

Hi Emma,

1

CJGL000994

When you have a chance could you let Jan know how much money is in her centers PC fund and the process involved for using the funds for center improvements?

Thanks for the assistance,

**Phil Farenga**
Field Operations Consultant

 (520) 235-3549

440 South Church St. Ste. 700
Charlotte, NC 28202

_____





*Proud Member of Driven Brands™*

2

CJGL000995

# EXHIBIT 3

Jessica Rosen, SBN 294923
  jrosen@lewitthackman.com
Heidy Nurinda SBN 333188
  hnurinda@lewitthackman.com
LEWITT, HACKMAN, SHAPIRO,
  MARSHALL & HARLAN
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Phone: (818) 990-2120; Fax: (818) 981-4764

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; AND MEINEKE REALTY, INC., a North Carolina Corporation, | Case No. 2:23-cv-00374-SPG-JC<br>Hon. Sherilyn Peace Garnett |
| Plaintiffs, | DEFENDANT CJGL INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS (SET ONE) |
| vs. | |
| CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual, | Complaint: January 18, 2023<br>Answer/Counterclaim: March 15, 2023 |
| Defendants. | Trial Date: April 9, 2024 |
| CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual, | |
| Counterclaimants, | |
| vs. | |
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; MEINEKE REALTY, INC., a North Carolina Corporation; and ECONO LUBE AND TUNE, INC., an unknown entity, | |
| Counterdefendants. | |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

- 1 -

1   **PROPOUNDING PARTY:**     **MEINEKE FRANCHISOR SPV, LLC**

2   **RESPONDING PARTY:**      **CJGL, INC.**

3   **SET NO.:**              **ONE (1)**

4

5       Defendant CJGL, Inc. responds to Plaintiff Meineke Franchisor SPV, LLC's

6   Request for Admissions as follows:

7                        **PRELIMINARY STATEMENT**

8       Defendant makes these responses solely for this action.  Defendant has not

9   completed discovery or investigation of facts or preparation for trial.  Defendant

10  provides these responses without prejudice to its right to learn at a later time

11  evidence of subsequently discovered facts or interpretations of those facts.

12      The information provided in response to these Requests is subject to any and

13  all objections regarding its relevancy, materiality, propriety or admissibility.

14  Defendant reserves the right to assert these objections and any other objection not

15  stated herein that would require the exclusion of the information, or any portion

16  thereof, if that information is offered as evidence at any time during this action.

17  Defendant may interpose these objections at any time prior to and during the trial of

18  this case.

19      No incidental or implied admissions are intended by these responses. Plaintiff

20  shall not construe Defendant's response or objection to any request as an admission

21  that Defendant accepts or admits the existence of any facts assumed by the Requests.

22

23

24

25

26

27

28

DEFENDANT CJGL, INC.'S OBJECTIONS & RESPONSES TO REQUEST FOR ADMISSIONS (SET ONE)

*Lewitt, Hackman, Shapiro, Marshall & Harlan*
*A Law Corporation*

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

## REQUESTS FOR ADMISSIONS

**REQUEST NO. 1:**

Admit that YOU executed the SUBLEASE on August 29, 2014.

**RESPONSE TO REQUEST NO. 1:**

Admit.

**REQUEST NO. 2:**

Admit that YOU took possession of the FRANCHISE PREMISES in 2014.

**RESPONSE TO REQUEST NO. 2:**

Responding Party objects to this Request on the ground that it is vague and ambiguous as to "possession," which is not defined. Subject to and without waiving objections, Admit.

**REQUEST NO. 3**

Admit that YOU remained in possession of the FRANCHISE PREMISES until August 6, 2022.

**RESPONSE TO REQUEST NO. 3:**

Responding Party objects to this Request on the ground that it is vague and ambiguous as to "possession," which is not defined. Subject to and without waiving objections, Admit.

**REQUEST NO. 4:**

Admit that YOUR possession of the FRANCHISE PREMISES between the dates on which YOU took possession in 2014 and August 6, 2022 was exclusive.

**RESPONSE TO REQUEST NO. 4:**

Responding Party objects to this Request on the ground that it is vague and ambiguous as to "possession" and "exclusive, which are not defined. Subject to and without waiving objections, Admit.

**REQUEST NO. 5:**

Admit that YOU abandoned the FRANCHISE PREMISES on or about August 6, 2022.

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

**RESPONSE TO REQUEST NO. 5:**

Responding Party objects to this request as vague and ambiguous as to the term "abandoned." Without waiving the objections, Responding Party admits that it ceased operations on or around August 6, 2022 at the FRANCHISE PREMISES due to not securing a lease between Responding Party and landlord, and vacated the FRANCHISE PREMISES thereafter.

**REQUEST NO. 6:**

Admit that when YOU executed the SUBLEASE, YOU agreed that the "Subleased Premises [were] in good and tenantable condition."

**RESPONSE TO REQUEST NO. 6:**

Responding Party objects to this request as vague and ambiguous as to the terms "agreed" and "good and tenantable condition." Responding Party further objects to this Request as it appears to be quoting text from an unincorporated document or attached exhibit. Responding Party objects to this request to the extent it calls for a legal conclusion. Without waiving the objections, Responding Party admits it was "tenable" in that Responding Party was able to use the FRANCHISE PREMISES for operations, and deny "good and tenable conditions" in that the FRANCHISE PREMISES was in need of repairs.

**REQUEST NO. 7**

Admit that when YOU executed the SUBLEASE, YOU agreed at YOUR sole cost and expense to maintain the "Subleased Premises…and all appurtenances thereto in good condition and repair."

**RESPONSE TO REQUEST NO. 7:**

Responding Party objects to this request as vague and ambiguous as to the terms "agreed" and "good condition and repair." Responding Party further objects to this Request as it appears to be quoting text from an unincorporated document or attached exhibit. Responding Party objects to this request to the extent it calls for a legal conclusion. Without waiving the objections, Responding Party admits it agreed

- 4 -

to do normal maintenance and deny that it agreed to undertake structural repairs and maintenance.

**REQUEST NO. 8**

Admit that YOU failed to comply with YOUR obligation to maintain the "Subleased Premises…and all appurtenances thereto in good condition and repair."

**RESPONSE TO REQUEST NO. 8:**

Responding Party objects to this request as vague and ambiguous as to the terms "agreed" and "good condition and repair." Responding Party further objects to this Request as it appears to be quoting text from an unincorporated document or attached exhibit. Responding Party objects to this request to the extent it calls for a legal conclusion.

Without waiving the objections, Deny.

**REQUEST NO. 9**

Admit that when YOU executed the SUBLEASE, YOU agreed that "Sublessor shall not have any duty or responsibility to repair or replace any part or portion of the Subleased Premises or in any way to provide any maintenance or repairs whatsoever."

**RESPONSE TO REQUEST NO. 9:**

Responding Party objects to this Request as it appears to be quoting text from an unincorporated document or attached exhibit. Responding Party objects to this request to the extent it calls for a legal conclusion. Without waiving the objections, Responding Party admits it agreed to do normal maintenance and deny that it agreed to undertake structural repairs and maintenance.

**REQUEST NO. 10**

Admit that YOU used HAZARDOUS MATERIALS at the FRANCHISE PREMISES.

**RESPONSE TO REQUEST NO. 10:**

Responding Party objects to this request as vague and ambiguous as to the

1  term "HAZARDOUS MATERIAL." Without waiving the objections, Responding
2  Party admits it used materials necessary for the operations of a Meineke shop.

3  **REQUEST NO. 11**

4      Admit that YOUR use of HAZARDOUS MATERIALS at the FRANCHISE
5  PREMISES was not necessary for YOUR use of the FRANCHISE PREMISES.

6  **RESPONSE TO REQUEST NO. 11:**

7      Responding Party objects to this request as vague and ambiguous as to the
8  terms "HAZARDOUS MATERIAL" and "necessary." Without waiving the
9  objections, Deny.

10  **REQUEST NO. 12**

11      Admit that YOU disposed of HAZARDOUS MATERIALS at the
12  FRANCHISE PREMISES.

13  **RESPONSE TO REQUEST NO. 12:**

14      Responding Party objects to this request as vague and ambiguous as to the
15  terms "HAZARDOUS MATERIAL" and "disposed." Without waiving the
16  objections, Deny.

17  **REQUEST NO. 13**

18      Admit that YOUR disposal of HAZARDOUS MATERIALS at the
19  FRANCHISE PREMISES was not necessary for your use of the FRANCHISE
20  PREMISES.

21  **RESPONSE TO REQUEST NO. 13:**

22      Responding Party objects to this request as vague and ambiguous as to the
23  terms "HAZARDOUS MATERIAL" and "necessary." Without waiving the
24  objections, Deny.

25  **REQUEST NO. 14**

26      Admit that YOU stored HAZARDOUS MATERIALS at the FRANCHISE
27  PREMISES.

28

*(Left margin, vertical text:)* Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

**RESPONSE TO REQUEST NO. 14:**

Responding Party objects to this request as vague and ambiguous as to the term "HAZARDOUS MATERIAL" and "stored." Without waiving the objections, Responding Party admits there were materials at the FRANCHISE PREMISES necessary for the operations of a Meineke shop.

**REQUEST NO. 15**

Admit that YOUR storage of HAZARDOUS MATERIALS at the FRANCHISE PREMISES was not necessary for YOUR use of the FRANCHISE PREMISES.

**RESPONSE TO REQUEST NO. 15:**

Responding Party objects to this request as vague and ambiguous as to the terms "HAZARDOUS MATERIAL" and "necessary." Without waiving the objections, Deny.

**REQUEST NO. 16**

Admit that YOU knew the MASTER LEASE had not been renewed when YOU executed the RENEWAL MUTUAL RELEASE.

**RESPONSE TO REQUEST NO. 16:**

Admit.

**REQUEST NO. 17**

Admit that Counter-Defendants' alleged representation that they "would ensure Counterclaimants obtained a new lease for the Franchise Premises" was not a representation of an existing fact.

**RESPONSE TO REQUEST NO. 17:**

Responding Party objects to this request on the ground that it calls for speculation, is vague and ambiguous, and confusing. Responding Party objects to this request to the extent it asks for a legal conclusion. Without waiving the objections, Deny.

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

**REQUEST NO. 18**

Admit that YOU failed to pay all the WEEKLY ROYALTIES due under the FRANCHISE AGREEMENT.

**RESPONSE TO REQUEST NO. 18:**

Deny.

**REQUEST NO. 19**

Admit that YOU failed to pay all the MAF CONTRIBUTIONS due under the FRANCHISE AGREEMENT.

**RESPONSE TO REQUEST NO. 19:**

Deny.

**REQUEST NO. 20**

Admit that YOU failed to make all of the payments due under the SUBLEASE.

**RESPONSE TO REQUEST NO. 20:**

Responding Party objects to this request on the ground that it calls for speculation, is vague and ambiguous as to time and scope, and confusing. Responding Party objects to this request to the extent it asks for a legal conclusion as to "all of the payments due." Without waiving the objections, Deny based on Responding Party paid all monies owed under the SUBLEASE through and including the month of July 2022.

**REQUEST NO. 21**

Admit that YOU breached the FRANCHISE AGREEMENT

**RESPONSE TO REQUEST NO. 21:**

Responding Party objects to this request on the ground that it calls for speculation, is vague and ambiguous as to "breached", and asks for a legal conclusion. Without waiving the objections, Deny.

**REQUEST NO 22**

Admit that YOU breached the SUBLEASE.

- 8 -

**RESPONSE TO REQUEST NO. 22:**

Responding Party objects to this request on the ground that it calls for speculation, is vague and ambiguous as to "breached", and asks for a legal conclusion. Without waiving the objections, Deny.

Dated: September 5, 2023          LEWITT, HACKMAN, SHAPIRO
                                                      MARSHALL & HARLAN


By:      /s/ Jessica Rosen
          Jessica W. Rosen
          Heidy Nurinda
          Attorneys for Defendants and
          Counterclaimants,
          CJGL, Inc., Carl Douma and Jan Douma

# PROOF OF SERVICE

STATE OF CALIFORNIA      )
                                  ) ss.
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California.  I am over 18 years of age and am not a party to the within action or proceeding.  My business address is 16633 Ventura Boulevard, 11th Floor, Encino, California 91436-1865.

On **September 5, 2023**, I served the foregoing document(s) described as: **DEFENDANT CJGL, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S REQUESTS FOR ADMISSION (SET ONE)** on the interested party(ies) in this action at the following address, fax number or email address:

Lawrence J. Hilton
ONE LLP
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
Email: lhilton@onellp.com

Attorneys for Plaintiffs and
Counterdefendants

☒ **(BY EMAIL)**   I caused the documents to be sent to the persons at the email addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒ **(FEDERAL)**   I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

/s/ Jessica Rosen
Jessica Rosen

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 3

LAWRENCE J. HILTON (State Bar No. 156524)
Email: lhilton@onellp.com
TAYLOR C. FOSS (State Bar No. 253486)
Email: tfoss@onellp.com
**ONE LLP**
23 Corporate Plaza
Suite 150-105
Newport Beach California 92660
Telephone:   (949) 502-2876
Facsimile:    (949) 258-5081

Attorneys for Plaintiffs and Counter-Defendants
MEINEKE FRANCHISOR SPV LLC and
MEINEKE REALTY, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina corporation, <br><br> Plaintiffs, <br><br> v. <br><br> CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual, <br><br> Defendants. <br> ——————————————— <br> AND RELATED COUNTERCLAIMS | Case No. 2:23-cv-00374-SPG-JC <br> Hon. Sherilyn Peace Garnett <br><br> **DECLARATION OF ZACHARY PFEIFFER** <br><br> Date:   April 10, 2024 <br> Time:  1:30 p.m. <br> Crtrm: 5C <br><br> Complaint Filed: January 18, 2023 <br> Answer/Counterclaim: March 15, 2023 <br><br> Trial Date: June 18, 2024 |

**DECLARATION OF ZACHARY PFEIFFER**

1    I, Zachary Pfeiffer, declare as follows:

2    1.    I am Vice President - Corporate Counsel for Driven Brands Shared

3    Services, LLC, which is an affiliate of Plaintiffs Meineke Franchisor SPV LLC and

4    Meineke Realty, Inc.  I have personal knowledge of the facts stated herein and, if

5    called as a witness, I could and would competently testify thereto.

6    2.    Attached hereto as **Exhibit 1** is a true and correct copy of an email

7    exchange between Jan Douma and me, with copies to my then colleagues Aaron

8    Davis and Morgan Byrne, which took place during the time period between August

9    17, 2018 and September 14, 2018.

10    I declare under penalty of perjury under the laws of the United States of

11    America that the foregoing is true and correct.  Executed on February 16, 2024 at

12    Charlotte, North Carolina.

13

14    _____

15    Zachary Pfeiffer

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**DECLARATION OF ZACHARY PFEIFFER**

# EXHIBIT 1

| From: | **Jan Douma** <jandouma1@gmail.com> |
|---|---|
| To: | **Zachary Pfeiffer** <ZPfeiffer@drivenbrands.com> |
| CC: | **Aaron Davis** <Aaron.Davis@meineke.com>; **Morgan Byrne** <Morgan.Byrne@drivenbrands.com> |
| Subject: | Re: 4118 construction |
| Date: | 14.09.2018 13:58:02 (+02:00) |
| Attachments: | image002.jpg (1 page) |

Zachary,

We are willing to enter into a lease with the landowner, but not on terms worse than the current arrangement. We consider Driven Brands to currently be in breach of their obligations under the sublease, as they have no ability to fulfill the terms of the sublease. Should we attempt to transfer the property for instance, the sublease has no value, and therefore our franchise has no value.  We are also at risk of expulsion from the property if Driven Brands does not fulfill its obligations under the lease, which to date it has not done, because the identified repairs were never performed when the lease was renewed in 2011.

Therefore, we expect Driven Brands to facilitate a new lease on the same or better terms than the current sublease. To date our conversation with the real estate agent for the Sourmany Trust was not promising, as they "preferred" working with a larger company. We have not heard whether Driven Brands has even attempted to contact the Sourmany Trust on a novation of the sublease.

We are also concerned with the fund under project constitution. The deadline passed for submitting plans, and we did not submit plans as it would be inappropriate. We have not heard from Driven Brands concerning the status of those funds.

As far as itemization, discussions with William Mills broke down when he wanted to adhere to only the items listed in the 2011 agreement without any consideration of deterioration that occurred because the original repairs were not made in 2011. Dry rot and termite damage don't remain static. For example, the original list included the rotting front door and windows and he would not include the door frame, which lies between the door and the windows and which is also rotted. We had to reinforce the frame a while back because the door was literally hanging by one hinge. Likewise, if we get up on the roof and find 30 broken tiles instead of 23, or if the subroof under the 23 broken tiles is rotted, I don't want to go back and forth about what was on the list.

Jan Douma
Co-Owner
Meineke Car Care Center #4118, Santa Barbara
(805) 687-0281

On Thu, Aug 30, 2018 at 9:44 AM Zachary Pfeiffer <ZPfeiffer@drivenbrands.com> wrote:

> Hi Jan, thanks for following up. I wanted to confirm as we start the process: You're willing and able to go direct with the landlord, right? The below repairs were proposed previously in the context of Meineke terminating the head lease and letting you go direct, so we'd be looking to accomplish that here as well.
>
> I found a generic list of repairs that we had considered previously. This is based on prior research/negotiation by William Mills, with whom I believe you negotiated previously, so I'd need to reserve in order to confirm final approval with our brand president and property mgmt team, but the preliminary list of Meineke's repairs would include:
>
> - Repair sidewalk separation from driveway
>
> - Prep and remove damaged exterior wall and repair as necessary
>
> - Termite damage (eves / rafter tails) – replace wood and chemically treat areas
>
> - Repair exposed conduits
>
> - Replace 23 broken roof tiles
>
> - Repair damaged roof section
>
> - Clean gutters

MEIN002124

- Install new GFI as needed

- Repair 22V subpanel and reconnect wires per code

- Repair damaged conduit and damaged outlet in office bathroom

- Restrap insulation at AC

Please let confirm you're OK with going direct with the landlord, and we'll approach LL about the repairs, termination, and a direct lease with the subtenant. Thanks again.

Best,

Zach

**Zachary Pfeiffer**
Corporate Counsel

440 South Church St., Suite 700
Charlotte, NC 28202
(office) 704 644 8105

http://drivensignature.com/i
mages/logos/driven-brands-
96.jpg

**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Wednesday, August 29, 2018 3:21 PM
**To:** Zachary Pfeiffer <ZPfeiffer@drivenbrands.com>
**Cc:** Aaron Davis <Aaron.Davis@meineke.com>
**Subject:** Re: 4118 construction

Any update?

Jan

On Fri, Aug 17, 2018 at 10:30 AM Jan Douma <jandouma1@gmail.com> wrote:

Zachary,

I'd like to get started with the repairs to our facility as previously negotiated with the landlord.

I'd imagine there are some economies with doing both repairs and PC upgrades concurrently rather than complete all repairs first. If so, I'm fine with that. We can allocate expenses to the appropriate budget bucket.

Something we really need to address is the wiring. When we got here, this shop was in the original EconoLube configuration, with the lobby and back office separated by a wall with a punch-out

window. A few months after we got here, we used our Meineke account allotment to remodel. We sealed up the window and created a doorway next to it with a countertop extending into the lobby. When the contractor broke into that separating wall and saw the wiring, he said he could not leave it that way, and we had to pay extra to have it brought up to code. He also warned us that there were most likely problems with other wiring we couldn't see. We've had to replace the bathroom light switch a couple of times, and now even with a new switch (and new bulbs) the light doesn't always work. That suggests wiring issues farther along the same wall.

As far as I know, the previous owners didn't remodel and didn't touch the structure except to drill holes for security cameras in the interior ceiling (not the roof).

What is the next step? How about if you list out your repairs, then I can add appropriate PC improvements in the order of priority, then get bids on the job?

Jan Douma

MEIN002126

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 4

1  LAWRENCE J. HILTON (State Bar No. 156524)
2  Email: lhilton@onellp.com
   TAYLOR C. FOSS (State Bar No. 253486)
3  Email: tfoss@onellp.com
4  **ONE LLP**
   23 Corporate Plaza
5  Suite 150-105
6  Newport Beach California 92660
   Telephone:  (949) 502-2876
7  Facsimile:   (949) 258-5081

8
   Attorneys for Plaintiffs and Counter-Defendants
9  MEINEKE FRANCHISOR SPV LLC and
10 MEINEKE REALTY, INC.

11              **UNITED STATES DISTRICT COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

13                   **WESTERN DIVISION**

14 | MEINEKE FRANCHISOR SPV LLC, | Case No. 2:23-cv-00374-SPG-JC |

MEINEKE FRANCHISOR SPV LLC,
a Delaware limited liability company;
and MEINEKE REALTY, INC., a
North Carolina corporation,

                    Plaintiffs,

           v.

CJGL, INC., a California corporation;
CARL DOUMA, an individual; JAN
DOUMA, an individual,

                    Defendants.

_____

AND RELATED COUNTERCLAIMS

Case No. 2:23-cv-00374-SPG-JC
Hon. Sherilyn Peace Garnett

**DECLARATION OF JOSEPH ROBINSON**

Date:   April 10, 2024
Time:  1:30 p.m.
Crtrm: 5C

Complaint Filed: January 18, 2023
Answer/Counterclaim: March 15, 2023

Trial Date: June 18, 2024

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                    **DECLARATION OF JOSEPH ROBINSON**

1   I, Joseph Robinson, declare as follows:

2   1.  At all times relevant to the matters set forth in this Declaration i have

3 held the title of General Manager of Econo Lube Franchisor SPV LLC and Renewal

4 Manager for Meineke Franchisor SPV LLC.  In those capacities, I was personally

5 involved in many of the transactions and communications between Plaintiffs and

6 Defendants that are the subject of this action.  I have personal knowledge of the

7 facts stated herein and, if called as a witness, I could and would competently testify

8 thereto.

9   2.  Attached hereto as **Exhibit 1** is a true and correct copy of an email

10 exchange between Jan Douma and me (which also included my colleagues Darrin

11 Krader and Phil Farenga) during the time period from May 11 through May 18,

12 2021.  The email exchange has bates numbers CJGL000997-CJGL001000.

13   I declare under penalty of perjury under the laws of the United States of

14 America that the foregoing is true and correct.

15   Executed on February 15 , 2024 at Folsom, California.

16

17

18                 _Joseph A. Rob____

19               Joseph Robinson

20

21

22

23

24

25

26

27

28

2

**DECLARATION OF JOSEPH ROBINSON**

# EXHIBIT 1

 Gmail

**Jan Douma <jandouma1@gmail.com>**

---

### RE: <External> Fwd: Renewal
4 messages

---

**Joseph Robinson** <joseph.robinson@drivenbrands.com>                     Tue, May 11, 2021 at 2:29 PM
To: Jan Douma <jandouma1@gmail.com>
Cc: Darrin Krader <Darrin.Krader@meineke.com>, Phil Farenga <phil.farenga@meineke.com>

Hi Jan,

Thank you for taking my call today.  As I mentioned, I will do my best to contact the LL and see what it will take to get you a master lease to match our 8 year FTA.

Talk to you soon,

Joe

---

**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Tuesday, May 11, 2021 9:18 AM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Cc:** Darrin Krader <Darrin.Krader@meineke.com>; Phil Farenga <phil.farenga@meineke.com>
**Subject:** <External> Fwd: Renewal

I have not heard anything from anyone about these things I asked for--things that should have been done before now. Please respond with what you expect to be able to do by the end of June.

---------- Forwarded message ---------
From: Jan Douma <jandouma1@gmail.com>
Date: Thu, Apr 29, 2021 at 2:18 PM
Subject: Renewal
To: Joseph Robinson <joseph.robinson@drivenbrands.com>

CJGL000997

Today is 2 months to the renewal deadline, so we'd like to put out this list of what we would like to see for renewal.

<u>REPAIRS</u>: Meineke needs to finish all repairs as required by the 2011-2016 lease with the landowners, the Sourmanys. The Sourmanys had an inspector come out and make a list of needed repairs. I sent a message to the Sourmanys that Meineke wanted the list, but it is Meineke's responsibility to get the list. I sent in pictures of our flooded parking lot and leaking storage room, so you have some idea where to start.

<u>LEASE</u>: We need a long-term lease as we were promised when we first took over the shop in 2014. Since 2016, we have only had a month-to-month lease and no security that the landlord won't decide to let someone else rent the property. Since Meineke was the primary lessor before, we are asking that you sign a new lease. If you can't or don't want to, let us know.

<u>RENT</u>: The rent is too high.

1. Rents in the area have fallen because of Covid. Businesses have disappeared, and there are many commercial spaces for rent.

2. We have had a 3% increase every year, and in all of those years, the actual rate of inflation was below 3%. Increases should be below 3%.

3. One of Meineke's business coaches reviewed our numbers and said everything was in line except the rent, which was way out of line.

<u>MAF</u>: We want to control our own advertising/MAF so we can do what works for our shop (internet, radio) and not do things that give us no return (postcards). A few years ago, we were told that we could do our own advertising if we could get every shop in our DMA to agree. We did that, and you still did not let us control MAF.

Jan Douma

---

**Joseph Robinson** <joseph.robinson@drivenbrands.com>                    Thu, May 13, 2021 at 9:46 AM
To: Jan Douma <jandouma1@gmail.com>
Cc: Darrin Krader <Darrin.Krader@meineke.com>, Phil Farenga <phil.farenga@meineke.com>

Hi Jan,

As a follow up, I did contact the LL (Mary), she plans to have her attorney contact me tomorrow for further discussions about getting you a master lease.

I will let you know how it goes.

Talk to you soon,

CJGL000998

Joe

[Quoted text hidden]

---

**Jan Douma** <jandouma1@gmail.com>                                  Tue, May 18, 2021 at 11:32 AM
To: Joseph Robinson <joseph.robinson@drivenbrands.com>

I received your voicemail. I don't see an email from you on Friday about signing the disclosure, but in any case, I signed the disclosure last year.

Jan

[Quoted text hidden]

---

**Joseph Robinson** <joseph.robinson@drivenbrands.com>              Tue, May 18, 2021 at 11:44 AM
To: Jan Douma <jandouma1@gmail.com>

Hi Jan,

I tried calling back to tell you the California FDD is not ready yet, that is why you did not receive it.  The one you signed last year expired.


**Joseph Robinson**
General Manager

 (916) 296-1810

440 South Church St. Ste. 700
Charlotte, NC 28202

---



Proud Member of Driven Brands™

---

**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Tuesday, May 18, 2021 11:32 AM

CJGL000999

**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** Re: <External> Fwd: Renewal

[Quoted text hidden]

CJGL001000

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 5

LAWRENCE J. HILTON (State Bar No. 156524)
Email: lhilton@onellp.com
TAYLOR C. FOSS (State Bar No. 253486)
Email: tfoss@onellp.com
**ONE LLP**
23 Corporate Plaza
Suite 150-105
Newport Beach California 92660
Telephone:   (949) 502-2876
Facsimile:   (949) 258-5081

Attorneys for Plaintiffs and Counter-Defendants
MEINEKE FRANCHISOR SPV LLC and
MEINEKE REALTY, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina corporation,<br><br>        Plaintiffs,<br><br>      v.<br><br>CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br><br>        Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:23-cv-00374-SPG-JC<br>Hon. Sherilyn Peace Garnett<br><br>**DECLARATION OF DARRIN KRADER**<br><br>Date:  April 10, 2024<br>Time:  1:30 p.m.<br>Crtrm: 5C<br><br>Complaint Filed: January 18, 2023<br>Answer/Counterclaim: March 15, 2023<br><br>Trial Date: June 18, 2024 |

**DECLARATION OF DARRIN KRADER**

I, Darrin Krader, declare as follows:

1. At all times relevant to the matters set forth in this Declaration I have held the titles of Senior Compliance Manager (since April, 2023) and Field Operations Consultant for Meineke Franchisor SPV LLC. In those capacities, I was personally involved in many of the transactions and communications between Plaintiffs and Defendants that are the subject of this action. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit 1** is a true and correct copy of an email exchange between Jan Douma and me on September 30, 2020, which includes as an attachment a true and correct copy of what was at time the operative Advertising Addendum to Franchise and Trademark Agreement dated January 20, 2016 executed by Jan Douma on behalf of CJGL, Inc. The Advertising Addendum was for a program known as "Project Constitution," which Meineke offered to qualified franchisees.

3. Attached hereto as **Exhibit 2** is a true and correct copy of an email exchange on February 5, 2020 between Jan Douma and my then colleague, Keven Harrell. I was copied on the exchange and I received Exhibit 2 via email on February 5, 2020.

4. Attached hereto as **Exhibit 3** is a true and correct copy of an email exchange during the time period between February 28, 2020 and March 9, 2020, exchanged between Carl Douma and my then colleague, Keven Harrell. I was copied on the exchange and I received the emails reflected in Exhibit 3 via email on the dates reflected therein.

5. Attached hereto as **Exhibit 4** is a true and correct copy of an email I received on August 16, 2022 from Andrew Simons, whom I knew to be the attorney representing the owner and landlord of the premises located at 3956 State Street Santa Barbara, California (the "Franchise Premises") where CJGL operated

**DECLARATION OF DARRIN KRADER**

Meineke Center #4118.  The email from Mr. Simons included a document entitled "Phase I Environmental Site Assessment: 3956 State Street Santa Barbara, California APN 057-233-018," prepared by Trak Environmental Group.  The Trak Environmental Group report included multiple photographs.  I recognized the photographs to be of the Franchise Premises, which I have personally visited on many occasions

6. Attached hereto as **Exhibit 5** is a true and correct copy of an email exchange that took place during the time period from September 26, 2022 and September 28, 2022 between Andrew Simons and me.  Attached to Mr. Simons' September 26, 2022 email are approximately two dozen photographs.  I recognize the photographs to be of the Franchise Premises, which I have personally visited on many occasions.

7. Attached hereto as **Exhibit 6** is a true and correct copy of an email exchange on October 25, 2022 between Andrew Simons, Jan Douma, my then colleague Chris Sullivan, and me.  I received Exhibit 6 via email on October 25, 2022.

8. Attached hereto as **Exhibit 7** is a true and correct copy of an email exchange that took place during the time period from October 28-31, 2022 of which I was a recipient.  Included as an attachment to the email exchange is a document entitled "Hazardous Waste Non-RCRA Large Quantity Generator Inspection Report Notice To Comply / Notice Of Violation," issued on October 25, 2022 by the Santa Barbara County Certified Unified Program Agency, which I received contemporaneously with the emails.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 16, 2024 at Roseville, California.

Darrin Krader

3

**DECLARATION OF DARRIN KRADER**

# EXHIBIT 1

| From: | **Darrin Krader** </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP /CN=RECIPIENTS/CN=0D9DB920B78B46658B9C319CB57A61BD-DARRIN KRAD> |
|---|---|
| To: | **Jan Douma** <jandouma1@gmail.com> |
| Subject: | PC addendum |
| Date: | 30.09.2020 00:14:55 (+02:00) |
| Attachments: | Douma_-_Project_Constitution_-_4118.pdf (6 pages) |

Jan,

Great to speak with you yesterday. I have done some research and got my hands on your PC addendum and it looks like outstanding rent does count against you. But you are on a payment plan and paying current so based upon this I am going to reach out to Aaron Jansen and see about getting you qualified for PC. Not sure if I can get it retroactive but will ask.

Will update you when I get an answer.

## Darrin Krader

Operational Compliance

**a:**  440 S. Church Street
      Charlotte, NC 28202
**t:**  (916) 305-1153



_Follow us:_  

MEIN000220

DocuSign Envelope ID: 7173F849-DE53-4BF9-9831-ADC5FF0D3998

### Advertising Addendum to Franchise and Trademark Agreement

This Advertising Addendum to the Meineke Franchise and Trademark Agreement ("Addendum") is made by and between Meineke Car Care Centers, LLC ("Meineke") and _CJGLI inc,_ ("Franchisee" or "You") as of the date appearing below our signature line at the end of this Advertising Addendum.

### Recitals

**WHEREAS,** Meineke and Franchisee are parties to a Meineke Franchise and Trademark Agreement for Meineke Center _4118_ (the "Existing Franchise Agreement") to operate a Meineke Center at _3956 State Street, Santa Barbara CA_ ("Location"); and

**WHEREAS,** the purpose of this Advertising Addendum is to provide a capital fund used to enhance the Meineke image and reduce the advertising contributions set forth in the Existing Franchise Agreement;

**WHEREAS,** Meineke and Franchisee have agreed to amend the advertising provisions of the Existing Franchise Agreement in accordance with the terms and conditions more particularly set forth herein;

### Agreement

**NOW THEREFORE,** in consideration of the promises, mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Effective Date.** Addendum shall not become effective unless and until at least fifty percent (50%) of open and operating Meineke Centers in the United States of America have signed this Addendum. We will notify You in when this Addendum is effective and such written notice shall provide the date when the terms and conditions of this Addendum are effective (the, "Effective Date"). Until that time You shall continue to pay your advertising fees in accordance with the terms of the Existing Franchise Agreement, and the advertising allocations listed in that agreement shall control.

2. **Tier One Eligibility Criteria.** For purposes of this Addendum, You shall be a Tier One Franchisee ("Tier One") if You have been open and operating for a period of twelve (12) consecutive months preceding the Effective Date and during the six (6) month period preceding the Effective Date You met the following stated eligibility requirements:

   a. Franchisee must be at least a "3-Star Dealer" in accordance with the then current Meineke Star Rating Program;

   b. Franchisee must be current in any franchise fees or advertising contributions, due and owing to Meineke, Meineke Realty, Inc. or Econo Lube N'Tune, LLC

1

MEIN000221

DocuSign Envelope ID: 7173F849-DE53-4BF9-9831-ADC5FF0D3998

meaning  Franchisee shall not have any accounts receivable balance outstanding more than thirty (30) days in arrears;

c.  Franchisee must be: (i) on a current Existing Franchise Agreement, meaning the stated expiration date of the Existing Franchise Agreement shall not have occurred, or; (ii) be actively engaged in the renewal process as determined by Meineke;

d.  Franchisee must be engaged in the following operational programs:

    i.  For the purposes of calculating the eligibility threshold set forth in this Paragraph 2(d)(i), for the first year following the Effective Date, Franchisee must make annual expenditures from Meineke Dealers Association Purchasing Cooperative, Inc. ("MDPCI") vendors and MDPCI approved programs amounting to 12.5% of your annual gross sales.  This reflects that the average center has a cost of goods sold of 25%, with the purchasing requirement set at 50% of that amount.  In subsequent years, this purchasing requirement may be increased from the 50% level but at no time will this requirement exceed 70% as calculated using this formula.  Any percentage change shall determined by Meineke only after consultation with the MDPCI.

    ii.  Franchisee must participate in the Cooper Tire Program or a then current Meineke preferred tire program meaning Franchisee must be actively enrolled in the Cooper Tire Program or the then current Meineke preferred tire program and selling Cooper tires or equivalent tires pursuant to the then current Meineke preferred tire program at the Location;

    iii.  Franchisee must participate in the Chevron Program or a then current Meineke preferred oil change program meaning Franchisee must be actively enrolled in the Chevron Program or the then current Meineke preferred oil change program and selling Chevron or equivalent products pursuant to the then current Meineke preferred oil  change program at the Location;

    iv.  Franchisee must be enrolled and participating in the Meineke Credit Card Program meaning Franchisee must have executed a definitive agreement with Synchrony Bank or their predecessor or a then current Meineke approved private label consumer credit program, is actively accepting and selling the Meineke Credit Card at the Location  and has successfully completed 24 new Synchrony card applications,  or its then current equivalent, per calendar year;

    v.  Franchisee must be utilizing the then current online appointment system;

    vi.  Franchisee must be enrolled with the LogMyCalls and Telmetrics programs or the then current Meineke preferred equivalent versions of such programs;

    vii.  Franchisees, including Multi-Center Franchisees, must log onto Dealer Access an average of at least once per week annually.

MEIN000222

DocuSign Envelope ID: 7173F849-DE53-4BF9-9831-ADC5FF0D3998

    viii.  Franchisee must have attended a minimum of either 1 regional meeting per year or attend either the annual Meineke or the Meineke Dealer's Association ("MDA") Convention.

3. **Tier One and Tier Two Eligibility Criteria.** For purposes of this Addendum, Tier One and Tier Two Franchisees ("Tier Two") shall be determined on an annual basis by Meineke in Meineke's discretion, after consultation with the MDA, in accordance with Paragraph 5(a) set forth herein.

4. **Capital Fund.** Provided You meet the eligibility requirements of Tier One or Tier Two, Meineke shall allocate your ongoing weekly Meineke Advertising Fund ("MAF") contributions in the following manner:

    a.  **Capital Fund.** For a term of one calendar year from the Effective Date and provided You remain current in your weekly advertising contributions, Meineke shall allocate 1.0% of your ongoing weekly MAF contributions to a capital fund to be disbursed in accordance with the terms more fully set forth herein. (hereinafter referred to as, "Capital Fund"). The Capital Fund shall be part of the Meineke Advertising Fund, subject to the MAF annual audit in accordance with Article 8.2 of the Existing Franchise Agreement and disbursed in accordance with Paragraph 4(b) herein. For the second calendar year following the Effective Date Meineke shall allocate 2.0% of your ongoing weekly MAF contributions to the Capital Fund. If You are not current in any advertising contribution due and owing, your remittance of any weekly advertising contribution shall first be applied to the MAF and shall not be allocated to the Capital Fund unless and until you are current in all of your advertising contributions. For the third calendar year following the Effective Date and for the remaining Term of the Existing Franchise Agreement, you shall remit ongoing weekly MAF contributions in accordance with Paragraph 5 herein.

    b.  **Capital Fund Disbursements.** Within the third calendar year following the Effective Date, Meineke shall use funds in the Capital Fund solely to improve the image of your Center including replacing and/or upgrading exterior and interior signs and decor, provided no such upgrading or remodeling during the Term will require any increase in the square footage of the Premises. Such improvements shall be in accordance with Meineke's then current image guidelines, standards and specifications. The form, manner, and priority of disbursements of Capital Funds for any Center image enhancements shall be determined by Meineke in its discretion in consultation with franchisee and the MDA. Not later than the first quarter of the third calendar year following the Effective Date, You shall meet and confer with a Meineke representative concerning how the Capital Fund shall be disbursed by Meineke to improve your center image in accordance with Meineke's standards and specifications. To the extent there are any remaining funds in the Capital Fund after funds are disbursed for Center improvements in accordance with Meineke's standards and specifications, any such remaining funds shall be disbursed by Meineke to You and You shall use all commercially reasonable efforts to use such funds for the purpose of Center improvement, at your discretion.

3

MEIN000223

DocuSign Envelope ID: 7173F849-DE53-4BF9-9831-ADC5FF0D3998

5. **Ongoing Meineke Advertising Fund Contributions**. For the third calendar year following the Effective Date and each year thereafter during the Term of the Existing Franchise Agreement, notwithstanding anything stated to the contrary in the Existing Franchise Agreement: (i) If you are a Tier One Franchisee you shall remit 6% of weekly Gross Revenues to the Meineke Advertising Fund ("Adjusted Tier One MAF Contribution"), and; (ii) If you are a Tier Two Franchisee you shall remit 5.5% of weekly Gross Revenues to the Meineke Advertising Fund ("Adjusted Tier Two MAF Contribution"). Notwithstanding the foregoing, You shall remit reduced advertising contributions set forth in the Existing Franchise Agreement for the sale of: (i) towing services; (ii) government regulated inspections; (iii) oil change services, and; (iv) tire sales. Meineke reserves the right to place a cap on annual advertising contributions for tier two franchisees as is deemed appropriate after consultation with the MDA.

   a. **Tier One and Tier Two Annual Assessment**. Not later than the end of the first quarter of each calendar year during the Term of the Franchise Agreement, Meineke shall determine, in its discretion after consultation with the MDA, whether You meet Tier One or Tier Two eligibility requirements. Tier One eligibility shall be determined based on the criteria as set forth in Paragraph 2. Tier 2 criteria and eligibility shall be determined on a yearly basis by Meineke after consultation with the MDA. Meineke shall make its determination on the basis of You or your Center(s)' performance during the prior full calendar year. After assessing You or your Center(s)' performance during the prior full calendar year, if Meineke determines that your Tier changes from Tier One to Tier Two or from Tier Two to Tier One, Meineke shall provide You with written notice, in accordance with the notice provision set forth herein, and You shall remit either the Adjusted Tier Two MAF Contribution or the Adjusted Tier One MAF Contribution in accordance with the written notice provided.

6. **Payment Obligations ("EFT")**. All initial franchise fees, royalty fees, MAF contributions and any other payments made pursuant to the Existing Franchise Agreement and Addendum shall be paid using electronic debit/credit transfer of funds. You agree to sign such documents, pay such bank fees and do such things as we deem necessary to facilitate electronic transfers of funds or other methods of payment. Subject to the limitations set forth herein, You agree to execute the EFT Payment Form attached hereto as Exhibit A. No restrictive endorsement on any check or in any letter or other communication accompanying any payment will bind us, and our acceptance of any such payment will not constitute an accord and satisfaction.

   Notwithstanding the foregoing, if and only if your Existing Franchise Agreement does not require remittance of payment to Meineke via EFT ("Non-EFT Dealer"), this Paragraph 6 shall not be in effect and you shall not be required to remit payment via EFT for twelve (12) months from the Effective Date. Twelve (12) months from the Effective Date, however, the foregoing paragraph takes effect. If you are a Non-EFT Dealer and this Paragraph 6 is in effect and there is a good faith dispute regarding the amount of franchise fees and advertising contributions owed pursuant to the Existing Franchise Agreement, You and Meineke shall meet and confer and mutually conduct a full reconciliation of the amount owed within thirty (30) business days of your notice of such good faith dispute. If after a full reconciliation, your accounts receivable balance cannot

4

MEIN000224

DocuSign Envelope ID: 7173F849-DE53-4BF9-9831-ADC5FF0D3998

in any way be reconciled with the requirements in the Existing Franchise Agreement, You shall have the right to opt-out of the EFT requirement and remit payment in accordance with the Existing Franchise Agreement.

7. **Notice.** All notices required to be delivered by this Agreement will be deemed delivered on the same day of the transmission by electronic mail to the electronic mail address provided to Meineke by Franchisee. Nothing in this Agreement shall alter the legal notice provisions set forth in the Existing Franchise Agreement. All Meineke preferred programs as indicated in Paragraph 2 shall clearly be communicated by Meineke as such in accordance with the Notice provision set forth herein.

8. **Merger.** In the event there is a direct conflict between the terms of this Addendum and the terms of your governing Meineke Franchise and Trademark Agreement, the terms of this Addendum shall control.

9. **Guaranty.** If the Franchisee is a corporation and is signing this Addendum as a representative of a corporation, then the guaranty signed by the individual stockholders of the corporation who signed the Existing Franchise Agreement ("Guaranty") shall be guarantors of this Addendum and shall execute where indicated below. The individual stockholders of the corporation shall be guarantors of this Addendum as if this Addendum were a part of the Existing Franchise Agreement when initially signed by the corporation and the guarantor stockholders.

10. **Cancellation.** In the event the average Meineke Center's annual gross sales, as published in Item 19 of Meineke's Franchise Disclosure Document, decreases more than 10% as compared to the preceding year, Meineke may at its discretion discontinue this program and terminate this addendum at any time upon notice to you. In that event upon notice, you will make all advertising payments to the MAF from the time such notice is issued to you in accordance with the Existing Franchise Agreement. Also, in that event upon notice, any monies that You have contributed to the Capital Fund for your center will be released into the MAF as general MAF funds to be used per the Existing Franchise Agreement. Notwithstanding the foregoing, this cancellation provision shall not be in effect ten (10) years following the Effective Date and for the remaining term of the Existing Franchise Agreement thereafter.

11. **Survival.** The terms and conditions of the Existing Franchise Agreement not modified by this Addendum shall remain in full force and effect, unchanged and un-canceled.

12. **Star Rating.** In no event shall Meineke render You in default of the Existing Franchise Agreement for your failure to maintain a specific star rating in accordance with Meineke's then current Meineke Star Rating Program. The star rating criteria shall be used solely for purposes of determining Tier One or Tier Two eligibility status and for no other purpose.

5

MEIN000225

DocuSign Envelope ID: 7173F849-DE53-4BF9-9831-ADC5FF0D3998

**IN WITNESS WHEREOF**, the parties have executed and delivered this Addendum as of xxxxxxxxxxxxxxxxxxxxJanuary 20, 2016

**FRANCHISEE**
an individual

**MEINEKE CAR CARE CENTERS, LLC**
a North Carolina limited liability company

By: _Brian A. Romanzo_
89389379A08F4B9...
Authorized Representative

Print Name: Brian A. Romanzo

Title: General Counsel

6

MEIN000226

# EXHIBIT 2

From: **Kevin Harrell** <Kevin.Harrell@meineke.com>
Date: Wed, Feb 5, 2020 at 3:18 PM
Subject: Re: <External> Re: Meineke Project Constitution Unused Funds
To: Jan Douma <jandouma1@gmail.com>
Cc: Phil Farenga <phil.farenga@meineke.com>, Darrin Krader <Darrin.Krader@meineke.com>


That makes sense. Jan we haven't had a meeting in a while. Do you have any availability tomorrow or Friday?

Best,

Kevin

Sent from my iPhone


On Feb 5, 2020, at 6:11 PM, Jan Douma <jandouma1@gmail.com> wrote:


We have not done so because Meineke has been making repairs required by the land owner. It didn't make sense to plan anything until this was done and signed off.

Jan

On Wed, Feb 5, 2020 at 1:46 PM Kevin Harrell <Kevin.Harrell@meineke.com> wrote:

Good afternoon,


I am reaching out to you because it has come across my attention that you have accrued PC funds for two years, and have yet to use your funds. Your center will need to submit a Project Constitution proposal to use the funds. Please reach out to PCsupport@drivenbrands.com

to fill out the proposal. Please do this asap.

1

CJGL000474

Best,


**Kevin Harrell**
Virtual Operations Consultant

<image001.gif>
<image002.png>
(919) 504-1577

440 South Church St. Ste. 700
Charlotte, NC 28202

<image003.gif>
<image004.jpg>
<image005.jpg>

=

–

<image009.png>

*Proud Member of Driven Brands™*

2

CJGL000475

# EXHIBIT 3

| | |
|---|---|
| From: | **Carldouma** <carldouma@gmail.com> |
| To: | **Kevin Harrell** <Kevin.Harrell@meineke.com> |
| CC: | **Darrin Krader** <Darrin.Krader@meineke.com> |
| Subject: | RE: <External> Re: 2020 Meineke Project Constitution Update - Center #4118 |
| Date: | 09.03.2020 09:42:26 (+01:00) |

Rent is not part of pc

Carl Douma

On Mar 9, 2020, at 9:41 AM, Kevin Harrell <kevin.harrell@meineke.com> wrote:

> Good morning,
>
> You owe 3 months of rent and a franchise fee.
>
> Best,
>
> **Kevin Harrell**
> Virtual Operations Consultant
>
>   (919) 504-1577
>
> 440 South Church St. Ste. 700
> Charlotte, NC 28202
>
> http://www.drivensignature.c
> om/images/logos/meineke-
> us.jpg
>
> *Proud Member of Driven Brands™*
>
> **From:** Carl Douma <carldouma@gmail.com>
> **Sent:** Saturday, February 29, 2020 12:16 AM
> **Cc:** Kevin Harrell <Kevin.Harrell@meineke.com>; Darrin Krader <Darrin.Krader@meineke.com>
> **Subject:** <External> Re: 2020 Meineke Project Constitution Update - Center #4118
>
> This is bizarre, since we have never been notified of any shortage of fees or MAF before now.
>
> The Supplemental Focus Marketing Qualification form also seems strange, since on the form we qualify, but I presume it ignores the fees and MAF issue.  However, to be clear, we do not want any supplemental focus marketing. Forcing non-participating franchisees to subsidize other franchisees is also objectionable if any of the funds come from MAF. The $100 CAC is excessive given the expenditure of funds on useless mailers.
>
> Carl Douma

MEIN000353

carldouma@gmail.com

Owner

Meineke Car Care Center #4118, Santa Barbara

(805) 687-0281

On Fri, Feb 28, 2020 at 8:38 PM MeinekeCarCare <meinekecarcare@meineke.com> wrote:

> Hello Franchisee,
>
> Attached is your 2020 Project Constitution Status Scorecard.
>
> If you feel something is not correct, please work with your Operations Team **(copied on this email)** to rectify. We will would like all issues to be resolved by **March 31st, 2020**.
>
> If eligible, to maintain the MAF reduction, you must qualify every year.
>
> **2020 Qualification Status: NOT QUALIFIED**
>
> Thank you,
>
> Meineke Operations

MEIN000354

# EXHIBIT 4

From:           **Andrew Simons** <Drew@dsimonslaw.com>
To:             **Darrin Krader** <Darrin.Krader@meineke.com>
Subject:        <External> Fw: 3956 State Street Environmental Issues
Date:           16.08.2022 16:50:26 (+02:00)
Attachments:    Kruder Darrin 081522.pdf (1 page), 1Report, no appendices.pdf (84 pages)

Darrin,

See attached. Apparently, my assistant misspelled your name. My apologies.

Drew

_____

**From:** Andrew Simons
**Sent:** Monday, August 15, 2022 9:56 PM
**To:** darrin.Kruder@mieneke.com <darrin.Kruder@mieneke.com>
**Subject:** 3956 State Street Environmental Issues

Darrin,

As we discussed, please see attached correspondence.

Drew

MEIN000523

**Andrew D. Simons, esq.**
**130 S. Patterson Ave., Box 748**
**Santa Barbara, CA 93111**
**805 705 2248**

August 15, 2022

**Via email (Darrin.Kruder@Meineke.com) and US MAIL**

Darrin Kruder, Operational Compliance
Driven Brands, Inc
440 S. Church Street, Suite700
Charlotte, NC 28202

      **RE: Notice of Investigation: AIR Standard Industrial Commercial Single-Tenant Lease**- Net dated July 1, 2012 (the "Lease") for the premises located at 3956 State Street, Santa Barbara CA

Dear Darrin:

      As you know, I represent the Lessor under the above referenced lease.  Capitalized terms used herein shall have the meanings assigned to such terms in the Lease.

      This letter constitutes notice that Lessor's environmental consultants recently conducted a Phase I inspection of the Property. A copy of the report is attached hereto. As you can see, it recommends further inspections and soil testing. The environmental consultants are in the process of preparing a scope of work for this additional testing and the remediation of any contamination they may find.

      Since Lessee is responsible for the cost of such testing and any remediation that may be required at the Property under the terms of the Lease, Lessor wanted to make you aware of this issue. Please let me know if you have comments or questions or want to discuss the findings with Lessor's environmental consultant. Otherwise, Lessor will keep you informed of the progress and send you invoices for the consultant's work for payment as the work progresses. Thank you.

      Sincerely,

      Andrew D. Simons, Esq.

cc:   Mary & Maurice Sourmany
       TRAK Environmental

MEIN000524

*TRAK Environmental Group*
*3637 B Arundell Circle*
*Ventura, California 93003*
*805-650-5333*
*www.trakenviro.com*



# PHASE I ENVIRONMENTAL SITE ASSESSMENT:
## 3956 STATE STREET
## SANTA BARBARA, CALIFORNIA
## APN 057-233-018

Prepared for:

Mary and Maurice Sourmany
c/o Andrew D. Simons, Esq.
130 S. Patterson Avenue
Santa Barbara, CA 93102-0748

Prepared by:
TRAK Environmental Group, Inc.
3637B Arundell Circle
Ventura, California 93003

_____
Robert Cashier, MS, CPSS
Director of Environmental Programs

_____
Bradford S. Newman PG, CHG
President

August 10, 2022

*Environmental Consultants - Engineers - Geologists - Chemists - Assessors*

MEIN000525



## TABLE OF CONTENTS

Page

1   EXECUTIVE SUMMARY ................................................................................ 1

2   INTRODUCTION ........................................................................................... 8
    2.1   Purpose ............................................................................................. 8
    2.2   Scope of Services .............................................................................. 8
    2.3   Limitations ......................................................................................... 10
    2.4   Reliance ............................................................................................ 10
    2.5   Data Gaps ......................................................................................... 10

3   SITE DESCRIPTION ...................................................................................... 11
    3.1   Site Description ................................................................................. 11
    3.2   Regional Hydrogeology ..................................................................... 11
    3.3   Adjacent Area Land Use .................................................................... 12

4   USER PROVIDED INFORMATION ................................................................ 13
    4.1   Location and Legal Description .......................................................... 13
    4.2   Title Records ..................................................................................... 13
    4.3   Environmental Liens or Activity and Use Limitations .......................... 13
    4.4   Specialized Knowledge ..................................................................... 14
    4.5   Commonly Known or Reasonably Ascertainable Information ............. 14
    4.6   Valuation Reduction for Environmental Liens .................................... 14
    4.7   Owner, Property Manager, and Occupant Information ........................ 14
    4.8   Reason for Performing Phase I .......................................................... 14

5   RECORDS REVIEW ....................................................................................... 15
    5.1   Results of Database Search ............................................................... 16
        5.1.1   Federal Lists ......................................................................... 16
        5.1.2   State and Tribal Lists ............................................................ 17
        5.1.3   Supplemental Federal, Tribal, State, and Local Lists ............ 21
        5.1.4   Other Ascertainable Records ................................................ 22
        5.1.5   "Orphan" List ........................................................................ 25
    5.2   Results of Agency File Review ........................................................... 26
        5.2.1   National Pipeline Mapping System ....................................... 26
        5.2.2   State Water Resources Control Board ................................... 26
        5.2.3   Santa Barbara County Air Pollution Control District ............ 31
        5.2.4   Santa Barbara County Environmental Health Services ......... 31
        5.2.5   Santa Barbara County Assessor ............................................ 33
        5.2.6   City of Santa Barbara Community Development Department ... 33
        5.2.7   City of Santa Barbara Fire Department .................................. 36
    5.3   Evaluation for Potential of Vapor Encroachment ................................ 37
        5.3.1   Vapor Encroachment Overview .............................................. 37
        5.3.2   Vapor Encroachment Evaluation ........................................... 38

6   SITE HISTORY ............................................................................................... 39
    6.1   Historical Aerial Photographs ............................................................ 39
    6.2   Historical Topographic Maps ............................................................. 43
    6.3   Historical Sanborn Maps ................................................................... 44
    6.4   Historical City Directory ..................................................................... 44
    6.5   Chain of Title ..................................................................................... 45

MEIN000526



**7      SITE RECONNAISSANCE AND INTERVIEWS** .................................................. **46**
   7.1     Site Reconnaissance ................................................................................ 46
   7.2     Results of Site Reconnaissance ............................................................... 48
   7.3     Interviews ................................................................................................. 50

**8      FINDINGS AND CONCLUSIONS** .......................................................................... **51**
   8.1     Findings .................................................................................................... 51
       8.1.1      Site Observations and Findings ................................................. 51
       8.1.2      Findings of Conditions .............................................................. 54
   8.2     Conclusions .............................................................................................. 56

**9      RECOMMENDATIONS** ........................................................................................... **57**

**10     DEVIATIONS** .......................................................................................................... **58**

**11     LIMITATIONS** ......................................................................................................... **59**

**12     QUALIFICATIONS OF ENVIRONMENTAL PROFESSIONALS** ............................ **60**
   12.1    Environmental Professionals Statement .................................................... 60
   12.2    Experience and Qualifications ................................................................... 60

**13     REFERENCES** ....................................................................................................... **62**

**TABLES**

Table 3-1      Site Location and Land Use
Table 3-2      Properties Adjacent to Parcel
Table 5-1      Records Reviewed and Search Distances
Table 5-2      County of Santa Barbara EHS, CUPA
Table 5-3      Santa Barbara Planning, Building Records
Table 5-4      Santa Barbara Fire Department Records
Table 6-1      Listing of Historical Aerial Photographs Reviewed
Table 6-2      Listing of Historical Topographic Maps Reviewed
Table 6-3      Summary of City Directory Listings

**PLATES**

Figure 1
Figure 2
Site Photographs

**APPENDICES**

Appendix A:   Regulatory Documentation (User Questionnaire, Agency and Building Records)

Appendix B:   EDR Environmental Lien Search Report, Historical Aerial Photographs, Historical City Directories, Historical Sanborn Maps, Historical Topographic Maps, Assessor Map

Appendix C:   EDR Radius Map (Executive Summary, Overview Map, Detail Map, Map Findings Summary, Map Findings, GeoCheck Addendum).

MEIN000527



## 1      EXECUTIVE SUMMARY

This Phase I Environmental Site Assessment (ESA) of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, Santa Barbara County, California (subject property) was performed by TRAK Environmental Group, Inc. (TRAK) for the User. This Phase I ESA was performed in general accordance with the scope and limitations of American Society for Testing and Materials (ASTM) Standard Practice E1527-13, *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process*, and the standards and practices for All Appropriate Inquiries (AAI) under 40 CFR Part 312.  Any exceptions to, or deletions from, this scope of work are described in Section 10 of this report.  TRAK finds the following:

**SITE OBSERVATIONS**

The subject property is comprised of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, in an area of commercial and multi-family residential land uses. The subject parcel (0.46 acres) is located at the northeast corner of the intersection of State Street and Calle Real.  At this intersection, Calle Real extends north-northwesterly past the southwestern margin of the subject parcel, and continues northwesterly along the northern side of U.S. Highway 101.  West of the intersection, the westbound lanes of State Street split, to either merge with the westbound onramp to U.S. Highway 101, or to continue westerly across U.S. Highway 101. On the south side of the intersection, the northbound offramp from U.S. Highway 101 exits to State Street, with connection across State Street to Calle Real. East of the intersection, is the Upper State Street area of Santa Barbara.

The subject parcel is rectangular, and oriented north-south, with southern margin along State Street.  The southern portion of the western margin adjoins the public right-of-way for Calle Real, and a drive entry off Calle Real connects with the southwestern part of the property. The northern portion of the western margin adjoins a residential condominium parcel (3965 Via Lucero). North-adjoining is a multi-family residential parcel (three, two-story apartment buildings, 3963 Via Lucero), and east-adjoining is commercial parcel with automobile-service business (Firestone Complete Auto Care, 3948 State Street).

The subject parcel is comprised of a southern, generally level portion, with access from State Street and Calle Real, and a northern, undeveloped portion that is steeply down-sloped to the north, with limited access to the surrounding parcels.  The southern portion is commercially developed with an automotive-service facility, including two auto-service buildings, with paved drive/parking areas that adjoin the frontages at State Street and Calle Real.  The northern-most of the two automobile-service buildings is oriented east-west on the north side of the level portion of lot, and the southern-most building is oriented north-south in the center of the lot at State Street frontage.

1

MEIN000528

TRAK

The northern-most service building (designated as building 2), of concrete-block construction (approximately 1,736 SF), was built in 1994-95 on the general footprint of the previously-existing gasoline service station building (circa 1965-94).   The northern-most building includes three service bays for general automobile service and repair, with bay entries on the south side of the building, which open to the drive/parking area that adjoins State Street.   This building also includes a customer waiting room, office, and restroom.   Each of the three service bays are equipped with above-grade vehicle lifts, including scissor lift and wheel alignment system (Hunter) in center bay (bay 2), and other two bays (bays 1 and 3) with two-post lifts (BendPak). In the center of the three bays are also flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis. Servicing equipment, tools, and storage areas for parts and materials are located along the side and rear walls of the service-bay area, and a portable, drum-mounted parts-washer is located between bays 1 and 2.  Along the rear wall of the building, in the northeast corner, is storage for lubricants and motor oil, an air compressor, and wash sink location. Localized staining was observed on the concrete floor and lower sidewalls in proximity to the wash sink, and also in an area along the rear wall of bay 2, in proximity to the wheel-alignment equipment.

The southern-most building (designated as building 1), of concrete-block construction (approximately 1,509 SF), was built in 1994-95 in the general area of the previously-existing dispenser islands and canopy (circa 1965-94). The southern-most building includes three drive-through service bays, two of which are served by subgrade inspection/service pit (bays 5 and 6), used for lubrication and oil-change service, and the third bay (bay 4) used for tune-ups and general service.   On the south side of bay 6 is storage area, including three, steel ASTs for motor oil and transmission oil, and shelving above for storage of small containers of automotive fluids; a small storage room is located on the south side of the building, with access to the drive/parking area.   Bay 4, on north side of the building, is served with above-grade, two-post vehicle lift, and a steel AST for motor oil  is located at the east entry.

Bays 5 and 6 of the southern-most building are served by a subgrade inspection/service pit (approximately 20 feet x 15 feet x 5 feet deep) that is accessed by stairway between bays 5 and 6, and each bay has a central opening that is fitted with roller-mounted waste-oil drain pan, and also swing-arm drain pans for collection of engine coolant.  Drained waste-oil is directed by piping to a steel, double-walled AST (450 gallon) located along east wall of pit, and waste coolant from drain pans directed to polyethylene 55-gallon drums along the east wall. Significant staining was observed on concrete floor and lower sidewalls in proximity to the waste-oil AST and waste-coolant drums, and along concrete benches on both sides of the pit, used for storage of miscellaneous equipment and oil-collection pans, observed with waste oil.

Parking/drive areas are located on the east side of building 1 (south of building 2) with access to State Street, and on the west side of buildings 1 and 2, with access to Calle Real.  The western parking/drive area includes the former area of the UST pit that was located on the west side of the former dispenser islands and canopy (presently building 1 location).  The parking/drive

2

MEIN000529

TRAK

areas are connected along the south side of the property, and also by a passageway between buildings 1 and 2.  On the west side of the western parking/drive area, adjacent to the top of the slope that adjoins Calle Real, is a storm drain grate.

On the east side of the eastern parking/drive area, adjacent to the building on east-adjoining property, is a walled trash enclosure with wood gate.  The enclosure includes a storage area for drums (6, 55-gallon) and tires.  Staining was observed on pavement and lower sidewalls of the enclosure, in proximity to the drums, and also on pavement outside the enclosure at the northwest and southwest corners.  A narrow passageway extends along the east side of building 2, from the area of the trash enclosure, north to the northeast corner of building 2.  This passageway is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for observation of underlying ground surface.  Along the north side of building 2 is a narrow passageway that is fenced on the north side, separating this area from the steep, north-sloping portion of the property.  Along the south side of the passageway, adjacent to wall of building 2, is row of pallets on the ground, used for stacking of used tires, and also an empty polyethylene AST (appearance of waste-coolant AST).  North of the fenceline, the ground surface is terraced, and beyond the terrace, slopes steeply downward to the northern property boundary; this area is generally open land with scattered eucalyptus trees.

In TRAK's opinion, observation of significant staining on pavement and lower sidewall surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, which appear to be evidence of leakage or spillage of automotive fluids or lubricants, constitutes evidence of *recognized environmental conditions* in connection with the subject *property.*

The site was formerly occupied by a gasoline service station (circa 1965 - 1994), and is identified as a LUST Cleanup Site (Exxon Rabadi) with Cleanup Status: Completed – Case Closed as of 01/09/1995.  The former Exxon (Hondo Oil) service station operated from 1965 through about 1991, and included a service station building with three service bays, two dispenser islands under a separate canopy, three 8,000-gallon fuel USTs (regular, unleaded, premium), and 500-gallon waste oil UST.  Leak-testing in 1988 indicted leakage in vapor-recovery piping, and gasoline-impacted soil confirmed in 1989.  Investigation was conducted in 1991-1993 (five soil borings, six vapor-extraction wells, one groundwater monitoring well), and UST removal in 1991 confirmed gasoline-impacted soil at south end of fuel UST excavation, and at waste-oil UST. Remediation included excavation and disposal of waste-oil impacted soil in 1991 (to 15 feet bgs), vapor extraction of gasoline-impacted soil (10 months, February - December 1993), and additional excavation of gasoline-impacted soil by large-diameter bucket auger to depths of 58 feet bgs.  Bucket-auger removal included 29 borings in the former UST pit (soil aerated onsite, then transported to Class III landfill), and 27 borings at the former northern dispenser island (transported to Class III landfill), for a total of about 600 cubic yards.  Case closure was granted by Santa Barbara County Environmental Health Services Division (EHS) on January 9, 1995.

3

MEIN000530

**TRAK**

In TRAK's opinion, the site's history as LUST Cleanup Site, with case closure in 1995, constitutes evidence of a *Historical Recognized Environmental Condition* (HREC) in connection with the subject *property.*

**FINDINGS**

A *Recognized Environmental Condition* (REC) is defined by ASTM Standard Practice E1527-13 as the presence or likely presence of any *hazardous substances* or *petroleum products* in, on, or at a *property*: (*1*) due to any *release* to the *environment*; (*2*) under conditions indicative of a *release* to the *environment*; or (*3*) under conditions that pose a *material threat* of a future *release* to the *environment. De minimis* conditions are not *recognized environmental conditions.*

- This assessment has revealed evidence of *recognized environmental conditions* in connection with the subject *property.* A *Recognized Environmental Condition* (REC) is associated with areas of significant staining on pavement and lower sidewalk surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, which appear to be evidence of leakage or spillage of automotive fluids or lubricants.

A *Controlled Recognized Environmental Condition* (CREC) is defined by ASTM Standard Practice E1527-13 as a *recognized environmental condition* resulting from a past *release* of *hazardous substances* or *petroleum products* that has been addressed to the satisfaction of the applicable regulatory authority (for example, as evidenced by the issuance of a no further action letter or equivalent, or meeting risk-based criteria established by regulatory authority), with *hazardous substances* or petroleum products allowed to remain in place subject to the implementation of required controls (for example, *property* use restrictions, *activity and use limitations, institutional controls,* or *engineering controls*). A condition considered by the *environmental professional* to be a *controlled recognized environmental condition* shall be listed in the Findings section of the *Phase I Environmental Site Assessment report*, and as a *recognized environmental condition* in the Conclusions section of the *Phase I Environmental Site Assessment report.*

- This assessment has revealed no evidence of *controlled recognized environmental conditions* in connection with the subject *property.*

4

MEIN000531



A *Historical Recognized Environmental Condition* (HREC) is defined by ASTM Standard Practice E1527-13 as a past *release* of any *hazardous substances* or *petroleum products* that has occurred in connection with the *property* and has been addressed to the satisfaction of the applicable regulatory authority or meeting unrestricted use criteria established by a regulatory authority, without subjecting the *property* to any required controls (for example, *property* use restrictions, *activity and use limitations*, *institutional controls*, or *engineering controls*). If the *environmental professional* considers the past *release* to be a *recognized environmental condition* at the time the Phase I ESA is conducted, the condition shall be included in the Conclusions section of the report as a *recognized environmental condition.*

- This assessment has revealed evidence of *historical recognized environmental conditions* in connection with the subject *property*. The *Historical Recognized Environmental Condition* (HREC) is associated with site's history as LUST Cleanup Site, with case closure in 1995.

A *De Minimis Condition* is defined by ASTM Standard Practice E1527-13 as a condition that generally does not present a threat to human health or the *environment* and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies. Conditions determined to be *de minimis conditions* are not *recognized environmental conditions* nor *controlled recognized environmental conditions.*

- This assessment has revealed no evidence of *de minimis conditions* in connection with the subject *property*.

Non-Scope Considerations may be environmental issues or conditions at a property that parties may wish to assess in connection with commercial real estate that are outside the scope of ASTM Standard Practice E1527-13 (non-scope considerations).

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. The narrow passageway that extends along the east side of building 2 is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for unimpeded movement and observation of underlying ground surface.

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. In building 2, in the center of each of the three service bays, are flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis.

5

MEIN000532



**CONCLUSIONS**

TRAK has performed a Phase I Environmental Site Assessment in conformance with the scope and limitations of ASTM Standard Practice E1527-13 of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, Santa Barbara County, the subject *property*.  Any exceptions to, or deletions from, this practice are described in Section 10 of this report.

- This assessment has revealed evidence of *recognized environmental conditions* in connection with the subject *property*. A *Recognized Environmental Condition* (REC) is associated with areas of significant staining on pavement and lower sidewall surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, which appear to be evidence of leakage or spillage of automotive fluids or lubricants.

- This assessment has revealed evidence of *historical recognized environmental conditions* in connection with the subject *property*. The *Historical Recognized Environmental Condition* (HREC) is associated with site's history as LUST Cleanup Site, with case closure in 1995.

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. The narrow passageway that extends along the east side of building 2 is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for unimpeded movement and observation of underlying ground surface.

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. In building 2, in the center of each of the three service bays, are flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis.

6

MEIN000533



**RECOMMENDATIONS**

In regard to *Recognized Environmental Condition* (REC) associated with areas of significant staining on pavement and lower sidewall surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, it is recommended that subsurface investigation be conducted to evaluate the current soil conditions under localized areas of staining on pavement surfaces, for possible evidence regarding potential of any environmental impairment associated with surface staining.

In regard to *Historical Recognized Environmental Condition* (HREC) associated with site's history as LUST Cleanup Site, with case closure in 1995, it is recommended that client be aware of, and plan future land uses in accordance with conditions of the case closure.

A Non-Scope Consideration is associated with the narrow passageway that extends along the east side of building 2, which is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for unimpeded movement and observation of underlying ground surface.  It is recommended that this area be cleared and waste materials transported for disposal in accordance with appropriate protocols, and the ground surface be inspected for possible evidence of any environmental impairment associated with the stored wastes.

A Non-Scope Consideration is associated with three service bays in building 2, in the centers of which are located flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis.  It is recommended that subsurface investigation be conducted to evaluate current soil conditions in proximity to the in-ground hoist assemblies, for possible evidence regarding potential of any environmental impairment associated with the former usage of hydraulic hoists.

7

MEIN000534



## 2      INTRODUCTION

This Phase I Environmental Site Assessment (ESA) of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, Santa Barbara County, California (subject property) was performed by TRAK Environmental Group, Inc. (TRAK) for the User. This Phase I ESA was performed in general accordance with the scope and limitations of American Society for Testing and Materials (ASTM) Standard Practice E1527-13, *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process*, and the standards and practices for All Appropriate Inquiries (AAI) under 40 CFR Part 312. Any exceptions to, or deletions from, this scope of work are described in Section 10 of this report.

### 2.1    PURPOSE

The Phase I ESA was conducted, in accordance with good commercial and customary practice, with the goal to identify *recognized environmental conditions* (RECs) associated with the subject property. The term *recognized environmental conditions* means the presence or likely presence of any *hazardous substances* or *petroleum products* in, on, or at a *property*: (*1*) due to any *release* to the *environment*; (*2*) under conditions indicative of a *release* to the *environment*; or (*3*) under conditions that pose a *material threat* of a future *release* to the *environment*.  The term is not intended to include *de minimis* conditions, which generally do not present a threat to human health or the *environment* and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies.

The Phase I ESA was conducted to permit the User to satisfy one of the requirements to qualify for the *innocent landowner*, *contiguous property owner*, or *bona fide prospective purchaser* limitations on CERCLA (Comprehensive Environmental Response, Compensation and Liability Act) liability (hereinafter, the "*landowner liability protections*," or "*LLPs*"): that is, the practice that constitutes *all appropriate inquiries* into the previous ownership and uses of the *property* consistent with good commercial and customary practice as defined at 42 U.S.C. §9601(35)(B).

### 2.2    SCOPE OF SERVICES

The following sections of this report describe TRAK's work scope:

- Section 3, **Site Description**, is a compilation of information concerning the site location, regional hydrogeology, and adjacent property use.

8

MEIN000535

- Section 4, **User Provided Information**, is a compilation of user provided information (e.g., available title records, environmental liens, specialized knowledge, valuation reduction information for environmental issues, owner, property manager and occupant information).

- Section 5, **Records** Review, is a compilation of TRAK's review of record information from governmental jurisdictions that is reasonably ascertainable including, (1) information that is publicly available, (2) information that is obtainable from its source within reasonable time and cost constraints, and (3) information that is practically reviewable. Review included standard federal, state, and tribal environmental record sources, supplemental and local sources compiled by Environmental Data Resources, Inc. (EDR), and also regulatory agency files and records in regard to subject property, and adjoining properties if warranted.

- Section 6, **Site History**, summarizes the history of the site and adjoining properties based on various sources which may include a review of aerial photographs, historical maps (topographic, Sanborn), city or suburban directories.

- Section 7, **Site Reconnaissance and Interviews**, describes TRAK's observations made during the site reconnaissance and interviews.

- Section 8, **Findings and Conclusions**, presents findings and conclusions regarding recognized environmental conditions, controlled recognized environmental conditions, historical recognized environmental conditions and *de minimis* conditions, with opinion regarding the presence of recognized environmental conditions associated with subject site.

- Section 9 presents TRAK's **Recommendations.**

- Section 10, **Deviations**, provides a statement regarding deviations and/or deletions from, or additions to, the Standard Practice for Environmental Site Assessments (ASTM E1527-13).

- Section 11 presents the **Limitations** of this assessment.

- Section 12 includes the **Qualifications of Environmental Professionals** performing the assessment, and the Environmental Professionals Statement.

- Section 13 presents our **References**.

9

MEIN000536



- **Tables** are included within the chapters where they are referenced.

- The **Plates** section at the end of the report text includes figures (location map and site map) and site photographs.

- The **Appendices** contain User Questionnaire, regulatory file information, user provided documents (if provided), copies of historical information (e.g., aerial photographs, topographic and Sanborn maps, city directories), and regulatory database report.

2.3     LIMITATIONS

This report was designed to meet the *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process*, outlined by American Society for Testing and Materials (ASTM) Standard Practice E1527-13, subject to limitations presented in Section 11.

2.4     RELIANCE

This report is exclusively for the use and benefit of the client identified on the title page of this report.  The purpose for which this report shall be used shall be limited to the use as stated in the contract between the client and TRAK.  This report is not for the use or benefit of, nor may it be relied upon by any other person or entity, for any purpose without the advance written consent of TRAK.

2.5     DATA GAPS

A data gap is a lack of, or inability to obtain information required by ASTM E1527-13 despite good faith efforts by the environmental professional to gather such information, including, but not limited to site reconnaissance and interviews.   A data gap is only significant if other information and/or professional experience raise reasonable concerns involving the data gap. Data failure is one type of data gap, being a failure to achieve the historical research objectives of ASTM E1527-13, even after reviewing the standard historical sources that are reasonably ascertainable and likely to be useful.    Notwithstanding a data failure, standard historical sources may be excluded if the sources are not reasonably ascertainable, or if past experience indicates that the sources are not likely to be sufficiently useful, accurate, or complete in terms of satisfying the objectives.

No significant data gaps were identified during the research and development of this report.

10

MEIN000537



# 3       SITE DESCRIPTION

The site setting is presented in this Section to describe the condition of the site at the time of the Phase I ESA.  Tables 3-1 through 3-2 summarize the physical characteristics of the site and adjacent properties.  The site location is shown on Figure 1.

The information presented in Table 3-1 includes the physical location of the site, as well as the size, and current and proposed use of the subject property.  This information was obtained from review of various maps (such as topographic maps, aerial photographs, and assessor maps), and/or review of public records at city and/or county offices.  As shown on Figure 1, the subject property is located in an area of commercial land uses.

## 3.1    SITE DESCRIPTION

Table 3-1 provides information regarding the location of the subject property.  Additional site description information was obtained during the site reconnaissance visit.  Please refer to Chapter 7 of this report for this information.

**TABLE 3-1**
**SITE LOCATION AND LAND USE**

| LOCATION | 3956 State Street, Santa Barbara |
|---|---|
| ASSESSOR'S PARCEL # AND SIZE | APN 057-233-018 (0.46 acres) |
| CURRENT USE | Commercial |
| PROPOSED USE | Unknown |

## 3.2    REGIONAL HYDROGEOLOGY

Information regarding regional hydrogeology was obtained from available previous reports, published data, and maps of the site vicinity.

Recent groundwater information for the subject site area is provided in the *First Quarter 2020 Groundwater Monitoring Report, Former Shell Station, 3925 State Street, Santa Barbara* (AECOM Technical Services, Inc. April 20, 2020) for the former Shell service station site located across State Street, approximately 400 feet southeast of site. The depth to groundwater in one monitoring well was 50.44 feet bgs, in March 2020, and although date were insufficient to determine groundwater flow direction, historically, groundwater flow has been to the west.

11

MEIN000538

TRAK

3.3    ADJACENT AREA LAND USE

A brief drive-by survey of the area adjacent to the parcel was performed on July 28, 2022, the same day as site reconnaissance visit.  Adjacent properties are identified in relation to the parcel address in closest proximity, summarized in Table 3-2.

**TABLE 3-2**
**PROPERTIES ADJACENT TO PARCELS**

| Direction | Land Use Description |
|---|---|
| NORTH | North-adjoining is a multi-family residential parcel (three, two-story apartment buildings, 3963 Via Lucero).  Beyond is Via Lucero, and multi-family and commercial occupancies. |
| EAST | East-adjoining is commercial parcel with automotive-service business (Firestone Complete Auto Care, 3948 State Street), beyond is restaurant (McDonald's, 3940 State Street), and further east is commercial, to the intersection of N. La Cumbre Road. |
| SOUTH | South-adjoining is State Street (divided highway, three westbound lanes, two eastbound lanes, and turn lanes).  Beyond is Five Points Shopping Center, and to southeast, past S. La Cumbre Road, is La Cumbre Plaza. |
| WEST | West-adjoining the southern portion of site is the Calle Real public right-of-way, and a drive entry off Calle Real connects with southwestern part of the property. West-adjoining the northern portion of site is a residential condominium parcel (3965 Via Lucero). Beyond is Calle Real. To southwest west of intersection of State Street and Calle Real, the westbound lanes of State Street split, to either merge with the westbound onramp to U.S. Highway 101, or to continue westerly across U.S. Highway 101. |

12

MEIN000539



# 4    USER PROVIDED INFORMATION

## 4.1    LOCATION AND LEGAL DESCRIPTION

The subject property is comprised of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, Santa Barbara County, California, in an area of commercial and multi-family residential land uses. Legal description was not provided to TRAK by the client.

## 4.2    TITLE RECORDS

A Preliminary Title Report for subject property was not provided to TRAK by user for review to identify environmental liens or activity and use limitations, if any, which are currently recorded against property. Deed information was obtained by EDR Environmental Lien Search Report; title to property identified by parcel (APN 057-233-018) is vested in Maurice & Mary Sourmany Trustees of the Sourmany 2006 Revocable Trust.

## 4.3    ENVIRONMENTAL LIENS OR ACTIVITY AND USE LIMITATIONS

TRAK ordered the EDR Environmental Lien Search Report, prepared by Environmental Data Resources, Inc. (EDR) of Southport, Connecticut.  The EDR Environmental Lien Search Report is intended to assist in the search for environmental liens filed in land title records.  Data provided in the EDR Environmental Lien Search Report include deed information, legal description, findings regarding environmental liens, and findings regarding other activity and use limitations (AULs).

No environmental liens or other activity and use limitations were found for the property.  The entire EDR Environmental Lien Search Report is included in Appendix B.

The User of this Phase I ESA was asked to complete a User Questionnaire, regarding any knowledge of the existence of environmental liens encumbering the subject property, or activity and land use limitations in connection to the property.  The User Questionnaire completed by Mary Sourmany indicated no knowledge regarding any environmental liens or activity and land use limitations in place. Copies of the User Questionnaire are included in Appendix A.

13

MEIN000540



4.4     SPECIALIZED KNOWLEDGE

The User is typically asked whether the User has specialized knowledge and experience or actual knowledge that may be material to recognized environmental conditions in connection to the site or nearby properties.  The User Questionnaire completed by Mary Sourmany indicated no specialized knowledge or experience related to the property or nearby properties.  Copies of the User Questionnaire are included in Appendix A.

4.5     COMMONLY KNOWN OR REASONABLY ASCERTAINABLE INFORMATION

The User is typically asked whether the User is aware of commonly known or reasonably ascertainable information about the subject property, which would help the environmental professional to identify conditions indicative of releases or threatened releases. The User Questionnaire completed by Mary Sourmany indicated that User had knowledge of past uses of property, specific chemicals present or once present, spills and chemical releases, and environmental cleanups that have taken place at the property.   Copies of the User Questionnaire are included in Appendix A.

4.6     VALUATION REDUCTION FOR ENVIRONMENTAL LIENS

The User is typically asked if the purchase price being paid for the property reasonably reflects the fair market value of the property, and if not, has the User considered whether the difference may be due to known or suspected contamination.  The User Questionnaire completed by Mary Sourmany indicated no information in regard to any valuation reduction for environmental liens or environmental conditions regarding the subject property.   Copies of User Questionnaire are included in Appendix A.

4.7     OWNER, PROPERTY MANAGER, AND OCCUPANT INFORMATION

The User was asked to provide TRAK with information regarding the owner, property manager, and occupant information.  The site contact is listed as Jan Douma.

4.8     REASON FOR PERFORMING PHASE I

The reason for completing this Phase I ESA was for purposes of qualifying for Landowner Liability Protections (LLPs) under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) unless otherwise so stated in this report.

14

MEIN000541



## 5      RECORDS REVIEW

The records review was conducted to help identify recognized environmental conditions in connection with the subject property. TRAK's record review included information from governmental jurisdictions that is reasonably ascertainable, comprising (1) information that is publicly available, (2) information that is obtainable from its source within reasonable time and cost constraints, and (3) information that is practically reviewable.

TRAK contracted a government database search completed by Environmental Data Resources, Inc. (EDR) of Southport, Connecticut (Appendix C). EDR database search included standard federal, state, and tribal environmental record sources, supplemental and local sources, as discussed in Section 5.1.  TRAK also conducted review of regulatory agency files and records in regard to subject property, as discussed in Section 5.2 following, and also for adjoining properties if warranted in accordance with ASTM E1527-13 Section 8.2.2.

Standard records (acronyms defined in EDR report) searched are summarized in Table 5-1.

### TABLE 5-1
### RECORDS REVIEWED AND SEARCH DISTANCES

| ASTM Standard | | | |
|---|---|---|---|
| **Federal** | **Distance** | **State and Tribal** | **Distance** |
| NPL | 1-mile | AWP | 1-mile |
| CERCLIS | ½-mile | HIST CAL-SITES/BEP | ½-mile |
| NFRAP | ½-mile | SWIS (SWF/LF)/WMUDS | ½-mile |
| RCRA-TSDF | ½-mile | SWAT | ½-mile |
| RCRA-GEN (LQG & SQG) | Site & Adjoining | LUST | ½-mile |
| ERNS | Site | UST/CA FID | Site & Adjoining |
| RCRA-CORRACTS | 1-mile | HIST UST | Site & Adjoining |
| INSTITUTIONAL CONTROLS | Site | CORTESE | ½-mile |
| ENGINEERING CONTROLS | Site | CHMIRS | Site & Adjoining |
| | | NOTIFY 65 | 1-mile |
| | | Toxic Pits | 1-mile |
| **ASTM Supplemental** | | | |
| **Federal** | | **Distance** | |
| FINDS | | Site & Adjoining | |
| **Tribal, State or Local** | | **Distance** | |
| HAZNET | | Site & Adjoining | |
| CA SLIC | | ½-mile | |
| WDS | | Site | |
| CLEANERS | | Site & Adjoining | |
| VCP | | ½-mile | |
| AST | | Site | |

15

MEIN000542



EDR utilizes a geographical information system to plot the site locations of reported data references.  This information is reviewed by TRAK to help establish if the site or nearby properties are identified in one or more of the standard environmental record sources.  The EDR report includes an Executive Summary that lists search results for subject property and properties within the standard search radii, two maps that show locations of referenced properties with respect to the site, a tabulation of map findings, and summaries of pertinent information for these properties.  A copy of the EDR report is included in Appendix C, and results of EDR database search summarized in following section.

## 5.1    RESULTS OF DATABASE SEARCH

The following sections in this chapter contain information on the results of EDR's record search. Listed search distances are those specified in ASTM standard. Site address was referenced in ASTM standard database in eleven listings, RCRA-SQG, LUST, SWEEPS UST, CA FID UST, AST, HIST UST, CHMIRS, Cortese, HIST CORTESE, FINDS, HAZNET, and nine other listings of ascertainable records, RGA LUST, CUPA, CERS, CERS HAZ WASTE, CERS TANKS, HWTS, ECHO, RCRA NonGen / NLR, and Hist Auto.

### 5.1.1   Federal Lists

NPL                      National Priority List (NPL) sites are Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) sites that the United States Environmental Protection Agency (US EPA) has identified as having priority to address conditions believed to pose a threat to public health and/or the environment.  No NPL sites were listed within the ASTM search distance of 1 mile.

SEMS                   The SEMS list tracks hazardous waste sites, potentially hazardous waste sites, and remedial activities performed in support of EPA's Superfund Program. The list was formerly known as CERCLIS, renamed to SEMS by EPA in 2015. No SEMS site is listed within ASTM search distance of ½ mile.

SEMS-ARCHIVE  The SEMS-ARCHIVE list tracks sites with no further interest under Federal Superfund Program based on available information. List was formerly known as CERCLIS-NFRAP, renamed to SEMS ARCHIVE by EPA in 2015.  No SEMS-ARCHIVE site is listed within ASTM search distance of ½ mile

RCRA-TSDF          Resource Conservation and Recovery Information System (RCRIS) includes selective information on sites that transport, store, treat and/or dispose of hazardous waste (referred to as TSDF sites) as defined by Resource Conservation and Recovery Act (RCRA).  No TSD site is listed within ASTM search distance of ½ mile.

16

MEIN000543



RCRA-GEN | RCRIS also includes RCRA generator (GEN) listings that indicate hazardous wastes are generated on a facility's premises as part of company's business practices. Four large quantity generator (LQG) facilities are listed within ¼ mile, but not within ASTM reporting distance of the site or adjoining properties. One small quantity generator (SQG) site is listed within ¼ mile, the subject site; Econo Lube N Tune 118 (3956 State Street, EDR ID A13). This reference associated with wastes generated during the course of typical and routine business activities, and transported for offsite disposal/recycling in accordance with appropriate protocols and regulatory requirements; and in TRAK's opinion, such listing alone unlikely to pose risk to subject site. Additional information regarding CUPA registration information is provided in following Section 5.2.4.

ERNS | The Emergency Response Notification System (ERNS) listing is a compilation of reported spills of petroleum products or hazardous substances. The ASTM reporting search distance is the site itself. No ERNS file was listed within ASTM search distance.

CORRACTS | The RCRA Corrective Action Report (CORRACTS) identifies hazardous waste handlers with RCRA corrective action activity. No CORRACTS site is listed within the ASTM search distance of 1 mile.

INSTITUTIONAL CONTROLS | Institutional Controls include administrative measures, such as groundwater use restrictions, construction restrictions, property use restrictions, and post remediation care requirements intended to prevent exposure to contaminants remaining on site. Deed restrictions are generally required as part of the institutional controls. The ASTM reporting search distance is the site itself. No INSTITUTIONAL CONTROLS were listed within ASTM search distance.

ENGINEERING CONTROLS | An Engineering Control listing is a listing of sites with engineering controls in place. Engineering controls include various forms of caps, building foundations, liners, and treatment methods to create pathway elimination for regulated substances to enter environmental media or effect human health. The ASTM reporting search distance is the site itself. No ENGINEERING CONTROLS were listed within the ASTM search distance.

5.1.2   State and Tribal Lists

RESPONSE | The State of California DTSC maintains a list of NPL-equivalent sites identified as high-priority with confirmed releases. No RESPONSE site is listed within the ASTM search distance of 1 mile.

17

MEIN000544

**TRAK**

ENVIROSTOR    California Department of Toxic Substances Control (DTSC) maintains a list of CERCLIS-equivalent sites with confirmed or suspected releases. No ENVIROSTOR site is listed within the ASTM search distance of one mile.

CAL-SITES    Cal/EPA maintained database of potentially hazardous waste facilities identified as Historical Cal-Sites list, formerly known as Abandoned Sites Program Information System (ASPIS). DTSC was the lead agency for Cal-Sites. The Cal-Sites database is no longer updated and was replaced by ENVIROSTOR. No Historic Cal-Sites are listed within the ASTM search distance of 1 mile.

SWIS    California Integrated Waste Management Board (CIWMB) maintains SWIS database regarding active, inactive, and closed landfills, and transfer and composting stations, published annually. SWIS is also known as Solid Waste Fills/Land Fills (SWF/LF). No SWF/LF sites are listed within ASTM search distance of ½ mile.

SWAT/WMUDS    The Solid Waste Assessment Test (SWAT) database contains information regarding solid waste landfills where known migration of hazardous chemicals has been reported from investigations conducted at the landfills. No SWAT sites were listed within the ASTM search distance. The Waste Management Unit Database (WMUDS) is used by the state for program tracking and inventory of waste management units. No WMUDS sites were listed within the ASTM search distance.

LUST    The LUST list is maintained by the State Water Resources Control Board. Twenty-two files (nineteen sites) located within ASTM search distance of ½ mile appeared on the State of California's LUST list. Of these, all nineteen LUST sites listed have been closed or eligible for closure. One of the sites with closed case files is the subject site, Exxon Service Station (3956 State Street, EDR ID A15), with Cleanup Status: Completed – Case Closed as of 01/09/1995. Another site with closed case files is the east-adjoining site, Bridgestone Firestone (3948 State Street, EDR ID A27, 0 - ⅛ mile ESE), with Cleanup Status: Completed – Case Closed as of 12/17/1993. In TRAK's opinion, the referenced features are unlikely to pose risk to the subject site, due to case status and corrective action conducted under guidance of regulatory agency, distance from and/or hydrogeologic position relative to the subject site. Additional information regarding subject site closed LUST file is discussed in Sections 5.2.2 and Section 5.2.4, and closed LUST file for east-adjoining site in Section 5.2.2.

MEIN000545

TRAK

SWEEPS UST    Statewide Environmental Evaluation and Planning System (SWEEPS) was registered UST listing in early 1990s and is no longer updated/maintained. Six SWEEPS UST sites were reported within ¼ mile of site, including former occupancy of subject site; Exxon Service Station (3956 State Street, EDR ID A17). This former service station site has a closed LUST case file, as discussed in preceding LUST section.  In TRAK's opinion, the registry listing (SWEEPS UST) alone is unlikely to pose risk to subject site. Additional information regarding subject site closed LUST file is discussed in Section 5.2.2.

CA FID    Facility Inventory Database (CA FID) contains active and inactive underground storage tank (UST) locations. Source is SWRCB.  Six CA FID sites were reported within ¼ mile of site, including former occupancy of subject site; Exxon Service Station (3956 State Street, EDR ID A17). This former service station site has a closed LUST case file, as discussed in preceding LUST section.  In TRAK's opinion, the registry listing (CA FID) alone is unlikely to pose risk to subject site. Additional information regarding subject site closed LUST file is discussed in Section 5.2.2.

VCP    The VCP database contains low threat level properties with either confirmed or unconfirmed releases, and project proponents requested that DTSC oversee investigation and/or cleanup activities and agreed to provide coverage for DTSC costs. No VCP site is listed within ASTM search distance of ½ mile.

HIST UST    This database identifies historical registered USTs.  Nine HIST UST sites were reported within ¼ mile of subject site, including two listings for former occupancy of subject site; Exxon Service Station (3956 State Street, EDR ID A7, 15). This former service station site has a closed LUST case file, as discussed in preceding LUST section.  In TRAK's opinion, the registry listing (HIST UST) alone is unlikely to pose risk to subject site. Additional information regarding subject site closed LUST file is discussed in Section 5.2.2.

CORTESE    This database identifies public drinking water wells with detectable levels of contamination, hazardous substance sites selected for remedial action, sites with known toxic material identified by the abandoned site assessment program, sites with USTs having a reportable release, and solid waste disposal facilities with known migration.  The source is the Cal/EPA Office of Emergency Information.  The State Water Resource Control Board (LUST), Integrated Waste Board (SWF/LS), and Department of Toxic Substances Control Board (Cal-Sites) designate the sites for listing.  This list is no longer updated by the state. Twenty files located within ASTM search distance of ½

19

MEIN000546



mile appeared on the CORTESE list.  Of these, all CORTESE sites listed have been closed or eligible for closure. One of the sites with closed case files is the subject site, Exxon Service Station (3956 State Street, EDR ID A15), with Cleanup Status: Completed – Case Closed as of 01/09/1995.   Another site with closed case files is the east-adjoining site, Bridgestone Firestone (3948 State Street, EDR ID A27, 0 - ⅛ mile ESE), with Cleanup Status: Completed – Case Closed as of 12/17/1993. In TRAK's opinion, the referenced features are unlikely to pose risk to the subject site, due to case status and corrective action conducted under guidance of regulatory agency, distance from and/or hydrogeologic position relative to the subject site. Additional information regarding subject site closed LUST file is discussed in Sections 5.2.2 and Section 5.2.4, and closed LUST file for east-adjoining site in Section 5.2.2.

CHMIRS/HMIRS The California Hazardous Material Incident Report System (CHMIRS) contains information on reported hazardous material incidents (i.e., accidental releases or spills).  The source is California Office of Emergency Services. Site address is referenced in one listing. The reference is in regard to incidental spill of waste motor (less than one quart), reported 6/20/1996, with cleanup by Santa Barbara Fire Department. In TRAK's opinion, the referenced incident is unlikely to pose risk to the subject site, due to cleanup under regulatory oversight, case status, localized or *de minimis* nature.  Additional information regarding Santa Barbara Fire Department file is discussed in Section 5.2.7.

NOTIFY 65 Notify 65 records contain facility notifications for releases that could impact drinking water and thereby expose public to a potential health risk.  Data come from SWRCB Proposition 65 database. Two Notify 65 sites are listed within the ASTM search distance of 1 mile. In TRAK's opinion, the referenced features are unlikely to pose risk to the subject site, due to case status, localized or *de minimis* nature, distance from and/or hydrogeologic position relative to the subject site.

TOXIC PITS This database is a list of Toxic Pits cleanup sites and identifies sites suspected of containing hazardous wastes where cleanup has not yet been completed.  The data are from the State Water Resource Control Board.  No Toxic Pits sites were listed within the ASTM search distance.

20

MEIN000547



5.1.3   Supplemental Federal, Tribal, State, and Local Lists

FINDS — Facility Index System/Facility Identification Initiative Program Summary Report (FINDS) contains both facility information and pointers to other sources that contain more detail.  Site addresses referenced in three listings. These references are associated with routine registration, and in TRAK's opinion listing alone unlikely to pose risk to subject site. Listings are summarized in following table, and additional information regarding CUPA registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|----|-----------|---------|----------|
| A12 | EXXON RABADI | 3956 STATE STREET | FINDS |
| A20 | CJGL INC DBA MEINEKE | 3956 STATE STREET | FINDS |
| A21 | ECONO LUBE N TUNE 118 | 3956 STATE STREET | FINDS |

HAZNET — The HAZNET database is extracted from the copies of hazardous waste manifests received each year by California Department of Toxic Substance Control (DTSC). Site addresses referenced in five listings. These references associated with wastes previously generated during the course of typical and routine business activities, and transported for offsite disposal/recycling in accordance with appropriate protocols and regulatory requirements; and in TRAK's opinion, such listing alone unlikely to pose risk to subject site. Listings are summarized in following table, and additional information regarding CUPA registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|----|-----------|---------|----------|
| A3 | ECONO LUBE N TUNE #118 | 3956 STATE STREET | HAZNET |
| A4 | MEINEKE-ECONO LUBE N'TUNE INC | 3956 STATE STREET | HAZNET |
| A6 | CJGL INC DBA MEINEKE CAR CARE | 3956 STATE STREET | HAZNET |
| A8 | 1X MAURICE SOURMANY | 3956 STATE STREET | HAZNET |
| A22 | MAURICE SOURMANY | 3956 STATE STREET | HAZNET |

CPS-SLIC — Cleanup Program Sites (CPS), also known as Site Cleanups (SC), formerly California Spills, Leaks, Investigations, and Cleanups (SLIC) sites, included in GeoTracker, Water Board data management system for sites that impact, or have potential to impact water quality, groundwater. Two CPS-SLIC sites are listed within ASTM search distance; of these, both files are closed.  In TRAK's opinion, referenced features are unlikely to pose risk to subject site, due to agency case status, localized or *de minimis* nature, distance from and/or hydrogeologic position relative to subject site.

WDS — The Waste Discharge System (WDS) list is a SWRCB listing of sites issued waste discharge requirements. Site address is not listed in WDS database.

21

MEIN000548



AST   The AST list is a State Water Resources Control Board listing of aboveground petroleum storage tank facilities. The subject site is not listed as an AST site.

CLEANERS  This database contains information on the location of dry-cleaning facilities that have EPA ID numbers. Source for this list is DTSC. No DRY CLEANERS sites were within ASTM reporting search distance of site and adjoining sites.

OGW   This database contains information on location and production information for regulated oil and gas wells (OGW) located in the State of California. This database did not contain information regarding the subject site. Information regarding oil and gas fields was also obtained from the 1994 Munger Map Book. No oil or gas fields in the immediate site vicinity were noted.

5.1.4 Other Ascertainable Records

RGA LUST Recovered Government Archive Leaking Underground Storage Tank. The EDR database provides a list of LUST incidents derived from historical databases and includes many records that no longer appear in current government lists. Compiled from Records formerly available from the State Water Resources Control Board in California. Site address is referenced in one listing. The references are in regard to closed LUST file associated with the subject site, Exxon Service Station (3956 State Street, EDR ID A15), with Cleanup Status: Completed – Case Closed as of 01/09/95. Additional information regarding subject site closed LUST file is discussed in Sections 5.2.2 and Section 5.2.4. RGA-LUST listing is summarized in following table.

| ID | SITE NAME | ADDRESS | DATABASE |
|----|-----------|---------|----------|
| A19 | EXXON RABADI | 3956 STATE STREET | RGA LUST |

CUPA Listings Listing of sites included in county Certified Unified Program Agency database, for administration, permits, inspections, and enforcement activities. Site address is referenced in three listings. The references are associated with routine registration in county CUPA, and in TRAK's opinion unlikely to pose risk to subject site. Additional information regarding CUPA registration information is provided in following Section 5.2.4. CUPA listings are summarized in following table.

| ID | SITE NAME | ADDRESS | DATABASE |
|----|-----------|---------|----------|
| A5 | MEINEKE CAR / ECONO LUBE #4118 | 3956 STATE STREET | CUPA |
| A7 | EXXON SERVICE STATION | 3956 STATE STREET | CUPA |
| A26 | ECONO LUBE N'TUNE-CLOSED | 3956 STATE STREET | CUPA |

22

MEIN000549



CERS               California Environmental Reporting System (CERS).  Site address referenced in two listings, for CERS Description (Chemical Storage Facilities). This reference is associated with routine registration, and in TRAK's opinion listing alone unlikely to pose risk to subject site. Listing is summarized in following table, and additional information regarding CUPA registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|----|-----------|---------|----------|
| A11 | EXXON RABADI | 3956 STATE STREET | CERS |
| A14 | MEINEKE CAR / ECONO LUBE #4118 | 3956 STATE STREET | CERS |

CERS HAZ           California Environmental Reporting System (CERS) Regulated Site Portal. Site address referenced in one listing, for CERS Description (Hazardous Waste Generator). This reference is associated with registration for wastes generated during the course of typical and routine business activities, and transported for offsite disposal / recycling in accordance with appropriate protocols and regulatory requirements, and in TRAK's opinion, such listing alone unlikely to pose risk to subject site.  Listing is summarized in following table, and additional information regarding CUPA registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|----|-----------|---------|----------|
| A14 | MEINEKE CAR / ECONO LUBE #4118 | 3956 STATE STREET | CERS |

CERS TANKS         California Environmental Reporting System (CERS) Regulated Site Portal. Site address referenced in one listing, for CERS Description (Aboveground Petroleum Storage). This reference is associated with registration of tankage for lubricants and waste fluids utilized during the course of typical and routine business activities, in accordance with appropriate protocols and regulatory requirements, and in TRAK's opinion, such listing alone unlikely to pose risk to subject site. Listing is summarized in following table, and additional information regarding registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|----|-----------|---------|----------|
| A14 | MEINEKE CAR / ECONO LUBE #4118 | 3956 STATE STREET | CERS TANKS |

23

MEIN000550



HWTS            Hazardous Waste Tracking System. Site addresses referenced in ten listings. These references associated with routine registration, and in TRAK's opinion listing alone unlikely to pose risk to subject site.  Listings are summarized in following table, and additional information regarding CUPA registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|---|---|---|---|
| A1 | MEINEKE CAR CARE CENTER #4118 | 3956 STATE STREET | HWTS |
| A3 | ECONO LUBE N TUNE #118 | 3956 STATE STREET | HWTS |
| A4 | MEINEKE-ECONO LUBE N'TUNE INC | 3956 STATE STREET | HWTS |
| A6 | CJGL INC DBA MEINEKE CAR CARE | 3956 STATE STREET | HWTS |
| A8 | 1X MAURICE SOURMANY | 3956 STATE STREET | HWTS |
| A9 | ECONO LUBE N TUNE 118 | 3956 STATE STREET | HWTS |
| A16 | RABADI EXXON | 3956 STATE STREET | HWTS |
| A22 | MAURICE SOURMANY | 3956 STATE STREET | HWTS |
| A24 | MEINEKE CAR CARE/ECONO LUBE N | 3956 STATE STREET | HWTS |
| A25 | 1X SOURMANY, MAURICE | 3956 STATE STREET | HWTS |

ECHO            Enforcement & Compliance History Information. ECHO provides integrated compliance and enforcement information for about 800,000 regulated facilities nationwide. Site addresses referenced in two listings. This reference associated with routine registration of facility under the regulatory oversight of appropriate agency, and in TRAK's opinion listing alone unlikely to pose risk to subject site.  Listings are summarized in following table, and additional information regarding CUPA registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|---|---|---|---|
| A10 | CJGL INC DBA MEINEKE CAR CARE | 3956 STATE STREET | ECHO |
| A21 | ECONO LUBE N TUNE 118 | 3956 STATE STREET | ECHO |

RCRA NG/NLR     Non Generators / No Longer Regulated. EPA database of selective information on sites which generate, transport, store, treat and/or dispose of hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA). Non-Generators do not presently generate hazardous waste. Site address referenced in one listing. This reference is associated with routine registration, and in TRAK's opinion listing alone unlikely to pose risk to subject site.  Listing is summarized in following table, and additional information regarding CUPA registration information is provided in following Section 5.2.4.

| ID | SITE NAME | ADDRESS | DATABASE |
|---|---|---|---|
| A23 | CJGL INC DBA MEINEKE CAR CARE | 3956 STATE STREET | RCRA NG/NLR |

24

MEIN000551



Hist Auto Station   EDR Historical Auto Station database is compiled from selected national collections of business directories for listings, limited to those categories of sources that might, in EDR's opinion, include gas station/filling station/service station establishments. The categories reviewed included, but were not limited to gas, gas station, gasoline station, filling station, auto, automobile repair, auto service station, service station, etc. Site address is referenced; A to Z Auto Repair (3956 State St, EDR ID A2), for the following:

| Year | Name | Type |
|------|------|------|
| 1970 | Masons Enco Service | Gasoline Stations |
| 1979 | Masons Exxon | General Automotive Repair Shops |
| 1980 | Masons Exxon | General Automotive Repair Shops |
| 1981 | Masons Exxon Service | Gasoline Stations |
| 1982 | Masons Exxon | General Automotive Repair Shops |
| 1983 | Masons Exxon | General Automotive Repair Shops |
| 1985 | A to Z Auto Repair | Automobile Repairing |
| 1985 | Rabadi Exxon | Gasoline Stations |
| 1985 | Masons Exxon | General Automotive Repair Shops |
| 1986 | Masons Exxon | General Automotive Repair Shops |
| 1987 | Masons Exxon | General Automotive Repair Shops |
| 1989 | Rabadi Exxon | Gasoline Stations |
| 1996 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 1997 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 1998 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 1999 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 2000 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 2001 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 2002 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 2003 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 2004 | Econo Lube N Tune Inc | General Automotive Repair Shops |
| 2009 | Meineke Car Care Center | Automotive Repair Shops, NEC |
| 2010 | Meineke Car Care Center | Automotive Repair Shops, NEC |
| 2011 | Meineke Car Care Center | Automotive Repair Shops, NEC |
| 2012 | Meineke Car Care Center | Automotive Repair Shops, NEC |
| 2013 | Meineke Car Care Center | Automotive Repair Shops, NEC |
| 2014 | Meineke Car Care Center | General Automotive Repair Shops |

The referenced listings are associated with gasoline service station and automotive repair activities, appropriate for permitted land uses, and in TRAK's opinion, listing alone is unlikely to pose risk to the subject site. This site is associated with a closed LUST case for the former gasoline service station, and additional information regarding closed LUST case is provided in following Sections 5.2.2 and 5.2.4.

5.1.5   "Orphan" List

TRAK reviewed the list of sites known as "orphan sites" that could not be plotted by EDR.     In TRAK's opinion, these sites are unlikely to impact the subject site, due to distance from the subject site, or hydrogeologic position relative to the subject site.

MEIN000552



5.2     RESULTS OF AGENCY FILE REVIEW

TRAK conducted review of regulatory agency files and records in regard to subject property, and also for adjoining properties if warranted in accordance with ASTM E1527-13 Section 8.2.2. Agency file sources and search results are described in following sections, and applicable copies of agency file review records are included in Appendix A.

5.2.1   National Pipeline Mapping System

The U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA), National Pipeline Mapping System (NPMS) database public map viewer was accessed for location information on hazardous liquid and natural gas pipelines. Review of NPMS map for subject site area also indicates a Gas Transmission Pipeline aligned along State Street, on south side of site, with information tabulated:

NPMS Database Information:

```
OPERATOR ID:              18484
OPERATOR NAME:            SOUTHERN CALIFORNIA GAS CO
SYSTEM NAME:              DISTRIBUTION
PIPELINE ID:              31
COMMODITY CATEGORY:       Natural Gas
COMMODITY DESCRIPTION:    NATURAL GAS
INTERSTATE DESIGNATION:   N
PIPELINE STATUS CODE:     Active (filled)
PERSON TO CONTACT:        Pipeline Integrity Team Lead
CONTACT ADDRESS:          555 W 5th St GT12B6, Los Angeles CA 90013
PHONE/FAX/EMAIL:          Phone: (213) 244-3114 Email: NPMS_Inquiries@semprautilities.com
```

5.2.2   State Water Resources Control Board

The State Water Resources Control Board GeoTracker website was accessed for records concerning groundwater for subject site and adjoining properties.  The LUST database was searched for possible leaking UST contamination for the subject site address and adjoining properties. TRAK also searched the GeoTracker website regarding the Other Cleanup Sites database for site address and adjoining properties.  Subject site is listed in the GeoTracker database, with closed case file for LUST Cleanup Site (Exxon Rabadi). East-adjoining site (3948 State Street) is listed in the GeoTracker database, with closed case file for LUST Cleanup Site (Bridgestone Firestone).  Both case files are discussed in the following pages.

MEIN000553



5.2.2    State Water Resources Control Board (cont)


**Subject Site: Exxon Rabadi (3956 State Street)**

Cleanup Status: Completed – Case Closed as of 1/9/1995.
Oversight Agency: Santa Barbara County LOP
Case: #52142
Potential Contaminants of Concern: Gasoline
Potential Media of Concern: Soil.


The Case Closure Summary (January 9, 1995) provides background information regarding the site's investigation and corrective action activities, the contaminant concentrations before and after cleanup, and closure parameters.  The Case Closure Summary (Section III Release and Site Characterization Information) verifies three 8,000-gallon gasoline USTs, one 500-gallon waste oil UST, and associated product and vapor-recovery piping were removed for disposal (7/26/1994). Remediation of gasoline-impacted soils included in-situ vapor extraction (10 months, January 1993 to 10/29/93), excavation and bioremediation (to 4/20/1994), and large-diameter bucket auger removal of additional gasoline-impacted soil to depths of 58 feet bgs (November 1994). Waste-oil-impacted soils were excavated to depth of clean soil (15 feet bgs) and transported offsite for disposal (3/23/1994).


Background information regarding the service-station history, identification of release, investigation, and initial remediation activities, is discussed in the report, *Soil and Groundwater Assessment Vapor Extraction Mitigation Confirmation Soil Borings for Sourmany Exxon Service Station, 3956 State Street, Santa Barbara* (Advanced Environmental Concepts. Inc., February 1994), with portions excerpted:

2.0 BACKGROUND

Hondo Oil Company has operated the Exxon Station from the time it was constructed in 1965. The station has three (3) single-wall steel, 8,000-gallon underground fuel storage tanks, dispensing regular, unleaded, and Exxon extra gasoline.

On April 28, 1988 Hondo Oil Company contracted Central Coast Tank Testing to perform the required yearly precision tank and product line testing. The results of that test Indicate that the tanks were within the 0.05 gal/hour product volume variance. However, the system failed the precision test at grade level which indicated there was a leak in the piping. Hondo Oil contracted Petroleum Specialties. Inc, to identity and repair the leak. On May 11, 1988 a leaking 3-inch vapor recovery cross was repaired.

California regulations also require that a continuous monitoring system be installed proximal to or inside the underground storage tanks and piping.  The monitoring system usually consists of vadose sensors or in-tank level monitors, coupled with product line sensors and overspill protection. In June of 1989, Hondo Oil received three bids to install the monitoring system. Concurrent with the installation of the vadose leak detection hardware, soil samples were collected from the three borings. Boring #2 (nearest the repaired vapor recovery fitting) exhibited hydrocarbon concentrations in excess of Santa Barbara County LUFT Department Recommended Action Levels (RAL) for soil. The analytical results prompted the LUFT Department to require a site assessment at the subject property.

27

MEIN000554



5.2.2    State Water Resources Control Board (cont)

**Subject Site: Exxon Rabadi (3956 State Street)**

The soil and groundwater assessment, remediation, and confirmation borings were authorized by Mr. Maurice Sourmany, and performed under the direct supervision of Mr. Steve Brown, LUFT Division, Santa Barbara County Environmental Health Department. The initial site characterization was performed during January 1991…Installation of vadose wells VE-1, VE-2, VE-3, and VE-4 occurred during January 1991. As a natural progression, the USTs were removed by B & T Service Station Contractors in August, 1991. The analytical results for the gasoline UST removals indicate that the highest concentrations of hydrocarbons, in soil, was identified at the south end of the UST excavation, adjacent the turbines. Concurrently, with the gasoline UST removals a 500-gallon waste-oil UST was removed adjacent the east property line. Significant waste oil contamination was identified, and in November 1991, the soil was removed and disposed of at the Laidlaw Disposal Facility, Buttonwillow, California. Installation of vadose wells VE-5 and VE-6 occurred during June of 1993. The vapor extraction system operated from February 1993 to December 1993.

Additional background information regarding the investigation and remediation activities conducted after the vapor-extraction project, is discussed in the report, *Current Mitigation Status of Northern Dispenser Island 3956 State Street, Santa Barbara* (Advanced Environmental Concepts. Inc., December 6 1994), with portions excerpted:

Prior work conducted at the site consisted of advancing five investigatory soil borings, installing six vapor extraction wells and one groundwater monitoring well, and removing three gasoline and one waste oil underground storage tanks. Remedial activity at the site involved employing vapor extraction techniques for approximately 10 months, followed by removal of the residual hydrocarbon impacted soil via a large diameter auger rig. This letter presents the results of the recent soil removal project beneath the northern dispenser island and was also conducted using a 4 foot diameter auger.

BACKGROUND

At the conclusion of the vapor extraction project, two confirmation borings (CB-1, CB-2) were advanced and soil samples collected and submitted to a state certified laboratory for analysis. The analytical results for CB-1, drilled beneath the former turbine locations of the USTs, indicated elevated concentrations of gasoline in soil. CB-2, drilled at the south boundary of the tank pit indicated non-detect to trace gasoline concentrations in soil. Based on analytical results, it was decided to conclude remedial actions by removing the residual hydrocarbon impacted soil. Subsequently AEC submitted a work plan to remove and treat the impacted soil. Between March 8 and March 23, 1994 a total of 29 large diameter borings were drilled proximal to the tank pit to remove the bulk of the hydrocarbon impacted soil. The borings were sufficient enough to cover the former UST locations and step outside the plume to confirm adequate soil removal. The excavated gasoline impacted soil was aerated and bio-remediated, then transported to a Class III landfill once analytical results indicated acceptable concentrations.

MITIGATION OF NORTHERN DISPENSER ISLAND

Between October 31 and November 7, 1994, a total of 27 large diameter auger borings were drilled proximal to the northern dispenser island to remove the bulk of the hydrocarbon impacted soil.  The borings were sufficient enough to cover the former dispenser location and step outside the plume to confirm adequate soil removal.

Soil samples were collected from the floor of each large diameter boring to confirm that the vertical extent of contaminated soil had been sufficiently removed. Soil was also collected and analyzed at approximately 5-foot intervals in lateral confirmation borings. Also, soil was continuously screened using a PhotoVac Micro Tip MP 100, calibrated each day prior to use. Additional field screening consisted of visual identification of gasoline impacted soil, (i.e. soil discoloration) and odors emitted from the cuttings. Analytical results are presented in Table 1.

28

MEIN000555



5.2.2    State Water Resources Control Board (cont)

**Subject Site: Exxon Rabadi (3956 State Street)**

The results of the screening indicate a gasoline plume beginning beneath the center portion of the northern island at approximately 5 feet below grade level (BGL). The gasoline apparently migrated through the clay matrix identified between 4 feet BGL to 25 feet BGL then to the more permeable silty sand zones logged between 35 and 45 feet BGL. The sand zones are interbedded with silty clays. As the large diameter auger borings radiated away from the center of the former dispenser island "clean" soil was logged to a depth of 30 feet, followed by gasoline impacted soil in the sand between 30 and 40 feet. Approximately 15 feet outside the former island location "clean" soil was described from grade level to approximate total depths of 45 to 53 feet BGL.

The holes were drilled at an average 5 feet beneath the last detected contamination (PID, and odor). Upon completion of the large diameter auger borings the holes were backfilled with float rock and a sand cement slurry up to 11 feet BGL followed by fill dirt to grade. Figures indicating large diameter auger boring locations, are included In Appendix B, laboratory reports and chain-of-custody documents are included in Appendix C.

The excavated soil was continuously screened and segregated into three separate spoils piles. The northeastern pile was for soil that exhibited less than 25 ppm TPH when screened with the PID. The southwestern pile was for borderline soil that exhibited less than 200 ppm TPH and the north center pile (about 200 yards) was for soil that exhibited greater than 200 ppm TPH. The "clean" soil was used to backfill the borings and it is the intent to treat the other two piles, then use all soil as fill for other construction projects in Santa Barbara,

Currently, AEC is aerating the soil that exhibited over 200 ppm TPH. The aeration process consisted of spreading the soli to a thickness of approximately 1 to 2 feet then turning the soil until the hydrocarbon concentration reach acceptable concentrations. AEC collected confirmation samples from the spoils pile on November 15. 1994. The results of this November sampling are presented in Table 3 and exhibited concentrations exceeding the recommended action levels.

On November 23,1994 AEC re-sampled soil from the spoils pile under the supervision of Ms. Kate Sulka. Sampling results are presented in Table 4 and exhibited acceptable TPH and BTXE concentrations. Subsequently, the soil has been transported by Santa Barbara Sand and Top Soil to their Class III landfill.

AEC wants to again apply for site closure based on the environmental services conducted at the site. The recent augering program has successfully removed approximately 600 cubic yards of gasoline laden soil from beneath the former tank and dispenser locations. The majority of the gasoline impacted soil was identified between 30 to 45 feet BGL and confined between a relatively continuous upper clay zone extending from 12 feet to 33 feet BGL and silty clay interbeds from 43 to 65 feet BGL. Any remaining residual gasoline is separated from first groundwater by approximately 30 feet. and has a clay cap over it. Additionally, the planned construction of the Econo Lube-N-Tune indicates that the entire portion of the former tank emplacement will be paved, and the island location will become a cement lined lube pit thus limiting the potential for the percolation of meteoric waters and subsequently displacing hydrocarbon downward.

The Case Closure letter (January 9, 1995) confirmed no further action, as excerpted:

This letter confirms the completion of site investigation and remedial action for the underground storage tank(s) at the above site. Thank you for your cooperation throughout this investigation. With the provision that the information provided to this agency was accurate and representative of site conditions, no further action related to the underground tank release is required based on the available information as set forth in California Code of Regulations, Title 23, Division 3, Chapter 16, Article 11, Section 2721(e) (Underground Storage Tank Corrective Action Regulations).

MEIN000556



5.2.2    State Water Resources Control Board (cont)

**Subject Site: Exxon Rabadi (3956 State Street)**

In summary, the former Exxon (Hondo Oil) service station operated from 1965 through about 1991, and included a service station building with three service bays, two dispenser islands under a separate canopy, three 8,000-gallon fuel USTs (regular, unleaded, premium), and 500-gallon waste oil UST.   Leak-testing in 1988 indicted leakage in vapor-recovery piping, and gasoline-impacted soil confirmed in 1989.  Investigation was conducted in 1991-1993 (five soil borings, six vapor-extraction wells, one groundwater monitoring well), and UST removal in 1991 confirmed gasoline-impacted soil at south end of fuel UST excavation, and at waste-oil UST. Remediation included excavation and disposal of waste-oil impacted soil in 1991 (to 15 feet bgs), vapor extraction of gasoline-impacted soil (10 months, February - December 1993), and additional excavation of gasoline-impacted soil by large-diameter bucket auger to depths of 58 feet bgs.  Bucket-auger removal included 29 borings in the former UST pit (soil aerated onsite, then transported to Class III landfill), and 27 borings at the former northern dispenser island (transported to Class III landfill), for a total of about 600 cubic yards.  Case closure was granted by Santa Barbara County Environmental Health Services Division (EHS) on January 9, 1995.

In TRAK's opinion, the site's history as LUST Cleanup Site, with case closure in 1995, constitutes evidence of a *Historical Recognized Environmental Condition* (HREC) in connection with the subject *property*.

**East-Adjoining Site: Bridgestone Firestone (3948 State Street)**

Cleanup Status: Completed – Case Closed as of 12/17/1993.
Oversight Agency: Santa Barbara County LOP
Case: #521431
Potential Contaminants of Concern: Waste oil / Motor / Hydraulic / Lubricating
Potential Media of Concern: Soil

The Case Closure letter (December 17, 1993) confirmed no further action, as excerpted:

This letter confirms the completion of site investigation and remedial action at the above site. With the provision that the information provided to this agency was accurate and representative of existing conditions, it is our position that no further action is required at this time.

Please be advised that this letter does not relieve you of any liability under the California Health and Safety Code or Water Code for past, present, or future conditions at the site. Nor does it relieve you of the responsibility to clean up existing, additional, or previously unidentified conditions at the site which cause or threaten to cause pollution or nuisance or otherwise pose a threat to water quality or public health.

Additionally, be advised that changes in the present or proposed use of the site may require further site characterization and mitigation activity. It is the property owner's responsibility to notify this agency of any changes in report content, future contamination findings, or site usage.

30

MEIN000557

TRAK

5.2.3    Santa Barbara County Air Pollution Control District

The Santa Barbara County Air Pollution Control District (SBCAPCD) Permitted Facilities Map database, which includes all the facilities permitted and regulated by SBCAPCD, was accessed to ascertain if subject site is listed as Permitted Facility.  Review of the Permitted Facilities Map verifies the subject site is not listed as any type of SBCAPCD Permitted Facility.

5.2.4    Santa Barbara County Environmental Health Services

TRAK conducted Public Records Request, for Santa Barbara County Public Health Department Environmental Health Services (EHS), formerly known as Santa Barbara County Fire Department Fire Prevention Division (FPD), for information regarding CUPA, Business Plan, Hazardous Waste, UST, LUFT, SMU files in reference to subject property. Response on July 29, 2022 verified Santa Barbara County records for 3956 State Street (primarily for period 2014-2021), and file copies provided, as summarized in table 5-2.

**TABLE 5-2**
**COUNTY OF SANTA BARBARA CUPA RECORDS**

| 3956 State Street | | | |
|---|---|---|---|
| **Date** | **Reference** | **CERS ID** | **Type of Permit and Use** |
| 11/24/21 | 3956 State St. | | HMBP HWG APSA NOV: 1) determine if waste generated is HW, 2) label containers/portable tanks, 3) HW containers closed except when add/remove, 4) inspect HW containers weekly, 5) label universal waste, 6) maintain aisle space, 7) SPCC, 8) SPCC briefings, 9) tanks not inspected/tested. |
| 11/22/21 | 3956 State St. | 102100483 | HWG Follow-up Inspection, NOV: failure to determine waste is HW, label containers/portable tanks, close HW containers except when add / remove, inspect HW containers weekly, maintain aisle space, clearance, label universal waste. |
| 11/22/21 | 3956 State St. | 102100483 | HMBP Follow-up Inspection, NOV: failure to certify/submit BP. Submit to CERS. |
| 11/22/21 | 3956 State St. | 102100483 | APSA Follow-up Inspection, NOV: failure to prepare SPCC, spill briefings not conducted annually, tanks not inspected/tested. |
| 9/30/21 | 3956 State St. | FA0013993 | Facility non-RCRA LQG change. |
| 9/29/21 | 3956 State St. | 102100483 | HWG Inspection, NOV: failure to determine if waste generated is HW, label containers/portable tanks, close HW containers except when add/remove, inspect HW containers weekly, maintain aisle space, clearance, label universal waste. |
| 9/29/21 | 3956 State St. | 102100483 | HMBP Inspection, NOV: failure to certify/submit BP. Submit to CERS. |
| 9/29/21 | 3956 State St. | 102100483 | ASPA Inspection, NOV: failure to prepare SPCC, spill briefings not conducted annually, tanks not inspected/tested. |

31

MEIN000558

TRAK

**Table 5-2 (cont)**

| \multicolumn{4}{c}{3956 State Street} | | | |
| Date | Reference | CERS ID | Type of Permit and Use |
|------|-----------|---------|------------------------|
| 12/23/18 | 3956 State St. | | AST and Components Visual Inspection for conformance w/ STI; inspect 1 used oil AST, 1 used antifreeze AST, appurtenances, ancillary equipment. ASTs in service pit. Serviceable and good condition. |
| 9/5/18 | 3956 State St. | | NOV: submit annual BP, employee raining, update BP w/in 30 days, HW accumulate longer 90 days, design of HW storage tank, SPCC, briefings, written records/procedures. |
| 9/4/18 | 3956 State St. | | CUPA re-inspection; open violations: annual BP, HW inventory, employee training, SPCC, briefings. |
| 7/25/18 | 3956 State St. | | Haz Waste Generator Inspection; manifests not retained. Determination facility LQG. |
| 7/25/18 | 3956 State St. | | AST inspection; notes: SPCC countermeasures for discharge, SPCC re total quantity potential discharge briefings. |
| 7/25/18 | 3956 State St. | | BP inspection; notes: submit annual BP, update BP, employee training. |
| 8/2/16 | 3956 State St. | | NOV: sign/return notice, correct BP, unclosed HW containers, manifests not retained, SPCC, no written cleanup procedures, inspection documentation. |
| 7/7/16 | 3956 State St. | | BP/AST inspection; notes: annual plan inventory, post CUPA permit, employee training, containers closed, empty containers, satellite accumulation HW containers, manifest retain, HW tanks inspect daily. |
| 1/14/16 | 3956 State St. | | BP/AST Inspection; ASTs include 2 x 400-g (oil), 1 x 200-g (oil), 1 x 250-g (ATF), 1 x 440 (waste oil). Prepare/implement SPCC. |
| 10/17/14 | 3956 State St. | | BP Inspection; waste antifreeze (85g) appears leak. Waste oil (440g) container open, no top oil filter drums (2), waste absorbent containers. |

The most recent CUPA Notice of Violations was issued November 24, 2021, with violations regarding Hazardous Waste (HWG), Aboveground Petroleum Storage Act (ASPA), and Hazardous Materials Business Plan (HMBP), as summarized:

1) Determine if waste generated is HW (fine metal powder from brake rotor work).
2) Label all containers or portable tanks containing HW.
3) Containers of HW closed except when adding or removing waste.
4) Inspect all HW storage areas at least weekly.
5) UWH label all universal waste (fluorescent bulbs).
6) Maintain adequate aisle space, to allow unobstructed movement of personnel, fire-protection equipment, spill-control/decontamination. Apply general housekeeping to HW accumulation (crush/consolidate used oil filters, waste oil from 5-gallon containers to drums/tanks).
7) Prepare an implement Spill Prevention Control and Counter Measures (SPCC) Plan.
8) Conduct annual SPCC briefings.
9) Tanks not inspected/tested by qualified person in accordance with industry standards.

32

MEIN000559



5.2.5   Santa Barbara County Assessor

TRAK accessed the Santa Barbara County Assessor records.  The property is comprised of one parcel, and information is summarized, by Assessor Parcel Number (APN):

| APN | Address | Size (acres) | Use |
|-----|---------|--------------|-----|
| APN 057-233-018 | 3956 State St. | 0.46 | Service Stations |

An APN map is included in Appendix B.

5.2.6   City of Santa Barbara Community Development Department

TRAK accessed the City of Santa Barbara Community Development Department (SBCDD) electronic file system for information regarding zoning, historical planning and building records. Site is zoned C-G/USS (Commercial General / Upper State Street Area). Records were reviewed for subject site address of 3956 State Street.  SBCDD records are summarized in Table 5-3.

**TABLE 5-3**
**CITY OF SANTA BARBARA PLANNING AND BUILDING RECORDS**

| 3956 State Street | | | |
|---|---|---|---|
| **Date** | **Reference** | **Permit** | **Type of Permit and Use** |
| 10/29/09 | 3956 State St | ENF2008-00414 | Violation; landscaping installed per approved plan. Case closed. |
| 2/24/09 | 3956 State St | ENF2008-00414 | Citation; banners, flags. All to be removed. |
| 2/19/09 | 3956 State St | BLD2009-00440 | C/OTC-SIGN; 3 (n) signs. Meineke Car Care Center, Econo Lube. |
| 2/12/09 | 3956 State St | BLD2009-00364 | C/OTC-SITE WORK; landscaping, remove 2 trees, abate ENF2008-00414. |
| 1/8/09 | 3956 State St | MST2009-00012 | C-LANDSCAPE; re-landscaping (e) commercial lot. |
| 10/2/08 | 3956 State St | BLD2008-02286 | C/OTC-DEMO; demo (e) substandard trellis (260 SF) between buildings. |
| 9/24/08 | 3956 State St | ENF2008-00414 | Violation; change to approved landscape plan w/o approval, damaged ground sign. |
| 5/26/06 | 3956 State St | ENF2006-00347 | Zoning; mobile sign. |
| 6/24/04 | 3956 State St | | Violation; dumping used mop water in storm drain. |
| 11/11/99 | 3956 State St | ENF1999-00603 | Zoning; banners. Abated 3/30/00. |
| 9/28/98 | 3956 State St | ENF98-0529 | Zoning; banners. Abated 9/28/98. |
| 6/15/95 | 3956 State St | | Zoning violation resolved; banners. |
| 5/9/95 | 3956 State St | | Occupancy Clearance; Econo Lube N'Tune. |
| 5/8/95 | 3956 State St | | Occupancy Clearance; new building (B2) |

33

MEIN000560



Table 5-3 (cont)

| 3956 State Street | | | |
|---|---|---|---|
| **Date** | **Reference** | **Permit** | **Type of Permit and Use** |
| 2/23/95 | 3956 State St | BLD94-2493 | SIGN; illuminated wall signs (2), ground sign. Econo Lube N' Tune. |
| 2/16/95 | 3956 State St | | Keystone retaining wall installed, soil compacted. |
| 11/4/94 | 3956 State St | | Soil Compaction Test; Removed Tanks Backfill. |
| 10/6/94 | 3956 State St | BLD94-2220 | C-TEMP POWER; Temp power 120/240, 100A. |
| 10/5/94 | 3956 State St | BLD94-2207 | SIGN; temporary ground sign (original #2626). |
| 9/21/94 | 3956 State St | BLD93-2358 | C-NEW COMM BLDG; Demo (e) service station bldg., removal (e) gasoline dispensing. Final 5/1/95. |
| 11/1/93 | 3956 State St | BLD93-2626 | Sign; temporary ground, Econo Lube N'Tune. |
| 9/1/93 | 3956 State St | ENV93-0083 | ABR; Planning Staff recommend project approval. |
| 8/6/93 | 3956 State St | ENV93-0083 | CEQA Negative Declaration. Initial Study. Project involves demolition of vacant 3-bay auto service building (1643 SF), and construction of two auto service buildings; one with 3 bays for lube facility (1509 SF), and one with 3 bays for auto repair (1736 SF), for total 3136 SF. |
| 8/3/92 | 3956 State St | MST92-0661 | Master Application; Demo (e) service station building, removal (e) canopy/dispensing equipment, replaced w/ (n) 3-bay auto service, w/ interior lube pit, 1457 SF (n) & 1736 SF 3-bay drive-in building. |
| 6/25/92 | 3956 State St | | Zoning violation resolved; dilapidated station, people camping in structure. |
| 3/31/92 | 3956 State St | | Lube N' Tune letter; plan to use (e) station building (1642 SF) for tune-ups, smog certification, brake / cooling system service, remove canopy (1170 SF), replace w/ (n) building (1000 SF) for lube, oil, filter changes (bays 4, 5), and tune-ups (bay 6). Site map shows (e) building w/ 2 (e) hoists (bays 2, 3), and (n) hoist (bay 1). |
| 7/2/91 | 3956 State St | 02-05181 | Permit, other; Tank Removal.   Remove fuel underground tank |
| 5/7/87 | 3956 State St | | Zoning;   illegal silk-flower stand,   wash/wax business. Abated 5/22/87. |
| 4/24/84 | 3956 State St | 1366 00 1 | Master Application; signs. |
| 3/19/84 | 3956 State St | | Zoning; mini-mart without CUP. |
| 10/24/83 | 3956 State St | | Zoning; unpermitted ground sign, pole, portable. |
| 2/19/82 | 3956 State St | | Sign Committee; ground sign, Exxon. |
| 2/5/80 | 3956 State St | 1221 00 1 | Plumbing; replace underground gasoline piping. |
| 1/18/74 | 3956 State St | 46671-1 | Electrical; motor, one pump only. Exxon |
| 11/9/72 | 3956 State St | 42435-5 | Sign; Exxon pole sign. |
| 3/19/71 | 3956 State St | 36168 | Electrical; outlets, fixtures. |

34

MEIN000561



**Table 5-3 (cont)**

| | 3956 State Street | | |
|---|---|---|---|
| **Date** | **Reference** | **Permit** | **Type of Permit and Use** |
| 10/15/70 | 3956 State St | 34561 | Building; addition (365 SF) service station. Humble. |
| 5/27/67 | 3956 State St | | Building letter re: signs. |
| 4/6/66 | 3956 State St | 17321 | Plumbing; vacuum breakers. Humble Oil. |
| 3/22/66 | 3956 State St | | Pacific Materials; soil compaction tests, fill material. |
| 3/2/66 | 3956 State St | 16873 | Electrical; outlets, recept, fixtures, motors. |
| 2/23/66 | 3956 State St | 16766 | Plumbing; lav, WC, urinal, drinking fountain, sump. |
| 2/9/66 | 3956 State St | | ABR; approve landscape plans. |
| 12/7/65 | 3956 State St | 15903 | Earth Moving; 3300 CY hauled in. |
| 11/29/65 | 3956 State St | 15706 | Building, renewed; service station (1370 SF) metal. 2 buildings on lot to be removed. Final 5/26/66. |
| 9/2/65 | 3956 State St | 146820 | Electrical; signs. |
| 9/2/65 | 3956 State St | 14681-1 | Sign; double face ID, Humble Oil Co. |
| 6/21/65 | 3956 State St | 565E760 | Encroachment Permit; driveways, sidewalks, planters at intersection State/Calle Real. |
| 5/25/65 | 3956 State St | | ABR; approve prelim plans service station. |
| 5/24/65 | 3956 State St | 14233 | Building; new service station (1370 SF) metal. 2 buildings on lot to be removed. Victor Sourmany. |
| 5/19/65 | 3956 State St | | Preliminary Plan Check; Humble Oil service station. |
| 11/29/60 | 3956 State St | | Application for Subdivision; 2 lots 110 x 200 each. Approved 12/14/60. |
| 3/31/50 | 3956 State St | X148 | Build bedroom on east side of present house. |
| 6/26/47 | 3956 State St | X34 | Residence at 4010 Hollister Ave., replace porch (10' x 16'), and room over the porch.  Sketch map shows residence set back 100' from Hollister Ave. |

A summary of the site activities documented by SBCDD files includes, by date:

| | |
|---|---|
| 1947: | Existing residence; replace porch and room (4010 Hollister Ave.). |
| 1950: | Residence; add bedroom. |
| 1960: | Lot split. |
| 1965: | Plans, new service station (Humble Oil), demo 2 buildings, earthwork. |
| 1966: | New service station (1370 SF); plumbing, electrical. |
| 1970: | Addition (365 SF) service station, Humble Oil. |
| 1980: | Replace underground gasoline piping, Exxon. |
| 1983-87: | Zoning violations; signs, mini-mart, flower stand, wash/wax business. |
| 1991: | Permit for underground fuel tank removal. |
| 1992: | Zoning violation; dilapidated station building. |
| 1992-93: | Plans; demo (e) building, replace w/ 3-bay lube (1457 SF), 3-bay service (1736 SF). |
| 1994-95: | Permit, demo (e), construct (n) 3-bay lube, 3-bay service.  Econo Lube N' Tune. |
| 1998-99: | Violations; banners, signs. |
| 2004: | Violation; dumping mop water to storm drain. |
| 2008-09: | Violations; unapproved landscape changes, signs.  New landscape, case abated. |

35

MEIN000562



5.2.7    City of Santa Barbara Fire Department

TRAK contacted Santa Barbara City Fire Department (SBFD) for files in reference to the subject
property.  Response from Carol Lupo verified archived files for site address, and provided file
copies, which are included in Appendix B, and summarized in Table 5-4.

**TABLE 5-4**
**CITY OF SANTA BARBARA FIRE DEPARTMENT RECORDS**

| 3956 State Street | | | |
|---|---|---|---|
| **Date** | **Reference** | **Notice** | **Type of Permit and Use** |
| 10/14/10 | Econo LubeN'Tune | | BP/Fire inspection; no violations. |
| 10/14/10 | Econo LubeN'Tune | #2176 | BP Inventory, new handler: acetylene (max 55cf), carbon dioxide/argon (max 125cf), motor oil (max 600g), oxygen (max 125cf), transmission oil (max 150g), waste antifreeze (max 25g), waste oil (max 440g).  Maps. |
| 8/25/04 | Econo LubeN'Tune | FA0012505 | BP Inventory; antifreeze (100g), ATF (120g), motor oil (720g), waste antifreeze (100g), waste motor oil (400g). |
| 6/28/04 | Econo LubeN'Tune | FA0012505 | 2004 Annual BP Certification |
| 3/26/04 | Econo LubeN'Tune | | BP/Fire inspection; FE needs servicing. |
| 10/19/00 | Econo LubeN'Tune | | Business Plan/Fire inspection; no fire code violations. |
| 4/-/98 | Econo LubeN'Tune | | Haz Mat Map; shows layout of buildings, and drain sump on north side of fence, in vacant land (approximate area of terrace). |
| 3/11/97 | Econo LubeN'Tune | 1216 | Complaint; drain overflow to north hillside. Stop flow to drain, pump as needed. Refer SB City Planning. |
| 10/2/96 | Econo LubeN'Tune | | Hazmat Inventory; ethylene glycol (100g), waste oil (480g), ATF (120g), motor oil (720g). |
| 6/26/96 | Econo LubeN'Tune | | New business; BP forms received. |
| 6/20/95 | Econo LubeN'Tune | | New business; BP forms received. |
| 5/8/95 | Econo Lube | | Occupancy Clearance; new building (B2). |
| 4/15/93 | Econo LubeN'Tune | | Letter for Development Plan Approval: remove (e) station building (1636 SF) replace with (n) 3-bay auto service building (1736 SF);  remove (e) canopy, 2 pump islands, replace w/ 3-bay auto service building (1509 SF) w/ lube pit (oil changes). |
| 8/10/92 | Sourmany | MST92-0661 | Master Application: remove (e) canopy, replace w/ 3-bay auto service building, lube pit; alterations to (e) station building. |

The SBFD database search did not indicate any current compliance issues or violations, nor
evidence of any recognized environmental conditions in connection to the site.

36

MEIN000563



5.3     EVALUATION FOR POTENTIAL OF VAPOR ENCROACHMENT

To augment the Phase I ESA, a preliminary screening evaluation for potential for vapor
encroachment was conducted, based on guidelines of ASTM Standard Guide E 2600-10,
"Standard Guide for Vapor Encroachment Screening on Property Involved in Real Estate
Transactions".  As stated in E 2600-10, "This guide may be used in conjunction with Practice
E1527 but does not alter or in any way define the scope of that practice. In addition,
performance of this guide is not a requirement of and does not constitute, expand, or in any way
define 'all appropriate inquiry' as defined and approved by the U.S. Environmental Protection
Agency (EPA) under the Comprehensive Environmental Response, Compensation, and Liability
Act (CERCLA) and the regulations there under, including 40 CFR Sec. 312.11."

5.3.1   Vapor Encroachment Overview

ASTM Standard Guide E 2600-10 provides guidelines for conducting a *vapor encroachment
screen (VES)* on a property with respect to *chemicals of concern (COC)* that may migrate as
vapors onto a property as a result of contaminated soil and groundwater on or near the
property. The goal of conducting a *VES* is to identify a *vapor encroachment condition (VEC)*,
which is the presence or likely presence of COC vapors in the sub-surface of the *target property
(TP)* caused by the release of vapors from contaminated soil or groundwater either on or near
the *TP* as identified by Tier 1 or Tier 2 procedures.

A Tier 1 screen typically evaluates *Phase I ESA*-type information for properties within an *area of
concern (AOC)*, identified as the distance from *TP* to a *contaminated property* with known or
suspect *COC* contamination of soil or groundwater or both; for petroleum hydrocarbon *COCs*,
the *AOC* search distance is 1/10 mile (for other *COCs*, 1/3 mile).  The possible conclusion from
a Tier 1 screening is *(1)* a *VEC* exists, *(2)* a *VEC* likely exists; *(3)* a *VEC* cannot be ruled out; or
*(4)* a *VEC* can be ruled out because a *VEC* does not or is not likely to exist.

A Tier 2 evaluation is indicated if a *VEC* cannot be ruled out by the Tier 1 screen, and uses
numeric screening criteria to existing or newly collected soil, soil gas, and/or groundwater
testing results to evaluate whether or not a *VEC* can be ruled out. The Tier 2 screen has two
data collection components: non-invasive and invasive.  Non-invasive evaluation is a review of
accessible information (regulatory agency files or other available documents) for a *contaminated
property*, to determine the status of remediation, the size of the *contaminated plume* and its
behavior, the specific *COC* and respective concentrations, and whether the *TP* is within the
*critical distance* of the *contaminated plume.* The *critical distance* represents an estimate of the
lineal distance *COC* vapors volatilized from contaminated groundwater or contaminated soil
might migrate in the vadose zone to the *TP*.  The *critical distance* is the lineal distance in any
direction between the nearest edge of the *contaminated plume* and the nearest *TP* boundary,
and is equal to 30 feet for dissolved petroleum hydrocarbon *COC* (100 feet for other *COC*).

37

MEIN000564

**TRAK**

If the plume test identifies that the *TP* boundary is within the *critical distance* from the nearest edge of the *contaminated plume*, then the *environmental professional* should, through investigation and analysis of data and information compiled as part of the screening evaluation, determine if a *VEC* exists at the *TP*.  If the plume test identifies the distance between the nearest edge of the *contaminated plume* and the nearest *TP* boundary as equal to or greater than the *critical distance*, then the *environmental professional* may conclude that migrating vapor from the edge of the groundwater *contaminated plume* is not likely to reach the subsurface of the *TP*.  The possible conclusion from a Tier 2 screening is: *(1)* a *VEC* exists, *(2)* a *VEC* likely exists, *(3)* a *VEC* cannot be ruled out, or *(4)* a *VEC* can be ruled out because a does not or is not likely to exist at the *TP*.

5.3.2   Vapor Encroachment Evaluation

The Tier 1 evaluation indicates that a vapor encroachment condition (VEC) can be ruled out because a *VEC* does not or is not likely to exist.

38

MEIN000565



# 6      SITE HISTORY

The history of the site was researched to identify obvious uses of the site parcel dating back to the first developed use or 40 years ago, whichever is earlier.

## 6.1    HISTORICAL AERIAL PHOTOGRAPHS

A review of historical aerial photography may indicate past activities at a site that may not be documented by other means, or observed during a site visit. Effectiveness of the technique depends on scale and quality of the photographs and available coverage.  Aerial photographs were obtained through EDR from several historical photograph collections.  A tabulation of the aerial photographs reviewed is shown in Table 6-1.  Copies are included in Appendix B.

**TABLE 6-1**
**LISTING OF HISTORICAL AERIAL PHOTOGRAPHS REVIEWED**

| Date | Scale | Source |
|------|-------|--------|
| 1928 | 1" = 500' | FAIR |
| 1938 | 1" = 500' | FAIR |
| 1943 | 1" = 500' | USDA |
| 1947 | 1" = 500' | USGS |
| 1954 | 1" = 500' | USDA |
| 1967 | 1" = 500' | USGS |
| 1975 | 1" = 500' | USGS |
| 1984 | 1" = 500' | USDA |
| 2005 | 1" = 500' | USDA/NAIP |
| 2009 | 1" = 500' | USDA/NAIP |
| 2012 | 1" = 500' | USDA/NAIP |
| 2016 | 1" = 500' | USDA/NAIP |

**Note:** Aerial photographs provide information on indications of land use and no conclusions regarding release of hazardous substances or petroleum products can be drawn from photograph review alone.

**Project Site**

Land uses are described for each of the historical periods documented by the aerial photographs, as summarized:

<u>1928</u>   The subject site is the southern portion of a linear, rural residential parcel on the north side of Hollister Avenue (State Street). On this lot is a residence that faces the Hollister Avenue frontage, with walkway on south side that leads to the roadway.  On west side of residence is garage structure, with dirt drive along the west parcel boundary that connects to Hollister Avenue.  The rear of the lot is planted with a small orchard.

39

MEIN000566

TRAK

1938   Subject site land use generally similar to that shown in 1928 aerial photograph, with residence that faces Hollister Avenue (State Street) frontage, garage on west side of residence, another structure (possible shop or barn) at rear of residence, small orchard and open land on north side of structures. On the south is Hollister Avenue (State Street), which extends from the intersection of La Cumbre Road (east of site) to a junction with U.S. Highway 101 (west of site), which has been developed along a northwest-southeast alignment south of the site.

1943   Subject site land use generally similar to that shown in 1938 aerial photograph.

1947   Subject site land use generally similar to that shown in 1943 aerial photograph. On south side of site is State Street (former Hollister Avenue) that continues westerly to a redeveloped junction with U.S. Highway 101. At this junction, U.S. Highway 101 is redeveloped as a divided highway, with two lanes in each direction, separated by a median strip. State Street crosses this divided highway and continues westerly in a slightly bowed alignment to connect with a two-lane frontage road (State Street) along the south side of U.S. Highway 101.  At the highway junction, a short segment branches off State Street as a transition to westbound U.S. Highway 101.

1954   Subject site land use generally similar to that shown in 1947 aerial photograph.

1967   Subject site is redeveloped in comparison to that shown in 1954 aerial photograph. The southern part of the parcel (level portion) is redeveloped with service station (Exxon), including a rectangular canopy (over the pump islands) oriented north-south in the center of the lot at State Street frontage, and separate service-station building (oriented east-west) on north side of level portion of lot.  Drive entries to the station are on the south (State Street) and southwest (Calle Real), and paved drive/parking areas on the west and east sides of the service station.  North of the service station building is open land on north-facing slope.

1975   Subject site land use is relatively similar to that shown in 1967 aerial photograph.

1984   Subject site land use is relatively similar to that shown in 1975 aerial photograph.

2005   Subject site land use is redeveloped in comparison to that shown in 2002 aerial photograph.  The former service station pump-island canopy in southern portion of lot is removed, and the currently-present lube/service building constructed in the same general area.  On the north side of lube/service building is former service station building redeveloped to auto service/repair use.

2009   Subject site land use is relatively similar to that shown in 2005 aerial photograph

2012   Subject site land use is relatively similar to that shown in 2009 aerial photograph.

40

MEIN000567



2016   Subject site land use is relatively similar to that shown in 2012 aerial photograph.

**Surrounding Area**

1928   The subject site is the southern portion of a linear, rural residential parcel on the north side of Hollister Avenue (State Street), with residence that faces the Hollister Avenue frontage, garage on west side of residence, and small orchard on north side of structures.  Further north on this parcel is open agricultural land, crossed by a small drainage course, and beyond is large parcel of open agricultural land.  East-adjoining is linear, rural residential parcel with ranchstead in southern portion, small orchard in central area, and open land in the north; further east are rural residential parcels, with scattered structures, small orchards, and open land, and further beyond is N. La Cumbre Road.  West-adjoining is linear, rural residential parcel with small structure in southern portion, small orchard at rear, and shed structures located adjacent to the drainage course, and open land in the north; further west are rural residential parcels, with scattered structures and open land, and further beyond is San Marcos Pass Road (Highway 154).  To the south is Hollister Avenue, and beyond is large parcel in agricultural land use, including open land, and orchard, which extends south to the to the Southern Pacific Railroad tracks.

1938   Surrounding land uses are additionally developed in comparison to that shown in 1928 aerial photograph.  On the south is Hollister Avenue, which extends from the intersection of La Cumbre Road (east of site) to a junction with U.S. Highway 101 (west of site).  West of this junction, U.S. Highway 101 continues westerly as a widened two-lane highway portion of Hollister Avenue; south-southeast of this junction, U.S. Highway 101 follows a northwest-southeast alignment, crossing the large agricultural parcel south of Hollister Avenue, and thence continuing along the north side of the SPRR tracks.

1943   Surrounding land use is generally similar to that shown in the 1938 aerial photograph.

1947   West and south of the site, U.S. Highway 101 is redeveloped as a divided highway, with two lanes in each direction, separated by a median strip.  West of the site is redeveloped junction of State Street with U.S. Highway 101. At this junction, State Street crosses the divided highway and continues westerly in a slightly bowed alignment to connect with a two-lane frontage road (State Street) along the south side of U.S. Highway 101.  At the highway junction, a short segment branches off State Street as a transition to westbound U.S. Highway 101. Surrounding land use north and east of the site is generally similar to that shown in the 1943 aerial photograph.

1954   Surrounding land use is generally similar to that shown in the 1947 aerial photograph, with additional redevelopment to the west.

41

MEIN000568



<u>1967</u>    Significant redevelopment has occurred in the surrounding areas in comparison to the 1954 photograph.  To the west and south, U.S. Highway 101 is redeveloped as a divided freeway, with two lanes in each direction, separated by a median strip, and no at-grade crossings.  To the south, State Street is widened, and at southwest corner of subject site is redeveloped intersection of State Street and Calle Real. The northbound offramp from U.S. Highway 101 exits at this intersection, with continuation across State Street to Calle Real, which continues northwesterly to junction with San Marcos Pass Road (Highway 154).  West of the intersection, State Street continues westerly over an overpass of U.S. Highway 101 to connect with State Street segment on south side of the freeway.

Areas to the south, east, north, and west are all significantly redeveloped in comparison to the 1954 photograph.  To the south, across widened State Street, is Five Points Shopping Center, and to southeast is realigned S. La Cumbre Road that borders the west side of La Cumbre Plaza.  To the east of site is commercial redevelopment on the west side of N. La Cumbre Road.  North-adjoining is redeveloped with three, two-story apartment buildings, and further north is Via Lucero, a roadway that connects from N. La Cumbre Road (east) to Wye Road (west).  On north side of Via Lucero are apartment buildings, and further north is residential development.  To west, on north side of Calle Real, is open land, and to northwest, on south side of Via Lucero, is apartment building.

<u>1975</u>    Surrounding land use is generally similar to that shown in the 1967 aerial photograph, with additional redevelopment in the area. East-adjoining is linear lot, and further east is redeveloped with commercial, including McDonalds Restaurant, parking lots, and commercial buildings easterly to the corner of N. La Cumbre Road.  To north, commercial redevelopment is generally built-out along both sides of Via Lucero.  To northwest, on north side of Calle Real is redeveloped with multi-family project (Hope Ranch Apartments).

<u>1984</u>    Surrounding land use is generally similar to that shown in the 1975 aerial photograph, with additional redevelopment in the area. East-adjoining parcel is redeveloped with commercial, including auto service (Firestone Complete Auto Care at 3948 State Street) on lot facing State Street, and professional building (including Bartlein & Company at 3944 State Street) on lot facing Via Lucero.

<u>2005</u>    Surrounding area land use is generally similar to that shown in 2002 aerial photograph, with additional redevelopment in the area.  To the northwest, west of Wye Road, former trailer park is redeveloped with the El Patio Gardens community, including extension of Via Lucero.

42

MEIN000569



<u>2009</u>   Surrounding area land use is generally similar to that shown in 2005 aerial photograph. with additional redevelopment in the area.  West-adjoining the northern portion of site is redeveloped lot with residential condominium structures, southerly-adjoining the apartment complex on south side of Via Lucero.

<u>2012</u>   Surrounding area land use is generally similar to that shown in 2009 aerial photograph.

<u>2016</u>   Surrounding area land use is generally similar to that shown in 2012 aerial photograph.

No recognizable environmental concerns were noted on the site parcel based on the historical aerial photograph review.

6.2    HISTORICAL TOPOGRAPHIC MAPS

Historical topographical maps covering the site were obtained for the years 1950, 1951, 1967, 1982, 1988, 1995, 2012, 2015, and 2018.  USGS historical topographic maps were purchased through EDR.  The topographic maps reviewed for this assessment are described below. Copies of selected topographic maps are included in the Appendix.

**TABLE 6-2**
**LISTING OF HISTORICAL TOPOGRAPHIC MAPS REVIEWED**

| Year | Quadrangle | Series | Scale |
|------|------------|--------|-------|
| 1950 | Goleta, CA | 7.5 minute | 1:24,000 |
| 1951 | Goleta, CA | 7.5 minute | 1:24,000 |
| 1967 | Goleta, CA | 7.5 minute | 1:24,000 |
| 1982 | Goleta, CA | 7.5 minute | 1:24,000 |
| 1988 | Goleta, CA | 7.5 minute | 1:24,000 |
| 1995 | Goleta, CA | 7.5 minute | 1:24,000 |
| 2012 | Goleta, CA | 7.5 minute | 1:24,000 |
| 2015 | Goleta, CA | 7.5 minute | 1:24,000 |
| 2018 | Goleta, CA | 7.5 minute | 1:24,000 |

**Project Site and Surrounding Area**

The 1950 and 1951 topographic maps show the subject site on north side of State Street, between a junction with U.S. Highway 101 (west of site) and N. La Cumbre Road (east of site). One structure is shown on the site, at State Street frontage, and structures are shown on west- and east-adjoining parcels. To the west, west of junction, U.S. Highway 101 is shown as 4-lane highway.  To the south and southeast, U.S. Highway 101 curves southeasterly (3-lane) towards the main part of Santa Barbara.  State Street is shown to cross the highway, and continue west along the south side of the highway.

43

MEIN000570



The 1967 topographic map shows U.S. Highway 101 as a divided freeway, with on- and off-ramps at State Street and Highway 154 (to northwest), and overpass for State Street.   The subject site and surrounding area is shown with the urban overlay depiction for developed areas on 1967, 1982, 1988, and 1995 topographic maps.   The 2012, 2015, and 2018 topographic maps shows the street layout and significant cultural features.   The southern, level portion of the site is at an approximate elevation of 200 feet above sea level, and northern portion, beyond break-in-slope, slopes down northerly to approximate elevation of 180 feet.   Topographic gradient is to the north-northwest.

No recognizable environmental concerns were noted on or adjoining the subject site based on the historical topographical map review.

6.3     HISTORICAL SANBORN MAPS

A Certified Sanborn® Map Report was ordered from EDR.  As reported by EDR, the subject site area is an unmapped property.

6.4     HISTORICAL CITY DIRECTORY

Site addresses were researched in Cole Information Services, Haines & Company Inc., GTE California, Polk, R.L. Polk & Co., Santa Barbara Directory Company directories, as summarized.

**TABLE 6-3**
**SUMMARY OF CITY DIRECTORY LISTINGS**

| 3956 State Street | | |
|---|---|---|
| **Address** | **Date** | **Occupant** |
| 3956 State Street | 2017 | ECONO LUBE N TUNE<br>MEINEKE CAR CARE CENTER |
| 3956 State Street | 2014 | ECONO LUBE N TUNE<br>MEINEKE CAR CARE CENTER |
| 3956 State Street | 2004 | ECONO LUBE & TUNE |
| 3956 State Street | 2002 | ECONO LUBE & TUNE |
| 3956 State Street | 1999 | ECONO LUBE & TUNE |
| 3956 State Street | 1985 | A to Z Auto Repair<br>Rabadi Exxon Service |
| 3956 State Street | 1981 | Masons Exxon Service |
| 3956 State Street | 1975 | Masons Exxon Service |
| 3956 State Street | 1970 | Masons Enco Service |
| 3956 State Street | 1961 | J Pinney Ted<br>Strehle Frank |
| 3956 State Street | 1955 | Jimenez Diego |
| 3956 State Street | 1951 | Jimenez Diego |

44

MEIN000571

No recognizable environmental concerns were noted on the subject site based on the historical City Directory review.

6.5    CHAIN OF TITLE

The client did not provide a 50-Year Chain of Title to TRAK to review as part of Phase I ESA.

MEIN000572



# 7      SITE RECONNAISSANCE AND INTERVIEWS
_____

TRAK's assessment activities included a site reconnaissance and a brief drive-by survey of the area adjacent to the site.  This chapter summarizes the findings from the site reconnaissance.

## 7.1     SITE RECONNAISSANCE

Mr. Bob Cashier of TRAK performed a site reconnaissance on July 28, 2022.   The site reconnaissance included a visual review of the site parcel to identify the presence or likely presence of hazardous substances or petroleum hydrocarbons under conditions that indicate an existing release, a past release, or threat of release into structures, soil, groundwater, or surface water at the site (recognized environmental conditions).   Table 7-1 summarizes site reconnaissance observations:

### TABLE 7-1
### GENERAL SITE OBSERVATIONS

| GENERAL OBSERVATIONS | | Observed | Not Observed |
|---|---|---|---|
| | Remarks | | |
| Current Use | Meineke Car Care Center; automotive service. | X | |
| Past Use | Service station (circa 1965-1994), residential. | | X |
| Structures (Permanent) | Two automotive service buildings, each with 3 service bays, one with service/inspection pit. | X | |
| Terrain | Generally level pad in southern half, steeply down-sloping to north, in north half. | X | |
| Hazardous substances and petroleum products use, storage, or disposal | Automotive fluids, lubricants, degreasers, and waste fluids, including waste oil and waste coolant. | X | |
| Storage Tanks (USTs) | None observed.  Formerly 3, 8,000-gallon gasoline, and waste-oil (circa 1965-1994). | | X |
| Storage Tanks (ASTs) | Motor oil, transmission fluid, waste oil, waste coolant. | X | |
| Odors | None observed. | | X |
| Pools of Liquid | None observed. | | X |
| Containers; contents, and origin is unknown | None observed. | | X |
| Electrical equipment | Typical for commercial occupancies. | X | |
| Chemical storage areas, chemical mixing areas | Containers of automotive fluids, lubricants, degreasers, and waste fluids, including waste oil and waste coolant. | X | |

46

MEIN000573

**TRAK**

**TABLE 7-1 (Continued)**

| INTERIOR OBSERVATIONS | Remarks | Observed | Not Observed |
|---|---|---|---|
| Heating/cooling system | Typical for commercial occupancies. | X | |
| Stains or corrosion | Building 1; floors and sidewalls of service/inspection pit. Building 2; floor and rear wall (bay 2), wash sink area. | X | |
| Drains & piping | None observed. | | X |
| Water supplies (potable and process) | Typical for commercial occupancies. | X | |
| Raw material areas | None observed. | | X |
| Sumps & clarifiers | None observed. | | X |
| Below-grade vaults | Building 1; service/inspection pit (bays 5 and 6), Building 2; three in-ground hydraulic hoist locations, with above-grade chassis removed. | X | |
| Industrial waste treatment equipment | None observed. | | X |

| EXTERIOR OBSERVATIONS | Remarks | Observed | Not Observed |
|---|---|---|---|
| Pits, Ponds, or Lagoons | None observed. | | X |
| Discolored soil or water | None observed. | | X |
| Stressed vegetation | None observed. | | X |
| Stained pavement or concrete | Trash enclosure area, pavement/sidewalls of enclosure, pavement at corners. | X | |
| Wastewater | None observed. | | X |
| Wells | None observed. Former soil vapor extraction wells, groundwater monitoring well, on west side of property, were removed circa 1994. | | X |
| Wastewater sewers | None observed. | | X |
| Solid waste | None observed. | | X |
| Surface water | None observed. | | X |
| Septic tanks | None observed. | | X |
| Leach Fields | None observed. | | X |
| Sanitary systems | None observed. | | X |
| Catch basins | None observed. | | X |
| Storm drains | Storm drain grate, in pavement, west of building 1. | X | |
| Sumps & clarifiers | None observed. | | X |
| Drains | Storm drain grate, in pavement, west of building 1. | X | |
| Hazardous waste storage | Trash enclosure, drum storage | X | |
| Below grade vaults | None observed. | | X |

47

MEIN000574



## 7.2    RESULTS OF SITE RECONNAISSANCE

The subject property is comprised of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, in an area of commercial and multi-family residential land uses. The subject parcel (0.46 acres) is located at the northeast corner of the intersection of State Street and Calle Real.  At this intersection, Calle Real extends north-northwesterly past the southwestern margin of the subject parcel, and continues northwesterly along the northern side of U.S. Highway 101.  West of the intersection, the westbound lanes of State Street split, to either merge with the westbound onramp to U.S. Highway 101, or to continue westerly across U.S. Highway 101. On the south side of the intersection, the northbound offramp from U.S. Highway 101 exits to State Street, with connection across State Street to Calle Real. East of the intersection, is the Upper State Street area of Santa Barbara.

The subject parcel is rectangular, and oriented north-south, with southern margin along State Street.  The southern portion of the western margin adjoins the public right-of-way for Calle Real, and a drive entry off Calle Real connects with the southwestern part of the property. The northern portion of the western margin adjoins a residential condominium parcel (3965 Via Lucero). North-adjoining is a multi-family residential parcel (three, two-story apartment buildings, 3963 Via Lucero), and east-adjoining is commercial parcel with automobile-service business (Firestone Complete Auto Care, 3948 State Street).

The subject parcel is comprised of a southern, generally level portion, with access from State Street and Calle Real, and a northern, undeveloped portion that is steeply down-sloped to the north, with limited access to the surrounding parcels.  The southern portion is commercially developed with an automotive-service facility, including two auto-service buildings, with paved drive/parking areas that adjoin the frontages at State Street and Calle Real.  The northern-most of the two automobile-service buildings is oriented east-west on the north side of the level portion of lot, and the southern-most building is oriented north-south in the center of the lot at State Street frontage.

The northern-most service building (designated as building 2), of concrete-block construction (approximately 1,736 SF), was built in 1994-95 on the general footprint of the previously-existing gasoline service station building (circa 1965-94).  The northern-most building includes three service bays for general automobile service and repair, with bay entries on the south side of the building, which open to the drive/parking area that adjoins State Street.  This building also includes a customer waiting room, office, and restroom.  Each of the three service bays are equipped with above-grade vehicle lifts, including scissor lift and wheel alignment system (Hunter) in center bay (bay 2), and other two bays (bays 1 and 3) with two-post lifts (BendPak). In the center of the three bays are also flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis. Servicing equipment, tools, and storage areas for parts and materials are located along the side

48

MEIN000575

and rear walls of the service-bay area, and a portable, drum-mounted parts-washer is located between bays 1 and 2.  Along the rear wall of the building, in the northeast corner, is storage for lubricants and motor oil, an air compressor, and wash sink location. Localized staining was observed on the concrete floor and lower sidewalls in proximity to the wash sink, and also in an area along the rear wall of bay 2, in proximity to the wheel-alignment equipment.

The southern-most building (designated as building 1), of concrete-block construction (approximately 1,509 SF), was built in 1994-95 in the general area of the previously-existing dispenser islands and canopy (circa 1965-94). The southern-most building includes three drive-through service bays, two of which are served by subgrade inspection/service pit (bays 5 and 6), used for lubrication and oil-change service, and the third bay (bay 4) used for tune-ups and general service.  On the south side of bay 6 is storage area, including three, steel ASTs for motor oil and transmission oil, and shelving above for storage of small containers of automotive fluids; a small storage room is located on the south side of the building, with access to the drive/parking area.  Bay 4, on north side of the building, is served with above-grade, two-post vehicle lift, and a steel AST for motor oil  is located at the east entry.

Bays 5 and 6 of the southern-most building are served by a subgrade inspection/service pit (approximately 20 feet x 15 feet x 5 feet deep) that is accessed by stairway between bays 5 and 6, and each bay has a central opening that is fitted with roller-mounted waste-oil drain pan, and also swing-arm drain pans for collection of engine coolant.  Drained waste-oil is directed by piping to a steel, double-walled AST (450 gallon) located along east wall of pit, and waste coolant from drain pans directed to polyethylene 55-gallon drums along the east wall. Significant staining was observed on concrete floor and lower sidewalls in proximity to the waste-oil AST and waste-coolant drums, and along concrete benches on both sides of the pit, used for storage of miscellaneous equipment and oil-collection pans, observed with waste oil.

Parking/drive areas are located on the east side of building 1 (south of building 2) with access to State Street, and on the west side of buildings 1 and 2, with access to Calle Real.  The western parking/drive area includes the former area of the UST pit that was located on the west side of the former dispenser islands and canopy (presently building 1 location).  The parking/drive areas are connected along the south side of the property, and also by a passageway between buildings 1 and 2.  On the west side of the western parking/drive area, adjacent to the top of the slope that adjoins Calle Real, is a storm drain grate.

On the east side of the eastern parking/drive area, adjacent to the building on east-adjoining property, is a walled trash enclosure with wood gate.  The enclosure includes a storage area for drums (6, 55-gallon) and tires.  Staining was observed on pavement and lower sidewalls of the enclosure, in proximity to the drums, and also on pavement outside the enclosure at the northwest and southwest corners.   A narrow passageway extends along the east side of building 2, from the area of the trash enclosure, north to the northeast corner of building 2.  This

49

MEIN000576

*TRAK*

passageway is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for observation of underlying ground surface.  Along the north side of building 2 is a narrow passageway that is fenced on the north side, separating this area from the steep, north-sloping portion of the property.   Along the south side of the passageway, adjacent to wall of building 2, is row of pallets on the ground, used for stacking of used tires, and also an empty polyethylene AST (appearance of waste-coolant AST).  North of the fenceline, the ground surface is terraced, and beyond the terrace, slopes steeply downward to the northern property boundary; this area is generally open land with scattered eucalyptus trees.

7.3    INTERVIEWS

General observations regarding general features were discussed with Jan Douma, owner/manager of Meineke Car Care Center.

50

MEIN000577



## 8        FINDINGS AND CONCLUSIONS

### 8.1    FINDINGS

The purpose of this assessment was to evaluate recognizable environmental conditions associated with the present or past usage, storage, or disposal of hazardous substances or petroleum hydrocarbons at the subject property.  Findings and opinions of this Phase I ESA are presented below, and are based on TRAK's observations of site conditions and information gathered during our review. These findings and opinions are subject to the limitations presented at the end of this report and may change if additional information becomes available.

#### 8.1.1   Site Observations and Findings

The subject property is comprised of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, in an area of commercial and multi-family residential land uses. The subject parcel (0.46 acres) is located at the northeast corner of the intersection of State Street and Calle Real.  At this intersection, Calle Real extends north-northwesterly past the southwestern margin of the subject parcel, and continues northwesterly along the northern side of U.S. Highway 101.  West of the intersection, the westbound lanes of State Street split, to either merge with the westbound onramp to U.S. Highway 101, or to continue westerly across U.S. Highway 101. On the south side of the intersection, the northbound offramp from U.S. Highway 101 exits to State Street, with connection across State Street to Calle Real. East of the intersection, is the Upper State Street area of Santa Barbara.

The subject parcel is rectangular, and oriented north-south, with southern margin along State Street.  The southern portion of the western margin adjoins the public right-of-way for Calle Real, and a drive entry off Calle Real connects with the southwestern part of the property. The northern portion of the western margin adjoins a residential condominium parcel (3965 Via Lucero). North-adjoining is a multi-family residential parcel (three, two-story apartment buildings, 3963 Via Lucero), and east-adjoining is commercial parcel with automobile-service business (Firestone Complete Auto Care, 3948 State Street).

The subject parcel is comprised of a southern, generally level portion, with access from State Street and Calle Real, and a northern, undeveloped portion that is steeply down-sloped to the north, with limited access to the surrounding parcels.  The southern portion is commercially developed with an automotive-service facility, including two auto-service buildings, with paved drive/parking areas that adjoin the frontages at State Street and Calle Real.  The northern-most of the two automobile-service buildings is oriented east-west on the north side of the level portion of lot, and the southern-most building is oriented north-south in the center of the lot at State Street frontage.

51

MEIN000578

TRAK

The northern-most service building (designated as building 2), of concrete-block construction (approximately 1,736 SF), was built in 1994-95 on the general footprint of the previously-existing gasoline service station building (circa 1965-94).  The northern-most building includes three service bays for general automobile service and repair, with bay entries on the south side of the building, which open to the drive/parking area that adjoins State Street.  This building also includes a customer waiting room, office, and restroom.  Each of the three service bays are equipped with above-grade vehicle lifts, including scissor lift and wheel alignment system (Hunter) in center bay (bay 2), and other two bays (bays 1 and 3) with two-post lifts (BendPak). In the center of the three bays are also flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis. Servicing equipment, tools, and storage areas for parts and materials are located along the side and rear walls of the service-bay area, and a portable, drum-mounted parts-washer is located between bays 1 and 2.  Along the rear wall of the building, in the northeast corner, is storage for lubricants and motor oil, an air compressor, and wash sink location. Localized staining was observed on the concrete floor and lower sidewalls in proximity to the wash sink, and also in an area along the rear wall of bay 2, in proximity to the wheel-alignment equipment.

The southern-most building (designated as building 1), of concrete-block construction (approximately 1,509 SF), was built in 1994-95 in the general area of the previously-existing dispenser islands and canopy (circa 1965-94). The southern-most building includes three drive-through service bays, two of which are served by subgrade inspection/service pit (bays 5 and 6), used for lubrication and oil-change service, and the third bay (bay 4) used for tune-ups and general service.  On the south side of bay 6 is storage area, including three, steel ASTs for motor oil and transmission oil, and shelving above for storage of small containers of automotive fluids; a small storage room is located on the south side of the building, with access to the drive/parking area.  Bay 4, on north side of the building, is served with above-grade, two-post vehicle lift, and a steel AST for motor oil  is located at the east entry.

Bays 5 and 6 of the southern-most building are served by a subgrade inspection/service pit (approximately 20 feet x 15 feet x 5 feet deep) that is accessed by stairway between bays 5 and 6, and each bay has a central opening that is fitted with roller-mounted waste-oil drain pan, and also swing-arm drain pans for collection of engine coolant.  Drained waste-oil is directed by piping to a steel, double-walled AST (450 gallon) located along east wall of pit, and waste coolant from drain pans directed to polyethylene 55-gallon drums along the east wall. Significant staining was observed on concrete floor and lower sidewalls in proximity to the waste-oil AST and waste-coolant drums, and along concrete benches on both sides of the pit, used for storage of miscellaneous equipment and oil-collection pans, observed with waste oil.

Parking/drive areas are located on the east side of building 1 (south of building 2) with access to State Street, and on the west side of buildings 1 and 2, with access to Calle Real.  The western parking/drive area includes the former area of the UST pit that was located on the west side of the former dispenser islands and canopy (presently building 1 location).  The parking/drive

52

MEIN000579

**TRAK**

areas are connected along the south side of the property, and also by a passageway between buildings 1 and 2. On the west side of the western parking/drive area, adjacent to the top of the slope that adjoins Calle Real, is a storm drain grate.

On the east side of the eastern parking/drive area, adjacent to the building on east-adjoining property, is a walled trash enclosure with wood gate. The enclosure includes a storage area for drums (6, 55-gallon) and tires. Staining was observed on pavement and lower sidewalls of the enclosure, in proximity to the drums, and also on pavement outside the enclosure at the northwest and southwest corners. A narrow passageway extends along the east side of building 2, from the area of the trash enclosure, north to the northeast corner of building 2. This passageway is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for observation of underlying ground surface. Along the north side of building 2 is a narrow passageway that is fenced on the north side, separating this area from the steep, north-sloping portion of the property. Along the south side of the passageway, adjacent to wall of building 2, is row of pallets on the ground, used for stacking of used tires, and also an empty polyethylene AST (appearance of waste-coolant AST). North of the fenceline, the ground surface is terraced, and beyond the terrace, slopes steeply downward to the northern property boundary; this area is generally open land with scattered eucalyptus trees.

In TRAK's opinion, observation of significant staining on pavement and lower sidewall surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, which appear to be evidence of leakage or spillage of automotive fluids or lubricants, constitutes evidence of *recognized environmental conditions* in connection with the subject *property*.

The site was formerly occupied by a gasoline service station (circa 1965 - 1994), and is identified as a LUST Cleanup Site (Exxon Rabadi) with Cleanup Status: Completed – Case Closed as of 01/09/1995. The former Exxon (Hondo Oil) service station operated from 1965 through about 1991, and included a service station building with three service bays, two dispenser islands under a separate canopy, three 8,000-gallon fuel USTs (regular, unleaded, premium), and 500-gallon waste oil UST. Leak-testing in 1988 indicted leakage in vapor-recovery piping, and gasoline-impacted soil confirmed in 1989. Investigation was conducted in 1991-1993 (five soil borings, six vapor-extraction wells, one groundwater monitoring well), and UST removal in 1991 confirmed gasoline-impacted soil at south end of fuel UST excavation, and at waste-oil UST. Remediation included excavation and disposal of waste-oil impacted soil in 1991 (to 15 feet bgs), vapor extraction of gasoline-impacted soil (10 months, February - December 1993), and additional excavation of gasoline-impacted soil by large-diameter bucket auger to depths of 58 feet bgs. Bucket-auger removal included 29 borings in the former UST pit (soil aerated onsite, then transported to Class III landfill), and 27 borings at the former northern dispenser island (transported to Class III landfill), for a total of about 600 cubic yards. Case closure was granted by Santa Barbara County Environmental Health Services Division (EHS) on January 9, 1995.

53

MEIN000580

TRAK

In TRAK's opinion, the site's history as LUST Cleanup Site, with case closure in 1995, constitutes evidence of a *Historical Recognized Environmental Condition* (HREC) in connection with the subject *property*.

8.1.2   Findings of Conditions

A *Recognized Environmental Condition* (REC) is defined by ASTM Standard Practice E1527-13 as the presence or likely presence of any *hazardous substances* or *petroleum products* in, on, or at a *property*: (*1*) due to any *release* to the *environment*; (*2*) under conditions indicative of a *release* to the *environment*; or (*3*) under conditions that pose a *material threat* of a future *release* to the *environment*. *De minimis* conditions are not *recognized environmental conditions.*

- This assessment has revealed evidence of *recognized environmental conditions* in connection with the subject *property*. A *Recognized Environmental Condition* (REC) is associated with areas of significant staining on pavement and lower sidewall surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, which appear to be evidence of leakage or spillage of automotive fluids or lubricants.

A *Controlled Recognized Environmental Condition* (CREC) is defined by ASTM Standard Practice E1527-13 as a *recognized environmental condition* resulting from a past *release* of *hazardous substances* or *petroleum products* that has been addressed to the satisfaction of the applicable regulatory authority (for example, as evidenced by the issuance of a no further action letter or equivalent, or meeting risk-based criteria established by regulatory authority), with *hazardous substances* or petroleum products allowed to remain in place subject to the implementation of required controls (for example, *property* use restrictions, *activity and use limitations, institutional controls,* or *engineering controls*). A condition considered by the *environmental professional* to be a *controlled recognized environmental condition* shall be listed in the Findings section of the *Phase I Environmental Site Assessment report*, and as a *recognized environmental condition* in the Conclusions section of the *Phase I Environmental Site Assessment report*.

- This assessment has revealed no evidence of *controlled recognized environmental conditions* in connection with the subject *property*.

MEIN000581



A *Historical Recognized Environmental Condition* (HREC) is defined by ASTM Standard Practice E1527-13 as a past *release* of any *hazardous substances* or *petroleum products* that has occurred in connection with the *property* and has been addressed to the satisfaction of the applicable regulatory authority or meeting unrestricted use criteria established by a regulatory authority, without subjecting the *property* to any required controls (for example, *property* use restrictions, *activity and use limitations*, *institutional controls*, or *engineering controls*). If the *environmental professional* considers the past *release* to be a *recognized environmental condition* at the time the Phase I ESA is conducted, the condition shall be included in the Conclusions section of the report as a *recognized environmental condition*.

- This assessment has revealed evidence of *historical recognized environmental conditions* in connection with the subject *property*. The *Historical Recognized Environmental Condition* (HREC) is associated with site's history as LUST Cleanup Site, with case closure in 1995.

A *De Minimis Condition* is defined by ASTM Standard Practice E1527-13 as a condition that generally does not present a threat to human health or the *environment* and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies. Conditions determined to be *de minimis conditions* are not *recognized environmental conditions* nor *controlled recognized environmental conditions*.

- This assessment has revealed no evidence of *de minimis conditions* in connection with the subject *property*.

Non-Scope Considerations may be environmental issues or conditions at a property that parties may wish to assess in connection with commercial real estate that are outside the scope of ASTM Standard Practice E1527-13 (non-scope considerations).

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. The narrow passageway that extends along the east side of building 2 is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for unimpeded movement and observation of underlying ground surface.

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. In building 2, in the center of each of the three service bays, are flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis.

MEIN000582



8.2    CONCLUSIONS

TRAK has performed a Phase I Environmental Site Assessment in conformance with the scope and limitations of ASTM Standard Practice E1527-13 of one parcel (APN 057-233-018), with street address of 3956 State Street, in City of Santa Barbara, Santa Barbara County, the subject *property*.  Any exceptions to, or deletions from, this practice are described in Section 10 of this report.

- This assessment has revealed evidence of *recognized environmental conditions* in connection with the subject *property*. A *Recognized Environmental Condition* (REC) is associated with areas of significant staining on pavement and lower sidewall surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, which appear to be evidence of leakage or spillage of automotive fluids or lubricants.

- This assessment has revealed evidence of *historical recognized environmental conditions* in connection with the subject *property*. The *Historical Recognized Environmental Condition* (HREC) is associated with site's history as LUST Cleanup Site, with case closure in 1995.

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. The narrow passageway that extends along the east side of building 2 is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for unimpeded movement and observation of underlying ground surface.

- This assessment has revealed evidence of non-scope considerations in connection with the subject *property*. In building 2, in the center of each of the three service bays, are flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis.

MEIN000583

TRAK

# 9     RECOMMENDATIONS

_____

This Phase I ESA was performed in accordance with the All Appropriate Inquiries Final Rule and scope and limitations of ASTM Standard Practice E1527-13, *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process.* Any exceptions to, or deviations from, this practice are described in Section 10 of this report. The recommendations of this Phase I ESA are presented below and are based on TRAK's observations of site conditions and information gathered during our review.

- In regard to *Recognized Environmental Condition* (REC) associated with areas of significant staining on pavement and lower sidewall surfaces, including service/inspection pit in building 1, rear wall and wash-sink area in building 2, and trash enclosure, it is recommended that subsurface investigation be conducted to evaluate the current soil conditions under localized areas of staining on pavement surfaces, for possible evidence regarding potential of any environmental impairment associated with surface staining.

- In regard to *Historical Recognized Environmental Condition* (HREC) associated with site's history as LUST Cleanup Site, with case closure in 1995, it is recommended that client be aware of, and plan future land uses in accordance with conditions of the case closure.

- A Non-Scope Consideration is associated with the narrow passageway that extends along the east side of building 2, which is clogged with an accumulation of used tires, a drum, and miscellaneous equipment, and inaccessible for unimpeded movement and observation of underlying ground surface.  It is recommended that this area be cleared and waste materials transported for disposal in accordance with appropriate protocols, and the ground surface be inspected for possible evidence of any environmental impairment associated with the stored wastes.

- A Non-Scope Consideration is associated with three service bays in building 2, in the centers of which are located flush-grade, steel plates that cover formerly-used in-ground hydraulic hoist systems that were left in place after removal of the above-grade chassis.  It is recommended that subsurface investigation be conducted to evaluate current soil conditions in proximity to the in-ground hoist assemblies, for possible evidence regarding potential of any environmental impairment associated with the former usage of hydraulic hoists.

57

MEIN000584

## 10     DEVIATIONS

During the preparation of this Phase I ESA, there were no deviations from, no deletions, and no additions to, the *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process* (ASTM E1527-13).

MEIN000585



## 11    LIMITATIONS

This report was designed to meet the *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process*, as outlined by American Society for Testing and Materials (ASTM) Standard Practice E1527-13.  The TRAK Environmental Group, Inc. (TRAK) duties, liabilities, and obligations, and Scope of Work are set forth in its proposal.

This Phase I ESA did not assess environmental issues or concerns that are outside the scope of ASTM Standard Practice E1527-13. Environmental issues or concerns outside the scope of ASTM Standard Practice E1527-13 include, but are not limited to, asbestos-containing materials (ACM), radon, mold, lead-based paint, lead in drinking water, wetlands, regulatory compliance, cultural and historic resources, industrial hygiene, health and safety, ecological resources, endangered species, indoor air quality, biological agents, and high voltage (EMF) power lines. These items, unless specifically included in the TRAK Scope of Work, are not included in this Phase I ESA.

The Phase I ESA included preliminary evaluation and consideration of impacts, of possible vapor intrusion conditions, generally based on guidelines of ASTM Standard Guide E 2600-10, "Standard Guide for Vapor Encroachment Screening on Property Involved in Real Estate Transactions".  As stated in Standard Guide E 2600-10, "This guide may be used in conjunction with Practice E1527 but does not alter or in any way define the scope of that practice. In addition, performance of this guide is not a requirement of and does not constitute, expand, or in any way define 'all appropriate inquiry' as defined and approved by the U.S. Environmental Protection Agency (EPA) under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the regulations there under, including 40 CFR Sec. 312.11."

This Phase I ESA did not include subsurface exploration, soil or water sampling, chemical analysis, or evaluation of geotechnical conditions or hazards.

The professional opinions presented herein apply to site conditions and regulatory standards at the time of the investigation.  The investigation was conducted with that level of care and skill ordinarily exercised by reputable members of the profession, practicing in the same locality, under similar budget and time constraints.  The passage of time may result in a change in the environmental circumstances at the study site and surrounding properties.  Regulatory standards applicable to the subject site are subject to change as a result of legislation or changes in implementation guidelines.

This document was prepared for the sole use of the client, their representatives and assignees. TRAK intends that this document be used only in its entirety.  Others who draw conclusions based on information drawn from portions of this report should independently determine the adequacy of the information for their intended use and time.

The findings and recommendations included in this report reflect TRAK's opinion based on the sources are believed, but not guaranteed, to be reliable.  TRAK is not responsible for information withheld by agencies, client, or other sources.

MEIN000586



## 12  QUALIFICATIONS OF ENVIRONMENTAL PROFESSIONALS

### 12.1  ENVIRONMENTAL PROFESSIONALS STATEMENT

We declare that, to the best of our professional knowledge and belief, we meet the definition of *Environmental Professional* as defined in §312.10 of 40 CFR 312.

We have the specific qualifications based on education, training, and experience to assess a property of the nature, history, and setting of the subject property.  We have developed and performed the all appropriate inquiries in conformance with the standards and practices set forth in 40 CFR Part 312.


Bradford S. Newman, PG, CHG                Robert Cashier, MS, CPSS, CAC #93-1158
President                                                      Director of Environmental Programs

### 12.2  EXPERIENCE AND QUALIFICATIONS

<u>Bradford S. Newman, PG, CHG - President, TRAK Environmental Group, Inc.</u>

Mr. Newman is noted for his breadth of knowledge in addressing the assessment and remediation of environmentally impaired resources.  He is a professional geologist specializing in hydrogeological analysis, site evaluations, and the characterization of hazardous material deposition.  He has over forty years of experience in natural resource evaluation, surface and subsurface assessments, contamination plume identification and mapping, and design of remediation systems.  His expertise is in managing all phases and types of site cleanup from initial characterization through closure.

Professional Registrations and Certifications

California Certified Hydrogeologist 515
California Professional Geologist 3562
California General Engineering Contractor 709623
California Certification Hazardous Substance Removal and Remedial Actions
California Well Drilling Classification C-57
Registered Well Inspector, Ventura County

Academic Background

Credential in Groundwater Science--Ohio State University
Doctoral Program in Environmental Science and Engineering--UCLA
M.S. Geology--UCLA; Thesis entitled Geology and Water Chemistry, North Fork Drainage, Bishop Creek, CA
B.S. Geology--UCLA
M.B.A.--California State College, Bakersfield

60

MEIN000587



<u>Robert Cashier, MS, CPSS, CAC #93-1158 - Director of Environmental Programs</u>

Mr. Cashier has over twenty-five years of experience in pollution liability litigation, design and implementation of Phase I assessments, Phase II soil and groundwater investigations, and in providing project oversight and management services for corrective action and agency closure. He has used his extensive field experience and education in providing clients with peer review of scientific reports and remedial plans, and expert witness testimony on pollution liability cases. Mr. Cashier provides project oversight, technical data interpretation, and client development for TRAK's pollution liability investigations.

Professional Registrations and Certifications

C.P.S.Sc., Certified Professional Soil Scientist, No. 21685, American Federation of Agriculture and Environmental Sciences, Society of Agronomy
California Registered Environmental Assessor II, DTSC No. 20084
Cal-OSHA-Certified Asbestos Consultant, No. 93-1158
Certified Lead Abatement Supervisor, DHS No. 12589
OSHA 29 CFR 1910.120 and CCR Title 8, 5192 40-Hour Training

Academic Background

M.S. Environmental Management--West Coast University, 1996
B.S. Soil Science, Concentration: Hydrocarbon Biodegradation--California Polytechnic State University, San Luis Obispo, 1979

61

MEIN000588

TRAK

## 13   REFERENCES

AECOM, 2020, *First Quarter 2020 Groundwater Monitoring Report, Former Shell Station, 3925 State Street, Santa Barbara*, April 20, 2020.

City of Santa Barbara Community Development Department

City of Santa Barbara Fire Department

County of Santa Barbara Air Pollution Control District

County of Santa Barbara Assessor

County of Santa Barbara Environmental Health Services

Environmental Data Resources, Inc., 2022, The EDR Radius Map with GeoCheck®, 3956 State St., Santa Barbara, CA 93101, July 20, 2022.

U.S. Dept. of Transportation Pipeline and Hazardous Materials Safety Administration

62

MEIN000589



**PLATES**

**FIGURE 1**
**FIGURE 2**
**SITE PHOTOGRAPHS**

MEIN000590





**SCALE 1:24000**

| FILE NAME: | DATE: | | |
|---|---|---|---|
| | | **SITE LOCATION MAP** | **FIGURE** |
| SOURCE: U.S.G.S. 7.5 MINUTE TOPOGRAPHIC QUADRANGLE MAP | | **3956 STATE STREET** **SANTA BARBARA, CALIFORNIA** | 1 |

**TRAK** *Environmental Group*

3637 B Arundell Circle
Ventura, California 93003

MEIN000591



PARCEL OUTLINE (APN 057-233-018)



| TRAK Environmental Group | FILE NAME: | DATE: | SITE MAP | FIGURE |
|---|---|---|---|---|
| 3637 B Arundell Circle<br>Ventura, California 93003 | SOURCE: | | 3956 STATE STREET<br>SANTA BARBARA, CALIFORNIA | 2 |

MEIN000592



1. View north from State Street, towards main entry, and drive that extends along the service bays on east side of front building (left-center) to the service bays in the back building (center). At far right is offsite, east-adjoining Firestone Complete Auto Care (3948 State Street).

2. View north from drive entry off State Street. At left is front building, and at right are service bays in the back building.





3. View northwest from drive, towards front building, showing doorway to storage room (left-center), and three service bay entries on east side of building.

| PROPERTY PHOTOGRAPHS |
|---|
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
|---|---|

MEIN000593



4. View southwest from drive, towards east side of front building, showing service bay entries, and open walkway on north side of building.  Walkway leads to parking area on west side of building.

5. View northwest from end of drive, towards south side of back building, showing doorway to customer waiting room (at left), and service bay entries.





6. View northeast from end of drive, towards south side of back building, showing service bay entries.  At far right is southeast corner of subject building; beyond the corner is entry to narrow walkway between the east side of back building, and offsite, east-adjoining building (3948 State Street).

| PROPERTY PHOTOGRAPHS | |
|---|---|
| 3956 State Street<br>Santa Barbara, California | |
| Date taken:<br>July 28, 2022 |  |

MEIN000594



7. View northwest from southwest corner of subject parcel, at intersection of Calle Real and State Street. In foreground is drive entry off of Calle Real, providing access to west side of property.



8. View northeast from southwest corner of subject parcel, at intersection of Calle Real and State Street, showing drive and parking area on west side of property, and service bays along west side of front building. In distance is southwest corner of back building (remainder hidden by front building). In parking area on west side of front building is former location UST pit associated with former service station (circa 1965-94).



9. View east from southwest corner of subject parcel, at intersection of Calle Real and State Street. At left is southern portion of front building, and at right is State Street.

| PROPERTY PHOTOGRAPHS |
| --- |
| 3956 State Street<br>Santa Barbara, California |
| Date taken:<br>July 28, 2022 |



MEIN000595



10. View south from west side of back building.  Chairs are located outside the customer waiting room in southwest corner of building.  Beyond is front building, and at right is parking area on west side of property.  In distance is intersection of Calle Real and State Street.

11. View east from parking area on west side of property, showing walkway that separates the back building (at left) from the front building (at right).





12. View southeast from parking area on west side of property, towards the west side of front building, and service bay entries. In parking area on west side of front building is former location UST pit associated with former service station (circa 1965-94).

| PROPERTY PHOTOGRAPHS |
| --- |
| 3956 State Street<br>Santa Barbara, California |
| Date taken:<br>July 28, 2022 |



MEIN000596



13. View northeast from parking area on west side of property, towards the west side of front building, and service bay entries. Yellow railing enclosure between bays is access stairway to service pits located in southern-most bay (visible at right) and central bay.  Northern-most bay has closed roll-up door.



14. View east from bay entry on west side of front building, showing southern-most bay, and service pit in center of floor. At left is yellow railing enclosure and access stairway. At right are three steel ASTs for motor oil and transmission oil, with dispensers, along the south wall of the bay, with shelving above (small containers of lubricants, cleaners, coolants).



15. View west from bay entry on east side of front building, showing southern-most bay, and service pit in center of floor. Inside pit rim is movable drain pan with connection to AST in pit, and with used oil-filters placed on pan for drainage.

| **PROPERTY PHOTOGRAPHS** |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000597



16. View northeast from bay entry on west side of front building, showing southern-most bay in foreground and service pit in center of floor. Beyond yellow railing enclosure and access stairway is center bay (also with pit), and further beyond in northern-most bay, with above-grade vehicle lift.



17. View east from bay entry on west side of front building, showing center bay; service pit in center of floor is covered by yellow diamond-plate cover.



18. View west from bay entry on east side of front building, showing center bay; service pit in center of floor is visible beneath the auto.  At left is steel AST for motor oil, with dispenser.

| PROPERTY PHOTOGRAPHS |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000598



19. View east from west side of front building, inside the service bays, showing access stairway to service pits; at base of stairway, to right is pit beneath southern-most bay, and to left is pit beneath center bay.

20. View east towards east wall of service pit, beneath the southern-most bay.  Three drums for storage of waste coolant.  Evidence of significant staining on concrete floor, and lower sidewalls, of pit beneath southern-most bay.





21. View east towards east wall of service pit, beneath center bay.  Steel AST for storage of waste oil. Flex arm (at upper left) is piping that connects drain pan with waste oil AST. Evidence of significant staining on concrete floor, and lower sidewalls, of pit beneath center bay.

| PROPERTY PHOTOGRAPHS |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000599



22. View north towards north wall of service pit, beneath center bay.  Steel AST for storage of waste oil (at right). Flex arm and piping that connects drain pan (right-center) with waste oil AST. At upper left is movable drain pan with flex hose connection to waste oil AST.  Evidence of significant staining on concrete floor, and lower sidewalls, of pit beneath center bay.

23. View west from base of stairway, towards west wall of service pit, beneath center bay, showing storage shelving for oil filters and miscellaneous parts, and drum (waste coolant?). Evidence of significant staining on concrete floor of pit beneath center bay.





24. View west from base of stairway, towards west wall of service pit, beneath southern-most bay, showing storage shelving for oil filters and miscellaneous parts.  At left are uncovered drip pans with waste fluids, and at right is trash barrel. Evidence of significant staining on concrete floor of pit beneath southern-most bay.

| **PROPERTY PHOTOGRAPHS** |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000600



25. View west from bay entry on east side of front building, showing northern-most bay. This bay is served by above-grade vehicle lift. In foreground is portable engine hoist.

26. View east from center of northern-most bay, towards bay entry on east side of front building, and drive beyond.  In area between northern-most bay and center bay (at right) is steel AST for motor oil, with dispenser





27. View northeast from east entry of northern-most bay, towards service bay entries on south side of back building.  Directly across (at photo right) is wood-gated enclosure for trash.

| **PROPERTY PHOTOGRAPHS** |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000601



28. View south from inside the back building, showing the above-grade vehicle lift in the center service bay of the back building. In floor of bay is steel plate (photo center) that covers location of remnant underground hydraulic hoist.

29. View west from center service bay, showing the work areas along the northern interior of the back building, including workstations, equipment, tools, and parts along the north wall of the building. In distance, at right, is air compressor, and build-out to left of compressor includes customer waiting room, restroom, and office.





30. View showing floor of center bay, at edge of north wall, with evidence of staining on concrete floor, and lower sidewall. At left is wheel-balancing equipment.

| PROPERTY PHOTOGRAPHS |
| --- |
| 3956 State Street<br>Santa Barbara, California |
| Date taken:<br>July 28, 2022 |



MEIN000602



31. View of interior at northeast corner of back building, showing compressor (right) and employee wash sink (left).  Evidence of significant staining on concrete floor, and lower sidewalls in this area.

32. View south from western-most service bay in back building, showing the work area along the west side of the bay, including workbench, equipment, tools, and storage shelving.  In floor of bay is steel plate that covers location of remnant underground hydraulic hoist.  Auto service presently accomplished by above-grade vehicle lift.





33. View south from area between center bay (at left) and western-most bay (at right), towards bay entries and drive/parking area beyond. In center is portable parts-washing bath and collection drum.

| **PROPERTY PHOTOGRAPHS** |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000603



34. Wood-gated trash enclosure on east side of drive, south of back building.

35. Interior of wood-gated trash enclosure on east side of drive.  View north towards southeast corner of back building (left-center), and walkway that runs between the back building and the offsite, east-adjoining parcel (3948 State Street).





36. Interior of wood-gated trash enclosure on east side of drive, showing storage of drums (7), tires, waste aerosol spray cans, 5-gallon propane tanks (2).  Evidence of staining on pavement.

| **PROPERTY PHOTOGRAPHS** |
|---|
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
|---|---|

MEIN000604



37. View east towards south side of wood-gated trash enclosure on east side of drive, showing storage of miscellaneous parts and equipment in small planter margin.
Evidence of staining on pavement along edge of planter curb and in front of trash enclosure.



38. View north from southeast corner of back building (far left), showing walkway that runs between the back building and the offsite, east-adjoining parcel (3948 State Street). Walkway area is used for storage of used tires, miscellaneous parts and equipment, including one drum.  Walkway area is not passable due to clutter of tires.



39. View east towards north side of wood-gated trash enclosure on east side of drive, showing storage of used tires.
Evidence of staining on pavement at northwest corner of trash enclosure.

| **PROPERTY PHOTOGRAPHS** |
| --- |
| 3956 State Street<br>Santa Barbara, California |
| Date taken:<br>July 28, 2022 |



MEIN000605



40. View south from northeast corner of back building, showing east side of back building (right), and walkway that runs between the east side of back building and the offsite, east-adjoining parcel (at left).  Walkway area is not passable due to clutter of tires.

41. View west from northeast corner of back building, showing the north side of back building (left), and pathway that runs along the north side of building. Portion of pathway is used for storage of used tires, stacked on pallets. At right is fenceline that delineates the break-in-slope of the parcel.





42. View east from northwest corner of back building, showing the north side of back building (left), and pathway that runs along the north side of building.  At right is storage area for used tires, stacked on pallets. At left is fenceline that delineates the break-in-slope of the parcel. Beyond fence, the parcel is north-sloping, open land.

| PROPERTY PHOTOGRAPHS |
| --- |
| |
| 3956 State Street<br>Santa Barbara, California |
| Date taken:<br>July 28, 2022 |

**TRAK**

MEIN000606



43. Storage area for used tires, stacked on pallets; view towards northwest corner of back building.  In foreground is poly AST (empty) under pallet and tire stack.

44. View north from north side of back building, at fenceline that delineates the break-in-slope of the parcel. View shows the north-sloping, open land on northern portion of subject parcel.  Beyond is offsite, north-adjoining parcel (3933 Via Lucero).





45. View south-southwest from base of slope, towards northern portion of subject parcel (terraced area and north-sloping open land), and north side of back building, beyond fenceline.

| PROPERTY PHOTOGRAPHS |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000607



46. View northeast, showing drive and parking area on west side of property. Storm drain is in pavement adjacent to curb, at oleander bush (just past Meineke vehicle), across from the northwest corner of front building.



47. Location of storm drain, in pavement on west side of property, at curb.  Beyond curb is oleander landscaping in planter at west margin of property.  Beyond oleander landscaping is top of slope that adjoins the northeast margin of Calle Real.



48 View northeast towards west margin of property, showing oleander-landscaped planter at top of slope, and beyond is front building (at right), and rear building (at left).  Slope in foreground adjoins the northeast margin of Calle Real.

| PROPERTY PHOTOGRAPHS |
| --- |
| 3956 State Street<br>Santa Barbara, California |

| Date taken:<br>July 28, 2022 |  |
| --- | --- |

MEIN000608

# EXHIBIT 5

| From: | **Andrew Simons** <Drew@dsimonslaw.com> |
|---|---|
| To: | **Chris Sullivan** <Chris.Sullivan@drivenbrands.com>; **Darrin Krader** <Darrin.Krader@meineke.com>; **Tony Winchester** <Tony.Winchester@drivenbrands.com> |
| CC: | **Justin Diem** <jdiem@radiusgroup.com>; **mlsourmany@cox.net** <mlsourmany@cox.net>; **moesourmany@gmail.com** <moesourmany@gmail.com> |
| Subject: | RE: <External> FW: 3956 State - Condition |
| Date: | 28.09.2022 14:37:56 (+02:00) |

Chris,

Thank you for your reply. Please let us know when you will need access to the interior.

Andrew D. Simons, Esq.
Law Offices of Andrew D. Simons
drew@dsimonslaw.com
805 705 2248

NOTICE OF CONFIDENTIALITY: This E-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged. This information is confidential information and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on this communication is strictly prohibited.

---

**From:** Chris Sullivan <Chris.Sullivan@drivenbrands.com>
**Sent:** Wednesday, September 28, 2022 7:25 AM
**To:** Andrew Simons <Drew@dsimonslaw.com>; Darrin Krader <Darrin.Krader@meineke.com>; Tony Winchester <Tony.Winchester@drivenbrands.com>
**Cc:** Justin Diem <jdiem@radiusgroup.com>; mlsourmany@cox.net; moesourmany@gmail.com
**Subject:** RE: <External> FW: 3956 State - Condition

Andrew – we are in the process of having someone onsite to assess the condition of the premises and will let you know as soon as we get that scheduled………..thanks

---

**From:** Andrew Simons <Drew@dsimonslaw.com>
**Sent:** Monday, September 26, 2022 8:30 PM
**To:** Darrin Krader <Darrin.Krader@meineke.com>; Chris Sullivan <Chris.Sullivan@drivenbrands.com>; Tony Winchester <Tony.Winchester@drivenbrands.com>
**Cc:** Justin Diem <jdiem@radiusgroup.com>; mlsourmany@cox.net; moesourmany@gmail.com
**Subject:** <External> FW: 3956 State - Condition

Darrin & Chris,

Below is additional information about the condition of the Premises with numerous pictures and noted deficiencies. In addition, you were required to maintain the roof, HVAC and parking area in good condition and repair which you did not. Per my previous email, you have until the end of this week to address these issues.  If you do not, Landlord will address them and add the cost thereof to its claim against you. Also, you are advised that these conditions will impact Landlord's ability to timely lease the Premises and will hold you responsible for any losses it incurs in connection therewith.

You have been advised accordingly.

MEIN000856

Andrew D. Simons, Esq.
Law Offices of Andrew D. Simons
drew@dsimonslaw.com
805 705 2248

We were able to do a site visit on Thursday during the inspection that JLI ordered. As is generally the case, a landlord's perception of their property often exceeds the reality. In this case, I think the land owner would be pretty shocked if he stepped foot in the facility. It is pretty disgusting. Nothing that would prevent us from operating a successful business, but definitely needs a lot of cleanup and repair.

It appears that the previous tenant left in a hurry. Evidence such as bags of lunch still sitting on the work bench, cash still in the cash drawer and some inventory still left on the shelves. Here are some of the things we noticed:

1) Several tires (estimated over 100) are lining the back wall of the building. The Phase II noted this – but then also used that as a "we didn't inspect there".

2) There are drums inside and outside the building/dumpster area. Those need to be disposed of properly.

3) There are several environmental hazards in the trash enclosure. The Phase II conducted the borings OUTSIDE the trash enclosure however, there are drums, brake cleaners, chemicals etc inside the dumpster area and exposed to the recent rains.

4) The hydraulic "pits" in the service bays that had been welded shut are still exposed and you can see down inside where trash and debris has collected.

5) The catch pans for lower bay still have oil in them and used filters collected on top. Those will need to be disposed of correctly.

6) Storm drain covers in the parking area are broken in at least one location. I don't see that the Phase II pointed that out or if any testing was done inside those drains – which one is right in the parking area downstream from the dumpster area.

7) A former employee who happened to stop by pointed out areas where the basement leaks and water accumulates.

8) There is severe wood rot on the trellis to the North West of the building.

9) At least one of the roll up bay doors is inoperable and needs to be serviced.

The major issues are obviously clean up and repair/maintenance. Examples are the parking lot needs to be sealed and restriped, the building has several areas where the paint is chipped off or holes haven't been patched, the interior is a disaster – where we can't even tell the condition of the actual walls or floors because so much trash is accumulated, etc. Obviously there needs to be a major clean up. We were also unable to test the HVAC as none of us could figure it out.

Finally there is the equipment/tools/inventory that is left in the location.

MEIN000857



MEIN000858



MEIN000859



MEIN000860



MEIN000861



MEIN000862



MEIN000863



MEIN000864



MEIN000865



MEIN000866



MEIN000867



MEIN000868



MEIN000869



MEIN000870



MEIN000871



MEIN000872



MEIN000873



MEIN000874



MEIN000875



MEIN000876



MEIN000877



MEIN000878



MEIN000879



Sent from my iPhone

MEIN000880

# EXHIBIT 6

| | |
|---|---|
| From: | **Darrin Krader** <Darrin.Krader@meineke.com> |
| To: | **Chris Sullivan** <Chris.Sullivan@drivenbrands.com> |
| Subject: | FW: <External> Fwd: Shop Equipment at 3956 State Street |
| Date: | 25.10.2022 20:08:30 (+02:00) |

FYI.......

## Darrin Krader

Operational Compliance

**a:**   440 S. Church Street
       Charlotte, NC 28202
**t:**   (916) 305-1153



Follow us:     

**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Tuesday, October 25, 2022 12:38 PM
**To:** Darrin Krader <Darrin.Krader@meineke.com>
**Subject:** Re: <External> Fwd: Shop Equipment at 3956 State Street

I have a buyer for the equipment. I think the buyer would be ready to take everything at any time. He is renovating a shop in another part of town.
Eventually the bankruptcy trustee will need to approve the sale, but that is a ways off.  Let me know if you want the buyer to clear it out sooner.

Jan

On Tue, Oct 25, 2022 at 12:07 PM Darrin Krader <Darrin.Krader@meineke.com> wrote:

> We have confirmed that they are only cleaning up the debris. They are not taking equipment. I strongly urge you  to go to the sight and  make sure your concerns are being addressed and make sure there is nothing there that you wanted or needed.
>
> With regard to the encumbered equipment what is the plan there?
>
> ## Darrin Krader
>
> Operational Compliance
>
> **a:**   440 S. Church Street
>        Charlotte, NC 28202
> **t:**   (916) 305-1153
>
> 
>
> Follow us:     
>
> **From:** Jan Douma <jandouma1@gmail.com>
> **Sent:** Tuesday, October 25, 2022 11:56 AM

MEIN000764

**To:** Darrin Krader <Darrin.Krader@meineke.com>
**Subject:** Re: <External> Fwd: Shop Equipment at 3956 State Street

I don't have any personal items there, but I am an hour away, and I was notified an hour and a half ago. If they took things apart, the damage is done.

Can anyone contact the workers?

On Tue, Oct 25, 2022 at 11:19 AM Darrin Krader <Darrin.Krader@meineke.com> wrote:

> Jan,
>
> It is my understanding that all our vendor is to be removing is the trash and debris from interior and exterior.
> If you are in the area please feel free to go to the location and let them know that they are not to remove the FF&E.
> While there please remove any of your personal items that may still be there.
>
> Building needs to be vacated ASAP.
>
> Thanks,
>
> ### Darrin Krader
>
> Operational Compliance
>
> **a:**   440 S. Church Street
>         Charlotte, NC 28202
> **t:**   (916) 305-1153
>
> **meineke**.com
>
> *Follow us:*    in

> **From:** Jan Douma <jandouma1@gmail.com>
> **Sent:** Tuesday, October 25, 2022 11:10 AM
> **To:** Darrin Krader <Darrin.Krader@meineke.com>; Chris Sullivan <Chris.Sullivan@drivenbrands.com>
> **Subject:** <External> Fwd: Shop Equipment at 3956 State Street
>
> Hello,
>
> Driven Brands cannot abandon claim to our property. However, it does not seem to be abandoning claim if it is now removing the property.
> Driven Brands also was previously notified that this property is ours and encumbered by a creditor. We never received any notice that it needed to be moved nor that it was going to be moved.
>
> Jan Douma
>
>
> ---------- Forwarded message ---------
> **From:** **Andrew Simons** <Drew@dsimonslaw.com>
> Date: Tue, Oct 25, 2022 at 10:57 AM
> Subject: RE: Shop Equipment at 3956 State Street

MEIN000765

To: Jan Douma <jandouma1@gmail.com>
Cc: John Rounds <jrounds@rslawllp.com>, Chris Sullivan <Chris.Sullivan@drivenbrands.com>

Jan,

You need to talk to Chris Sullivan at Driven Brands (copied here). Driven Brands is my client's tenant and it surrendered possession of the premises to my client last month and abandoned all of the equipment/personal property on site. Driven Brands has a crew there today removing all of the personal property, equipment and other items but it is not allowed to remove hazardous waste. The county inspector from CUPA is there today issuing citations for violations of hazardous waste disposal some of which violations have apparently been open and unresolved for sometime. The County shows you as the violator and responsible for the fines.

My clients have already incurred considerable damages in lost rent and other costs given the condition of the premises when the premises was surrendered and  intends to assert claims against Driven Brands once they are all known.


Andrew D. Simons, Esq.
Law Offices of Andrew D. Simons
drew@dsimonslaw.com
805 705 2248

NOTICE OF CONFIDENTIALITY: This E-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged. This information is confidential information and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on this communication is strictly prohibited.


**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Tuesday, October 25, 2022 10:35 AM
**To:** Andrew Simons <Drew@dsimonslaw.com>; Drew Simons <asimons@rppmh.com>
**Cc:** John Rounds <jrounds@rslawllp.com>
**Subject:** Shop Equipment at 3956 State Street

Drew,

I have been alerted to the fact that there are people at the shop removing things. I just want to remind you that the equipment (lifts, brake lathe, fluid machines, computers, etc.) belongs to me and is encumbered by a creditor. If you need to move it, you should let me know.

Has the place been rented?

Jan Douma

MEIN000766

# EXHIBIT 7

| From: | **Chris Sullivan** <Chris.Sullivan@drivenbrands.com> |
|---|---|
| To: | **Darrin Krader** <Darrin.Krader@meineke.com>; **Taylor Zimnock** <Taylor.Zimnock@drivenbrands.com> |
| Subject: | FW: <External> Santa Barbara County - Environmental Health |
| Date: | 31.10.2022 17:33:51 (+01:00) |
| Attachments: | _External_ Santa Barbara County - Environmental Health .eml (6 pages) |

Hey Darrin – do you have any contacts for environmental service providers in the Santa Barbara.

See Jimmy's email attached.

Thanks

**From:** Taylor Zimnock <Taylor.Zimnock@drivenbrands.com>
**Sent:** Monday, October 31, 2022 9:37 AM
**To:** Chris Sullivan <Chris.Sullivan@drivenbrands.com>
**Subject:** RE: <External> Santa Barbara County - Environmental Health

Got it- Thank you, So both vendors do not have the credentials to remove hazardous materials like the city is requiring.

Susan advised that Daren Krader might have someone in that area he uses, since we do not have any Take 5's we manage in that area to have someone.

**Taylor Zimnock**
*Facilities Analyst*
**Driven Legal**

**O:** (267) 429-6797
440 South Church St. Ste. 700
Charlotte, NC 28202



**From:** Chris Sullivan <Chris.Sullivan@drivenbrands.com>
**Sent:** Monday, October 31, 2022 9:35 AM
**To:** Taylor Zimnock <Taylor.Zimnock@drivenbrands.com>
**Subject:** FW: <External> Santa Barbara County - Environmental Health

fyi

**From:** Padilla, Jimmy <JPadilla@sbcphd.org>
**Sent:** Friday, October 28, 2022 2:59 PM
**To:** Chris Sullivan <Chris.Sullivan@drivenbrands.com>
**Cc:** Coria, Nicholas <ncoria@sbcphd.org>
**Subject:** <External> Santa Barbara County - Environmental Health

Hello,

Please find attached a copy of the hazardous waste generator inspection report for the inspection conducted on October 25, 2022 at the 3956 State St, Santa Barbara location . If you have any questions or

concerns regarding this email or the content of the report please do not hesitate to contact me at this email.

Best,



**Jimmy Padilla**
*Hazardous Materials Specialist II*
Santa Barbara County | CUPA
225 Camino Del Remedio
Santa Barbara, CA 93110
**Direct line** 805.681.4318
Website: https://countyofsb.org/phd/ehs/cupa.sbc

Confidentiality Notice:  The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

MEIN000207

From:           **Padilla, Jimmy** <JPadilla@sbcphd.org>
To:             **Chris Sullivan** <Chris.Sullivan@drivenbrands.com>
CC:             **Coria, Nicholas** <ncoria@sbcphd.org>
Subject:        <External> Santa Barbara County - Environmental Health
Date:           28.10.2022 18:59:14 (+02:00)
Attachments:    2022-10-25 HWG Inspecion Report-NOV.pdf (5 pages)

Hello,

Please find attached a copy of the hazardous waste generator inspection report for the inspection conducted on October 25, 2022 at the 3956 State St, Santa Barbara location . If you have any questions or concerns regarding this email or the content of the report please do not hesitate to contact me at this email.

Best,



**Jimmy Padilla**
*Hazardous Materials Specialist II*
Santa Barbara County | CUPA
225 Camino Del Remedio
Santa Barbara, CA 93110
**Direct line** 805.681.4318
Website: https://countyofsb.org/phd/ehs/cupa.sbc

Confidentiality Notice:  The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

MEIN000208



**SANTA BARBARA COUNTY**
**CERTIFIED UNIFIED PROGRAM AGENCY**

Page 1 of 5

☒ 225 Camino del Remedio, Santa Barbara, CA 93110 | (805) 681-4900 | Fax (805) 681-4901
☐ 2125 S. Centerpointe Pkwy., Rm 333, Santa Maria, CA 93455 | (805) 346-8460 | Fax (805) 346-8485

## HAZARDOUS WASTE NON-RCRA LARGE QUANTITY GENERATOR INSPECTION REPORT
### NOTICE TO COMPLY / NOTICE OF VIOLATION

Facility Name: CJGL, Inc., dba MEINEKE CAR / ECONO LUBE #4118
Site Address: 3956 STATE ST
City: SANTA BARBARA, CA 93105
Facility Contact: Jan Douma – CJGL., Inc

Date: 10/25/2022
CERS ID: 10210483
Inspected By: Jimmy Padilla
(Signature):

Consent Provided By: Mary Sourmany and Drew Simons
Title: Property Owner (Sourmany) and Attorney (Simons)

For: ☒ Photos ☒ Sampling ☒ Document Review

Purpose of Inspection: ☐ Routine   ☒ Follow-Up   ☐ New Permit   ☐ Complaint   ☐ Enforcement

Violation Classifications:   Minor (**M**),   Class II (**2**),   Class 1 (**1**)   *(Authority: HSC 25404)*

| Violation # | 1 2 M | Violation Description |
|---|---|---|
| **Recordkeeping / Documentation / Waste Determination** | | |
| H001 | | Obtained and/or maintained an active EPA ID number (unless exempted HSC 25143.13). 22 CCR 66262.12 (3010002)<br>Generator ID # CAL000400685   ☒ Yes ☐ No   Reactivate using DTSC Form 1358 or the electronic Verification Questionnaire. |
| H102 | | Failure to maintain an active generator ID number. HSC 25205.16 (3010) |
| H103 | | Failed to acquire a CUPA Permit. Local Ordinance 18C-35, 18C-39, 18C-46 (3015) |
| H002 | | Contingency Plan prepared and implemented. 22 CCR 66262.34(a)(4); 22 CCR 66265.51 (3130018) |
| H003 | | Contingency Plan and all revisions maintained at the facility. 22 CCR 66262.34(a)(4); 22 CCR 66265.53 (3110012) |
| H004 | | Contingency plan contains all required content. 22 CCR 66262.34(a)(4); 22 CCR 66265.52 (3110011) |
| H006 | | Facility personnel are trained annually and maintain required documentation until closure. 22 CCR 66262.34(a)(4); 22 CCR 66265.16 (3120001) |
| H007 | | Prepared a Uniform Hazardous Waste Manifest for transportation of hazardous waste. 22 CCR 66262.20 (3110002) |
| H008 | | Properly completed all Uniform Hazardous Waste Manifests. 22 CCR 66262.23(a) (3110003) |
| H009 | | Signed copy of Uniform Hazardous Waste Manifest kept for 3 years. 22 CCR 66262.40(a) (3110005) |
| H011 | | Completed all Uniform Hazardous Waste Manifest exception reporting requirements. 22 CCR 66262.42(a), (b), (d) (3110004) |
| H012 | | Sent a legible copy of each Uniform Hazardous Waste Manifest to the DTSC within 30 days of shipment. 22 CCR 66262.23(a)(4) (3110006) |
| H014 | | Certification of waste minimization on all manifests. 22 CCR 66262.27(a) (3010031) |
| H015 | | All consolidated manifest requirements are met. 22 CCR 66262.40(a); HSC 25160.2 (3110017) |
| H016 | | Exempt used oil management operating log records are retained for 3 years. HSC 25250.1. HSC 25250.19(b)(2); 25250.18, 25250.1 (3110018) |
| H017 | | Owner/Operator retained copy of manifest or bill of lading for spent lead acid batteries for 3 years. 22 CCR 66266.81(a)(4)(B) (3010014) |
| H018 | | Determined land disposal restrictions for hazardous waste. 22 CCR 66262.34(a)(4); 22 CCR 66268.7(a) (3130002) |
| H019 | | Determined if waste generated is hazardous waste. 22 CCR 66262.11 (3130001) |
| H020 | | Kept records of any test results, waste analyses, or other determinations. 22 CCR 66262.40(c) (3130028) |
| H021 | | Program data reported electronically when required. HSC 25404(e)(4) (3110020) |
| H022 | | Submitted Recyclable Materials Report every two years. HSC 25143.10 (3110021) |
| H023 | | Remote Waste Consolidation Site Annual Notification submitted. HSC 25110.10(d) (3110022) |
| H024 | | LQG conducted a source reduction evaluation review and plan every four years. 22 CCR 67100.7, 67100.8; HSC 25244.19 (3100018) |
| H025 | | LQG prepared a Summary Progress Report using DTSC form #1262 every four years. 22 CCR 67100.9 (3010019) |
| H026 | | LQG completed all source reduction evaluation review and plan requirements. 22 CCR 67100.5; HSC 25244.19, 25244.21 (3110010) |
| **Disposal / Accumulation Time Limits** | | |
| **H027** | | **Registered hazardous waste transporter used to transport hazardous waste. 22 CCR 66263.41; HSC 25163(a)** (3150001) |
| **H028** | **1** | **Disposed of hazardous waste at an authorized location. HSC 6.5 25189.5(a), 25201(a)** (3150003) |
| **H029** | | **Quarantined HW not removed, transferred, or disposed without permission by authorized agent. HSC 25187.6** (3140002) |

*Rev: 01/27/2021*

MEIN000209



**Hazardous Waste Non-RCRA Large Quantity Generator Inspection Report/Notice to Comply/Notice of Violation**

| Facility Name: | CJGL, Inc., dba MEINEKE CAR / ECONO LUBE #4118 | Date: | 10/25/2022 |
|---|---|---|---|
| Site Address: | 3956 STATE ST | | Page 2 of 5 |

| Violation # | 1 2 M | Violation Description |
|---|---|---|
| H032 | | Disposed of hazardous waste within 90 days of accumulation start. 22 CCR 66262.34(a); HSC 25123.3(b)(1), 25201 (3130004) |
| H035 | | Met all requirements for hazardous waste satellite accumulation. 22 CCR 66262.34(e) (3130023) |
| **Container Management** | | |
| H033 | 1 | Labeled all containers or portable tanks containing hazardous waste. 22 CCR 66262.34(f) (3130003) |
| H034 | | Accumulated hazardous waste in containers that are in good condition. 22 CCR 66265.171 (3130005) |
| H036 | | Hazardous waste accumulated in lined and/or compatible containers. 22 CCR 66262.34(a)(1); 22 CCR 66265.172 (3130006) |
| H037 | 1 | Containers of hazardous waste closed except when adding or removing waste. 22 CCR 66262.34(a)(1); 22 CCR 66265.173 (3130007) |
| H038 | | Inspects all hazardous waste storage areas at least weekly. 22 CCR 66262.34(a)(1); 22 CCR 66265.174 (3130008) |
| H050 | | Reactive and ignitable waste containers located at least 50 ft. from property line. 22 CCR 66262.34(a)(1); 22 CCR 66265.176 (3130009) |
| H039 | | Incompatible waste in containers managed properly to prevent a reaction. 22 CCR 66262.34(a)(1); 22 CCR 66265.17(b), 66265.177 (3130010) |
| H027 | | Complied with air emission requirements for HW in containers. 22 CCR 66262.34(a)(1); 22 CCR 66265.178 (3130025) |
| H053 | | Empty containers > 5 gallons properly managed. 22 CCR 66261.7 (3130024) |
| **Tank Management** | | |
| H054 | | Stationary tanks marked as "Hazardous Waste" and marked with accumulation start date. 22 CCR 66262.34(f) (3130022) |
| H055 | | Continuously fed hazardous waste tanks are equipped with an overfill protection device. 22 CCR 66262.34(d)(2); 40 CFR 262.34(d)(3), 265.201(b)(4) (3030025) |
| H056 | | Removed hazardous waste from tanks, equipment, and discharge confinement structures upon facility closure. 22 CCR 66262.34(d)(2); 40 CFR 262.34(d)(3), 265.201(f) (3050006) |
| H057 | | Uncovered hazardous waste tanks have 2 feet of freeboard unless equipped with adequate containment. 22 CCR 66262.34(d)(2); 40 CFR 262.34(d)(3), 265.201(b)(3) (3030024) |
| H060 | | Obtained a written hazardous waste tank system assessment prior to placing into use. 22 CCR 66262.34(a)(1); 22 CCR 66265.192(a) (3010025) |
| H061 | | Secondary containment provided and meets requirements for all hazardous waste tank systems. 22 CCR 66262.34(a)(1); 22 CCR 66265.193 (3130019) |
| H062 | | Conducts and documents daily inspections of hazardous waste tank system. 22 CCR 66262.34(a)(1); 22 CCR 66265.195(a), 66265.195(c) (3130012) |
| H063 | | Written hazardous waste tank system assessment/reassessment by P.E. completed. 22 CCR 66265.192(h) (311023) |
| H064 | | Written hazardous waste tank system assessment meets all requirements. 22 CCR 66265.192(k) (3110014) |
| H065 | | Tanks are compatible with hazardous waste and have spill/overflow prevention provided. 22 CCR 66262.34(a)(1); 22 CCR 66265.194 (3130011) |
| H066 | | Inspect/document the HW tank system cathodic protection system annually/impressed current bimonthly. 22 CCR 66262.34(a)(1); 22 CCR 66265.195(b), 66265.195(c) (3130020) |
| H067 | | Obtained approval before replacement of identical/equivalent tank system parts not in 66265.192(l). 22 CCR 66265.192(m) (3110015) |
| H068 | | Leaking/unfit HW tank or secondary containment removed from service. 22 CCR 66265.196 (3140001) |
| H069 | | All hazardous waste tank system closure requirements have been met. 22 CCR 66265.111, 66265.114, 66265.197 (3150002) |
| H070 | | Complied with air emissions requirements for HW in tanks. 22 CCR 66262.34(a)(1); 22 CCR 66265.202 (3130026) |
| **Recyclable Materials / Used Oil / Filters / Reusable Soiled Textiles / Lead Acid Batteries** | | |
| H071 | | Recyclable material is managed pursuant to HSC 25143.2(b), (c), or (d). HSC 25143.2, 25143.9 (3150004) |
| H072 | | Generator does not intentionally contaminate used oil with other hazardous wastes. HSC 25250.7 (3150005) |
| H073 | | Properly manages used oil and fuel filters. 22 CCR 66266.130; HSC 25250.22 (3130029) |
| H074 | | Meets requirements for handling/storing/transporting lead acid batteries. 22 CCR 66266.81(a)(1) (3030001) |
| H077 | | Meets all requirements when accepting spent lead-acid batteries. 22 CCR 66266.81(a)(3) (3030002) |
| H075 | | Properly manages, stores, and labels all damaged lead-acid batteries. 22 CCR 66266.81(b) (3130032) |
| H080 | | Properly managed reusable soiled textile materials prior to being sent for laundering. HSC 25144.6(b) (3130034) |
| **Laboratory Waste** | | |
| H081 | | Laboratory waste managed in accordance with HSC 25200.3.1(b). HSC 25200.3.1(b) (3130035) |
| H082 | | Laboratory waste treated in accordance with HSC 25200.3.1(c). HSC 25200.3.1 (c) (3130036) |
| **Site Safety** | | |
| H089 | | Emergency coordinator on the premises or on call. 22 CCR 66262.34(a)(4); 22 CCR 66265.55 (3130037) |
| H087 | | Facility equipped with all required emergency equipment. 22 CCR 66262.34(a)(4); 22 CCR 66265.32 (3130014) |
| H090 | | Tests and maintains all required safety equipment at the facility. 22 CCR 66262.34(a)(4); 22 CCR 66265.33 (3130015) |
| H086 | 1 | Maintains adequate aisle space. 22 CCR 66262.34(a)(4); 22 CCR 66265.35 (3130016) |
| H093 | 2 | Maintains and operates the facility to minimize the possibility of fire/explosion/release. 22 CCR 66262.34(a)(4); 22 CCR 66265.31 (3130013) |

*Rev: 10/10/2022*

MEIN000210

**Hazardous Waste Non-RCRA Large Quantity Generator Inspection Report/Notice to Comply/Notice of Violation**



Facility Name: CJGL, Inc., dba MEINEKE CAR / ECONO LUBE #4118    Date: 10/25/2022

Site Address: 3956 STATE ST    Page 3 of 5

| Violation # | 1 2 M | Violation Description |
|---|---|---|
| **Universal Waste Management** | | |
| H094 | | UWH notified the EPA and obtained a federal ID number prior to storing 5,000 kg or more of UW. 22 CCR 66273.32(a) (3010003) |
| H095 | | UWH obtained an EPA ID number from the DTSC prior to storing 5,000 kg or more of non-RCRA UW. 22 CCR 66273.32(b) (3010004) |
| H040 | | UWH of devices/CRTs/CRT glass that do not treat waste submitted all required information to DTSC. 22 CCR 66273.32(c) (3010005) |
| H041 | | UWH accepts 100kg or generates 5000 kg/yr of E-waste, CRTs, & submits report to DTSC Feb 1 annually. 22 CCR 66273.32(d) (3010020) |
| H043 | | UWH sending devices/CRTs/CRT glass to any foreign destination completed and submitted notification. 22 CCR 66273.40(a)(3) (3010006) |
| H096 | | UWH prepared the export notification report and included all required information. 22 CCR 66273.40(a)(4) (3010006) |
| H044 | | UWH labeled all universal waste. 22 CCR 66273.34 (3030008) |
| H097 | | UWH accumulated universal waste for no longer than 1 year. 22 CCR 66273.35 (3030011) |
| H098 | | UWH meets all accumulation standards for universal waste aerosol cans. HSC 25201.16(f) (3030051) |
| H099 | 2 | Universal waste aerosol cans managed to prevent fire, explosion and unauthorized release. HSC 25201.16(e) (3030050) |
| H046 | | UWH properly prepares, handles, and retains shipping papers for all universal waste shipped. 22 CCR 66273.38; 49 CFR 172.201(e) |
| H100 | | UWH transfers or disposes all universal waste to an appropriate destination facility. 22 CCR 66273.31(a) (3050003) |
| H047 | | UWH properly cleaned up and contained spills of electronic devices, CRTs and/or CRT glass. 22 CCR 66273.33.5 (3040004) |
| H101 | | UWH complied with all universal waste training requirements. 22 CCR 66273.36 (3020003) |
| **General** | | |
| H108 | | Release/Leaks/Spills/Containment – General. 22 CCR multiple chapters, sections; HSC 6.5 multiple sections (3040) |

## OBSERVATIONS / CORRECTIVE ACTION

Onsite to conduct a hazardous waste generator inspection. Consent to conduct a facility walkthrough and take pictures was granted by the property owner Mary Sourmany and their Attorney Drew Simons. During the inspection it was noted that CJGL, Inc. was no longer operating at this location.

Drew Simons stated during the inspection that Driven Brands., Inc. is the lessee who sublet the location to CJGL Inc. CJGL Inc. (tenant) is the entity permitted with the CUPA for the generation of hazardous waste. Per Drew Simons, the tenant surrendered possession of the property to the landlord on September 14th, 2022. At the time of this inspection, Driven Brands had contracted non-hazardous waste transporters to transport equipment and waste offsite. The contracted transporters were directed by the CUPA not to transport any hazardous or universal waste offsite unless they have the registration to do so.

**Note:** CJGL Inc. has open violations from the hazardous waste generator inspection conducted on September 29th, 2021 and the hazardous waste follow-up inspection conducted on November 22, 2021.

**Violation H028:** Failure to dispose of hazardous waste at an authorized location.
**Observation:** CUPA reached out to CJGL Inc. representative Jan Douma via email on September 21, 2022to conduct a closure inspection and address open violations stemming from the September and November 2021 inspection. Jan Douma from CJGL Inc. said that they no longer had access to the site and provided the CUPA with the contact information to for Drew Simons to schedule the closure inspection. Per Drew Simons,"CJGL Inc. turned over the property on September 14, 2022". At the time of inspection, the following waste was observed to be left onsite by the permitted hazardous waste generator CJGL Inc.

Service bay connected to the office:
One unlabeled 55 gallon drum, unknown if empty.
2 x 5 gallon gasoline containers, unknown if empty.
Several quart sized antifreeze and motor oil containers mixed in with trash on the floor, some containing pourable amounts of liquid.

Enclosed hazardous waste accumulation area ("trash enclosure") on east end of parking lot:
Several aerosol containers mixed with trash inside white plastic bags.
1 x 5 gallon propane cylinder.
Approximately 2 x 55 gallon metal drums containing used oil filters.
2 other 55 gallon drums in trash enclosure area. Some of the drums were observed to be opened.
Several 4 foot fluorescent bulbs, many broken.

*Rev: 10/10/2022*

MEIN000211



**Hazardous Waste Non-RCRA Large Quantity Generator Inspection Report/Notice to Comply/Notice of Violation**

| | |
|---|---|
| Facility Name: | CJGL, Inc., dba MEINEKE CAR / ECONO LUBE #4118 |
| Site Address: | 3956 STATE ST |

Date: 10/25/2022

Page 4 of 5

Aboveground service bay in the building across from the office:
Several quart to one gallon sized motor oil containers were left on the floor, some with pourable amounts of liquid, many without lids or caps.
Several quart to one gallon sized antifreeze containers were left on the floor, some with pourable amounts of liquid, many without lids or caps.
Several quart sized transmission fluid containers were left on the floor, some with pourable amounts of liquid, many without lids or caps.
2 x 15 to 20 gallon used oil caddies with filters placed on stop for draining were left onsite. Caddies contained an undetermined amount of liquid in them.
Several aerosol cans were left mixed in with white trash bags.
9 lead acid, automotive type battery cores where left on the ground, unknown if these were waste or new batteries.
2 x five gallon orange buckets storing mixed paper filters and metal filters left on floor. Hazardous waste containers were left with no top. One unlabeled drum unknown if empty.

Underground service bay in the building across from the office:
1x 55 gallon white poly drum, the hazardous waste label indicated waste antifreeze.
1x 55 gallon white poly drum, the hazardous waste label indicated used oil.
1x 55 gallon white poly drum, of ethylene glycol, left on-site by CJGL, Inc., considered waste.
1x 55 gallon white poly drum, the hazardous waste label indicated used oil.
1x ~440 gallon red rectangular tank labeled as used oil. Inspector utilized a dip stick available on top of the tank to stick the tank it was observed that the tank contained about 4 inches of used oil left in the tank.
**Corrective action:** The abandonment of these materials by CJGL, Inc. at the location indicates that these materials are wastes. As wastes, these materials are considered hazardous wastes disposed of by CJGL, Inc. at a point not authorized. Driven Brands, Inc., and/or CJGL, Inc. must ensure that hazardous waste is properly picked up and transported by a registered hazardous waste hauler and disposed of at a point authorized to receive and dispose of these wastes. Send hazardous waste manifest and other applicable disposal documentation to Jpadillia@sbcphd.org.

A material is a waste if it poses a threat to human health or the environment and meets either, or both, of the following:
(1) It is mislabeled or not adequately labeled, unless the material is correctly labeled or adequately labeled within 10 days after the material is discovered to be mislabeled or inadequately labeled;
(2) It is packaged in deteriorated or damaged containers, unless the material is contained in sound or undamaged containers within 96 hours after the containers are discovered to be deteriorated or damaged.

Hazardous waste is a hazardous material that is being discarded and is specifically defined by the California Department of Toxic Substances Control (DTSC) as: Waste substances which can pose a substantial or potential hazard to human health or the environment when improperly managed.

**Violation H033:** Failed to properly label all containers or portable tanks used to accumulate hazardous waste.
**Observation:** The following containers used in the accumulation of hazardous waste were observed without a hazardous waste label.
Multiple 5 gallon containers used for the accumulation of oil filters and used oil.
Multiple 55 gallon drums.
**Corrective Action:** Ensure all containers or portable tanks used in the accumulation of hazardous waste are labeled with all required content; the words hazardous waste, accumulation state, generator name and address, physical state of the waste, and hazardous characteristics of the waste.

**Violation H037:** Failed to close containers of hazardous waste except when adding or removing hazardous waste.
**Observation:** At time of inspection several drums and quart sized containers were uncapped and no closed.
**Corrective action:** Ensure all containers used in the accumulation of hazardous waste are closed when hazardous waste is not being added or removed.

**Violation H086:** Failure to maintain adequate aisle space.
**Observation:** Located in the trash enclosure, several 55 gallon drums were buried under various items of trash and solid waste. Inspector was unable to inspect these drums. These drums were utilized to accumulate used oil filters and gasoline/diesel removed from vehicles.
**Corrective Action:** Ensure all hazardous waste containers are provided with enough aisle space to allow for inspection of the entire container.

*Rev: 10/10/2022*

MEIN000212



**Hazardous Waste Non-RCRA Large Quantity Generator Inspection Report/Notice to Comply/Notice of Violation**

| | |
|---|---|
| Facility Name: CJGL, Inc., dba MEINEKE CAR / ECONO LUBE #4118 | Date: 10/25/2022 |
| Site Address: 3956 STATE ST | Page 5 of 5 |

**Violation H093:** CJGL Inc. failed to maintain and operate the facility to minimize the possibility of fire/explosion/release.
**Observation:** CJGL Inc. abandoned cracked and open containers of hazardous waste throughout the facility. Abandoned non-empty containers of hazardous materials are mixed with trash. Oil filled motor vehicle equipment was left on the ground and leaking black oil like material.
**Corrective action:** Ensure that the hazardous waste is properly disposed of at a point authorized and transported by registered hazardous waste haulers. Send hazardous waste manifest of waste disposed of to Jpadillia@sbcphd.org

**Violation H099:** Failure to properly manage universal waste in a manner that prevents fire, explosion, and the unauthorized release of any universal waste or component of a universal waste to the environment.
**Observation:** Business abandoned non-empty aerosol cans in piles of trash and inside white trash bags throughout service bays. Non-empty aerosol can were also observed mixed in with trash area inside the hazardous waste storage area. Fluorescent bulbs were observed not to be stored in containers and scattered along the properties east wall. White glass from broken fluorescent bulbs and lamps were observed along the eastern property wall.

**Corrective action:** Ensure universal waste is properly containerized, stored, and accumulated in proper containers, labeled, and disposed of at an authorized location. Send universal waste receipts, manifest and other applicable disposal documentation to Jpadillia@sbcphd.org.

**Violation H037:** Containers of hazardous waste were not closed except when adding or removing waste.
**Observation:** Abandoned non-empty containers of oil in quart and gallon sized quantities left throughout the facility. Three 55 gallon drums labeled as hazardous waste in the service bay were open at the time of the inspection.
**Corrective action:** Ensure hazardous waste containers are closed when not adding or removing waste.

During this inspection, and after discussions with the property owner, it was indicated that the site would be partially cleaned up by having solid waste segregated from hazardous waste. Solid waste would be picked up and disposed of while the hazardous waste would be staged for pickup at a future date.

---

☐ No Violations Noted at Time of Inspection     ☐ NOTICE TO COMPLY (Minor Violations)     ☒ NOTICE OF VIOLATION (Class I & II)

The marked items represent violations of the California Health and Safety Code, Chapter 6.5 (6.5 Cal. H&SC). A re-inspection may occur at any time on or after the compliance deadline to verify correction of violations. Failure to correct violations by the compliance deadline will result in further enforcement action, including, but not limited to, re-inspection fee, fines, formal enforcement and/or suspension or revocation of your Unified Program Facility Permit. **All violations are to be corrected and a copy of this form and accompanying requested documentation, signed and returned within 35 days, certifying the correction of these violations.**

Signature of Responsible Party: No Signature Required – COVID-19  Print Name: Mary Sourmany and Drew Simons  Date: 10/25/2022

Inspection report emailed to: Jan Douma jandouma1@gmail.com , Andrew Simons Drew@dsimonslaw.com, and the Property Owner Mary Sourmay at mlsourmany@cox.net

The violations noted above must be corrected by: 11/28/2022

**Compliance Certification: As the owner/operator of the above subject business, I certify that all of the violations cited above have been corrected.**

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Signature | Print Name | Date |

MEIN000213

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

MEINEKE FRANCHISOR SPV
LLC, a Delaware limited
liability company; and
MEINEKE REALTY, INC., a
North Carolina Corporation,

        Plaintiffs,

-vs-                  CASE NO. 2:23-CV-00374
                            SPG-JC
CJGI, INC., a California
corporation; CARL DOUMA, an
individual; JAN DOUMA, an
individual,

        Defendants.
                /
AND RELATED CROSS-COMPLAINT
_____/

VIDEOTAPED VIDEOCONFERENCE

RULE 30(b)(6) DEPOSITION OF

DARRIN KRADER

February 5, 2024

Reported By:

Cynthia Ornelas, CSR 9402

Job No.: 94875

1    A.  Correct.

2    Q.  And I guess if it's okay with you, we can

3  liken being current as that includes or encompasses

4  agreed to or accepted payment plan if there is some

5  back payment due?

6    A.  Correct.

7    Q.  So it's fair to say then that the Douma's

8  were current at the time they were enrolled in

9  Project Constitution with the franchise fees?

10    A.  Yes.  I mean, they were on a payment plan,

11  but they were current.

12    Q.  Exactly.  Not trying to put words in your

13  mouth, but utilizing an agreed upon payment plan as

14  applying to current as well?

15    A.  Correct.

16    Q.  What is the purpose of Project

17  Constitution, if you know?

18    A.  So the original plan, not the original

19  plan, the only reason why Project Constitution came

20  about is Meineke wanted to become, institute image

21  guidelines and brand standards.  We wanted every

22  Meineke, when you went to that Meineke, they would

23  all look the same or as close to the same as

24  possible.  And that required image upgrades,

25  improvements to the building, signage, lobby

1    upgrades, pavement, parking lot upgrades, things of

2    that nature.

3        Q.  Prior to Project Constitution, was there

4    not a system standards across the board for

5    presentation of the Meineke store?

6        A.  You had to have a Meineke sign up.

7        Q.  That's it.  Okay.

8        A.  All landlords are different.  All

9    buildings don't look the same.  And that again,

10   that's why we tried to institute that policy, you

11   know.  We got to get these as close to the same as

12   possible, right.  Some landlords aren't going to

13   let you paint the building white.  We understand

14   that.  We can appreciate that.  The game plan was

15   to get them all looking as similar as possible.

16   And some of the signage and some of the stores were

17   old and they weren't well lit up, you know.  And we

18   just wanted that to be across the board.  We wanted

19   improvements made to the brand.

20       Q.  Okay.  How did -- we can just if anything

21   at this moment in general, simple terms, how did

22   Project Constitution function then for an enrollee?

23       A.  Once you passed the enrollment process or

24   once you got qualified I think is what we called

25   it, then you went into a system where one percent

**RULE 30(B)(6) DARRIN KRADER**

**February 05, 2024**

1      A.   The AF is advertising fund.   That I knew.

2      Q.   How is that funded?   I mean, how does

3  money go into the MAF, putting aside distribution?

4      A.   From the fees every week, Meineke would

5  draft money every week from the franchisee, and it

6  would be for franchise fees or royalties, and then

7  it would be the MAF, M-A-F.

8      Q.   And generally speaking, that's identified

9  in the franchise agreement and/or a franchise

10  disclosure document of what the percentage may be,

11  correct?

12      A.   Correct.

13      Q.   So the Project Constitution, was the one

14  percent revenue, was that above the general MAF

15  contribution?

16      A.   No.   That came from the MAF fees that we

17  drafted every week.

18      Q.   So, and I apologize, I'm trying to make

19  sure I fully understand.   If the franchisee went

20  through, qualified, became an enrollee, they are

21  still paying the same amount of fees that they

22  would be paying, it's just one percent of it was

23  going into Project Constitution?

24      A.   Correct.

25      Q.   Okay.   So had CJGL not been an enrollee of

1   Project Constitution, is it your testimony that

2   they would still be paying the same amount into the

3   MAF contributions?

4      **A.  Correct.**

5      Q.  How often did franchisees utilize Project

6   Constitution, so for the sign upgrade, you know,

7   whatever type of upgrades in which the franchisees

8   were trying to update and bring the stores into a

9   more form, standardized brand system?

10      **A.  After two years.**

11      Q.  So you had to be a member or a participant

12   for two years before you could see distribution?

13      **A.  Correct.**

14      Q.  Let's say the two years have passed.  A

15   franchisee -- I guess this is whether or not -- let

16   me scratch that.  Let me start over.

17         When the franchisee would be seeking the

18   distribution, and again, this would be I suppose

19   after two years, so be it for the signage upgrade,

20   interior, et cetera, would that be generally part

21   and parcel with their franchise agreement, the need

22   to say update their stores or would this be

23   separate and apart, I decided I want to upgrade my

24   signage?

25      **A.  It was intended to upgrade the signage so**

RULE 30(B)(6) DARRIN KRADER

**February 05, 2024**

```
 1    that it all -- but again, we're trying to change
 2    brand standards and make the stores look better, so
 3    if that's what you're asking.  That's what its sole
 4    purpose was, right.
 5         Q.  I guess the question, yes, but I guess
 6    maybe I'm asking it poorly.  Was, I guess was there
 7    a time that Meineke, putting aside what the
 8    franchise agreement might have said, every five
 9    years upgrade your signage, let's say, or let's
10    make sure everything is looking good every five
11    years.  The Project Constitution, that was separate
12    and apart from a given franchisee's obligations
13    under the franchise agreement?  This was to in some
14    way or form independently update the brand when a
15    franchisee would seek the distributions.  It didn't
16    come at the time of renewal or only renewal?
17         A.  No.  It was at any time.  It had nothing
18    to do with renewing.  It just had to do with you
19    qualified, and that's the money that needs to be
20    spent to make the needed upgrades to the building,
21    the lobby, signage, whatever the case may be.
22         Q.  When Project Constitution started, do you
23    have knowledge if the MAF distribution, if there
24    was an increase to that because of implementation
25    of Project Constitution?
```

1      **A.  No.  To my knowledge there was not.**

2      Q.  Prior -- and then I'm just going to use a

3   hypothetical, right.  Prior to Project

4   Constitution, franchisees were contributing two

5   percent of revenue every week to the MAF fund?

6      **A.  No.  The franchisee contribution was more**

7   **than Project -- it was eight percent of.**

8      Q.  So we'll say eight percent.  Like I said,

9   I don't have the franchise agreement in front of

10  me, so I don't recall the exact.  And I always

11  hesitate to make assumptions since those numbers

12  can change at times.  We'll use the eight percent.

13      Prior to Project Constitution introduction

14  and implementation, it was eight percent?

15      **A.  Right.**

16      Q.  When Project Constitution was implemented,

17  it remained eight percent, it's just now a portion,

18  if you were in Project Constitution, would be set

19  aside for Project Constitution.  Is that --

20      **A.  Correct.**

21      Q.  Thank you.  How successful was Project

22  Constitution would you say?  Was Project

23  Constitution successful?

24      **A.  Yes.**

25      Q.  So you saw the stores, the imaging, the

**RULE 30(B)(6) DARRIN KRADER**

**February 05, 2024**

1    Meineke states the Douma's or, excuse me, CJGL

2    renewed the franchise agreement, on what date?

3         **A.   No.**

4         Q.   That might be more of a Joseph Robinson

5    question too.  I know he oversaw that far more in

6    detail.

7              I'm going to share my screen with you.  Do

8    you see this document with the Bates number MEIN,

9    Meineke, 001750?

10        **A.   Uh-huh.**

11        Q.   I'm going to scroll up now.  This is from

12   you to Ms. Douma.  And the date, correct me if I'm

13   wrong because it appears to be in some fashion

14   European or non U.S. standard, but it's July 27,

15   2022, correct?

16        **A.   Correct.**

17        Q.   Can you explain what this correspondence

18   is about?

19        **A.   Looks like at this point she was trying to**

20   **relocate.  So at that point in time the way that**

21   **John Thys that's referenced there, he works in real**

22   **estate and helps with relocation of stores, he**

23   **would have had a Google doc that she would have had**

24   **access to that would have listed out whatever other**

25   **shops are available at the time.**

1      Q.  Do you have any recollection as to why the
2  end of July 2022 you were providing Ms. Douma
3  information as to potential relocation?
4      A.  At some point I believe the landlord said
5  that he was going to evict her, maybe as soon as he
6  could get another tenant, something along those
7  lines.  And so we started this process trying to
8  relocate the location.  Again, object, bear in
9  mind, the object is always to keep the location
10  open, never close.  That would have been a way for
11  us to keep the location open is to relocate.
12      Q.  In this note to Ms. Douma, the last line
13  above your signature line, I will reach out to the
14  LL, I take that as the landlord, correct?
15      A.  Correct.
16      Q.  I will reach out to the LL today and
17  follow up with you when I hear from him.
18          What is that in relation to?  Of course
19  the landlord, but do you know why you were going to
20  be reaching out to the landlord that day?
21      A.  Again, probably referring back to I'm
22  going to evict her, and I'm trying to get an idea
23  of when she's going to evict or if there's some way
24  I can save this and get him and her to come to an
25  agreement.  I'm only drawing that conclusion based

**RULE 30(B)(6) DARRIN KRADER**

**February 05, 2024**

1    upon the fact, again, that's a relocation document,

2    the spreadsheet that she has access to.

3        Q.  I guess for purposes of authentication, is

4    this what it tends to look like?  There's some

5    property addresses that identifies retail, star

6    rating, et cetera?

7        A.  Correct.

8        Q.  I suppose I can say same for just the

9    information that's being provided?

10       A.  That was at three locations, and he

11   solicited an amount there, and she has access to

12   Google sheet.  And she can -- that's an old sheet.

13   I don't think we even use that sheet anymore, but

14   she would have been able to click on that sheet.  I

15   think it might have even brought a map or picture

16   up of the location or she could have taken that and

17   cut and pasted into Google map and taken a look at

18   it.

19            MS. ROSEN:  I'm going to mark this as, and

20   I apologize if I'm misnumbering, but I believe

21   Exhibit 7?

22            THE COURT REPORTER:  Yes.

23            (Defendant's Exhibit No. 7 was marked for

24            Identification).

25

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4          I, CYNTHIA ORNELAS, a Shorthand Reporter,

 5     State of California, do hereby certify:

 6          That DARRIN KRADER, in the foregoing

 7     deposition named, was present and by me sworn as a

 8     witness in the above-entitled action at the time

 9     and place therein specified;

10          That said deposition was taken via

11     videoconference at said time and place, and was

12     taken down in shorthand by me, a Certified

13     Shorthand Reporter of the State of California, and

14     was thereafter transcribed into typewriting, and

15     that the foregoing transcript constitutes a full,

16     true and correct report of said deposition and of

17     the proceedings that took place;

18          IN WITNESS WHEREOF, I have hereunder

19     subscribed my hand this 15th day of February 2024.

20
                          Cynthia Ornelas
21     _____
                          CYNTHIA ORNELAS, CSR NO. 9402
22                        State of California

23

24

25
```

# JOINT APPENDIX OF EXHIBITS
# EXHIBIT 7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


MEINEKE FRANCHISOR SPV LLC, a Delaware  )
limited liability company; and MEINEKE  )
REALTY, INC., a North Carolina          )
corporation,                            )
                                        )
                    Plaintiffs,         )
                                        )
        vs.                             )   No. 2:23-CV-00374-SPG-JC
                                        )
CJGL, INC., a California corporation;   )
CARL DOUMA, an individual; JAN DOUMA, an)
individual,                             )
                                        )
                    Defendants.         )
_____)
                                        )
AND RELATED CROSS ACTIONS.              )
_____)



VIDEOTAPED DEPOSITION PURSUANT TO FRCP 30(b)(6) OF

MEINEKE FRANCHISOR SPV LLC AND FRCP 30(b)(6) OF MEINEKE

REALTY, INC. (JOSEPH ROBINSON)

Tuesday, February 6, 2024


Reported stenographically by:
ANNA B. SACRIPANTI, CSR NO. 9533
Job No. 94874

30(B)(6)  JOSEPH ROBINSON

**February 06, 2024**

```
 1  relation to communication, discussions of renewing the
 2  franchise agreement months before, and all that dragged
 3  on, the -- one of the issues emphasized from the get-go
 4  from CJGL and ultimately through CJGL via Jan Douma was
 5  the issue with the commercial lease.  Correct?
 6      A    That was her issue, you said?
 7      Q    Yeah, the issue with the commercial lease, that
 8  that -- that there was not an existing --
 9      A    Oh, yeah.  She wanted another lease, yeah.  She
10  wanted to make sure the lease was in her name.
11      Q    And you -- you testified, you know, you've all
12  been -- I shouldn't say you've all been.  One of the
13  duties you did, I believe even to this day perhaps, is
14  assisting franchisees who want to sell the franchises.
15      A    What about that?
16      Q    Would you agree, in order to sell a franchise,
17  you need to have a commercial lease for a -- given a
18  specific specified term of that fran- -- for the term of
19  that franchise agreement.  Correct?
20      A    Not really, no.
21      Q    And why is that?
22      A    If I -- I don't know how far I can talk, but
23  like this is a great example.  If I would have known she
24  wanted to sell, we could have put other franchisees
25  right in front of that landlord to get them qualified
```

1   for that location, and that's a common thing.  So we

2   would renew someone that doesn't have a lease.  But if

3   they turn out the landlord was, you know, were going to

4   kick them out, we're going to do everything we can to

5   save that location.  We're going to put franchisees in

6   there, but they had to agree to sell it, so.

7       Q    But why is the, I guess, consideration changed

8   if the goal was to sell halfway through the term of the

9   renewal term?

10      A    If she wanted to sell or -- is that what you're

11  asking?

12      Q    Yes, yes.

13      A    If she wanted to sell, we would definitely help

14  her sell.  We would have put someone else in that

15  location.

16      Q    I understand.  The question is why would the

17  franchisee need to specifically identify desire to sell

18  prior to the renewal when there was no existing term,

19  commercial lease for the franchise premises?

20      A    This isn't the first time that someone wants to

21  sell because of a lease or they don't like the landlord,

22  whatever the case.  Our job is to -- if a franchisee

23  wants to sell, we're not going to force them to stay

24  there.  We don't want to see their store close.  So

25  we're going to do everything we can to sell it for them.

30(B)(6) JOSEPH ROBINSON

**February 06, 2024**

```
 1   intent?  We already asked if it covered --
 2       A    No, no.
 3       Q    -- payment, payback?
 4       A    I don't see it.  I don't see it.  It doesn't
 5   talk about allocation or anything.  It just says, "Hey,
 6   this is an option."
 7       Q    Well, it talks about eligibility, so.
 8       A    Yeah.
 9       Q    But in any case, do you have any knowledge or
10   understanding if the Doumas requested release of such
11   funds?
12       A    I don't have knowledge of them wanting the
13   funds anywhere in the system either.  And I'm talking
14   about FranConnect.
15       Q    I'm sorry.  You're talking about what?
16       A    Because I manage the Project Constitution
17   department, I could see who put in a request and who
18   hasn't.  And I didn't see any kind of request come
19   through for the Center 4118.  It never came through.
20       Q    Was there a specific form or application to
21   fill out?
22       A    Yes.
23       Q    And was that included on that email?
24       A    No.
25       Q    Was there a link?
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, ANNA B. SACRIPANTI, CSR No. 9533, Certified

 4   Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken before

 6   me at the time and place therein set forth, at which

 7   time the witness was put under oath by me;

 8          That the testimony of the witness, the questions

 9   propounded, and all objections and statements made at

10   the time of the examination were recorded

11   stenographically by me and were thereafter transcribed;

12          That a review of the transcript by the deponent

13   was requested;

14          That the foregoing is a true and correct

15   transcript of my shorthand notes so taken.

16          I further certify that I am not a relative or

17   employee of any attorney of the parties, nor financially

18   interested in the action.

19          I declare under penalty of perjury under the laws

20   of California that the foregoing is true and correct.

21          Dated this 16th day of February, 2024.

22

23

24

25                 ANNA B. SACRIPANTI, CSR NO. 9533
```

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 8

LAWRENCE J. HILTON (State Bar No. 156524)
Email: lhilton@onellp.com
TAYLOR C. FOSS (State Bar No. 253486)
Email: tfoss@onellp.com
**ONE LLP**
23 Corporate Plaza
Suite 150-105
Newport Beach California 92660
Telephone:  (949) 502-2876
Facsimile:   (949) 258-5081

Attorneys for Plaintiffs and Counter-Defendants
MEINEKE FRANCHISOR SPV LLC and
MEINEKE REALTY, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina corporation, <br><br> Plaintiffs, <br><br> v. <br><br> CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual, <br><br> Defendants. <br> ──────────────── <br> AND RELATED COUNTERCLAIMS | Case No. 2:23-cv-00374-SPG-JC <br> Hon. Sherilyn Peace Garnett <br><br> **DECLARATION OF DENNIS D. LEONE** <br><br> Date:  April 10, 2024 <br> Time: 1:30 p.m. <br> Crtrm: 5C <br><br> Complaint Filed: January 18, 2023 <br> Answer/Counterclaim: March 15, 2023 <br><br> Trial Date: June 18, 2024 |

**DECLARATION OF DENNIS D. LEONE**

1    I, Dennis D. Leone, declare as follows:

2    1.    I am a partner at the law firm of Shankman Leone, P.A. ("Shankman

3    Leone").  In 2021, Shankman Leone served as outside counsel for Plaintiffs

4    Meineke Franchisor SPV LLC and Meineke Realty, Inc.  In that capacity, I had a

5    number of communications with Jeff Haff, a partner at the law firm of Dady &

6    Gardner, P.A. Gardner, who represented the Defendants and Counterclaimants in

7    this action, CJGL, Inc., Jan Douma and Carl Douma.

8    2.    Attached hereto as **Exhibit 1** is a true and correct copy of an email

9    exchange that took place on September 21, 2021 between Mr. Haff and me.  The

10   email exchange included as an exhibit correspondence from Andrew Simons, an

11   attorney representing the landlord at the premises where CJGL, Inc. operated a

12   Meineke center.

13   3.    Attached hereto as **Exhibit 2** is a true and correct copy of an email

14   exchange that took place during the time period between September 24-27, 2021

15   between Mr. Haff, Jan Douma and me.

16   4.    Attached hereto as **Exhibit 3** is a true and correct copy of an email

17   exchange between Mr. Haff and Mr. Simons during the time period between

18   September 29, 2021 and November 5, 2021, on which I was copied.

19   5.    Attached hereto as **Exhibit 4** is a true and correct copy of an email

20   exchange between Mr. Haff, Mr. Simons and me during the time period between

21   September 29, 2021 and February 15, 2022.

22   6.    Attached hereto as **Exhibit 5** is a true and correct copy of an email

23   exchange between Mr. Haff and Mr. Simons during the time period between

24   September 29, 2021 and December 7, 2021, on which I was copied.

25

26   / / /

27   / / /

28   / / /

2

**DECLARATION OF DENNIS D. LEONE**

1    I declare under penalty of perjury under the laws of the United States of
2  America that the foregoing is true and correct.  Executed on February 16, 2024 at
3  Tampa, Florida.

DocuSigned by:

*Dennis Leone*

06A24437CDDD440...

Dennis D. Leone

**DECLARATION OF DENNIS D. LEONE**

# EXHIBIT 1

| From: | **Dennis Leone** <dleone@shankmanleone.com> |
|---|---|
| To: | **jhaff@dadygardner.com** <jhaff@dadygardner.com> |
| Subject: | RE: Douma |
| Date: | 21.09.2021 17:45:44 (+02:00) |
| Attachments: | Robinson Joseph 082521.pdf (2 pages), Flagship Construction Inc. - Inspection of Property 12.10.2019.pdf (2 pages) |

Jeff, here is the latest correspondence Meineke received about the repairs. Let me know. Thanks. Best,

Dennis

Dennis Leone
Shankman Leone, P.A.
707 North Franklin Street
Fifth Floor
Tampa, Florida 33602
Office (813) 223-1099
Facsimile (813) 223-1055

**Shankman**Leone

This e-mail contains privileged and confidential information intended only for the use of the individual or entity named above. If you are not the intended recipient, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and the information contained herein is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (813) 223-1099, or reply by e-mail and delete this message. Thank you for your cooperation.

---

**From:** Dennis Leone
**Sent:** Tuesday, September 21, 2021 1:36 PM
**To:** jhaff@dadygardner.com
**Subject:** Douma

Jeff, I was able to connect with my team on this.

The situation is a bit more complicated than I recalled for two reasons unfortunately. One is likely resolvable. I am unsure on the second. First, it turns out that your client is also responsible for making repairs to the property and is refusing to do so. Further, your client is arguing that Meineke is responsible for them. As a result, Meineke will require those repairs made, as will the landlord. I suspect that issue is manageable. The second issue is more systemic. Meineke wants out of the sublessor business and is not agreeable to moving forward as a party to this or other leases (in part due to issues like the above). As such, I am not sure how we cross the "new lease issue". My experience suggests, to paraphrase our friend Scott's strategy in seemingly hopeless matters, we beg. Meineke will support your clients efforts, however, I think your client needs to "right the wrongs" and pay all outstanding amounts and make all repairs as soon as possible. She may want to also offer additional security and the like to secure the lease.

Please let me know what you think your client can do and how quickly so we may consider a path forward. Thanks. Talk soon. Best regards,

Dennis

Dennis Leone
Shankman Leone, P.A.
707 North Franklin Street
Fifth Floor
Tampa, Florida 33602
Office (813) 223-1099

Facsimile (813) 223-1055

## Shankman Leone

This e-mail contains privileged and confidential information intended only for the use of the individual or entity named above. If you are not the intended recipient, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and the information contained herein is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (813) 223-1099, or reply by e-mail and delete this message. Thank you for your cooperation.

# REICKER PFAU

## ATTORNEYS AT LAW

Alan A. Blakeboro
John G. Busby
R. Mark Carney
Robert B. Forouzandeh
Diana Jessup Lee
Bruce W. McRoy
Kevin R. Nimmons
Michael E. Pfau
Daniel A. Reicker
Andrew D. Simons
Russell D. Terry
Timothy J. Trager
Fernando Velez, Jr.
Meghan K. Woodsome

Cory T. Baker
Nicholas A. Behrman

1421 State Street
Suite B
Santa Barbara, CA 93101

August 25, 2021

**Via email (*joseph.robinson@drivenbrands.com*) and US MAIL**

Joseph Robinson, Director or Real Estate
Driven Brands, Inc
440 S. Church Street, Suite700
Charlotte, NC 28202

   **RE:** AIR Standard Industrial Commercial Single-Tenant Lease- Net dated July 1, 2012 (the "Lease") for the premises located at 3956 State Street, Santa Barbara, CA: Demand to Make Repairs and Notice of Default

Dear Joe:

   This letter constitutes formal demand that Driven Brands as the Lessee of the above referenced Lease make the repairs to the Premises referenced on the list attached hereto. Capitalized terms used herein shall have the meanings assigned to such terms in the Lease.

   Lessor requested that Lessee make these repairs in 2019 and several times thereafter but they remain outstanding. Lessor's inspector recently inspected the Premises and confirmed the items have not been addressed and also noted: (i) a chip on the floor in Bay 1 that needs to be repaired, and (ii) that the trees on the property need to be cut back. Pursuant to section 7.1 of the Lease, these items are tenant's responsibility.

   This letter constitutes demand that Lessee promptly make the repairs and address the items noted in the attached report and paragraph above. Please also provide copies of the service contracts that Lessee has in place for the HVAC system pursuant to Section 7.1(b) of the Lease. If Lessee fails to do so within 30 days of the date hereof, Lessee will be in default under the Lease and Landlord will make the repairs and charge Lessee 115% of the cost thereof and/or terminate the Lease for breach.

-2-

Please call or write me if you have comments or questions. Otherwise, Lessee has been advised accordingly and my client reserves all rights it has under the Lease and by law.

Sincerely,

REICKER, PFAU, PYLE & MCROY LLP

By:
    Andrew D. Simons, Esq.

cc:   Mary & Maurice Sourmany

**FLAGSHIP CONSTRUCTION, INC.**

*INSPECTION OF PROPERTY Dec 10, 2019*

(805) 636-5152
flagship805@gmail.com

45 Dearborn Pl. #34
Goleta, CA 93117

Lic.994317

December 10, 2019

Maurice and Mary Sourmany
Property Owners
3956 State Street
Santa Barbara, CA 93105

Dear Maurice and Mary,
Upon inspection of the property located at 3956 State St on the 10th of December of 2019, our findings are as follows:

Fencing-
The fence in the rear of the property that has been apparently damaged by a fallen branch, still has a bent top rail in one area as well as a poorly connected top rail that appears to have been wired unprofessionally.

Our recommendation- Replace the bent top rail and connect top rails with a proper coupler at current break that is wired together.

Parapet walls-
Plaster has been repaired properly, but never primed or painted.
Our recommendation- Prime and paint the exposed patches on the parapet walls.

Gaps around electrical conduit-
These gaps remain.
Our recommendation- Plaster patch around conduits and use spray foam insulation as needed.

Patio Cover (Pergola)
The patio cover/ pergola shows signs of extreme dry-rot/ pest damage beyond Bond-O/ dutchman repairs.
Our recommendation- Demolish and either rebuild or waterproof and patch.

Electrical wiring between buildings-
Conduits running from building to building have exposed wiring.
Our recommendation- Run wire through proper conduit supported by guy wires exterior rated, properly sealed at penetrations.

Garage cracks-
The cracks appear to be normal for the age of the building.
Between 1/16" - 1/8"
We find this acceptable.

Tile roof-
About a 5'x5' area of tile roofing has severe damage.
Our recommendation- Replace all broken tiles and possible underlayment once broken tiles are removed to view.

Water heater-
Appears to be installed within a year or 2. It has no date. It is 6 gallons.

Sub panel appears in good order without issue.

Bathroom has been retiled.

Front door has been replaced however we recommend sealing the top and bottom with primer and paint.

The windows that were previously rotten have been properly repaired and are in good condition.

Flat roof-
Parapet walls and flashing in good condition. Flat comp roof is buckling all over and not draining water as well as collecting debris.
Our recommendation- Completely replace flat roof: Including everything down to the substrate. This will continue to puddle and collect debris and is susceptible to leaks. We believe this is the main concern and needing the most attention.

Sincerely yours,

12/10/19

Calvin Petersen

C.E.O.

# EXHIBIT 2

| From: | Jeffery S. Haff <jhaff@dadygardner.com> |
|---|---|
| To: | 'Dennis Leone' <dleone@shankmanleone.com> |
| CC: | 'Jan Douma' <jandouma1@gmail.com> |
| Subject: | RE: Jan Douma's Meineke Lease Issue |
| Date: | 27.09.2021 14:30:24 (+0000) |

[EXTERNAL EMAIL NOT FROM SHANKMANLEONE.COM]

Thanks, let me know.  Since we have been invited to make a proposal, we'd like to make the best proposal we can.  So, if Meineke will guaranty the lease, that would make our proposal better.  Let me know either way.

Jeff Haff

---

**From:** Dennis Leone <dleone@shankmanleone.com>
**Sent:** Friday, September 24, 2021 8:23 PM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** Re: Jan Douma's Meineke Lease Issue

Jeff, thank you for the update and counsel's feedback about the landlord's perspective.

He is correct to a point, I suppose. Meineke is exiting the business of guaranteeing its franchisees' leases and is no longer agreeing to provide guarantees for them. I will share landlord's counsel's gratuitous and self serving commentary though I suspect it will not change Meineke's decision even if it results in a loss of the location. If you have thoughts or a proposal you would like Meineke to consider, please let me know.

I will let you know once I receive a response though I do not expect different instruction. In the interim, please let me know if you have any questions. Talk soon. Best regards,

Dennis

---

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Friday, September 24, 2021 2:31:09 PM
**To:** Dennis Leone <dleone@shankmanleone.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** Jan Douma's Meineke Lease Issue

[EXTERNAL EMAIL NOT FROM SHANKMANLEONE.COM]

Dear Dennis:

I spoke with the landlord's attorney Drew Simons today regarding this matter.  He stated that Meineke "really blew it" by ending the chances of Jan getting a lease for $7,900/month when Meineke decided it would not guaranty the $7,900/month lease.  He now says the landlord is about to hire a broker and put the property on the market for $10,800 to $11,700/month (or more).  He said that, because of what it did, Meineke is probably going to lose the unit and some other national competitor will probably get it.

He said, "Ms. Douma can make a specific proposal, but she needs to do so quickly before we sign the engagement letter and put the property on the market."

Will Meineke agree to guaranty this lease as part of keeping this franchisee in business in Santa Barbara at her current location?  I need to know that before I can make a formal proposal to Drew Simons on Ms. Douma's behalf.

Please check with your client and let me know.

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

# EXHIBIT 3

| | |
|---|---|
| From: | **Drew Simons** <asimons@rppmh.com> |
| To: | **Jeffery S. Haff** <jhaff@dadygardner.com> |
| CC: | **'Dennis Leone'** <dleone@shankmanleone.com> |
| Subject: | RE: Santa Barbara Meineke |
| Date: | 05.11.2021 19:19:39 (+01:00) |

[EXTERNAL EMAIL NOT FROM SHANKMANLEONE.COM]
Jeff,

I have talked to my client. As I mentioned, they have a commercial broker ready to either list the property for sale or lease at a higher rate than $8900 a month. However, they are willing to consider entering into a new lease with Jan on the terms you proposed with the following modifications:

1.  Term would be for 3 years. They will consider an extension at that time depending on their circumstances but would not be obligated to extend.
2.  Lease would be absolute NNN, no landlord responsibilities for structural modifications or repairs.
3.  Meinke guarantee would be for 6 months.
4.  Jan/Meinke must provide evidence that the work referenced in my default letter dated August 25, 2021 has been fully performed and all defaults fully cured.

Let me know if you have questions or want to discuss. Otherwise, please promptly advise if Jan and Meinke want to proceed on this basis. Thanks.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA 93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com

----------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited. If you are not the intended recipient, please contact the sender and delete this e-mail.

----------------------------------------------

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Tuesday, November 2, 2021 10:53 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>; 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Hi Drew:

Does your client have any response to this proposal?

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

**From:** Jeffery S. Haff
**Sent:** Tuesday, October 19, 2021 3:34 PM
**To:** 'Drew Simons' <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>; 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Dear Drew:

Jan Douma is willing to enter into an $8,900/month NNN 7-year lease that would have a minimum 2% increase per year and a maximum 4% increase per year.  Major structural repairs would be the responsibility of the landlord.

I have spoken to Dennis Leone, counsel for Meineke.  He is copied here.  He has informed me that Meineke will agree to provide a 3 month guaranty of the Lease (using your numbers, roughly a $30,000 guaranty) so long as Meineke is given notice of any default and an opportunity (at its option) to cure the default and offer a substitute tenant if the lease would otherwise be terminated.

With that proposal, would your client be willing to continue with Jan Douma as the tenant and enter into a new lease?  As I have stated before, it is always easier to keep a tenant than get a new one.

Let me know.


Jeff Haff

---

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Thursday, October 7, 2021 11:36 AM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Subject:** RE: Santa Barbara Meineke

Jeff,

My clients will not accept $7900 but would consider $8900 NNN depending on Jan's financials. The brokers are confident they can lease the space for more as it is a highly coveted location and retail demand is strong right now.

If that is of interest to Jan, please provide a current financial statement and supporting documents which shows her net worth and liquid assets. Thanks.

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
-------------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
-------------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Thursday, October 7, 2021 8:57 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Hi Drew,

Just checking back in on this.  Any response from your client?

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

---

**From:** Jeffery S. Haff
**Sent:** Wednesday, September 29, 2021 10:19 AM
**To:** 'asimons@rppmh.com' <asimons@rppmh.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** Santa Barbara Meineke

Dear Drew:

Jan Douma and her company propose that her company remain as the tenant at this property and sign a 7-year lease.  The first year's rent would be $7,900/month and would go up by 2-4% per year, at the landlord's discretion.  She would guaranty the lease.  We have asked Meineke to guaranty the lease, but we have not yet heard back on whether they are willing to do so.

This proposal, we believe, gives your client the opportunity to maintain the same tenant that has been at the property and not worry about a new tenant who may have difficulty operating or finding employees (as we know that has been a problem recently nationwide).  There is a value to your client not having to transition from one tenant to another and having the old tenant moving its items out while the new tenant waits for the landlord to pay for tenant improvements to move in.  As you know, any new tenant is a crap shoot, and there may be any variety of issues that arise as a result of taking on a new client.

Let me know what else you need from our side to review our proposal.  We'd obviously like to maintain this location, and we will keep pressing Meineke (since I would imagine they'd like to keep the location as well).

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

# EXHIBIT 4

| From: | **Jeffery S. Haff** <jhaff@dadygardner.com> |
|---|---|
| To: | **Dennis Leone** <dleone@shankmanleone.com> |
| Subject: | FW: Santa Barbara Meineke |
| Date: | 15.02.2022 22:20:32 (+01:00) |

[EXTERNAL EMAIL NOT FROM SHANKMANLEONE.COM]
Your call reminded me that I needed to call Drew Simons on the Jan Douma matter.  The receptionist says he is "semi-retired" but she gave me his cell phone number.  I called and left him a message.

It may be that he no longer does this work.  If so, we maybe get a more flexible person to deal with?

Jeff Haff

---

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Friday, December 3, 2021 10:53 AM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

OK.  Look forward to hearing from you then.

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
---------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
---------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Friday, December 3, 2021 8:47 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

Can you give me until Close of Business on Monday?

Jeff Haff

---

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Tuesday, November 30, 2021 11:48 AM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

Jeff,

We need to determine if Jan is staying or we need to list the property for lease. The market for retail in Santa Barbara is very strong right now and this location is ideal for another automotive brand.  Please get back to me with a response this week.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
------------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
------------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Drew Simons
**Sent:** Friday, November 5, 2021 12:20 PM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

Jeff,

I have talked to my client. As I mentioned, they have a commercial broker ready to either list the property for sale or lease at a higher rate than $8900 a month. However, they are willing to consider entering into a new lease with Jan on the terms you proposed with the following modifications:

1. Term would be for 3 years. They will consider an extension at that time depending on their circumstances but would not be obligated to extend.
2. Lease would be absolute NNN, no landlord responsibilities for structural modifications or repairs.
3. Meinke guarantee would be for  6 months.
4. Jan/Meinke must provide evidence that the  work referenced in my default letter dated August 25, 2021 has been fully performed and all defaults fully cured.

Let me know if you have questions or want to discuss. Otherwise, please promptly advise if Jan and Meinke want to proceed on this basis. Thanks.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
------------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
------------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Tuesday, November 2, 2021 10:53 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>; 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Hi Drew:

Does your client have any response to this proposal?

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

**From:** Jeffery S. Haff
**Sent:** Tuesday, October 19, 2021 3:34 PM
**To:** 'Drew Simons' <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>; 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Dear Drew:

Jan Douma is willing to enter into an $8,900/month NNN 7-year lease that would have a minimum 2% increase per year and a maximum 4% increase per year.  Major structural repairs would be the responsibility of the landlord.

I have spoken to Dennis Leone, counsel for Meineke.  He is copied here.  He has informed me that Meineke will agree to provide a 3 month guaranty of the Lease (using your numbers, roughly a $30,000 guaranty) so long as Meineke is given notice of any default and an opportunity (at its option) to cure the default and offer a substitute tenant if the lease would otherwise be terminated.

With that proposal, would your client be willing to continue with Jan Douma as the tenant and enter into a new lease?  As I have stated before, it is always easier to keep a tenant than get a new one.

Let me know.

Jeff Haff

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Thursday, October 7, 2021 11:36 AM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Subject:** RE: Santa Barbara Meineke

Jeff,

My clients will not accept $7900 but would consider $8900 NNN depending on Jan's financials. The brokers are confident they can lease the space for more as it is a highly coveted location and retail demand is strong right now.

If that is of interest to Jan, please provide a current financial statement and supporting documents which shows her net worth and liquid assets. Thanks.

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
-----------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
-----------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Thursday, October 7, 2021 8:57 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Hi Drew,

Just checking back in on this.  Any response from your client?

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

---

**From:** Jeffery S. Haff
**Sent:** Wednesday, September 29, 2021 10:19 AM
**To:** 'asimons@rppmh.com' <asimons@rppmh.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** Santa Barbara Meineke

Dear Drew:

Jan Douma and her company propose that her company remain as the tenant at this property and sign a 7-year lease.  The first year's rent would be $7,900/month and would go up by 2-4% per year, at the landlord's discretion.  She would guaranty the lease.  We have asked Meineke to guaranty the lease, but we have not yet heard back on whether they are willing to do so.

This proposal, we believe, gives your client the opportunity to maintain the same tenant that has been at the property and not worry about a new tenant who may have difficulty operating or finding employees (as we know that has been a problem recently nationwide).  There is a value to your client not having to

transition from one tenant to another and having the old tenant moving its items out while the new tenant waits for the landlord to pay for tenant improvements to move in.  As you know, any new tenant is a crap shoot, and there may be any variety of issues that arise as a result of taking on a new client.

Let me know what else you need from our side to review our proposal.  We'd obviously like to maintain this location, and we will keep pressing Meineke (since I would imagine they'd like to keep the location as well).

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

# EXHIBIT 5

| From: | **Jeffery S. Haff** <jhaff@dadygardner.com> |
|---|---|
| To: | **'Drew Simons'** <asimons@rppmh.com> |
| CC: | **'Dennis Leone'** <dleone@shankmanleone.com>; **Jan Douma** <jandouma1@gmail.com> |
| Subject: | RE: Santa Barbara Meineke |
| Date: | 07.12.2021 00:01:04 (+01:00) |

[EXTERNAL EMAIL NOT FROM SHANKMANLEONE.COM]

Dear Drew:

My client and I have reviewed your 3-year lease proposal.  Given the ongoing expenses and ongoing capital commitments of operating a business of this type, Jan Douma does not feel comfortable signing only a 3-year lease.  3 years would not allow her to feel comfortable with getting a return on the expenditures she would need to make to adequately operate the business.

She would, however, be willing to sign a 10-year lease, with your previously-stated rent, on a triple-net basis with the only carve outs from "tenant must do all repairs" being:

1.      She will not repair the roof over the storeroom – that was always in bad shape, even before she became a tenant.

2.      She will not place a new "steeped" or "domed" roof on the property over the flat roof, as has been suggested.

3.      There are rotting posts in a trellis – she will remove those, but she will not repair or replace them, as they were bad before she ever become a tenant.

We don't know yet what Meineke is willing to do or not do, but we hope they would agree on a 6-month guaranty.  We would, of course, need to read and review the Lease and its specific language, but that is our proposal.  Let me know if the landlord will accept the 10-year proposal of we can get a 6-month guaranty from Meineke.

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

---

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Friday, December 3, 2021 10:53 AM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

OK.  Look forward to hearing from you then.

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
----------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
----------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Friday, December 3, 2021 8:47 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

Can you give me until Close of Business on Monday?

Jeff Haff

---

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Tuesday, November 30, 2021 11:48 AM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

Jeff,

We need to determine if Jan is staying or we need to list the property for lease. The market for retail in Santa Barbara is very strong right now and this location is ideal for another automotive brand.  Please get back to me with a response this week.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
---------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
---------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Drew Simons
**Sent:** Friday, November 5, 2021 12:20 PM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>
**Subject:** RE: Santa Barbara Meineke

Jeff,

I have talked to my client. As I mentioned, they have a commercial broker ready to either list the property for sale or lease at a higher rate than $8900 a month. However, they are willing to consider entering into a new lease with Jan on the terms you proposed with the following modifications:

1. Term would be for 3 years. They will consider an extension at that time depending on their circumstances but would not be obligated to extend.
2. Lease would be absolute NNN, no landlord responsibilities for structural modifications or repairs.
3. Meinke guarantee would be for 6 months.
4. Jan/Meinke must provide evidence that the work referenced in my default letter dated August 25, 2021 has been fully performed and all defaults fully cured.

Let me know if you have questions or want to discuss. Otherwise, please promptly advise if Jan and Meinke want to proceed on this basis. Thanks.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA 93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
------------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited. If you are not the intended recipient, please contact the sender and delete this e-mail.
------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Tuesday, November 2, 2021 10:53 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>; 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Hi Drew:

Does your client have any response to this proposal?

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

---

**From:** Jeffery S. Haff
**Sent:** Tuesday, October 19, 2021 3:34 PM
**To:** 'Drew Simons' <asimons@rppmh.com>
**Cc:** 'Dennis Leone' <dleone@shankmanleone.com>; 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Dear Drew:

Jan Douma is willing to enter into an $8,900/month NNN 7-year lease that would have a minimum 2% increase per year and a maximum 4% increase per year.  Major structural repairs would be the responsibility of the landlord.

I have spoken to Dennis Leone, counsel for Meineke.  He is copied here.  He has informed me that Meineke will agree to provide a 3 month guaranty of the Lease (using your numbers, roughly a $30,000 guaranty) so long as Meineke is given notice of any default and an opportunity (at its option) to cure the default and offer a substitute tenant if the lease would otherwise be terminated.

With that proposal, would your client be willing to continue with Jan Douma as the tenant and enter into a new lease?  As I have stated before, it is always easier to keep a tenant than get a new one.

Let me know.


Jeff Haff

---

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Thursday, October 7, 2021 11:36 AM
**To:** Jeffery S. Haff <jhaff@dadygardner.com>
**Subject:** RE: Santa Barbara Meineke

Jeff,

My clients will not accept $7900 but would consider $8900 NNN depending on Jan's financials. The brokers are confident they can lease the space for more as it is a highly coveted location and retail demand is strong right now.

If that is of interest to Jan, please provide a current financial statement and supporting documents which shows her net worth and liquid assets. Thanks.

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
-------------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
-------------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

**From:** Jeffery S. Haff <jhaff@dadygardner.com>
**Sent:** Thursday, October 7, 2021 8:57 AM
**To:** Drew Simons <asimons@rppmh.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** RE: Santa Barbara Meineke

Hi Drew,

Just checking back in on this.  Any response from your client?

Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

---

**From:** Jeffery S. Haff
**Sent:** Wednesday, September 29, 2021 10:19 AM
**To:** 'asimons@rppmh.com' <asimons@rppmh.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>
**Subject:** Santa Barbara Meineke

Dear Drew:

Jan Douma and her company propose that her company remain as the tenant at this property and sign a 7-year lease.  The first year's rent would be $7,900/month and would go up by 2-4% per year, at the landlord's discretion.  She would guaranty the lease.  We have asked Meineke to guaranty the lease, but we have not yet heard back on whether they are willing to do so.

This proposal, we believe, gives your client the opportunity to maintain the same tenant that has been at the property and not worry about a new tenant who may have difficulty operating or finding employees (as we know that has been a problem recently nationwide).  There is a value to your client not having to transition from one tenant to another and having the old tenant moving its items out while the new tenant waits for the landlord to pay for tenant improvements to move in.  As you know, any new tenant is a crap shoot, and there may be any variety of issues that arise as a result of taking on a new client.

Let me know what else you need from our side to review our proposal.  We'd obviously like to maintain this location, and we will keep pressing Meineke (since I would imagine they'd like to keep the location as well).


Jeff Haff
Partner
Dady & Gardner, P.A.
5100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-359-3514
Cell 612-203-4032

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 9

1  LAWRENCE J. HILTON (State Bar No. 156524)
   Email: lhilton@onellp.com
2  TAYLOR C. FOSS (State Bar No. 253486)
   Email: tfoss@onellp.com
3  **ONE LLP**
4  23 Corporate Plaza
   Suite 150-105
5  Newport Beach California 92660
6  Telephone:  (949) 502-2876
   Facsimile:   (949) 258-5081
7

8  Attorneys for Plaintiffs and Counter-Defendants
9  MEINEKE FRANCHISOR SPV LLC and
   MEINEKE REALTY, INC.
10

11              **UNITED STATES DISTRICT COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

13                    **WESTERN DIVISION**

| | |
|---|---|
| 13 MEINEKE FRANCHISOR SPV LLC,<br>14 a Delaware limited liability company;<br>15 and MEINEKE REALTY, INC., a<br>   North Carolina corporation,<br><br>16<br>17       Plaintiffs,<br><br>18    v.<br><br>19 CJGL, INC., a California corporation;<br>20 CARL DOUMA, an individual; JAN<br>   DOUMA, an individual,<br>21<br><br>22       Defendants.<br>23 _____<br><br>24 AND RELATED COUNTERCLAIMS<br>25 | Case No. 2:23-cv-00374-SPG-JC<br>Hon. Sherilyn Peace Garnett<br><br>**DECLARATION OF ANTHONY WINCHESTER**<br><br>Date:  April 10, 2024<br>Time:  1:30 p.m.<br>Crtrm: 5C<br><br>Complaint Filed: January 18, 2023<br>Answer/Counterclaim: March 15, 2023<br><br>Trial Date: June 18, 2024 |

26
27
28

_____

**DECLARATION OF ANTHONY WINCHESTER**

I, Anthony Winchester, declare as follows:

1. I am the Vice President – Legal, Real Estate for Driven Brands Shared Services, LLC, which is an affiliate of Plaintiffs Meineke Franchisor SPV LLC and Meineke Realty, Inc. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would competently testify thereto.

2. Attached hereto as **Exhibit 1** is a true and correct copy of a Mutual Release and Settlement Agreement between Meineke Car Care Centers, LLC, as successor to Econo Lube N' Tune, Inc. ("Meineke") and Maurice Sourmany and Mary Sourmany as Trustees of the Sourmany 2006 Trust, the owners of the property located at 3956 State Street, Santa Barbara, California (the "Premises") and the landlord under the "Lease" referenced therein. Until August, 2022, CJGL, Inc. operated Meineke Center #4118 at the Premises.

3. Meineke paid the Trust the sum of $117,860 to settle claims involving the condition of the Premises when CJGL, Inc. vacated, including $18,600 for costs incurred by the Trust to perform Phase I and Phase II environmental studies at the Premises.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 15, 2024 at Charlotte, North Carolina.

Anthony Winchester

2

**DECLARATION OF ANTHONY WINCHESTER**

# EXHIBIT 1

## MUTUAL RELEASE AND SETTLEMENT AGREEMENT

This Mutual Release and Settlement Agreement ("**Agreement**") is made and entered into on the date hereinafter set forth by and between Maurice Sourmany and Mary Sourmany as Trustees of the Sourmany 2006 Trust (the "**Trust**") and Meineke Car Care Centers, LLC, as successor to Econo Lube and Tune, Inc. ("**Meineke**")  on the terms set forth herein. Trust and Meineke are collectively referred to as the "**Parties**".

### R E C I T A L S

This Agreement is made with respect to the following facts:

A.        WHEREAS, on or about July 1, 2011, Meineke entered into a written Standard Industrial/Commercial Single-Tenant Lease - Net (the "**Lease**") with Trust for the property located at 3956 State Street, Santa Barbara, California (the "**Premises**").

B.        WHEREAS, the term of the Lease ended on September 14, 2022.

C.        WHEREAS, Meineke has vacated the Premises and relinquished possession of the Premises to Trust.

D.        WHEREAS, after an inspection of the Premises, Trust asserted various claims for damages against Meineke relating to the condition of the Premises and demanded that Meineke pay Trust in consideration for a release relating to those claims.

E.        WHEREAS, the Parties have agreed that Meineke shall pay Trust the total sum of One Hundred Seventeen Thousand Eight Hundred Sixty and No/100 Dollars ($117,860.00) in consideration for this Agreement, on the terms set forth herein.

F.        WHEREAS, it is the desire of the Parties to this Agreement to settle and terminate any and all disputes which now exist between the Parties to this Agreement. By this

1

Agreement,the Parties to this Agreement intend to resolve any and all differences between them.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and in order to resolve all disputes between the Parties to this Agreement, and for good cause and other valuable consideration, receipt of which is hereby acknowledged, it is agreed as follows:

1. **Release**.  Except as provided for herein, the Parties to this Agreement hereby generally and specifically release, discharge and acquit one another and their respective partners, employees, agents, officers, directors, accountants, attorneys, shareholders, predecessors, successors, servants, representatives, guarantors, indemnitors, insurers, assigns, members, and each of them, from any and all claims, demands, liabilities, actions, causes of action, damages, expenses and obligations arising out of or in any way related to the Lease and the Premises, including but not limited to, attorney's fees, accountant's fees, and any and all fees and costs associated with the subject claims and defenses of every nature, character and description whatsoever including personal injury claims, whether known or unknown, suspected or claimed.

2. **Consideration**.  As consideration for this Release, the Parties agree as follows:

a. Meineke shall pay to Trust the total sum of One Hundred Seventeen Thousand Eight Hundred Sixty and No/100 Dollars ($117,860.00)(the "**Total Remittance**").

b. Meineke previously made a partial payment of the Total Remittance to Trust in the amount of Eighteen Thousand Six Hundred and No/100 Dollars ($18,600.00) as reimbursement to Trust for the Phase I and Phase II environmental studies on the Premises (the "**Partial Payment**").  Trust acknowledges receipt of the Partial Payment.

c. Meineke shall pay to Trust the remaining balance due of Ninety-Nine Thousand Two Hundred Sixty and No/100 Dollars ($99,260.00) ("**Remaining Balance**").

2

    d.      Payment of the Remaining Balance shall be made by Meineke within two (2) business days of the full execution of this Agreement providedthat before that time a signed copy of this Agreement has been delivered by Trust to Meineke's counsel.

    e.      Payment shall be delivered by wire transfer as follows:

The Remaining Balance shall be wired to the Attorney-Client Trust Account of the Law Offices of Andrew D. Simons as follows:

| | |
|---|---|
| Account Number: | 021000021 |
| Bank Routing No.: | 322271627 |
| Name of Account: | Law Offices of Andrew D. Simons |
| | Attorney-Client Trust Account |
| Bank Information: | Chase Bank |
| | For deposit for IOTLA account #817590786 |

3.  **Waiver**. This Agreement is a full, mutual and general release and constitutes a full and final accord and satisfaction, extending to all claims of any nature that may exist between the Parties to this Agreement with regard to the Lease and the use, access and maintenance of the Premises, whether known or unknown, suspected or anticipated by them to exist in their favor and regardless of whether any unknown, unsuspected or unanticipated claim would materially affect settlement and compromise of each of the matters mentioned herein. The Parties to this Agreement hereby expressly, voluntarily and knowingly waive, relinquish and abandon each and every right, protection and benefit to which they would be entitled now or at any time hereafterunder Section 1542 of the *Civil Code* of California, which provides as follows:

> **"A general release does not extend to claims that the creditoror releasing party does not know or suspect to exist**

> **in his or her favor at the time of executing the release and**
>
> **that, if known by him or her, would have materially affected**
>
> **his or her settlement with the debtor or released party."**

The Parties to this Agreement, and each of them, specifically represent that they have read and understand the effect and import of this provision, and that they have beenrepresented and advised by their respective attorneys concerning this provision.

4. **Final Settlement**. In making this voluntary express waiver of the protections of Section 1542 of the *Civil Code* of California, the parties to this Agreement acknowledge that they may discover claims or facts in addition to or different from those which they know or believe to exist with respect to the matters mentioned herein. It is their intention to fully and forever settle and release any and all of such matters, claims and dispute, whether known or unknown, suspected or unsuspected, anticipated or unanticipated, incident to such intention between the parties, with regard to the Lease and the Premises. This Release is, and shall remain, a full and complete general release notwithstanding the discovery or existence of any such additional or different claims or facts.

5. **No Assignment**. The parties represent and warrant that they have not heretofore collectively or individually assigned, transferred, or hypothecated or purported to have assigned or transferred or hypothecated or will in the future assign, transfer or hypothecate to anyone any debt, judgment, claim liability, demand, action, cause of action, or any interest therein, based upon or arising out of or pertaining to or concerning or connected with any matter, fact, event,circumstance, or thing released herein.

6. **Authorization**. To further the interests of the parties in this Agreement, each of the Parties warrants that he/she/it has the power to settle and release fully and completely all claims,

4

causes of action, demands, charges, and liabilities against the other parties to this Agreement arising out of, or relating to, the Lease and the Premises. Each of the Parties signing this Agreement on behalf of any of the Parties warrants that he or she is duly authorized and empowered to sign this Agreement on that party's behalf.

7. **No Inducement**.  The parties declare and represent that no promises, inducements, or agreements not expressly contained herein were made, that this Release contains the entire agreement between the parties.

8. **Binding Effect**. The provisions of this Agreement will be binding upon and inure to the benefit of the heirs, executors, administrators, personal representatives, predecessors-in-interest, successors-in-interest and assigns of the Parties.  The Parties agree to forever refrain and forebear from commencing, instituting or prosecuting any arbitration, action or other proceeding against one another based on, arising out of, or in connection with any claim, debt, liability, demand, obligation, cost, expense, action or cause of action that is released and discharged by reason of this Agreement except to enforce the terms and provisions of this Agreement.

9. **Indemnity.**   Notwithstanding anything else contained herein, Meineke shall indemnify and hold the Trust harmless against any claims, cost or expense that the Trust may suffer or incur in connection with any lawsuit, claims or legal proceeding between Meineke and its subtenant who occupied the Premises, Jan Douma.

10. **Further Documents**. The Parties agree to promptly sign all papers and to promptly execute and deliver such additional documents as are required to effectuate each of the terms of this Agreement.

11. **Representation**.  The parties represent and acknowledge that they have conferred with

5

and are represented by counsel of their own selection with respect to this Agreement and all matters covered by it. Each of the Parties represents that he, she or it wasfully advised by counsel with respect to all rights which are affected by this Agreement.

12. **No Modification**. This document sets forth the entire agreement between the Parties and may not be altered, amended or modified in any respect except by writing duly executed by the Party to be charged. All earlier understandings and oral agreements are expressly superseded and are of no further force and effect.

13. **Attorneys' Fees**. In the event that any action or proceeding is brought to enforce or interpret any of the terms and conditions of this Agreement, then the party in whose favor judgment shall be entered shall be entitled to have and recover from the other party costs incurred in connection with the enforcement action including reasonable attorneys' fees.

14. **Headings**. Headings are used herein for convenience only and shall have no force or effect in the interpretation or construction of this Agreement. As used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter gender.

15. **California Law**. This Agreement shall be governed by the laws of the State of California. In the event that any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect.

16. **Construction**. This Agreement and Release shall be construed without regard to who drafted same, and shall be construed as though all parties hereto participated equally in the drafting of the Agreement and Release.

17. **Counterparts and Electronic Signatures**. For the convenience of the parties, this Agreement may be executed electronically and in counterparts, which shall together constitute

6

the Agreement of the Parties as one and the same document. A copy of this Agreement may be used in lieu of the original for all purposes. Electronic signatures shall be binding.

WE HAVE EXECUTED THIS AGREEMENT AND RELEASE ON THE DATE BELOW WRITTEN, EFFECTIVE UPON EXECUTION BY ALL PARTIES.

**SOURMANY 2006 TRUST**

Dated: July 07/13/2023 __, 2023                    By:_____
                                                              Maurice Sourmany, Trustee

Dated: July 07/13/2023 __, 2023                    By:_____
                                                              Mary Sourmany, Trustee

Dated: July 11, 2023                    **MEINEKE CAR CARE CENTERS, LLC**

                                                        By:_____
                                                              Anthony Winchester,
                                                              Vice President – Legal, Real Estate

7

# JOINT APPENDIX OF EXHIBITS
# EXHIBIT 10

Jessica Rosen, SBN 294923
jrosen@lewitthackman.com
Heidy A. Nurinda, SBN 333188
hnurinda@lewitthackman.com
Lewitt, Hackman, Shapiro, Marshall & Harlan
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Telephone: (818) 990-2120
Fax: (818) 981-4764

Attorneys for Defendants/Counterclaimant

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br><br>Defendants. | Case No. 2:23-cv-00374-SPG-JC<br><br>DECLARATION OF JESSICA ROSEN IN SUPPORT OF COUNTERCLAIMANTS' PORTION IN JOINT BRIEF RE SUMMARY JUDGMENT<br><br>Complaint: January 18, 2023<br>Answer/Counterclaim: March 15, 2023<br><br>Trial Date: June 18, 2024 |
| CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br>Counterclaimants,<br><br>vs.<br><br>MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; MEINEKE REALTY, INC., a North Carolina Corporation; and ECONO LUBE AND TUNE, INC., an unknown entity,<br><br>Counterdefendants. | |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

ROSEN DECL. RE. OPP. TO MEINEKE'S MTN / X-CLAIMANTS' CROSS-MTN SUMMARY JUDGMENT

**DECLARATION OF JESSICA ROSEN**

I, Jessica Rosen, declare as follows:

1.      I am an attorney licensed to practice in the State of California. I am a shareholder in the law firm of Lewitt Hackman Shapiro Marshall & Harlan LLP, attorneys for Defendants and Counterclaimants in this action. I personally know the facts stated except those stated on information and belief and as to those I am informed and believe them to be true. If called as a witness, I would testify under oath as follows:

2.      The parties held virtual (in-person) meet and confer on January 25, 2024. I was present on behalf of CJGL and the Doumas, and plaintiffs' counsel, Larry Hilton and Taylor were present on behalf of Meineke.

3.      Meineke's counsel identified that Meineke would move for summary judgment on the General Mutual Release signed at franchise renewal in 2021 and that likely the Release would apply to all counterclaims. I identified that CJGL and the Doumas would cross-move for summary judgment on the CFIL claim.

4.      During depositions in early February 2024, Meineke's counsel indicated raising statute of limitations defense at summary judgment for certain counterclaims Meineke contends accrued in 2018. I understood the argument was limited to some but not all counterclaims and narrow in scope and evidence, so I did not object on that delayed meet and confer.

5.      Upon receipt of Plaintiffs' portion of the Joint Brief, I learned for the first time when reviewing and evaluating the arguments presented that Meineke also moved for summary judgment on claimed insufficient evidence and/or legal arguments not raised at the Jan. 25th meet and confer or at some time thereafter before Plaintiffs' delivery on February 9, 2024.

6.      Attached as Exhibit "O" is a true and correct copy of Meineke's Initial Disclosures, served on April 19, 2023.

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

EXECUTED on March 8, 2024 at Encino, California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

/s/ Jessica Rosen
JESSICA ROSEN

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

# EXHIBIT O

LAWRENCE J. HILTON (State Bar No. 156524)
Email: lhilton@onellp.com
ALEC P. SCHULMAN (State Bar No. 336491)
Email: aschulman@onellp.com
**ONE LLP**
23 Corporate Plaza
Suite 150-105
Newport Beach California 92660
Telephone:  (949) 502-2876
Facsimile:   (949) 258-5081

Attorneys for Plaintiffs and Counter-Defendants
MEINEKE FRANCHISOR SPV LLC and
MEINEKE REALTY, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:23-cv-00374-SPG-JC<br>Hon. Sherilyn Peace Garnett<br><br>**RULE 26(a) INITIAL DISCLOSURES BY MEINEKE FRANCHISOR SPV LLC AND MEINEKE REALTY, INC.**<br><br>Complaint Filed: January 18, 2023 |

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiffs and Counter-Defendants MEINEKE FRANCHISOR SPV LLC and MEINEKE REALTY, INC. ("Plaintiffs") hereby provide their initial disclosures:

## I.   INDIVIDUALS LIKELY TO HAVE INFORMATION

Plaintiffs believe that the following are persons are likely to have discoverable information that it may use to support their claims and defenses.

| Individual | Discoverable Information | Contact Information |
|---|---|---|
| Jan Douma | Ms. Douma is expected to have information about the execution of the Franchise Documents, including the Franchise Agreement(s), the Sublease and the Personal Guaranty.  Ms. Douma also is expected to have knowledge about CJGL, Inc.'s failure to perform its contractual obligations, its storage and release of Hazardous Materials at the Franchise Premises, and its execution of the Renewal Mutual Release on September 29, 2021.  Ms. Douma also is expected to have knowledge of CJGL, Inc.'s dissolution and the Certificate of Dissolution she signed under penalty of perjury stating that CJGL, Inc.'s "known debts have been actually paid . . ." | Defendants' counsel |
| Carl Douma | Mr. Douma is expected to have information about the execution of the Franchise Documents, including the Franchise Agreement(s), the Sublease and the Personal Guaranty.  Mr. Douma also is expected to have knowledge about CJGL, Inc.'s failure to perform its contractual obligations, its storage and release of Hazardous Materials at the Franchise Premises, and its execution of the Renewal Mutual Release on September 29, 2021.  Mr. Douma also is | Defendants' counsel |

| Individual | Discoverable Information | Contact Information |
|---|---|---|
| | expected to have knowledge of CJGL, Inc.'s dissolution and the Certificate of Dissolution he signed under penalty of perjury stating that CJGL, Inc.'s "known debts have been actually paid . . ." | |
| John Kelley (Collections Manager); Frank Farrar (Collections Representative); Dana Winn (Collections Representative); Rinnell Curry (Collections Representative) | These individuals have information about CJGL, Inc.'s failure to perform its contractual obligations under the Franchise Documents and the Sublease, the amounts due under the agreements and the aging of accounts receivable due from Defendants. | Plaintiffs' counsel |
| Landlord: Maurice and/or Mary Sourmany | These individuals have information about repairs and maintenance that were performed, or should have been performed, at the Franchise Premises during the term of the Sublease and CJGL, Inc.'s storage, release and disposal of Hazardous materials at the premises.  These individual also have knowledge of the expenses incurred in the repair of the Franchise Premises, including the disposal and remediation of conditions at the Franchise Premises needed to abate the conditions caused by the Hazardous Materials. | |
| Nicholas Coria Hazardous Materials Supervisor Santa Barbara County | CUPA | Mr. Coria has information about CJGL, Inc.'s storage, release and disposal of Hazardous materials at the premises. | 225 Camino Del Remedio Santa Barbara, CA 93110 Direct line: 805-681-4954 |

3

**RULE 26(a) INITIAL DISCLOSURES**

| Individual | Discoverable Information | Contact Information |
|---|---|---|
| | | Website: https://www.countyofsb.org/2171/Hazardous-Materials |
| Darrin Krader, Chris Sullivan, Tony Winchester | These individuals have information about repairs and maintenance that were performed, or should have been performed, at the Franchise Premises during the term of the Sublease and CJGL, Inc.'s storage, release and disposal of Hazardous materials at the premises. | Plaintiff's counsel |
| Andrew D. Simons, Esq. | Mr. Simons has information about the condition of the Franchise Premises when they were abandoned by CJGL, Inc. and the storage, release and disposal of Hazardous materials at the premises. | Law Offices of Andrew D. Simons drew@dsimonslaw.com 805-705-2248 |
| Joseph Robinson (Resale Manager); Jeff Todd (former Vice President of Development); Adriana Crip (Franchise Development Manager); Aaron Davis (Field Operations Consultant); Tripp Setliff, (Former Field Operations Consultant); Kevin Harrell (Field | These individuals have information about CJGL's operation of the Meineke franchise at the Franchise Premises and CJGL, Inc.'s failure to comply with its obligations under the Franchise Agreement(s) and the Sublease. | Plaintiffs' counsel |

**RULE 26(a) INITIAL DISCLOSURES**

| Individual | Discoverable Information | Contact Information |
|---|---|---|
| Operations Consultant); David Hooks (Regional Director) | | |

Identification of the above persons does not waive any privileges or work product protection that may apply to information possessed by them.  Plaintiffs reserve all rights to disclose and use whatever additional witnesses and information come to its attention as their discovery and investigation proceed.

**II.   DOCUMENTS AND TANGIBLE THINGS**

The following categories of documents and tangible things that Plaintiffs may use to support their claims are in the custody of Plaintiffs and/or their counsel:

1. The Meineke Franchise and Trademark Agreement entered into by CJGL, Inc and Meineke Franchisor SPV LLC;

2. The Real Property Sublease entered into by CJGL, Inc. and Meineke Realty;

3. The Renewal Addendum to Franchise and Trademark Agreement entered into by CJGL, Inc an Meineke Franchisor SPV LLC;

4. The Advertising Addendum to Franchise and Trademark Agreement entered into by CJGL, Inc an Meineke Franchisor SPV LLC;

5. The Renewal Mutual Release entered into by CJGL, Inc an Meineke Franchisor SPV LLC;

6. Royalty reports and accounts receivable records showing amounts due from operations of franchise;

7. Communications between Meineke (and its affiliates) and Defendants regarding Sublease, Franchise Documents and operations;

8. Communications with Landlord regarding necessary repairs and maintenance on Franchise Premises and costs of maintenance and repairs;

9. Any and all property inspection reports;

10. Photographs of the condition of the Franchise Premises when they were abandoned by Defendants;

11. Correspondence with Landlord and its representatives regarding the condition of the Franchise Premises when they were abandoned by Defendants, the use, storage, release and disposal of Hazardous Materials by Defendants at the Franchise Premises and the expenses incurred to repair and remediate conditions at the Franchise Premises after they were abandoned; and

12. Correspondence with Nicholas Coria regarding the use, storage, release and disposal of Hazardous Materials by Defendants at the Franchise Premises and the expenses incurred to repair and remediate conditions at the Franchise Premises after they were abandoned and the actions needed to dispose of and remediate conditions at the Franchise Premises to abate the conditions caused by the Hazardous Materials.

Plaintiffs reserve all rights to disclose and use in this litigation, including but not limited to trial, whatever additional evidence comes to its attention as its discovery and investigation proceed.

## III. DAMAGES

Plaintiffs seek at least $200,000 of past damages against CJGL for Breach of Franchise Documents plus lost future profits for early termination against CJGL for Breach of the Franchise Documents with seven years left on the term, along with $65,000 against CJGL for Breach of the Sublease and $265,000 of past damages, plus lost future profits for early termination of the Franchise Documents with seven years left on the term.  Numerous courts have held that at least three years of future

damages are recoverable for early termination of a franchise agreement. *See Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 281 (4th Cir. 2011); *Econo Lube Franchisor SPV Ltd. Liab. Co. v. Hafsi*, No. SA-19-CV-01192-OLG, 2021 U.S. Dist. LEXIS 74821, at *11-12 (W.D. Tex. Feb. 26, 2021).

These damages are also recoverable against Carl and Jan Douma for breach of their Personal Guaranty to pay and perform CJGL obligations under the agreement.

## IV. INSURANCE

Plaintiffs will produce for inspection and copying any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated:  April 19, 2023                     ONE LLP
                                            LAWRENCE J. HILTON


By: _____
        Lawrence J. Hilton

Attorneys for Plaintiffs and Counter-Defendants
MEINEKE FRANCHISOR SPV LLC and
MEINEKE REALTY, INC.

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 23 Corporate Plaza, Suite 150-105, Newport Beach, CA 92660.

On April 19, 2023, I caused to be served the following document(s) to the address(es) and by the method of service described below:

**RULE 26(A) INITIAL DISCLOSURES BY MEINEKE FRANCHISOR SPV LLC AND MEINEKE REALTY, INC.**

Gayane Ghandilyan
Jessica Wynette Rosen
**LEWITT HACKMAN SHAPIRO MARSHALL AND HARLAN**
16633 Ventura Blvd., 11th Fl.
Encino, CA 91436
Tel:   818-990-2120
Fax:   818-981-4746
Email: gghandilyan@lewitthackman.com
Email: jrosen@lewitthackman.com

*Attorneys for Defendants and Counter-Claimants*

[  ]   (BY E-SERVICE) I delivered to ONELEGAL, LLC, an e-filing and e-service provider with the Superior Court of California, the above-described document(s), to be filed and electronically served through the Superior Court's e-filing system on the above registered participants on this date.

[**X**]   (BY EMAIL)

[  ]   (BY PERSONAL SERVICE)

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on April 19, 2023.

_____
Nate Lichtenberger

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 11

Jessica Rosen, SBN 294923
jrosen@lewitthackman.com
Heidy A. Nurinda, SBN 333188
hnurinda@lewitthackman.com
Lewitt, Hackman, Shapiro, Marshall & Harlan
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Telephone: (818) 990-2120
Fax: (818) 981-4764

Attorneys for Defendants/Counterclaimant

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br><br>Defendants. | Case No. 2:23-cv-00374-SPG-JC<br><br>DECLARATION OF JAN DOUMA IN SUPPOR OF DEFENDANTS / COUNTERCLAIMANTS CJGL, INC., CARL DOUMA, AND JAN DOUMA'S OPPOSITION TO COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT / REQUEST FOR SUMMARY JUDGMENT ON ISSUES RAISED IN MOTION / IN SUPPORT OF CROSS-MOTION FOR COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGMENT ON CFIL COUNTERCLAIM |
| CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,<br>Counterclaimants,<br><br>vs.<br><br>MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; MEINEKE REALTY, INC., a North Carolina Corporation; and ECONO LUBE AND TUNE, INC., an unknown entity,<br><br>Counterdefendants. | Complaint: January 18, 2023<br>Answer/Counterclaim: March 15, 2023<br><br>Trial Date: June 18, 2024 |

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

## **DECLARATION OF JAN DOUMA**

I, Jan Douma, declare as follows:

1.     I am a party to the action and an officer and director of party, CJGL, Inc. I personally know the facts stated except those stated on information and belief and as to those I am informed and believe them to be true. If called as a witness, I would testify under oath as follows:

2.     On or around August 29, 2014, CJGL and Meineke Franchisor entered into a "Meineke Franchise and Trademark Agreement" for the operation of an existing Meineke Car Care Center #4118 (the "2014 Franchise Agreement"), located at 3956 State Street, Santa Barbara, California, 93105. The term was for seven years to June 29, 2021, with right of renewal by CJGL. Attached as "Exhibit A" is a true and correct copy of the 2014 Franchise Agreement.

3.     Also, on or around August 29, 2014, CJGL, as subtenant, and Meineke Realty, as sublessor, executed a Real Property Sublease (the "Sublease") for the Franchise Premises. The Sublease specifically referred to and incorporated the Air Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease for the Franchise Premises (the "Master Lease") between Meineke (formerly Econo Lube), as tenant, and Maurice and Mary Sourmany, Trustees of the Sourmany 2006 Trust, as Landlord (the "Landlord"). Attached as "Exhibit B" is a true and correct copy of the Sublease and as "Exhibit C" is a true and correct copy of the Master Lease.

4.     The Master Lease was for an initial term to June 29, 2016 and granted to the master tenant (Realty) two options to renew the Master Lease, each for an additional 60-month terms (through June 29, 2026). The Sublease provided for termination upon the earlier of (i) expiration on June 28, 2021, or (ii) termination or expiration of the Master Lease for the Franchise Premises. (*See* Ex. C.)

5.     Meineke did not renew the Master Lease prior to the expiration date of June 30, 2016. Meineke did not notify CJGL, myself, or my husband, Carl Douma

(also a party to this action), that Meineke would not exercise its first renewal option. We learned of the of the non-renewal in 2018, well after expiration of the Master Lease. I understand that Meineke claims to have become a month-to-month tenant, despite the Master Lease containing a "No-Holdover" Provision. (*See* Ex. C.)

6.     From 2018 up to the expiration date of the 2014 Franchise Agreement in June 2021, I continually identified to Meineke CJGL's concerns about Meineke's failure to renew the Master Lease and present risk of termination of possession at any time by the Landlord. Meineke agents, including Meineke's Renewal Manager, Joseph Robinson, consistently represented to me that Meineke would approach the Landlord to arrange a direct lease with CJGL for the Franchise Premises. I repeatedly asked Meineke for status of transferring the lease to CJGL. Attached as Exhibit "D," "E," and "F" are e-mail correspondence over the years concerning lease arrangement for the Franchise Premises.

7.     In or around December 2019, Mary Sourmany visited the Franchise Premises with an inspector she hired to inspect the property. I approached her, not for the first time, about signing a directing lease with us for the Franchise Premises. She responded that she would be happy to do so but that first Meineke needed to make all repairs that Meineke was supposed to do under the Master Lease.

8.     In early May 2021, prior to renewal, I had a telephone call with Meineke's Renewal Manager, Mr. Robinson. He assured me that Meineke would obtain a direct lease for the Franchise Premises and that Meineke would sign a guaranty if needed. Attached as Exhibit "G" is a true and correct copy of the e-mail confirming that call.

9.     Mr. Robinson, confirmed this in his e-mail to me on May 8, 2021, stating in relevant part: "Thank you for taking my call today. As I mentioned, <u>I will do my best to contact the LL and see what it will take to get you a master lease to match our 8 year FTA</u>." On May 13, 2021, Mr. Robinson confirmed to me he had reached out to the Landlord to further discuss "getting [CJGL] a master lease." (*See* Ex. G.)

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

10.     Based on Mr. Robinson's representations that Meineke was working to arrange a direct lease and that Meineke, through Mr. Robinson, were in discussions and coordination with the Landlord, neither CJGL, myself, nor Carl attempted at the time to pursue possible legal claims against Meineke. Rather, we made reasonable efforts to enter into a new lease agreement directly with the Landlord.

11.     On or around June 7, 2021, the Landlord, through the Landlord's attorney, Andrew Simon, sent an e-mail to Meineke (Mr. Robinson) and me. In that e-mail, the Landlord informed me that Meineke agreed to guaranty the commercial lease. The Landlord also stated its intent to offer me an 8-year lease at current market value, and that the Landlord was in the process of determining the market value. Attached as Exhibit "H" is a true and correct copy of that e-mail correspondence. Mr. Robinson did not respond to the Landlord's e-mail denying or otherwise correcting the Landlord's understanding that Meineke agreed to guaranty the lease.

12.     On June 25, 2021 (Friday), I sent an e-mail to Mr. Robinson asking that Meineke grant a reasonable extension of the 2014 Franchise Agreement while I and the Landlord completed negotiations of and finalized the direct lease. The following Monday, June 28, 2021, Mr. Robinson stated Meineke does not grant extensions for renewals. In the same correspondence, Mr. Robinson congratulated me (on behalf of CJGL) on receiving final approval. Attached as Exhibit "I" is a true and correct copy of that e-mail correspondence.

13.     In response to Mr. Robinson's June 28th e-mail, I asked "What happens if I sign the franchise agreement and Meineke decides not to guarantee the lease? In 2014, I was supposed to have a five-year lease with two five-year options, and I only had a lease until 2016." Mr. Robinson did not answer that question. He simply stated, "Your renewal was approved last Friday, and will be sent to you sometime this week. I understand why you want both the lease and FTA coinciding with each other, one down, one to go." (*See* Ex. I.)

14.     On June 30, 2021, the Landlord sent by e-mail to me and Mr. Robinson

- 4 -

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

1  the proposed direct lease and addendum for the Franchise Premises and guaranty of

2  lease (for Meineke). I negotiated the lease to $7,900 rent per month for eight years—

3  substantially less than the $10,300 per month that CJGL had been paying to Meineke

4  under the Sublease. I approved the proposed lease on behalf of CJGL and waited for

5  the finalized lease for execution. Attached as Exhibit "J" is a true and correct copy of

6  that e-mail correspondence and attachments of the proposed lease and guaranty. Mr.

7  Robinson did not respond to the Landlord's e-mail denying or otherwise correcting

8  the Landlord's continued understanding that Meineke agreed to guaranty the lease.

9       15.    On July 12, 2021, the Landlord again sent the guaranty to Meineke,

10 stating that I was "is ready to execute the new lease," and if "Meineke [is] ready to

11 execute the guaranty and move this process forward? Please advise." Attached as

12 Exhibit "K" is a true and correct copy of that e-mail correspondence.

13      16.    On that same day (July 12, 2021), I executed the renewal agreement to

14 operate the Meineke Car Care Center for an additional eight years, to 2029 (the "2021

15 Franchise Agreement") as an authorized agent for CJGL. I understood I had to

16 execute the renewal and accompanying papers so that Meineke would execute the

17 guaranty for the direct lease after a telephone call with Mr. Robinson, who told me

18 Meineke would not "go to bat" for an "uncommitted franchisee." Further, not

19 renewing the franchise would have resulted in the loss of jobs for our employees, our

20 Small Business Administration ("SBA") loan being accelerated and losing our source

21 of income. Attached as Exhibit "L" is a true and correct copy of the 2021 Franchise

22 Agreement.

23      17.    Meineke was the drafter of both the 2014 Franchise Agreement and

24 2021 Franchise Agreement. Each agreement was preprinted on Meineke letterhead.

25 It was long with addenda and printed in small, single-spaced font. The renewal was

26 presented on a take-it-or-leave-it basis. There was no negotiation and no opportunity

27 for negotiating material terms relating to possession of the Franchise Premises,

28 especially when Meineke plainly refused reasonable extension of the existing 2014

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Franchise Agreement pending completion and execution of a new commercial lease for the Franchise Premises. We were concerned we would lose our franchise business if we did not renew and felt we had no choice but to renew the franchise.

18.     On August 25, 2021, I was copied on an e-mail with an attached letter from the Landlord to Mr. Robinson as "Director of Real Estate" for Driven Brands. The letter was the Landlord's "formal demand" that Meineke's parent company, "Driven Brands as the Lessee" of the Master Lease "make the repairs to the Premises referenced on the list attached hereto." Attached as Exhibit "M" is a true and correct copy of that August 25, 2021 letter.

19.     On or around September 8, 2021, the Landlord told me and Meineke that the offer to lease the Franchise Premises directly to CJGL / the Doumas was withdrawn.

20.     By late September 2021, Meineke still had not made the requisite repairs under the Master Lease, including those repairs identified by the Landlord as a condition for the Landlord to enter a direct lease with CJGL, and refused to guaranty the lease. (*See* Ex. 2 to Leone Decl.)

21.     CJGL, Carl and I had retained Jeffrey Haff of Dady & Gardner, P.A. to represent us in the ongoing issues over possession of the Franchise Premises and Meineke's failure to exercise its option and renew the Master Lease for the term of the initial franchise term and the loss of the second option to renew. Mr. Haff was not retained to represent us in "renewal negotiations."

22.     On September 24, 2021, the Landlord informed us, through our counsel, that Meineke "blew it" by refusing to guarantee the lease. (*See* Ex. 2 to Leone Decl.) The Landlord stated that they would nonetheless entertain a *different* offer of lease terms until the Landlord signed the deal to put the property on the market.

23.     I understand Meineke claims the "effective date" of the 2021 Franchise Agreement is September 29, 2021, despite CJGL having executed the lease in July 2021. I was told by Meineke representatives that my husband, Carl Douma needed to

DOUMA DECL. RE. OPP. TO MEINEKE'S MTN / X-CLAIMANTS' CROSS-MTN SUMMARY JUDGMENT

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

1  sign the 2021 Franchise Agreement, which Meineke indicated as needed for renewal
2  even though CJGL executed the renewal months earlier. On a call with Mr. Robinson
3  around this time, he again informed me that Meineke would not arrange or assist in
4  securing the direct lease for the Franchise Premises if the renewal was not signed by
5  Carl.

6       24.    At this time (around September 29th) Meineke knew we were
7  represented by counsel in September 2021. As far as I know, Meineke did not send
8  the 2021 Franchise Agreement and accompanying Release to our then counsel, Mr.
9  Haff who represented us before and after September 29, 2021 over continuing issues
10 with the Franchise Premises under Meineke's Master Lease with the Landlord.
11 Additionally, neither Meineke nor its corporate counsel advised me or Carl that
12 signing the Release would jeopardize the on-going disputes among the parties now
13 subject to this litigation.

14      25.    We did not understand the significance of the Release and that the
15 Release covered the instant disputes and legal action when we were engaged in
16 discussions over several disputes before, during, and after, the renewal in July and
17 September 2021. And Meineke did not inform me at any time after September 29,
18 2021, during the ongoing discussions over the Franchise Premises, that our disputes
19 and claims were released and/or waived pursuant to the renewal. Meineke raised the
20 purported Release for the first time in this litigation in response to the counterclaims.

21      26.    Meineke modified the 2021 Franchise Agreement when it approved the
22 renewal but ignored the renewal term that CJGL "maintain the right to possession of
23 the [existing Meineke Car Care Center] for the term of the successor franchise
24 agreement." (2014 FA § 14.) Meineke did not make requisite disclosures to us of that
25 modification as required under California law at any time and certainly not in advance
26 of execution of the 2021 Franchise Agreement.

27      27.    By October and November 2021, the Landlord would not revisit the
28 direct lease and terms I negotiated. The Landlord would not enter a direct lease with

- 7 -

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

us until repairs for the deferred maintenance was completed. The Landlord demanded a higher monthly rental rate than originally negotiated and shortened the term to three years (from the original eight years in line with the renewal term of the franchise). (*See also* Exs. 2 - 5 to Leone Decl.)

28.     Once the Landlord began advertising the Franchise Premises for lease, including placing a large sign on the property in June 2022, CJGL could no longer sustain operations. Given the inability to secure a lease for the Premises, we had no other option but to shut down operations and vacate the premises in early August 2022.

        EXECUTED on _____, at Ventura, California.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

                                        *Jan Douma*
                                        Jan Douma (Mar 1, 2024 13:00 PST)
                                        JAN DOUMA

- 8 -

DOUMA DECL. RE. OPP. TO MEINEKE'S MTN / X-CLAIMANTS' CROSS-MTN SUMMARY JUDGMENT

# Douma Declaration-Final

Final Audit Report                                                              2024-03-01

| | |
|---|---|
| Created: | 2024-03-01 |
| By: | Jessica Rosen (jrosen@lewitthackman.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAYwlQEJJAAuHLYrxjZgmBWRn9w3yNjhQl |

## "Douma Declaration-Final" History

📄 Document created by Jessica Rosen (jrosen@lewitthackman.com)
   2024-03-01 - 8:54:25 PM GMT- IP address: 23.242.213.187

📧 Document emailed to Jan Douma (jandouma1@gmail.com) for signature
   2024-03-01 - 8:54:29 PM GMT

📄 Email viewed by Jan Douma (jandouma1@gmail.com)
   2024-03-01 - 8:55:23 PM GMT- IP address: 75.225.53.220

✒️ Document e-signed by Jan Douma (jandouma1@gmail.com)
   Signature Date: 2024-03-01 - 9:00:35 PM GMT - Time Source: server- IP address: 75.225.53.220

✅ Agreement completed.
   2024-03-01 - 9:00:35 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT "A"

# EXHIBIT E

# FRANCHISE AGREEMENT

CJGL000117

**EXHIBIT E**

# MEINEKE®
# CAR CARE CENTERS, LLC
# FRANCHISE AND TRADEMARK AGREEMENT

_____

DEALER

_____

CENTER NUMBER

MCC 5/2014

CJGL000118

TABLE OF CONTENTS

Page

ARTICLE 1:   INTRODUCTION AND DEFINITIONS ................................................................. 1
   1.1   Meineke Car Care Centers ......................................................................... 1
   1.2   Acknowledgments ....................................................................................... 1
   1.3   Definitions .................................................................................................. 1

ARTICLE 2:   GRANT OF RIGHTS ............................................................................................ 3
   2.1   Grant of Franchise/Reservation of Rights .................................................. 3
   2.2   Selection of Location for New Center ......................................................... 3
   2.3   Your Territorial Protection .......................................................................... 4
   2.4   Your Right to Associate with Other Meineke Dealers ................................ 5
   2.5   Consultation with the Dealer Association Advisory Council ...................... 5
   2.6   Relocation of Center ................................................................................... 6

ARTICLE 3:   FEES .................................................................................................................... 6
   3.1   Initial Franchise Fee ................................................................................... 6
   3.2   Royalty Fees ............................................................................................... 6
   3.3   Royalty Fee Administration ........................................................................ 8
   3.4   Contributions to Meineke Advertising Fund .............................................. 8
   3.5   Technology Administrative Fee ................................................................... 9
   3.6   Interest on Late Payments .......................................................................... 9
   3.7   Method of Payment ..................................................................................... 9
   3.8   Application of Payments ............................................................................. 10

ARTICLE 4:   DEVELOPMENT OF YOUR CENTER ............................................................... 10
   4.1   Purchase or Lease of Premises .................................................................. 10
   4.2   Development and Opening of Your Center .................................................. 11
   4.3   Equipment, Fixtures and Signs ................................................................... 11
   4.4   Ownership of Telephone Listings ............................................................... 11

ARTICLE 5:   TRAINING AND GUIDANCE ............................................................................. 12
   5.1   Training Programs ...................................................................................... 12
   5.2   On-Going Guidance .................................................................................... 13
   5.3   Periodic Visits ............................................................................................ 13
   5.4   Operations Manual ..................................................................................... 13

ARTICLE 6:   YOUR ORGANIZATION AND MANAGEMENT ................................................ 13
   6.1   Disclosure of Ownership Interests ............................................................. 13
   6.2   Management of Center ................................................................................ 14

ARTICLE 7:   OPERATING STANDARDS ................................................................................ 14
   7.1   Authorized Products and Services .............................................................. 14
   7.2   Parts and Supplies ...................................................................................... 14
   7.3   Maintenance and Repair of Equipment ...................................................... 15
   7.4   Condition of Center/Center Upgrades ........................................................ 16
   7.5   Periodic Upgrades ...................................................................................... 16
   7.6   Specifications and Standards ...................................................................... 16
   7.7   Changes to Specifications and Standards/Days and Hours of Operation ......... 16
   7.8   Compliance with Laws ............................................................................... 17

CJGL000119

| 7.9 | Personnel | 17 |
| 7.10 | Insurance | 17 |
| 7.11 | Conformity to the Discount Price Program | 18 |
| 7.12 | Customer Warranties | 18 |
| 7.13 | Customer Complaints | 19 |

| ARTICLE 8: | MARKETING AND ADVERTISING | 19 |
| 8.1 | Marketing and Advertising Programs | 19 |
| 8.2 | Meineke Advertising Fund | 19 |
| 8.3 | Allocation Between Local Advertising and Yellow Pages | 22 |
| 8.4 | Local Advertising | 22 |
| 8.5 | Dealer Web Site | 22 |
| 8.6 | Approval of Advertising Content | 22 |

| ARTICLE 9: | REPORTS AND INSPECTIONS | 23 |
| 9.1 | Records | 23 |
| 9.2 | Computer System | 23 |
| 9.3 | Periodic Reports | 24 |
| 9.4 | Use of Customer Information | 24 |
| 9.5 | Inspections | 24 |
| 9.6 | Audits | 24 |

| ARTICLE 10: | TRADEMARKS | 25 |
| 10.1 | Ownership of the Marks | 25 |
| 10.2 | Use of the Marks | 25 |
| 10.3 | Discontinuance of Use of Marks | 25 |
| 10.4 | Notification of Infringements and Claims | 25 |
| 10.5 | Indemnification of Dealer | 26 |

| ARTICLE 11: | RESTRICTIVE COVENANTS | 26 |
| 11.1 | Confidential Information | 26 |
| 11.2 | Dealer's In-Term Covenants | 26 |
| 11.3 | Information Exchange | 27 |
| 11.4 | Dealer's Post-Term Covenants | 27 |
| 11.5 | Meineke's Non-Competition Covenant | 27 |
| 11.6 | Competition by Meineke's Affiliates | 28 |
| 11.7 | Meineke's Management Commitment | 29 |

| ARTICLE 12: | TRANSFER OF AGREEMENT | 30 |
| 12.1 | Transfer by You Subject to Our Approval | 30 |
| 12.2 | Conditions for Approval | 30 |
| 12.3 | Transfer to a Corporation | 31 |
| 12.4 | Special Transfers | 32 |
| 12.5 | Death or Disability of Dealer | 32 |
| 12.6 | Your Right to Offer Your Franchise to Us | 32 |
| 12.7 | Our Right of First Refusal | 33 |
| 12.8 | Transfer by Us | 34 |

| ARTICLE 13: | TERMINATION OF AGREEMENT | 34 |
| 13.1 | Termination Upon Notice | 34 |
| 13.2 | Termination After Opportunity to Cure | 35 |

CJGL000120

ARTICLE 14:   RENEWAL RIGHTS ........................................................................................ 36

ARTICLE 15:   EFFECT OF TERMINATION OR EXPIRATION ........................................... 37
    15.1   Payment of Amounts Owed to Us ..................................................................... 37
    15.2   Discontinue Use of Marks and Confidential Information ................................. 37
    15.3   Customers ......................................................................................................... 38
    15.4   Possession of Premises ..................................................................................... 38
    15.5   Continuing Obligations ..................................................................................... 39

ARTICLE 16:   RELATIONSHIP OF THE PARTIES .......................................................... 39
    16.1   Independent Contractors ................................................................................... 39
    16.2   Indemnification ................................................................................................. 39
    16.3   Taxes ................................................................................................................. 40

ARTICLE 17:   MISCELLANEOUS ........................................................................................ 40
    17.1   Governing Law .................................................................................................. 40
    17.2   Arbitration ......................................................................................................... 40
    17.3   Preliminary Injunctive Relief ........................................................................... 41
    17.4   Multi-Plaintiff and Class Action Claims .......................................................... 41
    17.5   Venue ................................................................................................................ 41
    17.6   Costs and Attorneys' Fees ................................................................................ 42
    17.7   Limitations on Legal Claims ............................................................................. 42
    17.8   Severability and Substitution of Provisions ..................................................... 42
    17.9   Waiver of Obligations ....................................................................................... 42
    17.10   Exercise of Rights ........................................................................................... 42
    17.11   Construction .................................................................................................... 43
    17.12   Modification .................................................................................................... 43
    17.13   Policy Regarding Meineke Chain Expansion ................................................. 44
    17.14   Notices and Payments ..................................................................................... 44
    17.15   Ombudsman ..................................................................................................... 44

MEINEKE®
**FRANCHISE AND TRADEMARK AGREEMENT**

**THIS AGREEMENT** between **MEINEKE CAR CARE CENTERS, LLC** ("Franchisor" or "we"), a North Carolina limited liability company, with its principal place of business located at 440 South Church Street, Suite 700, Charlotte, North Carolina 28202 and _____ ("Dealer or "you"), a(n) _____, whose principal address is _____ is made and entered into as of the date appearing below our signature line at the end of this Agreement (the "Agreement Date").

**ARTICLE 1:**
**INTRODUCTION AND DEFINITIONS**

**1.1     Meineke Car Care Centers**

We operate, and grant others ("Meineke Dealers") the right to operate, automotive maintenance and repair businesses known as "Meineke Car Care Centers".  As a result of our investment of time, skill, effort and money, we have developed comprehensive business methods and systems, that we may improve or otherwise change from time to time, for operating Meineke Car Care Centers.

**1.2     Acknowledgments**

You and we acknowledge our shared commitment to the common goals of enhancing customer goodwill toward the Marks, to strengthening the business of Meineke Car Care Centers and to expanding the chain of Meineke Car Care Centers.  You and we further acknowledge that the success of achieving these common goals is dependent on us and Meineke Dealers working together in a spirit of mutual respect and cooperation.  In accordance with that spirit, we have developed this form of franchise agreement with the advice and counsel of the Dealer Association Advisory Council.

The provisions of this Agreement are based on the guiding principles that:  (a) we should respect your interest in the going-concern value of your business; and (b) you should respect our ownership of the System, including the Marks, trade secrets, confidential information and the associated goodwill, and our rights to determine the nature and quality of the products and services sold under the Marks, to control the manner in which the Marks are used, to enforce System standards and to manage the System.  You understand the terms of this Agreement and accept them as being reasonably necessary for us to maintain the uniformity of our high quality standards at all Meineke Car Care Centers and to protect the goodwill of the Marks and the integrity of the System.

**1.3     Definitions**

The terms listed below have the meanings which follow them or have the meanings which are set out in the referenced Section and include the plural as well as the singular.  Other terms are defined elsewhere in this Agreement in the context in which they arise.

(1)     "Adjustment" - See Section 3.4.

(2)     "Affiliate" - Any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party.

(3)     "Agreement Date" - See Preamble.

1

CJGL000122

(4)     "Annual Administrative Expense" - See <u>Section 8.2</u>.

(5)     "Annual Minimum Royalty" – See <u>Section 3.2</u>.

(6)     "Authorized Products and Services" - See <u>Section 7.1</u>.  Also see <u>Section 3.2</u>.

(7)     "Calculated Royalties" – See <u>Section 3.2</u>.

(8)     "CPI" - The index number in the table relating to "Consumer Price Index - United States City Average, All Items, for Urban Wage Earners and Clerical Workers" as presently published in the "Monthly Labor Review" of the Bureau of Labor Statistics for the United States Department of Labor (the "Bureau").  In the event the Bureau ceases publishing the Consumer Price Index or materially changes the methods of its computation or other features of it, we may substitute comparable statistics on the purchasing power of the consumer dollar published by the Bureau, another governmental agency or a responsible financial periodical or recognized authority to be chosen by us.

(9)     "Competitive Business" - See <u>Section 11.2</u>.

(10)    "Confidential Information" - See <u>Section 11.1</u>.

(11)    "Core Authorized Products and Services" - See <u>Section 7.1</u>.

(12)    "DAAC" or "Dealer Association Advisory Council" - See <u>Section 2.5</u>.

(13)    "Dealer" or "you" - See <u>Preamble</u>.

(14)    "Franchisor" or "we" - See <u>Preamble</u>.

(15)    "Gross Revenues" - See <u>Section 3.3</u>.

(16)    "Immediate Family" - Spouse, parents, brothers, sisters and children, whether natural or adopted.

(17)    "MAF" - See <u>Section 3.4</u>.

(18)    "Market Area" - The MSA, PMSA, NECMA, county, parish or other corresponding geographical area used by the U.S. Census Bureau and as described in <u>Schedule A</u>, attached hereto and incorporated herein by reference.

(19)    "Marks" - Our current and future trademarks, service marks and trade dress, including the mark Meineke®, that we authorize Meineke Dealers to use.

(20)    "Meineke Dealers" - See <u>Section 1.1</u>.

(21)    "Meineke Car Care Centers," "Meineke Centers" or "Centers" - Automotive maintenance and repair businesses that we operate, or that we grant others the right to operate, and which offer and sell the Authorized Products and Services using the Marks and the System.

(22)    "Operating Partner" - See <u>Section 6.2</u>.

(23)    "Operations Manual" - See <u>Section 5.4</u>.

CJGL000123

(24)    "Opening Date" - See <u>Section 4.2</u>.

(25)    "Owner" - See <u>Section 6.1</u>.

(26)    "Preferred Supplier" - A supplier of equipment, parts, supplies or other products who we have approved and whose equipment, parts, supplies or products we use in training programs and the Operations Manual to demonstrate and teach techniques in performing services associated with Authorized Products and Services.

(27)    "Premises" - The location of your Center identified in <u>Schedule B</u>, attached hereto and incorporated herein by reference.

(28)    "Protected Area" - See <u>Section 2.3</u>.

(29)    "System" - The business methods, systems, designs and arrangements for developing and operating Meineke Car Care Centers that include the Marks; the Confidential Information; standards and specifications for equipment; service standards; training and assistance; advertising and promotional programs; and certain operations and business standards and policies.

(30)    "Term" - See <u>Section 2.1</u>.

(31)    "Transfer the Franchise" - See <u>Section 12.1</u>.

(32)    "Weekly Royalties" - See <u>Section 3.2</u>.

(33)    "Your Center" - See <u>Section 2.1</u>.

## ARTICLE 2:
## GRANT OF RIGHTS

**2.1    Grant of Franchise/Reservation of Rights**

Subject to the terms and conditions of this Agreement, we grant you the right, and you assume the obligation, to operate a Meineke Center ("your Center") at the Premises and to use the System solely in connection therewith, for a term expiring on the expiration date set forth in <u>Schedule A</u> or otherwise expiring on the 15th anniversary of the Opening Date (the "Term"). You may not conduct the business of your Center or use the System anywhere other than the Premises without our consent.

Except as otherwise expressly provided in this Agreement, we and our Affiliates reserve all of our respective rights and discretion with respect to the Marks, the System and Meineke Centers anywhere in the world and the right to engage in any business whatsoever, including: (a) the right to operate, and grant to others the right to operate, Meineke Centers at such locations and on such terms and conditions as we deem appropriate; and (b) the right to acquire, merge or consolidate with, be acquired by, operate and expand businesses.

**2.2    Selection of Location for New Center**

If this Agreement is for a new Center, you agree to propose a location for your Center in the Market Area within 270 days after the Agreement Date. Your proposed location must conform to our site selection guidelines and requirements and is subject to our approval. You agree to submit to us all information about the proposed location that we request, including a complete site analysis report. We have no obligation to

CJGL000124

consider a proposed location until we receive all requested information.  You agree not to execute any lease or purchase agreement for, nor commit to any other binding obligation to purchase, occupy or improve, any proposed location until we have approved the location in accordance with our standard procedures.  In approving or disapproving any proposed location, we will consider the factors we deem relevant, including general location, neighborhood and the distance to any other Meineke Center operating in the Market Area.  We will have no liability whatsoever to you or anyone else for disapproving a proposed location.  Upon approval of a proposed location, the location will be identified in <u>Schedule B</u> and <u>Schedule B</u> will be signed by both parties and attached to this Agreement.  Once <u>Schedule B</u> has been completed and signed, the location identified in <u>Schedule B</u> will be deemed the "Premises".

If you and we are unable to mutually agree on a location for your Center within 270 days after the Agreement Date, either party may terminate this Agreement, effective upon notice.  We will refund, without interest, the initial franchise fee you have paid hereunder (less our costs and expenses relating to processing your application, including franchise sales commissions, and evaluating proposed locations, which costs and expenses will not be less than $10,000), provided you and your Owners sign a general release in form and substance satisfactory to us.

Neither our site selection guidelines and requirements, our approval of the Premises, nor any information we may impart to you about the Premises, constitutes a warranty or representation of any kind, express or implied, that your Center will be profitable or successful.  Our approval of the Premises merely signifies that we authorize you to operate a Meineke Center at that site.  You are solely responsible for the selection of an appropriate site for your Center.

**2.3      Your Territorial Protection**

Once the Premises have been identified in accordance with <u>Section 2.2</u>, we will not during the Term operate, nor grant others the right to operate, (a) a Meineke Center within a radius of 2 miles from the Premises (the "Protected Area"), (b) a Meineke Center outside of the Protected Area but within a radius of 3 miles from the Premises without offering you a right of first refusal, as described in this <u>Section 2.3</u>, or (c) more than 1 Meineke Center for every 50,000 motor vehicles (i.e., automobiles and light trucks that are licensed to operate on public highways) registered in the Market Area at the time each Center is opened.

If, during the Term, we want to operate, or to grant someone else the right to operate, a Meineke Center outside the Protected Area, but at a proposed location within a 3-mile radius from the Premises, we will first offer a franchise to you on our then-standard terms and conditions for new Meineke Car Care Centers, provided that you are Option Eligible (as defined below).  If you do not accept our offer within 30 days, we will be entitled to operate, and to grant to someone else the right to operate, a Meineke Center at the proposed location.  Notwithstanding anything to the contrary contained in this <u>Section 2.3</u>, if there is more than one then-existing Meineke Center located within a 3-mile radius from the proposed location of the new Meineke Center, then you will be entitled to the right of first refusal contained in this <u>Section 2.3</u> only if (a) your Center is closest to the proposed location of the new Meineke Center, or (b) the owners of all Meineke Car Care Centers that are closer to the proposed location of the new Meineke Center fail to accept any similar right of first refusal contained in their franchise agreements.

For purposes of this <u>Section 2.3</u>, you will be "Option Eligible" if:  (1) you are not then in arrears in any payment to us or to any of our Affiliates for 30 days or more and we have not delivered to you a notice of default during the preceding 12 months; and (2) you have no outstanding customer warranty matters or customer complaints which are not resolved within 30 days after we notify you of them.  You acknowledge and agree that the foregoing "Option Eligible" standard does not encompass our normal requirements and criteria for issuing a new franchise, approving a transferee or renewing a franchise and, by agreeing to limit our criteria under this <u>Section 2.3</u>, we are not limiting our requirements or criteria for any other types of

CJGL000125

franchise sales or transactions or acknowledging that being Option Eligible means you are in compliance with this Agreement.

Your rights and our obligations in this <u>Section 2.3</u> do not apply to any Meineke Center that is open or under development, or as to which the location has been approved, as of the date we notify you of our approval of the Premises.

### 2.4   Your Right to Associate with Other Meineke Dealers

We agree not to prohibit or restrict you from lawfully associating with other Meineke Dealers, nor from forming, joining or participating in the lawful activities of any independent association of Meineke Dealers. Notwithstanding the foregoing, our exercise and enforcement of rights under this Agreement or under applicable law will not, by itself, constitute a breach of this <u>Section 2.4</u>. You are not required to be a member or participate in the activities of any independent association of Meineke Dealers.

### 2.5   Consultation with the Dealer Association Advisory Council

We agree to consult with DAAC (or, as applicable, the Advertising Committee) on a periodic basis with respect to the matters specified in <u>Sections 3.3</u> (Royalty Fee Administration), <u>Section 7.1</u> (Authorized Products and Services), <u>Section 7.2</u> (Parts and Supplies), <u>Section 7.8</u> (Insurance), <u>Section 7.10</u> (Customer Warranties), <u>Section 8.2</u> (Meineke Advertising Fund), <u>Section 17.12</u> (Policy Regarding Meineke Chain Expansion) and <u>Section 17.14</u> (Ombudsman) and other matters relating to our relationship with Meineke Dealers as to which we may, at our sole discretion, agree to consult with DAAC from time to time. You agree that we may consult with and consider the advice and counsel of DAAC, but that we are not bound by its views.

Provided that Meineke Dealers Association, Inc. (d/b/a "The New Meineke Dealers Association, Inc." and f/k/a "Association of Muffler Dealers, Inc.") ("MDA"), a Delaware non-profit corporation, complies with its obligations under the Meineke/Dealer Association Cooperation Agreement dated on or about May 1, 2000 to amend its organizational documents before July 31, 2000 in accordance with the terms of that agreement, the "Dealer Association Advisory Council" or "DAAC" shall be a representative committee of Meineke Dealers (or officers or directors of Meineke Dealers operating in corporate form) duly elected from time to time by the members of MDA through democratic processes and reflecting reasonable geographical representation, so long as MDA represents the owners of more than 50% of all franchised Meineke Car Care Centers in the United States of America. In the event that MDA does not fulfill its obligations under the above-referenced agreement, or the owners of 50% or less of all franchised Meineke Car Care Centers in the United States of America are members of MDA, and another association of Meineke Dealers which represents the owners of more than 50% of all franchised Meineke Car Care Centers in the United States of America and whose governing documents meet our reasonable requirements from time to time for ensuring democratic processes and representation of the interests of all Meineke Dealers, including appropriate electoral regions and districts, then the DAAC shall consist of a committee of duly elected representatives of such other association.

We may from time to time require that MDA or any other independent association of Meineke Dealers intending to qualify for a DAAC demonstrate to our reasonable satisfaction that it qualifies to establish a DAAC, and we shall have no obligation to recognize any purported DAAC of any association, including MDA, that has failed or refused to so demonstrate its qualifications.

If, at any time, no association of Meineke Dealers exists or qualifies to establish a DAAC, we may, but are not obligated to, establish an elected or appointed DAAC, and if we determine not to do so, we will have no obligation, notwithstanding anything to the contrary contained in this Agreement, to seek the advice

MCC 5/2014

CJGL000126

and counsel (or consent under Section 17.13 or otherwise) of any DAAC (or, as applicable, Advertising Committee), unless and until an association of Meineke Dealers qualifies to establish a DAAC.

### 2.6        Relocation of Center

If your lease or sublease for the Premises terminates prior to its expiration for reasons other than a default there under by you or expires without you being able to obtain a renewal of the lease or sublease, then you may relocate your Center in accordance with this Section 2.6, subject to our approval.  Any such relocation shall be at your sole expense.  The relocation of your Center is subject to all of the provisions of Section 2.2, Section 2.3, Section 3.3, Section 4.1, Section 4.2, Section 4.3 and Section 4.4 as if you were establishing a new Center, provided, however:   (a) your rights under Section 2.3 terminate effective immediately upon closing of the old Premises and become operative again only when the new Premises are approved by us; (b) your Center at the new Premises must open within 12 months after the date of closing of the old Premises; (c) your initial franchise fee is not refundable; and (d) you agree to reimburse us for all of our costs and expense incurred in connection with your relocation.

### ARTICLE 3:
### FEES

### 3.1        Initial Franchise Fee

If your Center is a new Meineke Center, you agree to pay us an initial franchise fee of $30,000 (less any creditable deposit), payable on the Agreement Date.  The initial franchise fee is fully earned by us on the Agreement Date and, except as otherwise provided in Section 2.2 and Section 4.1, is non-refundable.

### 3.2        Royalty Fees

During the term of this Agreement and any extensions or renewals thereof you agree to pay us royalties at the greater of the percentages set forth below for the identified categories of Authorized Products and Services derived from the sale of these products or services ("Calculated Royalties") or annual minimum royalties in the amount of $20,800 subject to adjustment as provided for in Article 3.3 of this Agreement ("Annual Minimum Royalties").  While these royalties will be computed and, in the case of Calculated Royalties, aggregated on an annual basis you are to make individual royalty payments to us on a weekly basis as stated below.

Before Wednesday of each week you agree to pay us weekly royalties ("Weekly Royalties") that are defined as the greater of $400 subject to adjustment as provided for in Article 3.3 of this Agreement ("Weekly Minimum Royalties"), or the Calculated Royalties for the immediately preceding week (i.e. Sunday through Saturday period):

At the end of each calendar year during the term of your Agreement and any extensions or renewals thereof we will rebate to you the *difference* between the aggregate of the Weekly Royalties from the operation of your center for that year and the Yearly Royalties (which are defined as the greater of the aggregated Calculated Royalties and the Annual Minimum Royalties).  In other words if your Yearly Royalties paid to us are more than the greater of your Calculated Royalties or your Annual Minimum Royalties for that year then you will be rebated the difference.  Under no circumstances will you pay less than the Annual Minimum Royalties in any one year of this Agreement. To the extent that your Center opens at a time other than the first week of the fiscal year your Annual Minimum Royalties for that year will be prorated based on a 52 week year.

CJGL000127

Notwithstanding anything stated to the contrary, if you are signing this Agreement as a new franchisee for a new Meineke Center that has never been opened for business then the calculation and payment of the Annual Minimum Royalties and the payment of the Weekly Minimum Royalties shall not commence until the expiration of 6 months from the first Monday that you open your Center for business. At the end of the 6 month period you will begin to pay your Weekly Minimum Royalties as required by this Agreement, but your Annual Minimum Royalties, which are calculated  on a calendar year basis, shall be prorated for that year on a 52 week basis.

| Authorized Product or Service | Royalty rate as a percentage of Gross Revenues |
|---|---|
| Exhaust systems (incl. catalytic converters) | 7% |
| Replacement of Engines or Transmissions | 5.5% |
| Engine Diagnostics | 5.5% |
| Engine Seals, Gaskets, Mounts | 5.5% |
| Transmission Mounts | 5.5% |
| Scheduled Maintenance | 5.5% |
| Batteries | 4% |
| Government regulated Inspections | 3% |
| Tires | 3% |
| Towing  services | 3% |
| All Other Authorized Products and Services | 5% |

| Unauthorized Product or Service | Royalty rate as a percentage of Gross Revenues |
|---|---|
| Engine Rebuilding | 7% |
| Transmission Rebuilding | 7% |
| Other unauthorized Services | |
| Listed in your Operations Manual | 7% |
| Non-automotive services | 7% |

Except for the Unauthorized services noted above and listed in your Operations Manual from time to time, authorized products and services are defined as the installation, repair and maintenance of and all parts relating to the mechanical and electrical systems on cars and light vehicles and the sale of any such parts ("Authorized Products and Services").  Additionally, from time -to- time we may authorize additional products and/or services that may be sold at your center that may or may not fit the current definition of Authorized Products and Services.  Any additional products and services that are authorized by us will be posted in your Operations Manual together with their applicable royalty rates.

In addition to the foregoing, for parts that are purchased from a new car dealership and sold to a Meineke customer, you are eligible to receive a rebate on royalty fees required to be paid pursuant to the terms of the Agreement  down to a royalty rate of not lower than 3% [the rebate will be calculated on the cost of the part as the difference between the actual fees paid and 3% for royalties]  ("Royalties") and Meineke Advertising Contributions not to be lower than 1.5% [the rebate will be calculated on the cost of the part as the difference between the actual contributions paid and 1.5%] ("MAF"). The rebate is based on part costs to you (that rebate is based on the COST of the part to the Franchisee, and not their selling price of such part).  The rebate is for the cost of parts only and does not include the cost of labor associated with the installation of such parts for the customer. The maximum annual sales per year subject to the payment of a rebate is limited to 1% of the total gross sales of such center for that year as defined this Agreement.

CJGL000128

### 3.3     Royalty Fee Administration

Notwithstanding the provisions of <u>Section 3.2</u>, royalty fees payable pursuant thereto and MAF Contributions payable pursuant to <u>Section 3.4</u> on work performed for commercial customers who do not pay for those services at the time they are performed, i.e., trade accounts, shall be paid by the earlier of:  (a) 7 days after the date of payment from the customer; or (b) 90 days after the services are performed.  If you can demonstrate, within one year after the services have been performed for a particular trade account, that such account is uncollectible, you may assign such account to us and we will credit you for the amount of royalty and MAF Contribution that you have paid on such account.

Notwithstanding anything to the contrary contained in <u>Section 3.2</u>:  (a) subject what is stated in <u>Section 3.1</u> of this Agreement the royalty fee will be 7% of all revenues derived from products sold and services rendered at or in connection with your Center that are not Authorized Products and Services; (b) the royalty fee will be 7% of all Gross Revenues, if you fail to provide us required reports and information using computer systems in accordance with <u>Section 9.2</u>; (c) the royalty fee will be 8% of all unreported Gross Revenues, including those uncovered by an audit conducted pursuant to <u>Section 9.6</u>; and (d) we have the right to establish the amount of the royalty fee for any new products or services that become part of the Authorized Products and Services after the Agreement date.  We agree to consult with DAAC on the amount of the royalty fee for any such new products or services and to consider, among other things, the potential profitability of such new products and services in determining the amount of the royalty fee.

"Gross Revenues" are all the revenues derived from or in connection with the operation of your Center, whether from sales for cash or credit, and irrespective of their collection, including charges for Authorized Products and Services and applicable proceeds from any business interruption insurance for your Center, but excluding:  (a) sales taxes, use taxes, gross receipts taxes, and other similar taxes added to the sale price, collected from the customer and remitted to the appropriate tax authorities; (b) credit card fees on credit card sales; and (c) check guaranty fees.  Gross Revenues also include revenues derived from any products or services sold and/or performed from or in connection with your Center that are not Authorized Products and Services, without such inclusion in this definition or the related collection of royalty fees constituting an acknowledgment or admission by us that such products or services are Authorized Products and Services or constituting in any manner a waiver of our right to assert that any such sale breaches this Agreement or otherwise violates our rights.

Both the Annual Minimum Royalties and the Weekly Minimum Royalties referred to in <u>Article 3.2</u> together with any required services fees shall be subject to adjustment not more than once per calendar year to reflect any increase in the Consumer Price Index,  All Urban Consumers, All Items, All U.S. Cities (revised 1982-84:100) published by the United States Department of Labor, Bureau of Statistics (the "Adjustment")  from the base period.  For the purpose of the Royalty Fees and service fees, if any, the base period shall refer to October 2010.  We may at our election, in order to facilitate the computation of the Adjustment, use the CPI published three months prior to the effective date of each Adjustment to determine the amount of the Adjustment.  The first such adjustment shall be on October 1, 2011, and each subsequent adjustment shall be made effective as of each succeeding anniversary.

MCC 5/2014

CJGL000129

### 3.4      Contributions to Meineke Advertising Fund

You agree to contribute 8% of your Gross Revenues to the Meineke Advertising Fund ("MAF"), provided however, if your Center is a new Center, you agree to pay the greater of 8% of your Gross Revenues or $250 for each of the first 12 weeks that your Center is open.  You acknowledge and agree that we may enforce your obligation to contribute to the MAF.

Notwithstanding the foregoing:  (a) we may from time to time reduce the percentage amount of your contributions to the MAF on Gross Revenues from the sale of any products and services that are not Core Authorized Products and Services and determine the manner in which such reduced percentage amounts are allocated under Section 8.2.  Specifically, and without limitation, at such time that we advise you in writing of the activation of this section, the percentage amount of your contributions to the MAF on the Gross Revenues derived from the sale of oil change services shall be 4% of which all goes to the Meineke Customer Relations Marketing program ("CRM").   Customer Relationship Marketing shall include, but not be limited to, local and national marketing using print, e club and other loyalty programs, and telephone and other communication vehicles that communicate with a customer on a one-to-one basis. To the extent that there is any shortfall for the CRM expenditures such shortfall shall be satisfied from the Local allocation of the MAF contributions.   In order to cover the additional costs of administering the Meineke advertising program, the Annual Administrative Expense referenced in Section 8.2 of your Franchise and Trademark Agreement shall be increased to 3.1% of all contributions by all Meineke Car Care Centers to the MAF, including those MAF dollars referenced in Section 4 of this Agreement.   ; and (b) the percentage amount of your contributions to the MAF on Gross Revenues derived from the sale of tires shall be 1.5%, of which .5% will be allocated to Creative and 1% will be allocated to National Advertising in accordance with Section 8.2. (c) the percentage amount of your contributions to the MAF on Gross Revenues derived from the sale of Towing services and government regulated inspections shall be 1.5% of which .5% will be allocated to Creative and 1% will be allocated to National Advertising in accordance with Section 8.2.

Your contributions to the MAF are due and payable weekly together with the royalty fees due under Section 3.2.  Meineke Car Care Centers owned by us and any of our Affiliates will contribute to the advertising programs funded by the MAF on the same basis as you are required to hereunder.  Without waiving any rights or constituting any election of remedies, we have the right to notify DAAC or other regionally elected Dealer representatives of any delinquencies in your payment of contributions to the MAF.

### 3.5      Technology Administrative Fee

If you fail to keep your computer system updated or you fail to promptly install all additions, changes, modifications, substitutions or replacements to the computer hardware, computer software, internet connections, telephone and power lines, and other data transmission facilities we direct, as required in Section 9.2, you must pay us our then-current administrative fee to cover our costs related to your delayed installation.

### 3.6      Interest on Late Payments

All amounts which you owe us or any of our Affiliates, including MAF contributions, will bear interest from and after ten (10) days after their due date at the highest contract rate of interest permitted by law, not to exceed 3% above the prime rate announced from time to time by The Chase Manhattan Bank or any other national bank we select.  In addition, we have the right to assess service charges for any checks that are returned for insufficient funds and late charges if permitted by applicable law.  Notwithstanding the imposition of interest or charges, your failure to pay all amounts, when due, constitutes grounds for termination of this Agreement as provided in Article 13.

MCC 5/2014

CJGL000130

**3.7     Method of Payment**

All initial franchise fees, royalty fees, MAF contributions and any other payments hereunder shall be paid using those methods of payment we may require from time to time, including electronic debit/credit transfer of funds.  You agree to sign such documents, pay such bank fees and do such things as we deem necessary to facilitate electronic transfers of funds or other methods of payment, provided that so long as we require you to send us hard copies of invoices for work performed pursuant to Section 9.3, we will pay for bank transfer fees, if we require electronic transfer of funds.  No restrictive endorsement on any check or in any letter or other communication accompanying any payment will bind us, and our acceptance of any such payment will not constitute an accord and satisfaction.

**3.8     Application of Payments**

We may apply any of your payments to us to any of your past due indebtedness for royalty fees, MAF contributions, purchases of products or supplies or any other past due indebtedness to us or any of our Affiliates, notwithstanding any contrary designation by you, provided that any payments that are designated as MAF contributions will be applied first to any currently due or past due MAF contributions.  You agree that all such payments will be made as and when due without any setoff, deduction or prior demand therefore.

**ARTICLE 4:**
**DEVELOPMENT OF YOUR CENTER**

**4.1     Purchase or Lease of Premises**

If your Center is a new Meineke Center, you agree to lease, sublease or purchase the Premises within 1 year after the Agreement Date.  We have the right to approve the terms of any lease, sublease or purchase contract for the Premises, which approval will not be unreasonably withheld.  You agree to deliver a copy of such lease, sublease or purchase contract to us for our approval before you sign it.  You agree that any lease or sublease for the Premises shall, in form and substance satisfactory to us: (a) provide for notice to us of your default under the lease or sublease and an opportunity for us to cure such default; (b) require the lessor or sublessor to disclose to us, on our request, sales and other information furnished by you; (c) give us the right on any termination or expiration of this Agreement to assume the lease or sublease or to enter into a further sublease for a period of not less than 12 months and not more than 18 months (the "Interim Sublease"), without the lessor's or sublessor's consent; (d) give us the right to enter the Premises to make any modifications to your Center to protect our rights to the Marks; (e) provide that the lessor and/or sublessor relinquish to us, on any such termination or expiration of this Agreement, any lien or other ownership interest, whether by operation of law or otherwise, in and to any tangible property that embodies any of the Marks; (f) give us the right to assign the lease or sublease to a successor Meineke Dealer, in which event the Interim Sublease (if any) shall terminate and be of no further force or effect; and (g) include an acknowledgement by the lessor and/or sublessor that we have no liability or obligation whatsoever under the lease or sublease until and unless we assume the lease or sublease on termination or expiration of this Agreement or enter into the Interim Sublease.

You may not execute a lease, sublease or purchase contract for the Premises or any modification, amendment or assignment thereof before we have approved it.  Our approval of the lease, sublease or purchase contract does not constitute a warranty or representation of any kind, express or implied, as to its fairness or suitability or as to your ability to comply with its terms.  We do not, by virtue of approving the lease, sublease or purchase contact, assume any liability or responsibility to you or to any third parties.  You agree to deliver a copy of the fully signed lease, sublease or purchase contract to us within 5 days after its execution.

10

CJGL000131

If for any reason you fail to lease or purchase the Premises within 1 year after the Agreement Date, we may terminate this Agreement, effective upon delivery of notice thereof.  In the event of such termination, we will refund, without interest, the initial franchise fee you have paid hereunder (less our costs and expenses relating to processing your application, including franchise sales commissions, evaluating proposed locations for your Center and assisting in developing your Center, which costs and expenses will not be less than $10,000), provided you and your Owners sign a general release and any other instruments we require in order to rescind all transactions between you and us, all in form and substance satisfactory to us.

### 4.2     Development and Opening of Your Center

You are solely responsible for developing and operating your Center and for all associated expenses.  If your Center is a new Meineke Center, we will furnish you prototype plans for a Meineke Center. You may modify the prototype plans only to the extent necessary to comply with all applicable laws, regulations, ordinances, building codes and permit requirements (including the Americans with Disabilities Act and the Occupation Safety and Health Act) and any lease requirements and restrictions.  You agree to submit such plans and specifications to us for our approval before starting to develop the Premises.  All development must be in accordance with the plans and specifications we have approved and must comply with all applicable laws, ordinances and local rules and regulations.  We may periodically inspect the Premises during its development.  Your Center may not be opened for business until we notify you that all our requirements for opening have been met.  The date of our formal notification to you that such requirements have been met shall be deemed the "Opening Date" for purposes of this Agreement.  You agree to open your Center within 18 months after the Agreement Date.  However, if a failure to open your Center within such 18-month period is due to reasons beyond your control (such as acts of God, unavoidable delays in obtaining zoning permits or unavoidable construction delays), we agree to grant a reasonable extension of time for you to open your Center.

### 4.3     Equipment, Fixtures and Signs

You agree that all signs that you purchase or lease for your Center shall be of the types, brands and models that meet our standards and specifications.  You agree that all fixtures and equipment that you purchase or lease for your Center shall be of the types, brands and models that we reasonably determine meet industry standards as to quality, performance and safety.  You may purchase or lease such equipment, fixtures and signs from any suppliers.

### 4.4     Use and Ownership of Telephone Numbers

Certain advertising placed for a Meineke is placed using a Remote Call Forward (RCF) telephone number, or other such tracking mechanism that we may use from time to time.  This/these number(s) are established by us and will be directed to the primary local telephone number secured for your center. You are not to publish, print, or otherwise use the RCF number(s), or other tracking mechanism used or sponsored by us, are  not to be published, printed or used by you or your  Meineke Center in connection with any other business or any Meineke business related forms such as business cards, invoices, letterhead, etc.   At no time does the franchisee have rights to or control of a Meineke Advertising RCF number. Only at such time when the Meineke franchise license associated with the location using the particular RCF number, or other tracking mechanism that may be used from time to time, is terminated, will the franchisee lose the use of the RCF number or such tracking mechanism.

You will be required to obtain local telephone service and establish it according to the guidelines set forth by Meineke.  For your advertising RCF number(s) to be established and for your center to be included in Meineke coordinated advertising programs, you will be required to provide Meineke with the

11

CJGL000132

documentation showing the primary local telephone number and showing that it was established in the required manner. The primary local telephone number that you obtain will be the number used on business cards, letterhead, invoices and other business forms. This will also be the number to which your advertising RCF number(s) will be directed. It is understood and agreed by you that the RCF program at some time may be replaced with other telephone tracking mechanisms that we believe is more advanced than the current tracking mechanism and in that event you agree to comply with the same or similar requirements that may be necessary to provide the same type of benefits that are now provided through the RCF number.

In addition, you agree to sign such release and transfer documents as we may require to authorize us to obtain the telephone numbers of your Center upon any termination or expiration (without renewal) of this Agreement. If, during the Term, the telephone numbers for your Center should be transferred to someone other than us, you will cooperate with us to ensure that they are returned to us.

You agree not to place any restrictive codes on the telephone numbers for your Center without our consent. You agree not to terminate any such telephone numbers during the Term or do anything else that may directly or indirectly impede our ability to transfer or use those numbers upon any termination or expiration (without renewal) of this Agreement.

All telephone numbers and directory listings for your Center are our property, and we have the right to transfer, terminate or amend such telephone numbers and directory listings only on termination or expiration (without renewal) of this Agreement. If we take any action pursuant to this Section 4.4, the telephone company and all listing agencies may accept this Agreement as conclusive evidence of our exclusive rights to such telephone numbers and directory listings and as conclusive evidence of our authority to direct their amendment, termination or transfer, without any liability to you.

## ARTICLE 5:
## TRAINING AND GUIDANCE

### 5.1    Training Programs

If you (or, if applicable, your Operating Partner) have not previously attended and successfully completed our initial training program, then prior to opening or operating your Center, you (or your Operating Partner) must attend and successfully complete an initial training program on the operation of a Meineke Center at such time(s) and place(s) as we designate. If you have paid in full the initial franchise fee in accordance with Section 3.1 and you (or your Operating Partner) attend the initial training program prior to the opening of your Center, then: (a) we will not charge you any separate fees for the training program; and (b) we will pay for the reasonable cost of travel and lodging for not more than 2 persons (who have either signed this agreement or guaranteed this agreement if you are a corporation) in connection with attending the initial training program. At any time during the Term, you (or your Operating Partner) may attend, subject to availability, the initial training program for retraining. We will not charge you a fee for such retraining.

In connection with Core Products and Services added after the Agreement Date, we will make available, if reasonably appropriate, training to you (or your Operating Partner) with respect to general aspects of such Core Products or Services, such training to be made available at such time(s) and place(s) as we may determine. We will not charge any fees for training for additional Core Products and Services.

On your request, we will endeavor to provide special training on various aspects of operating a Meineke Center for which you will be required to pay the training fees and charges we may establish from time to time. If we determine that there are significant deficiencies in the operations of your Center, we may

CJGL000133

require you (or your Operating Partner) and your managers and key employees to attend and successfully complete periodic or additional training programs for which we may charge reasonable training fees.

Except as otherwise provided in this <u>Section 5.1</u>, you will be responsible for all expenses you incur in connection with attending all training programs, including compensation, travel, lodging and meals.

### 5.2     On-Going Guidance

We will furnish you on-going guidance with respect to the System, including improvements and changes to it.  Such guidance, at our discretion, will be furnished in the form of the Operations Manual, bulletins (such as our periodic newsletter) and other written or electronic communications, consultations by telephone or in person at our offices or at your Center, and by any other means of communications.  You acknowledge and agree that various means of communication (e.g., electronic communication) may require you to incur expenses for communication technology, including hardware, software and access fees.

### 5.3     Periodic Visits

We will conduct inspections of your Center to evaluate your Center's operations and compliance with the System when and as frequently as we deem appropriate.

### 5.4     Operations Manual

We will loan you one copy of the Operations Manual during the Term.  "Operations Manual" means our confidential operations manual, as amended from time to time, that may consist of one or more written manuals (including training manuals), containing our mandatory and suggested standards, specifications and operating procedures relating to the development and operation of Meineke Car Care Centers and other information relating to your obligations under this Agreement.  "Operations Manual" also includes alternative or supplemental means of communicating such information by other media which specifically reference that they are to be considered to be part of the Operations Manual, including bulletins, e-mails, videotapes, audio tapes, compact discs, computer diskettes and CD Roms.  You agree to keep your copy of the Operations Manual current.  If there is a dispute relating to the contents of the Operations Manual, our master copy will be controlling.  The Operations Manual contains Confidential Information, and you agree not to copy any part of it.

### ARTICLE 6:
### YOUR ORGANIZATION AND MANAGEMENT

### 6.1     Disclosure of Ownership Interests

You and each Owner (as defined below) represent, warrant and agree that <u>Schedule C</u>, attached hereto and incorporated herein by reference, is current, complete and accurate.  You agree to promptly update <u>Schedule C</u> so that <u>Schedule C</u> (as so revised and signed by you) is at all times current, complete and accurate.  Each person who is or becomes an Owner must execute an Owner's Personal Guaranty, in the form of <u>Schedule D</u>, attached hereto and incorporated herein by reference, undertaking to be bound jointly and severally by the terms of this Agreement.  Each Owner must be an individual acting in his personal capacity, unless we waive this requirement.

The term "Owner" is defined as a person or entity that has a 10% or more direct or indirect legal or beneficial ownership interest in you, if you are a business corporation, partnership, limited liability company or other legal entity.  You must designate to us at least one officer, or if you operate in any other

13

CJGL000134

capacity, at least one general partner or other individual who has signed the Franchise and Trademark Agreement as the person who may act for and on behalf of the Franchise.

**6.2      Management of Center**

We may require you (or your Operating Partner, as defined below) to actively participate in, and exert your best efforts to, the management of your Center and other Meineke Car Care Centers you own. You agree that your Center at all times shall be managed by you (or your Operating Partner) or a manager who has satisfactorily completed our training program.

If you are, or at any time during the Term become, a business corporation, partnership, limited liability company or other legal entity, you agree to designate as the "Operating Partner" an individual approved by us who:  (a) owns and controls not less than 10% of your equity and voting rights; (b) has completed our training program to our satisfaction; and (c) has the power and authority to bind you in all dealings with us, unless you designate in writing another Owner reasonably acceptable to us who has the power and authority to so bind you.

**ARTICLE 7:**
**OPERATING STANDARDS**

**7.1      Authorized Products and Services**

You agree that your Center will offer for sale only those automotive maintenance and repair products and services we authorize Meineke Car Care Centers to offer and sell to the public from time to time pursuant to the Operations Manual ("Authorized Products and Services").  You agree to offer for sale, and to exert your best efforts to aggressively market and sell, all Core Authorized Products and Services. "Core Authorized Products and Services" shall mean repair and replacement of exhaust system components, brake system components, shocks and struts, and any other Authorized Products and Services that we designate from time to time to be products or services central to the operation of Meineke Car Care Centers.  All other Authorized Products and Services (i.e., those which are not Core Authorized Products and Services) shall be optional, and you are not required to offer them for sale at your Center.

We have the right to add or delete Authorized Products and Services (including those identified in Section 3.2), and to conditionally approve Authorized Products and Services.  We agree to consult with DAAC with respect to decisions to add or delete Authorized Products and Services.  You acknowledge and agree that additional Authorized Products and Services may require you to incur additional costs for equipment, inventory, additional personnel, personnel training and leasehold improvements.

We have the right to add Core Authorized Products and Services once the Gross Revenues of such product or service category reaches 10% or more of system-wide sales (i.e., the aggregate Gross Revenues of all Meineke Car Care Centers located in the U.S.) for one year.  We have the right to delete Core Authorized Products and Services once the Gross Revenues of such product or service category reaches less than 10% of system-wide sales for one year, provided we agree not to delete any products or services that are designated as Core Authorized Products and Services as of August 1, 1999.

Your Center may not be used for any purpose other than the operation of a Meineke Center in compliance with this Agreement, or a co-branded automotive center as we may permit from time to time. You agree that your Center will offer courteous and efficient service in accordance with our standards.

CJGL000135

### 7.2     Parts and Supplies

You acknowledge that the reputation and goodwill of Meineke Car Care Centers is based at least in part on the sale of high quality products and services.  Therefore, you agree that your Center will use only parts, uniforms, forms, labels, and other inventory and supplies that conform to our specifications and standards as to quality, performance, and safety and/or are purchased from suppliers (which may include us and/or our Affiliates) we approve.  For exhaust system parts, standards meeting the most stringent noise regulations of all the states in the United States of America, which the parties acknowledge currently is California, shall be deemed approved.  All other parts that meet the original equipment manufacturer's standards shall be deemed approved, unless we reasonably determine otherwise.  If we lower standards for any part, those standards will apply to all suppliers of the particular part.

We (or a designated supplier) will be the only supplier of customer receipts, which will be sold to you at reasonable prices.  We and our Affiliates may be suppliers of any other items, including equipment, signs, parts, uniforms, forms and labels.  If we require you to purchase any such other items exclusively from us, we agree to sell such items at our cost; otherwise, any such other items may be sold at a profit.

We agree to subject any Preferred Supplier arrangement to a periodic competitive bidding process, the timing of which we will determine with the advice of DAAC.  From time to time, we may, with the advice of DAAC, modify our specifications and standards and the list of approved suppliers.  After notice of such modification, you may not reorder any parts, uniforms, forms, labels or other inventory and supplies that do not meet our then-current specifications and standards or reorder any such items from any supplier who is no longer approved.  At the request of DAAC, we will make available to members of DAAC relevant information in order to verify the financial arrangements we may have with approved third-party suppliers, provided we shall have received reasonable assurances in writing that such information will be treated confidentially and will not be misused.

If you propose to order on a regular basis any parts, uniforms, forms, labels and other inventory and supplies from any supplier who is not then approved by us, you must first submit to us sufficient information, specifications and samples concerning the supplier so that we can decide whether the supplier meets our approved supplier criteria.  If we do not disapprove such supplier within 30 days after we have received all requested information, then such supplier shall be deemed approved.  If the part offered by a supplier for which you seek approval has not been tested by an independent certified laboratory, we have the right to charge reasonable fees to cover our costs of evaluating such supplier.  We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers that we may require to be incorporated in written agreements.

We agree not to solicit or accept any rebates from any approved supplier of equipment, signs, parts or other supplies based on the amount of your purchases from such supplier, but we may solicit and accept rebates based on the amount of purchases by us and our Affiliates.  We may solicit and accept other benefits from suppliers, such as promotional allowances, provided we use them solely for the benefit of the chain of Meineke Car Care Centers, such as defraying the cost of training programs, dealer conventions or other meetings.  Otherwise, you and we mutually agree not to solicit or accept any benefits from any Preferred Supplier that such supplier does not offer on a comparable basis to all owners of Meineke Car Care Centers.  Notwithstanding anything to the contrary contained herein, we may solicit and accept royalty fees and other payments from suppliers for authorization to use the Marks, provided we do not require you to purchase any such items exclusively from such suppliers.

### 7.3     Maintenance and Repair of Equipment

MCC 5/2014

CJGL000136

You agree to use, operate and maintain all equipment and fixtures in a careful and proper manner in accordance with all applicable laws and regulations, all manufacturers' guidelines and our standards and operating procedures.   You agree to undertake all required inspections and, to the extent required by applicable law, post appropriate certificates of inspection or other evidence of governmental approval.   You agree to maintain and/or install all safety features as originally installed and as required by applicable safety codes and regulations and to not alter any safety features.   You agree to periodically repair and, if reasonably necessary, replace any worn-out or obsolete equipment or fixtures.

### 7.4    Condition of Center/Center Upgrades

You agree to maintain the condition and appearance of your Center so that it is clean and attractive. If at any time the general state of repair, appearance or cleanliness of your Center, or its fixtures, equipment, furnishings or signs, does not meet our standards, we may notify you of the action you must take to correct such deficiency.  If, within 30 days after receiving such notice, you fail or refuse to initiate and continue with due diligence a bona fide program to complete such required repair or maintenance, we have the right (in addition to our rights under Article 13), but not the obligation, to enter the Premises and perform such repair or maintenance on your behalf and at your expense.   You must promptly reimburse us for the expenses we incur in performing such repair or maintenance.

### 7.5    Periodic Upgrades

You agree to periodically upgrade and/or remodel your Center as we may reasonably require, including replacing and/or upgrading exterior and interior signs and decor, provided no such upgrading or remodeling during the Term will require any increase in the square footage of the Premises.  We agree that substantial upgrades or remodeling shall not be required more than once every 5 years during the Term or involve a capital cost of more than $10,000 per occurrence during the Term.   You may not make any alterations to your Center, nor any replacements, relocations or alterations of fixtures, equipment or signs that do not meet our then current standards and specifications.  If you should make any improvements in your Center prior to this 5 year period you may receive credit against the $10,000 spending requirement stated in this section of the Agreement , provided that you notify us in writing and provide us with a copy of the invoice showing the cost you paid for the improvement.  We will advise you within 30 days from our receipt of these items as to whether improvements satisfy our upgrade requirements.

### 7.6    Specifications and Standards

You acknowledge that each and every aspect of the operation of your Center is important to us and is subject to our specifications and standards.   You agree to comply with all mandatory specifications, standards and operating procedures and other obligations that are contained in the Operations Manual relating to the development and operation of a Meineke Center, including: (a) all aspects (other than prices) of Authorized Products and Services offered by your Center and the manner in which they are promoted and sold; (b) sales procedures and customer warranties and services; (c) advertising and promotional programs; (d) appearance and dress of employees; (e) safety, appearance, cleanliness and standards of service and operation of your Center; (f) days and hours of operation; and (g) accounting and recordkeeping systems and forms.  Mandatory specifications, standards and operating procedures and other obligations set forth in the Operations Manual constitute provisions of this Agreement.

### 7.7    Changes to Specifications and Standards/Days and Hours of Operation

We may modify the Operations Manual to reflect changes in standards, specifications and operating procedures and other obligations, provided no addition or modification may alter your rights, and fundamental status, under this Agreement.  We agree to consult with DAAC with respect to any material

CJGL000137

changes to mandatory standards in the Operations Manual.  If DAAC recommends that we not make any material change to required days and hours of operation for Meineke Car Care Centers, we agree not to make such change unless:  (a) at the time we propose such change, all Meineke Car Care Centers located in the U.S. owned by us and our Affiliates operate during such days and hours (except to the extent prohibited by applicable law) and at least 33.3% of all Meineke Car Care Centers in the U.S. (other than those owned by us or any of our Affiliates) operate during such days and hours; and (b) we give at least 6 months' prior notice to any such change.

### 7.8    Compliance With Laws

You agree to maintain in force in your name all required licenses, permits and certificates relating to your Center.  You agree to operate your Center in full compliance with all applicable laws, ordinances and regulations, including the Occupational Safety and Health Act and the Americans with Disabilities Act and to take reasonably prompt action to cure any deficiencies.  You agree to notify us in writing within 5 days after the commencement of any legal or administrative action, the issuance of any order of any court, agency or other governmental instrumentality, or the delivery of any notice of violation or alleged violation of any law, ordinance or regulation that may adversely affect the operation of your Center or your financial condition.  You agree to adhere to our standards of honesty, integrity, fair dealing and ethical conduct in all dealings with your customers.

### 7.9    Personnel

You agree that your Center at all times will be staffed by a sufficient number of competent and properly trained employees.  You are responsible for hiring all employees of your Center and are exclusively responsible for the terms of their employment, including their compensation and training.  You are solely responsible for all employment decisions for your Center, including those related to hiring, firing, remuneration, personnel policies, benefits, record keeping, supervision and discipline, and regardless of whether you received advice from us on these subjects (unless such advice from us is a mandatory standard set forth in the Operations Manual).

You may not recruit or hire any person who is then (or was within the immediately preceding 30 days) employed by any Meineke Center operated by us, our Affiliates or another Meineke Dealer, without obtaining the employer's consent, which consent may be withheld for any or no reason.  We agree not to recruit or hire any person who is then (or was within the immediately preceding 30 days) employed by you at your Center without obtaining your consent, which consent may be withheld for any or no reason.

At least one employee of your Center must obtain (within a reasonable period of time, not to exceed 1 year after the Agreement Date or Opening Date, if your Center is a new Meineke Center) and maintain certification by Automotive Service Excellence ("ASE") (or any successor or similar organization we designate) for each of the areas of service comprising Authorized Products and Services performed at your Center for which certification is provided.  In the event of changes in personnel at your Center in functions that require ASE certification, you will have a reasonable period of time, not to exceed 1 year, to obtain appropriate certification of any replacement personnel.  If in the future ASE certification is offered on Authorized Products and Services that is not offered as of the Agreement Date, or if in the future you perform Authorized Products or Services for which ASE certification is offered, you agree to obtain such certification within a reasonable period of time, not to exceed 1 year.

### 7.10    Insurance

You agree to maintain in force:  (a) comprehensive, commercial, general, product, garage keeper and automobile liability insurance; (b) general casualty insurance, including fire and extended coverage,

MCC 5/2014

CJGL000138

vandalism and malicious mischief insurance, for the replacement value of your Center and its contents; and (c) such other insurance policies, such as business interruption insurance, as we may reasonably determine from time to time.  All insurance policies shall be issued by carriers with at least an A- rating with A.M. Best (or a similar rating by a comparable rating service acceptable to us), shall contain such types and minimum amounts of coverage, exclusions and maximum deductibles as we reasonably determine from time to time, shall name us and our Affiliates as additional insureds, shall provide for 30 days' prior written notice to us of any material modification, cancellation or expiration of such policy and shall include such other provisions as we may require.  We agree to consult with DAAC on any material changes in the types and minimum amounts of coverage, exclusions and maximum deductibles.

At our request, you shall furnish us with such evidence of insurance coverage and payment of premiums as we require.  If you fail or refuse to maintain any required insurance coverage, or to furnish satisfactory evidence thereof, we, at our option and in addition to our other rights and remedies hereunder, may obtain such insurance coverage on your behalf.  If we do so, you agree to fully cooperate with us in our effort to obtain such insurance policies and agree to pay us any costs and premiums we incur.  Your obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance we may choose to maintain, nor does it relieve you of your obligations under Section 16.02.  Our approval of the insurance you obtain shall not constitute a representation or warranty as to the adequacy of the limits of coverage of such insurance.

### 7.11    Conformity to the Discount Price Program

You agree to conform to the discount price program that is the foundation of the marketing concept of Meineke Car Care Centers, i.e., services performed at prices measurably less than those charged by authorized new car dealers.  You acknowledge that the foregoing pricing commitment is necessary to maintain the marketing concept of Meineke Car Care Centers and does not, in any manner, mandate or attempt to mandate the retail prices you charge customers.  You agree not to enter into any agreement, understanding or arrangement, or engage in any concerted practice, with other Meineke Dealers or others relating to the prices at which Authorized Products and Services are offered or sold by you or any other Meineke Center.

### 7.12    Customer Warranties

You recognize the importance of standardization of customer warranties offered by Meineke Car Care Centers and agree to deliver warranties to your customers with respect to Authorized Products or Services on terms and conditions we determine from time to time and using such product and service warranty forms as we may furnish to you.  We agree, unless prohibited by applicable law, that all Meineke Car Care Centers owned by us and our Affiliates will offer and perform all such customer warranties.  You agree, unless prohibited by applicable law, to offer and perform all such customer warranties at your Center.  You will have sole responsibility for all such warranties that you issue and for performing any other authorized warranties you issue to customers.  We agree to consult with DAAC if we propose to require a new warranty, or change an existing warranty requirement, on terms that are materially more favorable to consumers than are generally granted by major competitors in the automotive maintenance and repair industry.

You agree to comply with all policies and procedures on warranty programs set forth in the Operations Manual, including performing warranty service on customer warranties issued by other Meineke Car Care Centers and keeping records with respect to your reimbursement claims.  You agree that all warranty services are performed by you as an independent contractor and not as our agent.

18

CJGL000139

We agree to establish and maintain a national customer warranty program containing such policies and procedures as we deem appropriate from time to time.  You authorize us to charge you for warranty services performed by another Meineke Center on customer warranties issued by you, and to credit you for warranty services you perform on customer warranties issued by another Meineke Center, in such amounts as we may determine to be appropriate from time to time for the national customer warranty program.  You agree to pay us any net debit balances, and we agree to pay you any net credit balances, with respect to the national customer warranty program at such times and on such conditions as we determine from time to time.

WE MAKE NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY OR SUITABILITY OF ANY PRODUCTS SOLD OR SERVICES PERFORMED BY YOU.  You have no authority to make any kind of warranty or representation to others on our behalf.  You agree not to make or give to any customer any warranty or representation as to the quality or fitness for use for any purpose, either express or implied, with respect to any Authorized Products or Services, unless we have approved the warranty or representation.

Your obligations and liabilities under this <u>Section 7.11</u> shall survive any termination or expiration of this Agreement.

### 7.13    Customer Complaints

You agree to promptly address all customer complaints in accordance with the procedures contained in the Operations Manual.  If you are unable or unwilling to resolve a customer complaint within 30 days and it becomes necessary for us to reimburse a customer in settlement of his or her complaint about work performed at your Center, you agree to promptly reimburse us for amounts expended on account of any such complaint.  Your obligations and liabilities under this <u>Section 7.12</u> shall survive any termination or expiration of this Agreement.

## ARTICLE 8:
## MARKETING AND ADVERTISING

### 8.1    Marketing and Advertising Programs

Recognizing the value of advertising, and the importance of the standardization of advertising to enhancing the goodwill associated with the Marks, to promoting the sale of Authorized Products and Services and to developing and maintaining a favorable public image of Meineke Car Care Centers, you agree that we have the right to determine, conduct and administer all national, regional, local and other marketing, advertising, promotions, market research and other related activities for Meineke Car Care Centers as may be instituted from time to time, including advertising and marketing funded by the MAF, and the right to direct all such advertising and marketing with sole authority and discretion (exercised in accordance with the terms, and subject to the conditions, contained in this <u>Article 8</u>) over all aspects thereof, including concepts, materials, media, nature, type, scope, frequency, place, form, copy, layout and content.

### 8.2    Meineke Advertising Fund

We agree to administer the MAF for the creation, development and implementation of marketing, advertising and related programs and materials to enhance the goodwill associated with the Marks, to promote the sale of any or all Authorized Products and Services and to develop and maintain a favorable public image of Meineke Car Care Centers.  We will have sole discretion over all aspects of the materials and programs funded by MAF, including concepts, materials, media, nature, type, scope, frequency, place, form, copy, layout and context, provided we will periodically (not more frequently than once every 6

CJGL000140

months) seek the advice of the Advertising Committee (as defined below) with respect to the creative concepts and media used for programs funded by the MAF. The "Advertising Committee" will consist of a committee of not more than 7 Meineke Dealers appointed from time to time by DAAC.

We may use funds from the MAF to pay for all costs and expenses associated with such programs and materials, including the costs of preparing, producing and distributing marketing, advertising and related programs and materials, employing advertising agencies and media buying agencies, supporting market research activities, administering the MAF and all other related costs and expenses. Although the MAF is intended to enhance the goodwill associated with the Marks, to promote the sale of any or all Authorized Products and Services and to develop and maintain a favorable public image of Meineke Car Care Centers for the benefit of all Meineke Car Care Centers, we cannot assure you that any particular Meineke Center, or that Meineke Centers in any particular local market area, will benefit directly or pro-rata from any marketing, advertising or related program.

Your contributions to the MAF will be held and disbursed by a national bank or trust company or other financial institution ("MAF Trustee") we appoint from time to time, with the advice of DAAC, with the MAF Trustee being obligated to receive, hold and disburse funds in the MAF in accordance with an agreement that: (a) is consistent with the parties' rights and obligations hereunder; (b) includes reasonable provisions regarding limitations on the scope of MAF Trustee's fiduciary duties to Meineke Dealers and us; and (c) is mutually acceptable to the MAF Trustee and us. We agree to remit promptly all of your MAF contributions to the MAF Trustee and to periodically monitor the performance of the MAF Trustee under its trust agreement. We may direct the MAF Trustee to make payments directly to third parties or to make such payments to us for remittance to such third parties. All fees, compensation, charges and expenses of the MAF Trustee ("MAF Trustee Fees") shall be paid from MAF, and we will have no liability or responsibility for paying MAF Trustee Fees.

Subject to the provisions Section 3.4, we agree to allocate your contributions to the MAF as follows: (a) an amount not more than 0.5% of your Gross Revenues will be used for Creative (as defined below); (b) an amount not more than 3%, of your Gross Revenues will be used for National Advertising (as defined below); and (c) an amount not less than 4.5% of your Gross Revenues will be used for Yellow Pages Advertising (as defined below) and Local Advertising (as defined below). The following chart illustrates the foregoing allocation:

<u>Allocation of your 8% of Gross Revenues Contribution to the MAF</u>

Creative - Not more than .5%
National Advertising - Not more than 3%
Yellow Pages Advertising and Local Advertising - Not less than 4.5%

You agree that we may, with the advice of the Advertising Committee, from time to time change the foregoing allocations of your contributions to MAF among Creative, National Advertising and Yellow Pages Advertising and Local Advertising in order to enhance the effectiveness of advertising and promotional efforts.

Notwithstanding anything stated in <u>Section 3.4</u>, <u>8.2</u>, <u>8.3</u>, and <u>8.4</u> of your Franchise and Trademark Agreement, and at such time that we advise you in writing of the activation of this section, the percentage amount of your contributions to the MAF on the Gross Revenues derived from the sale of oil change services shall be 4% of which all goes to the Meineke Customer Relations Marketing program ("CRM"). Customer Relationship Marketing shall include, but not be limited to, local and national marketing using print, e club and other loyalty programs, and telephone and other communication vehicles that communicate with a customer on a one-to-one basis. To the extent that there is any shortfall

CJGL000141

for the CRM expenditures such shortfall shall be satisfied from the Local allocation of the MAF contributions. In order to cover the additional costs of administering the Meineke advertising program, the Annual Administrative Expense referenced in <u>Section 8.2</u> of your Franchise and Trademark Agreement shall be increased to 3.1% of all contributions by all Meineke Car Care Centers to the MAF, including those MAF dollars referenced in <u>Section 4</u> of this Agreement.

The term "Creative" includes the costs associated with creating, developing and distributing national or general advertising, marketing, promotions, public relations and market research programs and related activities, including costs relating to preparing television, radio, newspaper, point-of-sales and other media programs and materials (such as Web Sites for the Internet) and all related fees, charges and commissions, including fees charged by national spokespersons and commissions charged for creative works. In addition, up to 30% of your contributions to Creative may be used from time to time to offset any deficits in media placement costs incurred as part of the Local Advertising portion of the MAF in any local market area on such terms and conditions as we may determine from time to time. As part of the Creative portion of the MAF, we may furnish you with marketing, advertising and promotional materials at cost, plus any related administrative, shipping, handling and storage charges. The term "National Advertising" includes all costs associated with placing and purchasing national media advertising (e.g., national television, print media and electronic media) and related activities and associated fees and commissions, including commissions charged by media buying companies. The term "Yellow Pages Advertising" includes all costs associated with placing and purchasing advertising in classified advertising directories (i.e., yellow pages) through various media, including print and electronic media, and related activities and associated fees and commissions, including commissions charged by media buying companies. The term "Local Advertising" includes all costs associated with regional and local advertising and promotional programs and related activities and associated fees and commissions, including commissions charged by advertising agencies and media buying companies. To the extent any costs can be allocated to more than one of the above categories or to the extent that any costs appropriately charged to the MAF do not fall within a particular category, we may, in our sole discretion, allocate such costs to one or more of such categories.

We agree to maintain an adequately staffed advertising department to perform the services we customarily provide in administering the advertising and other programs funded by the MAF. Subject to the provisions stated in <u>Section 3.4</u>, we are entitled to be paid each year from the MAF for such services in an amount equal to 2.75% of all contributions by all Meineke Car Care Centers to the MAF ("the Annual Administrative Expense"). We may pay ourselves the Annual Administrative Expense in advance in quarterly installments each year. We will allocate the Annual Administrative Expense, MAF Trustee Fees and the costs relating to the annual audit of the revenues and expenses of the MAF proportionately to the Creative, National Advertising, Yellow Pages Advertising and Local Advertising portions of the MAF, notwithstanding anything to the contrary contained in this Agreement.

The MAF will be accounted for separately from our other funds and will not, except for the Annual Administrative Expense, be used to defray any of our or any Affiliate's general operating expenses. Except for the Annual Administrative Expense and the repayment of any advances or loans we may make to the MAF, neither we nor any of our Affiliates will be entitled to derive any income from the MAF, including commissions, rebates or discounts for media purchases from the MAF. Any advertising agency commissions and discounts granted to us or any of our Affiliates for media purchases from the MAF will be contributed to the MAF or netted against the invoice for such purchases.

All disbursements from the MAF shall be made first from income and then from contributions. We may compromise any claim for past due contributions to the MAF from any Meineke Dealer, provided any compromise of contributions to the MAF shall be proportionate to any contemporaneous compromise of other amounts such Dealer owes us and our Affiliates, and we have the right to charge a proportionate

CJGL000142

amount of the collection costs against contributions we recover.  In any fiscal year, we may spend amounts that are more or less than the aggregate contributions of all Meineke Car Care Centers to the MAF in that year, and we may fund any deficits with contributions from future years.  The MAF may borrow from us (on commercially reasonable terms and rates) or other lenders to cover deficits or cause the MAF to invest any surplus for future use.  We will cause to be prepared an annual audit of the revenues and expenses incurred by the MAF and will furnish you a copy upon your written request.  The costs of such audits shall be charged against the MAF.  On request, the Advertising Committee may periodically review the books and records of the MAF.

Except as otherwise expressly provided in this Section 8.2, we assume no direct or indirect liability or obligation with respect to the maintenance, direction or administration of the MAF.  We do not act as trustee or in any other fiduciary capacity with respect to the MAF.

### 8.3    Allocation Between Local Advertising and Yellow Pages

The 4.5% allocation of your MAF contributions (as well as those of other Meineke Car Care Centers in your Market Area) that are designated to be used for Yellow Pages and Local Advertising shall be allocated between Yellow Pages and Local Advertising on an annual basis by the owners of all of the Meineke Car Care Centers located in your Market Area in accordance with the provisions of this Section 8.3, provided however that under no circumstances will less than 2.5% be allocated to Yellow Pages without our prior consent.  The allocation shall be determined annually by a majority vote (on a one-vote-per-Center basis) of all owners of Meineke Car Care Centers in the Market Area (including us and our Affiliates, as to any Meineke Car Care Centers owned in the Market Area) who shall vote on such allocation.  If no vote shall take place, then the allocation shall be determined by us.  Notwithstanding anything stated to the contrary, we may, but we are not obligated to do so, re-allocate a portion of your the Local Advertising and Yellow Pages portion of your contribution to the MAF to be redirected towards the  advertising and marketing of your specific Meineke center, which may include varied programs that we believe contribute to the overall marketing, advertising, and recognition of the Meineke brand and Meineke system.

The parties acknowledge that the foregoing allocation is based on projected revenues for the following year in the Market Area and that the actual amounts expended will deviate from the projected percentage allocation.

### 8.4    Local Advertising

In addition to your 8% of Gross Revenues contributions to MAF, we strongly recommend that you spend 2% of your Gross Revenues on local advertising, but you are not required to do so and your failure to do so does not constitute a breach of this Agreement.

### 8.5    Dealer Web Site

You may maintain a World Wide Web site in connection with your Center with our prior approval.  You agree to submit to us for prior approval, true and correct printouts of all Web site pages, materials and content you propose to use on your Web site associated with your Center.  You agree to provide all hyperlinks or other links that we may reasonably require.  All modifications to your Web site are subject to our prior approval.  You may not post on your Web site any material (including text, video clips, photographs, images and sound bites) in which any third party has any direct or indirect ownership interest.  You agree to obtain our prior written approval for any Internet domain name and/or home page address.

### 8.6    Approval of Advertising Content

CJGL000143

You agree to submit to us, for our prior approval, samples of all advertising and promotional materials not prepared by us and which vary from our standard advertising and promotional materials. You may not use any advertising or promotional materials that we have not approved or that we have disapproved. All of your advertising and promotion shall comply with all applicable laws, shall be completely factual and shall conform to the highest standards of ethical advertising. You agree to refrain from any business or advertising practice which may be injurious to our business, to the business of other Meineke Car Care Centers or to the goodwill associated with the Marks.

## ARTICLE 9:
## REPORTS AND INSPECTIONS

### 9.1     Records

You agree to prepare and maintain for 5 years complete and accurate books, records (including invoices and records relating to your Gross Revenues) and accounts (using our standard chart of accounts specified in the Operations Manual) for your Center, copies of your sales tax returns, bank statements, and such portions of your state and federal income tax returns as relate to your Center. All such books and records shall be kept at the Premises, unless we otherwise approve. Alternatively, you may keep such books and records at the premises of the accountant who maintains your financial records and/or prepares your tax returns, provided you notify us in advance and such accountant agrees to give us unrestricted access to such books and records. You agree to cause such accountant to fully cooperate with us in connection with any review or audit of such books and records.

You may not commingle any of your funds derived from the operation of your Center with any other funds. If you commingle any of the funds derived from the operation of your Center with other funds, such as your personal funds, then, in addition to our other rights hereunder and under applicable law, we will have the right to review and photocopy all of the records and accounts relating to such other funds, including your personal records and accounts.

### 9.2     Computer System

We may require you to purchase or lease, at your expense, such computer hardware and software, required dedicated telephone and power lines, internet connections and other data transmission facilities, modems, printers, and other computer-related accessories or peripheral equipment as we may specify from time to time for management information functions, such as recording and reporting Gross Revenues. You may use any computer hardware you consider to be appropriate, provided it meets our specifications and provided further that it functions properly with the computer software we require. You agree not to use any point of sale software in the operation of your Center that we have not approved. We agree not to unreasonably withhold approval of a request to use alternative software, provided the software meets all of our requirements and specifications, which we will make available on reasonable request.

You agree to provide such assistance as may be required to connect your computer system with our computer system or the computer system of a third party data collection service we designate. You agree to transmit electronically to us such data from your computer system as we, in our sole discretion, deem desirable, with the cost of such telephonic transmission to be borne by you if we mandate electronic submission of such data and we no longer require you to furnish hard copy of such data pursuant to Section 9.3.

You agree, at your expense, to keep your computer systems in good condition and to promptly install such additions, changes, modifications, substitutions or replacements to the computer hardware, computer software, internet connections, telephone and power lines, and other data transmission facilities as

CJGL000144

we direct to ensure full operational efficiency and optimum communication capability between and among computer systems. In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, you agree to use computer software that complies with our specifications.

### 9.3    Periodic Reports

You agree to furnish us:  (a) no later than Wednesday of each week, a report of Gross Revenues for the immediately preceding week, along with copies of invoices for work performed; (b) no later than the 15th day of each month during the first 3 months of the operation of your Center, an income statement and statement of cash flow for your Center for the preceding month and for the year-to-date and a balance sheet as of the end of such month; (c) within 120 days after the end of each calendar year, a year-end balance sheet and income statement and statement of cash flow of your Center for such year, reflecting all year-end adjustments and accruals, provided we will not unreasonably withhold our consent to a request for an extension of time to provide such statements; and (d) such other information as we may require from time to time, including reports on marketing activities, customer warranty work, cost of goods sold and labor costs, sales and your income tax statements (provided, however, that if you are an individual, only the parts of income tax statements that disclose information about your Center need be furnished).  You agree that the information in each such report and financial statement shall be complete and accurate.

### 9.4    Use of Customer Information

We have the right to use or disclose information from all reports, statements and electronic data transmissions from you in such manner as we deem reasonably appropriate, provided we will not identify you by name unless required to do so by law or in connection with any legal proceeding, and provided further that, during the Term, we agree not to (a) use the identity of customers of your Center for soliciting Authorized Products and Services by Meineke Car Care Centers owned by us or any of our Affiliates, (b) sell, or authorize any Affiliate of ours to sell, such information to any third party, or (c) disclose such information to any Affiliate that offers or sells any of the Core Products and Services under trademarks or service marks that are not the Marks.

### 9.5    Inspections

We and our agents have the right at any time during business hours and without prior notice to: (a) inspect your Center; (b) observe, photograph, audio-tape and/or video tape the operations of your Center; and (c) interview personnel and customers of your Center, provided we will not interfere unduly with the operation of your Center.  You agree to cooperate fully with such activities.

### 9.6    Audits

We have the right at any time during business hours to inspect, photocopy and audit the books, records, bank statements, tax returns and documents relating to the development, ownership, lease, occupancy or operation of your Center for the sole purpose of determining your compliance with the provisions of this Agreement.  We agree to provide you reasonable prior notice (which in no event shall be more than 30 days) of any such audit unless we have justification for not providing prior notice, in which case no prior notice need be given.  You must cooperate fully with our representatives and independent accountants conducting such audits.  If any audit discloses an understatement of Gross Revenues, we agree to provide you with a copy of the audit report, and you agree to pay us, within 7 days after receipt of the audit report, the royalties and MAF payments due on the amount of such understatement, plus interest (as provided in Section 3.6) from the date originally due until the date of payment.  Our acceptance of any such payment does not constitute a waiver of any rights, including our rights under Article 13, an estoppel or an

24

CJGL000145

election of remedies.  If you dispute the findings of the audit, you may, at your expense, invoke the Ombudsman procedures of <u>Section 17.15</u> hereof, without affecting the rights and obligations of the parties hereto.

In addition, you agree to pay us the costs of any audits performed as a result of:  (a) your failure to submit statements of Gross Revenues; (b) your failure to maintain books and records or computer systems as required by <u>Section 9.1</u> and <u>Section 9.2</u>; (c) your reporting Gross Revenues for any period of twelve consecutive months that are more than 5% percent below your actual Gross Revenues for such period, as determined by any such audit; or (d) your failure to produce all of your books and records as required by us or our authorized agents within 15 days after we request any such items.  Such audit costs include the fees and costs of any independent accountants and per diem fees and travel and related costs of our employees.

## ARTICLE 10:
## TRADEMARKS

### 10.1     Ownership of the Marks

You acknowledge that the Marks are valid and that we own the Marks.  Your right to use the Marks is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement.  Your unauthorized use of any of the Marks constitutes a breach of this Agreement and an infringement of our rights to the Marks.  This Agreement does not confer on you any goodwill or other interests in the Marks.  Your use of the Marks and any goodwill established thereby inures to our exclusive benefit.  All provisions of this Agreement applicable to the Marks apply to any additional or substitute trademarks, service marks and trade dress we authorize you to use.  You may not at any time during or after the Term contest, or assist any other person in contesting, the validity or ownership of any of the Marks.

### 10.2     Use of the Marks

You agree to use the Marks as the sole identification of your Center, provided you identify yourself as the independent owner in the manner we prescribe.  You agree to use the Marks as we prescribe in connection with the sale of Authorized Products and Services.  You may not use any Mark (or any abbreviation, modification or colorable imitation) as part of any corporate or legal business name or in any other manner (including as an electronic media identifier, such as websites, web pages or domain names) not expressly authorized by us in writing.

MCC 5/2014

CJGL000146

### 10.3     Discontinuance of Use of Marks

If we determine it is advisable at any time for us and/or you to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks, service marks or trade dress, you agree to comply with our directions within a reasonable time after notice. We will have no liability or obligation to you whatsoever with respect to any such required modification or discontinuance of any Mark, or the promotion of a substitute trademark, service mark or trade dress, that is a result of our determination of a risk of conflicting rights with others.

### 10.4     Notification of Infringements and Claims

You agree to notify us immediately of any apparent infringement of or challenge to your use of any Mark, or any claim by another person of any rights in any Mark.  You may not communicate with any person, other than us, our counsel and your counsel, in connection with any such infringement, challenge or claim.  We will have sole discretion to take such action as we deem appropriate and will have the right to control exclusively any litigation or U.S. Patent and Trademark Office proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark.  You must sign any and all documents, render such assistance and do such things as may be advisable in the opinion of our counsel to protect our interests in any litigation or U.S. Patent and Trademark Office proceeding or otherwise to protect our interests in the Marks.

### 10.5     Indemnification of Dealer

We agree to indemnify you against, and to reimburse you for, all damages for which you are held liable in any action for trademark infringement arising out of your authorized use of any Mark pursuant to and in compliance with this Agreement and, except as provided herein, for all costs you reasonably incur in defending any such claim brought against you, provided you have timely notified us of such claim and provided further that you and your Owners are in compliance with this Agreement and all other agreements entered into with us or any of our Affiliates.  We, at our sole discretion, are entitled to prosecute, defend and/or settle any such action arising out of your use of any Mark, and if we undertake to prosecute, defend and/or settle any such matter, we have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

### ARTICLE 11:
### RESTRICTIVE COVENANTS

### 11.1     Confidential Information

We own proprietary and confidential information ("Confidential Information") relating to the development and operation of Meineke Car Care Centers, including:  (1)  technical information and expertise relating to Authorized Products and Services and the equipment used in connection therewith; (2) site selection criteria for Meineke Car Care Centers; (3) sales, marketing and advertising programs and techniques for Meineke Car Care Centers; (4) knowledge of operating results and financial performance of Meineke Car Care Centers, other than your Center and other Meineke Car Care Centers that you own; (5) comprehensive methods of operating Meineke Car Care Centers, including pricing information and inventory mix; and (6) computer software programs.

We agree to disclose relevant parts of the Confidential Information to you solely for your use in the operation of your Center.  The Confidential Information is proprietary and includes trade secrets.  During the Term and thereafter:  (a) you may not use the Confidential Information  in any other business or capacity (and you acknowledge that such use is an unfair method of competition); (b) you agree to maintain the

CJGL000147

confidentiality of the Confidential Information; (c) you may not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (d) you agree to implement all reasonable procedures we prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including the use of nondisclosure agreements with your officers, directors, and managers and the delivery of such agreements to us.  Your restrictions on disclosure and use of Confidential Information do not apply to information or techniques which are or become generally known in the automotive service industry (other than through your own disclosure), provided you obtain our prior written consent to such disclosure or use.  We agree to consent to such disclosure or use if we believe such information is in the public domain.

### 11.2    Dealer's In-Term Covenants

During the Term, neither you nor any of your Owners may:

(a)    directly or indirectly (such as through corporations or other entities owned or controlled by you or your Owners) own any legal or beneficial interest in, manage, operate or consult with:  (1) any Competitive Business located anywhere; or (2) any entity located anywhere which grants franchises, licenses or other rights to others to operate any Competitive Business; or

(b)    divert or attempt to divert any business or customer of any Meineke Center to any competitor or do anything injurious or prejudicial to the goodwill associated with the Marks or the System.

The term "Competitive Business" is defined as any enterprise (other than a Meineke Center operated under a franchise agreement with us) that offers or sells any of the Core Authorized Products and Services.  Notwithstanding anything to the contrary contained in this Agreement, you are not restricted from:  (a) owning shares of a class of securities of a Competitive Business that are listed on a stock exchange or traded on the over-the-counter market and that represent less than 5% of that class of securities; or (b) owning and operating an enterprise (i) that offers and sells products and services which we consider to be Core Authorized Products and Services, other than repair and replacement of exhaust system components, brake system components and ride system components, (ii) that you own and operate prior to the date that such product or service is designated as an Authorized Product or Service (even if such designation is on a test basis) and (iii) that you fully disclose to us in writing before the date such product or service is designated an Authorized Product or Service.

### 11.3    Information Exchange

The value of the System is maximized by our evaluating and, if we deem appropriate, incorporating into the System innovations suggested by Meineke Dealers.  If such innovations from other Meineke Dealers are incorporated in the System, you will be entitled to use them as part of the System.  You agree to a reciprocal obligation and to disclose to us all ideas, concepts, methods, techniques and products relating to the development, marketing and/or operation of a Meineke Center that you conceive or develop, other than patentable inventions.  If we adopt any of them as part of the System, you agree to grant us a perpetual, royalty-free, world-wide license to incorporate same into the System and to use, and sublicense the use, of same in connection with Meineke Car Care Centers.  You agree to execute documents and do such other things as we may reasonably request for you to secure intellectual property rights in such ideas, concepts, methods, techniques or products.

MCC 5/2014

CJGL000148

**11.4     Dealer's Post-Term Covenants**

For a period of 1 year, starting the later of the effective date of termination or expiration (without you exercising your rights pursuant to, and in accordance with, <u>Article 14</u>) of this Agreement or at such time that you stop operating a Competitive Business , neither you nor any of your Owners may directly or indirectly (such as through corporations or other entities owned or controlled by you or your Owners) own a legal or beneficial interest in, manage, operate or consult with: (a) any Competitive Business located at the Premises; (b) any Competitive Business located within a radius of 6 miles of your Center;  or (c) any Competitive Business located within a radius of 6 miles of any Meineke Center in operation at the time that you execute this Agreement.

You and each of your Owners acknowledge that we have a protectable legal interest in the System and that these non-competition covenants contained in <u>Section 11.2</u> and <u>Section 11.4</u> are necessary elements to their protection and are an integral part of this Agreement.

**11.5     Meineke's Non-Competition Covenant**

If we or any subsidiary of ours (and specifically excluding all other Affiliates of ours) acquires a business, then to the extent any retail outlet of such business at the time of the acquisition is located in the Protected Area and 15% or more of such outlet's revenues during the 12 months prior to the acquisition are derived from Core Authorized Products and Services, we agree to exert reasonable efforts to sell such outlet, or to discontinue any franchise or other licensing arrangement with such outlet, within 12 months after the acquisition ("Divestiture Period").   If, despite such efforts, we are unable to effect such sale or discontinuance within the Divestiture Period, we will not be in breach of this Agreement as a result of such failure, but you may, at your election, invoke "Meineke's Encroachment Insurance Policy" referenced in <u>Section 17.13</u> with respect to any adverse impact caused by such outlet or exercise your right to sell the assets of your Center to us in accordance with <u>Section 11.6</u>.

**11.6     Competition by Meineke's Affiliates**

If:  (a) you have the right to sell your Center to us pursuant to <u>Section 11.5</u>; or

(b)(i) any of our Affiliates (including any subsidiary of ours) acquires a business, and such business, after the acquisition and while it is an Affiliate of ours, opens a new retail outlet (and specifically excluding any existing retail outlets) in your Protected Area; and (ii) 15% or more of such new outlet's revenues during the 12 months after its opening ("1-Year Opening Period") are derived from the sale of Core Authorized Products and Services; or

(c) any of our Affiliates (including any subsidiary of ours) acquires a business with an existing retail outlet located in your Protected Area, and such retail outlet, prior to the acquisition, did not  derive 15% or more of its revenues from the sale of Core Authorized Products and Services in your Protected Area during the 12 months prior to its acquisition but during the 12 months after its acquisition ("1-Year Opening Period") it derives 15% or more of its revenues from the sale of Core Authorized Products and Services in your Protected Territory;

then you have the option ("Put Option") exercisable by giving us written notice ("Put Option Notice") 120 days after the expiration of the Divestiture Period or the 1-Year Opening Period, as applicable, to sell to us at Fair Market Value (as determined below) all of the tangible assets of your Center that you own ("the Purchased Assets" for purposes of this <u>Section 11.6</u>), including signs, equipment, inventories of saleable parts, products, materials and supplies, and to assign to us the lease for the Premises of your Center and any equipment lease for equipment used to perform Authorized Products and Services at your Center.

CJGL000149

If you exercise your Put Option and you or any of your Affiliates or Owners directly or indirectly own the land and/or building of your Center, you agree to lease, or cause such Affiliate or Owner to lease, such land and/or building to us or our designee at reasonable and customary rental rates and other terms prevailing in the community where your Center is located.

Upon delivery of the Put Option Notice, you agree (a) to continue to operate your Center in the ordinary course of business in accordance with the terms of this Agreement, and (b) not to sell or remove any of the Purchased Assets from the Premises (other than the sale of inventory in the ordinary course of business), and (c) to give us, our designated agents and the Appraiser (as defined below) full access to your Center and all of your books and records at any time during customary business hours in order to conduct inventories and determine the purchase price for the Purchased Assets.  Upon delivery of the Put Option Notice and pending the closing of the purchase, we may require that the operation of your Center be subject to the supervision and control of one or more managers appointed by us.

The Fair Market Value shall be determined by consultation between you and us to establish the amount which an arm's length purchaser would be willing to pay for the Purchased Assets, assuming that the Purchased Assets would be used for the operation of a Meineke Center at the Premises under a valid franchise agreement reflecting the then-current (or if we are not offering franchises at that time, then the most recent) standard terms upon which we offer franchises for Meineke Car Care Centers.  The Fair Market Value may reflect the going concern value of the operation of your Center at the Premises, but under no circumstances will any value be attributed to any goodwill associated with any Mark.  If you and we are unable to agree on the Fair Market Value of the Purchased Assets within 30 days after the Put Option Notice, then Fair Market Value will be determined by a mutually agreeable member of a nationally recognized accounting firm (other than a firm which conducts audits of our or your financial statements) who has experience in the valuation of retail businesses (the "Appraiser").  The Appraiser will make his or her determination and submit a written report ("Appraisal Report") to you and us as soon as practicable, but in no event more than 60 days after his or her appointment.  Each party may submit in writing to the Appraiser its judgment of Fair Market Value (together with its reasons therefore).  The Appraiser's fees and costs shall be borne equally by the parties hereto.

Within 10 days after delivery of the Appraisal Report or the date we mutually agree to the Purchase Price, whichever is applicable, we, you and your Owners will enter into a purchase agreement in form and substance reasonably satisfactory to us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as we deem reasonably necessary to fully protect our interests, including representations, warranties and other closing documents and post-closing indemnifications and covenants as we reasonably require, including:  (a) instruments transferring good and merchantable title to the Purchased Assets, free and clear of all liens, encumbrances, and liabilities, to us or our designee, with all sales and other transfer taxes paid by you; (b) a mutual termination of this Agreement, with you and your Owners continuing to be bound by all post-term covenants and obligations contained herein; and (c) an assignment of all leases of tangible assets and real property used in the operation of your Center, including land, building and/or equipment (or if an assignment is prohibited, a sublease to us or our designee for the full remaining term and on the same terms and conditions as your lease, including renewal and/or purchase options).  In addition, if you or any of your Owners or Affiliates directly or indirectly own the land and/or building of your Center, you agree to lease, or to cause such Owner or Affiliate to lease, such land and/or building to us or our designee at reasonable and customary rental rates and other terms prevailing in the community where your Center is located.  Any dispute concerning the rental rates and terms of such lease shall be resolved by the Appraiser.

The consummation of the purchase of the Purchased Assets ("closing" for purposes of this Section 11.6) shall occur at such place, time and date we designate in the purchase agreement, but not later than 90 days after the date the Appraisal Report is delivered or the date we and you have mutually agreed to the

MCC 5/2014

CJGL000150

Purchase Price, whichever is applicable.  In accordance with the terms and conditions of the purchase agreement:  (a) fifty percent (50%) of the purchase price for the Purchased Assets will be paid in cash at the closing; (b) twenty-five percent (25%) of the purchase price (plus accrued and unpaid interest on the unpaid balance, at the Prime Rate, as defined below, from and after the closing date) shall be payable on the first anniversary of the closing date; and (c) the remaining twenty-five percent (25%) of the purchase price (plus accrued and unpaid interest on the unpaid balance, at the Prime Rate, from and after the closing date) shall be payable on the second anniversary of the closing date.  The "Prime Rate" for purposes of this <u>Section 11.6</u> shall be the published prime rate as of the date of the closing of The Chase Manhattan Bank or any other national bank we select.

If you cannot deliver clear title to all of the Purchased Assets, or if there are other unresolved issues, the closing of the sale may, at our option, be accomplished through an escrow on such terms and conditions as we deem reasonably appropriate, including the making of payments, to be deducted from the purchase price, directly to third parties in order to obtain clear title to all of the Purchased Assets.  Further, you and we shall comply with any applicable Bulk Sales provisions of the Uniform Commercial Code as enacted in the state where your Center is located and all applicable state and local sales and income tax notification and/or escrow procedures.  We have the right to set off against and reduce the Purchase Price by any and all amounts owed by you or any of your Owners or Affiliates to us or any of our Affiliates.

### 11.7    Meineke's Management Commitment

We agree not to authorize our executive officers who perform line management functions (specifically excluding any such officers who are also members of our Board of Directors, except for any Chief Operating Officer or Vice President of Marketing) to be employed by or to have management responsibility for an Affiliate of ours that is a Competitor.  For the avoidance of doubt, the foregoing restriction shall not apply to our executive officers who perform staff functions, such as a General Counsel or Chief Financial Officer.  For purposes of this <u>Section 11.7</u>, a "Competitor" shall mean a business enterprise that:  (a) does not use any of the Marks; and (b) has annual revenues from the sale of Core Authorized Products and Services that exceed 15% of its total annual revenues.

### ARTICLE 12:
### TRANSFER OF AGREEMENT

### 12.1    Transfer by You Subject to Our Approval

You and/or your Owners may Transfer the Franchise (as defined below) subject to our approval and subject to your complying with all of the applicable provisions of this <u>Article 12</u>.  You agree to submit to us all information we require in order to determine whether to approve a proposed Transfer of the Franchise, and we agree to notify you of our approval or disapproval within a reasonable period of time, not to exceed 10 business days, after we have received all requested information relating to the proposed Transfer of the Franchise.

The term "Transfer the Franchise" or "Transfer of the Franchise" means the voluntary or involuntary, direct or indirect, sale, assignment, transfer, pledge, grant of a security interest in, or other disposition of this Agreement, any right or obligation under this Agreement, or any form of ownership interest in Dealer or the assets, revenues or income of your Center, including:  (1) any issuance or redemption of a legal or beneficial ownership interest in the capital stock of Dealer; (2) any merger or consolidation of Dealer, whether or not Dealer is the surviving corporation; (3) any transfer as a result of a divorce, insolvency or dissolution proceeding or otherwise by operation of law; (4) any transfer on the death of Dealer or any Owner of Dealer by will, declaration of trust or under the laws of intestate succession; or (5) any foreclosure of your Center or your transfer, surrender or loss of possession, control or management

CJGL000151

of your Center.  A marketing list, customer list or potential customer list may be transferred only to a transferee to whom your rights and obligations under this Agreement are simultaneously being transferred in accordance with the terms hereof.

**12.2      Conditions for Approval**

If we have not exercised our rights under Section 12.6 or Section 12.7, we will not unreasonably withhold our approval of a Transfer of the Franchise that meets all of the reasonable restrictions, requirements and conditions that we may impose on the transfer, the transferor(s) and/or the transferee(s), including the following:

(a)      you and your Owners and Affiliates must be in compliance with the provisions of this Agreement and all other agreements with us or any of our Affiliates that relate to your Center;

(b)      the transferee (or its owners) must meet our then-applicable standards for Meineke Dealers, and if the transferee is an existing Meineke Dealer, such transferee must be in compliance with its agreements with us and our Affiliates for at least 6 months prior to the proposed date of transfer;

(c)      the transferee (or its Operating Partner) must complete our initial training program to our satisfaction;

(d)      your Center must be open and operating, unless we otherwise agree in writing;

(e)      the transferee (and its owners) must execute, at your option, (i) an assignment and assumption agreement in form and substance satisfactory to us, pursuant to which the transferee (and its owners) assume your obligations hereunder and you will remain responsible for future performance of the obligations under this Agreement for the longer of a period of time of one (1) year after the effective date of the transfer or the period of time during which the transferee or any of its Affiliates has any financial obligations to you or any of your Affiliates in connection with the transfer; or (ii) our then current standard form of franchise agreement and related documents offered to new Meineke Dealers in the state in which your Center is located (which may provide for different royalties, advertising contributions and expenditures, term and other rights and obligations than those provided in this Agreement) in conjunction with you and us mutually terminating this Agreement;

(f)      you or the transferee must pay us a standard transfer fee of $5,000, which fee may be increased to reflect any increase in the CPI as of the date of transfer over the CPI as of January 1, 1998;

(g)      the transferee must execute an agreement, in form and substance satisfactory to us, to remodel your Center, add or replace fixtures, furnishings, equipment and signs and otherwise modify your Center so it meets the specifications and standards then applicable for new Meineke Car Care Centers, provided the transferee shall not be required to replace equipment or increase the square footage of the Premises if the transferee executes an assignment and assumption agreement pursuant to Section 12.2(e)(i) hereof;

(h)      you and your Owners and Affiliates must, except to the extent limited or prohibited by applicable law, execute a mutual general release, in form and substance satisfactory to us, of any and all claims against us and our Affiliates, stockholders, officers, directors, employees, agents, successors and assigns (unless such claims have been filed in accordance with this Agreement and are then pending and not finally resolved or are filed in accordance with this Agreement within 12 months after the effective date of transfer), and an affidavit stating that you have not offered any unauthorized warranties to customers of your Center;

CJGL000152

(i)     the terms of the proposed Transfer of the Franchise must not, in our reasonable judgment, place an unreasonable financial or operational burden on the transferee;

(j)     any financing you (or any of your Owners or Affiliates) offer the transferee must be subordinate to any current or future obligations of the transferee to us;

(k)     you and your Owners must execute a noncompetition covenant, in form and substance satisfactory to us, in favor of us and the transferee, agreeing that, for a period of not less than 1 year, starting on the effective date of the transfer, you and your Owners will not directly or indirectly own any legal or beneficial interest in, manage, operate or consult with: (1) any Competitive Business that is located within a 6-mile radius of your Center; (2) any Competitive Business that is located within a 6-mile radius of any other Meineke Center in operation as of the effective date of such transfer; or (3) any entity which grants franchises, licenses or other interests to others to operate any Competitive Business; and

(l)     you and your Owners must execute such other documents and do such other things as we may reasonably require to protect our interests under this Agreement.

### 12.3    Transfer to a Corporation

Notwithstanding Section 12.1 and Section 12.2, on 30 days' prior notice to us, you (if you are an individual or partnership) may transfer this Agreement, in conjunction with a transfer of all of the assets of your Center, by an agreement in form and substance satisfactory to us, to a corporation or limited liability company of which you own and control all of the equity and voting power of all issued and outstanding capital stock. No such assignment will relieve you or your Owners of your obligations hereunder, and you and your Owners will remain jointly and severally liable for all obligations hereunder.

### 12.4    Special Transfers

Neither Section 12.2(b) nor Section 12.2(d) shall apply to any Transfer of the Franchise among any of your then current Owners disclosed in Schedule C. Section 12.6 shall not apply to a Transfer of the Franchise to a member of the Immediate Family of Dealer (if an individual) or to a member of the Immediate Family of a then current Owner of Dealer (if a corporation, limited liability company or partnership).

### 12.5    Death or Disability of Dealer

Upon your death or permanent disability, or the death or permanent disability of your Operating Partner, the executor, administrator or other personal representative of such person must transfer his interest in this Agreement or his interest in Dealer to a third party approved by us in accordance with all of the applicable provisions of Article 12 within a reasonable period of time, not to exceed 12 months from the date of death or permanent disability.

CJGL000153

**12.6     Your Right to Offer Your Franchise to Us**

If you or any of your Owners desires to Transfer the Franchise for legal consideration before obtaining an offer from a buyer, you may send us an offer in writing ("Offer Notice") containing the exact terms and conditions on which you desire to Transfer the Franchise and including (a) financial statements of your Center (including balance sheets and income statements) for the last 3 fiscal years and the year-to-date; (b) federal income tax returns and all applicable schedules for your Center for the last 3 fiscal years; and (c) a complete and accurate copy of your then current lease for the Premises of your Center.  Upon receipt of the Offer Notice we will have the option, exercisable by notice ("Response Notice") delivered to you within 15 business days thereafter, to indicate our intention to accept your offer to sell such interest in this Agreement, your Center or in Dealer for the price and terms contained in the Offer Notice.  We have the right to investigate and analyze the business, assets and liabilities and all other matters we deem necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms described in the Offer Notice.  We may conduct such investigation and analysis in any manner we deem reasonably appropriate, and you and your Owners agree to provide us with all information we request and to cooperate fully with us in connection therewith.

If we deliver a Response Notice, we and you and/or your Owners will enter into a purchase agreement reasonably satisfactory to both you and us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as is reasonably necessary to protect each party's interests.  The closing shall occur not more than 90 days after the date of the Response Notice, unless the closing is delayed for reasons beyond our reasonable control.

If we do not deliver a Response Notice, as provided above, you and/or your Owners may solicit offers to Transfer the Franchise from other parties at the exact same price and on the exact same terms as presented in the Offer Notice for a period of time expiring 365 days after the Offer Notice is delivered to us. You must immediately deliver to us a complete and accurate copy of any offer that you receive within such 365-day period from any such third party that you and/or your Owners are willing to accept ("Third Party Offer").

If the terms of the Third Party Offer are the same as those contained in the Offer Notice, then you or your Owners may accept such offer and complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in <u>Section 12.1</u> and <u>Section 12.2</u>, provided that if the sale to such offeror is not completed within 90 days after delivery of such Third Party Offer to us, or if there is any change in the terms of the offer, you must promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30-day period following your notification of the expiration of the 90-day period or the change to the terms of the offer.

**12.7     Our Right of First Refusal**

If the terms of the Third Party Offer pursuant to <u>Section 12.6</u> are different in any material respect (including price and/or payment terms) from those contained in the Offer Notice pursuant to <u>Section 12.6</u>, we will have the option, exercisable by notice delivered to you within 15 business days from the date of delivery to us of a complete and accurate copy of the Third Party Offer, to purchase such interest in this Agreement, your Center or in Dealer for the price and on the terms and conditions contained in such Third Party Offer.

In addition, if you or any of your Owners desire to transfer the Franchise for legal consideration to a prospective buyer without first giving us an Offer Notice pursuant to <u>Section 12.6</u>, you or such Owner must

obtain a bona fide, executed written offer and earnest money deposit in the amount of at least 5% of the offering price from a responsible and full disclosed purchaser and must deliver immediately to us a complete and accurate copy of such offer ("Right of First Refusal Offer"), including:  (a) financial statements of your Center (including balance sheets and income statements) for the last 3 fiscal years and the year-to-date; (b) federal income tax returns and all applicable schedules for your Center for the last 3 fiscal years; and (c) a complete and accurate copy of your then-current lease for the Premises of your Center.  If the offeror proposes to buy any other property or rights from you or any of your Owners or Affiliates (other than rights under other franchise agreements for Meineke Car Care Centers) as part of the bona fide offer, the proposal for such property or rights must be set forth in a separate, contemporaneous offer that is disclosed to us, and the price and terms of purchase offered to you or your Owners for the Transfer of the Franchise must reflect the bona fide price offered therefore and may not reflect any value for any other property or rights.  We have the option, exercisable by notice delivered to you or your Owners within 15 business days from the date of delivery of the Right of First Refusal Offer, to purchase such interest for the price and on the terms and conditions contained in such offer.  We have the right to investigate and analyze the business, assets and liabilities and all other matters we deem necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms of our right of first refusal.  We may conduct such investigation and analysis in any manner we deem reasonably appropriate and you and your Owners must cooperate fully with us in connection therewith.

If we exercise our option to purchase pursuant to the terms of the Third Party Offer or the Right of First Refusal Offer, as provided in this <u>Section 12.7</u>, we and you and/or your Owners will enter into a purchase agreement reasonably satisfactory to you and us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as are reasonably necessary to protect each party's interests.  The closing shall occur not more than 90 days after the date of our response to the Third Party Offer or Right of First Refusal Offer, as applicable, unless the closing is delayed for reasons beyond our reasonable control.  In the event the consideration, terms and/or conditions offered by a third party are such that we may not reasonably be able to furnish the same consideration, terms and/or conditions, then we may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, we at our own expense may designate an independent appraiser and the appraiser's determination shall be binding.

If we do not exercise our option to purchase pursuant to the terms of the Third Party Offer or the Right of First Refusal Offer, as provided in this <u>Section 12.7</u>, you or your Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in <u>Section 12.1</u> and <u>Section 12.2</u>, provided that if the sale to such offeror is not completed within 90 days after delivery of such offer to us, or if there is any change in the terms of the offer, you must promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30-day period following your notification of the expiration of the 90-day period or the change to the terms of the offer.

**12.8     Transfer by Us**

We have the right to transfer or assign all or any part of our rights or obligations under this Agreement to any person or legal entity.  If the assignee expressly assumes and agrees to perform all of our obligations under this Agreement accruing after the date of assignment, then the assignee will become solely responsible for all of our obligations under this Agreement from and after one (1) year after the effective date of assignment.  In addition, and without limiting the foregoing, we may sell our assets; may sell our securities in a public offering or in a private placement; may merge with or acquire other corporations, or be acquired by another corporation; and may undertake any refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

34

CJGL000155

## ARTICLE 13:
## TERMINATION OF AGREEMENT

### 13.1    Termination Upon Notice

In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if:

(a)    you become insolvent by reason of your inability to pay your debts as they mature;

(b)    you are adjudicated bankrupt or insolvent;

(c)    you file a petition in bankruptcy, reorganization or similar proceedings under the bankruptcy laws of the United States or have such a petition filed against you which is not discharged within 30 days;

(d)    a receiver or other custodian, permanent or temporary, is appointed for your business, assets or property (other than in connection with your death and for reasons other than financial concerns or irregularities);

(e)    you request the appointment of a receiver or make a general assignment for the benefit of creditors;

(f)    final judgment against you in the amount of $25,000 or more remains unsatisfied of record for 30 days or longer (unless and until such judgment is appealed in accordance with applicable law and is affirmed);

(g)    your bank accounts, property or accounts receivable relating to your Center are attached and such attachment is not lifted within 30 days;

(h)    execution is levied against any property or assets used in connection with your Center;

(i)    you voluntarily dissolve or liquidate or have a petition filed for dissolution and such petition is not dismissed within 30 days;

(j)    you fail to have your Center open for business for any 6 consecutive days after you open your Center (other than in connection with a relocation pursuant to Section 2.6 or due to force majeure);

(k)    you fail to open your Center and start business, as provided in Section 4.2 or fail to operate your Center as a Meineke Center;

(l)    you or any of your Owners or Affiliates make any material misstatement or omission in an application for a Meineke Center franchise or in any other information provided to us, including reports of Gross Revenues;

(m)    you suffer cancellation or termination of the lease or sublease for your Center as a result of a default there under;

35

CJGL000156

(n)      you or any of your Owners or Affiliates are convicted of, or plead no contest to, a felony or other crime or offense that we reasonably believe may adversely affect the goodwill associated with the Marks;

(o)      you or any of your Owners or Affiliates make an unauthorized Transfer of the Franchise;

(p)      you or any of your Owners or Affiliates make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Operations Manual in violation of this Agreement;

(q)      you or any of your Owners or Affiliates fail, on 3 or more separate occasions within any period of 12 consecutive months, to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with this Agreement (including the Operations Manual), which failures are brought to your attention by delivery of formal notices of default, regardless whether such defaults are timely cured; or

(r)      you or any of your Owners or Affiliates fail, on 7 or more separate occasions during the Term, to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with this Agreement (including the Operations Manual), which failures are brought to your attention by delivery of notices of default, regardless whether such defaults are timely cured, provided however, any notice of default which you timely cure to our satisfaction shall be disregarded for purposes of determining the foregoing number of defaults if you are not thereafter sent any further notices of default in any successive 12-month period (provided no such 12-month period can be used to disregard more than one notice of default).

**13.2    Termination After Opportunity to Cure**

In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if you or any of your Owners or Affiliates:

(a)      offer or sell any products or services from your Center that are not Authorized Products and Services and fail to discontinue such practice within 30 days after a formal notice of default is delivered to you; or

(b)      fail to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with any provision of this Agreement (including the Operations Manual) not otherwise mentioned in <u>Section 13.1</u> or this <u>Section 13.2</u>, and do not correct such failure within 30 days after a formal notice of default is delivered to you.

CJGL000157

## ARTICLE 14:
## RENEWAL RIGHTS

You have the right, subject to the conditions contained in this Article 14, to acquire a successor franchise for your Center on the terms and conditions of our then-current form of franchise agreement, if upon expiration of the Term:  (a) you and your Owners and Affiliates are in compliance with this Agreement and all other agreements with us or any of our Affiliates, and you and your Owners have been in substantial compliance with this Agreement throughout the Term; and (b) you maintain the right to possession of the Premises for the term of the successor franchise agreement and enter into an agreement with us whereby you agree within a specified time period, starting on the date of signing of a successor franchise agreement, to remodel your Center, add or replace fixtures, furnishings, equipment and signs and otherwise upgrade your Center to the specifications and standards then applicable for new Meineke Car Care Centers (provided we will not require any increase in square footage of your Center that would be impractical or uneconomical as a result of property lines, zoning restrictions or unreasonable cost of demolition and reconstruction).

You agree to give us notice of your desire to acquire a successor franchise at least 180 days prior to the expiration of the Term in order to provide us sufficient time to conduct a renewal inspection of your Center and complete the renewal process.  We agree to give you notice, not later than 60 days after receipt of your notice, of our decision whether you have the right to acquire a successor franchise pursuant to this Article 14.  Notwithstanding that our notice may state that you have the right to acquire a successor franchise for your Center and that you and we may have executed a successor franchise agreement, your right to a successor franchise will be subject to your continued compliance with all the provisions of this Agreement up to the date of its expiration.  If you so request in writing, we will give you the estimated costs or range of costs for upgrading your Center to the specifications and standards for new Meineke Car Care Centers and you will have two weeks following receipt of this information to evaluate it and notify us as to whether you will exercise your right to a successor franchise.

If you have the right to acquire a successor franchise, and state you intent to exercise that right, all in accordance with this Article 14, then:  (a) we and you (and your Owners) will execute a Successor Franchise Agreement (as defined below); (b) you will be obligated to pay a successor franchise fee of $2,500, which fee may be increased to reflect any increase in the CPI as of the end of the Term over the CPI as of January 1, 1998; and (c) you and your Owners will be obligated to execute release agreements, in form and substance satisfactory to us, releasing us and our Affiliates, stockholders, officers, directors, employees, agents, successors and assigns from any and all claims relating to this Agreement, unless such claims have been filed in accordance with this Agreement and are then pending and not finally resolved, or are filed in accordance with this Agreement within 12 months after execution of the successor franchise agreement. Failure by you (and your Owners) to sign such agreements and releases, or to pay the successor franchise fee, within 30 days after such documents are delivered to you will be deemed an election by you not to acquire a successor franchise for your Center.  Your right to a successor franchise will be subject to your ability to obtain a lease for the location in form and substance satisfactory to us.

The term "Successor Franchise Agreement" shall mean our then-current form of franchise agreement, which may contain provisions materially different from those contained herein, except:  (i) that we agree not to materially change the provisions of Section 2.3, Section 3.2, Section 3.4 or Section 17.13; and (ii) at your option, the term of the successor franchise may be for 15 years (in which case the Unilateral Right to Independence Rider, attached hereto, shall be executed by both parties), 8 years or 5 years (in which case the Unilateral Right to Independence Rider shall not be executed and instead, at your option, the Reciprocal Right to Independence Rider, attached hereto, may be executed by both parties).  The term "Successor Franchise Agreement" shall also include all ancillary agreements (including personal guarantees by your Owners and a remodeling agreement in form and substance satisfactory to us) which we then

37

CJGL000158

customarily use in granting successor franchises for the operation of Meineke Car Care Centers.  The parties hereto explicitly acknowledge and agree that the Unilateral Right to Independence and Reciprocal Right to Independence Riders are not part of this Agreement and are attached hereto solely for purposes of establishing such rights in connection with any successor franchise agreement.

**ARTICLE 15:**
**EFFECT OF TERMINATION OR EXPIRATION**

**15.1    Payment of Amounts Owed to Us**

You agree to pay us and our Affiliates immediately upon termination or expiration (without grant of a successor franchise) of this Agreement, all royalties, MAF payments, amounts owed for purchases from us or our Affiliates, interest due on any of the foregoing and all other amounts owed to us or our Affiliates which are then unpaid.

**15.2    Discontinue Use of Marks and Confidential Information**

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, you will:

(a)  not directly or indirectly at any time or in any manner use any Mark, any colorable imitation of any Mark or any other indicia of a Meineke Center;

(b)  take such action as may be required to cancel all fictitious or assumed name registrations relating to your use of any Mark;

(c)  notify the telephone company and all telephone directory publishers of the termination or expiration of any rights you may have to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and to authorize transfer of the number to us or at our direction.  You must immediately execute such instruments and take such steps as we deem necessary or appropriate to transfer and assign each such telephone number.  You irrevocably appoint our then-President as your duly authorized agent and attorney-in-fact to execute all instruments and take all steps to transfer and assign each such telephone number;

(d)  if we do not exercise our right to take possession of the Premises of your Center pursuant to Section 15.4, promptly remove from the Premises, and discontinue using for any purpose, all signs, fixtures, posters, decor items, advertising materials, forms and other materials and supplies which display any of the Marks or any distinctive features, images, or designs associated with Meineke Car Care Centers and, at your expense, make such alterations as may be necessary to distinguish the Premises so clearly from its former appearance as a Meineke Center as to prevent any possibility of confusion by the public;

(e)  on our request, promptly sell to us (free and clear of any and all liens, encumbrances, liabilities and restrictions) all of your inventory of parts and supplies at a mutually agreeable reasonable price.  We will have the right to set off against and reduce the purchase price by any and all amounts you or any of your Owners owe us or any of our Affiliates.  If we do not purchase all of your inventory of parts and supplies which contain any of the Marks, you will promptly remove all such labels and markings from any such remaining inventory;

(f)  immediately cease to use all Confidential Information and return to us all copies of the Operations Manual and any other confidential materials which we have loaned to you;

CJGL000159

(g)  immediately cease to use all computer software incorporating any of the Marks or any of our Confidential Information;

(h)  comply with the post-term covenants as provided in <u>Section 11.4</u>; and

(i)  within 30 days after the effective date of termination or expiration, furnish us evidence satisfactory to us of your compliance with the foregoing obligations.

### 15.3   Customers

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we have the unrestricted right, without paying you any legal consideration, to offer and sell, and to permit other Meineke Dealers to offer and sell, any products or services, to any and all customers of your Center. We have the right to use information from your computer system or related reports submitted to us for such purposes, notwithstanding anything to the contrary contained in this Agreement.

### 15.4   Possession of Premises

(a)     Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we may require you:

(i) to promptly assign to us the lease or sublease for the Premises of your Center (or, at our option, sublease to us the Premises of your Center as an Interim Sublease in accordance with <u>Section 4.1</u> and otherwise on the same terms and conditions as your lease) and promptly grant us possession to the Premises of your Center; or

(ii) if this Agreement is for a new Center and you or one of your Affiliates or Owners owns the Premises, to promptly enter into a lease with us on commercially reasonable terms for an initial term of 18 months, with 2 additional 18-month options to renew.

(b)     You will not be obligated to lease or sublease to us the Premises of your Center if you have notified us at least 18 months prior to expiration of the Term that you do not intend to exercise your right to a successor franchise under <u>Article 14</u>, and that neither you nor any Affiliate or Owner of yours intends to own, operate, manage, lease, lend funds to or otherwise assist a Competitive Business at the Premises after expiration of the Term, and you and your Affiliates and Owners in fact do not engage in any such activities with respect to the Premises for one year after expiration of the Term.

(c)     For the avoidance of doubt, if this Agreement is for a Meineke Center that operated as a Meineke Center prior to the date hereof, and you or one of your Affiliates owns the Premises as of the Effective Date, then you will not be obligated to lease the Premises to us in accordance with the terms of this Agreement upon termination or expiration of this Agreement, provided that neither you nor any Affiliate or Owner of yours owns, operates, manages, leases, lends funds to or otherwise assists a Competitive Business at the Premises for a 1 year term after the termination or expiration.

CJGL000160

### 15.5    Continuing Obligations

All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect until they are satisfied in full or by their nature expire.

## ARTICLE 16:
## RELATIONSHIP OF THE PARTIES

### 16.1    Independent Contractors

You and we are independent contractors.  Neither this Agreement, the nature of the relationship of the parties nor the dealings of the parties pursuant to this Agreement will create, directly or indirectly, any fiduciary or similar relationship between the parties hereto.

Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever.  You agree to conspicuously identify yourself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your Center and agree to place such other notices of independent ownership at your Center and on forms, business cards, stationery, advertising and other materials as we may require from time to time.

You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors.  We will not be obligated by or have any liability  under any agreements made by you with any third party or for any representations made by you to any third party.  We will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of your business hereunder.

### 16.2    Indemnification

You agree to indemnify us, our Affiliates and our respective directors, officers, employees, shareholders, agents, successors and assigns (collectively "indemnitees"), and to hold the indemnitees harmless to the fullest extent permitted by law, from any and all losses and expenses (as defined below) incurred in connection with any litigation or other form of adjudicatory procedure, claim, demand, investigation, or formal or informal inquiry (regardless of whether it is reduced to judgment) or any settlement thereof which arises directly or indirectly from, or as a result of, a claim of a third party in connection with the selection, development, ownership, operation or closing of your Center (collectively "event"), and regardless of whether it resulted from any strict or vicarious liability imposed by law on the indemnitees, provided, however, that this indemnity will not apply to any liability arising from a breach of this Agreement by the indemnitees or the gross negligence or willful acts of indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein will extend to any finding of comparative or contributory negligence attributable to Dealer).  The term "losses and expenses" includes compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs associated with any of the foregoing losses and expenses.  You agree to give us prompt notice of any event of which you are aware from which indemnification is required, and, at your expense and risk, we may elect to assume (but under no circumstance obligated to undertake) the defense and/or settlement thereof, provided that we will seek your advice and counsel.  Our assumption of the defense does not modify your indemnification obligation.  We may, in our reasonable discretion, take such actions as we deem necessary and appropriate

CJGL000161

to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereof as may be, in our reasonable discretion, necessary for the protection of the indemnitees or Meineke Car Care Centers generally.  This Section 16.2 will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 16.3    Taxes

You agree to promptly pay to us an amount equal to all taxes levied or assessed, including unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipt taxes, taxes on royalties, any similar taxes or levies, imposed upon or required to be collected or paid by us by reason of the furnishing of products, intangible property (including trademarks) or services to you.  In the event of a bona fide dispute as to your liability for taxes, you may contest your liability in accordance with applicable law.

**ARTICLE 17:**
**MISCELLANEOUS**

### 17.1    Governing Law

Except as otherwise provided in Section 17.2 with respect to the United States Arbitration Act (9 U.S.C. § 1, et seq.), this Agreement and all issues arising from or relating to this Agreement will be governed by and construed under the laws of the State of North Carolina, provided the foregoing does not constitute a waiver of your rights under any applicable franchise registration and disclosure or franchise relationship law of another state.  Otherwise, in the event of any conflict of law, North Carolina law will prevail, without regard to the application of North Carolina conflict of law principles.

### 17.2    Arbitration

Subject to Section 17.3 and Section 17.4, any controversies, disputes, or claims between the parties, including their respective Affiliates, owners, officers, directors, agents, and employees, arising from or relating to this Agreement may be submitted on demand,  by either party at the time of the filing of a claim if you are the claimant, or before the expiration of ten (10) days after receipt of service of process of the claim by the respondent, for arbitration to the American Arbitration Association ("AAA"). The arbitration shall be governed exclusively by the United States Arbitration Act (9 U.S.C. § 1, et seq.), without reference to any state arbitration statutes.  The parties agree that, in connection with any such arbitration proceeding, each shall submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedures) within the same proceeding as the claim to which it relates.  Any such claim which is not submitted or filed in such proceeding shall be barred.  The arbitration proceedings shall be conducted in the city where we then have our principal place of business in accordance with the then-current commercial arbitration rules of the AAA, except the parties shall be entitled to limited discovery at the discretion of the arbitrator(s) who may, but are not required to, allow depositions.  The parties acknowledge that the arbitrators' subpoena power is not subject to geographic limitations.  The parties agree to be bound by the provisions of any limitation on the period of time by which claims must be brought under North Carolina law or any applicable federal law.

The arbitration proceedings may, at the discretion of the arbitrator(s), also include claims under other Meineke Franchise and Trademark Agreements that permit arbitration on substantially similar terms as those contained in this Section 17.2, provided that the parties to all such agreements are identical to the parties to this Agreement (or their successors and assigns in accordance with their respective provisions) or are Affiliates of such parties.  Otherwise, the arbitration proceedings shall be conducted on an individual basis and not on a multi-plaintiff, consolidated or class-wide basis.

MCC 5/2014

CJGL000162

The arbitrator(s) shall have the right to award the relief which he or she deems proper, consistent with the terms of this Agreement, including compensatory damages (with interest on unpaid amounts from date due), specific performance, injunctive relief, legal fees and costs.  The award and decision of the arbitrator(s) shall be conclusive and binding on all parties, and judgment upon the award may be entered in any court of competent jurisdiction.  Any right to contest the validity or enforceability of the award shall be governed exclusively by the United States Arbitration Act.  The provisions of this Section 17.2 shall continue in full force and effect subsequent to and notwithstanding expiration or termination of this Agreement.

### 17.3    Preliminary Injunctive Relief

Either party hereto may obtain in any court of competent jurisdiction temporary restraining orders and preliminary injunctions in accordance with applicable law, whether or not the case has been referred to arbitration pursuant to Section 17.2.  The parties agree that any violation of Article 10, Article 11, Section 12.2(k), Section 15.2 or Section 15.4 would result in irreparable harm for which no adequate remedy at law may be available.  The provisions of this Section 17.3 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 17.4    Multi-Plaintiff and Class Action Claims

Subject to and in accordance with applicable law, you may institute a multi-plaintiff claim (involving more than one plaintiff that is not one of your Owners or Affiliates) or a class action claim in a court of competent jurisdiction against us for the sole purpose of seeking:  (a) preliminary and permanent injunctive relief or specific performance as a result of a breach of this Agreement; (b) restitution to the MAF as a result of a breach of Article 8 hereof; or (c) restitution as a result of a breach of our obligation under Section 7.2 not to take rebates, benefits and promotional allowances from suppliers, other than in accordance with the terms of Section 7.2.  You agree that multi-plaintiff or class action claims may not be instituted for any claims or purposes other than those listed above in this Section 17.4.  You further agree that any such action shall be brought exclusively in the jurisdiction where we then have our principal place of business, notwithstanding the provisions of Section 17.5.  The provisions of this Section 17.4 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 17.5    Venue

Any judicial proceeding we may bring against you or any of your Owners in accordance with the terms of this Agreement may be brought in the jurisdiction where we then have our principal place of business and, if brought in that jurisdiction, may not be transferred to another jurisdiction on the basis that the other jurisdiction is more convenient for the parties and witnesses.  Any judicial proceedings you may bring against us in accordance with the terms of this Agreement may be brought in the jurisdiction where your Center is located and, if brought in that jurisdiction, may not be transferred to another jurisdiction on the basis that the other jurisdiction is more convenient to the parties and witnesses.

### 17.6    Costs and Attorneys' Fees

The party who prevails in any arbitration or judicial proceeding will be awarded its costs and expenses incurred in connection with such proceedings, including reasonable attorneys' fees.

### 17.7    Limitations on Legal Claims

CJGL000163

Except with respect to any of your obligations herein regarding the Confidential Information and the Marks, we and you (and your Owners) each agrees, to the fullest extent permitted by law, not to assert any right to or claim for any punitive, exemplary or special damages against the other directly or indirectly arising from or relating to this Agreement.

### 17.8    Severability and Substitution of Provisions

Every part of this Agreement will be considered severable. If for any reason any part of this Agreement is held to be invalid, that determination will not impair the other parts of this Agreement. If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of geographical area, type of business activity prohibited and/or length of time, but could be rendered enforceable by reducing any part or all of it, you and we agree that it will be enforced to the fullest extent permissible under applicable law and public policy.

If any applicable law requires a greater prior notice of termination of or refusal to renew this Agreement than is required hereunder, a different standard of "good cause" to terminate or not renew this Agreement, or the taking of some other action not required hereunder, then the prior notice, "good cause" standard and/or other action required by such law will be substituted for the comparable provisions hereof. However, the foregoing shall not be deemed a waiver of our right to contest the validity, enforceability or application of any such law. If any provision of this Agreement or any specification, standard or operating procedure prescribed by us is invalid or unenforceable under applicable law, we have the right, in our sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to make it valid and enforceable.

### 17.9    Waiver of Obligations

We and you may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. You and we will not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it; any failure, refusal or neglect by you or us to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by us to exercise any right, whether of the same, similar or different nature, with respect to other Meineke Centers or dealers; or the acceptance by us of any payments due from you after any breach of this Agreement.

### 17.10    Exercise of Rights

Except as otherwise expressly provided herein, the rights of the parties hereto are cumulative and no exercise or enforcement by either party of any right or remedy hereunder will preclude the exercise or enforcement of any other right or remedy which such party is entitled to enforce by law.

### 17.11    Construction

The language of this Agreement will be construed according to its fair meaning and not strictly against or for any party. The introduction, personal guarantees, Schedules and addenda (if any) to this Agreement, as well as the Operations Manual, are a part of this Agreement and constitute the entire agreement of the parties with respect to the subject matters hereof and supersede all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein. If there is an inconsistency between the terms of this Agreement and the Operations Manual, the terms of this Agreement will prevail. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement, other than our franchise disclosure document, that either party may or does rely on or that will have any force or effect.

43

CJGL000164

This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest. Nothing in this Agreement will be deemed to confer any rights or remedies on any person or legal entity not a party hereto (including any independent association of Meineke Dealers or DAAC), other than successors and assigns of any party to this Agreement whose interests are assigned in accordance with its terms.

The headings of articles and sections are for convenience only and do not limit or construe their contents. The word "including" will be construed to include the words "without limitation". The term "Dealer" or "you" is applicable to one or more persons, a corporation, limited liability company or a partnership and its owners, as the case may be. If two or more persons are at any time Dealer hereunder, whether as partners, joint venturers or otherwise, their obligations and liabilities to us will be joint and several. The parties hereto acknowledge and agree that the franchise relationship contemplated by this Agreement, as well as other similar agreements with other Meineke Dealers, confers on us discretion to make decisions and to take certain actions and that we will exercise our business judgment honestly in doing so.

Whenever this Agreement requires the approval or consent of either party, the other party must make written request therefore, and such approval or consent must be obtained in writing. This Agreement may be executed in multiple copies, each of which will be deemed an original. Time is of the essence in this Agreement.

### 17.12 Modification

This Agreement may not be amended except: (a) as noted below; (b) by written agreement signed by both parties; and (c) as otherwise provided herein with respect to the Operations Manual.

This Agreement may be amended at any time whenever we and a super-majority (as hereinafter defined) of Meineke Dealers agree to any such amendment. We agree to provide you, at least ninety (90) days prior to the date such amendment is to be effective, a copy of the proposed amendment, together with a brief statement explaining the reasons therefore. A "super-majority" of Meineke Dealers shall consist of the owners of at least seventy-five percent (75%) of all franchised Meineke Car Care Centers in the United States of America. Whenever a super-majority of Meineke Dealers approve an amendment in the manner provided for herein, such amendment shall be binding on all Meineke Dealers, including you, to the same extent and in the same manner as if the amendment was unanimously approved by all Meineke Dealers, and regardless whether you may or may not desire to be bound by the amendment. By signing this Agreement, you appoint any of our officers as your attorney in fact with irrevocable power and authority to execute any such amendment so approved.

### 17.13 Policy Regarding Meineke Chain Expansion

We have developed certain policies to determine the potential loss of sales incurred by existing Meineke Car Care Centers as a result of the addition of new Meineke Car Care Centers in a local market area. These policies are embodied in a written document entitled "Meineke's Encroachment Insurance Policy" ("the Policy"), which is not part of this Agreement and which we may change from time to time. We agree to seek the advice of DAAC with respect to any material changes to the Policy and not to make any material changes to the Policy before January 1, 2006 without the consent of DAAC.

You may invoke the procedures set forth in the Policy at your option. However, if you choose not to invoke the Policy and instead you pursue legal action against us in connection with the opening of new Meineke Car Care Centers in the vicinity of your Center, your legal rights with respect to our actions in opening new Meineke Car Care Centers will be limited solely and exclusively to those contained in

MCC 5/2014

CJGL000165

Section 2.3, and we shall have no liability whatsoever with respect to the opening or operation of additional Meineke Car Care Centers, provided we do not breach our express obligations under Section 2.3. You acknowledge and agree that, if you institute any legal action relating directly or indirectly to the opening of additional Meineke Car Care Centers, the Policy does not confer on you any legal rights whatsoever (whether as a matter of contract, any implied covenant of good faith and fair dealing or otherwise), and that the Policy, and our practices and communications there under, are not relevant or material to the issues in such proceedings and therefore are inadmissible as evidence in such proceedings.

### 17.14   Notices and Payments

All notices, requests and reports permitted or required to be delivered by this Agreement will be deemed delivered:  (a) at the time delivered by hand to the recipient party (or to an officer, director or partner of the recipient party); (b) on the same day of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (c) one business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (d) five business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing.  All payments and reports required by this Agreement must be sent to us at the address identified in this Agreement unless and until a different address has been designated by written notice.

### 17.15   Ombudsman

We agree to appoint, with the advice of DAAC, a neutral person with experience in resolving franchise disputes ("Ombudsman") who will be available to you in attempting to resolve any disputes, in accordance with the provisions set forth below, in the event (a) we exercise our rights under Section 13; or (b) a dispute arises as to the findings of an audit conducted pursuant to Section 9.6.

If we have delivered to you a formal notice of default or a notice of termination, then you have the right to seek the assistance of the Ombudsman within 10 days thereafter, if you believe we are not entitled to terminate this Agreement.  We agree to consider the views of the Ombudsman, but are not bound by his or her views.  If the matter for which you seek the Ombudsman to assist you involves termination for reasons that include monetary defaults, then you agree to pay for the fees and costs of the Ombudsman, except that if the Ombudsman notifies us that he or she believes that you are not in default of your monetary obligations or that our notice of termination is defective, we agree to reimburse you for such fees and costs.  Otherwise, in all other circumstances, you and we agree to share equally the fees and costs of the Ombudsman.

If:  (a) we have delivered to you a formal notice of default or notice of termination as a result of one or more non-monetary defaults (regardless whether we also assert monetary defaults); and (b) the Ombudsman notifies us that he or she believes that we have no right to terminate this Agreement on any basis set forth in the default letter; then, we agree that we will not invoke our rights under Section 15.2(c) or Section 15.2(d) without obtaining an order or declaration from a court or arbitrator that we may invoke such rights.

The exercise of your right to seek the assistance of the Ombudsman hereunder shall not negate our right to terminate this Agreement and, except as otherwise explicitly provided in this Section 17.15, to enforce your post-termination obligations hereunder or under applicable law.

You and we agree that all information received by the Ombudsman while serving in that capacity shall be kept confidential.  Accordingly, the parties agree not to serve the Ombudsman with any subpoena or discovery request (or otherwise compel the Ombudsman's attendance or testimony) in connection with any

CJGL000166

legal or administrative action between the parties.  Each party agrees to maintain the confidentiality of all communications it receives relating to the Ombudsman, and not to use it for any purpose other than resolution of the dispute in the Ombudsman process.  Nothing contained in this Section 17.15, nor our participation in the Ombudsman process, shall constitute a waiver of our right to terminate this Agreement at any time in accordance with its terms or in accordance with applicable law.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the Agreement Date.

**DEALER**
If a corporation, limited liability company
or partnership:

a _____

(Name of corporation, limited
liability company or partnership)

By:_____

Print Name:_____

Title:_____

If individuals:

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

Date:_____, _____

**MEINEKE CAR CARE CENTERS, LLC**
a North Carolina limited liability company

By:_____
    Authorized Representative

Attest: _____

Date: _____, _____

46

CJGL000167

## SCHEDULE A - MARKET AREA

**MEINEKE®**
**FRANCHISE AND TRADEMARK AGREEMENT**
**WITH**

_____
(insert Dealer name)

The expiration date of the agreement is _____

The "Market Area" is:

MSA Market Area _____

DMA Advertising Market Area _____

**DEALER**                                          **MEINEKE CAR CARE CENTERS, LLC**
If a corporation, limited liability company          a North Carolina limited liability company
or partnership:

_____                    By:_____
a _____                       Authorized Representative

(Name of corporation, limited
 liability company or partnership)

By:_____

Print Name:_____          Attest: _____
Title:_____

If individuals:

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

Date:_____, _____          Date:  _____, _____

i

CJGL000168

## <u>SCHEDULE B - PREMISES</u>

**MEINEKE**®
**FRANCHISE AND TRADEMARK AGREEMENT**
**WITH**

_____
(insert Dealer name)

The "Premises" of your Center shall be as follows:

_____
_____
_____

**DEALER**
If a corporation, limited liability company
or partnership:


_____
a _____

(Name of corporation, limited
 liability company or partnership)

By:_____

Print Name:_____
Title:_____

If individuals:


_____
(Signature)


_____
(Print Name)


_____
(Signature)


_____
(Print Name)

Date:_____, _____

**MEINEKE CAR CARE CENTERS, LLC**
a North Carolina limited liability company


By:_____
     Authorized Representative




Attest: _____




Date:  _____, _____

MCC 5/2014

CJGL000169

### <u>SCHEDULE C - DISCLOSURE OF OWNERSHIP INTERESTS</u>

**MEINEKE®**
**FRANCHISE AND TRADEMARK AGREEMENT**
**WITH**

_____

(insert Dealer name)

1.      <u>Operating Partner.</u>  The name and home address of the Operating Partner is as follows: _____
_____
_____ .

2.      <u>Form of Entity of Dealer</u>.

        (a)  <u>Corporation or Limited Liability Company</u>.  Dealer was incorporated/organized on
_____,____, under the laws of the State of _____.  It has not conducted business under any name other than its company name.  The following is a list of all of Dealer's Directors/Members and Officers/Manager as of _____,____.

| <u>Name of Each Director/Officer</u> | <u>Position(s) Held</u> |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

        (b)  <u>Partnership</u>.      Dealer   is   a   [general]   [limited]   partnership   formed   on
_____, _____ under the laws of the State of _____.  It has not conducted business under any name other than its partnership name.  The following is a list of all of Dealer's general partners as of _____, _____.

| <u>Name of General Partner</u> |
|---|
| _____ |
| _____ |
| _____ |

3.      <u>Owners</u>.  Dealer and each of its Owners represents and warrants that the following is a complete and accurate list of all Owners of Dealer, including the full name and mailing address of each Owner, and fully describes the nature and extent of each Owner's interest in Dealer.  Dealer, and each Owner as to his ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial

- i -

CJGL000170

owner of his ownership interest in Dealer, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

<u>Owner's Name and Address</u>                  <u>Description of Interest</u>

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

MCC 5/2014

CJGL000171

**DEALER**

If a corporation, limited liability company or partnership:

a _____

(Name of corporation, limited
  liability company or partnership)

Print Name: _____
Title: _____

If individuals:

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

Date: _____, _____

**MEINEKE CAR CARE CENTERS, LLC**

a North Carolina limited liability company

By: _____
    Authorized Representative

By: _____

Attest: _____

Date:  _____, _____

- iii -

CJGL000172

**<u>SCHEDULE D - OWNERS' PERSONAL GUARANTY</u>**

**MEINEKE®
FRANCHISE AND TRADEMARK AGREEMENT
WITH**

_____
(insert Dealer name)

In consideration of, and as an inducement to, the execution of the Meineke® Franchise and Trademark Agreement dated as of _____, _____ (the "Agreement") by and between MEINEKE CAR CARE CENTERS, LLC ("Franchisor"), and _____("Dealer") and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the undersigned, each of whom is an owner of an interest in Dealer as of the date of this document, hereby personally and unconditionally:  (1) guarantees to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Dealer shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and that each and every representation of Dealer made in connection with the Agreement is true, correct and complete in all respects at and as of the time given; and (2) agrees personally to be bound by, and personally liable for the breach of, each and every provision in the Agreement.

Each of the undersigned waives:  (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right he may have to require that an action be brought against Dealer or any other person as a condition of liability; and (e) any and all other notices and legal or equitable defenses to which he may be entitled relating to the validity or enforceability of this guaranty.

Each of the undersigned consents and agrees that:  (i) his direct and immediate liability under this guaranty shall be joint and several; (ii) he shall render any payment or performance required under the Agreement upon demand if Dealer fails or refuses punctually to do so; (iii) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Dealer or any other person; and (iv) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time to time grant to Dealer or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement and thereafter and shall continue until any and all indebtednesses and obligations there under are satisfied in full.

**IN WITNESS THEREOF**, each of the undersigned has hereunto affixed his signature, under seal, on the same day and year as the Agreement was executed.

MCC 5/2014

CJGL000173

**PERCENTAGE OF OWNERSHIP**
**INTERESTS IN DEALER**

**GUARANTOR(S)**

_____

_____

(Signature)

_____

(Print Name)

_____

_____

(Signature)

_____

(Print Name)

_____

_____

(Signature)

_____

(Print Name)

_____

_____

(Signature)

_____

(Print Name)

_____

_____

(Signature)

_____

(Print Name)

DATE: _____, _____

- ii -

MCC 5/2014

CJGL000174

**"APPLIES ONLY TO THE RENEWAL OF THIS FRANCHISE AND TRADEMARK AGREEMENT."**

**RECIPROCAL RIGHT TO INDEPENDENCE RIDER**

This Rider, effective upon signature by both parties, amends the Meineke Franchise Agreement to which it is attached ("the Franchise Agreement").

**1.      RIGHT TO INDEPENDENCE**

Notwithstanding anything to the contrary contained in the Franchise Agreement, if you give us written notice, not more than 21 months and not less than 18 months prior to the expiration of the term of the Franchise Agreement, that you desire to operate an automobile repair and maintenance business independent of us after expiration ("Independence Notice"), then we will not have any right under the Franchise Agreement to take possession of the Premises of your Center and you will not be subject to any post-termination non-competition covenant contained in the Franchise Agreement on expiration of its term.  After delivery of the Independence Notice, you will have the right to establish an additional telephone number under a different name for your Center (which is not a colorable imitation of any of the Marks), so long as you continue to operate your Center as a Meineke Center and continue to promote the Marks throughout the remainder of the term of the Franchise Agreement.  Your delivery of an Independence Notice constitutes an irrevocable waiver of any exclusive rights or territorial protection, whether derived from the Franchise Agreement, any of our internal policies regarding encroachment or applicable law (statutory or otherwise), and we will have the right at any time thereafter to accelerate the expiration of the term of the Franchise Agreement, without cause, effective 60 days after delivery of notice thereof ("Acceleration Notice") to you.  You agree that, upon your Independence Notice, we may open a new Meineke Center anywhere within your immediate market area and solicit (or cause the dealer of the new Meineke Center to solicit) the customers of your Center without incurring any liability to you whatsoever.  You further agree that upon delivery of an Acceleration Notice, you shall immediately take all appropriate action to comply with all of your post-termination obligations under the Franchise Agreement (other than any obligation to grant us possession to the Premises of your Center or to refrain from engaging in any competitive business), so that you will be in full compliance with those obligations immediately upon expiration of the 60-day period after delivery of the Acceleration Notice.  Notwithstanding anything to the contrary herein, this Rider shall not constitute a waiver of our right to terminate the Franchise Agreement in accordance with its terms or otherwise after your Independence Notice, and if we so terminate the Franchise Agreement, we will have all of our rights upon termination, including any right to take possession of the Premises of your Center, and you will be subject to all of your obligations upon termination, including any post-termination non-competition covenants.  For example, if after your Independence Notice, but before expiration of the term (or the accelerated expiration of the term), you discontinue operating your Center as a Meineke Center, we have the right to terminate the Franchise Agreement and to take possession of the Premises of your Center and you will be subject to any post-termination non-competition covenant and liable for all actual and consequential damages caused by your breach of the Franchise Agreement.

**2.      WAIVER OF RENEWAL RIGHTS**

Notwithstanding anything to the contrary contained in the Franchise Agreement or under applicable law, including, without limitation, any franchise relationship statute in effect in the state where your Center is located, you agree, in consideration of your right to independence as set forth in Section 1 of this Rider, that on expiration of the term of the Franchise Agreement you will have no right whatsoever to renew or extend the term of the Franchise Agreement, to enter into a successor franchise agreement or to otherwise continue your relationship with us, and you hereby irrevocably waive all rights thereto.  The parties agree that the foregoing waiver is an integral part of this Rider and if for any reason, notwithstanding such waiver, you continue to have any right to

- i -

CJGL000175

renew the franchise, whether as a matter of contract or applicable law (statutory or otherwise), then the provisions of <u>Section</u> 1 of this Rider shall be void and of no effect.

**3.      EFFECT OF RIDER**

        This Rider shall be deemed to be part of the Franchise Agreement.  All defined terms used but not defined in this Rider shall have the same meanings as ascribed to them in the Franchise Agreement.  If there is any inconsistency between the terms of this Rider and the Franchise Agreement, the terms of this Rider will prevail.

        **IN WITNESS WHEREOF**, the parties have executed and delivered this Rider as of the _____ day of _____, _____.

**DEALER**
If a corporation, limited liability company
or partnership:
_____
a _____

(Name of corporation, limited
   liability company or partnership)

By:_____

Print Name:_____
Title:_____

**If individuals:**

_____
(Signature)
_____
(Print Name)
_____
(Signature)
_____
(Print Name)


Date:_____, _____

**MEINEKE CAR CARE CENTERS, LLC**
a North Carolina limited liability company

By:_____

Print Name:_____
Title:_____



Date:   _____, _____

- ii -

CJGL000176

**"APPLIES ONLY TO THE RENEWAL OF THIS FRANCHISE AND TRADEMARK AGREEMENT."**

**UNILATERAL RIGHT TO INDEPENDENCE RIDER**

This Rider, effective upon signature by both parties, amends the Meineke Franchise Agreement to which it is attached ("the Franchise Agreement").

**1.    RIGHT TO INDEPENDENCE**

Notwithstanding anything to the contrary contained in the Franchise Agreement, if you give us written notice, not more than 21 months and not less than 18 months prior to the expiration of the term of the Franchise Agreement, that you desire to operate an automobile repair and maintenance business independent of us after expiration ("Independence Notice"), then we will not have any right under the Franchise Agreement to take possession of the Premises of your Center and you will not be subject to any post-termination non-competition covenant contained in the Franchise Agreement on expiration of its term.  After delivery of the Independence Notice, you will have the right to establish an additional telephone number under a different name for your Center (which is not a colorable imitation of any of the Marks), so long as you continue to operate your Center as a Meineke Center and continue to promote the Marks throughout the remainder of the term of the Franchise Agreement.  Your delivery of an Independence Notice constitutes an irrevocable waiver of any exclusive rights or territorial protection, whether derived from the Franchise Agreement, any of our internal policies regarding encroachment or applicable law (statutory or otherwise), and we will have the right at any time thereafter to accelerate the expiration of the term of the Franchise Agreement, without cause, effective 60 days after delivery of notice thereof ("Acceleration Notice") to you.  You agree that, upon your Independence Notice, we may open a new Meineke Center anywhere within your immediate market area and solicit (or cause the dealer of the new Meineke Center to solicit) the customers of your Center without incurring any liability to you whatsoever.  You further agree that upon delivery of an Acceleration Notice, you shall immediately take all appropriate action to comply with all of your post-termination obligations under the Franchise Agreement (other than any obligation to grant us possession to the Premises of your Center or to refrain from engaging in any competitive business), so that you will be in full compliance with those obligations immediately upon expiration of the 60-day period after delivery of the Acceleration Notice.  Notwithstanding anything to the contrary herein, this Rider shall not constitute a waiver of our right to terminate the Franchise Agreement in accordance with its terms or otherwise after your Independence Notice, and if we so terminate the Franchise Agreement, we will have all of our rights upon termination, including any right to take possession of the Premises of your Center, and you will be subject to all of your obligations upon termination, including any post-termination non-competition covenants.  For example, if after your Independence Notice, but before expiration of the term (or the accelerated expiration of the term), you discontinue operating your Center as a Meineke Center, we have the right to terminate the Franchise Agreement and to take possession of the Premises of your Center and you will be subject to any post-termination non-competition covenant and liable for all actual and consequential damages caused by your breach of the Franchise Agreement.

**2.    EARLY ELECTION OF SUCCESSOR FRANCHISE**

If you so request in writing not more than 21 months and not less than 18 months prior to expiration of the term of the Franchise Agreement ("Early Election Period"), we will give you a copy of our then-current form of franchise agreement (and all related agreements and documents used for renewal) and, if applicable, our then-current franchise disclosure document.  You have the right to a successor franchise on the terms and conditions of such franchise agreement (and such related agreements and documents) by giving us notice thereof before the expiration of the Early Election Period, subject to all of the terms and conditions contained in the Franchise Agreement, provided we will give you notice of our decision whether you have the right to acquire a successor franchise not later than 30 days after your notice and provided further that you execute such franchise agreement

- i -

CJGL000177

(and such related agreements and documents) before the expiration of the Early Election Period.  Any such successor franchise agreement shall be effective as of the expiration date of the Franchise Agreement and shall be subject to your compliance with the Franchise Agreement throughout the remainder of its term.

3.       **EFFECT OF RIDER**

This Rider shall be deemed to be part of the Franchise Agreement.  All defined terms used but not defined in this Rider shall have the same meanings as ascribed to them in the Franchise Agreement.  If there is any inconsistency between the terms of this Rider and the Franchise Agreement, the terms of this Rider will prevail.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider as of the _____ day of _____, _____.

**DEALER**

If a corporation, limited liability company or partnership:

_____

a _____

(Name of corporation, limited
   liability company or partnership)

By:_____

Print Name:_____
Title:_____

**If individuals:**

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

Date:_____, _____

**MEINEKE CAR CARE CENTERS, LLC**

a North Carolina limited liability company

By:_____

Print Name:_____
Title:_____

Date:  _____, _____

- ii -

CJGL000178

# EXHIBIT "B"

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

## REAL PROPERTY SUBLEASE

THIS SUBLEASE is made and entered into by and between MEINEKE REALTY, INC., a North Carolina corporation, hereinafter called "Sublessor" and CJGL, INC., a corporation, hereinafter called "Sublessee".

### I.
### DEMISE AND DESCRIPTION OF PROPERTY

Sublessor hereby leases to Sublessee, and Sublessee hereby hires from Sublessor, on the terms and subject to the conditions and covenants set forth, the Subleased Premises.  The term "Subleased Premises" shall mean that certain real property described as follows: 3956 State Street, Santa Barbara, CA 93105, including all land, improvements and fixtures, except as provided in paragraph B below.

### II.
### TERM

A.          The term of this Sublease shall be for that period, commencing on the date of execution by both parties to this Sublease, but not later than the date of possession of the Premises by the Sublessees, and terminating upon the sooner of (i) June 29, 2021, (ii) the termination or expiration of that certain lease, hereinafter called the "Master Lease", wherein Sublessor is the Lessee of the Subleased Premises, a copy of which is annexed hereto as **Exhibit "A."**

### III.
### USE OF PREMISES

The Subleased Premises shall be used by Sublessee only for the purpose of conducting thereon a Meineke Car Care / Econo Lube co-branded automotive center (hereinafter called the "Franchised Business") pursuant to the terms and conditions of the Franchise Agreement and for no other purpose whatsoever.

### IV.
### RENT

A.          Commencing on the date of the mutual execution of this Sublease, but in no event later than the date upon which the Sublessee takes possession of the Premises, and on the first day of each calendar month thereafter during the term hereof, Sublessee shall pay to Sublessor:

1.          A minimum rental of Nine Thousand Fifteen Dollars and 43/100 Dollars ($9,015.43), subject to annual adjustment pursuant to Paragraph IVA.6 below, based upon increases in the Consumer Price Index. Rent for any partial month shall be payable on a prorata basis. First month's rent shall be payable upon execution hereof.  If the lease commences after the first day of the calendar month any prorations shall occur on the second month of the sublease and any invoice provided to the Sublessee for rent payment shall reflect such proration. Any proration shall be based on a 30 day month.

#4004 – Charlotte, NC

1

MEIN000712

DocuSign Envelope ID: 6F5FD398-8DC7-44B ... C6-5CFBAF17541F

2.              In addition to the foregoing minimum rental, an amount equal to the percentage rent payable by Sublessor, as Lessee, to its Landlord under the Master Lease, if applicable.

3.              Subject to Paragraph IV.C. below, all taxes of whatever nature, including taxes and assessments relating to the Subleased Premises as may be required to be paid by Sublessor under the Master Lease. At the option of Sublessor, it may collect from Sublessee upon the commencement of the sublease an amount equal to the combined monthly taxes and common area maintenance charges estimated for the Premises. This amount will be in addition to the base rent paid by Sublessee to Sublessor at such time.

4.              Subject to Paragraph IV.C. below, all taxes that now or may in the future be levied, assessed or imposed upon the rent reserved hereunder by any governmental authority acting under any present or future law.

5.              Subject to Paragraph IV.C. below, such fees, charges, costs, dues, contributions or other costs as Sublessor may be required to pay as Lessee under the Master Lease, including, but not limited to, costs or charges for energy, heating and air conditioning, maintenance, whether for parking areas or other common areas, merchants' association dues, and premiums for insurance on the improvements on the Subleased Premises.

6.              The minimum rental described in Paragraph IV.A.1 above shall be subject to annual increase, but never a decrease, from the prior period's rent, effective as of the first (1st) day of January of each year, (the first increase to be January 1, 2015), by a percentage equal to the greater of (a) the percentage increase from the base period, if any, in the Consumer Price Index, All Urban Consumers, All Items, (revised 1982-84=100) published by the United States Department of Labor, or the highest similar future index if these figures become unavailable (the "CPI"), or (b) that percentage of the rental increase imposed upon Sublessor under the Master Lease. For the purpose of this Agreement the "base period" shall refer to the date for which said index is published which is closest to January 1, 2014; provided, however, that Sublessor may, at its election, in order to facilitate the computation of the adjustments hereunder, use the CPI published two months prior to the effective date of each rental increase and the base date to determine the amount of such rental increase. However, in no event will such annual increase be less than three percent (3%).

7.              Sublessee hereby acknowledges that late payment by Sublessee to Sublessor of rent and other sums due hereunder will cause Sublessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Sublessor by the terms of any lease or trust deed covering the Subleased Premises. Accordingly, if any installment of rent or any other sum due from Sublessee shall not be received by Sublessor or Sublessor's designee within five (5) days after such amount shall be due, then, without any requirement for notice (including, without limitation, billing) to Sublessee, Sublessee shall pay to Sublessor a late charge equal to ten percent (10%) of such overdue amount. The parties hereby agree that such late charge represents

#4004 – Charlotte, NC

MEIN000713

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ...C6-5CFBAF17541F

a fair and reasonable estimate of the costs Sublessor will incur by reason of late payment by Sublessee. Acceptance of such late charge by Sublessor shall in no event constitute a waiver of Sublessee's default with respect to such overdue amount, nor prevent Sublessor from exercising any other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of rent, then rent shall automatically become due and payable quarterly, in advance, rather than monthly, notwithstanding any other provision of this Lease to the contrary.

       8.       **ALL RENT PAYMENT AND OTHER FEES THAT ARE REQUIRED TO BE PAID BY THE SUBLESSEE TO THE SUBLESSOR SHALL BE BY ELECTRONIC TRANSFER OF FUNDS ('EFT'), AND SUBLESSEE SHALL COOPERATE WITH SUBLESSOR IN SIGNING ALL DOCUMENTS NECESSARY TO PROVIDE SUBLESSOR WITH THE POWER AND AUTHORITY TO EFFECTUATE THE PAYMENT OF SUCH PAYMENTS THROUGH EFT. ANY FAILURE BY SUBLESSEE TO HAVE THE NECESSARY FUNDS AVAILABLE FOR EFT, OR ANY REVERSAL OF AN EFT TRANSFER THAT WOULD OTHERWISE BE DUE SUBLESSOR SHALL CONSITUTE A MATERIAL DEFAULT OF THIS SUBLEASE. IN ADDITION TO ALL REMEDIES THAT SUBLESSOR SHALL HAVE AVAILABLE TO IT RELATING TO SUCH DEFAULT, FOR EACH FAILURE BY SUBLESSEE TO PAY THE AMOUNT OF RENT BECAUSE OF THEIR FAILURE TO HAVE THE NECESSARY EFT FUNDS AVAILABLE ON THE DUE DATE OF SUCH TRANSFER SHALL PAY TO SUBLESSOR AN ADMINISTRATIVE FEE IN THE AMOUNT OF $100 DOLLARS TO REIMBURSE SUBLESSOR FOR ITS ADMINISTRATIVE EXPENSES IN HAVING TO ADMINISTER SUCH FAILURE. NOTHING IN THIS PARAGRAPH SHALL PRECLUDE OR LIMIT SUBLESSOR FROM UNDERTAKING ANY REMEDIES AVAILABLE TO IT FOR SUCH DEFAULT OF THE SUBLEASE TERMS BY SUBLESSEE.**

       B.       Upon execution hereof, and on an annual basis thereafter, Sublessor shall estimate the amount of payments to be made pursuant to Paragraphs IV.A.3., IV.A.4. and IV.A.5. hereof (collectively, the "Additional Payments") which shall be paid during the upcoming calendar year, and such amount shall be divided by the number of months remaining in such calendar year (the "Monthly Estimated Payment"). Pursuant to Paragraph IV.A. above, Sublessee shall pay to Sublessor the Monthly Estimated Payment on the same day as the rent is due hereunder. The Monthly Estimated Payment for any period during the term hereof which is less than one month shall be a pro-rata portion of the monthly installment. Within sixty (60) days after the expiration of each calendar year, Sublessor shall send to Sublessee a reasonably detailed statement showing the actual amount of Additional Payments incurred during the preceding calendar year. If the total of Sublessee's Monthly Estimated Payments during said preceding calendar year exceed the actual amount of Additional Payments as indicated on said statement, Sublessee shall be entitled to credit the amount of such overpayment against the Monthly Estimated Payment to be paid by Sublessee next falling due. If the total of Sublessee's Monthly Estimated Payments during said preceding calendar year were less than the actual amount of Additional Payments, Sublessee shall pay to Sublessor the amount of the deficiency within ten (10) days after delivery by Sublessor to Sublessee of said statement. All money paid to Sublessor under this Paragraph may be intermingled with other moneys of Sublessor and shall

#4004 -- Charlotte, NC

MEIN000714

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

not bear interest.  In the event of a default in the obligations of Sublessee to perform under this Sublease, then any balance remaining from funds paid to Sublessor under the provisions of this Paragraph may at the option of Sublessor, be applied to the payment of any monetary default of Sublessee in lieu of being applied to the payment of Additional Payments.

      C.        Attached to this Sublease as **Exhibit B** is a schedule of the first month's base rent, taxes and common area maintenance expenses that Sublessee shall be required to pay to Sublessor together with the subsequent mode of calculation of escalations for rent, taxes, and common area maintenance costs, and if applicable and computed rent credits thereon ("Schedule of Base and Additional Rents").  The Schedule of Rents shall be incorporated by reference to the Sublease.

**V.**

**MAINTENANCE AND REPAIR**

      A.        Sublessee, by taking possession of the Subleased Premises agrees that such Subleased Premises are in good and tenantable condition, and Sublessee agrees that it shall, at its sole cost and expense maintain the Subleased Premises, the Franchised Business, and all of the appurtenances thereto in good condition and repair.  The Subleased Premises may not be altered or changed by Sublessee without the prior written consent of Sublessor, said Sublessee hereby waiving all rights to make repairs at Sublessor's expense.  Sublessor may as a condition to Sublessor's giving such consent, require Sublessee to provide Sublessor, at Sublessee's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such alterations, repairs or changes, to insure Sublessor against any liability for mechanics' and materialmens' liens and to insure completion of any work.  Unless otherwise provided by written agreement, all alterations, improvements and changes that may be undertaken at the cost of Sublessee, shall be the property of Sublessor and shall remain upon and be surrendered with the Subleased Premises.

      B.        The parties hereby expressly agree that Sublessor shall not have any duty or responsibility to repair or replace any part or portion of the Subleased Premises or in any way to provide any maintenance or repairs whatsoever, but, on the contrary, same shall be the sole cost and responsibility of Sublessee.  Failure by Sublessee to maintain or repair said Subleased Premises shall constitute a material breach of this Agreement and Sublessor shall have the sole right to terminate this Sublease if Sublessee fails to maintain or repair said Subleased Premises within five (5) days (ten (10) days if the Subleased Premises is located in Illinois, or if Sublessee is a resident of Illinois) after receipt of written notice by Sublessor.

      C.        Without in any way limiting the generality of the foregoing, Sublessee shall be responsible for any replacement, repair or maintenance that may be necessary as to any part or portion of the Subleased Premises, expressly including the roof, store front, signage, floors, ceilings, sidewalks, drive and parking areas, interior and exterior lighting, landscaping, doors, plate glass, window casements, glazing, sewer, water connections, pipes and plumbing facilities, gas mains, electrical wiring and conduits, heating and air conditioning systems (if any), and each and every other part or portion thereof.  The parties further recognize that the Sublessee is at the time of the execution of this Sublease fully aware of the condition of the said demised premises and the probable condition thereof as of the date of the commencement of the term

#4004 – Charlotte, NC

MEIN000715

DocuSign Envelope ID: 6F5FD398-8DC7-44B......C6-5CFBAF17541F

hereof, and takes the Subleased Premises, the parties hereby expressly acknowledging that Sublessor has not made and does not hereby make any representations or warranties whatsoever concerning the use to which they may be put.

      D.      Sublessee shall pay, when due, all claims for labor or materials furnished to or for Sublessee at or for use in the Subleased Premises, which claims are or may be secured by a mechanics' or materialmens' liens against the Subleased Premises, or any interest therein. Sublessor shall have the right to post notices of non-responsibility at or on the Subleased Premises as provided by law.

      E.      Sublessee shall, upon the expiration or sooner termination of the Lease, surrender the Subleased Premises to the Sublessor in good condition, broom clean, ordinary wear and tear excepted.

## VI.
## INDEMNITY AND INSURANCE

      A.      Sublessor shall not be liable at any time for any loss, damage or injury to any person or the property of any person whomsoever at any time occasioned by or arising out of any act or omission of the Sublessee, or of anyone holding under Sublessee or the Subleased Premises or any part thereof or the parking lot by or under the Sublessee, or directly or indirectly from any state of condition of the Subleased Premises or any part during the term of this Sublease

      B.      Notwithstanding anything to the contrary in this Sublease and irrespective of any insurance carried by Sublessee for the benefit of Sublessor, Sublessee shall protect, indemnify, defend (with counsel acceptable to Sublessor), and hold the Subleased Premises and Sublessor and its officers, directors, and employees harmless from any and all damages, liabilities, claims, costs, and expenses (including without limitation, attorneys' fees) of whatsoever nature arising under the terms of this Sublease or arising out of or in connection with the operation carried on by Sublessee on, or the use or occupancy of, the Subleased Premises.

      C.      Sublessee shall carry and maintain during the entire term of the Sublease, at Sublessee's sole cost and expense, the following types of insurance in the amounts specified and in the form provided for in this Section:

      1.      Sublessee shall maintain and keep enforced during the term of this Sublease, either Commercial Comprehensive General Liability Insurance or Commercial General Liability Insurance applying to the Subleased Premises, and the Building, or any part of either, or any areas adjacent thereto, and the business operated by Sublessee on the Subleased Premises. The insurance shall include Broad Form Contractual Liability Insurance coverage insuring all of the Sublessee's indemnity obligations under this Lease. Such coverage shall have a minimum combined single limit of liability of at least One Million Dollars ($1,000,000), and a general aggregate limit of Two Million Dollars ($2,000,000). All policies shall be written to apply to all bodily injury, property damage, personal injury and other covered loss, however occasioned,

#4004 – Charlotte, NC

MEIN000716

DocuSign Envelope ID: 6F5FD398-8DC7-44B___C6-5CFBAF17541F

occurring during the policy term, shall be endorsed to add Sublessor as an additional insured, to provide that such coverage shall be primary and that any insurance maintained by Sublessor shall be excess insurance only.  The insurance shall contain the "Amendment of the Pollution Exclusion" for damages caused by heat, smoke or fumes from a hostile fire.  The limits of this insurance required by Lease or as carried by Lessee shall not, however, limit the liability of Sublessee or relieve Sublessee of any obligation under this Lease.  The limits of the liability insurance may be increased upon the reasonable request of Sublessor, but not more frequently then once every three (3) years.

2.      Sublessee shall also maintain Workers' Compensation Insurance in accordance with the law or laws of the state in which the Subleased Premises is located, and Employers' Liability Insurance with a limit of not less than One Million Dollars ($1,000,000) per employee and One Million Dollars ($1,000,000) per occurrence.  This coverage shall be endorsed to waive the insurer's rights of subrogation against Sublessor.

3.      Sublessee shall obtain and keep in force during the Sublease term a policy or policies in the name of Sublessor, with loss payable to Sublessor and to the holders of any mortgages, deeds of trust or ground leases on the Subleased Premises ("Lenders"), insuring loss or damage to the Subleased Premises.  The amount of such insurance shall be equal to the full replacement costs of the Subleased Premise, as the same shall exist from time to time, or the amount required by the Lenders and shall also cover all of Sublessee's improvements, fixtures, equipment and merchandise, which may from time to time be located in the Subleased Premises, and any and all trade fixtures and equipment of others which are in the Sublessee's possession and which are located within the Subleased Premises.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake, unless required by a Lender), including coverage for any additional costs resulting from debris removal and reasonable amounts of coverage for the enforcement of any ordinance or law regulating the reconstruction or replacement of any undamaged sections of the Subleased Premises required to be demolished or removed by reason of the enforcement of any building, zoning, safety or land use laws as a result of a covered cause of loss.  The policy or polices shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection against an increase in annual property insurance coverage amount by a factor of not less than the adjusted U.S. department of Labor Consumer Price Index for all Urban Consumers for the city nearest to where the Subleased Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed One Thousand Dollars ($1,000) per occurrence, and Sublessee shall be liable for such deductible amount in the event of a loss covered by such insurance.

D.      If the Subleased Premises is damaged or destroyed by means which are not covered by said insurance, then Sublessee shall pay the cost of repairs to restore the same.  If the damage is beyond repair, the Sublessee shall pay Sublessor the reasonable market value of the Subleased Premises before such damage or destruction and said sum shall become immediately due and payable to Sublessor.

#4004 – Charlotte, NC

MEIN000717

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ...C6-5CFBAF17541F

E.      All policies of insurance to be provided for in this Article VII shall be issued by companies having not less than Best's A: Triple A rating and shall be issued in the names of the Sublessor, the Lessor under the Master Lease and Sublessee for the mutual and joint protection and benefit of the parties. All public liability and property damage policies shall contain a provision that the Sublessor, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss, injury or damage to Sublessor, its servants, agents, and employees by reason for the negligence of the Sublessee.

F.      Sublessee shall deliver to Sublessor policies evidencing the insurance procured by Sublessee, or deliver in lieu thereof certificates of coverage from the insurance company or companies writing the policy or policies of insurance, which certificates shall, among other things, designate the company writing the same, the number, amount and provisions thereof. Upon Sublessor's written request, duplicate copies of such certificates of insurance shall be delivered to the Lessor under the Master Lease.

G.      All insurance policies shall contain a provision that such policy shall not be canceled or terminated without thirty (30) days' prior written notice from the insurance company to Sublessor. Sublessee agrees that on or before ten (10) days prior to the expiration of any insurance policy, Sublessee will deliver to Sublessor written notification in the form of a receipt or other similar document from the applicable insurance company that said policy or policies have been renewed, or deliver certificates of coverage from other good and solvent insurance companies for such coverage as identified in Section E, above.

H.      Sublessee shall procure an appropriate clause in, or an endorsement on, any policy of fire extended coverage insurance covering th, fixtures and equipment located in or on the Subleased Premises, pursuant to which the insurance companies waive subrogation or consents to waive of right of recovery against Sublessor to recover from the Sublessor any loss or damage to its property or the property of others resulting from fire or other hazards covered by such fire and extended coverage insurance.

I.      Notwithstanding anything to the contrary contained herein, in no event shall the amounts of insurance or types of insurance required hereunder be less than that required to be maintained by Sublessor as the Lessee under the terms of the Master Lease, or required to be maintained by Sublessee as Franchise under the Franchise Agreement.

## VII.
## ASSIGNMENT AND SUBLETTING

Sublessee shall not assign, mortgage or hypothecate this Sublease in whole or in part, nor sublet all or any part of the Subleased Premises without the prior written consent of Sublessor in each instance, which consent may be withheld in Sublessor's sole and absolute discretion. For purposes of this Paragraph, if the Sublessee is a corporation or partnership, then the transfer of more than 15% of the stock of the corporation shall constitute an assignment, and the transfer of 15% of the partnership interests of the partnership shall constitute an assignment. The prohibition against assigning or subletting shall be construed to include a prohibition against any

#4004 – Charlotte, NC

MEIN000718

DocuSign Envelope ID: 6F5FD398-8DC7-44B6-5CFBAF17541F

assignment or subletting by operation of law. Should the Sublessor, as the Franchisor, consent to the assignment of the Franchise Agreement, in accordance with the terms of the Franchise Agreement, the Sublessee shall assign this Sublease to the same assignee upon Sublessee's receipt of such consent. Notwithstanding any assignment of Sublease, with the consent of Sublessor, the Sublessee shall remain fully liable on this Sublease and shall not be released from performing any of the terms, covenants and conditions of this Sublease.

## VIII.
## DEFAULT AND REMEDIES

A.         Sublessor may, at its option and without limiting Sublessor in the exercise of any other right or remedy it may have on account of a default or breach by Sublessee, exercise the rights and remedies specified in Paragraph B of this article if:

1.         Sublessee defaults in the payment of any money agreed to be paid by Sublessee to Sublessor for rent, taxes, utilities, or for any other purpose hereunder, and if such default continues for three (3) days (ten (10) days if the Subleased Premises is located in Illinois, or if Sublessee is a resident of Illinois) after written notice to Sublessee from Sublessor.

2.         Sublessee abandons the Subleased Premises as the term "abandonment" is defined in the Franchise Agreement or Master Lease.

3.         Sublessee defaults in the performance of any other of its agreements, conditions or covenants under this Sublease and such default continues for three (3) days (ten (10) days if the Subleased Premises is located in Illinois, or if Sublessee is a resident of Illinois) after written notice to Sublessee by Sublessor and such additional period of delay as Sublessee may encounter in the performance of its agreements by reason of matters beyond the control of Sublessee.

4.         Sublessee commits any material breach of any other agreement between the parties, including, but without limitation the Franchise Agreement, as defined therein, or any other act or omission to act which gives the Sublessor the right to terminate the Franchise, and Sublessee fails to cure such breach in the manner and within the time periods prescribed by such agreement.

B.         On any breach, default, or abandonment as described in Paragraph A above, Sublessor may exercise any of the following rights within the periods of time stated in Paragraph A above:

1.         Immediately re-enter and remove all persons and all properties (other than the personal property and other property belonging to Sublessor) from the Subleased Premises, storing said personal property in a public warehouse or elsewhere at the cost of, for the account of and at the risk of Sublessee. In the event that there is any such re-entry by Sublessor, Sublessor may take any repairs, additions or improvements in, to or upon the Subleased Premises which may be necessary or convenient; provided, however, that Sublessor shall be entitled to

#4004 – Charlotte, NC

MEIN000719

DocuSign Envelope ID: 6F5FD398-8DC7-44B...06-5CFBAF17541F

recover from Sublessee the expenses for such repairs, additions or improvements only to the extent necessary to restore the Franchised Business to the condition it was at commencement of the term of the Sublease, reasonable wear and tear excepted. In such instance, this Sublease will be terminated and Sublessor will be entitled otherwise to recover all damages allowable under law and this Sublease.

    2.   To collect by suit or otherwise, each installment of rent or other sum as it becomes due hereunder, or to enforce, by suit or otherwise, any other term or provision hereof on the part of the Sublessee required to be kept or performed, it being specifically agreed that all unpaid installments of rent or other sums shall be computed at the highest rate from the date thereof until paid.

    3.   Terminate this Sublease, in which event Sublessee agrees to immediately surrender possession of the Subleased Premises and personal property and pay to Sublessor, in addition to any other remedy Sublessor may have, all damages Sublessor may incur by reason of default, including the cost of recovering the Subleased Premises.

    C.   The damages the Sublessor may recover include the worth at time of award of the amount by which the unpaid rent for the balance of the term of this Sublease and after the time of award exceeds the amount of such rental loss for the same period that Sublessee proves could be reasonably avoided.

    D.   Sublessor's failure to take advantage of any default or breach of covenant on the part of Sublessee shall not be, or be construed as a waiver thereof, nor shall any custom or practice which may grow up between the parties in the course of administering this instrument be construed to waive or lessen the right of Sublessor to insist upon the performance by Sublessee of any term, covenant or condition hereof, or to exercise any right given it on account of any such default. The acceptance of rent hereunder shall not become or be construed to become a waiver of any term, covenant or condition of this Sublease.

    E.   Sublessee hereby pledges and hypothecates to Sublessor any and all furniture and personal property which Sublessee may bring into or upon the Subleased Premises hereby leased, including such property as may be exempt by law from execution or attachment, to secure the performance under the terms and conditions hereof. Sublessee covenants and agrees that in the event of any default and in addition to any remedies set forth in this article, such furniture shall be subject to a lien on behalf of Sublessor. The enforcement of such lien or forbearance of enforcement shall be at the sole option of Sublessor.

    F.   The rights, powers, elections and remedies of the Sublessor contained in this Sublease shall be construed as cumulative and no one of them is or shall be considered exclusive of the other or exclusive of any rights or remedies allowed by law, and the exercise of one or more rights or powers, elections or remedies shall not impair Sublessor's rights to exercise any other.

#4004 – Charlotte, NC

9

MEIN000720

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ..C6-5CFBAF17541F

G.      If Sublessee shall be in default in the performance of any covenant on his part to be performed under this Sublease, then, after notice and without waiving or releasing Sublessee from the performance thereof, Sublessor may, but shall not be obligated to, perform any such covenant, and in exercising any such right, pay necessary and incidental costs and expenses in connection therewith. All sums so paid by Sublessor, together with interest thereon at the highest rate allowable by law, shall be deemed additional rent and shall be payable to Sublessor on the next rent paying day.

H.      In the event Sublessor desires to commence any action or proceeding for unlawful detainer, non-payment of rent, or for any other breach of this Sublease, Sublessor shall have the right to proceed with such action in any court of competent jurisdiction, and Sublessee agrees not to demand arbitration of such disputes under the Franchise Agreement, or any other ancillary agreement, which is acknowledged to be a contract separate and apart from this Sublease.

I.      Attorney's Fees and Cost of Notice of Default. In the event Sublessor elects, in its sole opinion, to employ an attorney or any other person or firm to service notice and/or demand for any overdue payment of any kind by Lessee or failure or delinquency by Sublessee to perform under the covenants, provisions and conditions of this Sublease, Sublessee shall pay immediately upon demand for all such costs and expenses incurred by Sublessor in addition to any late fees or interest associated therewith.

## IX.
## CONDEMNATION

In the event that any action or proceeding is commenced for condemnation, in exercise of the right of eminent domain, of the Subleased Premises or any portion thereof, or if Sublessor is advised in writing by any government (Federal, State or Municipal) or agency or department or bureau thereof, or any entity or body having the right of power of condemnation, of its intention to condemn the whole or any portion of the Subleased Premises, Sublessee having right of possession of the Subleased Premises at the time thereof, or if the Subleased Premises or any portion thereof be condemned through such action, then and in any of said events:

A.      Sublessor may without any obligation or liability to Sublessee, and without affecting the validity and existence of this Sublease other than as hereafter expressly provided, agree to sell and/or convey to the condemnor or to the Lessor under the Master Lease, without first requiring any action or proceeding be instituted, or if such action or proceeding shall have been instituted, without requiring any trial or hearing thereof (and Sublessor is expressly empowered to stipulate to judgment therein), the Subleased Premises or any portion thereof sought by the condemnor, free from this Sublease and the rights of Sublessee hereunder.

B.      Sublessee shall have no claim against Sublessor under the Master Lease, nor be entitled to any part or portion of the amount that may be paid or awarded as a result of the sale for the reasons as aforesaid or condemnation of the Subleased Premises or any portion thereof, Sublessee hereby assigning, transferring and setting over unto Sublessor the interest, if any, which Sublessee would but for this provision have in, to, upon or against the Subleased

#4004 – Charlotte, NC

MEIN000721

DocuSign Envelope ID: 6F5FD398-8DC7-44B?_____?6-5CFBAF17541F

Premises or any portion thereof, or the amount agreed to be paid and/or awarded and paid to Sublessor or the Lessor under the Master Lease.

C.         If any part of the Subleased Premises shall be taken or condemned as hereinbefore provided, and a part thereof remains which is suitable for the use contemplated hereunder, this Sublease shall, as to the part so taken, terminate as of the date title shall vest in the condemnor and the rent payable hereunder shall be adjusted for the remainder of the term as of the date of such termination in the same proportion as provided in the Master Lease. If all of the Subleased Premises be taken or condemned as hereinbefore provided, or so much thereof that the contemplated use shall be substantially impaired in the judgment of Sublessor, this Sublease shall thereupon terminate.

## X.
## COMPLIANCE WITH LAW, LIMITATIONS OF USE

A.         Sublessee, at Sublessee's expense, shall comply with all laws, rules, orders, ordinances, directions, regulations and requirements of Federal, State, County and Municipal authorities, now in force or which may later be in force, which shall impose any duty upon Sublessor or Sublessee as to the use, occupation or alteration of the Subleased Premises, including without limitation, The Americans With Disabilities Act of 1990.

B.         Notwithstanding any provision in the Master Lease to the contrary, Sublessee shall not cause or permit any "Hazardous Materials" (as defined below) to be used, generated, stored or disposed of near, on, under or about or transported to or from, the Subleased Premises (collectively "Hazardous Materials Activities") except as necessary for Sublessee's use of the Subleased Premises, as provided herein, and permitted by applicable law. Sublessee shall conduct any and such permissible Hazardous Materials Activities in strict compliance (at Sublessee's expense) with "Governmental Regulation" (as defined below) and using all necessary and appropriate precautions. Sublessor shall not be liable for any Hazardous Materials Activities by Sublessee, Sublessee's employees, agents, contractors, licensees or invitees. Sublessee shall indemnify, defend (with counsel acceptable to Sublessor) and hold Sublessor harmless from and against any claims, judgments, damages, penalties, fines, costs, liabilities and/or losses (including, without limitation, diminution in value of the Subleased Premises) arising out of or in connection with any Hazardous Material Activities. Such indemnification of Sublessor by Sublessee shall include, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any court or federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on, under or adjacent to the Subleased Premises. Without limiting the foregoing, in the event of any contamination of the Subleased Premises or any adjacent land by Hazardous Materials, Sublessee shall promptly take all actions, at its sole expense, as are necessary to return the Subleased Premises and any such adjacent land contaminated by such Hazardous Materials to the condition existing prior to the introduction of any such Hazardous Materials; provided that Sublessor's written approval of such actions shall first be obtained. Sublessee shall provide Sublessor with a copy of all Hazardous Materials inventory statements and updates filed and/or required by any applicable Governmental Regulation. Sublessee shall immediately notify Sublessor both by telephone and in writing of any spill, release or unauthorized discharge of Hazardous Materials or of any condition

#4004 – Charlotte, NC

MEIN000722

DocuSign Envelope ID: 6F5FD398-8DC7-44B__6-5CFBAF17541F

constituting an "imminent hazard" under Governmental Regulations. Sublessor and/or its representatives and employees may enter the Subleased Premises at any time during the term of this Sublease to inspect Sublessee's compliance herewith. Sublessee acknowledges and agrees that any recommendation and/or other involvement by Sublessor in the construction, operation and/or maintenance of the Subleased Premises does not constitute any promise, representation, warranty or other assurance of any nature whatsoever that compliance with said recommendation will satisfy Governmental Regulations. Notwithstanding anything to the contrary provided in this Sublease, Sublessee hereby assumes all responsibility for compliance with Governmental Regulations and waives all action and/or defenses available to Sublessee, if any, against Sublessor relating to any recommendations and/or other involvement by Sublessor at any time in the construction, operation and/or maintenance of the Subleased Premises. The indemnification of Sublessor by Sublessee contained in Article VII and this Article XI shall continue in full force and effect notwithstanding the expiration or termination of this Sublease or any assignment, or other transfer of any of Sublessee's interest hereunder. Sublessee acknowledges that no consent to any assignment or other transfer by Sublessee described in Article VIII, shall in any way limit or waive Sublessee's obligations under this Paragraph.

C.       Notwithstanding the absence of any specific requirement set forth in Governmental Regulations, Lessee shall (1) take such actions as may be necessary to prevent mixing of used oil with any hazardous wastes, substances or materials, and (2) only employ or contract with licensed and qualified used oil transporters and recyclers and, where appropriate, licensed and qualified hazardous waste transporters and disposal facilities.

D.       "Hazardous Materials." For the purpose of this Sublease, Hazardous Materials shall include, but not be limited to, (a) "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. Section 9601 et seq.), as amended, or any successor statute in effect during the Lease term, (b) "hazardous material" as defined in the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.), as amended, or any successor statue in effect during the Lease term, (c) "hazardous waste," "solid waste," "sludge," "used oil," "recycled oil," "lubricating oil" and "re-refined oil" as defined in the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.), as amended, or any successor statute in effect during the Lease term, (d) "hazardous substance" as defined in the Clean Water Act (33 U.S.C. Section 1251 et seq.), as amended, or any successor statue in effect during the Lease term, or (e) any substances, materials or wastes listed in (1) the United States Department of Transportation Hazardous Materials Table (49 C.F.R. Section 172.101), as amended; (2) the Environmental Protection Agency list (40 C.F.R. Part 302), as amended; or (3) any other list published by any federal or state governmental entity, or (f) a "hazardous air pollutant" under The Federal Clean Air Act (42 U.S.S. Section 74112) as amended, or any successor statute in effect during the Lease term; or (g) toxic or hazardous pursuant to regulations promulgated now or later under any of the aforementioned laws; or (h) presenting a risk to human health or the environment under other applicable Federal, State, or local laws, ordinances, or regulations, as now or as may be passed or promulgated in the future; or (i) any substance that after release into the environment and upon exposure, ingestion, inhalation or assimilation will or may reasonably be anticipated to cause death, disease, behavior abnormalities, cancer or genetic abnormalities, or (j) asbestos, petroleum

#4004 – Charlotte, NC

MEIN000723

DocuSign Envelope ID: 6F5FD398-8DC7-44B:...:6-5CFBAF17541F

and any petroleum by-products, formaldehyde, poly-chlorinated biphenyls (PCBs) and urea formaldehyde.

      E.       For purposes of this Sublease, "Governmental Regulations" refer to all laws, statutes, rules and regulations referenced in Paragraph D. above or otherwise pertaining to, relating to and governing the use, generation, manufacture, production, storage, disposition or release of Hazardous Materials.

## XI.
## SUBORDINATION

Sublessee expressly agrees that this Sublease and Sublessee's rights hereunder shall be subject and subordinate to all Master Leases, mortgages, deeds or trust or any other encumbrances now or hereafter placed, charged or enforced against the Subleased Premises or any land, buildings or improvements included thereon or of which the Subleased Premises are a part of any portion or portions thereof. Sublessee further agrees to execute at any time, and from time to time, such documents as may be required to effectuate such subordination, and upon failure to execute any such documents at Sublessor's request, Sublessor shall be, and hereby is, appointed Sublessee's attorney-in-fact to do so.

## XII.
## NOTICES

Any notice required or permitted to be given hereunder shall be in writing and shall be served upon the other party personally or by registered or certified mail, postage prepaid. Any notice to Sublessor shall be addressed to it at 440 South Church Street, Suite 700, Charlotte, North Carolina 28202, Attention: The President. Any notice to Sublessee may be addressed to him at the address of the Subleased Premises. Either party may designate another address at any time by appropriate written notice to the other. Service of any notice or demand by mail shall be deemed complete and shall be effective forty-eight (48) hours after the time the same is deposited in the United States mails as aforesaid.

## XIII.
## INCORPORATION OF MASTER LEASE

The provisions of the Master Lease are incorporated by reference into, and made a part of this Sublease, except for the following paragraphs N/A. If there is conflict between provisions in the Master Lease and this Sublease, the Master Lease shall control, except for Article II and Article IV, in which provisions of the Sublease shall control. Sublessee hereby expressly assumes and agrees to perform all of the obligations and covenants required by the Master Lease to be kept or performed by Sublessor as the Lessee thereof. Sublessor agrees to maintain the Master Lease during the entire term of this Sublease, subject, however, to any earlier termination of the Master Lease without fault of Sublessor, and to pay all rents and taxes provided for therein in accordance with the terms of the Master Lease. Notwithstanding the foregoing, Sublessee shall not be required to pay the rent or the taxes payable by Sublessor as Lessee under the Master Lease so long as he pays the rent and other sums payable to Sublessor by Sublessee pursuant to this Sublease.

#4004 – Charlotte, NC

MEIN000724

DocuSign Envelope ID: 6F5FD398-8DC7-44B...6-5CFBAF17541F

This Sublease is subject to all of the provisions of the Master Lease, and Sublessee shall not permit any act or omission to act that will violate or breach any provisions of the Master Lease, including, but not limited to, non-competition by other tenants of a development to which the Subleased Premises are a part, or are associated. Sublessee shall indemnify and hold Sublessor harmless of any act(s) committed in direct or indirect violation of such provisions, or as a result of Master Lessor's failure, inability, whether temporary or indefinite, or refusal to enforce such provisions, as provided under Article VII above.

Sublessee acknowledges that there may be certain provisions in the Master Lease, including, but not limited to, a provision against competition among the tenants of the development in which the Subleased Premises are located, requiring performance by other tenants and subtenants within the development or by the Master Lessor. Sublessor shall not be liable for any breach or default of any such provision by any other such tenant or subtenant within the development or by the Master Lessor, or for Master Lessor's failure, inability (whether temporary or indefinite), or simple refusal, to enforce such provisions. Sublessee further acknowledges that Sublessor shall have no obligation whatsoever to require the Master Lessor to enforce any provision of the Master Lease.

## XIV.
## MISCELLANEOUS

A.      The language and parts of this Sublease shall be construed according to their fair meaning and not strictly for or against either Sublessee or Sublessor.

B.      The captions of the Articles of this Sublease are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Sublease.

C.      Unless otherwise stated hereinabove, any sum accruing to Sublessor under the provisions of this Sublease which shall not be paid when due shall bear interest at the highest rate permissible by law from the date notice specifying such non-payment is served on the defaulting party, until paid.

D.      Neither this Sublease nor this Paragraph D of this Article is subject to modification except in writing signed by all of the parties.

E.      The parties agree that the law of the jurisdiction where the Leased Premises are located shall apply except that the conflict of laws for that jurisdiction shall not apply or serve to change the agreement of the parties as to the applicable law.

F.      SUBLESSEE, HAS READ AND UNDERSTANDS ALL SECTIONS OF THE SUBLEASE AND ALL OF ITS PROVISIONS, INCLUDING, BUT NOT LIMITED TO THEIR RESPONSIBILITY REGARDING THE MAINTENANCE AND REPAIR

#4004 – Charlotte, NC

14

MEIN000725

DocuSign Envelope ID: 6F5FD398-8DC7-44B6-...-C6-5CFBAF17541F

OBLIGATIONS AS STATED IN SECTION V, SUBSECTIONS A-E OF THIS REAL PROPERTY SUBLEASE.

THIS SUBLEASE has been executed by the parties on ___August 29, 2014___.

**SUBLESSOR:**

MEINEKE REALTY, INC.
a North Carolina corporation

By: _Noah Pollack_____
Authorized Representative

**SUBLESSEE:**
**CJGL, INC.**
a California corporation

By: _Carl Douma_____
Carl Douma

By: _Jan Douma_____
Jan Douma

Attachments:

      Exhibit A - Master Lease
      Exhibit B - Schedule of Rent

#4004 – Charlotte, NC

MEIN000726

DocuSign Envelope ID: 6F5FD398-8DC7-44B...6-5CFBAF17541F

EXHIBIT A

# AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1.     **Basic Provisions ("Basic Provisions").**

    1.1   **Parties:** This Lease ("Lease"), dated for reference purposes only _July 1, 2011_
is made by and between _Maurice and Mary Sourmany Trustees of the Sourmany 2006 Trust_

("Lessor")
and _Econo Lube and Tune, Inc._

("Lessee"),
(collectively the "Parties," or individually a "Party").

    1.2   **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as _3956 State Street_
located in the County of _Santa Barbara_, State of _California_,
and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project) _automotive repair and service facility_

("Premises"). (See also Paragraph 2)

    1.3   **Term:** _five_ years and _no_ months ("Original Term") commencing _July 1, 2011_
("Commencement Date") and ending _June 30, 2016_ ("Expiration Date"). (See also Paragraph 3)

    1.4   **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing _currently in possession_ ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

    1.5   **Base Rent:** $_7,000.00_ per month ("Base Rent"), payable on the _first_ day of
each month commencing _July 1, 2011. Rental payments to be electronically deposited._
. (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _59_

    1.6   **Base Rent and Other Monies Paid Upon Execution:**

        (a)   Base Rent: $_7,000.00_ for the period _July 2011_

        (b)   Security Deposit: $ _-0-_ ("Security Deposit"). (See also Paragraph 5)

        (c)   Association Fees: $_____ for the period _____

        (d)   Other: $_____ for _____

        (e)   Total Due Upon Execution of this Lease: $_____

    1.7   **Agreed Use:** _automotive repair and service facility_

. (See also Paragraph 6)

    1.8   **Insuring Party:** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

    1.9   **Real Estate Brokers:** (See also Paragraph 15)

        (a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☐ _____ represents Lessor exclusively ("Lessor's Broker");

☐ _____ represents Lessee exclusively ("Lessee's Broker"); or

☐ _____ represents both Lessor and Lessee ("Dual Agency").

        (b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to

PAGE 1 OF 22

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000727

DocuSign Envelope ID: 6F5FD398-8DC7-44B_-_C6-5CFBAF17541F

in their separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

      1.10    **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____
_____ ("Guarantor").  (See also Paragraph 37)

      1.11    **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☒ an Addendum consisting of Paragraphs 51_____ through 59____ ;
☒ a plot plan depicting the Premises;
☐ a current set of the Rules and Regulations;
☐ a Work Letter;
☒ other (specify): <u>original lease and inspection reports and Option to Extend</u>
_____

_____

2.      **Premises.**

      2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different.  Note: Lessee is advised to verify the actual size prior to executing this Lease.

      2.2    **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense.  The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building.  If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.

      2.3    **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed.  Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.  If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense.  If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.  If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

            (a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent.  If Lessee elects termination, Lessee shall immediately cease

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000728

DocuSign Envelope ID: 6F5FD398-8DC7-44B__:___6-5CFBAF17541F

the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4    Acknowledgements. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

3.    Term.

3.1    Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2    Early Possession. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3    Delay in Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are

PAGE 3 OF 22

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000729

DocuSign Envelope ID: 6F5FD398-8DC7-44E⋯C6-5CFBAF17541F

reached between Lessor and Lessee, in writing.

    3.4    **Lessee Compliance.** Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.    **Rent.**

    4.1.    **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

    4.2    **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

    4.3    **Association Fees.** ~~In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owners' association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.~~

5.    **Security Deposit.** ~~Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.~~

6.    **Use.**

    6.1    **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessee elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

    6.2    **Hazardous Substances.**

_____
INITIALS

NP
M.S.
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000730

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

(a) **Reportable Uses Require Consent.** The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. **"Reportable Use"** shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e) **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease,

PAGE 5 OF 22

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000731

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3    **Lessee's Compliance with Applicable Requirements.**  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether such Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    **Inspection; Compliance.**  Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.

7.    Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.

7.1    **Lessee's Obligations.**

(a) **In General.**  Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.  Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b) **Service Contracts.**  Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises:  (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers.  However, Lessor

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000732

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and  Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)  **Failure to Perform.**    If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)  **Replacement.**    Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month).  Lessee shall pay interest on the unamortized balance  but may prepay its obligation at any time.

7.2      **Lessor's Obligations.**    Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee.  It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3      **Utility Installations; Trade Fixtures; Alterations.**

(a)  **Definitions.**    The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises.  The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises.  The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion.  "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)  **Consent.**    Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent  in any one year.  Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner.  Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)  **Liens; Bonds.**    Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein.  Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility.  If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4      **Ownership; Removal; Surrender; and Restoration.**

(a)  **Ownership.**    Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000733

DocuSign Envelope ID: 6F5FD398-8DC7-44B___06-5CFBAF17541F

Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    **Insurance; Indemnity.**

8.1    **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

8.2    **Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3    **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-B/08E

MEIN000734

DocuSign Envelope ID: 6F5FD398-8DC7-44E___C6-5CFBAF17541F

factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4 **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5 **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6 **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7 **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8 **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000735

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

**8.9     Failure to Provide Insurance.**  Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

**9.     Damage or Destruction.**

**9.1     Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance , in, on, or under the Premises which requires remediation.

**9.2     Partial Damage - Insured Loss.**  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

**9.3     Partial Damage - Uninsured Loss.**  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000736

DocuSign Envelope ID: 6F5FD398-8DC7-44B __ 36-5CFBAF17541F

soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    **Total Destruction.**  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    **Damage Near End of Term.**  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.**  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.**  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    **Termination; Advance Payments.**  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.    **Real Property Taxes.**

10.1    **Definition.**  As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2    **Payment of Taxes.**  In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000737

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent.  Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent.  When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes.  If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary.  Advance payments may be intermingled with other moneys of Lessor and shall not bear interest.  In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3    **Joint Assessment.**  If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4    **Personal Property Taxes.**  Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.**  Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.  If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed.  There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

12.1    **Lessor's Consent Required.**

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

~~(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.~~

~~(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.~~

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or subletting shall:  (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

INITIALS
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000738

DocuSign Envelope ID: 6F5FD398-8DC7-44B ... 6-5CFBAF17541F

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    **Default; Breach; Remedies.**

13.1    **Default; Breach.** A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000739

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    Remedies. If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000740

DocuSign Envelope ID: 6F5FD398-8DC7-44B   6-5CFBAF17541F

greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture. Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges. Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest. Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessor.

(a) Notice of Breach. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach of performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor. In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation. If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in

PAGE 15 OF 22

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000741

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ...6-5CFBAF17541F

utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    Brokerage Fees.

15.1.    **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that:  (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then,  Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.

15.2    **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder.  Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3    **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.    Estoppel Certificates.

(a) Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    **Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.    **Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

PAGE 16 OF 22

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000742

DocuSign Envelope ID: 6F5FD398-8DC7-44B:...:6-5CFBAF17541F

19.     **Days.**  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.     **Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.     **Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.     **No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.     **Notices.**

23.1     **Notice Requirements.**  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2     **Date of Notice.**  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     **Waivers.**

(a)     No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)     The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)     THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.     **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)     When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)     **Lessor's Agent.**  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party

**PAGE 17 OF 22**

---

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000743

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...6-5CFBAF17541F

any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii) **Lessee's Agent.** An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. **To the Lessee:** A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. **To the Lessee and the Lessor:** a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii) **Agent Representing Both Lessor and Lessee.** A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)      Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)      Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.      **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. ~~In the event that Lessee holds-over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.~~ Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.      **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.      **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.      **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.      Subordination; Attornment; Non-Disturbance.

30.1      **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice hereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2      **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Devise to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of

---

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000744

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...6-5CFBAF17541F

ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a **"Non-Disturbance Agreement"**) from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.  Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4    **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    **Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment.  The term, **"Prevailing Party"** shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense.  The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.  In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.    **Lessor's Access; Showing Premises; Repairs.**  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises.  All such activities shall be without abatement of rent or liability to Lessee.

33.    **Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent.  Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    **Signs.**  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof.  Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent.  All signs must comply with all Applicable Requirements.

35.    **Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies.  Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    **Consents.**  Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed.  Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor.  Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent.  The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given.  In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000745

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...-6-5CFBAF17541F

37.     **Guarantor.**

37.1     **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2     **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.     **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.     **Options.** If Lessee is granted an Option, as defined below, then the following provisions shall apply:

39.1     **Definition.** "**Option**" shall mean:  (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2     **Options Personal To Original Lessee.**  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3     **Multiple Options.**  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4     **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option:  (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.     **Multiple Buildings.** If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform.  Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41.     **Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same.  Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.     **Reservations.**  Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee.  Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.     **Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.

44.     **Authority; Multiple Parties; Execution.**

(a)     If either Party hereto is a corporation, trust, limited liability company,  partnership, or similar entity, each individual

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000746

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...26-5CFBAF17541F

executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)     If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)     This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.     **Conflict.** Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.     **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.     **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.     **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49.     **Arbitration of Disputes.** An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

50.     **Americans with Disabilities Act.** Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:** IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| Executed at: *SANTA BARBARA, CA* | Executed at: *Charlotte, NC* |
|---|---|
| On: *1-24-13* | On: *November 2, 2012* |
| By LESSOR: | By LESSEE: |
| Maurice and Mary Sourmany Trustees of the Sourmany 2006 Trust | Econo Lube and Tune, Inc. |

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000747

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-___6-5CFBAF17541F

By: _Maurice Sourmany_

Name Printed: Maurice Sourmany

Title: Trustee

By: _Mary Sourmany_

Name Printed: Mary Sourmany

Title: Trustee

Address: _____

Telephone:( ) _____

Facsimile:( ) _____

Federal ID No. _____

By: _Noah Pollick_

Name Printed: Paul Baratta _Noah Pollick_

Title: Executive Vice President

By: _Paul Baratta_

Name Printed: _Paul Baratta_

Title: _Dir Finance Operations_

Address: _128 S. Tryon St_
_Charlotte   NC   28202_

Telephone:(704) _377 8855_

Facsimile:( ) _____

Federal ID No. _____

**BROKER:**

Attn: _____

Title: _____

Address: _____

Telephone:( ) _____

Facsimile:( ) _____

Federal ID No. _____

**BROKER:**

Attn: _____

Title: _____

Address: _____

Telephone:( ) _____

Facsimile:( ) _____

Federal ID No. _____

**NOTICE:** These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association. All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

---

INITIALS

**PAGE 22 OF 22**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000748

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...26-5CFBAF17541F



# ADDENDUM

Date: ~~Jan. 17, 2012~~   *July 1, 2011*

**By and Between (Lessor)** <u>Maurice and Mary Sourmany, Trustees</u>

<u>(Lessee) Econo Lube and Tune</u>

**Address of Premises:** <u>3956 State Street</u>

<u>Santa Barbara, CA 93105</u>

Paragraph _____

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

51. The original Real Property Lease , hereinafter "Lease" between The Sourmany Trustees and Econo Lube and Tune, Inc dated 2-10-89 is incorporated herein by reference.

52. The Lease expired by its own terms and continued on as a month-to-month tenancy.

53. Pursuant to Paragraph 9.1 of the Lease, certain obligations tobe performed by Lessee remained unfulfilled.

54. Lessee remaining obligations concern corrective work and maintenance issues pursuant to the original Lease. Lessor has had inspections performed by Lenz Pest control and De Vries Building Consultants. Both reports call for corrective work; copies of both reports are attched hereto.

55. As an express condition of entering into the new Lease, Lessee at their sole expense shall have the corrective work called out in both reports completed by a license and bonded contractor within one hundred twenty days (120) from the execution of the Lease. Prior to the commencement of work, Lessee shall provide a copy of the propoeed contract to Lessor for approval.

56. There shall be no rent abatement during the time the corrective work is performed.

57. Rental Increases. The rental rate will remain the same for the first two years of the lease. Commencing July 1, 2013 and on each anniversary date thereafter, the base rent will be adjusted by any increase in the Consumer Price Index (CPI), (All Urban Consumers) for L.A./Riverside Orange County. The new rate shall be calculated as follows: The monthly base rent, as paid in the initial term of the lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month two months before the month the increase takes effect (May 2013), and the denominator of which shall be the CPI for the calendar month two

PAGE 1 OF 2

_____
INITIALS

_____
INITIALS

MEIN000749

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-___-6-5CFBAF17541F

months before the original lease term commences (May 2011). This sum so calculated shall constitute the new monthly rental rate hereunder, but in no event shall such new monthly rent be less than the rent payable for the month immediately preceding the date for the rent adjustment. The minimum increase will be at two percent (2%) and the maximum increase will be four percent (4%).

5B.  Lessor and Lessee agree that if professional property management is obtained, it will be included as a triple net expense.

INITIALS

INITIALS

MEIN000750

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...C6-5CFBAF17541F



# OPTION(S) TO EXTEND
### STANDARD LEASE ADDENDUM

Dated     ~~Jan. 27, 2012~~ *July 1, 2011*

By and Between (Lessor) Maurice and Mary Sourmany, Trustees

By and Between (Lessee) Econo Lube and Tune

Address of Premises: 3956 State Street

Santa Barbara, CA 93105

Paragraph 59

**A.   OPTION(S) TO EXTEND:**
Lessor hereby grants to Lessee the option to extend the term of this Lease for two (2)          additional sixty (60
month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i)   In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least three  but not more than   six   months prior to the date that the option period would commence, time being of the essence. If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire.  Options (if there are more than one) may only be exercised consecutively.

(ii)   The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

(iii)   Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

(iv)   This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v)   The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:
(Check Method(s) to be Used and Fill in Appropriately)

☐   I.   **Cost of Living Adjustment(s) (COLA)**
a.   On (Fill in COLA Dates): _____

the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area):

All Items (1982-1984 = 100), herein referred to as "CPI".

b.   The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): ☐ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐

_____
INITIALS

PAGE 1 OF 3

_____
INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OE-3-8/00E

MEIN000751

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-      6-5CFBAF17541F

(Fill in Other "Base Month"):

The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent be less than the rent payable for the month immediately preceding the rent adjustment.

c.   In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☑   II.   Market Rental Value Adjustment(s) (MRV)

a.   On (Fill in MRV Adjustment Date(s)) <u>upon exercise of the first and second option</u>

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1)   Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached, within thirty days, then:

(a)   Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties, or

(b)   Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

(i)   Within 15 days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii)   The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii)   If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv)   The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

2)   Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.   Upon the establishment of each New Market Rental Value:

1)   the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and
2)   the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☐   III.   Fixed Rental Adjustment(s) (FRA)
The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

B.   NOTICE:
Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.   BROKER'S FEE:
The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

PAGE 2 OF 3

_____
INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OE3-8/00E

MEIN000752

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ...C6-5CFBAF17541F

NOTICE:  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR Commercial Real Estate Association,  800 W 6th Street, Suite 800, Los Angeles, CA 90017.  Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

PAGE 3 OF 3

INITIALS

INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OE3-8/00E

MEIN000753

DocuSign Envelope ID: 6FSFD398-8DC7-44B3-ABC6-5CFBAF17541F

Exhibit B

**Store 4118**

|  | Base Rent | Personal PropTax | Rptax Impound | Total Due |
|---|---|---|---|---|
| Security Deposit | $    - |  |  | $    - |
| Sep-14 | -$    8,386.41 |  | $    629.02 | $    9,015.43 |
| Oct-14 | $    8,386.41 |  | $    629.02 | $    9,015.43 |
| Nov-14 | $    8,386.41 |  | $    629.02 | $    9,015.43 |
| Dec-14 | $    8,386.41 |  | $    629.02 | $    9,015.43 |
| Jan-15 | $    8,386.41 | ** | $    641.60 | $    9,028.01 |
| Feb-15 | $    8,386.41 |  | $    641.60 | $    9,028.01 |
| Mar-15 | $    8,386.41 |  | $    641.60 | $    9,028.01 |
| Apr-15 | $    8,386.41 |  | $    641.60 | $    9,028.01 |
| May-15 | $    8,386.41 |  | $    641.60 | $    9,028.01 |
| Jun-15 | *  $    8,638.00 |  | $    641.60 | $    9,279.60 |
| Jul-15 | $    8,638.00 |  | $    641.60 | $    9,279.60 |
| Aug-15 | $    8,638.00 |  | $    641.60 | $    9,279.60 |
| Sep-15 | $    8,638.00 |  | $    641.60 | $    9,279.60 |

First cpi inc Jan 1, 2015

\* Rent increased by 3% minimum per Section IV, Subsection A, Paragraph 6 of the sublease although increase could be greater depending on cpi calculation.

\*\* Taxes were adjusted using a 2% cost of living increase. Exact increase, if any, will depend on actual tax rate.

Prepared
Reviewed            Darin Shay

MEIN000754

# EXHIBIT "C"

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

EXHIBIT A

## AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1. **Basic Provisions ("Basic Provisions").**

1.1 **Parties:** This Lease ("Lease"), dated for reference purposes only _July 1, 2011_
is made by and between _Maurice and Mary Sourmany Trustees of the Sourmany 2006 Trust_
("Lessor")
and _Econo Lube and Tune, Inc._
("Lessee"),
(collectively the "Parties," or individually a "Party").

1.2 **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as _3956 State Street_
located in the County of _Santa Barbara_ , State of _California_
and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project)
_automotive repair and service facility_

("Premises"). (See also Paragraph 2)

1.3 **Term:** _five_ years and _no_ months ("Original Term") commencing _July 1, 2011_
("Commencement Date") and ending _June 30, 2016_ ("Expiration Date"). (See also Paragraph 3)

1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing _currently in possession_ ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5 **Base Rent:** $_7,000.00_ per month ("Base Rent"), payable on the _first_ day of each month commencing _July 1, 2011._   _Rental payments to be electronically deposited._
. (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _59_

1.6 **Base Rent and Other Monies Paid Upon Execution:**

(a) Base Rent: $_7,000.00_ for the period _July 2011_

(b) Security Deposit: $ _-0-_ ("Security Deposit"). (See also Paragraph 5)

(c) Association Fees: $___ for the period ___

(d) Other: $___ for ___

(e) Total Due Upon Execution of this Lease: $___

1.7 **Agreed Use:** _automotive repair and service facility_

. (See also Paragraph 6)

1.8 **Insuring Party:** Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

1.9 **Real Estate Brokers:** (See also Paragraph 15)

(a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☐ ___ represents Lessor exclusively ("Lessor's Broker");

☐ ___ represents Lessee exclusively ("Lessee's Broker"); or

☐ ___ represents both Lessor and Lessee ("Dual Agency").

(b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to

___
INITIALS

PAGE 1 OF 22

_NP_
_M.S._
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000727

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

in their separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

      1.10    **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____
_____ ("Guarantor").  (See also Paragraph 37)

      1.11    **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs 51_____ through 59_____ ;

☑ a plot plan depicting the Premises;

☐ a current set of the Rules and Regulations;

☐ a Work Letter;

☑ other (specify): <u>original lease and inspection reports and Option to Extend</u>
_____

_____

2.      **Premises.**

      2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different.  Note: Lessee is advised to verify the actual size prior to executing this Lease.

      2.2    **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense.  The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building.  If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.

      2.3    **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed.  Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.  If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense.  If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.  If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

            (a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent.  If Lessee elects termination, Lessee shall immediately cease

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

_____
INITIALS

FORM STN-11-8/08E

MEIN000728

DocuSign Envelope ID: 6F5FD398-8DC7-44B...6-5CFBAF17541F

the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4     Acknowledgements. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5     Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

3.      Term.

3.1     Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2     Early Possession. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3     Delay In Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are

INITIALS                                                                                                                                            INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                   FORM STN-11-8/08E

MEIN000729

DocuSign Envelope ID: 6F5FD398-8DC7-44E⋯C6-5CFBAF17541F

reached between Lessor and Lessee, in writing.

**3.4    Lessee Compliance.**  Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5).  Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance.  Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.    Rent.**

**4.1.    Rent Defined.**  All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

**4.2    Payment.**    Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar.  In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease.  Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month.  Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing.  Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.  In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future payments be paid by cashier's check.  Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

**4.3 .    Association Fees.**  ~~In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owners' association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.~~

**5.    Security Deposit.**  ~~Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.~~

**6.    Use.**

**6.1    Use.**  Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose.  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessee elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

**6.2    Hazardous Substances.**

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000730

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

(a) **Reportable Uses Require Consent.**  The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory.  Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements.  "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties.  Notwithstanding the foregoing,  Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor.  In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) **Duty to Inform Lessor.**  If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.**  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.**  Lessee shall indemnify,  defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e) **Lessor Indemnification.**  Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation,  which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) **Investigations and Remediations.**  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment.  Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.**  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease,

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000731

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3     **Lessee's Compliance with Applicable Requirements.**  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether such Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4     **Inspection; Compliance.**  Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.

7.      Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.

7.1     **Lessee's Obligations.**

(a) **In General.**  Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.  Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b) **Service Contracts.**  Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises:  (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers; However, Lessor

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000732

DocuSign Envelope ID: 6F5FD398-8DC7-44B.    C6-5CFBAF17541F

reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and  Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) **Failure to Perform.**   If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof. .

(d) **Replacement.**  Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month).  Lessee shall pay interest on the unamortized balance  but may prepay its obligation at any time.

7.2      **Lessor's Obligations.**  Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee.  It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3      **Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions.**  The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises.  The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises.  The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion.  "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) **Consent.**  Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent.  Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent  in any one year.  Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner.  Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) **Liens; Bonds.**  Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein.  Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility.  If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4      **Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.**  Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000733

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8.**      **Insurance; Indemnity.**

**8.1**      **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

**8.2**      **Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

**8.3**      **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a

PAGE 8 OF 22

INITIALS _____

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-B/08E

MEIN000734

DocuSign Envelope ID: 6F5FD398-8DC7-44E   C6-5CFBAF17541F

factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4     **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5     **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6     **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7     **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8     **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000735

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    **Failure to Provide Insurance.**  Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.    **Damage or Destruction.**

9.1    **Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance , in, on, or under the Premises which requires remediation.

9.2    **Partial Damage - Insured Loss.**  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose.  Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs.   In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to:  (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.  Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    **Partial Damage - Uninsured Loss.**  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000736

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4     **Total Destruction.**  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5     **Damage Near End of Term.**  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6     **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.**  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.**  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7     **Termination; Advance Payments.**  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.     **Real Property Taxes.**

10.1     **Definition.**  As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located.  Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2     **Payment of Taxes.**  In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date.  If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated.  In the event Lessee incurs a late charge on any Rent payment, Lessor

_____
INITIALS

_____
M.S.
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000737

DocuSign Envelope ID: 6F5FD398-8DC7-44B_____C6-5CFBAF17541F

may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent.  Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent.  When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes.  If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary.  Advance payments may be intermingled with other moneys of Lessor and shall not bear interest.  In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

      10.3    **Joint Assessment.**  If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

      10.4    **Personal Property Taxes.**  Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.**  Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.  If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed.  There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

      12.1    **Lessor's Consent Required.**

          (a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "**assign or assignment**") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

          ~~(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.~~

          ~~(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.~~

          (d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

          (e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

          f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

          (g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

      12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

          (a) Regardless of Lessor's consent, no assignment or subletting shall:  (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000738

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-B6-5CFBAF17541F

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    **Default; Breach; Remedies.**

13.1    **Default; Breach.** A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000739

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    Remedies.  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM STN-11-8/08E

MEIN000740

DocuSign Envelope ID: 6F5FD398-8DC7-44B...C6-5CFBAF17541F

greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture. Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges. Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest. Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessor.

(a) Notice of Breach. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor. In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation. If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000741

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ...36-5CFBAF17541F

utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.     Brokerage Fees.

15.1.     Additional Commission. In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that:  (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then,  Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.

15.2     Assumption of Obligations. Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3     Representations and Indemnities of Broker Relationships. Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.     Estoppel Certificates.

(a) Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.     Definition of Lessor.  The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.     Severability.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

PAGE 16 OF 22

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000742

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ...6-5CFBAF17541F

19.     **Days.**  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.     **Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.     **Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.     **No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.     **Notices.**

        **23.1     Notice Requirements.**  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

        **23.2     Date of Notice.**  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon.  If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     **Waivers.**

        (a)     No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

        (b)     The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

        (c)     THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.     **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

        (a)     When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

                (i)     Lessor's Agent.  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations: To the Lessor:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  To the Lessee and the Lessor:  a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000743

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...6-5CFBAF17541F

any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)   **Lessee's Agent.** An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations.  To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties.  b. A duty of honest and fair dealing and good faith.  c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)   **Agent Representing Both Lessor and Lessee.** A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.

(b)   Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)   Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.   **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds-over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.   **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.   **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.   **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.   Subordination; Attornment; Non-Disturbance.

30.1   **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device  by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2   **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Devise to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of

PAGE 18 OF 22

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000744

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...6-5CFBAF17541F

ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    Non-Disturbance.   With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.  Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4    Self-Executing.  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    Attorneys' Fees.  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment.  The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense.  The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.  In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.    Lessor's Access; Showing Premises; Repairs.  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises.  All such activities shall be without abatement of rent or liability to Lessee.

33.    Auctions.  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent.  Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    Signs.  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof.  Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent.  All signs must comply with all Applicable Requirements.

35.    Termination; Merger.  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies.  Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    Consents.  Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed.  Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor.  Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent.  The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given.  In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

PAGE 19 OF 22

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000745

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...6-5CFBAF17541F

37.     **Guarantor.**

37.1     **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2     **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.     **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.     **Options.** If Lessee is granted an Option, as defined below, then the following provisions shall apply:

39.1     **Definition. "Option"** shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2     **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3     **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4     **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.     **Multiple Buildings.** If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform.  Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41.     **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same.  Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.     **Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee.  Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.     **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.

44.     **Authority; Multiple Parties; Execution.**

(a)     If either Party hereto is a corporation, trust, limited liability company,  partnership, or similar entity, each individual

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000746

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-__C6-5CFBAF17541F

executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

        **(b)**    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

        **(c)**    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**45.**    **Conflict.**  Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**46.**    **Offer.**  Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**47.**    **Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**48.**    **Waiver of Jury Trial.**  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

**49.**    **Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

**50.**    **Americans with Disabilities Act.**  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

<u>ATTENTION:</u> NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

<u>WARNING:</u> IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| Executed at: *SANTA BARBARA, CA* | Executed at: *Charlotte, NC* |
|---|---|
| On: *1-24-13* | On: *November 2, 2012* |
| By LESSOR: | By LESSEE: |
| Maurice and Mary Sourmany Trustees of the Sourmany 2006 Trust | Econo Lube and Tune, Inc. |

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

MEIN000747

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-___6-5CFBAF17541F

By: _Maurice Sourmany_          By: _____
Name Printed: Maurice Sourmany    Name Printed: ~~Paul Baratta~~ Noah Pollick
Title: Trustee                    Title: Executive Vice President
By: _Mary Sourmany_               By: _Paul Baratta_
Name Printed: Mary Sourmany       Name Printed: Paul Baratta
Title: Trustee                    Title: Dir Finance Operations
Address: _____  Address: 128 S. Tryon St
                                  Charlotte NC 28202

Telephone:(___) _____   Telephone:(704) 377 8855
Facsimile:(___) _____   Facsimile:(___) _____
Federal ID No. _____    Federal ID No. _____

BROKER:                           BROKER:

_____           _____

Attn: _____     Attn: _____
Title: _____    Title: _____
Address: _____  Address: _____

Telephone:(___) _____   Telephone:(___) _____
Facsimile:(___) _____   Facsimile:(___) _____
Federal ID No. _____    Federal ID No. _____

**NOTICE:** These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association. All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

_____
INITIALS

PAGE 22 OF 22

_NP_
_MS_
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION.

FORM STN-11-8/08E

MEIN000748

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...C6-5CFBAF17541F



# ADDENDUM

Date: ~~Jan. 17, 2012~~  *July 1, 2011*

By and Between (Lessor) <u>Maurice and Mary Sourmany, Trustees</u>

(Lessee) <u>Econo Lube and Tune</u>

**Address of Premises:** <u>3956 State Street</u>

<u>Santa Barbara, CA 93105</u>

Paragraph _____

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

51. The original Real Property Lease , hereinafter "Lease" between The Sourmany Trustees and Econo Lube and Tune, Inc dated 2-10-89 is incorporated herein by reference.

52. The Lease expired by its own terms and continued on as a month-to-month tenancy.

53. Pursuant to Paragraph 9.1 of the Lease, certain obligations tobe performed by Lessee remained unfulfilled.

54. Lessee remaining obligations concern corrective work and maintenance issues pursuant to the original Lease. Lessor has had inspections performed by Lenz Pest control and De Vries Building Consultants. Both reports call for corrective work; copies of both reports are attched hereto.

55. As an express condition of entering into the new Lease, Lessee at their sole expense shall have the corrective work called out in both reports completed by a license and bonded contractor within one hundred twenty days (120) from the execution of the Lease. Prior to the commencement of work, Lessee shall provide a copy of the proposed contract to Lessor for approval.

56. There shall be no rent abatement during the time the corrective work is performed.

57. Rental increases. The rental rate will remain the same for the first two years of the lease. Commencing July 1, 2013 and on each anniversary date thereafter, the base rent will be adjusted by any increase in the Consumer Price Index (CPI), (All Urban Consumers) for L.A./Riverside Orange County. The new rate shall be calculated as follows: The monthly base rent, as paid in the initial term of the lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month two months before the month the increase takes effect (May 2013), and the denominator of which shall be the CPI for the calendar month two

PAGE 1 OF 2

_____
INITIALS

_____
INITIALS

MEIN000749

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-....6-5CFBAF17541F

months before the original lease term commences (May 2011). This sum so calculated shall constitute the new monthly rental rate hereunder, but in no event shall such new monthly rent be less than the rent payable for the month immediately preceding the date for the rent adjustment. The minimum increase will be at two percent (2%) and the maximum increase will be four percent (4%).

5B.   Lessor and Lessee agree that if professional property management is obtained, it willbe included as a triple net expense.

PAGE 2 OF 2

INITIALS

INITIALS

MEIN000750

DocuSign Envelope ID: 6F5FD398-8DC7-44B3-...C6-5CFBAF17541F



# OPTION(S) TO EXTEND
## STANDARD LEASE ADDENDUM

Dated _____ ~~Jan. 27, 2012~~ July 1, 2011

By and Between (Lessor) <u>Maurice and Mary Sourmany, Trustees</u>

By and Between (Lessee) <u>Econo Lube and Tune</u>

Address of Premises: <u>3956 State Street</u>

<u>Santa Barbara, CA 93105</u>

Paragraph <u>59</u>

**A.    OPTION(S) TO EXTEND:**
Lessor hereby grants to Lessee the option to extend the term of this Lease for <u>two  (2)</u>                additional <u>sixty  (60</u>
month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i)    In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least <u>three</u>  but not more than   <u>six</u>   months prior to the date that the option period would commence, time being of the essence. If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire.  Options (if there are more than one) may only be exercised consecutively.

(ii)   The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

(iii)  Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

(iv)   This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v)    The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:
(Check Method(s) to be Used and Fill in Appropriately)

☐    I.    **Cost of Living Adjustment(s) (COLA)**
a.    On (Fill in COLA Dates): _____

the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill In Urban Area):

All items (1982-1984 = 100), herein referred to as "CPI".

b.    The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): ☐ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐

_____
**INITIALS**

PAGE 1 OF 3

**INITIALS**

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OE-3-8/00E

MEIN000751

DocuSign Envelope ID: 6F5FD398-8DC7-44B... ...6-5CFBAF17541F

(Fill In Other "Base Month"):

The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent be less than the rent payable for the month immediately preceding the rent adjustment.

    c.   In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☒  II.   Market Rental Value Adjustment(s) (MRV)

   a.  On (Fill In MRV Adjustment Date(s))  <u>upon exercise of the first and second option</u>

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

    1)  Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached, within thirty days, then:

        (a)  Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties, or

        (b)  Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

            (i)  Within 15 days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

            (ii)  The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

            (iii)  If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

            (iv)  The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

    2)  Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

   b.  Upon the establishment of each New Market Rental Value:

    1)  the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and

    2)  the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☐  III.   Fixed Rental Adjustment(s) (FRA)

The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill In FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**B.**  **NOTICE:**

    Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

**C.**  **BROKER'S FEE:**

    The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

PAGE 2 OF 3

_____
INITIALS

_____
INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OE3-8/00E

MEIN000752

DocuSign Envelope ID: 6F5FD398-8DC7-44B\_\_\_\_\_C6-5CFBAF17541F

NOTICE:  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR Commercial Real Estate Association,  800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

PAGE 3 OF 3

INITIALS

INITIALS

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OE3-8/00E

MEIN000753

DocuSign Envelope ID: 6FSFD398-8DC7-44B3-ABC6-5CFBAF17541F

Exhibit B

**Store 4118**

| | | Base Rent | Personal PropTax | | Rptax Impound | | Total Due |
|---|---|---|---|---|---|---|---|
| Security Deposit | $ | - | | | | $ | - |
| Sep-14 | $ | 8,386.41 | | $ | 629.02 | $ | 9,015.43 |
| Oct-14 | $ | 8,386.41 | | $ | 629.02 | $ | 9,015.43 |
| Nov-14 | $ | 8,386.41 | | $ | 629.02 | $ | 9,015.43 |
| Dec-14 | $ | 8,386.41 | | $ | 629.02 | $ | 9,015.43 |
| Jan-15 | $ | 8,386.41 | ** | $ | 641.60 | $ | 9,028.01 |
| Feb-15 | $ | 8,386.41 | | $ | 641.60 | $ | 9,028.01 |
| Mar-15 | $ | 8,386.41 | | $ | 641.60 | $ | 9,028.01 |
| Apr-15 | $ | 8,386.41 | | $ | 641.60 | $ | 9,028.01 |
| May-15 | $ | 8,386.41 | | $ | 641.60 | $ | 9,028.01 |
| Jun-15 | * $ | 8,638.00 | | $ | 641.60 | $ | 9,279.60 |
| Jul-15 | $ | 8,638.00 | | $ | 641.60 | $ | 9,279.60 |
| Aug-15 | $ | 8,638.00 | | $ | 641.60 | $ | 9,279.60 |
| Sep-15 | $ | 8,638.00 | | $ | 641.60 | $ | 9,279.60 |

First cpi inc Jan 1, 2015

\* Rent increased by 3% minimum per Section IV, Subsection A, Paragraph 6 of the sublease although increase could be greater depending on cpi calculation.

\*\* Taxes were adjusted using a 2% cost of living increase. Exact increase, if any, will depend on actual tax rate.

Prepared

Reviewed        Darin Shay

MEIN000754

# EXHIBIT "D"

| From: | **Jan Douma** <jandouma1@gmail.com> |
|---|---|
| To: | **Zachary Pfeiffer** <ZPfeiffer@drivenbrands.com> |
| CC: | **Aaron Davis** <Aaron.Davis@meineke.com>; **Morgan Byrne** <Morgan.Byrne@drivenbrands.com> |
| Subject: | Re: 4118 construction |
| Date: | 14.09.2018 13:58:02 (+02:00) |
| Attachments: | image002.jpg (1 page) |

Zachary,

We are willing to enter into a lease with the landowner, but not on terms worse than the current arrangement. We consider Driven Brands to currently be in breach of their obligations under the sublease, as they have no ability to fulfill the terms of the sublease. Should we attempt to transfer the property for instance, the sublease has no value, and therefore our franchise has no value.  We are also at risk of expulsion from the property if Driven Brands does not fulfill its obligations under the lease, which to date it has not done, because the identified repairs were never performed when the lease was renewed in 2011.

Therefore, we expect Driven Brands to facilitate a new lease on the same or better terms than the current sublease. To date our conversation with the real estate agent for the Sourmany Trust was not promising, as they "preferred" working with a larger company. We have not heard whether Driven Brands has even attempted to contact the Sourmany Trust on a novation of the sublease.

We are also concerned with the fund under project constitution. The deadline passed for submitting plans, and we did not submit plans as it would be inappropriate. We have not heard from Driven Brands concerning the status of those funds.

As far as itemization, discussions with William Mills broke down when he wanted to adhere to only the items listed in the 2011 agreement without any consideration of deterioration that occurred because the original repairs were not made in 2011. Dry rot and termite damage don't remain static. For example, the original list included the rotting front door and windows and he would not include the door frame, which lies between the door and the windows and which is also rotted. We had to reinforce the frame a while back because the door was literally hanging by one hinge. Likewise, if we get up on the roof and find 30 broken tiles instead of 23, or if the subroof under the 23 broken tiles is rotted, I don't want to go back and forth about what was on the list.

Jan Douma
Co-Owner
Meineke Car Care Center #4118, Santa Barbara
(805) 687-0281

On Thu, Aug 30, 2018 at 9:44 AM Zachary Pfeiffer <ZPfeiffer@drivenbrands.com> wrote:

> Hi Jan, thanks for following up. I wanted to confirm as we start the process: You're willing and able to go direct with the landlord, right? The below repairs were proposed previously in the context of Meineke terminating the head lease and letting you go direct, so we'd be looking to accomplish that here as well.
>
> I found a generic list of repairs that we had considered previously. This is based on prior research/negotiation by William Mills, with whom I believe you negotiated previously, so I'd need to reserve in order to confirm final approval with our brand president and property mgmt team, but the preliminary list of Meineke's repairs would include:
>
> - Repair sidewalk separation from driveway
> - Prep and remove damaged exterior wall and repair as necessary
> - Termite damage (eves / rafter tails) – replace wood and chemically treat areas
> - Repair exposed conduits
> - Replace 23 broken roof tiles
> - Repair damaged roof section
> - Clean gutters

- Install new GFI as needed

- Repair 22V subpanel and reconnect wires per code

- Repair damaged conduit and damaged outlet in office bathroom

- Restrap insulation at AC


Please let confirm you're OK with going direct with the landlord, and we'll approach LL about the repairs, termination, and a direct lease with the subtenant. Thanks again.


Best,

Zach


**Zachary Pfeiffer**
Corporate Counsel

440 South Church St., Suite 700
Charlotte, NC 28202
(office) 704 644 8105


http://drivensignature.com/i
mages/logos/driven-brands-
96.jpg


**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Wednesday, August 29, 2018 3:21 PM
**To:** Zachary Pfeiffer <ZPfeiffer@drivenbrands.com>
**Cc:** Aaron Davis <Aaron.Davis@meineke.com>
**Subject:** Re: 4118 construction


Any update?


Jan


On Fri, Aug 17, 2018 at 10:30 AM Jan Douma <jandouma1@gmail.com> wrote:

Zachary,


I'd like to get started with the repairs to our facility as previously negotiated with the landlord.


I'd imagine there are some economies with doing both repairs and PC upgrades concurrently rather than complete all repairs first. If so, I'm fine with that. We can allocate expenses to the appropriate budget bucket.


Something we really need to address is the wiring. When we got here, this shop was in the original EconoLube configuration, with the lobby and back office separated by a wall with a punch-out

MEIN002125

window. A few months after we got here, we used our Meineke account allotment to remodel. We sealed up the window and created a doorway next to it with a countertop extending into the lobby. When the contractor broke into that separating wall and saw the wiring, he said he could not leave it that way, and we had to pay extra to have it brought up to code. He also warned us that there were most likely problems with other wiring we couldn't see. We've had to replace the bathroom light switch a couple of times, and now even with a new switch (and new bulbs) the light doesn't always work. That suggests wiring issues farther along the same wall.

As far as I know, the previous owners didn't remodel and didn't touch the structure except to drill holes for security cameras in the interior ceiling (not the roof).

What is the next step? How about if you list out your repairs, then I can add appropriate PC improvements in the order of priority, then get bids on the job?

Jan Douma

MEIN002126

# EXHIBIT "E"

| From: | **Jan Douma** <jandouma1@gmail.com> |
| To: | **Morgan Byrne** <Morgan.Byrne@drivenbrands.com> |
| CC: | **Aaron Davis** <Aaron.Davis@meineke.com>; **Zachary Celaya** <Zac.Celaya@meineke.com> |
| Subject: | ETA 4118 |
| Date: | 15.04.2019 13:31:03 (+02:00) |

What kind of ETA are we looking at with respect to:

1. repayment for repairs
2. moving the lease to our name
3. starting additional repairs

Jan Douma

MEIN001503

# EXHIBIT "F"

| From: | **Jan Douma** <jandouma1@gmail.com> |
|---|---|
| To: | **Morgan Byrne** <Morgan.Byrne@drivenbrands.com>; **Zachary Pfeiffer** <ZPfeiffer@drivenbrands.com>; **Zachary Celaya** <Zac.Celaya@meineke.com>; **Aaron Davis** <Aaron.Davis@meineke.com> |
| Subject: | 4118 |
| Date: | 26.04.2019 09:17:38 (+02:00) |

Please advise when I can expect to get money reimbursed for repairs I made to the shop. I have sent documentation to verify the repairs.

What is the next step forward re getting the rest of the repairs done, getting PC upgrades, and getting us a lease directly with the Sourmanys.

Jan Douma

MEIN001436

# EXHIBIT "G"

| | |
|---|---|
| From: | **Joseph Robinson** <joseph.robinson@drivenbrands.com> |
| To: | **Jan Douma** <jandouma1@gmail.com> |
| CC: | **Darrin Krader** <Darrin.Krader@meineke.com>; **Phil Farenga** <phil.farenga@meineke.com> |
| Subject: | RE: <External> Fwd: Renewal |
| Date: | 13.05.2021 16:46:48 (+02:00) |

Hi Jan,

As a follow up, I did contact the LL (Mary), she plans to have her attorney contact me tomorrow for further discussions about getting you a master lease.

I will let you know how it goes.

Talk to you soon,

Joe

---

**From:** Joseph Robinson
**Sent:** Tuesday, May 11, 2021 2:30 PM
**To:** Jan Douma <jandouma1@gmail.com>
**Cc:** Darrin Krader <Darrin.Krader@meineke.com>; Phil Farenga <phil.farenga@meineke.com>
**Subject:** RE: <External> Fwd: Renewal

Hi Jan,

Thank you for taking my call today.  As I mentioned, I will do my best to contact the LL and see what it will take to get you a master lease to match our 8 year FTA.

Talk to you soon,

Joe

---

**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Tuesday, May 11, 2021 9:18 AM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Cc:** Darrin Krader <Darrin.Krader@meineke.com>; Phil Farenga <phil.farenga@meineke.com>
**Subject:** <External> Fwd: Renewal

I have not heard anything from anyone about these things I asked for--things that should have been done before now. Please respond with what you expect to be able to do by the end of June.

---------- Forwarded message ---------
From: **Jan Douma** <jandouma1@gmail.com>
Date: Thu, Apr 29, 2021 at 2:18 PM
Subject: Renewal
To: Joseph Robinson <joseph.robinson@drivenbrands.com>

Today is 2 months to the renewal deadline, so we'd like to put out this list of what we would like to see for renewal.

REPAIRS: Meineke needs to finish all repairs as required by the 2011-2016 lease with the landowners, the Sourmanys. The Sourmanys had an inspector come out and make a list of needed repairs. I sent a message

MEIN003666

to the Sourmanys that Meineke wanted the list, but it is Meineke's responsibility to get the list. I sent in pictures of our flooded parking lot and leaking storage room, so you have some idea where to start.

<u>LEASE</u>: We need a long-term lease as we were promised when we first took over the shop in 2014. Since 2016, we have only had a month-to-month lease and no security that the landlord won't decide to let someone else rent the property. Since Meineke was the primary lessor before, we are asking that you sign a new lease. If you can't or don't want to, let us know.

<u>RENT</u>: The rent is too high.

1. Rents in the area have fallen because of Covid. Businesses have disappeared, and there are many commercial spaces for rent.

2. We have had a 3% increase every year, and in all of those years, the actual rate of inflation was below 3%. Increases should be below 3%.

3. One of Meineke's business coaches reviewed our numbers and said everything was in line except the rent, which was way out of line.

<u>MAF</u>: We want to control our own advertising/MAF so we can do what works for our shop (internet, radio) and not do things that give us no return (postcards). A few years ago, we were told that we could do our own advertising if we could get every shop in our DMA to agree. We did that, and you still did not let us control MAF.


Jan Douma

MEIN003667

# EXHIBIT "H"

**From: Drew Simons <**asimons@rppmh.com**>**
**Date:** Fri, Jun 25, 2021 at 6:00 PM
**Subject:** FW: <External> 3956 State St,. Santa Barbara
**To:** Jandouma1@gmail.com <Jandouma1@gmail.com>

Jan,

See attached list of property issues.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com

-------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.

-------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

**From:** Drew Simons
**Sent:** Friday, June 11, 2021 12:13 PM
**To:** 'Joseph Robinson' <joseph.robinson@drivenbrands.com>
**Subject:** RE: <External> 3956 State St,. Santa Barbara

1

Joe,

See attached summary. Do you have square footage or other information about the building?

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com

-----------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.

-----------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Tuesday, June 8, 2021 9:52 AM
**To:** Drew Simons <asimons@rppmh.com>
**Subject:** RE: <External> 3956 State St,. Santa Barbara

Hi Drew,

Please send me the list, I heard of it, and believe we addressed all items previous to the current tenants.

Thank you,

Joe

2

CJGL001002

**From:** Drew Simons <asimons@rppmh.com>
**Sent:** Monday, June 7, 2021 6:16 PM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** <External> 3956 State St,. Santa Barbara


Joe,


I spoke to Jan and told her that landlord is willing to lease to her directly as Meineke corporate has agreed to guarantee  the lease. She is excited about moving forward. We intend to offer her an 8 year lease at current market value which I am now in the process of determining. As a condition to entering into the new lease, we will need her or Meineke to address the remaining deferred maintenance issues from the list prepared by the inspector some 18 months ago. Are you familiar with that list and the work that needs to be done? Please advise. Thanks.


Drew


**ANDREW D. SIMONS | PARTNER**
**Reicker, Pfau, Pyle & McRoy, LLP** | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com

------------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.

------------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

3

CJGL001003

**FLAGSHIP CONSTRUCTION, INC.**

*INSPECTION OF PROPERTY Dec 10, 2019*

(805) 636-5152
flagship805@gmail.com

45 Dearborn Pl. #34
Goleta, CA 93117

Lic.994317

December 10, 2019

Maurice and Mary Sourmany
Property Owners
3956 State Street
Santa Barbara, CA 93105

Dear Maurice and Mary,
Upon inspection of the property located at 3956 State St on the 10th of December of 2019, our findings are as follows:

Fencing-
The fence in the rear of the property that has been apparently damaged by a fallen branch, still has a bent top rail in one area as well as a poorly connected top rail that appears to have been wired unprofessionally.

Our recommendation- Replace the bent top rail and connect top rails with a proper coupler at current break that is wired together.

Parapet walls-
Plaster has been repaired properly, but never primed or painted.
Our recommendation- Prime and paint the exposed patches on the parapet walls.

Gaps around electrical conduit-
These gaps remain.
Our recommendation- Plaster patch around conduits and use spray foam insulation as needed.

Patio Cover (Pergola)
The patio cover/ pergola shows signs of extreme dry-rot/ pest damage beyond Bond-O/ dutchman repairs.
Our recommendation- Demolish and either rebuild or waterproof and patch.

Electrical wiring between buildings-
Conduits running from building to building have exposed wiring.
Our recommendation- Run wire through proper conduit supported by guy wires exterior rated, properly sealed at penetrations.

Garage cracks-
The cracks appear to be normal for the age of the building.
Between 1/16" - 1/8"
We find this acceptable.

Tile roof-
About a 5'x5' area of tile roofing has severe damage.
Our recommendation- Replace all broken tiles and possible underlayment once
broken tiles are removed to view.

Water heater-
Appears to be installed within a year or 2. It has no date. It is 6 gallons.

Sub panel appears in good order without issue.

Bathroom has been retiled.

Front door has been replaced however we recommend sealing the top and bottom
with primer and paint.

The windows that were previously rotten have been properly repaired and are in
good condition.

Flat roof-
Parapet walls and flashing in good condition. Flat comp roof is buckling all over and
not draining water as well as collecting debris.
Our recommendation- Completely replace flat roof: Including everything down to the
substrate. This will continue to puddle and collect debris and is susceptible to leaks.
We believe this is the main concern and needing the most attention.

Sincerely yours,

12/10/19

Calvin Petersen

C.E.O.

CJGL001005

# EXHIBIT "I"

| From: | **Joseph Robinson** <joseph.robinson@drivenbrands.com> |
| To: | **Jan Douma** <jandouma1@gmail.com> |
| CC: | **Darrin Krader** <Darrin.Krader@meineke.com> |
| Subject: | RE: <External> Re: extension |
| Date: | 28.06.2021 21:50:14 (+02:00) |

Hi Jan,

The lease should be done using a LOI, that way you know your terms going into the lease.  Your renewal was approved last Friday, and will be sent to you sometime this week.  I understand why you want both the lease and FTA coinciding with each other, one down, one to go.

Another note on the lease, your negotiations for the T.I.'s need to go into the LOI.

Talk to you soon,

Joe

---

**From:** Jan Douma <jandouma1@gmail.com>
**Sent:** Monday, June 28, 2021 2:29 PM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Cc:** Darrin Krader <Darrin.Krader@meineke.com>
**Subject:** Re: <External> Re: extension

I think we have settled all the terms of the lease, but I have not seen it yet. Likewise I have not seen the franchise renewal agreement.
I have two concerns:

1. They won't sign the lease unless you guarantee it. What happens if I sign the franchise agreement and Meineke decides not to guarantee the lease?  In 2014, I was supposed to have a five year lease with two five-year options, and I only had a lease until 2016.
2. They are still looking to get repairs done by you from the 2011 lease. At one time they said they didn't want to make a new lease until all repairs were done, though it looks like they are now willing to go forward anyway.

Jan

On Mon, Jun 28, 2021 at 8:44 AM Joseph Robinson <joseph.robinson@drivenbrands.com> wrote:

> Hi Jan,
>
> I am sorry to hear about your mothers condition, I live about 15 miles from Carmichael, if there is anything I can do, I'm here.  As per the renewal, last week we received the final approval for you to renew (congratulations).  We do not grant 30 day extensions for renewals, but I do know the lease is holding you up.  With the lease on hold, how are your negotiations with the landlord, do you need assistance?
>
> Let me know,
>
> Joe
>
> ---
>
> **From:** Jan Douma <jandouma1@gmail.com>
> **Sent:** Friday, June 25, 2021 6:08 PM

MEIN003757

**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Cc:** Darrin Krader <Darrin.Krader@meineke.com>
**Subject:** <External> Re: extension

Are you going to be able to give me an extension?

On Fri, Jun 25, 2021 at 9:38 AM Jan Douma <jandouma1@gmail.com> wrote:

> You may have heard that my mother, who has not been in the hospital since the 1960s, suddenly had to go to the hospital a few weeks ago. It turned out she had a fractured femur requiring surgery and rehab and stage 4 cancer requiring treatment. I am an only child, and she lives in Carmichael, 400 miles away from me. I have some help from my daughter and my aunt, but you can imagine I have a lot on my plate now.
>
> I would like to request an extension on the franchise renewal for 30 days, which would be Thursday July 29. I still intend to resign for 8 years, but I have not been able to sort out the lease with the landlord's attorney, and I know we both want that nailed down.
>
> Thank you,
> Jan Douma

MEIN003758

# EXHIBIT "J"

| From: | **Drew Simons** <asimons@rppmh.com> |
|---|---|
| To: | **Jandouma1@gmail.com** <Jandouma1@gmail.com>; **Joseph Robinson** <joseph.robinson@drivenbrands.com> |
| CC: | **Mary L Sourmany** <mlsourmany@cox.net> |
| Subject: | <External> Lease and Guaranty for 3956 State Street |
| Date: | 30.06.2021 01:09:44 (+02:00) |
| Attachments: | Lease_rv1.pdf (16 pages), Guaranty_rv1.pdf (2 pages), Flagship Construction Inc. - Inspection of Property 12.10.2019.pdf (2 pages), Lease Addendum .docx (3 pages) |

Jan & Joe,

Attached is the lease/addendum and guaranty for your review. Please call or send me your comments or approve and I will circulate for execution. Thanks.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
------------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
------------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

MEIN001992



# STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE - NET
# (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1.    Basic Provisions ("Basic Provisions").**

1.1    **Parties.** This Lease ("**Lease**"), dated for reference purposes only __July 1, 2021__ , is made by and between __Maurice and Mary Sourmany Trustees of the Sourmany 2006 Trust__ ("**Lessor**") and __Jan Douma__ ("**Lessee**"), (collectively the "**Parties**," or individually a "**Party**").

1.2    **Premises.** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as (street address, city, state, zip): __3956 State Street, Santa Barbara, CA 93105__ ("**Premises**"). The Premises are located in the County of __Santa Barbara__ , and are generally described as (describe briefly the nature of the property and , if applicable, the "**Project**," if the property is located within a Project): _____ . (See also Paragraph 2)

1.3    **Term:** __8__ years and __0__ months ("**Original Term**") commencing __August 1, 2021__ ("**Commencement Date**") and ending __July 31, 2029__ ("**Expiration Date**"). (See also Paragraph 3)

1.4    **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing __n/a__ ("**Early Possession Date**"). (See also Paragraphs 3.2 and 3.3)

1.5    **Base Rent:** $ __$2,910__ per month ("**Base Rent**"), payable on the __1st__ day of each month commencing __August 1, 2021__ . (See also Paragraph 4)

☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.  See Paragraph _____ .

1.6    **Base Rent and Other Monies Paid Upon Execution:**

(a)    **Base Rent:** _____ for the period _____ .

(b)    **Security Deposit:** _____ ("**Security Deposit**"). (See also Paragraph 5)

(c)    **Association Fees:** _____ for the period _____ .

(d)    **Other:** _____ for _____ .

(e)    **Total Due Upon Execution of this Lease:** _____ .

1.7    **Agreed Use.** __Meineke Auto repair facility__ . (See also Paragraph 6)

1.8    **Insuring Party.** Lessor is the "**Insuring Party**" unless otherwise stated herein. (See also Paragraph 8)

~~1.9    **Real Estate Brokers.** (See also Paragraph 15 and 25)~~

~~(a)    **Representation:** Each Party acknowledges receiving a Disclosure Regarding Real Estate Agency Relationship, confirms and consents to the following agency relationships in this Lease with the following real estate brokers ("**Broker(s)**") and/or their agents ("**Agent(s)**"):~~

~~Lessor's Brokerage Firm _____ License No. _____ is the broker of (check one): ☐ the Lessor; or ☐ both the Lessee and Lessor (dual agent).~~

~~Lessor's Agent _____ License No. _____ is (check one): ☐ the Lessor's Agent (salesperson or broker associate); or ☐ both the Lessee's Agent and the Lessor's Agent (dual agent).~~

~~Lessee's Brokerage Firm _____ License No. _____ is the broker of (check one): ☐ the Lessee; or ☐ both the Lessee and Lessor (dual agent).~~

~~Lessee's Agent _____ License No. _____ is (check one): ☐ the Lessee's Agent (salesperson or broker associate); or ☐ both the Lessee's Agent and the Lessor's Agent (dual agent).~~

~~(b)    **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.~~

1.10    **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by __Mieneke Car Care Centers LLC__ ("**Guarantor**"). (See also Paragraph 37)

1.11    **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs __51__ through __53__ ;

☐ a plot plan depicting the Premises;

☐ a current set of the Rules and Regulations;

☐ a Work Letter;

☐ other (specify): _____ .

**2.    Premises.**

2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different.  **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2    **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever

_____                                                              _____
INITIALS                                                                    INITIALS

© 2019 AIR CRE.  All Rights Reserved.

MEIN001993

first occurs ("**Start Date**"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("**HVAC**"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "**Building**") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law.  If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except at otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense.  The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building.  If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.  Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3    **Compliance**.  Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Applicable Requirements**") that were in effect at the time that each improvement, or portion thereof, was constructed.  Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee.  **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.**  If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense.  If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.  If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("**Capital Expenditure**"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)    Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent.  If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter.  Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises.  Lessee shall pay Interest on the balance but may prepay its obligation at any time.  If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure.  If Lessee does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid.  If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements.  If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense.  Lessee shall not, however, have any right to terminate this Lease.

2.4    **Acknowledgements**.  Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease.  In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    **Lessee as Prior Owner/Occupant**.  The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises.  In such event, Lessee shall be responsible for any necessary corrective work.

**3.    Term.**

3.1    **Term**.  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2    **Early Possession**.  Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession.  All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.3    **Delay In Possession**.  Lessor agrees to use commercially reasonable efforts to deliver exclusive possession of the Premises to Lessee by the Commencement Date.  If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date.  Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor

_____                                    _____
INITIALS                                     INITIALS

MEIN001994

delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4 **Lessee Compliance**. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.    Rent.**

4.1 **Rent Defined**. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2 **Payment**. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3 **Association Fees**. In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

**5.    Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

**6.    Use.**

6.1 **Use**. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2 **Hazardous Substances**.

(a) **Reportable Uses Require Consent**. The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability including, but not limited to, the installation (and removal on or before

_____                                                    _____
INITIALS                                                     INITIALS

© 2019 AIR CRE.  All Rights Reserved.

Last Edited: 6/29/2021 5:33 PM

MEIN001995

Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)  **Duty to Inform Lessor.**  If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)  **Lessee Remediation.**  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)  **Lessee Indemnification.**  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

(e)  **Lessor Indemnification.**  Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)  **Investigations and Remediations.**  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment.  Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)  **Lessor Termination Option.**  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3  **Lessee's Compliance with Applicable Requirements.**  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.  In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of a written request therefor.  In addition, Lessee shall provide Lessor with copies of its business license, certificate of occupancy and/or any similar document within 10 days of the receipt of a written request therefor.

6.4  **Inspection; Compliance.**  Lessor and Lessor's "**Lender**" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1(e)) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of a written request therefor.  Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease.  The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

**7.  Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1  **Lessee's Obligations.**

(a)  **In General.**  Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for

_____            _____
INITIALS              INITIALS

© 2019 AIR CRE.  All Rights Reserved.
Last Edited: 6/29/2021 5:33 PM

MEIN001996

Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises.  Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.  Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

(b)   **Service Contracts.**  Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises:  (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers.  However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and  Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)   **Failure to Perform.**  If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)   **Replacement.**  Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (i.e. 1/144th of the cost per month).  Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.

7.2   **Lessor's Obligations.**  Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee.  It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises.

7.3   **Utility Installations; Trade Fixtures; Alterations**.

(a)   **Definitions.**  The term "**Utility Installations**" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises.  The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises.  The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion.  "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)   **Consent.**  Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent.  Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year.  Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner.  Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications.  For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)   **Liens; Bonds**.  Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein.  Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility.  If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4   **Ownership; Removal; Surrender; and Restoration**.

(a)   **Ownership**.  Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises.  Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations.  Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)   **Removal**.  By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease.  Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)   **Surrender; Restoration**.  Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted.  "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice.  Notwithstanding the foregoing and the provisions of Paragraph 7.1(a), if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered

_____                                                    _____
INITIALS                                                      INITIALS

© 2019 AIR CRE.  All Rights Reserved.

STN-27.30, Revised 10-22-2020

MEIN001997

to Lessee on the Start Date with NO allowance for ordinary wear and tear.  Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee.  Lessee shall also completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements.  Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee.  Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire.  The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8.    Insurance; Indemnity.**

    **8.1    Payment For Insurance**.  Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence.  Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term.  Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

    **8.2    Liability Insurance**.

        **(a)    Carried by Lessee**.  Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000.  Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement.  The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "**insured contract**" for the performance of Lessee's indemnity obligations under this Lease.  The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder.  Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

        **(b)    Carried by Lessor**.  Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee.  Lessee shall not be named as an additional insured therein.

    **8.3    Property Insurance - Building, Improvements and Rental Value**.

        **(a)    Building and Improvements**.  The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises.  The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof.  Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss.  Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

        **(b)    Rental Value**.  The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance").  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.  Lessee shall be liable for any deductible amount in the event of such loss.

        **(c)    Adjacent Premises**.  If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

    **8.4    Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance**.

        **(a)    Property Damage**.  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

        **(b)    Business Interruption**.  Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

        **(c)    Worker's Compensation Insurance**.  Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements.  Such policy shall include a 'Waiver of Subrogation' endorsement.  Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

        **(d)    No Representation of Adequate Coverage**.  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

    **8.5    Insurance Policies**.  Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor.  Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less.  If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

    **8.6    Waiver of Subrogation**.  Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein.  The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto.  The Parties agree to have

———————        ———————
INITIALS                  INITIALS

© 2019 AIR CRE.  All Rights Reserved.

STN-27.30, Revised 10-22-2020

MEIN001998

their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7   **Indemnity**.  Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, a Breach of the Lease by Lessee and/or the use and/or occupancy of the Premises and/or Project by Lessee and/or by Lessee's employees, contractors or invitees.  If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense.  Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8   **Exemption of Lessor and its Agents from Liability**.  Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom.  Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9   **Failure to Provide Insurance**.  Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater.  The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

**9.**   **Damage or Destruction.**

9.1   **Definitions**.

(a)   **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b)   **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)   **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)   **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)   **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2   **Partial Damage - Insured Loss**.  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose.  Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs.  In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to:  (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.  Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3   **Partial Damage - Uninsured Loss**.  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4   **Total Destruction**.  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

_____                                                _____

INITIALS                                                INITIALS

© 2019 AIR CRE.  All Rights Reserved.

MEIN001999

9.5   **Damage Near End of Term**.  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6   **Abatement of Rent; Lessee's Remedies**.

(a)   **Abatement**.  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)   **Remedies**.  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7   **Termination; Advance Payments**.  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

**10.   Real Property Taxes.**

10.1   **Definition**.  As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address.  Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2   **Payment of Taxes**.  In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date.  If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated.  In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent.  Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent.  When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes.  If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary.  Advance payments may be intermingled with other moneys of Lessor and shall not bear interest.  In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3   **Joint Assessment**.  If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4   **Personal Property Taxes**.  Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11.   Utilities and Services.**

11.1   Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.  If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed.  There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

11.2   Within fifteen days of Lessor's written request, Lessee agrees to deliver to Lessor such information, documents and/or authorization as Lessor needs in order for Lessor to comply with new or existing Applicable Requirements relating to commercial building energy usage, ratings, and/or the reporting thereof.

**12.   Assignment and Subletting.**

12.1   **Lessor's Consent Required**.

(a)   Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "**assign or assignment**") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)   Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent.  The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)   The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most

_____                                    _____
INITIALS                                     INITIALS

MEIN002000

recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent.  "**Net Worth of Lessee**" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

    (d)   An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

    (e)   Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

    (f)   Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

    (g)   Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

**12.2  Terms and Conditions Applicable to Assignment and Subletting.**

    (a)   Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

    (b)   Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

    (c)   Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

    (d)   In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

    (e)   Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

    (f)   Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

    (g)   Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing.  (See Paragraph 39.2)

**12.3  Additional Terms and Conditions Applicable to Subletting.**  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

    (a)   Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

    (b)   In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

    (c)   Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

    (d)   No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

    (e)   Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

**13.  Default; Breach; Remedies.**

**13.1  Default; Breach.**  A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

    (a)   The abandonment of the Premises; the vacating of the Premises prior to the expiration or termination of this Lease without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism; or failure to deliver to Lessor exclusive possession of the entire Premises in accordance herewith prior to the expiration or termination of this Lease.

    (b)   The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.  THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

    (c)   The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.  In the

---

_____                _____
INITIALS                    INITIALS

© 2019 AIR CRE.  All Rights Reserved.             Last Edited: 6/29/2021 5:33 PM
STN-27.30, Revised 10-22-2020             Page 9 of 16

MEIN002001

event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d)    The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)    A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)    The occurrence of any of the following events:  (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "**debtor**" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)    The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)    If the performance of Lessee's obligations under this Lease is guaranteed:  (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2  **Remedies**.  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)    Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee:  (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)    Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations.  Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)    Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located.  The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3  **Inducement Recapture**.  Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.  Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee.  The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4  **Late Charges**.  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender.  Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater.  The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in

_____                                        _____
INITIALS                                                  INITIALS

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 10-22-2020

MEIN002002

advance.

13.5 **Interest**. Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6 **Breach by Lessor**.

(a) **Notice of Breach**. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor**. In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14. Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15. Brokerage Fees.**

15.1 **Additional Commission**. In addition to the payments owed pursuant to Paragraph 1.9 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed. The provisions of this paragraph are intended to supersede the provisions of any earlier agreement to the contrary.

15.2 **Assumption of Obligations**. Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3 **Representations and Indemnities of Broker Relationships**. Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker, agent or finder (other than the Brokers and Agents, if any) in connection with this Lease, and that no one other than said named Brokers and Agents is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16. Estoppel Certificates.**

(a) Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by AIR CRE, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17. Definition of Lessor.** The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a

_____  _____
INITIALS  INITIALS

MEIN002003

sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor.  Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18.  Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.  Days.**  Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

**20.  Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21.  Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.  No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23.  Notices.**

23.1  **Notice Requirements**.  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2  **Date of Notice**.  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon.  If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

23.3  **Options.**  Notwithstanding the foregoing, in order to exercise any Options (see paragraph 39), the Notice must be sent by Certified Mail (return receipt requested), Express Mail (signature required), courier (signature required) or some other methodology that provides a receipt establishing the date the notice was received by the Lessor.

**24.  Waivers.**

(a)   No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)   The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)   THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)   When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)   *Lessor's Agent.*  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations:  *To the Lessor*:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  *To the Lessee and the Lessor*:  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)   *Lessee's Agent.*  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  *To the Lessee*:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  *To the Lessee and the Lessor*:  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)   *Agent Representing Both Lessor and Lessee.*  A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not, without the express permission of the respective Party, disclose to the other Party confidential information, including, but not limited to, facts relating

_____
INITIALS

_____
INITIALS

© 2019 AIR CRE.  All Rights Reserved.

STN-27.30, Revised 10-22-2020

Last Edited: 6/29/2021 5:33 PM

Page 12 of 16

MEIN002004

to either Lessee's or Lessor's financial position, motivations, bargaining position, or other personal information that may impact rent, including Lessor's willingness to accept a rent less than the listing rent or Lessee's willingness to pay rent greater than the rent offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.  Both Lessor and Lessee should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

(b)   Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)   Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26.   No Right To Holdover.**  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  At or prior to the expiration or termination of this Lease Lessee shall deliver exclusive possession of the Premises to Lessor.  For purposes of this provision and Paragraph 13.1(a), exclusive possession shall mean that Lessee shall have vacated the Premises, removed all of its personal property therefrom and that the Premises have been returned in the condition specified in this Lease.  In the event that Lessee does not deliver exclusive possession to Lessor as specified above, then Lessor's damages during any holdover period shall be computed at the amount of the Rent (as defined in Paragraph 4.1) due during the last full month before the expiration or termination of this Lease (disregarding any temporary abatement of Rent that may have been in effect), but with Base Rent being 150% of the Base Rent payable during such last full month.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27.   Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28.   Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29.   Binding Effect; Choice of Law.**  This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.  Signatures to this Lease accomplished by means of electronic signature or similar technology shall be legal and binding.

**30.   Subordination; Attornment; Non-Disturbance.**

30.1  **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2  **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new  owner.

30.3  **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.  Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4  **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31.   Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment.  The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense.  The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.  In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**32.   Lessor's Access; Showing Premises; Repairs.**  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and

_____                                    _____
INITIALS                                     INITIALS

© 2019 AIR CRE.  All Rights Reserved.                                                    Last Edited: 6/29/2021 5:33 PM

MEIN002005

otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

**33. Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

**34. Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

**35. Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

**36. Consents.** All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgement that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

**37. Guarantor.**

37.1 **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by AIR CRE, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2 **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38. Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39. Options.** If Lessee is granted any Option, as defined below, then the following provisions shall apply.

39.1 **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2 **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3 **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4 **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

**40. Multiple Buildings.** If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

**41. Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

**42. Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such

_____        _____
INITIALS          INITIALS

© 2019 AIR CRE. All Rights Reserved.
STN-27.30, Revised 10-22-2020

Last Edited: 6/29/2021 5:33 PM

MEIN002006

easement rights, dedication, map or restrictions.

**43.   Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

**44.   Authority; Multiple Parties; Execution.**
(a)   If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf.  Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
(b)   If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder.  It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
(c)   This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**45.   Conflict.**  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**46.   Offer**.  Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party.  This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**47.   Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.  As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**48.   Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS LEASE.**

**49.   Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is  ☐ is not attached to this Lease.

**50.   Accessibility; Americans with Disabilities Act.**
(a)   The Premises:
☑ have not undergone an inspection by a Certified Access Specialist (CASp).  Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

(b)   Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

**LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.**

**ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:**
**1.   SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.**
**2.   RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.**

**WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH**

_____   _____
INITIALS                    INITIALS

© 2019 AIR CRE.  All Rights Reserved.

MEIN002007

THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _____ | Executed at: _____ |
| On: _____ | On: _____ |
| By **LESSOR**: | By **LESSEE**: |
| _Maurice and Mary Sourmany Trustees of the_ | _Jan Douma_ |
| _Sourmany 2006 Trust_ | |
| | By: _____ |
| By: _____ | Name Printed: _____ |
| Name Printed: _____ | Title: _____ |
| Title: _____ | Phone: _____ |
| Phone: _____ | Fax: _____ |
| Fax: _____ | Email: _____ |
| Email: _____ | |
| | By: _____ |
| By: _____ | Name Printed: _____ |
| Name Printed: _____ | Title: _____ |
| Title: _____ | Phone: _____ |
| Phone: _____ | Fax: _____ |
| Fax: _____ | Email: _____ |
| Email: _____ | |
| | Address: _____ |
| Address: _____ | Federal ID No.: _____ |
| Federal ID No.: _____ | |

| | |
|---|---|
| **BROKER** | **BROKER** |
| _____ | _____ |
| Attn: _____ | Attn: _____ |
| Title: _____ | Title: _____ |
| Address: _____ | Address: _____ |
| Phone: _____ | Phone: _____ |
| Fax: _____ | Fax: _____ |
| Email: _____ | Email: _____ |
| Federal ID No.: _____ | Federal ID No.: _____ |
| Broker DRE License #: _____ | Broker DRE License #: _____ |
| Agent DRE License #: _____ | Agent DRE License #: _____ |

AIR CRE  *  https://www.aircre.com  *  213-687-8777  *  contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

_____               _____
INITIALS                   INITIALS

© 2019 AIR CRE.  All Rights Reserved.
STN-27.30, Revised 10-22-2020

Last Edited: 6/29/2021 5:33 PM

MEIN002008



# GUARANTY OF LEASE

WHEREAS, ___Maurice and Mary Sourmany Trustees of the Sourmany 2006 Trust___, hereinafter "Lessor", and ___Jan Douma___, hereinafter "Lessee", are about to execute a document entitled "Lease" dated ___July 1, 2021___ concerning the premises commonly known as (street address, city, state, zip) ___3956 State Street, Santa Barbara, CA 93105___ wherein Lessor will lease the premises to Lessee, and

WHEREAS, ___Mieneke Car Centers LLC___ hereinafter "Guarantors" have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of said Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed by Lessor and Guarantors that: (i) the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and (ii) said Lease may be assigned by Lessor or any assignee of Lessor without the consent of or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease.

No notice of default by Lessee under the Lease need be given by Lessor to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors following any breach or default by Lessee under the Lease without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation that Guarantors may have against Lessee.

Guarantors do hereby subordinate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided, shall be deemed to also require the Guarantors to provide estoppel statements and financial statements to Lessor. The failure of the Guarantors to provide the same to Lessor shall constitute a default under the Lease.

The term "Lessor" refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term "Lessee" refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

Any recovery by Lessor from any other guarantor or insurer shall first be credited to the portion of Lessee's indebtedness to Lessor which exceeds the maximum liability of Guarantors under this Guaranty.

No provision of this Guaranty or right of the Lessor can be waived, nor can the Guarantors be released from their obligations except in writing signed by the Lessor.

Any litigation concerning this Guaranty shall be initiated in a state court of competent jurisdiction in the county in which the leased premises are located and the Guarantors consent to the jurisdiction of such court. This Guaranty shall be governed by the laws of the State in which the leased premises are located and for the purposes of any rules regarding conflicts of law the parties shall be treated as if they were all residents or domiciles of such State.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee. The attorney's fee award shall not be computed in accordance with any court fee schedule, but shall be such as to full reimburse all attorneys' fees reasonably incurred.

If any Guarantor is a corporation, partnership, or limited liability company, each individual executing this Guaranty on said entity's behalf represents and warrants that he or she is duly authorized to execute this Guaranty on behalf of such entity. Signatures to this Guaranty accomplished by means of electronic signature or similar technology shall be legal and binding.

_____                                    _____
INITIALS                                   INITIALS

© 2017 AIR CRE. All Rights Reserved.
GR-3.22, Revised 10-22-2020

Last Edited: 6/29/2021 5:36 PM

MEIN002009

If this Form has been filled in, it has been prepared for submission to your attorney for his approval.  No representation or recommendation is made by AIR CRE, the real estate broker or its agents or employees as to the legal sufficiency, legal effect, or tax consequences of this Form or the transaction relating thereto.

GUARANTORS                                              Executed At: _____

 _Mieneke Car Centers LLC_                              On: _____

By: _____                   By: _____
Name Printed: _____                               Name Printed: _____
Title: _____                                      Title: _____
Address: _____                                    Address: _____

AIR CRE  *  https://www.aircre.com  *  213-687-8777  *  contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

_____                                                _____
INITIALS                                               INITIALS

© 2017 AIR CRE.  All Rights Reserved.
GR-3.22, Revised 10-22-2020

MEIN002010

**FLAGSHIP CONSTRUCTION, INC.**

*INSPECTION OF PROPERTY Dec 10, 2019*

(805) 636-5152
flagship805@gmail.com

December 10, 2019

45 Dearborn Pl. #34
Goleta, CA 93117

Maurice and Mary Sourmany
Property Owners
3956 State Street
Santa Barbara, CA 93105

Lic.994317

Dear Maurice and Mary,
Upon inspection of the property located at 3956 State St on the 10th of December of 2019, our findings are as follows:

Fencing-
The fence in the rear of the property that has been apparently damaged by a fallen branch, still has a bent top rail in one area as well as a poorly connected top rail that appears to have been wired unprofessionally.

Our recommendation- Replace the bent top rail and connect top rails with a proper coupler at current break that is wired together.

Parapet walls-
Plaster has been repaired properly, but never primed or painted.
Our recommendation- Prime and paint the exposed patches on the parapet walls.

Gaps around electrical conduit-
These gaps remain.
Our recommendation- Plaster patch around conduits and use spray foam insulation as needed.

Patio Cover (Pergola)
The patio cover/ pergola shows signs of extreme dry-rot/ pest damage beyond Bond-O/ dutchman repairs.
Our recommendation- Demolish and either rebuild or waterproof and patch.

Electrical wiring between buildings-
Conduits running from building to building have exposed wiring.
Our recommendation- Run wire through proper conduit supported by guy wires exterior rated, properly sealed at penetrations.

MEIN002011

Garage cracks-
The cracks appear to be normal for the age of the building.
Between 1/16" - 1/8"
We find this acceptable.

Tile roof-
About a 5'x5' area of tile roofing has severe damage.
Our recommendation- Replace all broken tiles and possible underlayment once broken tiles are removed to view.

Water heater-
Appears to be installed within a year or 2. It has no date. It is 6 gallons.

Sub panel appears in good order without issue.

Bathroom has been retiled.

Front door has been replaced however we recommend sealing the top and bottom with primer and paint.

The windows that were previously rotten have been properly repaired and are in good condition.

Flat roof-
Parapet walls and flashing in good condition. Flat comp roof is buckling all over and not draining water as well as collecting debris.
Our recommendation- Completely replace flat roof. Including everything down to the substrate. This will continue to puddle and collect debris and is susceptible to leaks. We believe this is the main concern and needing the most attention.

Sincerely yours,

12/10/19

Calvin Petersen

C.E.O.

MEIN002012

**ADDENDUM**
**TO**
**STANDARD INDUSTRIAL/COMMERCIAL SINGLE -TENANT LEASE - NET**

     **THIS ADDENDUM** (this "Addendum") is made and entered into as of July 1, 2021, by and between **Maurice and Mary Sourmany, as Trustees of the Sourmany 2006 Trust** ("Lessor"), and **Jan Douma** ("Lessee"), with reference to the following facts:

     A.     This Addendum modifies and is to be made a part of that certain Standard Industrial/Commercial Single-Tenant Lease - Net of even date herewith between Lessor and Lessee (the "Lease") with respect to those certain premises commonly known as 3956 State Street Street, Santa Barbara, California 93105 and particularly described in the Lease (the "Premises").

     B.     Capitalized terms used but not defined herein have the meanings assigned to them in the Lease.

     NOW, THEREFORE, in consideration of the foregoing recitals and the covenants and agreements set forth herein, together with other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto, intending to be legally bound, agree that the following provisions are incorporation into the Lease:

     **51. Annual Rent Increase.** The Base Rent described in paragraph 1.5 of the Lease shall be increased on August 1st of each year of the Term by the percentage increase, if any, which has occurred in the Consumer Price Index between July 1st and June 30th of the preceding year but in no event shall the increase be less than two percent (2%) annually. Such percentage increase shall be determined by using the Consumer Price Index (CPI) for All Urban Consumers Los Angeles, Long Beach Anaheim issued by the Bureau of Labor Statistics of the United States Department of Labor, or its successor, published for "All Items" "U.S. City Average" (1982-84 = 100). The index numbers to be used for the purposes of this increase shall be those in effect for the dates described above and if such Index shall be converted to a different standard reference base or shall otherwise be revised, the percentage increase shall be made with the use of such conversion factors, formula or tables as may be published for such purpose.

     **52. Insuring Party.** Lessee shall be the Insuring Party under the Lease and shall obtain all insurance coverages referenced in Section 8 of the Lease.

     **53. Lessee Work**. Lessee is the current occupant of the Premises and acknowledges that the list of deferred maintenance issues attached hereto as Exhibit A (the "Lessee Work"), remain outstanding. Lessee agrees to complete all such Lessee Work to Lessor's reasonable satisfaction within 3 months of the Commencement Date.

*(Signature page follows.)*

MEIN002013

**IN WITNESS WHEREOF**, the Parties have executed this Addendum as of the date first set forth above.

**LESSOR**                                                    **LESSEE**


_____                _____

Maurice Sourmany, Trustee of the Sourmany 2006        Jan Douma
Trust


_____

Mary Sourmany, Trustee of the Sourmany 2006 Trust

MEIN002014

Exhibit A

Lessee Work

MEIN002015

# EXHIBIT "K"

| From: | **Drew Simons** <asimons@rppmh.com> |
|---|---|
| To: | **Joseph Robinson** <joseph.robinson@drivenbrands.com> |
| CC: | **Jan Douma** <jandouma1@gmail.com> |
| Subject: | <External> Guaranty for 3956 State Street Santa Barbara CA |
| Date: | 12.07.2021 16:58:06 (+02:00) |
| Attachments: | Guaranty_rv1.pdf (2 pages) |

Joe,

I have not heard back from you and want to confirm you received the guaranty. Jan is ready to execute the new lease. Is Meineke ready to execute the guaranty and move this process forward? Please advise. Thanks.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com
-----------------------------------------------
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.
-----------------------------------------------
CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

MEIN001989



# GUARANTY OF LEASE

WHEREAS,  Maurice and Mary Sourmany Trustees of the Sourmany 2006 Trust , hereinafter "Lessor", and  Jan Douma  , hereinafter "Lessee", are about to execute a document entitled "Lease" dated  July 1, 2021  concerning the premises commonly known as (street address, city, state, zip)  3956 State Street, Santa Barbara, CA 93105  wherein Lessor will lease the premises to Lessee, and

WHEREAS,  Mieneke Car Centers LLC  hereinafter "Guarantors" have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of said Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed by Lessor and Guarantors that: (i) the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and (ii) said Lease may be assigned by Lessor or any assignee of Lessor without the consent of or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease.

No notice of default by Lessee under the Lease need be given by Lessor to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors following any breach or default by Lessee under the Lease without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty. (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation that Guarantors may have against Lessee.

Guarantors do hereby subordinate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided, shall be deemed to also require the Guarantors to provide estoppel statements and financial statements to Lessor.  The failure of the Guarantors to provide the same to Lessor shall constitute a default under the Lease.

The term "Lessor" refers to and means the Lessor named in the Lease and also Lessor's successors and assigns.  So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term "Lessee" refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

Any recovery by Lessor from any other guarantor or insurer shall first be credited to the portion of Lessee's indebtedness to Lessor which exceeds the maximum liability of Guarantors under this Guaranty.

No provision of this Guaranty or right of the Lessor can be waived, nor can the Guarantors be released from their obligations except in writing signed by the Lessor.

Any litigation concerning this Guaranty shall be initiated in a state court of competent jurisdiction in the county in which the leased premises are located and the Guarantors consent to the jurisdiction of such court.  This Guaranty shall be governed by the laws of the State in which the leased premises are located and for the purposes of any rules regarding conflicts of law the parties shall be treated as if they were all residents or domiciles of such State.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee.  The attorney's fee award shall not be computed in accordance with any court fee schedule, but shall be such as to full reimburse all attorneys' fees reasonably incurred.

If any Guarantor is a corporation, partnership, or limited liability company, each individual executing this Guaranty on said entity's behalf represents and warrants that he or she is duly authorized to execute this Guaranty on behalf of such entity.  Signatures to this Guaranty accomplished by means of electronic signature or similar technology shall be legal and binding.

_____                            _____
INITIALS                            INITIALS

© 2017 AIR CRE.  All Rights Reserved.
Last Edited: 6/29/2021 5:36 PM

MEIN001990

If this Form has been filled in, it has been prepared for submission to your attorney for his approval.  No representation or recommendation is made by AIR CRE, the real estate broker or its agents or employees as to the legal sufficiency, legal effect, or tax consequences of this Form or the transaction relating thereto.

GUARANTORS

 Mieneke Car Centers LLC 

Executed At: _____

On: _____

By: _____

Name Printed: _____

Title: _____

Address: _____

By: _____

Name Printed: _____

Title: _____

Address: _____

AIR CRE  *  https://www.aircre.com  *  213-687-8777  *  contracts@aircre.com

NOTICE:  No part of these works may be reproduced in any form without permission in writing.

_____
INITIALS

_____
INITIALS

© 2017 AIR CRE.  All Rights Reserved.

GR-3.22, Revised 10-22-2020

Last Edited: 6/29/2021 5:36 PM

MEIN001991

# EXHIBIT "L"

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

# MEINEKE FRANCHISOR SPV LLC
# FRANCHISE AND TRADEMARK AGREEMENT

**CJGL, INC.**
DEALER

**4118**
CENTER NUMBER

September 29, 2021
AGREEMENT DATE

MEIN000776

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

# TABLE OF CONTENTS

**Page**

ARTICLE 1: INTRODUCTION AND DEFINITIONS....................................................1

    1.1    Meineke Car Care Centers ...............................................1

    1.2    Acknowledgments ...........................................................1

    1.3    Definitions .......................................................................1

ARTICLE 2: GRANT OF RIGHTS ..........................................................................3

    2.1    Grant of Franchise/Reservation of Rights ......................3

    2.2    Selection of Location for New Center ..............................4

    2.3    Your Territorial Protection ...............................................4

    2.4    Your Right to Associate with Other Meineke Dealers .....5

    2.5    Consultation with the Dealer Association Advisory Council ...........5

    2.6    Relocation of Center .......................................................6

ARTICLE 3: FEES 6

    3.1    Initial Franchise Fee .......................................................6

    3.2    Royalty Fees....................................................................6

    3.3    Royalty Fee Administration .............................................8

    3.4    Initial Advertising Contribution and Contributions to Meineke Advertising Fund ...........9

    3.5    Technology Administrative Fee .......................................9

    3.6    Interest on Late Payments ...............................................9

    3.7    Method of Payment .........................................................10

    3.8    Application of Payments .................................................10

ARTICLE 4: DEVELOPMENT OF YOUR CENTER ...............................................10

    4.1    Purchase or Lease of Premises .....................................10

    4.2    Development and Opening of Your Center ......................11

    4.3    Equipment, Fixtures and Signs.......................................11

    4.4    Use and Ownership of Telephone Numbers ...................11

ARTICLE 5: TRAINING AND GUIDANCE .............................................................12

    5.1    Training Programs...........................................................12

    5.2    On-Going Guidance .......................................................13

    5.3    Periodic Inspections ......................................................13

    5.4    Operations Manual .........................................................13

ARTICLE 6: YOUR ORGANIZATION AND MANAGEMENT. ...............................13

    6.1    Disclosure of Ownership Interests ..................................13

i

MEIN000777

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

# TABLE OF CONTENTS
(continued)

**Page**

6.2    Management of Center ........................................................................................ 14

ARTICLE 7: OPERATING STANDARDS ..................................................................... 14

7.1    Authorized Products and Services ................................................................... 14

7.2    Parts and Supplies ............................................................................................ 14

7.3    Maintenance and Repair of Equipment ......................................................... 15

7.4    Condition of Center/Center Upgrades ............................................................ 16

7.5    Periodic Upgrades ........................................................................................... 16

7.6    Specifications and Standards ........................................................................... 16

7.7    Changes to Specifications and Standards/Days and Hours of Operation ......... 16

7.8    Compliance With Laws ................................................................................... 17

7.9    Personnel ......................................................................................................... 17

7.10   Insurance ......................................................................................................... 17

7.11   Conformity to the Discount Price Program .................................................... 18

7.12   Customer Warranties ....................................................................................... 18

7.13   Customer Complaints ...................................................................................... 19

ARTICLE 8: MARKETING AND ADVERTISING ....................................................... 19

8.1    Marketing and Advertising Programs ............................................................ 19

8.2    Initial Advertising Contribution ..................................................................... 19

8.3    Meineke Advertising Fund .............................................................................. 19

8.4    Allocation Between Local Advertising and Local Directories ....................... 22

8.5    Local Advertising ............................................................................................ 22

8.6    Dealer Websites and Online Listings ............................................................. 22

8.7    Approval of Advertising Content .................................................................... 22

ARTICLE 9: REPORTS AND INSPECTIONS ............................................................... 23

9.1    Records ............................................................................................................ 23

9.2    Computer System ............................................................................................ 23

9.3    Periodic Reports .............................................................................................. 24

9.4    Use of Customer Information .......................................................................... 24

9.5    Inspections ...................................................................................................... 25

9.6    Audits .............................................................................................................. 25

ARTICLE 10: TRADEMARKS ....................................................................................... 25

10.1   Ownership of the Marks ................................................................................. 25

Meineke FA (2021)
EAST\178929093.5

MEIN000778

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 10.2 | Use of the Marks | 26 |
| 10.3 | Discontinuance of Use of Marks | 26 |
| 10.4 | Notification of Infringements and Claims | 26 |
| 10.5 | Indemnification of Dealer | 26 |
| ARTICLE 11: | RESTRICTIVE COVENANTS | 26 |
| 11.1 | Confidential Information | 26 |
| 11.2 | Dealer's In-Term Covenants | 27 |
| 11.3 | Information Exchange | 27 |
| 11.4 | Dealer's Post-Term Covenants | 28 |
| 11.5 | Meineke's Non-Competition Covenant | 28 |
| 11.6 | Competition by Meineke's Affiliates | 28 |
| 11.7 | Meineke's Management Commitment | 30 |
| ARTICLE 12: | TRANSFER OF AGREEMENT | 30 |
| 12.1 | Transfer by You Subject to Our Approval | 30 |
| 12.2 | Conditions for Approval | 31 |
| 12.3 | Transfer to a Corporation | 32 |
| 12.4 | Special Transfers | 32 |
| 12.5 | Death or Disability of Dealer | 32 |
| 12.6 | Your Right to Offer Your Franchise to Us | 33 |
| 12.7 | Our Right of First Refusal | 33 |
| 12.8 | Transfer by Us | 34 |
| ARTICLE 13: | TERMINATION OF AGREEMENT | 35 |
| 13.1 | Termination Upon Notice | 35 |
| 13.2 | Termination After Opportunity to Cure | 36 |
| ARTICLE 14: | RENEWAL RIGHTS | 36 |
| ARTICLE 15: | EFFECT OF TERMINATION OR EXPIRATION | 38 |
| 15.1 | Payment of Amounts Owed to Us | 38 |
| 15.2 | Discontinue Use of Marks and Confidential Information | 38 |
| 15.3 | Customers | 39 |
| 15.4 | Possession of Premises | 39 |
| 15.5 | Continuing Obligations | 39 |
| ARTICLE 16: | RELATIONSHIP OF THE PARTIES | 39 |

3

MEIN000779

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

## TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 16.1 | Independent Contractors | | 39 |
| 16.2 | Indemnification | | 40 |
| 16.3 | Taxes | | 41 |
| ARTICLE 17: MISCELLANEOUS | | | 41 |
| 17.1 | Governing Law | | 41 |
| 17.2 | Arbitration | | 41 |
| 17.3 | Preliminary Injunctive Relief | | 42 |
| 17.4 | Multi-Plaintiff and Class Action Claims | | 42 |
| 17.5 | Venue | | 42 |
| 17.6 | Costs and Attorneys' Fees | | 43 |
| 17.7 | Limitations on Legal Claims | | 43 |
| 17.8 | Severability and Substitution of Provisions | | 43 |
| 17.9 | Waiver of Obligations | | 43 |
| 17.10 | Exercise of Rights | | 43 |
| 17.11 | Construction | | 44 |
| 17.12 | Modification | | 44 |
| 17.13 | Policy Regarding Meineke Chain Expansion | | 45 |
| 17.14 | Notices and Payments | | 45 |
| 17.15 | Ombudsman | | 45 |

<u>SCHEDULES</u>

SCHEDULE A – Franchise Information
SCHEDULE B – Premises
SCHEDULE C – Disclosure of Ownership Interests
SCHEDULE D – Owners' Personal Guaranty

iv

MEIN000780

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

MEINEKE®
FRANCHISE AND TRADEMARK AGREEMENT

**THIS FRANCHISE AND TRADEMARK AGREEMENT** (the "Agreement") between **MEINEKE FRANCHISOR SPV LLC**, a Delaware limited liability company,  with its principal place of business located at 440 South Church Street, Suite 700, Charlotte, North Carolina  28202 ("Franchisor" or "we"), and **CJGL, INC.**, a California corporation, with its principal place of business located at 667 Seeger Avenue, Ventura, California 93003 ("Dealer" or "you"), is made and entered into as of the date appearing below our signature line at the end of this Agreement (the  "Agreement Date").

ARTICLE 1:
INTRODUCTION AND DEFINITIONS

1.1    Meineke Car Care Centers

We and our Affiliates operate, and we grant others ("Meineke Dealers") the right to operate, automotive maintenance and repair businesses known as "Meineke Car Care Centers." As a result of our investment of time, skill, effort and money, we and our Affiliates have developed comprehensive business methods and systems, that we may improve or otherwise change from time to time, for operating Meineke Car Care Centers.

1.2    Acknowledgments

You and we acknowledge our shared commitment to the common goals of enhancing customer goodwill toward the Marks, to strengthening the business of Meineke Car Care Centers and to expanding the chain of Meineke Car Care Centers.  You and we further acknowledge that the success of achieving these common goals is dependent on us and Meineke Dealers working together in a spirit of mutual respect and cooperation.  In accordance with that spirit, we and our Affiliates have developed this form of franchise agreement with the advice and counsel of the Dealer Association Advisory Council.

The provisions of this Agreement are based on the guiding principles that: (a) we should respect your interest in the going-concern value of your business; and (b) you should respect our ownership of the System, including the Marks, trade secrets, confidential information and the associated goodwill, and our rights to determine the nature and quality of the products and services sold under the Marks, to control the manner in which the Marks are used, to enforce System standards and to manage the System. You understand the terms of this Agreement and accept them as being reasonably necessary for us to maintain the uniformity of our high quality standards at all Meineke Car Care Centers and to protect the goodwill of the Marks and the integrity of the System.

1.3    Definitions

The terms listed below have the meanings which follow them or have the meanings which are set out in the referenced Section and include the plural as well as the singular. Other terms are defined elsewhere in this Agreement in the context in which they arise.

(1)    "Adjustment" - See Section 3.4.

(2)    "Affiliate" - Any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party.

MEIN000781

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

(3)    "Agreement Date" - See <u>Preamble</u>.

(4)    "Annual Administrative Expense" - See <u>Section 8.3</u>.

(5)    "Annual Minimum Royalty" - See <u>Section 3</u>.2.

(6)    "Authorized Products and Services" - See <u>Section 3.2</u>.  Also see <u>Section 7.1</u>.

(7)    "Calculated Royalties" - See <u>Section 3</u>.2.

(8)    "CPI" - The index number in the table relating to "Consumer Price Index - United States City Average, All Items, for Urban Wage Earners and Clerical Workers" as presently published in the "Monthly Labor Review" of the Bureau of Labor Statistics for the United States Department of Labor (the "Bureau").  In the event the Bureau ceases publishing the Consumer Price Index or materially changes the methods of its computation or other features of it, we may substitute comparable statistics on the purchasing power of the consumer dollar published by the Bureau, another governmental agency or a responsible financial periodical or recognized authority to be chosen by us.

(9)    "Competitive Business" - Any enterprise that offers or sells any of the Core Authorized Products and Services, provided that, for purposes of this Agreement, the following will not be deemed a Competitive Business:  (a) any other Meineke Center operated under a franchise agreement with us; (b) any other automotive business franchised by Driven Brands Holdings Inc. or its subsidiaries; or (c) an enterprise (i) that offers and sells products and services that we consider to be Core Authorized Products and Services, other than repair and replacement of exhaust system components, brake system components and ride system components, (ii) that you owned and were operating prior to the date that such product or service is designated as an Authorized Product or Service (even if such designation is on a test basis), and (iii) that you fully disclosed to us in writing before the date such product or service is designated an Authorized Product or Service.

(10)    "Confidential Information" - See <u>Section 11.1</u>.

(11)    "Core Authorized Products and Services" - See <u>Section 7.1</u>.

(12)    "DAAC" or "Dealer Association Advisory Council" - See <u>Section 2.5</u>.

(13)    "Dealer" or "you" - See <u>Preamble</u>.

(14)    "Franchisor" or "we" - See <u>Preamble</u>.

(15)    "Gross Revenues" - See <u>Section 3</u>.3.

(16)    "Immediate Family" - Spouse, parents, brothers, sisters and children, whether natural or adopted.

(17)    "MAF" - See <u>Section 3.4</u>.

(18)    "Market Area" - The MSA, PMSA, NECMA, county, parish or other corresponding geographical area used by the U.S. Census Bureau and as described in <u>Schedule A</u>, attached hereto and incorporated herein by reference.

MEIN000782

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

(19)    "Marks" - Our current and future trademarks, service marks and trade dress, including the mark Meineke®, that we authorize Meineke Dealers to use.

(20)    "Meineke Dealers" - See <u>Section 1.1</u>.

(21)    "Meineke Car Care Centers," "Meineke Centers" or "Centers" - Automotive maintenance and repair businesses that we or our Affiliates operate, or that we grant others the right to operate, and which offer and sell the Authorized Products and Services using the Marks and the System.

(22)    "Operating Partner" - See <u>Section 6.2</u>.

(23)    "Operations Manual" - See <u>Section 5.4</u>.

(24)    "Opening Date" - See <u>Section 4.</u>2.

(25)    "Owner" - See <u>Section 6.1</u>.

(26)    "Preferred Supplier" - A supplier of equipment, parts, supplies or other products who we have approved and whose equipment, parts, supplies or products we use in training programs and the Operations Manual to demonstrate and teach techniques in performing services associated with Authorized Products and Services.

(27)    "Premises" - The location of your Center identified in <u>Schedule B</u>, attached hereto and incorporated herein by reference.

(28)    "Protected Area" - See <u>Section 2.</u>3.

(29)    "System" - The business methods, systems, designs and arrangements for developing and operating Meineke Car Care Centers that include the Marks; the Confidential Information; standards and specifications for equipment; service standards; training and assistance; advertising and promotional programs; and certain operations and business standards and policies.

(30)    "Term" - See <u>Section 2.</u>1.

(31)    "Transfer the Franchise" - See <u>Section 12.1</u>.

(32)    "Weekly Royalties" - See <u>Section 3.2</u>.

(33)    "Your Center" - See <u>Section 2.1</u>.

**ARTICLE 2:**
**GRANT OF RIGHTS**

2.1    Grant of Franchise/Reservation of Rights

Subject to the terms and conditions of this Agreement, we grant you the right, and you assume the obligation, to operate a Meineke Center ("your Center") at the Premises and to use the System solely in connection therewith, for a term expiring on the expiration date set forth in <u>Schedule A</u> or otherwise expiring on the 15th anniversary of the Opening Date (the "Term"). You may not conduct the business of your Center or use the System anywhere other than the Premises without our consent.

3

MEIN000783

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

Except as otherwise expressly provided in this Agreement, we and our Affiliates reserve all of our respective rights and discretion with respect to the Marks, the System and Meineke Centers anywhere in the world and the right to engage in any business whatsoever, including: (a) the right to operate, and grant to others the right to operate, Meineke Centers at such locations and on such terms and conditions as we deem appropriate; and (b) the right to acquire, merge or consolidate with, be acquired by, operate and expand businesses.

2.2     Selection of Location for New Center

If this Agreement is for a new Meineke Center, you agree to propose a location for your Center in the Market Area no later than 180 days after the Agreement Date. Your proposed location must conform to our site selection guidelines and requirements and is subject to our approval. You agree to submit to us all information about the proposed location that we request, including a complete site analysis report. We have no obligation to consider a proposed location until we receive all requested information. You agree not to execute any lease or purchase agreement for, nor commit to any other binding obligation to purchase, occupy or improve, any proposed location until we have approved the location in accordance with our standard procedures. In approving or disapproving any proposed location, we will consider the factors we deem relevant, including general location, neighborhood and the distance to any other Meineke Center operating in the Market Area.  We will have no liability whatsoever to you or anyone else for approving or disapproving a proposed location. Upon approval of a proposed location, the location will be identified in Schedule B and Schedule B will be signed by both parties and attached to this Agreement.  Once Schedule B has been completed and signed, the location identified in Schedule B will be deemed the "Premises".

If you and we are unable to mutually agree on a location for your Center within 180 days after the Agreement Date, either party may terminate this Agreement, effective upon notice.

Neither our site selection guidelines and requirements, our approval of the Premises, nor any information we may impart to you about the Premises, constitutes a warranty or representation of any kind, express or implied, that your Center will be profitable or successful. Our approval of the Premises merely signifies that we authorize you to operate a Meineke Center at that site. You are solely responsible for the selection of an appropriate site for your Center.

2.3     Your Territorial Protection

Once the Premises have been identified in accordance with Section 2.2, we will not during the Term operate, nor grant others the right to operate, (a) a Meineke Center within a radius of 2 miles from the Premises (the "Protected Area"), (b) a Meineke Center outside of the Protected Area but within a radius of 3 miles from the Premises without offering you a right of first refusal, as described in this Section 2.3, or (c) more than 1 Meineke Center for every 50,000 motor vehicles (i.e., automobiles and light trucks that are licensed to operate on public highways) registered in the Market Area at the time each Center is opened.

If, during the Term, we want to operate, or to grant someone else the right to operate, a Meineke Center outside the Protected Area, but at a proposed location within a 3-mile radius from the Premises, we will first offer a franchise to you on our then-standard terms and conditions for new Meineke Car Care Centers, provided that you are Option Eligible (as defined below).  If you do not accept our offer within 30 days of written notice thereof, we will be entitled to operate, and to grant to someone else the right to operate, a Meineke Center at the proposed location.  Notwithstanding anything to the contrary contained in this Section 2.3, if there is more than one then-existing Meineke Center located within a 3-mile radius from the proposed location of the new Meineke Center, then you will be entitled to the right of first refusal contained in this Section 2.3 only if (a) your Center is closest to the proposed location of the new Meineke

MEIN000784

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

Center, or (b) the owners of all Meineke Car Care Centers that are closer to the proposed location of the new Meineke Center fail to accept any similar right of first refusal contained in their franchise agreements.

For purposes of this Section 2.3, you will be "Option Eligible" if:  (1) you are not then in arrears in any payment to us or to any of our Affiliates for 30 days or more and we have not delivered to you a notice of default during the preceding 12 months; (2) you have no outstanding customer warranty matters or customer complaints which are not resolved within 30 days after we notify you of them; and (3) you are at least a "3-Star Dealer" in accordance with the then-current Meineke Star Rating Program for at least the final 2 years of your existing Term. You acknowledge and agree that the foregoing "Option Eligible" standard does not encompass our normal requirements and criteria for issuing a new franchise, approving a transferee or renewing a franchise and, by agreeing to limit our criteria under this Section 2.3, we are not limiting our requirements or criteria for any other types of franchise sales or transactions or acknowledging that being Option Eligible means you are in compliance with this Agreement.

Your rights and our obligations in this Section 2.3 do not apply to any Meineke Center that is open or under development, or as to which the location has been approved, as of the date we notify you of our approval of the Premises.

2.4     Your Right to Associate with Other Meineke Dealers

We agree not to prohibit or restrict you from lawfully associating with other Meineke Dealers, nor from forming, joining or participating in the lawful activities of any independent association of Meineke Dealers. Notwithstanding the foregoing, our exercise and enforcement of rights under this Agreement or under applicable law will not, by itself, constitute a breach of this Section 2.4.  You are not required to be a member or participate in the activities of any independent association of Meineke Dealers.

2.5     Consultation with the Dealer Association Advisory Council

We agree to consult with DAAC (or, as applicable, the Advertising Committee) on a periodic basis with respect to the matters specified in Sections 3.3 (Royalty Fee Administration), Section 7.1 (Authorized Products and Services), Section 7.2 (Parts and Supplies), Section 7.8 (Insurance), Section 7.10 (Customer Warranties), Section 8.3 (Meineke Advertising Fund), Section 17.12 (Policy Regarding Meineke Chain Expansion) and Section 17.14 (Ombudsman) and other matters relating to our relationship with Meineke Dealers as to which we may, at our sole discretion, agree to consult with DAAC from time to time. You agree that we may consult with and consider the advice and counsel of DAAC, but that we are not bound by its views.

Provided that Meineke Dealers Association, Inc. (d/b/a "The New Meineke Dealers Association, Inc." and f/k/a "Association of Muffler Dealers, Inc.") ("MDA"), a Delaware non-profit corporation, complies with its obligations under the Meineke/Dealer Association Cooperation Agreement dated on or about May 1, 2000 to amend its organizational documents before July 31, 2000 in accordance with the terms of that agreement, the "Dealer Association Advisory Council" or "DAAC" shall be a representative committee of Meineke Dealers (or officers or directors of Meineke Dealers operating in corporate form) duly elected from time to time by the members of MDA through democratic processes and reflecting reasonable geographical representation, so long as MDA represents the owners of more than 50% of all franchised Meineke Car Care Centers in the United States of America. In the event that MDA does not fulfill its obligations under the above-referenced agreement, or the owners of 50% or less of all franchised Meineke Car Care Centers in the United States of America are members of MDA, and another association of Meineke Dealers which represents the owners of more than 50% of all franchised Meineke Car Care Centers in the United States of America and whose governing documents meet our reasonable requirements from time to time for ensuring democratic processes and representation of the interests of all Meineke

5

MEIN000785

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

Dealers, including appropriate electoral regions and districts, then the DAAC shall consist of a committee of duly elected representatives of such other association.

We may from time to time require that MDA or any other independent association of Meineke Dealers intending to qualify for a DAAC demonstrate to our reasonable satisfaction that it qualifies to establish a DAAC, and we shall have no obligation to recognize any purported DAAC of any association, including MDA, that has failed or refused to so demonstrate its qualifications.

If, at any time, no association of Meineke Dealers exists or qualifies to establish a DAAC, we may, but are not obligated to, establish an elected or appointed DAAC, and if we determine not to do so, we will have no obligation, notwithstanding anything to the contrary contained in this Agreement, to seek the advice and counsel (or consent under Section 17.13 or otherwise) of any DAAC (or, as applicable, Advertising Committee), unless and until an association of Meineke Dealers qualifies to establish a DAAC.

2.6     Relocation of Center

If your lease or sublease for the Premises terminates or expires prior to the end of the Term, or if you otherwise lose control of the location, then you shall make commercially reasonable efforts to relocate your Center in accordance with this Section 2.6, subject to our approval; provided, that if you or one of your Affiliates, or a related individual, terminates your lease or sublease or allows it to expire before the end of the Term, or if you or such Affiliate or related individual otherwise causes you to lose control of the location, then you shall relocate your Center in accordance with this Section 2.6. Any exceptions to this requirement to relocate shall be subject to review in our sole discretion. Any such relocation shall be at your sole expense. The relocation of your Center is subject to all of the provisions of Section 2.2, Section 2.3, Section 3.3, Section 4.1, Section 4.2, Section 4.3 and Section 4.4 as if you were establishing a new Meineke Center, provided, however: (a) your rights under Section 2.3 terminate effective immediately upon closing of the old Premises and become operative again only when the new Premises are approved by us; (b) your Center at the new Premises must open no later than 12 months after the date of closing of the old Premises; (c) your initial franchise fee is not refundable; and (d) you agree to pay us a relocation fee in the amount of $1,000 for our costs and expenses incurred in connection with your relocation.

## ARTICLE 3:
## FEES

3.1     Initial Franchise Fee

You agree to pay us an initial franchise fee in the amount set forth in Schedule A (less any creditable deposit), payable on the Agreement Date. The initial franchise fee is fully earned by us on the Agreement Date and is non-refundable.

3.2     Royalty Fees

During the term of this Agreement and any extensions or renewals thereof you agree to pay us royalties at the greater of the percentages set forth below for the identified categories of Authorized Products and Services derived from the sale of these products or services ("Calculated Royalties") or annual minimum royalties in the amount of $20,800 subject to adjustment as provided for in Article 3.3 of this Agreement ("Annual Minimum Royalties"). While these royalties will be computed and, in the case of Calculated Royalties, aggregated on an annual basis you are to make individual royalty payments to us on a weekly basis as stated below.

Before Wednesday of each week, you agree to pay us weekly royalties ("Weekly Royalties") that are defined as the greater of $400 subject to adjustment as provided for in Article 3.3 of this Agreement

6

MEIN000786

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

("Weekly Minimum Royalties"), or the Calculated Royalties for the immediately preceding week (i.e. Sunday through Saturday period):

At the end of each calendar year during the term of your Agreement and any extensions or renewals thereof we will rebate to you the difference between the aggregate of the Weekly Royalties from the operation of your Center for that year and the Yearly Royalties (which are defined as the greater of the aggregated Calculated Royalties and the Annual Minimum Royalties). In other words, if your Yearly Royalties paid to us are more than the greater of your Calculated Royalties or your Annual Minimum Royalties for that year then you will be rebated the difference. Under no circumstances will you pay less than the Annual Minimum Royalties in any one year of this Agreement. To the extent that your Center opens at a time other than the first week of the fiscal year your Annual Minimum Royalties for that year will be prorated based on a 52-week year.

Notwithstanding anything stated to the contrary, if you are signing this Agreement as a new franchisee for a new Meineke Center that has never been opened for business then the calculation and payment of the Annual Minimum Royalties and the payment of the Weekly Minimum Royalties shall not commence until the expiration of 6 months from the first Monday that you open your Center for business. At the end of the 6-month period you will begin to pay your Weekly Minimum Royalties as required by this Agreement, but your Annual Minimum Royalties, which are calculated on a calendar-year basis, shall be prorated for that year on a 52-week basis.

| Authorized Product or Service | Royalty rate as a percentage of Gross Revenues |
|---|---|
| Exhaust systems        (incl. catalytic converters) | 7% |
| Replacement of Engines or Transmissions | 5.5% |
| Engine Diagnostics | 5.5% |
| Engine Seals, Gaskets, Mounts | 5.5% |
| Transmission Mounts | 5.5% |
| Scheduled Maintenance | 5.5% |
| Batteries | 4% |
| Government regulated Inspections | 3% |
| Tires | 3% |
| Towing services | 3% |
| All Other Authorized Products and Services | 5% |

| Unauthorized Product or Service | Royalty rate as a percentage of Gross Revenues |
|---|---|
| Engine Rebuilding | 7% |
| Transmission Rebuilding | 7% |
| Other unauthorized Services | |
| Listed in your Operations Manual | 7% |
| Non-automotive services | 7% |

Except for the unauthorized services noted above and listed in your Operations Manual from time to time, authorized products and services are defined as the installation, repair and maintenance of and all parts relating to the mechanical and electrical systems on cars and light vehicles and the sale of any such parts ("Authorized Products and Services"). Additionally, from time-to-time we may authorize additional products and/or services that may be sold at your Center that may or may not fit the current definition of Authorized Products and Services. Any additional products and services that are authorized by us will be posted in your Operations Manual together with their applicable royalty rates.

Meineke FA (2021)
EAST\178929093.5

MEIN000787

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

In addition to the foregoing, for parts that are purchased from a new car dealership and sold to a Meineke customer, you are eligible to receive a rebate on royalty fees required to be paid pursuant to the terms of the Agreement down to a royalty rate of not lower than 3% (the rebate will be calculated on the cost of the part as the difference between the actual fees paid and 3% for royalties) ("Royalties") and Meineke Advertising Contributions not to be lower than 1.5% (the rebate will be calculated on the cost of the part as the difference between the actual contributions paid and 1.5%) ("MAF"). The rebate is based on part costs to you (that rebate is based on the COST of the part to the Franchisee, and not their selling price of such part). The rebate is for the cost of parts only and does not include the cost of labor associated with the installation of such parts for the customer. The maximum annual sales per year subject to the payment of a rebate is limited to 1% of the total gross sales of such center for that year as defined this Agreement.

3.3     Royalty Fee Administration

Notwithstanding the provisions of Section 3.2, royalty fees payable pursuant thereto and MAF Contributions payable pursuant to Section 3.4 on work performed for commercial customers who do not pay for those services at the time they are performed, i.e., trade accounts, shall be paid by the earlier of:  (a) 7 days after the date of payment from the customer; or (b) 90 days after the services are performed. If you can demonstrate, within one year after the services have been performed for a particular trade account, that such account is uncollectible, you may assign such account to us and we will credit you for the amount of royalty and MAF Contribution that you have paid on such account.

Notwithstanding anything to the contrary contained in Section 3.2: (a) subject to what is stated in Section 3.1 of this Agreement the royalty fee will be 7% of all revenues derived from products sold and services rendered at or in connection with your Center that are not Authorized Products and Services; (b) the royalty fee will be 7% of all Gross Revenues, if you fail to provide us required reports and information using computer systems in accordance with Section 9.2; (c) the royalty fee will be 8% of all unreported Gross Revenues, including those uncovered by an audit conducted pursuant to Section 9.6; and (d) we have the right to establish the amount of the royalty fee for any new products or services that become part of the Authorized Products and Services after the Agreement Date. We agree to consult with DAAC on the amount of the royalty fee for any such new products or services and to consider, among other things, the potential profitability of such new products and services in determining the amount of the royalty fee.

"Gross Revenues" are all the revenues derived from or in connection with the operation of your Center, whether from sales for cash or credit, and irrespective of their collection, including charges for Authorized Products and Services and applicable proceeds from any business interruption insurance for your Center, but excluding:  (a) sales taxes, use taxes, gross receipts taxes, and other similar taxes added to the sale price, collected from the customer and remitted to the appropriate tax authorities; (b) credit card fees on credit card sales; and (c) check guaranty fees. Gross Revenues also include revenues derived from any products or services sold and/or performed from or in connection with your Center that are not Authorized Products and Services, without such inclusion in this definition or the related collection of royalty fees constituting an acknowledgment or admission by us that such products or services are Authorized Products and Services or constituting in any manner a waiver of our right to assert that any such sale breaches this Agreement or otherwise violates our rights.

Both the Annual Minimum Royalties and the Weekly Minimum Royalties referred to in Article 3.2 together with any required services fees shall be subject to adjustment not more than once per calendar year to reflect any increase in the Consumer Price Index, All Urban Consumers, All Items, All U.S. Cities (revised 1982-84:100) published by the United States Department of Labor, Bureau of Statistics (the "Adjustment")  from the base period. For the purpose of the Royalty Fees and service fees, if any, the base period shall refer to October 2010.  We may at our election, in order to facilitate the computation of the

Meineke FA (2021)
EAST\178929093.5

MEIN000788

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

Adjustment, use the CPI published three months prior to the effective date of each Adjustment to determine the amount of the Adjustment. The first such adjustment shall be on October 1, 2011, and each subsequent adjustment shall be made effective as of each succeeding anniversary.

### 3.4 Initial Advertising Contribution and Contributions to Meineke Advertising Fund

You must pay to us an initial advertising contribution in the amount of $20,000 payable before you attend the initial training program, or, if you are an existing franchisee and will not attend initial training, 60 days before opening (the "Initial Advertising Contribution"). If you are signing this Agreement in connection with the renewal of your franchise rights, no Initial Advertising Contribution shall be due and payable to Franchisor. We will spend the Initial Advertising Contribution on pre-opening, grand opening and post-opening promotion, including, but not limited to, promotional materials, initial advertising (traditional and/or online) of the Center and other activities related to the opening of the Center as we determine.

In addition, you will contribute weekly to the Meineke Advertising Fund ("MAF") 8% of your Gross Revenues. If, however, your Center is a new Meineke Center, during the 12-week period following the opening of your Center, your weekly MAF contribution will be the greater of 8% of your Gross Revenues or $250. You acknowledge and agree that we may enforce your obligation to contribute to the MAF.

Notwithstanding the foregoing: (a) we may from time to time reduce the percentage amount of your contributions to the MAF on Gross Revenues from the sale of any products and services that are not Core Authorized Products and Services and determine the manner in which such reduced percentage amounts are allocated under Section 8.3; and (b) the percentage amount of your contributions to the MAF on Gross Revenues derived from the sale of tires, towing services and government-regulated inspections shall be 1.5%, of which .5% will be allocated to Creative and 1% will be allocated to National Advertising in accordance with Section 8.3.

Your contributions to the MAF are due and payable weekly together with the royalty fees due under Section 3.2. Meineke Car Care Centers owned by us and any of our Affiliates will contribute to the advertising programs funded by the MAF on the same basis as you are required to hereunder. Without waiving any rights or constituting any election of remedies, we have the right to notify DAAC or other regionally elected Dealer representatives of any delinquencies in your payment of contributions to the MAF.

### 3.5 Technology Administrative Fee

If you fail to keep your computer system updated or you fail to promptly install all additions, changes, modifications, substitutions or replacements to the computer hardware, computer software, internet connections, telephone and power lines, and other data transmission facilities we direct, as required in Section 9.2, you must pay us an administrative fee of $100 per month to cover our costs related to your delayed installation.

### 3.6 Interest on Late Payments

All amounts which you owe us or any of our Affiliates, including MAF contributions, will bear interest from and after ten (10) days after their due date at the highest contract rate of interest permitted by law, not to exceed 3% above the prime rate announced from time to time by The Chase Manhattan Bank or any other national bank we select. In addition, we have the right to assess service charges for any checks that are returned for insufficient funds and late charges if permitted by applicable law. Notwithstanding the imposition of interest or charges, your failure to pay all amounts, when due, constitutes grounds for termination of this Agreement as provided in Article 13.

Meineke FA (2021)
EAST\178929093.5

MEIN000789

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

3.7     Method of Payment

All initial franchise fees, royalty fees, MAF contributions and any other payments hereunder shall be paid by electronic debit/credit transfer of funds or credit/debit card.  You agree to sign such documents, pay such bank fees and do such things as we deem necessary to facilitate electronic transfers of funds or other approved methods of payment, provided that so long as we require you to send us hard copies of invoices for work performed pursuant to Section 9.3, we will pay for bank transfer fees, if we require electronic transfer of funds.  No restrictive endorsement on any check or in any letter or other communication accompanying any payment will bind us, and our acceptance of any such payment will not constitute an accord and satisfaction.

3.8     Application of Payments

We may apply any of your payments to us to any of your past due indebtedness for royalty fees, MAF contributions, purchases of products or supplies or any other past due indebtedness to us or any of our Affiliates, notwithstanding any contrary designation by you, provided that any payments that are designated as MAF contributions will be applied first to any currently due or past due MAF contributions.  You agree that all such payments will be made as and when due without any setoff, deduction or prior demand therefore.

**ARTICLE 4:
DEVELOPMENT OF YOUR CENTER**

4.1     Purchase or Lease of Premises

If your Center is a new Meineke Center, you agree to lease, sublease or purchase the Premises within 1 year after the Agreement Date. We have the right to approve the terms of any lease, sublease or purchase contract for the Premises, which approval will not be unreasonably withheld.  You agree to deliver a copy of such lease, sublease or purchase contract to us for our approval before you sign it.  You agree that any lease or sublease for the Premises shall, in form and substance satisfactory to us: (a) provide for notice to us of your default under the lease or sublease and an opportunity for us to cure such default; (b) require the lessor or sublessor to disclose to us, on our request, sales and other information furnished by you; (c) give us the right on any termination or expiration of this Agreement to assume the lease or sublease or to enter into a further sublease for a period of not less than 12 months and not more than 18 months (the "Interim Sublease"), without the lessor's or sublessor's consent; (d) give us the right to enter the Premises to make any modifications to your Center to protect our rights to the Marks; (e) provide that the lessor and/or sublessor relinquish to us, on any such termination or expiration of this Agreement, any lien or other ownership interest, whether by operation of law or otherwise, in and to any tangible property that embodies any of the Marks; (f) give us the right to assign the lease or sublease to a successor Meineke Dealer, in which event the Interim Sublease (if any) shall terminate and be of no further force or effect; and (g) include an acknowledgment by the lessor and/or sublessor that we have no liability or obligation whatsoever under the lease or sublease until and unless we assume the lease or sublease on termination or expiration of this Agreement or enter into the Interim Sublease.

You may not execute a lease, sublease or purchase contract for the Premises or any modification, amendment or assignment thereof before we have approved it.  Our approval of the lease, sublease or purchase contract does not constitute a warranty or representation of any kind, express or implied, as to its fairness or suitability or as to your ability to comply with its terms. We do not, by virtue of approving the lease, sublease or purchase contact, assume any liability or responsibility to you or to any third parties.  You agree to deliver a copy of the fully signed lease, sublease or purchase contract to us within 5 days after its execution.

10

MEIN000790

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

If for any reason you fail to lease or purchase the Premises within 1 year after the Agreement Date, we may terminate this Agreement, effective upon delivery of notice thereof.

### 4.2    Development and Opening of Your Center

You are solely responsible for developing and operating your Center and for all associated expenses. You agree to submit plans and specifications to us for our approval before starting to develop the Premises. All development must be in accordance with the plans and specifications we have approved and must comply with all applicable laws, ordinances and local rules and regulations (including the Americans with Disabilities Act and the Occupational Safety and Health Act). We may periodically inspect the Premises during its development. Your Center may not be opened for business until we notify you that all our requirements for opening have been met. The date of our formal notification to you that such requirements have been met shall be deemed the "Opening Date" for purposes of this Agreement. You agree to open your Center within 18 months after the Agreement Date. However, if a failure to open your Center within such 18-month period is due to reasons beyond your control (such as acts of God, unavoidable delays in obtaining zoning permits or unavoidable construction delays), we agree to grant a reasonable extension of time for you to open your Center.

### 4.3    Equipment, Fixtures and Signs

You agree that all signs that you purchase or lease for your Center shall be of the types, brands and models that meet our standards and specifications. You agree that all fixtures and equipment that you purchase or lease for your Center shall be of the types, brands and models that we reasonably determine meet industry standards as to quality, performance and safety. You may purchase or lease such equipment, fixtures and signs from any suppliers.

### 4.4    Use and Ownership of Telephone Numbers

Certain advertising placed for a Meineke Center is placed using a Remote Call Forward (RCF) telephone number, or other such tracking mechanism, online or otherwise, that we may use from time to time. This/these number(s) are established by us and will be directed to the primary local telephone number secured for your Center or other call answering services as we determine, from time to time. You are not to publish, print, or otherwise use the RCF number(s), or other tracking mechanism used or sponsored by us, and such RCF number(s) and other tracking mechanisms are not to be published, printed or used by you or your Center in connection with any other business or any Meineke business related forms such as business cards, invoices, letterhead, etc. At no time does the franchisee have rights to or control of a Meineke Advertising RCF number. Only at such time when the Meineke franchise license associated with the location using the particular RCF number, or other tracking mechanism that may be used from time to time, is terminated, will the franchisee lose the use of the RCF number or such tracking mechanism.

You will be required to obtain local telephone service and establish it according to the guidelines set forth by Meineke. For your advertising RCF number(s) to be established and for your Center to be included in Meineke coordinated advertising programs, you will be required to provide Meineke with the documentation showing the primary local telephone number and showing that it was established in the required manner. The primary local telephone number that you obtain will be the number used on business cards, letterhead, invoices and other business forms. This will also be the number to which your advertising RCF number(s) will be primarily directed. It is understood and agreed by you that the RCF program at some time may be replaced with other telephone tracking mechanisms that we believe is more advanced than the current tracking mechanism and in that event you agree to comply with the same or similar requirements that may be necessary to provide the same type of benefits that are now provided through the RCF number. Franchisor reserves the right to redirect calls from RCF numbers to Meineke's call center.

Meineke FA (2021)
EAST\178929093.5

MEIN000791

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

In addition, you agree to sign such release and transfer documents as we may require authorizing us or our Affiliate to obtain the telephone numbers of your Center at the time you procure such telephone number(s). If, during the Term, the telephone numbers for your Center should be transferred to someone other than us or our Affiliate, you will cooperate with us, at your cost, to ensure that they are returned to us.

You agree not to place any restrictive codes on the telephone numbers for your Center without our consent. You agree not to terminate any such telephone numbers during or after the Term or do anything else that may directly or indirectly impede our ability to transfer or use those numbers upon any termination or expiration (without renewal) of this Agreement.

All telephone numbers and directory listings for your Center are our property, and we have the right to transfer, terminate or amend such telephone numbers and directory listings only on termination or expiration (without renewal) of this Agreement. If we take any action pursuant to this <u>Section 4</u>.4, the telephone company and all listing agencies may accept this Agreement as conclusive evidence of our exclusive rights to such telephone numbers and directory listings and as conclusive evidence of our authority to direct their amendment, termination or transfer, without any liability to you.

## ARTICLE 5:
## TRAINING AND GUIDANCE

### 5.1    Training Programs

If you (or, if applicable, your Operating Partner) have not previously attended and successfully completed (as determined by us in our sole discretion) our initial training program, then prior to opening or operating your Center, you (or your Operating Partner) must attend and successfully complete an initial training program on the operation of a Meineke Center at such time(s) and place(s) as we designate.  If you have paid in full the initial franchise fee in accordance with <u>Section 3.1 </u>and you (or your Operating Partner) attend the initial training program prior to the opening of your Center, then:  (a) we will not charge you any separate fees for the training program; and (b) we will pay for the reasonable cost of travel and lodging for not more than 2 persons (who have either signed this Agreement or guaranteed this Agreement if you are a business entity) in connection with attending the initial training program. At any time during the Term, you (or your Operating Partner) may attend, subject to availability, the initial training program for retraining.  We will not charge you a fee for such retraining.

In addition, your manager must successfully complete (as determined by us in our sole discretion) our Internet training program prior to opening or operating your Center. We will not charge any fees for such training.

In connection with Core Products and Services added after the Agreement Date, we will make available, if reasonably appropriate, training to you (or your Operating Partner) with respect to general aspects of such Core Products or Services, such training to be made available at such time(s) and place(s) as we may determine.  We will not charge any fees for training for additional Core Products and Services.

On your request, we will endeavor to provide special training on various aspects of operating a Meineke Center for which you will be required to pay the training fees and charges we may establish from time to time. If we determine that there are significant deficiencies in the operations of your Center, we may require you (or your Operating Partner) and your managers and key employees to attend and successfully complete periodic or additional training programs for which we may charge reasonable training fees.

Meineke FA (2021)
EAST\178929093.5

MEIN000792

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

Except as otherwise provided in this Section 5.1, you will be responsible for all expenses you incur in connection with attending all training programs, including compensation, travel, lodging and meals.

5.2     On-Going Guidance

We will furnish you on-going guidance with respect to the System, including improvements and changes to it. Such guidance, at our discretion, will be furnished in the form of the Operations Manual, bulletins (such as our periodic newsletter) and other written or electronic communications, consultations by telephone or in person at our offices or at your Center, and by any other means of communications. You acknowledge and agree that various means of communication (e.g., electronic communication) may require you to incur expenses for communication technology, including hardware, software and access fees.

5.3     Periodic Inspections

We ourselves and/or our agents may conduct both on-site and virtual inspections of your Center to evaluate your Center's operations and compliance with the System when and as frequently as we deem appropriate.

5.4     Operations Manual

We will provide you access to the Operations Manual during the Term. "Operations Manual" means our confidential operations manual, as amended from time to time, that may consist of one or more written manuals (including training manuals), containing our mandatory and suggested standards, specifications and operating procedures relating to the development and operation of Meineke Car Care Centers and other information relating to your obligations under this Agreement. "Operations Manual" also includes alternative or supplemental means of communicating such information by other media which specifically reference that they are to be considered to be part of the Operations Manual, including bulletins, e-mails, video and audio recordings, websites and other electronic media. You agree to keep your copy of the Operations Manual current. If there is a dispute relating to the contents of the Operations Manual, our master copy will be controlling. The Operations Manual contains Confidential Information, and you agree not to copy any part of it.

**ARTICLE 6:**
**YOUR ORGANIZATION AND MANAGEMENT**

6.1     Disclosure of Ownership Interests

You and each Owner (as defined below) represent, warrant and agree that Schedule C, attached hereto and incorporated herein by reference, is current, complete and accurate. You agree to promptly update Schedule C so that Schedule C (as so revised and signed by you) is at all times current, complete and accurate. Each person who is or becomes an Owner must execute an Owner's Personal Guaranty, in the form of Schedule D, attached hereto and incorporated herein by reference, undertaking to be bound jointly and severally by the terms of this Agreement. Each Owner must be an individual acting in his personal capacity, unless we waive this requirement.

The term "Owner" is defined as a person or entity that has a 10% or more direct or indirect legal or beneficial ownership interest in you, if you are a business corporation, partnership, limited liability company or other legal entity. You must designate to us at least one officer, or if you operate in any other capacity, at least one general partner or other individual who has signed the Agreement as the person who may act for and on behalf of the Franchise.

Meineke FA (2021)
EAST\178929093.5

MEIN000793

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

6.2     Management of Center

We may require you (or your Operating Partner, as defined below) to actively participate in, and exert your best efforts with respect to, the direction and management of your Center's business and the business of other Meineke Car Care Centers you own (if applicable). You shall designate a manager who has satisfactorily completed (as determined by us in our sole discretion) our Internet training program to serve as the Center's manager. Such manager must devote substantially all of his or her business time and attention to the on-premises management and operation of the Center.

If you are, or at any time during the Term become, a business corporation, partnership, limited liability company or other legal entity, you agree to designate as the "Operating Partner" an individual approved by us who: (a) owns and controls not less than 10% of your equity and voting rights; (b) has completed our training program to our satisfaction; and (c) has the power and authority to bind you in all dealings with us, unless you designate in writing another Owner reasonably acceptable to us who has the power and authority to so bind you.

## ARTICLE 7:
## OPERATING STANDARDS

7.1     Authorized Products and Services

You agree that your Center will offer for sale only those automotive maintenance and repair products and services we authorize Meineke Car Care Centers to offer and sell to the public from time to time pursuant to the Operations Manual. You agree to offer for sale, and to exert your best efforts to aggressively market and sell, all Core Authorized Products and Services. "Core Authorized Products and Services" shall mean repair and replacement of exhaust system components, brake system components, shocks and struts, and any other Authorized Products and Services that we designate from time to time to be products or services central to the operation of Meineke Car Care Centers. All other Authorized Products and Services (i.e., those which are not Core Authorized Products and Services) shall be optional, and you are not required to offer them for sale at your Center.

We have the right to add or delete Authorized Products and Services (including those identified in Section 3.2), and to conditionally approve Authorized Products and Services. We agree to consult with DAAC with respect to decisions to add or delete Authorized Products and Services. You acknowledge and agree that additional Authorized Products and Services may require you to incur additional costs for equipment, inventory, additional personnel, personnel training and leasehold improvements.

We have the right to add Core Authorized Products and Services once the Gross Revenues of such product or service category reaches 10% or more of system-wide sales (i.e., the aggregate Gross Revenues of all Meineke Car Care Centers located in the U.S.) for one year. We have the right to delete Core Authorized Products and Services once the Gross Revenues of such product or service category reaches less than 10% of system-wide sales for one year, provided we agree not to delete any products or services that are designated as Core Authorized Products and Services as of August 1, 1999.

Your Center may not be used for any purpose other than the operation of a Meineke Center in compliance with this Agreement, or a co-branded automotive center as we may permit from time to time. You agree that your Center will offer courteous and efficient service in accordance with our standards.

7.2     Parts and Supplies

You acknowledge that the reputation and goodwill of Meineke Car Care Centers is based at least in part on the sale of high quality products and services. Therefore, you agree that your Center will use

14

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

only parts, uniforms, forms, labels, and other inventory and supplies that conform to our specifications and standards as to quality, performance, and safety and/or are purchased from suppliers (which may include us and/or our Affiliates) we approve. For exhaust system parts, standards meeting the most stringent noise regulations of all the states in the United States of America, which the parties acknowledge currently is California, shall be deemed approved. All other parts that meet the original equipment manufacturer's standards shall be deemed approved, unless we reasonably determine otherwise. If we lower standards for any part, those standards will apply to all suppliers of the particular part.

We (or a designated supplier) will be the only supplier of customer receipts, which will be sold to you at reasonable prices. We and our Affiliates may be suppliers of any other items, including equipment, signs, parts, uniforms, forms and labels. If we require you to purchase any such other items exclusively from us, we agree to sell such items at our cost; otherwise, any such other items may be sold at a profit.

We agree to subject any Preferred Supplier arrangement to a periodic competitive bidding process, the timing of which we will determine with the advice of DAAC. From time to time, we may, with the advice of DAAC, modify our specifications and standards and the list of approved suppliers. After notice of such modification, you may not reorder any parts, uniforms, forms, labels or other inventory and supplies that do not meet our then-current specifications and standards or reorder any such items from any supplier who is no longer approved. At the request of DAAC, we will make available to members of DAAC relevant information in order to verify the financial arrangements we may have with approved third-party suppliers from whom we require you to purchase exclusively from us, provided we shall have received reasonable assurances in writing that such information will be treated confidentially and will not be misused.

If you propose to order on a regular basis any parts, uniforms, forms, labels and other inventory and supplies from any supplier who is not then approved by us, you must first submit to us sufficient information, specifications and samples concerning the supplier so that we can decide whether the supplier meets our approved supplier criteria. If we do not disapprove such supplier within 30 days after we have received all requested information, then such supplier shall be deemed approved. If the part offered by a supplier for which you seek approval has not been tested by an independent certified laboratory, we have the right to charge reasonable fees to cover our costs of evaluating such supplier. We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers that we may require to be incorporated in written agreements.

We agree not to solicit or accept any rebates from any approved supplier of equipment, signs, parts or other supplies based on the amount of your purchases from such supplier, but we may solicit and accept rebates based on the amount of purchases by us and our Affiliates. We may solicit and accept other benefits from suppliers, such as promotional allowances, provided we use them solely for the benefit of the chain of Meineke Car Care Centers, such as defraying the cost of training programs, dealer conventions or other meetings. Otherwise, you and we mutually agree not to solicit or accept any benefits from any Preferred Supplier that such supplier does not offer on a comparable basis to all owners of Meineke Car Care Centers. Notwithstanding anything to the contrary contained herein, we may solicit and accept royalty fees and other payments from suppliers for authorization to use the Marks, provided we do not require you to purchase any such items exclusively from such suppliers.

### 7.3    Maintenance and Repair of Equipment

You agree to use, operate and maintain all equipment and fixtures in a careful and proper manner in accordance with all applicable laws and regulations, all manufacturers' guidelines and our standards and operating procedures. You agree to undertake all required inspections and, to the extent required by applicable law, post appropriate certificates of inspection or other evidence of governmental approval. You agree to maintain and/or install all safety features as originally installed and as required by applicable safety

15

MEIN000795

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

codes and regulations and to not alter any safety features.  You agree to periodically repair and, if reasonably necessary, replace any worn-out or obsolete equipment or fixtures.

### 7.4    Condition of Center/Center Upgrades

You agree to maintain the condition and appearance of your Center so that it is clean and attractive. If at any time the general state of repair, appearance or cleanliness of your Center, or its fixtures, equipment, furnishings or signs, does not meet our standards, we may notify you of the action you must take to correct such deficiency. If, within 30 days after receiving such notice, you fail or refuse to initiate and continue with due diligence a bona fide program to complete such required repair or maintenance, we have the right (in addition to our rights under Article 13), but not the obligation, to enter the Premises and perform such repair or maintenance on your behalf and at your expense. You must promptly reimburse us for the expenses we incur in performing such repair or maintenance.

### 7.5    Periodic Upgrades

You agree to periodically upgrade and/or remodel your Center as we may reasonably require, including replacing and/or upgrading exterior and interior signs and decor, provided no such upgrading or remodeling during the Term will require any increase in the square footage of the Premises.  We agree that substantial upgrades or remodeling shall not be required more than once every 5 years during the Term or involve a capital cost of more than $10,000 per occurrence during the Term. You may not make any alterations to your Center, nor any replacements, relocations or alterations of fixtures, equipment or signs that do not meet our then current standards and specifications. If you should make any improvements in your Center prior to this 5-year period you may receive credit against the $10,000 spending requirement stated in this section of the Agreement, provided that you notify us in writing and provide us with a copy of the invoice showing the cost you paid for the improvement.  We will advise you within 30 days from our receipt of these items as to whether improvements satisfy our upgrade requirements.

### 7.6    Specifications and Standards

You acknowledge that each and every aspect of the operation of your Center is important to us and is subject to our specifications and standards. You agree to comply with all mandatory specifications, standards and operating procedures and other obligations that are contained in the Operations Manual relating to the development and operation of a Meineke Center, including:  (a) all aspects (other than prices) of Authorized Products and Services offered by your Center and the manner in which they are promoted and sold; (b) sales procedures and customer warranties and services; (c) advertising and promotional programs; (d) appearance and dress of employees; (e) safety, appearance, cleanliness and standards of service and operation of your Center; (f) days and hours of operation; and (g) accounting and recordkeeping systems and forms.  Mandatory specifications, standards and operating procedures and other obligations set forth in the Operations Manual constitute provisions of this Agreement.

### 7.7    Changes to Specifications and Standards/Days and Hours of Operation

We may modify the Operations Manual to reflect changes in standards, specifications and operating procedures and other obligations, provided no addition or modification may alter your rights, and fundamental status, under this Agreement. We agree to consult with DAAC with respect to any material changes to mandatory standards in the Operations Manual. If DAAC recommends that we not make any material change to required days and hours of operation for Meineke Car Care Centers, we agree not to make such change unless: (a) at the time we propose such change, all Meineke Car Care Centers located in the U.S. owned by us and our Affiliates operate during such days and hours (except to the extent prohibited by applicable law) and at least 33.3% of all Meineke Car Care Centers in the U.S. (other than

16

MEIN000796

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

those owned by us or any of our Affiliates) operate during such days and hours; and (b) we give at least 6 months' prior notice to any such change.

### 7.8    Compliance With Laws

You agree to maintain in force in your name all required licenses, permits and certificates relating to your Center. You agree to operate your Center in full compliance with all applicable laws, ordinances and regulations, including the Occupational Safety and Health Act (OSHA); the Americans with Disabilities Act (ADA); the CAN-SPAM Act; the Telephone Consumer Protection Act (TCPA), the Telemarketing Sales Rule (TSR), and other federal and state anti-solicitation laws regulating phone calls, spamming, and faxing; and federal and state laws that regulate data security and privacy (including, but not limited to the use, storage, transmission, and disposal of data regardless of media type). You must take reasonably prompt action to cure any noncompliance with such laws. You agree to notify us in writing within 5 days after the commencement of any legal or administrative action, the issuance of any order of any court, agency or other governmental instrumentality, or the delivery of any notice of violation or alleged violation of any law, ordinance or regulation that may adversely affect the operation of your Center or your financial condition. You agree to adhere to our standards of honesty, integrity, fair dealing and ethical conduct in all dealings with your customers. You must comply with all laws and regulations relating to privacy and data protection, and must comply with any privacy policies or data protection and breach response policies we may periodically establish. You must notify us immediately of any suspected data breach at or in connection with your Center.

### 7.9    Personnel

You agree that your Center at all times will be staffed by a sufficient number of competent and properly  trained employees. You are responsible for hiring all employees of your Center and are exclusively responsible for the terms of their employment, including their compensation and training.  You are solely responsible for all employment decisions for your Center, including those related to hiring, firing, remuneration, personnel policies, benefits, record keeping, supervision and discipline, and regardless of whether you received advice from us on these subjects.

At least one employee of your Center must obtain (within a reasonable period of time, not to exceed 1 year after the Agreement Date or Opening Date, if your Center is a new Meineke Center) and maintain certification by Automotive Service Excellence ("ASE") (or any successor or similar organization we designate) for each of the areas of service comprising Authorized Products and Services performed at your Center for which certification is provided.  In the event of changes in personnel at your Center in functions that require ASE certification, you will have a reasonable period of time, not to exceed 1 year, to obtain appropriate certification of any replacement personnel. If in the future ASE certification is offered on Authorized Products and Services that is not offered as of the Agreement Date, or if in the future you perform Authorized Products or Services for which ASE certification is offered, you agree to obtain such certification within a reasonable period of time, not to exceed 1 year.

### 7.10    Insurance

You agree to maintain in force: (a) comprehensive, commercial, general, product, garage keeper and automobile liability insurance; (b) general casualty insurance, including fire and extended coverage, vandalism and malicious mischief insurance, for the replacement value of your Center and its contents; and (c) such other insurance policies, such as business interruption insurance, as we may reasonably determine from time to time. All insurance policies shall be issued by carriers with at least an A- rating with A.M. Best (or a similar rating by a comparable rating service acceptable to us), shall contain such types and minimum amounts of coverage, exclusions and maximum deductibles as we reasonably determine from

Meineke FA (2021)
EAST\178929093.5

MEIN000797

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

time to time, shall name us and our Affiliates as additional insureds, shall provide for 30 days' prior written notice to us of any material modification, cancellation or expiration of such policy and shall include such other provisions as we may require.  We agree to consult with DAAC on any material changes in the types and minimum amounts of coverage, exclusions and maximum deductibles.

At our request, you shall furnish us with such evidence of insurance coverage and payment of premiums as we require. If you fail or refuse to maintain any required insurance coverage, or to furnish satisfactory evidence thereof, we, at our option and in addition to our other rights and remedies hereunder, may obtain such insurance coverage on your behalf. If we do so, you agree to fully cooperate with us in our effort to obtain such insurance policies and agree to pay us any costs and premiums we incur. Your obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance we may choose to maintain, nor does it relieve you of your obligations under Section 16.02.  Our approval of the insurance you obtain shall not constitute a representation or warranty as to the adequacy of the limits of coverage of such insurance.

### 7.11    Conformity to the Discount Price Program

You agree to conform to the discount price program that is the foundation of the marketing concept of Meineke Car Care Centers, i.e., services performed at prices measurably less than those charged by authorized new car dealers. You acknowledge that the foregoing pricing commitment is necessary to maintain the marketing concept of Meineke Car Care Centers and does not, in any manner, mandate or attempt to mandate the retail prices you charge customers.  You agree not to enter into any agreement, understanding or arrangement, or engage in any concerted practice, with other Meineke Dealers or others relating to the prices at which Authorized Products and Services are offered or sold by you or any other Meineke Center.

### 7.12    Customer Warranties

You recognize the importance of standardization of customer warranties offered by Meineke Car Care Centers and agree to deliver warranties to your customers with respect to Authorized Products or Services on terms and conditions we determine from time to time and using such product and service warranty forms as we may furnish to you. We agree, unless prohibited by applicable law, that all Meineke Car Care Centers owned by us and our Affiliates will offer and perform all such customer warranties. You agree, unless prohibited by applicable law, to offer and perform all such customer warranties at your Center. You will have sole responsibility for all such warranties that you issue and for performing any other authorized warranties you issue to customers. We agree to consult with DAAC if we propose to require a new warranty, or change an existing warranty requirement, on terms that are materially more favorable to consumers than are generally granted by major competitors in the automotive maintenance and repair industry.

You agree to comply with all policies and procedures on warranty programs set forth in the Operations Manual, including performing warranty service on customer warranties issued by other Meineke Car Care Centers and keeping records with respect to your reimbursement claims. You agree that all warranty services are performed by you as an independent contractor and not as our agent.

We agree to establish and maintain a national customer warranty program containing such policies and procedures as we deem appropriate from time to time. You authorize us to charge you for warranty services performed by another Meineke Center on customer warranties issued by you, and to credit you for warranty services you perform on customer warranties issued by another Meineke Center, in such amounts as we may determine to be appropriate from time to time for the national customer warranty program.  You agree to pay us any net debit balances, and we agree to pay you any net credit balances, with respect to the

Meineke FA (2021)
EAST\178929093.5

MEIN000798

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

national customer warranty program at such times and on such conditions as we determine from time to time.

WE MAKE NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY OR SUITABILITY OF ANY PRODUCTS SOLD OR SERVICES PERFORMED BY YOU. You have no authority to make any kind of warranty or representation to others on our behalf. You agree not to make or give to any customer any warranty or representation as to the quality or fitness for use for any purpose, either express or implied, with respect to any Authorized Products or Services, unless we have approved the warranty or representation.

Your obligations and liabilities under this Section 7.12 shall survive any termination or expiration of this Agreement.

7.13    Customer Complaints

You agree to promptly address all customer complaints in accordance with the procedures contained in the Operations Manual.  If you are unable or unwilling to resolve a customer complaint within 30 days and it becomes necessary for us to reimburse a customer in settlement of his or her complaint about work performed at your Center, you agree to promptly reimburse us for amounts expended on account of any such complaint. Your obligations and liabilities under this Section 7.13 shall survive any termination or expiration of this Agreement.

## ARTICLE 8:
## MARKETING AND ADVERTISING

8.1    Marketing and Advertising Programs

Recognizing the value of advertising, and the importance of the standardization of advertising to enhancing the goodwill associated with the Marks, to promoting the sale of Authorized Products and Services and to developing and maintaining a favorable public image of Meineke Car Care Centers, you agree that we have the right to determine, conduct and administer all national, regional, local and other marketing, advertising, promotions, market research and other related activities for Meineke Car Care Centers as may be instituted from time to time, including advertising and marketing funded by the MAF, and the right to direct all such advertising and marketing with sole authority and discretion (exercised in accordance with the terms, and subject to the conditions, contained in this Article 8) over all aspects thereof, including concepts, materials, media, nature, type, scope, frequency, place, form, copy, layout and content.

8.2    Initial Advertising Contribution

We will spend the Initial Advertising Contribution on pre-opening, grand opening and post-opening promotion, including, but not limited to, promotional materials, initial advertising (traditional and/or online) of the Center and other activities related to the opening of the Center as we determine.

8.3    Meineke Advertising Fund

We agree to administer the MAF for the creation, development and implementation of marketing, advertising and related programs and materials to enhance the goodwill associated with the Marks, to promote the sale of any or all Authorized Products and Services and to develop and maintain a favorable public image of Meineke Car Care Centers. We will have sole discretion over all aspects of the materials and programs funded by MAF, including concepts, materials, media, nature, type, scope, frequency, place, form, copy, layout and context, provided we will periodically (not more frequently than once every 6 months) seek the advice of the Advertising Committee (as defined below) with respect to the creative

MEIN000799

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

concepts and media used for programs funded by the MAF. The "Advertising Committee" will consist of a committee of not more than 7 Meineke Dealers appointed from time to time by DAAC.

We may use funds from the MAF to pay for all costs and expenses associated with such programs and materials, including the costs of preparing, producing and distributing marketing, advertising and related programs and materials, employing advertising agencies and media buying agencies, supporting market research activities, administering the MAF and all other related costs and expenses. Although the MAF is intended to enhance the goodwill associated with the Marks, to promote the sale of any or all Authorized Products and Services and to develop and maintain a favorable public image of Meineke Car Care Centers for the benefit of all Meineke Car Care Centers, we cannot assure you that any particular Meineke Center, or that Meineke Centers in any particular local market area, will benefit directly or pro-rata from any marketing, advertising or related program.

Your contributions to the MAF will be held and disbursed by a national bank or trust company or other financial institution ("MAF Trustee") we appoint from time to time, with the advice of DAAC, with the MAF Trustee being obligated to receive, hold and disburse funds in the MAF in accordance with an agreement that: (a) is consistent with the parties' rights and obligations hereunder; (b) includes reasonable provisions regarding limitations on the scope of MAF Trustee's fiduciary duties to Meineke Dealers and us; and (c) is mutually acceptable to the MAF Trustee and us. We agree to remit promptly all of your MAF contributions to the MAF Trustee and to periodically monitor the performance of the MAF Trustee under its trust agreement. We may direct the MAF Trustee to make payments directly to third parties or to make such payments to us for remittance to such third parties. All fees, compensation, charges and expenses of the MAF Trustee ("MAF Trustee Fees") shall be paid from MAF, and we will have no liability or responsibility for paying MAF Trustee Fees.

Subject to Section 3.4, we agree to allocate your weekly contributions to the MAF as follows:

| Creative (as defined below) | Not more than 0.5% of your Gross Revenues |
| National Advertising (as defined below) | Not more than 3% of your Gross Revenues |
| Local Directory Advertising and Local Advertising (as defined below) | Not less than 4.5% of your Gross Revenues |

Notwithstanding the foregoing allocation of the weekly MAF contribution, if your Center is a new Meineke Center, and you must pay the minimum of $250 to the MAF during any week in the 12-week period following the opening of your Center, we will allocate your contribution as follows: not more than 6% to Creative, not more than 38% to National Advertising, and not less than 56% to Local Directory Advertising and Local Advertising.

You agree that we may, with the advice of the Advertising Committee, from time to time change the foregoing allocations of your contributions to MAF among Creative, National Advertising and Local Directory Advertising and Local Advertising in order to enhance the effectiveness of advertising and promotional efforts.

The term "Creative" includes the costs associated with creating, developing and distributing national or general advertising, marketing, promotions, public relations and market research programs and related activities, including, but not limited to, costs relating to preparing television, radio, newspaper, point-of-sales, digital, social media, smart phone applications, call center scripts, reputation management, and other media programs and materials (such as websites for the Internet) and all related fees, charges and commissions, including fees charged by national spokespersons and commissions charged for creative works. In addition, up to 30% of your contributions to Creative may be used from time to time to offset any deficits in media placement costs incurred as part of the Local Advertising portion of the MAF in any

MEIN000800

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

local market area on such terms and conditions as we may determine from time to time. As part of the Creative portion of the MAF, we may furnish you with marketing, advertising and promotional materials at cost, plus any related administrative, shipping, handling and storage charges. The term "National Advertising" includes all costs associated with placing and purchasing national media advertising (e.g., national television, print media and electronic media) and related activities and associated fees and commissions, including commissions charged by media buying companies. The term "Local Directory Advertising" includes all costs associated with placing and purchasing advertising in classified advertising directories through various media, including print and electronic media, and related activities and associated fees and commissions, including commissions charged by media buying companies. The term "Local Advertising" includes all costs associated with regional and local advertising and promotional programs and related activities and associated fees and commissions, including commissions charged by advertising agencies and media buying companies. To the extent any costs can be allocated to more than one of the above categories or to the extent that any costs appropriately charged to the MAF do not fall within a particular category, we may, in our sole discretion, allocate such costs to one or more of such categories.

We agree to maintain an adequately staffed advertising and marketing department to perform the services we customarily provide in administering the advertising and other programs funded by the MAF. Subject to the provisions stated in Section 3.4, we are entitled to be paid each year from the MAF for such services in an amount equal to 2.75% of all contributions by all Meineke Car Care Centers to the MAF ("the Annual Administrative Expense"). We may pay ourselves the Annual Administrative Expense in advance in quarterly installments each year. We will allocate the Annual Administrative Expense, MAF Trustee Fees and the costs relating to the annual audit of the revenues and expenses of the MAF proportionately to the Creative, National Advertising, Local Directory Advertising and Local Advertising portions of the MAF, notwithstanding anything to the contrary contained in this Agreement.

The MAF will be accounted for separately from our other funds and will not, except for the Annual Administrative Expense, be used to defray any of our or any Affiliate's general operating expenses. Except for the Annual Administrative Expense and the repayment of any advances or loans we may make to the MAF, neither we nor any of our Affiliates will be entitled to derive any income from the MAF, including commissions, rebates or discounts for media purchases from the MAF. Any advertising agency commissions and discounts granted to us or any of our Affiliates for media purchases from the MAF will be contributed to the MAF or netted against the invoice for such purchases.

All disbursements from the MAF shall be made first from income and then from contributions. We may compromise any claim for past due contributions to the MAF from any Meineke Dealer, provided any compromise of contributions to the MAF shall be proportionate to any contemporaneous compromise of other amounts such Meineke Dealer owes us and our Affiliates, and we have the right to charge a proportionate amount of the collection costs against contributions we recover. In any fiscal year, we may spend amounts that are more or less than the aggregate contributions of all Meineke Car Care Centers to the MAF in that year, and we may fund any deficits with contributions from future years. The MAF may borrow from us (on commercially reasonable terms and rates) or other lenders to cover deficits or cause the MAF to invest any surplus for future use. We will cause to be prepared an annual audit of the revenues and expenses incurred by the MAF and will furnish you a copy upon your written request. The costs of such audits shall be charged against the MAF. On request, the Advertising Committee may periodically review the books and records of the MAF.

Except as otherwise expressly provided in this Section 8.3, we assume no direct or indirect liability or obligation with respect to the maintenance, direction or administration of the MAF. We do not act as trustee or in any other fiduciary capacity with respect to the MAF.

Meineke FA (2021)
EAST\178929093.5

MEIN000801

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

8.4      Allocation Between Local Advertising and Local Directories

The allocation of your MAF contributions (as well as those of other Meineke Car Care Centers in your Market Area) that are designated to be used for Local Directory and Local Advertising shall be allocated between Local Directory and Local Advertising on an annual basis by the owners of all of the Meineke Car Care Centers located in your Market Area in accordance with the provisions of this <u>Section 8.4</u>, provided however that under no circumstances will more than 1% be allocated to Local Directory without our prior consent. The allocation shall be determined annually by a majority vote (on a one-vote-per-Center basis) of all owners of Meineke Car Care Centers in the Market Area (including us and our Affiliates, as to any Meineke Car Care Centers owned in the Market Area) who shall vote on such allocation. If no vote shall take place, then the allocation shall be determined by us. Notwithstanding anything to the contrary in this Agreement, we may, but we are not obligated to, re-allocate part of the Local Advertising portion of your contribution to the MAF to the advertising and marketing of your specific Meineke Center, which may include varied programs that we believe contribute to the overall marketing, advertising, and recognition of the Meineke brand and Meineke system.

The parties acknowledge that the foregoing allocation is based on projected revenues for the following year in the Market Area and that the actual amounts expended will deviate from the projected percentage allocation.

8.5      Local Advertising

In addition to your weekly MAF contribution, we strongly recommend that you spend 2% of your Gross Revenues on local advertising, but you are not required to do so and your failure to do so does not constitute a breach of this Agreement. Any local advertising purchased pursuant to this Section shall be subject to approval in accordance with <u>Section 8</u>.7.

8.6      Dealer Websites and Online Listings

All advertising by you in any medium must be approved by us in writing prior to development or use, and must conform to our standards and specifications, including, but not limited to, websites and online listings. You may not create and maintain your own websites for the Center or that advertise the Center or other Meineke Centers you own and operate. We will create and maintain these properties for you to ensure they are consistent with Meineke standards and adhere to best practices. You must submit to us, for prior approval, samples of all advertising and promotional plans and materials that have not been prepared or previously approved by us. We reserve all rights to directory or online listings, which include any online presence or accounts that use the Marks. You must cooperate in any attempts by Franchisor to gain access to and control of such listings. You may be provided the right to gain access to online listings created by Franchisor and/or post content on online listings for your Center, but all content posted must be approved by Franchisor, such approval not to be unreasonably withheld. We reserve the right to revoke access to online listings if brand standards are violated or our consent is either not solicited or withheld.

8.7      Approval of Advertising Content

You agree to submit to us no later than 60 days in advance samples of all advertising and promotional materials not prepared by us, and use of such advertising and promotional materials shall be subject to our prior written approval. You may not use any advertising or promotional materials (including, but not limited to, on websites and in print materials and other advertisements) that we have not approved in writing or that we have disapproved. All of your advertising and promotion shall comply with all applicable laws, and shall be completely factual and shall conform to the highest standards of ethical

Meineke FA (2021)
EAST\178929093.5

MEIN000802

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

advertising. You agree to refrain from any business or advertising practice which may be injurious to our business, to the business of other Meineke Car Care Centers or to the goodwill associated with the Marks.

## ARTICLE 9:
## REPORTS AND INSPECTIONS

### 9.1     Records

You agree to prepare and maintain for 5 years complete and accurate books, records (including invoices and records relating to your Gross Revenues) and accounts (using our standard chart of accounts specified in the Operations Manual) for your Center, copies of your sales tax returns, bank statements, and such portions of your state and federal income tax returns as relate to your Center. All such books and records shall be kept at the Premises, unless we otherwise approve. Alternatively, you may keep such books and records at the premises of the accountant who maintains your financial records and/or prepares your tax returns, provided you notify us in advance and such accountant agrees to give us unrestricted access to such books and records. You agree to cause such accountant to fully cooperate with us in connection with any review or audit of such books and records.

You may not commingle any of your funds derived from the operation of your Center with any other funds. If you commingle any of the funds derived from the operation of your Center with other funds, such as your personal funds or funds from your operation of any other business, then, in addition to our other rights hereunder and under applicable law, we will have the right to review and photocopy all of the records and accounts relating to such other funds, including your personal records and accounts, and you will be required to pay us $2,500, plus $250 for each month thereafter until the funds are separately accounted for, as determined by us in our sole discretion.

### 9.2     Computer System

We may require you to purchase or lease, at your expense, such computer hardware and software, required dedicated telephone and power lines, internet connections and other data transmission facilities, modems, printers, and other computer-related accessories or peripheral equipment as we may specify from time to time for management information functions, such as recording and reporting Gross Revenues. You may use any computer hardware you consider to be appropriate, provided it meets our specifications and provided further that it functions properly with the computer software we require. You agree not to use any point of sale software in the operation of your Center that we have not approved.

You agree to provide such assistance as may be required to connect your computer system with our computer system or the computer system of a third-party data collection service we designate. You agree to transmit electronically to us such data from your computer system as we, in our sole discretion, deem desirable, with the cost of such telephonic transmission to be borne by you if we mandate electronic submission of such data and we no longer require you to furnish hard copy of such data pursuant to Section 9.3.

You agree, at your expense, to keep your computer systems in good condition and to promptly install such additions, changes, modifications, substitutions or replacements to the computer hardware, computer software, internet connections, telephone and power lines, and other data transmission facilities as we direct to ensure full operational efficiency and optimum communication capability between and among computer systems. In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, you agree to use computer software that complies with our specifications.

Meineke FA (2021)
EAST\178929093.5

MEIN000803

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

We and our Affiliates may condition any license of required or recommended proprietary software to you, and/or your use of technology developed or maintained by or for us, on your signing a software license agreement or similar document, or otherwise agreeing to the terms (for example, by acknowledging your consent to and accepting the terms of a click through license agreement), that we and our Affiliates periodically prescribe to regulate your use of, and our (or our Affiliates') and your respective rights and responsibilities with respect to, such software or technology. We and our Affiliates may charge you upfront and ongoing fees for any required or recommended proprietary software or technology that we or our Affiliates license to you and for other required or recommended computer system maintenance and support services that we provide you during the Term. The aggregate ongoing fees for such software, technology, and services, however, shall not exceed $750 per month (the "Monthly Technology Cap"), which Monthly Technology Cap we may increase on January 30, 2026 and every five years thereafter to reflect any increase in the CPI for the preceding 60-month period or, if we elected not to increase the Monthly Technology Cap on any applicable January 30, the aggregate increase in the CPI from the date of the last increase. For the avoidance of doubt, and notwithstanding anything to the contrary in this Agreement, the following will not be subject to the Monthly Technology Cap: (a) any initial or upfront fees or similar one-time fees; (b) any optional software, technology, or services that we have not expressly recommended; (c) any computer hardware; (d) any front office software or applications; and (e) any software, products, applications, services, or equipment that you are required to purchase or lease in order to offer and provide Authorized Products and Services and/or otherwise operate the Center.

9.3     Periodic Reports

You agree to furnish us: (a) no later than Wednesday of each week, a report of Gross Revenues for the immediately preceding week, along with copies of invoices for work performed; (b) no later than the 15th day of each month during the first 3 months of the operation of your Center, an income statement and statement of cash flow for your Center for the preceding month and for the year-to-date and a balance sheet as of the end of such month; (c) within 120 days after the end of each calendar year, a year-end balance sheet and income statement and statement of cash flow of your Center for such year, reflecting all year-end adjustments and accruals, provided we will not unreasonably withhold our consent to a request for an extension of time to provide such statements; and (d) such other information as we may require from time to time, including reports on marketing activities, customer warranty work, cost of goods sold and labor costs, sales and your income tax statements (provided, however, that if you are an individual, only the parts of income tax statements that disclose information about your Center need be furnished). You agree that the information in each such report and financial statement shall be complete and accurate. Notwithstanding the requirement to provide the reports listed above, you also agree to provide within 10 days of our request any of the foregoing information, upon our request.

9.4     Use of Customer Information

We have the right to use or disclose information from all reports, statements and electronic data transmissions from you in such manner as we deem reasonably appropriate, provided we will not identify you by name unless required to do so by law or in connection with any legal proceeding, and provided further that, during the Term, we agree not to (a) use the identity of customers of your Center for soliciting Authorized Products and Services by Meineke Car Care Centers owned by us or any of our Affiliates, (b) sell, or authorize any Affiliate of ours to sell, such information to any third party, or (c) disclose such information to any Affiliate that offers or sells any of the Core Products and Services under trademarks or service marks that are not the Marks.

MEIN000804

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

9.5     Inspections

We and our agents have the right at any time during business hours and without prior notice to: (a) inspect your Center; (b) observe, photograph, audio-tape and/or video tape the operations of your Center; (c) interview personnel and customers of your Center; and (d) listen to and record phone calls with your Center's customers, provided we will not interfere unduly with the operation of your Center. You agree to cooperate fully with such activities.

9.6     Audits

We have the right at any time to inspect, photocopy and audit the books, records, bank statements, tax returns and documents relating to the development, ownership, lease, occupancy or operation of your Center for the sole purpose of determining your compliance with the provisions of this Agreement. An audit may be conducted pursuant to this Section 9.6 either in person or by an electronic request for books, records, bank statements, tax returns, and other relevant documents. We agree to provide reasonable prior notice to you of any audit being conducted in the ordinary course, but we are not required to provide notice if, in our sole discretion, we are conducting an audit for cause. You must cooperate fully with our representatives and independent accountants conducting such audits. If any audit discloses an understatement of Gross Revenues, we agree to provide you with a copy of the audit report, and you agree to pay us, within 7 days after receipt of the audit report, the royalties and MAF payments due on the amount of such understatement, plus interest (as provided in Section 3.6) from the date originally due until the date of payment. Our acceptance of any such payment does not constitute a waiver of any rights, including our rights under Article 13, an estoppel or an election of remedies. If you dispute the findings of the audit, you may, at your expense, invoke the Ombudsman procedures of Section 17.15 hereof, without affecting the rights and obligations of the parties hereto.

In addition, you agree to pay us the costs of any audits performed as a result of:  (a) your failure to submit statements of Gross Revenues; (b) your failure to maintain books and records or computer systems as required by Section 9.1 and Section 9.2, including point of sale records; (c) your reporting Gross Revenues for any period of twelve consecutive months that are more than 2% percent below your actual Gross Revenues for such period, as determined by any such audit; or (d) your failure to produce all of your books and records as required by us or our authorized agents within 15 days after we request any such items. Such audit costs include the charges of any independent accountant and/or third-party vendor and attorneys' fees, and per diem fees and costs of our employees, related travel and lodging and other out-of-pocket costs, plus interest.

## ARTICLE 10:
## TRADEMARKS

10.1    Ownership of the Marks

You acknowledge that the Marks are valid and that we own the Marks. Your right to use the Marks is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement. Your unauthorized use of any of the Marks constitutes a breach of this Agreement and an infringement of our rights to the Marks. This Agreement does not confer on you any goodwill or other interests in the Marks. Your use of the Marks and any goodwill established thereby inures to our exclusive benefit. All provisions of this Agreement applicable to the Marks apply to any additional or substitute trademarks, service marks and trade dress we authorize you to use. You may not at any time during or after the Term contest, or assist any other person in contesting, the validity or ownership of any of the Marks.

MEIN000805

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

10.2     Use of the Marks

You agree to use the latest Marks approved by us as current, as the sole identification of your Center, provided you identify yourself as the independent owner in the manner we prescribe.  You agree to use the Marks as we prescribe in connection with the sale of Authorized Products and Services. You may not use any Mark (or any abbreviation, modification or colorable imitation) as part of any corporate or legal business name, or individual title, or in any other manner (including as an electronic media identifier, such as websites, web pages or domain names) not expressly authorized by us in writing.

10.3     Discontinuance of Use of Marks

If we determine it is advisable at any time for us and/or you to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks, service marks or trade dress, you agree to comply with our directions within a reasonable time after notice.  We will have no liability or obligation to you whatsoever with respect to any such required modification or discontinuance of any Mark, or the promotion of a substitute trademark, service mark or trade dress, that is a result of our determination of a risk of conflicting rights with others.

10.4     Notification of Infringements and Claims

You agree to notify us immediately of any apparent infringement of or challenge to your use of any Mark, or any claim by another person of any rights in any Mark. You may not communicate with any person, other than us, our counsel and your counsel, in connection with any such infringement, challenge or claim. We will have sole discretion to take such action as we deem appropriate and will have the right to control exclusively any litigation or U.S. Patent and Trademark Office proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark.  You must sign any and all documents, render such assistance and do such things as may be advisable in the opinion of our counsel to protect our interests in any litigation or U.S. Patent and Trademark Office proceeding or otherwise to protect our interests in the Marks.

10.5     Indemnification of Dealer

We agree to indemnify you against, and to reimburse you for, all damages for which you are held liable in any action for trademark infringement arising out of your authorized use of any Mark pursuant to and in compliance with this Agreement and, except as provided herein, for all costs you reasonably incur in defending any such claim brought against you, provided you have timely notified us of such claim and provided further that you and your Owners are in compliance with this Agreement and all other agreements entered into with us or any of our Affiliates. We, at our sole discretion, are entitled to prosecute, defend and/or settle any such action arising out of your use of any Mark, and if we undertake to prosecute, defend and/or settle any such matter, we have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

**ARTICLE 11:**
**RESTRICTIVE COVENANTS**

11.1     Confidential Information

We own proprietary and confidential information ("Confidential Information") relating to the development and operation of Meineke Car Care Centers, including: (1) technical information and expertise relating to Authorized Products and Services and the equipment used in connection therewith; (2) site selection criteria for Meineke Car Care Centers; (3) sales, marketing and advertising programs, algorithm and techniques for Meineke Car Care Centers; (4) knowledge of operating results and financial

MEIN000806

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

performance of Meineke Car Care Centers, other than your Center and other Meineke Car Care Centers that you own; (5) comprehensive methods of operating Meineke Car Care Centers, including pricing information, royalty and advertising contribution rates, and inventory mix; (6) computer software programs; and (7) Internet training modules.

We agree to disclose relevant parts of the Confidential Information to you solely for your use in the operation of your Center. The Confidential Information is proprietary and includes trade secrets. During the Term and thereafter:  (a) you may not use the Confidential Information in any other business or capacity (and you acknowledge that such use is an unfair method of competition); (b) you agree to maintain the confidentiality of the Confidential Information; (c) you may not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (d) you agree to implement all reasonable procedures we prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including the use of nondisclosure agreements with your officers, directors, and managers and the delivery of such agreements to us.  Your restrictions on disclosure and use of Confidential Information do not apply to information or techniques which are or become generally known in the automotive service industry (other than through your own disclosure), provided you obtain our prior written consent to such disclosure or use.  We agree to consent to such disclosure or use if we believe such information is in the public domain.

11.2    Dealer's In-Term Covenants

During the Term, neither you nor any of your Owners may:

(a)    directly or indirectly (such as through corporations or other entities owned or controlled by you or your Owners) own any legal or beneficial interest in, manage, operate or consult with: (1) any Competitive Business located anywhere; or (2) any entity located anywhere which grants franchises, licenses or other rights to others to operate any Competitive Business; or

(b)    divert or attempt to divert any business or customer of any Meineke Center to any Competitive Business or do anything injurious or prejudicial to the goodwill associated with the Marks or the System.

Notwithstanding anything to the contrary contained in this Agreement, you are not restricted from owning shares of a class of securities of a Competitive Business that are listed on a stock exchange or traded on the over-the-counter market and that represent less than 5% of that class of securities.

11.3    Information Exchange

The value of the System is maximized by our evaluating and, if we deem appropriate, incorporating into the System innovations suggested by Meineke Dealers. If such innovations from other Meineke Dealers are incorporated in the System, you will be entitled to use them as part of the System. You agree to a reciprocal obligation and to disclose to us all ideas, concepts, methods, techniques and products relating to the development, marketing and/or operation of a Meineke Center that you conceive or develop, other than patentable inventions. If we adopt any of them as part of the System, you agree to grant us a perpetual, royalty-free, world-wide license to incorporate same into the System and to use, and sublicense the use, of same in connection with Meineke Car Care Centers. You agree to execute documents and do such other things as we may reasonably request for you to secure intellectual property rights in such ideas, concepts, methods, techniques or products.

MEIN000807

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

### 11.4    Dealer's Post-Term Covenants

For a period of one year, starting the later of the effective date of termination or expiration (without you exercising your rights pursuant to, and in accordance with, <u>Article 14</u>) of this Agreement or at such time that you stop operating a Competitive Business, neither you nor any of your Owners may directly or indirectly (such as through corporations or other entities owned or controlled by you or your Owners) own a legal or beneficial interest in, manage, operate or consult with: (a) any Competitive Business located at the Premises; (b) any Competitive Business located within a radius of 6 miles of your Center; or (c) any Competitive Business located within a radius of 6 miles of any Meineke Center in operation at the time that you execute this Agreement.

You and each of your Owners acknowledge that we have a protectable legal interest in the System and that these non-competition covenants contained in <u>Section 11.2</u> and <u>Section 11.4</u> are necessary elements to its protection and are an integral part of this Agreement.

### 11.5    Meineke's Non-Competition Covenant

If we or any subsidiary of ours (and specifically excluding all other Affiliates of ours) acquires a business, then to the extent any retail outlet of such business at the time of the acquisition is located in the Protected Area and 15% or more of such outlet's revenues during the 12 months prior to the acquisition are derived from Core Authorized Products and Services, we agree to exert reasonable efforts to sell such outlet, or to discontinue any franchise or other licensing arrangement with such outlet, within 12 months after the acquisition ("Divestiture Period"). If, despite such efforts, we are unable to effect such sale or discontinuance within the Divestiture Period, we will not be in breach of this Agreement as a result of such failure, but you may, at your election, invoke "Meineke's Encroachment Insurance Policy" referenced in <u>Section 17.13</u> with respect to any adverse impact caused by such outlet or exercise your right to sell the assets of your Center to us in accordance with <u>Section 11.</u>6.

### 11.6    Competition by Meineke's Affiliates

If:  (a) you have the right to sell your Center to us pursuant to <u>Section 11.</u>5; or

(b)(i) any of our Affiliates (including any subsidiary of ours) acquires a business, and such business, after the acquisition and while it is an Affiliate of ours, opens a new retail outlet (and specifically excluding any existing retail outlets) in your Protected Area; and (ii) 15% or more of such new outlet's revenues during the 12 months after its opening ("1-Year Opening Period") are derived from the sale of Core Authorized Products and Services; or

(c) any of our Affiliates (including any subsidiary of ours) acquires a business with an existing retail outlet located in your Protected Area, and such retail outlet, prior to the acquisition, did not derive 15% or more of its revenues from the sale of Core Authorized Products and Services in your Protected Area during the 12 months prior to its acquisition but during the 12 months after its acquisition ("1-Year Opening Period") it derives 15% or more of its revenues from the sale of Core Authorized Products and Services in your Protected Territory;

then you have the option ("Put Option") exercisable by giving us written notice ("Put Option Notice") 120 days after the expiration of the Divestiture Period or the 1-Year Opening Period, as applicable, to sell to us at Fair Market Value (as determined below) all of the tangible assets of your Center that you own ("the Purchased Assets" for purposes of this <u>Section 11.</u>6), including signs, equipment, inventories of saleable parts, products, materials and supplies, and to assign to us the lease for the Premises of your Center and any equipment lease for equipment used to perform Authorized Products and Services at your Center. If you exercise your Put Option and you or any of your Affiliates or Owners directly or indirectly own the

28

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

land and/or building of your Center, you agree to lease, or cause such Affiliate or Owner to lease, such land and/or building to us or our designee at reasonable and customary rental rates and other terms prevailing in the community where your Center is located.

Upon delivery of the Put Option Notice, you agree (a) to continue to operate your Center in the ordinary course of business in accordance with the terms of this Agreement, and (b) not to sell or remove any of the Purchased Assets from the Premises (other than the sale of inventory in the ordinary course of business), and (c) to give us, our designated agents and the Appraiser (as defined below) full access to your Center and all of your books and records at any time during customary business hours in order to conduct inventories and determine the purchase price for the Purchased Assets. Upon delivery of the Put Option Notice and pending the closing of the purchase, we may require that the operation of your Center be subject to the supervision and control of one or more managers appointed by us.

The Fair Market Value shall be determined by consultation between you and us to establish the amount which an arm's length purchaser would be willing to pay for the Purchased Assets, assuming that the Purchased Assets would be used for the operation of a Meineke Center at the Premises under a valid franchise agreement reflecting the then-current (or if we are not offering franchises at that time, then the most recent) standard terms upon which we offer franchises for Meineke Car Care Centers. The Fair Market Value may reflect the going concern value of the operation of your Center at the Premises, but under no circumstances will any value be attributed to any goodwill associated with any Mark. If you and we are unable to agree on the Fair Market Value of the Purchased Assets within 30 days after the Put Option Notice, then Fair Market Value will be determined by a mutually agreeable member of a nationally recognized accounting firm (other than a firm which conducts audits of our or your financial statements) who has experience in the valuation of retail businesses (the "Appraiser"). The Appraiser will make his or her determination and submit a written report ("Appraisal Report") to you and us as soon as practicable, but in no event more than 60 days after his or her appointment. Each party may submit in writing to the Appraiser its judgment of Fair Market Value (together with its reasons therefore). The Appraiser's fees and costs shall be borne equally by the parties hereto.

Within 10 days after delivery of the Appraisal Report or the date we mutually agree to the Purchase Price, whichever is applicable, we, you and your Owners will enter into a purchase agreement in form and substance reasonably satisfactory to us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as we deem reasonably necessary to fully protect our interests, including representations, warranties and other closing documents and post-closing indemnifications and covenants as we reasonably require, including: (a) instruments transferring good and merchantable title to the Purchased Assets, free and clear of all liens, encumbrances, and liabilities, to us or our designee, with all sales and other transfer taxes paid by you; (b) a mutual termination of this Agreement, with you and your Owners continuing to be bound by all post-term covenants and obligations contained herein; and (c) an assignment of all leases of tangible assets and real property used in the operation of your Center, including land, building and/or equipment (or if an assignment is prohibited, a sublease to us or our designee for the full remaining term and on the same terms and conditions as your lease, including renewal and/or purchase options). In addition, if you or any of your Owners or Affiliates directly or indirectly own the land and/or building of your Center, you agree to lease, or to cause such Owner or Affiliate to lease, such land and/or building to us or our designee at reasonable and customary rental rates and other terms prevailing in the community where your Center is located. Any dispute concerning the rental rates and terms of such lease shall be resolved by the Appraiser.

The consummation of the purchase of the Purchased Assets ("closing" for purposes of this Section 11.6) shall occur at such place, time and date we designate in the purchase agreement, but not later than 90 days after the date the Appraisal Report is delivered or the date we and you have mutually agreed to the Purchase Price, whichever is applicable. In accordance with the terms and conditions of the purchase

MEIN000809

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

agreement: (a) fifty percent (50%) of the purchase price for the Purchased Assets will be paid in cash at the closing; (b) twenty-five percent (25%) of the purchase price (plus accrued and unpaid interest on the unpaid balance, at the Prime Rate, as defined below, from and after the closing date) shall be payable on the first anniversary of the closing date; and (c) the remaining twenty-five percent (25%) of the purchase price (plus accrued and unpaid interest on the unpaid balance, at the Prime Rate, from and after the closing date) shall be payable on the second anniversary of the closing date.  The "Prime Rate" for purposes of this Section 11.6 shall be the published prime rate as of the date of the closing of The Chase Manhattan Bank or any other national bank we select.

If you cannot deliver clear title to all of the Purchased Assets, or if there are other unresolved issues, the closing of the sale may, at our option, be accomplished through an escrow on such terms and conditions as we deem reasonably appropriate, including the making of payments, to be deducted from the purchase price, directly to third parties in order to obtain clear title to all of the Purchased Assets. Further, you and we shall comply with any applicable Bulk Sales provisions of the Uniform Commercial Code as enacted in the state where your Center is located and all applicable state and local sales and income tax notification and/or escrow procedures. We have the right to set off against and reduce the Purchase Price by any and all amounts owed by you or any of your Owners or Affiliates to us or any of our Affiliates.

11.7     Meineke's Management Commitment

We agree not to authorize our executive officers who perform line management functions (specifically excluding any such officers who are also members of our Board of Managers, except for any Chief Operating Officer or Vice President of Marketing) to be employed by or to have management responsibility for an Affiliate of ours that is a Competitor. For the avoidance of doubt, the foregoing restriction shall not apply to our executive officers who perform staff functions, such as a General Counsel or Chief Financial Officer. For purposes of this Section 11.7, a "Competitor" shall mean a business enterprise that: (a) does not use any of the Marks; and (b) has annual revenues from the sale of Core Authorized Products and Services that exceed 15% of its total annual revenues.

**ARTICLE 12:
TRANSFER OF AGREEMENT**

12.1     Transfer by You Subject to Our Approval

You and/or your Owners may Transfer the Franchise (as defined below) subject to our approval and subject to your complying with all of the applicable provisions of this Article 12.  You agree to submit to us all information we require in order to determine whether to approve a proposed Transfer of the Franchise, and we agree to notify you of our approval or disapproval within a reasonable period of time, not to exceed 10 business days, after we have received all requested information relating to the proposed Transfer of the Franchise.

The term "Transfer the Franchise" or "Transfer of the Franchise" means the voluntary or involuntary, direct or indirect, sale, assignment, transfer, pledge, grant of a security interest in, or other disposition of this Agreement, any right or obligation under this Agreement, or any form of ownership interest in Dealer or the assets, revenues or income of your Center, including: (1) any issuance or redemption of a legal or beneficial ownership interest in the capital stock of Dealer; (2) any merger or consolidation of Dealer, whether or not Dealer is the surviving corporation; (3) any transfer as a result of a divorce, insolvency or dissolution proceeding or otherwise by operation of law; (4) any transfer on the death of Dealer or any Owner of Dealer by will, declaration of trust or under the laws of intestate succession; or (5) any foreclosure of your Center or your transfer, surrender or loss of possession, control or management of your Center.  A marketing list, customer list or potential customer list may be transferred only to a

MEIN000810

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

transferee to whom your rights and obligations under this Agreement are simultaneously being transferred in accordance with the terms hereof.

12.2    Conditions for Approval

If we have not exercised our rights under Section 12.6 or Section 12.7, we will not unreasonably withhold our approval of a Transfer of the Franchise  that meets all of the reasonable restrictions, requirements and conditions that we may impose on the transfer, the transferor(s) and/or the transferee(s), including the following:

(a)    you and your Owners and Affiliates must be in compliance with the provisions of this Agreement and all other agreements with us or any of our Affiliates that relate to your Center;

(b)    the transferee (or its owners) must meet our then-applicable standards for Meineke Dealers, and if the transferee is an existing Meineke Dealer, such transferee must be in compliance with its agreements with us and our Affiliates for at least 6 months prior to the proposed date of transfer;

(c)    the transferee (or its Operating Partner) must complete our initial training program to our satisfaction;

(d)    your Center must be open and operating, unless we otherwise agree in writing;

(e)    the transferee (and its owners) must execute, at our option, (i) an assignment and assumption agreement in form and substance satisfactory to us, pursuant to which the transferee (and its owners) assume your obligations hereunder and you will remain responsible for future performance of the obligations under this Agreement for the longer of a period of time of one (1) year after the effective date of the transfer or the period of time during which the transferee or any of its Affiliates has any financial obligations to you or any of your Affiliates in connection with the transfer; or (ii) our then current standard form of franchise agreement and related documents offered to new Meineke Dealers in the state in which your Center is located (which may provide for different royalties, advertising contributions and expenditures, term and other rights and obligations than those provided in this Agreement) in conjunction with you and us mutually terminating this Agreement;

(f)    you or the transferee must pay us a standard transfer fee of $7,500, which fee may be increased to reflect any increase in the CPI as of the date of transfer over the CPI as of January 1, 2020; except that, if the transferee executes our then current standard form of franchise agreement and related documents in connection with the Transfer of the Franchise, then, at our option, the transfer fee shall be equal to our then current initial franchise fee for Meineke Centers;

(g)    the transferee must execute an agreement, in form and substance satisfactory to us, to remodel your Center, add or replace fixtures, furnishings, equipment and signs and otherwise modify your Center so it meets the specifications and standards then applicable for new Meineke Car Care Centers, provided the transferee shall not be required to replace equipment or increase the square footage of the Premises if the transferee executes an assignment and assumption agreement pursuant to Section 12.2(e)(i) hereof;

(h)    you and your Owners and Affiliates must, except to the extent limited or prohibited by applicable law, execute a mutual general release, in form and substance satisfactory to us, of any and all claims against us and our Affiliates, stockholders, officers, directors, employees, agents, successors and assigns (unless such claims have been filed in accordance with this Agreement and are then pending and not finally resolved or are filed in accordance with this Agreement within 12 months after the effective date of

Meineke FA (2021)
EAST\178929093.5

MEIN000811

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

transfer), and an affidavit stating that you have not offered any unauthorized warranties to customers of your Center;

(i)     the terms of the proposed Transfer of the Franchise must not, in our reasonable judgment, place an unreasonable financial or operational burden on the transferee;

(j)     any financing you (or any of your Owners or Affiliates) offer the transferee must be subordinate to any current or future obligations of the transferee to us;

(k)     you and your Owners must execute a noncompetition covenant, in form and substance satisfactory to us, in favor of us and the transferee, agreeing that, for a period of not less than 1 year, starting on the effective date of the transfer, you and your Owners will not directly or indirectly own any legal or beneficial interest in, manage, operate or consult with: (1) any Competitive Business that is located within a 6-mile radius of your Center; (2) any Competitive Business that is located within a 6-mile radius of any other Meineke Center in operation as of the effective date of such transfer; or (3) any entity which grants franchises, licenses or other interests to others to operate any Competitive Business;

(l)     to the extent any third party broker is retained by you or transferee or if a third party broker assists in the Transfer of the Franchise, you or the transferee must remit any and all applicable third party broker fees and costs to the third party broker, or pay us our then current initial franchise fee for single Meineke Center franchises, at our option;

(m)     you and your Owners must execute such other documents and do such other things as we may reasonably require to protect our interests under this Agreement; and

(n)     the transferee must pay us an Initial Advertising Contribution equal to $20,000 for re-opening promotion, including, but not limited to, promotional materials, advertising (traditional and/or online) of the Center and related activities for the Center as we determine.

### 12.3    Transfer to a Corporation

Notwithstanding Section 12.1 and Section 12.2, on 30 days' prior notice to us, you (if you are an individual or partnership) may transfer this Agreement, in conjunction with a transfer of all of the assets of your Center, by an agreement in form and substance satisfactory to us, to a corporation or limited liability company of which you own and control all of the equity and voting power of all issued and outstanding capital stock. No such assignment will relieve you or your Owners of your obligations hereunder, and you and your Owners will remain jointly and severally liable for all obligations hereunder.

### 12.4    Special Transfers

Neither Section 12.2(b) nor Section 12.2(d) shall apply to any Transfer of the Franchise among any of your then current Owners disclosed in Schedule C. Section 12.6 shall not apply to a Transfer of the Franchise to a member of the Immediate Family of Dealer (if an individual) or to a member of the Immediate Family of a then current Owner of Dealer (if a corporation, limited liability company or partnership).

### 12.5    Death or Disability of Dealer

Upon your death or permanent disability, or the death or permanent disability of your Operating Partner, the executor, administrator or other personal representative of such person must transfer his interest in this Agreement or his interest in Dealer to a third party approved by us in accordance with all of the

Meineke FA (2021)
EAST\178929093.5

MEIN000812

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

applicable provisions of Article 12 within a reasonable period of time, not to exceed 12 months from the date of death or permanent disability.

### 12.6 Your Right to Offer Your Franchise to Us

If you or any of your Owners desires to Transfer the Franchise for legal consideration before obtaining an offer from a buyer, you may send us an offer in writing ("Offer Notice") containing the exact terms and conditions on which you desire to Transfer the Franchise and including (a) financial statements of your Center (including balance sheets and income statements) for the last 3 fiscal years and the year-to-date; (b) federal income tax returns and all applicable schedules for your Center for the last 3 fiscal years; and (c) a complete and accurate copy of your then current lease for the Premises of your Center. Upon receipt of the Offer Notice we will have the option, exercisable by notice ("Response Notice") delivered to you within 15 business days thereafter, to indicate our intention to accept your offer to sell such interest in this Agreement, your Center or in Dealer for the price and terms contained in the Offer Notice. We have the right to investigate and analyze the business, assets and liabilities and all other matters we deem necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms described in the Offer Notice. We may conduct such investigation and analysis in any manner we deem reasonably appropriate, and you and your Owners agree to provide us with all information we request and to cooperate fully with us in connection therewith.

If we deliver a Response Notice, we and you and/or your Owners will enter into a purchase agreement reasonably satisfactory to both you and us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as is reasonably necessary to protect each party's interests. The closing shall occur not more than 90 days after the date of the Response Notice, unless the closing is delayed for reasons beyond our reasonable control.

If we do not deliver a Response Notice, as provided above, you and/or your Owners may solicit offers to Transfer the Franchise from other parties at the exact same price and on the exact same terms as presented in the Offer Notice for a period of time expiring 365 days after the Offer Notice is delivered to us.  You must immediately deliver to us a complete and accurate copy of any offer that you receive within such 365-day period from any such third party that you and/or your Owners are willing to accept ("Third Party Offer").

If the terms of the Third Party Offer are the same as those contained in the Offer Notice, then you or your Owners may accept such offer and complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in Section 12.1 and Section 12.2, provided that if the sale to such offeror is not completed within 90 days after delivery of such Third Party Offer to us, or if there is any change in the terms of the offer, you must promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30-day period following your notification of the expiration of the 90-day period or the change to the terms of the offer.

### 12.7 Our Right of First Refusal

If the terms of the Third Party Offer pursuant to Section 12.6 are different in any material respect (including price and/or payment terms) from those contained in the Offer Notice pursuant to Section 12.6, we will have the option, exercisable by notice delivered to you within 15 business days from the date of delivery to us of a complete and accurate copy of the Third Party Offer, to purchase such interest in this Agreement, your Center or in Dealer for the price and on the terms and conditions contained in such Third Party Offer.

Meineke FA (2021)
EAST\178929093.5

MEIN000813

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

In addition, if you or any of your Owners desire to transfer the Franchise for legal consideration to a prospective buyer without first giving us an Offer Notice pursuant to <u>Section 12</u>.6, you or such Owner must obtain a bona fide, executed written offer and earnest money deposit in the amount of at least 5% of the offering price from a responsible and full disclosed purchaser and must deliver immediately to us a complete and accurate copy of such offer ("Right of First Refusal Offer"), including: (a) financial statements of your Center (including balance sheets and income statements) for the last 3 fiscal years and the year-to-date; (b) federal income tax returns and all applicable schedules for your Center for the last 3 fiscal years; and (c) a complete and accurate copy of your then-current lease for the Premises of your Center. If the offeror proposes to buy any other property or rights from you or any of your Owners or Affiliates (other than rights under other franchise agreements for Meineke Car Care Centers) as part of the bona fide offer, the proposal for such property or rights must be set forth in a separate, contemporaneous offer that is disclosed to us, and the price and terms of purchase offered to you or your Owners for the Transfer of the Franchise must reflect the bona fide price offered therefore and may not reflect any value for any other property or rights. We have the option, exercisable by notice delivered to you or your Owners within 15 business days from the date of delivery of the Right of First Refusal Offer, to purchase such interest for the price and on the terms and conditions contained in such offer.  We have the right to investigate and analyze the business, assets and liabilities and all other matters we deem necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms of our right of first refusal.  We may conduct such investigation and analysis in any manner we deem reasonably appropriate and you and your Owners must cooperate fully with us in connection therewith.

If we exercise our option to purchase pursuant to the terms of the Third Party Offer or the Right of First Refusal Offer, as provided in this <u>Section 12.7</u>, we and you and/or your Owners will enter into a purchase agreement reasonably satisfactory to you and us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as are reasonably necessary to protect each party's interests.  The closing shall occur not more than 90 days after the date of our response to the Third Party Offer or Right of First Refusal Offer, as applicable, unless the closing is delayed for reasons beyond our reasonable control.  In the event the consideration, terms and/or conditions offered by a third party are such that we may not reasonably be able to furnish the same consideration, terms and/or conditions, then we may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, we at our own expense may designate an independent appraiser and the appraiser's determination shall be binding.

If we do not exercise our option to purchase pursuant to the terms of the Third Party Offer or the Right of First Refusal Offer, as provided in this <u>Section 12.7</u>, you or your Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in <u>Section 12.1</u> and <u>Section 12.2</u>, provided that if the sale to such offeror is not completed within 90 days after delivery of such offer to us, or if there is any change in the terms of the offer, you must promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30-day period following your notification of the expiration of the 90-day period or the change to the terms of the offer.

12.8    Transfer by Us

We have the right to transfer or assign all or any part of our rights or obligations under this Agreement to any person or legal entity.  If the assignee expressly assumes and agrees to perform all of our obligations under this Agreement accruing after the date of assignment, then the assignee will become solely responsible for all of our obligations under this Agreement from and after one (1) year after the effective date of assignment. In addition, and without limiting the foregoing, we may sell our assets; may sell our securities in a public offering or in a private placement; may merge with or acquire other

MEIN000814

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

corporations, or be acquired by another corporation; and may undertake any refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

## ARTICLE 13:
## TERMINATION OF AGREEMENT

13.1     Termination Upon Notice

In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if:

(a)      you become insolvent by reason of your inability to pay your debts  as they mature;

(b)      you are adjudicated bankrupt or insolvent;

(c)      you file a petition in bankruptcy, reorganization or similar proceedings under the bankruptcy laws of the United States or have such a petition filed against you which is not discharged within 30 days;

(d)      a receiver or other custodian, permanent or temporary, is appointed for your business, assets or property (other than in connection with your death and for reasons other than financial concerns or irregularities);

(e)      you request the appointment of a receiver or make a general assignment for the benefit of creditors;

(f)      final judgment against you in the amount of $25,000 or more remains unsatisfied of record for 30 days or longer (unless and until such judgment is appealed in accordance with applicable law and is affirmed);

(g)      your bank accounts, property or accounts receivable relating to your Center are attached and such attachment is not lifted within 30 days;

(h)      execution is levied against any property or assets used in connection with your Center;

(i)      you voluntarily dissolve or liquidate or have a petition filed for dissolution and such petition is not dismissed within 30 days;

(j)      you fail to have your Center open for business for any 6 consecutive days after you open your Center (other than in connection with a relocation pursuant to Section 2.6 or due to force majeure);

(k)      you fail to open your Center and start business, as provided in Section 4.2 or fail to operate your Center as a Meineke Center;

(l)      you or any of your Owners or Affiliates make any material misstatement or omission in an application for a Meineke Center franchise or in any other information provided to us, including reports of Gross Revenues;

(m)      you suffer cancellation or termination of the lease or sublease for your Center as a result of a default there under;

Meineke FA (2021)
EAST\178929093.5

MEIN000815

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

(n)      you or any of your Owners or Affiliates are convicted of, or plead no contest to, a felony or other crime or offense that we reasonably believe may adversely affect the goodwill associated with the Marks;

(o)      you or any of your Owners or Affiliates make an unauthorized Transfer of the Franchise;

(p)      you or any of your Owners or Affiliates make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Operations Manual in violation of this Agreement;

(q)      you or any of your Owners or Affiliates fail, on 3 or more separate occasions within any period of 12 consecutive months, to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with this Agreement (including the Operations Manual), which failures are brought to your attention by delivery of formal notices of default, regardless whether such defaults are timely cured;

(r)      you or any of your Owners or Affiliates fail, on 7 or more separate occasions during the Term, to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with this Agreement (including the Operations Manual), which failures are brought to your attention by delivery of notices of default, regardless whether such defaults are timely cured, provided however, any notice of default which you timely cure to our satisfaction shall be disregarded for purposes of determining the foregoing number of defaults if you are not thereafter sent any further notices of default in any successive 12-month period (provided no such 12-month period can be used to disregard more than one notice of default); or

(s)      you or any of your Owners or Affiliates default under any other agreement between you or any of your Owners or Affiliates and us and fail to cure the default within the applicable cure period, if any.

13.2     Termination After Opportunity to Cure

In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if you or any of your Owners or Affiliates:

(a)      offer or sell any products or services from your Center that are not Authorized Products and Services and fail to discontinue such practice within 30 days after a formal notice of default is delivered to you; or

(b)      fail to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with any provision of this Agreement (including the Operations Manual) not otherwise mentioned in Section 13.1 or this Section 13.2, and do not correct such failure within 30 days after a formal notice of default is delivered to you.

**ARTICLE 14:**
**RENEWAL RIGHTS**

You have the right, subject to the conditions contained in this Article 14, to acquire a successor franchise for your Center on the terms and conditions of our then-current form of franchise agreement, if upon expiration of the Term:  (a) you and your Owners and Affiliates are in compliance with this Agreement and all other agreements with us or any of our Affiliates, and you and your Owners have been in substantial

36

MEIN000816

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

compliance with this Agreement throughout the Term; and (b) you maintain the right to possession of the Premises for the term of the successor franchise agreement and enter into an agreement with us whereby you agree within a specified time period, starting on the date of signing of a successor franchise agreement, to remodel your Center, add or replace fixtures, furnishings, equipment and signs and otherwise upgrade your Center to the specifications and standards then applicable for new Meineke Car Care Centers (provided we will not require any increase in square footage of your Center that would be impractical or uneconomical as a result of property lines, zoning restrictions or unreasonable cost of demolition and reconstruction).

You agree to give us notice of your desire to acquire a successor franchise at least 180 days prior to the expiration of the Term in order to provide us sufficient time to conduct a renewal inspection of your Center and complete the renewal process.  We agree to give you notice, not later than 60 days after receipt of your notice, of our decision whether you have the right to acquire a successor franchise pursuant to this Article 14. Notwithstanding that our notice may state that you have the right to acquire a successor franchise for your Center and that you and we may have executed a successor franchise agreement, your right to a successor franchise will be subject to your continued compliance with all the provisions of this Agreement up to the date of its expiration.  If you so request in writing, we will give you the estimated costs or range of costs for upgrading your Center to the specifications and standards for new Meineke Car Care Centers and you will have two weeks following receipt of this information to evaluate it and notify us as to whether you will exercise your right to a successor franchise.

If you have the right to acquire a successor franchise, and state you intent to exercise that right, all in accordance with this Article 14, then: (a) we and you (and your Owners) will execute a Successor Franchise Agreement (as defined below); (b) you will be obligated to pay a successor franchise fee of $5,000, which fee may be increased to reflect any increase in the CPI as of the end of the Term over the CPI as of January 1, 2020; and (c) you and your Owners will be obligated to execute release agreements, in form and substance satisfactory to us, releasing us and our Affiliates, stockholders, officers, directors, employees, agents, successors and assigns from any and all claims relating to this Agreement, unless such claims have been filed in accordance with this Agreement and are then pending and not finally resolved, or are filed in accordance with this Agreement within 12 months after execution of the successor franchise agreement.  Failure by you (and your Owners) to sign such agreements and releases, or to pay the successor franchise fee, within 30 days after such documents are delivered to you will be deemed an election by you not to acquire a successor franchise for your Center. Your right to a successor franchise will be subject to your ability to obtain a lease for the location in form and substance satisfactory to us.

The term "Successor Franchise Agreement" shall mean our then-current form of franchise agreement, which may contain provisions materially different from those contained herein, except:  (i) that we agree not to materially change the provisions of Section 2.3, Section 3.2, Section 3.4 or Section 17.13; and (ii) at your option, the term of the successor franchise may be for 15 years (in which case the Unilateral Right to Independence Rider, attached hereto, shall be executed by both parties), 8 years or 5 years (in which case the Unilateral Right to Independence Rider shall not be executed and instead, at your option, the Reciprocal Right to Independence Rider, attached hereto, may be executed by both parties). The term "Successor Franchise Agreement" shall also include all ancillary agreements (including personal guarantees by your Owners and a remodeling agreement in form and substance satisfactory to us) which we then customarily use in granting successor franchises for the operation of Meineke Car Care Centers. The parties hereto explicitly acknowledge and agree that the Unilateral Right to Independence and Reciprocal Right to Independence Riders are not part of this Agreement and are attached hereto solely for purposes of establishing such rights in connection with any successor franchise agreement.

Meineke FA (2021)
EAST\178929093.5

MEIN000817

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

## ARTICLE 15:
## EFFECT OF TERMINATION OR EXPIRATION

15.1     Payment of Amounts Owed to Us

You agree to pay us and our Affiliates immediately upon termination or expiration (without grant of a successor franchise) of this Agreement, all royalties, MAF payments, amounts owed for purchases from us or our Affiliates, interest due on any of the foregoing and all other amounts owed to us or our Affiliates which are then unpaid.

15.2     Discontinue Use of Marks and Confidential Information

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, you will:

(a)     not directly or indirectly at any time or in any manner use any Mark, any colorable imitation of any Mark or any other indicia of a Meineke Center;

(b)     take such action as may be required to cancel all fictitious or assumed name registrations relating to your use of any Mark;

(c)     notify the telephone company and all telephone directory publishers of the termination or expiration of any rights you may have to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and to authorize transfer of the number to us or at our direction.  You must immediately execute such instruments and take such steps as we deem necessary or appropriate to transfer and assign each such telephone number.  You irrevocably appoint our then-President as your duly authorized agent and attorney-in-fact to execute all instruments and take all steps to transfer and assign each such telephone number;

(d)     if we do not exercise our right to take possession of the Premises of your Center pursuant to Section 15.4, promptly remove from the Premises, and discontinue using for any purpose, all signs, fixtures, posters, decor items, advertising materials, forms and other materials and supplies which display any of the Marks or any distinctive features, images, or designs associated with Meineke Car Care Centers and, at your expense, make such alterations as may be necessary to distinguish the Premises so clearly from its former appearance as a Meineke Center as to prevent any possibility of confusion by the public;

(e)     on our request, promptly sell to us (free and clear of any and all liens, encumbrances, liabilities and restrictions) all of your inventory of parts and supplies at a mutually agreeable reasonable price. We will have the right to set off against and reduce the purchase price by any and all amounts you or any of your Owners owe us or any of our Affiliates.  If we do not purchase all of your inventory of parts and supplies which contain any of the Marks, you will promptly remove all such labels and markings from any such remaining inventory;

(f)     immediately cease to use all Confidential Information and return to us all copies of the Operations Manual and any other confidential materials which we have loaned to you;

(g)     immediately cease to use all computer software incorporating any of the Marks or any of our Confidential Information;

(h)     comply with the post-term covenants as provided in Section 11.4; and

38

MEIN000818

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

(i)  within 30 days after the effective date of termination or expiration, furnish us evidence satisfactory to us of your compliance with the foregoing obligations.

15.3  Customers

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we have the unrestricted right, without paying you any legal consideration, to offer and sell, and to permit other Meineke Dealers to offer and sell, any products or services, to any and all customers of your Center. We have the right to use information from your computer system or related reports submitted to us for such purposes, notwithstanding anything to the contrary contained in this Agreement.

15.4  Possession of Premises

(a)  Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we may require you:

(i)  to promptly assign to us the lease or sublease for the Premises of your Center (or, at our option, sublease to us the Premises of your Center as an Interim Sublease in accordance with Section 4.1 and otherwise on the same terms and conditions as your lease) and promptly grant us possession to the Premises of your Center; or

(ii)  if this Agreement is for a new Meineke Center and you or one of your Affiliates or Owners owns the Premises, to promptly enter into a lease with us on commercially reasonable terms for an initial term of 18 months, with 2 additional 18-month options to renew.

(b)  You will not be obligated to lease or sublease to us the Premises of your Center if you have notified us at least 18 months prior to expiration of the Term that you do not intend to exercise your right to a successor franchise under Article 14, and that neither you nor any Affiliate or Owner of yours intends to own, operate, manage, lease, lend funds to or otherwise assist a Competitive Business at the Premises after expiration of the Term, and you and your Affiliates and Owners in fact do not engage in any such activities with respect to the Premises for one year after expiration of the Term.

(c)  For the avoidance of doubt, if this Agreement is for a Meineke Center that operated as a Meineke Center prior to the date hereof, and you or one of your Affiliates owns the Premises as of the Effective Date, then you will not be obligated to lease the Premises to us in accordance with the terms of this Agreement upon termination or expiration of this Agreement, provided that neither you nor any Affiliate or Owner of yours owns, operates, manages, leases, lends funds to or otherwise assists a Competitive Business at the Premises for a 1 year term after the termination or expiration.

15.5  Continuing Obligations

All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect until they are satisfied in full or by their nature expire.

**ARTICLE 16:**
**RELATIONSHIP OF THE PARTIES**

16.1  Independent Contractors

You are an independent contractor. Nothing in this Agreement, or arising from the conduct of the parties hereunder, is intended to or does in fact or law make either party a general or special agent, joint

Meineke FA (2021)
EAST\178929093.5

MEIN000819

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

venturer, partner, or employee of the other for any purpose. Neither this Agreement, the nature of the relationship of the parties nor the dealings of the parties pursuant to this Agreement creates a fiduciary relationship between the parties. Further, we and you are not and do not intend to be partners, associates, or joint employers in any way, and we shall not be construed to be jointly liable for any of your acts or omissions under any circumstances. Although we retain the right to establish and modify the System that you must follow, you retain the responsibility for the day-to-day management and operation of your Center and implementing and maintaining standards at the Center. To the extent that the Operations Manual or our guidelines or standards contain employee-related policies or procedures that might apply to your employees, those policies and procedures are provided for informational purposes only and do not represent mandatory policies and procedures to be implemented by you. You must determine to what extent, if any, these policies and procedures may be applicable to your operations at the Center. We and you recognize that we neither dictate nor control labor or employment matters for franchisees and that you, and not us, are solely responsible for dictating the terms and conditions of employment for your employees including, but not limited to, training, wages, benefits, promotions, hirings and firings, vacations, safety, work schedules, and specific tasks. We have no relationship with your employees, and you have no relationship with our employees.

You agree to conspicuously identify yourself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your Center and agree to place such other notices of independent ownership at your Center and on forms, business cards, stationery, advertising and other materials as we may require from time to time.

You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. We will not be obligated by or have any liability under any agreements made by you with any third party or for any representations made by you to any third party. We will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of your business hereunder.

16.2     Indemnification

You agree to indemnify us, our Affiliates and our respective directors, officers, employees, shareholders, agents, successors and assigns (collectively "indemnitees"), and to hold the indemnitees harmless to the fullest extent permitted by law, from any and all losses and expenses (as defined below) incurred in connection with any litigation or other form of adjudicatory procedure, claim, demand, investigation, or formal or informal inquiry (regardless of whether it is reduced to judgment) or any settlement thereof which arises directly or indirectly from, or as a result of, a claim of a third party in connection with the selection, development, ownership, operation or closing of your Center (collectively "event"), and regardless of whether it resulted from any strict or vicarious liability imposed by law on the indemnitees, provided, however, that this indemnity will not apply to any liability arising from a breach of this Agreement by the indemnitees or the gross negligence or willful acts of indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein will extend to any finding of comparative or contributory negligence attributable to you). The term "losses and expenses" includes compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs associated with any of the foregoing losses and expenses. You agree to give us prompt notice of any event of which you are aware for which indemnification is required, and, at your expense and risk, we may elect to assume (but under no circumstance obligated to undertake) the defense and/or settlement thereof, provided that we will seek your advice and counsel. Our assumption of the defense does not modify your indemnification obligation. We may, in our reasonable discretion, take such actions as we deem necessary and appropriate

40

MEIN000820

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereof as may be, in our reasonable discretion, necessary for the protection of the indemnitees or Meineke Car Care Centers generally.

You acknowledge and agree that except as provided under an applicable guarantee of performance, or express statutory liability for such conduct, none of our past, present or future directors, officers, employees, incorporators, members, partners, stockholders, subsidiaries, affiliates, controlling parties, entities under common control, ownership or management, vendors, service providers, agents, attorneys or representatives will have any liability for (i) any of our obligations or liabilities relating to or arising from this Agreement, (ii) any claim against us based on, in respect of, or by reason of, the relationship between you and us, or (iii) any claim against us based on any of our alleged unlawful act or omission. For the avoidance of doubt, this provision constitutes an express waiver of any claims based on a theory of vicarious liability, unless such vicarious claims are authorized by a guarantee of performance or statutory obligation. It is not meant to bar any direct contractual, statutory or common law claim that would otherwise exist.

This Section 16.2 will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

16.3     Taxes

You agree to promptly pay to us an amount equal to all taxes levied or assessed, including unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipt taxes, taxes on royalties, any similar taxes or levies, imposed upon or required to be collected or paid by us by reason of the furnishing of products, intangible property (including trademarks) or services to you. In the event of a bona fide dispute as to your liability for taxes, you may contest your liability in accordance with applicable law.

**ARTICLE 17:**
**MISCELLANEOUS**

17.1     Governing Law

Except as otherwise provided in Section 17.2 with respect to the United States Arbitration Act (9 U.S.C. § 1, et seq.), this Agreement and all issues arising from or relating to this Agreement will be governed by and construed under the laws of the State of North Carolina, provided the foregoing does not constitute a waiver of your rights under any applicable franchise registration and disclosure or franchise relationship law of another state. Otherwise, in the event of any conflict of law, North Carolina law will prevail, without regard to the application of North Carolina conflict of law principles.

17.2     Arbitration

Subject to Section 17.3 and Section 17.4, any controversies, disputes, or claims between the parties, including their respective Affiliates, owners, officers, directors, agents, and employees, arising from or relating to this Agreement may be submitted  on demand,  by either party at the time of the filing of a claim if you are the claimant, or before the expiration of ten (10) days after receipt of service of process of the claim by the respondent, for arbitration to the American Arbitration Association ("AAA").  The arbitration shall be governed exclusively by the United States Arbitration Act (9 U.S.C. § 1, et seq.), without reference to any state arbitration statutes.  The parties agree that, in connection with any such arbitration proceeding, each shall submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedures) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding shall be barred. The arbitration proceedings shall be conducted in the city where we then have our principal place of business in accordance

41

MEIN000821

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

with the then-current commercial arbitration rules of the AAA, except the parties shall be entitled to limited discovery at the discretion of the arbitrator(s) who may, but are not required to, allow depositions. The parties acknowledge that the arbitrators' subpoena power is not subject to geographic limitations. The parties agree to be bound by the provisions of any limitation on the period of time by which claims must be brought under North Carolina law or any applicable federal law.

The arbitration proceedings may, at the discretion of the arbitrator(s), also include claims under other Meineke Franchise and Trademark Agreements that permit arbitration on substantially similar terms as those contained in this Section 17.2, provided that the parties to all such agreements are identical to the parties to this Agreement (or their successors and assigns in accordance with their respective provisions) or are Affiliates of such parties. Otherwise, the arbitration proceedings shall be conducted on an individual basis and not on a multi-plaintiff, consolidated or class-wide basis.

The arbitrator(s) shall have the right to award the relief which he or she deems proper, consistent with the terms of this Agreement, including compensatory damages (with interest on unpaid amounts from date due), specific performance, injunctive relief, legal fees and costs. The award and decision of the arbitrator(s) shall be conclusive and binding on all parties, and judgment upon the award may be entered in any court of competent jurisdiction. Any right to contest the validity or enforceability of the award shall be governed exclusively by the United States Arbitration Act. The provisions of this Section 17.2 shall continue in full force and effect subsequent to and notwithstanding expiration or termination of this Agreement.

### 17.3    Preliminary Injunctive Relief

Either party hereto may obtain in any court of competent jurisdiction temporary restraining orders and preliminary injunctions in accordance with applicable law, whether or not the case has been referred to arbitration pursuant to Section 17.2. The parties agree that any violation of Article 10, Article 11, Section 12.2(k), Section 15.2 or Section 15.4 would result in irreparable harm for which no adequate remedy at law may be available. The provisions of this Section 17.3 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 17.4    Multi-Plaintiff and Class Action Claims

Subject to and in accordance with applicable law, you may institute a multi-plaintiff claim (involving more than one plaintiff that is not one of your Owners or Affiliates) or a class action claim in a court of competent jurisdiction against us for the sole purpose of seeking: (a) preliminary and permanent injunctive relief or specific performance as a result of a breach of this Agreement; (b) restitution to the MAF as a result of a breach of Article 8 hereof; or (c) restitution as a result of a breach of our obligation under Section 7.2 not to take rebates, benefits and promotional allowances from suppliers, other than in accordance with the terms of Section 7.2. You agree that multi-plaintiff or class action claims may not be instituted for any claims or purposes other than those listed above in this Section 17.4. You further agree that any such action shall be brought exclusively in the jurisdiction where we then have our principal place of business, notwithstanding the provisions of Section 17.5. The provisions of this Section 17.4 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 17.5    Venue

Any judicial proceeding we may bring against you or any of your Owners in accordance with the terms of this Agreement may be brought in the jurisdiction where we then have our principal place of business and, if brought in that jurisdiction, may not be transferred to another jurisdiction on the basis that

MEIN000822

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

the other jurisdiction is more convenient for the parties and witnesses. Any judicial proceedings you may bring against us in accordance with the terms of this Agreement may be brought in the jurisdiction where your Center is located and, if brought in that jurisdiction, may not be transferred to another jurisdiction on the basis that the other jurisdiction is more convenient to the parties and witnesses.

17.6     Costs and Attorneys' Fees

The party who prevails in any arbitration or judicial proceeding will be awarded its costs and expenses incurred in connection with such proceedings, including reasonable attorneys' fees.

17.7     Limitations on Legal Claims

Except with respect to any of your obligations herein regarding the Confidential Information and the Marks, we and you (and your Owners) each agrees, to the fullest extent permitted by law, not to assert any right to or claim for any punitive, exemplary or special damages against the other directly or indirectly arising from or relating to this Agreement.

17.8     Severability and Substitution of Provisions

Every part of this Agreement will be considered severable. If for any reason any part of this Agreement is held to be invalid, that determination will not impair the other parts of this Agreement. If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of geographical area, type of business activity prohibited and/or length of time, but could be rendered enforceable by reducing any part or all of it, you and we agree that it will be enforced to the fullest extent permissible under applicable law and public policy.

If any applicable law requires a greater prior notice of termination of or refusal to renew this Agreement than is required hereunder, a different standard of "good cause" to terminate or not renew this Agreement, or the taking of some other action not required hereunder, then the prior notice, "good cause" standard and/or other action required by such law will be substituted for the comparable provisions hereof. However, the foregoing shall not be deemed a waiver of our right to contest the validity, enforceability or application of any such law. If any provision of this Agreement or any specification, standard or operating procedure prescribed by us is invalid or unenforceable under applicable law, we have the right, in our sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to make it valid and enforceable.

17.9     Waiver of Obligations

We and you may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. You and we will not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it; any failure, refusal or neglect by you or us to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by us to exercise any right, whether of the same, similar or different nature, with respect to other Meineke Centers or dealers; or the acceptance by us of any payments due from you after any breach of this Agreement.

17.10    Exercise of Rights

Except as otherwise expressly provided herein, the rights of the parties hereto are cumulative and no exercise or enforcement by either party of any right or remedy hereunder will preclude the exercise or enforcement of any other right or remedy which such party is entitled to enforce by law.

MEIN000823

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

### 17.11    Construction

The language of this Agreement will be construed according to its fair meaning and not strictly against or for any party. The introduction, personal guarantees, Schedules and addenda (if any) to this Agreement, as well as the Operations Manual, are a part of this Agreement and constitute the entire agreement of the parties with respect to the subject matters hereof and supersede all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein. If there is an inconsistency between the terms of this Agreement and the Operations Manual, the terms of this Agreement will prevail. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement, other than our franchise disclosure document, that either party may or does rely on or that will have any force or effect. This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest. Nothing in this Agreement will be deemed to confer any rights or remedies on any person or legal entity not a party hereto (including any independent association of Meineke Dealers or DAAC), other than successors and assigns of any party to this Agreement whose interests are assigned in accordance with its terms.

The headings of articles and sections are for convenience only and do not limit or construe their contents. The word "including" will be construed to include the words "without limitation." The term "Dealer" or "you" is applicable to one or more persons, a corporation, limited liability company or a partnership and its owners, as the case may be. If two or more persons are at any time Dealer hereunder, whether as partners, joint venturers or otherwise, their obligations and liabilities to us will be joint and several. The parties hereto acknowledge and agree that the franchise relationship contemplated by this Agreement, as well as other similar agreements with other Meineke Dealers, confers on us discretion to make decisions and to take certain actions and that we will exercise our business judgment honestly in doing so.

Whenever this Agreement requires the approval or consent of either party, the other party must make written request therefore, and such approval or consent must be obtained in writing.  This Agreement may be executed in multiple copies, each of which will be deemed an original.  Time is of the essence in this Agreement.

### 17.12    Modification

This Agreement may not be amended except:  (a) as noted below; (b) by written agreement signed by both parties; and (c) as otherwise provided herein with respect to the Operations Manual.

This Agreement may be amended at any time whenever we and a super-majority (as hereinafter defined) of Meineke Dealers agree to any such amendment. We agree to provide you, at least ninety (90) days prior to the date such amendment is to be effective, a copy of the proposed amendment, together with a brief statement explaining the reasons therefore. A "super-majority" of Meineke Dealers shall consist of the owners of at least seventy-five percent (75%) of all franchised Meineke Car Care Centers in the United States of America. Whenever a super-majority of Meineke Dealers approve an amendment in the manner provided for herein, such amendment shall be binding on all Meineke Dealers, including you, to the same extent and in the same manner as if the amendment was unanimously approved by all Meineke Dealers, and regardless whether you may or may not desire to be bound by the amendment. By signing this Agreement, you appoint any of our officers as your attorney in fact with irrevocable power and authority to execute any such amendment so approved.

Meineke FA (2021)
EAST\178929093.5

MEIN000824

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

17.13    Policy Regarding Meineke Chain Expansion

We and our affiliates have developed certain policies to determine the potential loss of sales incurred by existing Meineke Car Care Centers as a result of the addition of new Meineke Car Care Centers in a local market area. These policies are embodied in a written document entitled "Meineke's Encroachment Insurance Policy" ("the Policy"), which is not part of this Agreement and which we may change from time to time. We agree to seek the advice of DAAC with respect to any material changes to the Policy and not to make any material changes to the Policy before January 1, 2006 without the consent of DAAC.

You may invoke the procedures set forth in the Policy at your option.  However, if you choose not to invoke the Policy and instead you pursue legal action against us in connection with the opening of new Meineke Car Care Centers in the vicinity of your Center, your legal rights with respect to our actions in opening new Meineke Car Care Centers will be limited solely and exclusively to those contained in Section 2.3, and we shall have no liability whatsoever with respect to the opening or operation of additional Meineke Car Care Centers, provided we do not breach our express obligations under Section 2.3.  You acknowledge and agree that, if you institute any legal action relating directly or indirectly to the opening of additional Meineke Car Care Centers, the Policy does not confer on you any legal rights whatsoever (whether as a matter of contract, any implied covenant of good faith and fair dealing or otherwise), and that the Policy, and our practices and communications there under, are not relevant or material to the issues in such proceedings and therefore are inadmissible as evidence in such proceedings.

17.14    Notices and Payments

All notices, requests and reports permitted or required to be delivered by this Agreement will be deemed delivered: (a) at the time delivered by hand to the recipient party (or to an officer, director or partner of the recipient party); (b) on the same day of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (c) one business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (d) five business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing.  All payments and reports required by this Agreement must be sent to us at the address identified in this Agreement unless and until a different address has been designated by written notice.

17.15    Ombudsman

We agree to appoint, with the advice of DAAC, a neutral person with experience in resolving franchise disputes ("Ombudsman") who will be available to you in attempting to resolve any disputes, in accordance with the provisions set forth below, in the event (a) we exercise our rights under Section 13; or (b) a dispute arises as to the findings of an audit conducted pursuant to Section 9.6.

If we have delivered to you a formal notice of default or a notice of termination, then you have the right to seek the assistance of the Ombudsman within 10 days thereafter, if you believe we are not entitled to terminate this Agreement.  We agree to consider the views of the Ombudsman, but are not bound by his or her views. If the matter for which you seek the Ombudsman to assist you involves termination for reasons that include monetary defaults, then you agree to pay for the fees and costs of the Ombudsman, except that if the Ombudsman notifies us that he or she believes that you are not in default of your monetary obligations or that our notice of termination is defective, we agree to reimburse you for such fees and costs. Otherwise, in all other circumstances, you and we agree to share equally the fees and costs of the Ombudsman.

Meineke FA (2021)
EAST\178929093.5

MEIN000825

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

If: (a) we have delivered to you a formal notice of default or notice of termination as a result of one or more non-monetary defaults (regardless whether we also assert monetary defaults); and (b) the Ombudsman notifies us that he or she believes that we have no right to terminate this Agreement on any basis set forth in the default letter; then, we agree that we will not invoke our rights under Section 15.2(c) or Section 15.2(d) without obtaining an order or declaration from a court or arbitrator that we may invoke such rights.

The exercise of your right to seek the assistance of the Ombudsman hereunder shall not negate our right to terminate this Agreement and, except as otherwise explicitly provided in this Section 17.15, to enforce your post-termination obligations hereunder or under applicable law.

You and we agree that all information received by the Ombudsman while serving in that capacity shall be kept confidential. Accordingly, the parties agree not to serve the Ombudsman with any subpoena or discovery request (or otherwise compel the Ombudsman's attendance or testimony) in connection with any legal or administrative action between the parties.  Each party agrees to maintain the confidentiality of all communications it receives relating to the Ombudsman, and not to use it for any purpose other than resolution of the dispute in the Ombudsman process.  Nothing contained in this Section 17.15, nor our participation in the Ombudsman process, shall constitute a waiver of our right to terminate this Agreement at any time in accordance with its terms or in accordance with applicable law.

*[Signatures to follow]*

Meineke FA (2021)
EAST\178929093.5

MEIN000826

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the Agreement Date.

**CJGL, INC.**
a California corporation

By: _____
Print Name: Carl Douma

Date: _____
September 29, 2021

By: _____
Print Name: Jan Douma

Date: _____
July 12, 2021

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _____
Authorized Representative

Date: _____
September 29, 2021

Attest: _____

47

MEIN000827

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

**SCHEDULE A – FRANCHISE INFORMATION**

**MEINEKE®**
**FRANCHISE AND TRADEMARK AGREEMENT**
**WITH**
**CJGL, INC.**

1.    **Initial Franchise Fee.**  The initial franchise fee payable under Section 3.1 of this Agreement is not applicable.

2.    **Expiration Date.**  The expiration date of the Agreement is ___September 29___, 2029.

3.    **Market Area.**  The "Market Area" is: Santa Barbara, California

4.    **MSA Market Area.**  The "MSA Market Area" is: Santa Barbara-Santa Maria-Lompoc, California

5.    **DMA Advertising Market Area.**  The "DMA Advertising Market Area" is: Santa Barbara-Sanmar-Sanluob

CJGL, INC.                                          MEINEKE FRANCHISOR SPV LLC
a California corporation                            a Delaware limited liability company

By: _____             By: _____
Print Name: Carl Douma                             Authorized Representative

Date: ___September 29, 2021___                     Date: ___September 29, 2021___

By: _____             Attest: _____
Print Name: Jan Douma

Date: ___July 12, 2021___

A-1

MEIN000828

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

**SCHEDULE B - PREMISES**

**MEINEKE®**
**FRANCHISE AND TRADEMARK AGREEMENT**
**WITH**
**CJGL, INC.**

The "Premises" of your Center shall be as follows:

3956 State Street, Santa Barbara, California 93105

**CJGL, INC.**
a California corporation

By: _Carl Douma_
Print Name: Carl Douma

Date: September 29, 2021

By: _Jan Douma_
Print Name: Jan Douma

Date: July 12, 2021

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _Scott O'Melia_
Authorized Representative

Date: September 29, 2021

Attest: _Leah Tate_

B-1

Meineke FA (2021)
EAST\178929093.5

MEIN000829

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

## SCHEDULE C - DISCLOSURE OF OWNERSHIP INTERESTS

**MEINEKE®**
**FRANCHISE AND TRADEMARK AGREEMENT**
**WITH**
**CJGL, INC.**

1.    <u>Operating Partner</u>.  The name and home address of the Operating Partner is as follows:

Carl Douma: <u>667 Seeger Avenue, Ventura, California 93003</u>

Jan Douma: <u>667 Seeger Avenue, Ventura, California 93003</u>

2.    <u>Form of Entity of Dealer</u>.

(a) <u>Corporation or Limited Liability Company</u>.  Dealer was incorporated/organized on December 26, 2012, under the laws of the State of California. It has not conducted business under any name other than its company name. The following is a list of all of Dealer's Directors/Members and Officers/Manager as of <u>September 29</u>, 2021.

| Name of Each Director/Officer | Position(s) Held |
|---|---|
| Carl Douma | President |
| Jan Douma | Vice President |

(b) <u>Partnership</u>.  Dealer is a [general] [limited] partnership formed on _____,_____under the laws of the State of _____. It has not conducted business under any name other than its partnership name. The following is a list of all of Dealer's general partners as of _____,          .

<u>Name of General Partner</u>
N/A

3.    <u>Owners</u>.  Dealer and each of its Owners represents and warrants that the following is a complete and accurate list of all Owners of Dealer, including the full name and mailing address of each Owner, and fully describes the nature and extent of each Owner's interest in Dealer. Dealer, and each Owner as to his ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of his ownership interest in Dealer, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

| Owner's Name | Description of Interest |
|---|---|
| Carl Douma | 54 % |
| June Douma | 46 % |

*[Signatures to follow]*

C-1

MEIN000830

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

**CJGL, INC.**
a California corporation

By: _Carl Douma_
   A3FCFC72EAAC470...
Print Name: Carl Douma

Date: _September 29, 2021_

By: _Jan Douma_
   125152B91AFB491...
Print Name: Jan Douma

Date: _July 12, 2021_

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _Scott O'Melia_
   BA4DA03F566D4D8...
Authorized Representative

Date: _September 29, 2021_

Attest: _Leah Tate_
   A1331713F63F401...

C-2

Meineke FA (2021)
EAST\178929093.5

MEIN000831

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

## SCHEDULE D - OWNERS' PERSONAL GUARANTY

MEINEKE®
FRANCHISE AND TRADEMARK AGREEMENT
WITH
CJGL, INC.
(insert Dealer name)

     In consideration of, and as an inducement to, the execution of the Meineke® Franchise and Trademark Agreement dated as of _September 29_, 2021 (the "Agreement") by and between **MEINEKE FRANCHISOR SPV LLC** ("Franchisor"), and **CJGL, INC.** ("Dealer") and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the undersigned, each of whom is an owner of an interest in Dealer as of the date of this document, hereby personally and unconditionally:  (1) guarantees to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Dealer shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and that each and every representation of Dealer made in connection with the Agreement is true, correct and complete in all respects at and as of the time given; and (2) agrees personally to be bound by, and personally liable for the breach of, each and every provision in the Agreement.

     Each of the undersigned waives: (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right he may have to require that an action be brought against Dealer or any other person as a condition of liability; and (e) any and all other notices and legal or equitable defenses to which he may be entitled relating to the validity or enforceability of this guaranty.

     Each of the undersigned consents and agrees that: (i) his direct and immediate liability under this guaranty shall be joint and several; (ii) he shall render any payment or performance required under the Agreement upon demand if Dealer fails or refuses punctually to do so; (iii) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Dealer or any other person; and (iv) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time to time grant to Dealer or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement and thereafter and shall continue until any and all indebtednesses and obligations there under are satisfied in full.

*[Signatures to follow]*

D-1

MEIN000832

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

**IN WITNESS THEREOF**, each of the undersigned has hereunto affixed his signature, under seal, on the same day and year as the Agreement was executed.

**PERCENTAGE OF OWNERSHIP INTERESTS IN DEALER**

**GUARANTOR(S)**

54

_Carl Douma_

A3FCFC72EAAC470...

(Signature)

Carl Douma

(Print Name)

46

_Jan Douma_

125152B91AFB491...

(Signature)

Jan Douma

(Print Name)

D-2

MEIN000833

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

## RENEWAL ADDENDUM TO FRANCHISE AND TRADEMARK AGREEMENT

This Renewal Addendum to Franchise and Trademark Agreement ("Renewal Addendum") is made this 29th day of September , 2021, by and between, **MEINEKE FRANCHISOR SPV LLC**, a Delaware limited liability company ("Franchisor" or "Meineke"), and **CJGL, INC**., a California corporation ("Franchisee").

### Recitals

**WHEREAS**, Franchisee operates a Meineke Car Care Center located at 3956 State Street, Santa Barbara, California 93105 ("Meineke Center #4118");

**WHEREAS**, the operation of Franchisee's Meineke Center #4118 is governed by a Meineke Franchise and Trademark Agreement executed on August 29, 2014, as amended, restated, supplemented, or otherwise modified (the "Prior Franchise Agreement");

**WHEREAS**, pursuant to its terms, the Prior Franchise Agreement for Meineke Center #4118 expired on June 29, 2021; and

**WHEREAS**, Franchisee has requested, and Meineke has agreed, that the franchise shall be renewed pursuant to the terms of this Renewal Addendum, the Prior Franchise Agreement and Meineke's current Franchise and Trademark Agreement, to be entered into concurrently herewith (the "Franchise Agreement").

**NOW**, **THEREFORE**, in consideration of the mutual promises contained herein Franchisor and Franchisee agree as follows:

1.      **Effective Date.** The effective date of this Renewal Addendum shall be the date that Meineke signs the document after first being signed by the Franchisee ("Effective Date").

2.      **Renewal Term.** The renewal term of the Franchise Agreement will be for a period of eight (8) years, effective as of the date of this Renewal Addendum.

3.      **Renewal Fee.** The renewal fee of Two Thousand Five Hundred and 00/100 Dollars ($2,500.00) is due and payable upon execution of this Renewal Addendum.

4.      **Electronic Funds Transfer.** Franchisee shall execute the automatic bank draft authorization form as a condition precedent to renewal.  Franchisor acknowledges that Franchisee's current method of payment for the royalty fees and advertising fees is via check, and that the current method of payment for Mkey fees is via electronic funds transfer.

5.      **Exclusions.** Upon the execution of this Renewal Addendum and the Franchise Agreement, Franchisee shall be bound by all of the terms and conditions stated in the governing Franchise Agreement and shall comply with all provisions of the Franchise Agreement except that:

   a.   Franchisee shall not be required to remit to Meineke another initial franchise fee set forth in Article 3.1 of the Franchise Agreement; and

   b.   Franchisee shall not be required to attend the initial training program more particularly set forth in Article 5.1 of the Franchise Agreement; and

1

MCC 4118

MEIN000834

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

      c.     Section 3.4 of the Franchise Agreement shall be amended to waive the initial advertising contribution in the amount of Twenty Thousand and 00/100 Dollars ($20,000.00).

6.     This Renewal Addendum is intended to modify certain terms and conditions contained in the Franchise Agreement. This Renewal Addendum is an integral part of the Franchise Agreement and the terms of this Renewal Addendum shall be controlling with respect to the subject matter contained in this Renewal Addendum. This Renewal Addendum may not be amended, changed, revised or altered, except by instrument in writing signed by the parties.

7.     The Franchise Agreement, the schedules attached thereto and this Renewal Addendum, constitute the entire, full and complete Agreement between Franchisor and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute the Franchise Agreement or this Renewal Addendum. Except as amended hereby and explicitly stated herein, all other terms and conditions of the Franchise Agreement are unmodified and confirmed.

8.     Franchisee agrees and acknowledge that any and all Federal Express or similar courier fees incurred by Franchisor relative to this renewal, shall be paid by Franchisee and Franchisor may draft Franchisee for such costs and expenses.

*[Signatures to follow]*

MCC 4118

2

MEIN000835

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

Intending to be legally bound, the parties execute this Renewal Addendum as of the date first written above.

**CJGL, INC**.
a California corporation

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _____
*Carl Douma*
A3FCFC72EAAC470...

Print Name: Carl Douma

By: _____
*Scott O'Melia*
BA4DA03F566D4D8...

Authorized Representative

Date: _____September 29, 2021_____

Date: ___September 29, 2021___

By: _____
*Jan Douma*
125152B91AFB491...

Print Name: Jan Douma

Attest: _____
*Leah Tate*
A1331713F63F401...

Date: _____July 12, 2021_____

3

MEIN000836

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

# ADVERTISING ADDENDUM TO
# FRANCHISE AND TRADEMARK AGREEMENT

**THIS ADVERTISING ADDENDUM TO THE FRANCHISE AND TRADEMARK AGREEMENT** (the "Addendum") is made by and between **MEINEKE FRANCHISOR SPV LLC** ("Meineke"), and **CJGL, INC.** ("Franchisee"), as of the date appearing below Meineke's signature line at the end of this Addendum.

## RECITALS

**WHEREAS**, Meineke and Franchisee are parties to a Meineke Franchise and Trademark Agreement for Meineke Center #4118, dated <u>September 29</u>, 2021 (the "<u>Existing Franchise Agreement</u>"), under which Franchisee will operate a Meineke Center at the location specified in Schedule B of the Existing Franchise Agreement (the "<u>Location</u>") (capitalized terms used but not defined in this Addendum shall have the meanings set forth in the Existing Franchise Agreement); and

**WHEREAS**, Meineke and Franchisee have agreed to amend the advertising provisions of the Existing Franchise Agreement in accordance with the terms and conditions more particularly set forth herein.

**NOW**, **THEREFORE**, in consideration of the promises, mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Effective Date.**  This Addendum shall be in effect on the date of execution by Meineke after first being executed by Franchisee (the "<u>Effective Date</u>").

2.    **Tier One Eligibility Criteria.**  For purposes of this Addendum, Franchisee shall be a Tier One Franchisee ("<u>Tier One</u>") provided Franchisee has been open and operating for a period of twelve (12) consecutive months and Franchisee meets the following stated eligibility requirements:

    a.    Franchisee must be at least a "3-Star Dealer" in accordance with the then current Meineke Star Rating Program;

    b.    Franchisee must be current in any franchise fees or advertising contributions, due and owing to Meineke, Meineke Realty, Inc. or Econo Lube N' Tune, LLC, meaning Franchisee shall not have any accounts receivable balance outstanding more than thirty (30) days in arrears;

    c.    Franchisee must be:  (i) on a current Existing Franchise Agreement, meaning the stated expiration date of the Existing Franchise Agreement shall not have occurred, or; (ii) be actively engaged in the renewal process as determined by Meineke;

    d.    Franchisee must be engaged in the following operational programs:

        i.    For the purposes of calculating the eligibility threshold set forth in this Paragraph  2(d)(i), for the first year following the Effective Date, Franchisee

MEIN000837

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

must make annual expenditures from Meineke Dealers Association Purchasing Cooperative, Inc. ("MDPCI") vendors, and MDPCI approved programs must amount to twelve and one-half percent (12.5%) of Franchisee's annual gross sales. This reflects that the average Meineke Center has a cost of goods sold of twenty-five percent (25%), with the purchasing requirement set at fifty percent (50%) of that amount. In subsequent years, this purchasing requirement may be increased above fifty percent (50%), but at no time will this requirement exceed seventy percent (70%) as calculated using this formula. Any percentage change shall be determined by Meineke only after consultation with the MDPCI.

ii.   Franchisee must participate in the Cooper Tire Program or a then current Meineke preferred tire program, meaning Franchisee must be actively enrolled in the Cooper Tire Program or the then current Meineke preferred tire program and selling Cooper tires or equivalent tires pursuant to the then current Meineke preferred tire program at the Location;

iii.  Franchisee must participate in the Chevron Program or a then current Meineke preferred oil change program, meaning Franchisee must be actively enrolled in the Chevron Program or the then current Meineke preferred oil change program and selling Chevron or equivalent products pursuant to the then current Meineke preferred oil change program at the Location;

iv.   Franchisee must be enrolled and participating in the Meineke Credit Card Program, meaning Franchisee must have executed a definitive agreement with Synchrony Bank or their predecessor or a then current Meineke approved private label consumer credit program, is actively accepting and selling the Meineke Credit Card at the Location and has successfully completed twenty-four (24) new Synchrony card applications, or its then current equivalent, per calendar year;

v.    Franchisee must be utilizing the then current online appointment system;

vi.   Franchisee must be enrolled with the LogMyCalls and Telmetrics programs or the then current Meineke preferred equivalent versions of such programs;

vii.  Franchisee must log onto Dealer Access an average of at least once per week annually; and

viii. Franchisee must have attended a minimum of either one (1) regional meeting per year or attend either the annual Meineke or the Meineke Dealer's Association ("MDA") Convention.

3.   **Tier One and Tier Two Eligibility Criteria.**  For purposes of this Addendum, Tier One and Tier Two ("Tier Two")) Franchisees shall be determined on an annual basis by Meineke in Meineke's discretion, after consultation with the MDA, in accordance with Paragraph 4(a) set forth herein.

MEIN000838

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

4. **Ongoing Meineke Advertising Fund Contributions.** Notwithstanding anything stated to the contrary in the Existing Franchise Agreement, starting on the Effective Date and continuing until the the date on which the determination referred to in Paragraph 3 is completed, Franchisee shall remit six percent (6%) of weekly Gross Revenues to the Meineke Advertising Fund. For the twelve (12)-month period following such date and each year thereafter during the Term of the Existing Franchise Agreement, notwithstanding anything stated to the contrary in the Existing Franchise Agreement: (i) if Franchisee is a Tier One franchisee, Franchisee shall remit six percent (6%) of weekly Gross Revenues to the Meineke Advertising Fund ("Adjusted Tier One MAF Contribution"); and, (ii) if Franchisee is a Tier Two franchisee, Franchisee shall remit five and one-half percent (5.5%) of weekly Gross Revenues to the Meineke Advertising Fund ("Adjusted Tier Two MAF Contribution"). Notwithstanding the foregoing, Franchisee shall remit reduced advertising contributions set forth in the Existing Franchise Agreement for the sale of: (1) towing services; (2) government regulated inspections; (3) oil change services; and, (4) tire sales. Meineke reserves the right to place a cap on annual advertising contributions for Tier Two franchisees as is deemed appropriate after consultation with the MDA.

 a. **Tier One and Tier Two Annual Assessment.** Not later than the end of the first quarter of each calendar year during the Term of the Existing Franchise Agreement, Meineke shall determine, in its discretion after consultation with the MDA, whether Franchisee meets Tier One or Tier Two eligibility requirements. Tier One eligibility shall be determined based on the criteria as set forth in Paragraph 2 herein. Tier Two eligibility shall be determined on a yearly basis by Meineke after consultation with the MDA. Meineke shall make its determination on the basis of Franchisee's or the Location's performance during the prior full calendar year. After assessing Franchisee or the Location's performance during the prior full calendar year, if Meineke determines that Franchisee's tier changes from Tier One to Tier Two or from Tier Two to Tier One, Meineke shall provide Franchisee with written notice, in accordance with the notice provision set forth in Paragraph 6 of this Addendum, and Franchisee shall remit either the Adjusted Tier Two MAF Contribution or the Adjusted Tier One MAF Contribution in accordance with the written notice provided.

5. **Center Image Improvement.** No later than one year from date of execution of this Addendum (the "Completion Date"), Franchisee agrees to confer with a Meineke representative and replace and/or upgrade the following items and/or features of the center situated at the Location (the "Required Updates"), which replacements and/or upgrades shall be in accordance with Meineke's current image guidelines, standards, and specifications:

| Item / Feature | Replacement Required? |
|---|---|
| Exterior Paint (paint yellow areas white) | Yes |
| Fascia panels | Yes |
| Paint Kiosk (white) | Yes |

MEIN000839

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

| Interior floors | Yes |
| Black padded chairs | Yes |
| Hospitality station upgrade | Yes |

If Franchisee does not complete the Required Updates by the Completion Date, Franchisee agrees that this Addendum shall immediately and automatically terminate. The Existing Franchise Agreement shall otherwise continue and remain in full force and effect.

Upon termination Franchisee shall pay immediately to Meineke all advertising contribution amounts that would have been due since the Effective Date without giving effect to the two percent (2%) discount in Paragraph 4 of this Addendum, and Meineke shall remit such amounts to the MAF. For example, if Franchisee would have owed $800 for advertising contributions between the Effective Date and Completion Date but paid $600 pursuant to Paragraph 4 of this Addendum, then Franchisee would immediately pay Meineke $200.

      6.    **Notice.**  All notices required to be delivered by this Addendum will be deemed delivered on the same day of the transmission by electronic mail to the electronic mail address provided to Meineke by Franchisee. Nothing in this Addendum shall alter the legal notice provisions set forth in the Existing Franchise Agreement. All Meineke preferred programs referenced in Paragraph 2 shall clearly be communicated by Meineke as such in accordance with this Paragraph 6.

      7.    **Merger.**  In the event there is a direct conflict between the terms of this Addendum and the terms of the Existing Franchise Agreement, the terms of this Addendum relating to the subject matter herein shall control.

      8.    **Guaranty.**  If Franchisee is a corporation and is signing this Addendum as a representative of a corporation, then the guaranty signed by the individual stockholders of the corporation who signed the Existing Franchise Agreement ("Guaranty") shall be guarantors of this Addendum and shall execute where indicated below. The individual stockholders of the corporation shall be guarantors of this Addendum as if this Addendum were a part of the Existing Franchise Agreement when initially signed by the corporation and the guarantor stockholders.

      9.    **Cancellation.**  In the event the average Meineke Center's annual gross sales, as published in Item 19 of Meineke's Franchise Disclosure Document, decreases more than ten percent (10%) as compared to the preceding year, Meineke may at its discretion discontinue this program and terminate this Addendum at any time upon notice to Franchisee. In that event upon notice, Franchisee shall make all advertising payments to the MAF from the time such notice is issued to Franchisee in accordance with the Existing Franchise Agreement. Notwithstanding the foregoing, this cancellation provision shall not be in effect ten (10) years following the Effective Date and for the remaining Term of the Existing Franchise Agreement thereafter.

      10.  **Survival.**  The terms and conditions of the Existing Franchise Agreement not modified by this Addendum shall remain in full force and effect, unchanged and un-canceled.

MEIN000840

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

11. **Star Rating.** In no event shall Meineke render Franchisee in default of the Existing Franchise Agreement for Franchisee's failure to maintain a specific star rating in accordance with Meineke's then current Meineke Star Rating Program. The star rating criteria shall be used solely for purposes of determining Tier One or Tier Two eligibility status and for no other purpose.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Addendum as of the __29th__ day of __September__, 2021.

**CJGL, INC**.
a California corporation

By: _Carl Douma_
    A3FCFC72EAAC470...
Print Name: Carl Douma

Date: _September 29, 2021_

By: _Jan Douma_
    125152B91AFB491...
Print Name: Jan Douma

Date: _July 12, 2021_

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _Scott O'Melia_
    BA4DA03F566D4D8...
Authorized Representative

Date: _September 29, 2021_

Attest: _Leah Tate_
    A1331713F63F401...

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

# ADVERTISING ADDENDUM TO
# FRANCHISE AND TRADEMARK AGREEMENT

**THIS ADVERTISING ADDENDUM TO THE FRANCHISE AND TRADEMARK AGREEMENT** (the "Addendum") is made by and between **MEINEKE FRANCHISOR SPV LLC** ("Meineke"), and **CJGL, INC.** ("Franchisee"), as of the date appearing below Meineke's signature line at the end of this Addendum.

## RECITALS

**WHEREAS**, Meineke and Franchisee are parties to a Meineke Franchise and Trademark Agreement for Meineke Center #4118, dated <u>September 29</u>, 2021 (the "Existing Franchise Agreement"), under which Franchisee will operate a Meineke Center at the location specified in Schedule B of the Existing Franchise Agreement (the "Location") (capitalized terms used but not defined in this Addendum shall have the meanings set forth in the Existing Franchise Agreement); and

**WHEREAS**, Meineke and Franchisee have agreed to amend the advertising provisions of the Existing Franchise Agreement in accordance with the terms and conditions more particularly set forth herein.

**NOW**, **THEREFORE**, in consideration of the promises, mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   **Effective Date.**  This Addendum shall be in effect on the date of execution by Meineke after first being executed by Franchisee (the "Effective Date").

2.   **Tier One Eligibility Criteria.**  For purposes of this Addendum, Franchisee shall be a Tier One Franchisee ("Tier One") provided Franchisee has been open and operating for a period of twelve (12) consecutive months and Franchisee meets the following stated eligibility requirements:

   a.   Franchisee must be at least a "3-Star Dealer" in accordance with the then current Meineke Star Rating Program;

   b.   Franchisee must be current in any franchise fees or advertising contributions, due and owing to Meineke, Meineke Realty, Inc. or Econo Lube N' Tune, LLC, meaning Franchisee shall not have any accounts receivable balance outstanding more than thirty (30) days in arrears;

   c.   Franchisee must be:  (i) on a current Existing Franchise Agreement, meaning the stated expiration date of the Existing Franchise Agreement shall not have occurred, or; (ii) be actively engaged in the renewal process as determined by Meineke;

   d.   Franchisee must be engaged in the following operational programs:

      i.   For the purposes of calculating the eligibility threshold set forth in this Paragraph  2(d)(i), for the first year following the Effective Date, Franchisee

MEIN000842

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

must make annual expenditures from Meineke Dealers Association Purchasing Cooperative, Inc. ("MDPCI") vendors, and MDPCI approved programs must amount to twelve and one-half percent (12.5%) of Franchisee's annual gross sales. This reflects that the average Meineke Center has a cost of goods sold of twenty-five percent (25%), with the purchasing requirement set at fifty percent (50%) of that amount. In subsequent years, this purchasing requirement may be increased above fifty percent (50%), but at no time will this requirement exceed seventy percent (70%) as calculated using this formula. Any percentage change shall be determined by Meineke only after consultation with the MDPCI.

ii. Franchisee must participate in the Cooper Tire Program or a then current Meineke preferred tire program, meaning Franchisee must be actively enrolled in the Cooper Tire Program or the then current Meineke preferred tire program and selling Cooper tires or equivalent tires pursuant to the then current Meineke preferred tire program at the Location;

iii. Franchisee must participate in the Chevron Program or a then current Meineke preferred oil change program, meaning Franchisee must be actively enrolled in the Chevron Program or the then current Meineke preferred oil change program and selling Chevron or equivalent products pursuant to the then current Meineke preferred oil change program at the Location;

iv. Franchisee must be enrolled and participating in the Meineke Credit Card Program, meaning Franchisee must have executed a definitive agreement with Synchrony Bank or their predecessor or a then current Meineke approved private label consumer credit program, is actively accepting and selling the Meineke Credit Card at the Location and has successfully completed twenty-four (24) new Synchrony card applications, or its then current equivalent, per calendar year;

v. Franchisee must be utilizing the then current online appointment system;

vi. Franchisee must be enrolled with the LogMyCalls and Telmetrics programs or the then current Meineke preferred equivalent versions of such programs;

vii. Franchisee must log onto Dealer Access an average of at least once per week annually; and

viii. Franchisee must have attended a minimum of either one (1) regional meeting per year or attend either the annual Meineke or the Meineke Dealer's Association ("MDA") Convention.

3.   **Tier One and Tier Two Eligibility Criteria.**   For purposes of this Addendum, Tier One and Tier Two ("Tier Two")) Franchisees shall be determined on an annual basis by Meineke in Meineke's discretion, after consultation with the MDA, in accordance with Paragraph 4(a) set forth herein.

MEIN000843

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

4.      **Ongoing Meineke Advertising Fund Contributions.**  Notwithstanding anything stated to the contrary in the Existing Franchise Agreement, starting on the Effective Date and continuing until the the date on which the determination referred to in Paragraph 3 is completed, Franchisee shall remit six percent (6%) of weekly Gross Revenues to the Meineke Advertising Fund.  For the twelve (12)-month period following such date and each year thereafter during the Term of the Existing Franchise Agreement, notwithstanding anything stated to the contrary in the Existing Franchise Agreement:  (i) if Franchisee is a Tier One franchisee, Franchisee shall remit six percent (6%) of weekly Gross Revenues to the Meineke Advertising Fund ("Adjusted Tier One MAF Contribution"); and, (ii) if Franchisee is a Tier Two franchisee, Franchisee shall remit five and one-half percent (5.5%) of weekly Gross Revenues to the Meineke Advertising Fund ("Adjusted Tier Two MAF Contribution").   Notwithstanding the foregoing, Franchisee shall remit reduced advertising contributions set forth in the Existing Franchise Agreement for the sale of:  (1) towing services; (2) government regulated inspections; (3) oil change services; and, (4) tire sales.  Meineke reserves the right to place a cap on annual advertising contributions for Tier Two franchisees as is deemed appropriate after consultation with the MDA.

   a.   **Tier One and Tier Two Annual Assessment.**  Not later than the end of the first quarter of each calendar year during the Term of the Existing Franchise Agreement, Meineke shall determine, in its discretion after consultation with the MDA, whether Franchisee meets Tier One or Tier Two eligibility requirements. Tier One eligibility shall be determined based on the criteria as set forth in Paragraph 2 herein.  Tier Two eligibility shall be determined on a yearly basis by Meineke after consultation with the MDA.  Meineke shall make its determination on the basis of Franchisee's or the Location's performance during the prior full calendar year.  After assessing Franchisee or the Location's performance during the prior full calendar year, if Meineke determines that Franchisee's tier changes from Tier One to Tier Two or from Tier Two to Tier One, Meineke shall provide Franchisee with written notice, in accordance with the notice provision set forth in Paragraph 6 of this Addendum, and Franchisee shall remit either the Adjusted Tier Two MAF Contribution or the Adjusted Tier One MAF Contribution in accordance with the written notice provided.

5.      **Center Image Improvement.**  No later than one year from date of execution of this Addendum (the "Completion Date"), Franchisee agrees to confer with a Meineke representative and replace and/or upgrade the following items and/or features of the center situated at the Location (the "Required Updates"), which replacements and/or upgrades shall be in accordance with Meineke's current image guidelines, standards, and specifications:

| Item / Feature | Replacement Required? |
|---|---|
| Exterior Paint (paint yellow areas white) | Yes |
| Fascia panels | Yes |
| Paint Kiosk (white) | Yes |

MEIN000844

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

| Interior floors | Yes |
|---|---|
| Black padded chairs | Yes |
| Hospitality station upgrade | Yes |

If Franchisee does not complete the Required Updates by the Completion Date, Franchisee agrees that this Addendum shall immediately and automatically terminate. The Existing Franchise Agreement shall otherwise continue and remain in full force and effect.

Upon termination Franchisee shall pay immediately to Meineke all advertising contribution amounts that would have been due since the Effective Date without giving effect to the two percent (2%) discount in Paragraph 4 of this Addendum, and Meineke shall remit such amounts to the MAF. For example, if Franchisee would have owed $800 for advertising contributions between the Effective Date and Completion Date but paid $600 pursuant to Paragraph 4 of this Addendum, then Franchisee would immediately pay Meineke $200.

6.      **Notice.**  All notices required to be delivered by this Addendum will be deemed delivered on the same day of the transmission by electronic mail to the electronic mail address provided to Meineke by Franchisee.  Nothing in this Addendum shall alter the legal notice provisions set forth in the Existing Franchise Agreement.  All Meineke preferred programs referenced in Paragraph 2 shall clearly be communicated by Meineke as such in accordance with this Paragraph 6.

7.      **Merger.**  In the event there is a direct conflict between the terms of this Addendum and the terms of the Existing Franchise Agreement, the terms of this Addendum relating to the subject matter herein shall control.

8.      **Guaranty.**  If Franchisee is a corporation and is signing this Addendum as a representative of a corporation, then the guaranty signed by the individual stockholders of the corporation who signed the Existing Franchise Agreement ("Guaranty") shall be guarantors of this Addendum and shall execute where indicated below.   The individual stockholders of the corporation shall be guarantors of this Addendum as if this Addendum were a part of the Existing Franchise Agreement when initially signed by the corporation and the guarantor stockholders.

9.      **Cancellation.**  In the event the average Meineke Center's annual gross sales, as published in Item 19 of Meineke's Franchise Disclosure Document, decreases more than ten percent (10%) as compared to the preceding year, Meineke may at its discretion discontinue this program and terminate this Addendum at any time upon notice to Franchisee.  In that event upon notice, Franchisee shall make all advertising payments to the MAF from the time such notice is issued to Franchisee in accordance with the Existing Franchise Agreement.  Notwithstanding the foregoing, this cancellation provision shall not be in effect ten (10) years following the Effective Date and for the remaining Term of the Existing Franchise Agreement thereafter.

10.    **Survival.**  The terms and conditions of the Existing Franchise Agreement not modified by this Addendum shall remain in full force and effect, unchanged and un-canceled.

MEIN000845

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

11.     **Star Rating.**  In no event shall Meineke render Franchisee in default of the Existing Franchise Agreement for Franchisee's failure to maintain a specific star rating in accordance with Meineke's then current Meineke Star Rating Program.  The star rating criteria shall be used solely for purposes of determining Tier One or Tier Two eligibility status and for no other purpose.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Addendum as of the __29th__ day of __September__, 2021.

**CJGL, INC.**
a California corporation

By: _____Carl Douma_____
    A3FCFC72EAAC470...
Print Name: Carl Douma

Date: _____September 29, 2021_____

By: _____Jan Douma_____
    125152B91AFB491...
Print Name: Jan Douma

Date: _____July 12, 2021_____

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _____Scott O'Melia_____
    BA4DA03F566D4D8...
        Authorized Representative

Date: __September 29, 2021__

Attest: _____Leale Tate_____
        A1331713F63F401...

Meineke 2021
PC Addendum v2.1

MEIN000846

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

STATE OF NORTH

CAROLINA  COUNTY OF

MECKLENBURG

<u>RENEWAL</u>
<u>MUTUAL</u>
<u>RELEASE</u>

**THIS RENEWAL MUTUAL RELEASE** ("Release") is entered into by and between **MEINEKE FRANCHISOR SPV LLC**, a Delaware limited liability company, with its principal offices located at 440 South Church Street, Charlotte, North Carolina 28202 ("Meineke"), and **CJGL, INC.**, a California corporation, with its principal offices located at 667 Seeger Avenue, Ventura, California 93003 ("Franchisee"). For purposes of this Release, "Meineke" and "Franchisee" are sometimes collectively referred to as, "Parties."

**WHEREAS**, pursuant to that one certain Meineke Franchise and Trademark Agreement entered into as of ___September 29___, 2021, by and between Franchisee and Meineke ("Agreement"), where Franchisee was granted a license to operate a Meineke Econolube Center located at 3956 State Street, Santa Barbara, California 93105 ("Center No. 4118");

**WHEREAS**, certain circumstances have arisen that necessitate that the franchise relationship granted by the Agreement between Meineke and Franchisee be renewed.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and the grant of a renewal of the existing Agreement, the sufficiency all of which is hereby confessed, the Parties agree as follows:

1.     The Agreement that has governed the relationship between Meineke and Franchisee is extended effective upon the date that this Release is signed by both Parties through the date that the new Franchise and Trademark Agreement is executed by both Parties, subject to the conditions stated herein. Franchisor and Franchisee mutually agree that certain Co-Brand Addendum that permitted Franchisee to incorporate the name Econo Lube in the operation of the Meineke business shall be terminated as of the effective date of this Release, except for paragraph 11. Franchisee further agrees to remove all Econo Lube trademarks and trade dress from the premises within thirty (30) days of the effective date of this Release.

2.     Franchisee, its heirs, executors, administrators, successors and assigns, hereby releases Meineke, and its past and present, direct or indirect, parents, subsidiaries, members, affiliates, officers, directors, managers, current and former employees, agents, representatives, successors and assigns of and from any and all rights, duties, responsibilities, claims or causes of action whatsoever, whether in contract or in tort, existing by common law or by statute, known or unknown, heretofore existing between Meineke and Franchisee which may have accrued or which may accrue on account of, arising from, or in any manner growing out of or resulting from the franchise relationship and the Agreement governing that relationship. Nothing in this paragraph shall constitute a waiver of future compliance under any law of any state. This section of the release shall become effective as of the date of this Mutual Release as referenced herein, and any claims that Franchisees may have pending, not finally resolved, or may discover relating to his franchise relationship with Meineke, up to the date of this Mutual Release may not be asserted by Franchisee without such claim being subject to a dismissal by virtue of this Release. Nothing in this section shall invalidate any

MEIN000847

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

statute of limitations that may have run on any claim that Franchisee claims to have against Meineke, where such statute of limitations would have run prior to or as of the date of this Mutual Release. Nothing in this paragraph shall constitute a waiver of compliance under any law of any state. Subject to the renewal of the franchise for Center No. 4118, and Franchisee's fulfillment of its obligations regarding such renewal contained in the Agreement  for said Center, including, but not limited to, the payment of all amounts owed to Meineke for Franchisee's  operation of the Center, Meineke, and its past and present, direct or indirect, parents, subsidiaries, members,  affiliates, officers, directors, managers, current and former employees, successors and assigns, hereby release  Franchisee and its guarantors from any and all duties, responsibilities and claims that they have or may have  now or at any time in the future arising out of the Agreement, except for the any express  obligation or  obligations which shall by their terms continue in force beyond the extension of the Agreement and regardless  of the basis or the manner of the extension.  Nothing in this paragraph shall constitute a waiver of compliance under any law of any state.

3.	This Release shall not relieve any party from liability under any applicable state franchise law where such law prohibits the release of such claims.

4.	This Release shall be binding upon and inure to the benefit of all Parties, their officers, directors, affiliates, successors and assigns.

5.	This Release constitutes the entire agreement between the Parties relative to the subject matter contained herein, and all prior understandings, representations and agreements made by and between the Parties relative to contents contained in this Release are merged into this Release.

6.	This shall not be modified in any manner, except by written instrument signed by both Release parties.

7.	This  Release shall be  governed by the State of North Carolina.  If it should become necessary to enforce any term(s) of this Release, venue shall be deemed to be proper exclusively in a court of competent jurisdiction encompassed in the Western District of North Carolina or within Mecklenburg County,  North Carolina.

*[Signatures to follow]*

Meineke 2021
EAST\178930053.2

MEIN000848

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

**IN WITNESS WHEREOF**, the Parties have executed this Release as of this day, in duplicate, and have set forth their signatures with the intention of executing this document.

**CJGL, INC.**
a California corporation

By: _____
Print Name: Carl Douma

Date: _____ September 29, 2021 _____

By: _____
Print Name: Jan Douma

Date: _____ July 12, 2021 _____

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _____
Authorized Representative

Date: ___ September 29, 2021 ___

Attest: _____

L-3

Meineke 2021
EAST\178930053.2

MEIN000849

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

## RENEWAL ADDENDUM TO FRANCHISE AND TRADEMARK AGREEMENT

This Renewal Addendum to Franchise and Trademark Agreement ("Renewal Addendum") is made this 29th day of September _____, 2021, by and between, **MEINEKE FRANCHISOR SPV LLC**, a Delaware limited liability company ("Franchisor" or "Meineke"), and **CJGL, INC**., a California corporation ("Franchisee").

### Recitals

**WHEREAS**, Franchisee operates a Meineke Car Care Center located at 3956 State Street, Santa Barbara, California 93105 ("Meineke Center #4118");

**WHEREAS**, the operation of Franchisee's Meineke Center #4118 is governed by a Meineke Franchise and Trademark Agreement executed on August 29, 2014, as amended, restated, supplemented, or otherwise modified (the "Prior Franchise Agreement");

**WHEREAS**, pursuant to its terms, the Prior Franchise Agreement for Meineke Center #4118 expired on June 29, 2021; and

**WHEREAS**, Franchisee has requested, and Meineke has agreed, that the franchise shall be renewed pursuant to the terms of this Renewal Addendum, the Prior Franchise Agreement and Meineke's current Franchise and Trademark Agreement, to be entered into concurrently herewith (the "Franchise Agreement").

**NOW**, **THEREFORE**, in consideration of the mutual promises contained herein Franchisor and Franchisee agree as follows:

1.      **Effective Date.** The effective date of this Renewal Addendum shall be the date that Meineke signs the document after first being signed by the Franchisee ("Effective Date").

2.      **Renewal Term.** The renewal term of the Franchise Agreement will be for a period of eight (8) years, effective as of the date of this Renewal Addendum.

3.      **Renewal Fee.** The renewal fee of Two Thousand Five Hundred and 00/100 Dollars ($2,500.00) is due and payable upon execution of this Renewal Addendum.

4.      **Electronic Funds Transfer.** Franchisee shall execute the automatic bank draft authorization form as a condition precedent to renewal.  Franchisor acknowledges that Franchisee's current method of payment for the royalty fees and advertising fees is via check, and that the current method of payment for Mkey fees is via electronic funds transfer.

5.      **Exclusions.** Upon the execution of this Renewal Addendum and the Franchise Agreement, Franchisee shall be bound by all of the terms and conditions stated in the governing Franchise Agreement and shall comply with all provisions of the Franchise Agreement except that:

a.      Franchisee shall not be required to remit to Meineke another initial franchise fee set forth in Article 3.1 of the Franchise Agreement; and

b.      Franchisee shall not be required to attend the initial training program more particularly set forth in Article 5.1 of the Franchise Agreement; and

1

MEIN001910

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

    c.    Section 3.4 of the Franchise Agreement shall be amended to waive the initial advertising contribution in the amount of Twenty Thousand and 00/100 Dollars ($20,000.00).

6.    This Renewal Addendum is intended to modify certain terms and conditions contained in the Franchise Agreement. This Renewal Addendum is an integral part of the Franchise Agreement and the terms of this Renewal Addendum shall be controlling with respect to the subject matter contained in this Renewal Addendum. This Renewal Addendum may not be amended, changed, revised or altered, except by instrument in writing signed by the parties.

7.    The Franchise Agreement, the schedules attached thereto and this Renewal Addendum, constitute the entire, full and complete Agreement between Franchisor and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute the Franchise Agreement or this Renewal Addendum. Except as amended hereby and explicitly stated herein, all other terms and conditions of the Franchise Agreement are unmodified and confirmed.

8.    Franchisee agrees and acknowledge that any and all Federal Express or similar courier fees incurred by Franchisor relative to this renewal, shall be paid by Franchisee and Franchisor may draft Franchisee for such costs and expenses.

*[Signatures to follow]*

MCC 4118

MEIN001911

DocuSign Envelope ID: 79A4EEBF-F23E-4314-96F1-C1D6B97F7C07

4118

Intending to be legally bound, the parties execute this Renewal Addendum as of the date first written above.

**CJGL, INC.**
a California corporation

**MEINEKE FRANCHISOR SPV LLC**
a Delaware limited liability company

By: _Carl Douma_
Print Name: Carl Douma

By: _Scott O'Melia_
Authorized Representative

Date: September 29, 2021

Date: September 29, 2021

By: _Jan Douma_
Print Name: Jan Douma

Attest: _Leah Tate_

Date: July 12, 2021

MCC 4118

3

MEIN001912

# EXHIBIT "M"

From: **Drew Simons** <asimons@rppmh.com>
Date: Wed, Aug 25, 2021 at 9:58 AM
Subject: 3956 State Street Santa Barbara CA
To: Joseph Robinson <joseph.robinson@drivenbrands.com>
Cc: Jan Douma <jandouma1@gmail.com>, Mary L Sourmany <mlsourmany@cox.net>, Maurice Sourmany <moesourmany@gmail.com>

Joe,

Please see attached letter. Please confirm you will address these issues ASAP. Thanks.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com

-----------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.

-----------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

CJGL001037

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Tuesday, July 20, 2021 1:44 PM
**To:** Drew Simons <asimons@rppmh.com>
**Subject:** FW: <External> Renewal - MCC4118Joseph Robinson <joseph.robinson@drivenbrands.com>

Hi Drew,

You might have the attached invoices for repairs, please take a look, if you notice any of these on the list you provided, please mark completed.

Thank you,

Joe

**From:** Morgan Byrne
**Sent:** Tuesday, May 11, 2021 1:07 PM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** RE: <External> Renewal - MCC4118

Hey Joe,

It was my understanding we completed repairs that were originally agreed too. I think the FZ was having issues because they wanted other items addressed, but per the sublease they were responsible for any repairs or maintenance once they took over.

Attached are the invoices from the HVAC, roof, and other misc repairs completed.

Thanks,

Morgan

CJGL001038

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Tuesday, May 11, 2021 12:38 PM
**To:** Morgan Byrne
**Subject:** RE: <External> Renewal - MCC4118

Hi Morgan,

In 2019 you mention we did a lot of repairs, did we do all the repairs, and why?

Thank you,

Joe

**From:** Morgan Byrne
**Sent:** Wednesday, May 5, 2021 11:00 AM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** RE: <External> Renewal - MCC4118

Hi Joe,

I apologize for the delay in getting back to you. This shop has been on a month to month lease for several years (before I even started). We do not want to extend the lease, as our goal is to get out of being the middleman. We have told the FZ and landlord this and they need to enter a lease together if they want something long term.

Ultimately, under the sublease the FZ is responsible for repairs, however, there has been a lot of back and forth as apparently many years ago we said we would make certain repairs but didn't. In 2019 we tried to resolve things and made quite a few repairs to the properties.

Thanks,

Morgan

3

CJGL001039

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Thursday, April 29, 2021 5:58 PM
**To:** Morgan Byrne  Susan Mervine
**Subject:** FW: <External> Renewal - MCC4118

Hi Morgan,

Below is from Jan at 4118, what are our responsibilities to the repairs and are we giving them the okay to go direct?

Let me know,

**Joseph Robinson**
Meineke Renewal Manager

 (916) 296-1810

440 South Church St. Ste. 700
Charlotte, NC 28202

_Proud Member of Driven Brands™_

CJGL001040

# REICKER PFAU

### ATTORNEYS AT LAW

Alan A. Blakeboro
John G. Busby
R. Mark Carney
Robert B. Forouzandeh
Diana Jessup Lee
Bruce W. McRoy
Kevin R. Nimmons
Michael E. Pfau
Daniel A. Reicker
Andrew D. Simons
Russell D. Terry
Timothy J. Trager
Fernando Velez, Jr.
Meghan K. Woodsome

Cory T. Baker
Nicholas A. Behrman

1421 State Street
Suite B
Santa Barbara, CA 93101

August 25, 2021

**Via email (*joseph.robinson@drivenbrands.com*) and US MAIL**

Joseph Robinson, Director or Real Estate
Driven Brands, Inc
440 S. Church Street, Suite700
Charlotte, NC 28202

**RE:** AIR Standard Industrial Commercial Single-Tenant Lease- Net dated July 1, 2012 (the "Lease") for the premises located at 3956 State Street, Santa Barbara, CA: Demand to Make Repairs and Notice of Default

Dear Joe:

This letter constitutes formal demand that Driven Brands as the Lessee of the above referenced Lease make the repairs to the Premises referenced on the list attached hereto. Capitalized terms used herein shall have the meanings assigned to such terms in the Lease.

Lessor requested that Lessee make these repairs in 2019 and several times thereafter but they remain outstanding.  Lessor's inspector recently inspected the Premises and confirmed the items have not been addressed and also noted: (i)  a chip on the floor in Bay 1 that needs to be repaired, and (ii) that the trees on the property need to be cut back.  Pursuant to section 7.1 of the Lease, these items are tenant's responsibility.

This letter constitutes demand that Lessee promptly make the repairs and address the items noted in the attached report and paragraph above. Please also provide copies of the service contracts that Lessee has in place for the HVAC system pursuant to Section 7.1(b) of the Lease. If Lessee fails to do so within 30 days of the date hereof, Lessee will be in default under the Lease and Landlord will make the repairs and charge Lessee 115% of the cost thereof and/or terminate the Lease for breach.

CJGL001041

-2-

Please call or write me if you have comments or questions. Otherwise, Lessee has been advised accordingly and my client reserves all rights it has under the Lease and by law.

Sincerely,

REICKER, PFAU, PYLE & MCROY LLP

By:
    Andrew D. Simons, Esq.

cc:    Mary & Maurice Sourmany

CJGL001042

**FLAGSHIP CONSTRUCTION, INC.**

*INSPECTION OF PROPERTY*
*Dec 10, 2019*

(805) 636-5152
flagship805@gmail.com

December 10, 2019

45 Dearborn Pl. #34
Goleta, CA 93117

Maurice and Mary Sourmany
Property Owners
3956 State Street
Santa Barbara, CA 93105

Lic.994317

Dear Maurice and Mary,
Upon inspection of the property located at 3956 State St on the 10th of December of 2019, our findings are as follows:

Fencing-
The fence in the rear of the property that has been apparently damaged by a fallen branch, still has a bent top rail in one area as well as a poorly connected top rail that appears to have been wired unprofessionally.

Our recommendation- Replace the bent top rail and connect top rails with a proper coupler at current break that is wired together.

Parapet walls-
Plaster has been repaired properly, but never primed or painted.
Our recommendation- Prime and paint the exposed patches on the parapet walls.

Gaps around electrical conduit-
These gaps remain.
Our recommendation- Plaster patch around conduits and use spray foam insulation as needed.

Patio Cover (Pergola)
The patio cover/ pergola shows signs of extreme dry-rot/ pest damage beyond Bond-O/ dutchman repairs.
Our recommendation- Demolish and either rebuild or waterproof and patch.

Electrical wiring between buildings-
Conduits running from building to building have exposed wiring.
Our recommendation- Run wire through proper conduit supported by guy wires exterior rated, properly sealed at penetrations.

Garage cracks-
The cracks appear to be normal for the age of the building.
Between 1/16" - 1/8"
We find this acceptable.

Tile roof-
About a 5'x5' area of tile roofing has severe damage.
Our recommendation- Replace all broken tiles and possible underlayment once
broken tiles are removed to view.

Water heater-
Appears to be installed within a year or 2. It has no date. It is 6 gallons.

Sub panel appears in good order without issue.

Bathroom has been retiled.

Front door has been replaced however we recommend sealing the top and bottom
with primer and paint.

The windows that were previously rotten have been properly repaired and are in
good condition.

Flat roof-
Parapet walls and flashing in good condition. Flat comp roof is buckling all over and
not draining water as well as collecting debris.
Our recommendation- Completely replace flat roof: Including everything down to the
substrate. This will continue to puddle and collect debris and is susceptible to leaks.
We believe this is the main concern and needing the most attention.

Sincerely yours,

12/10/19

Calvin Petersen

C.E.O.

CJGL001044

From: **Jan Douma** <jandouma1@gmail.com>
Date: Wed, Sep 8, 2021 at 1:14 PM
Subject: Fwd: 3956 State Street Santa Barbara CA
To: Carl Douma <carldouma@gmail.com>

---------- Forwarded message ---------
From: **Drew Simons** <asimons@rppmh.com>
Date: Wed, Sep 8, 2021 at 1:08 PM
Subject: RE: 3956 State Street Santa Barbara CA
To: Joseph Robinson <joseph.robinson@drivenbrands.com>, Jan Douma <jandouma1@gmail.com>

Joe & Jan,

Please be advised that landlord withdraws its offer to lease the space directly to Jan and is now considering other options. Please direct any questions or concerns directly to me.  Thanks.

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com

----------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.

CJGL001045

--------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Drew Simons
**Sent:** Wednesday, August 25, 2021 9:58 AM
**To:** 'Joseph Robinson' <joseph.robinson@drivenbrands.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>; 'Mary L Sourmany' <mlsourmany@cox.net>; Maurice Sourmany <moesourmany@gmail.com>
**Subject:** 3956 State Street Santa Barbara CA


Joe,


Please see attached letter. Please confirm you will address these issues ASAP. Thanks.


Drew


**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com


--------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.

--------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

---

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Tuesday, July 20, 2021 1:44 PM
**To:** Drew Simons <asimons@rppmh.com>
**Subject:** FW: <External> Renewal - MCC4118Joseph Robinson <joseph.robinson@drivenbrands.com>

CJGL001046

Hi Drew,

You might have the attached invoices for repairs, please take a look, if you notice any of these on the list you provided, please mark completed.

Thank you,

Joe

---

**From:** Morgan Byrne
**Sent:** Tuesday, May 11, 2021 1:07 PM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** RE: <External> Renewal - MCC4118

Hey Joe,

It was my understanding we completed repairs that were originally agreed too. I think the FZ was having issues because they wanted other items addressed, but per the sublease they were responsible for any repairs or maintenance once they took over.

Attached are the invoices from the HVAC, roof, and other misc repairs completed.

Thanks,

Morgan

---

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Tuesday, May 11, 2021 12:38 PM
**To:** Morgan Byrne
**Subject:** RE: <External> Renewal - MCC4118

CJGL001047

Hi Morgan,

In 2019 you mention we did a lot of repairs, did we do all the repairs, and why?

Thank you,

Joe

---

**From:** Morgan Byrne
**Sent:** Wednesday, May 5, 2021 11:00 AM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** RE: <External> Renewal - MCC4118

Hi Joe,

I apologize for the delay in getting back to you. This shop has been on a month to month lease for several years (before I even started). We do not want to extend the lease, as our goal is to get out of being the middleman. We have told the FZ and landlord this and they need to enter a lease together if they want something long term.

Ultimately, under the sublease the FZ is responsible for repairs, however, there has been a lot of back and forth as apparently many years ago we said we would make certain repairs but didn't. In 2019 we tried to resolve things and made quite a few repairs to the properties.

Thanks,

Morgan

---

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Thursday, April 29, 2021 5:58 PM
**To:** Morgan Byrne  Susan Mervine
**Subject:** FW: <External> Renewal - MCC4118

4

CJGL001048

Hi Morgan,

Below is from Jan at 4118, what are our responsibilities to the repairs and are we giving them the okay to go direct?

Let me know,

**Joseph Robinson**
Meineke Renewal Manager

 (916) 296-1810

440 South Church St. Ste. 700
Charlotte, NC 28202

_____

*Proud Member of Driven Brands™*

5

CJGL001049

From: **Drew Simons** <asimons@rppmh.com>
Date: Thu, Sep 23, 2021 at 11:02 AM
Subject: RE: 3956 State Street Santa Barbara CA
To: Joseph Robinson <joseph.robinson@drivenbrands.com>
Cc: Jan Douma <jandouma1@gmail.com>, Mary L Sourmany <mlsourmany@cox.net>, Maurice Sourmany
<moesourmany@gmail.com>


Joe,


I have not received any response from you with regard to this default. Please accept this email as a reminder that Driven
Brands will be in default under the Lease if the noted breach is not cured by September 25th.



**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA 93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com


-----------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly
prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.


-----------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is
not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of
promoting, marketing or recommending to another party any transaction or tax-related matter.


**From:** Drew Simons
**Sent:** Wednesday, August 25, 2021 9:58 AM
**To:** 'Joseph Robinson' <joseph.robinson@drivenbrands.com>
**Cc:** 'Jan Douma' <jandouma1@gmail.com>; 'Mary L Sourmany' <mlsourmany@cox.net>; Maurice Sourmany
<moesourmany@gmail.com>
**Subject:** 3956 State Street Santa Barbara CA

1

Joe,

Please see attached letter. Please confirm you will address these issues ASAP. Thanks.

Drew

**ANDREW D. SIMONS | PARTNER**
Reicker, Pfau, Pyle & McRoy, LLP | *Santa Barbara's Business Law Firm*
1421 State Street, Suite B | Santa Barbara, CA  93101 | www.reickerpfau.com
Phone: (805) 966-2440 | Mobile: (805) 705-2248 | Fax: (805) 966-3320 | Email: dsimons@rppmh.com

----------------------------------------------

This e-mail may contain confidential and privileged material for the sole use of the intended recipient.  Any review or distribution by others is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete this e-mail.

----------------------------------------------

CIRCULAR 230 DISCLOSURE:  Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended and may not be used by any person for the purpose of avoiding tax penalties that may be imposed upon a taxpayer or for the purpose of promoting, marketing or recommending to another party any transaction or tax-related matter.

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Tuesday, July 20, 2021 1:44 PM
**To:** Drew Simons <asimons@rppmh.com>
**Subject:** FW: <External> Renewal - MCC4118Joseph Robinson <joseph.robinson@drivenbrands.com>

Hi Drew,

You might have the attached invoices for repairs, please take a look, if you notice any of these on the list you provided, please mark completed.

Thank you,

2

CJGL001051

Joe

---

**From:** Morgan Byrne
**Sent:** Tuesday, May 11, 2021 1:07 PM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** RE: <External> Renewal - MCC4118

Hey Joe,

It was my understanding we completed repairs that were originally agreed too. I think the FZ was having issues because they wanted other items addressed, but per the sublease they were responsible for any repairs or maintenance once they took over.

Attached are the invoices from the HVAC, roof, and other misc repairs completed.

Thanks,

Morgan

---

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Tuesday, May 11, 2021 12:38 PM
**To:** Morgan Byrne
**Subject:** RE: <External> Renewal - MCC4118

Hi Morgan,

In 2019 you mention we did a lot of repairs, did we do all the repairs, and why?

Thank you,

Joe

3

CJGL001052

**From:** Morgan Byrne
**Sent:** Wednesday, May 5, 2021 11:00 AM
**To:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Subject:** RE: <External> Renewal - MCC4118

Hi Joe,

I apologize for the delay in getting back to you. This shop has been on a month to month lease for several years (before I even started). We do not want to extend the lease, as our goal is to get out of being the middleman. We have told the FZ and landlord this and they need to enter a lease together if they want something long term.

Ultimately, under the sublease the FZ is responsible for repairs, however, there has been a lot of back and forth as apparently many years ago we said we would make certain repairs but didn't. In 2019 we tried to resolve things and made quite a few repairs to the properties.

Thanks,

Morgan

**From:** Joseph Robinson <joseph.robinson@drivenbrands.com>
**Sent:** Thursday, April 29, 2021 5:58 PM
**To:** Morgan Byrne  Susan Mervine
**Subject:** FW: <External> Renewal - MCC4118

Hi Morgan,

Below is from Jan at 4118, what are our responsibilities to the repairs and are we giving them the okay to go direct?

Let me know,

CJGL001053

**Joseph Robinson**
Meineke Renewal Manager

(916) 296-1810

440 South Church St. Ste. 700
Charlotte, NC 28202



*Proud Member of Driven Brands™*

5

CJGL001054

# JOINT APPENDIX OF EXHIBITS

# EXHIBIT 12

Jessica Rosen, SBN 294923
jrosen@lewitthackman.com
Heidy A. Nurinda, SBN 333188
hnurinda@lewitthackman.com
Lewitt, Hackman, Shapiro, Marshall & Harlan
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Telephone: (818) 990-2120
Fax: (818) 981-4764

Attorneys for Defendants/Counterclaimant

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina Corporation,

Plaintiffs,

vs.

CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,

Defendants.

CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,

Counterclaimants,

vs.

MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; MEINEKE REALTY, INC., a North Carolina Corporation; and ECONO LUBE AND TUNE, INC., an unknown entity,

Counterdefendants.

Case No. 2:23-cv-00374-SPG-JC

DECLARATION OF DAVID HOLMES IN SUPPORT OF COUNTERCLAIMANTS' PORTION IN JOINT BRIEF RE SUMMARY JUDGMENT

Complaint: January 18, 2023
Answer/Counterclaim: March 15, 2023

Trial Date: June 18, 2024

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

## DECLARATION OF DAVID HOLMES

I, David Holmes, declare as follows:

1.      I am a domestic and international franchising practices expert. I was retained by Defendants and Counterclaimants' counsel to serve as expert witness for them in this action. All facts contained herein are within my personal knowledge except those stated on information and belief and as to those I am informed and believe them to be true. If called as a witness, I could and would competently testify under oath as follows:

2.      I have practiced law in the domestic and international franchising area since 1975, having graduated from the University of Southern California in 1966 and its Law School in 1969. I was certified as a Franchise and Distribution Law Specialist by the State Bar of California's Board of Legal Specialization; since my retirement from active practice, however, the certification ended on December 13, 2014.

3.      My past experience includes serving as in house counsel for renowned franchises, such as Century 21 Real Estate Corporation and International House of Pancakes. I then went on to open my own private practice specializing exclusively in franchising law. Over the last two decades, I have been designated, and testified, as an expert witness on franchising and franchise-related matters in both federal and state courts as well as alternative dispute resolution proceedings.

4.      A true and correct copy of my expert report is attached as Exhibit "N". Attached to my expert report is my biography setting forth my qualifications and professional experience, and compensation for expert witness services in this matter; and the materials I reviewed in forming my expert opinions.

5.      In my expert opinion:

a.      In a franchise relationship, it is standard practice in franchising that the franchisor assist a franchisee to remain open for business, including (as one alternative) securing a direct lease for the franchised premises.

b.      It is also standard custom and practice in the franchise industry to

keep a franchisee informed on matters related to the master lease and sublease for the franchised premises, including communications between the franchisor and the landlord.

c.      If Meineke failed to meaningfully assist CJGL to remain open for business and to keep CJGL informed on all matters relating to the Master Lease and Sublease then Meineke's acts and/or omissions are not consistent with standard franchise industry custom and practice.

6.      Thorough evaluation and bases for my expert opinions are detailed in my report and submitted in support of Defendants' and Counterclaimants' Opposition to Meineke's Motion for Summary Judgment and Counterclaimants' Cross-Motion for Summary Judgment.

EXECUTED on March 6, 2024 at Oceanside, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_David Holmes_
David Holmes (Mar 6, 2024 15:23 PST)
DAVID HOLMES

HOLMES DECL. RE. OPP. TO MEINEKE'S MTN / X-CLAIMANTS' CROSS-MTN SUMMARY JUDGMENT

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

# EXHIBIT "N"

Jessica Rosen, SBN 294923
jrosen@lewitthackman.com
Heidy A. Nurinda, SBN 333188
hnurinda@lewitthackman.com
Lewitt, Hackman, Shapiro, Marshall & Harlan
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Telephone: (818) 990-2120
Fax: (818) 981-4764

Attorneys for Defendants/Counterclaimant

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; and MEINEKE REALTY, INC., a North Carolina Corporation,

Plaintiffs,

vs.

CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,

Defendants.

CJGL, INC., a California corporation; CARL DOUMA, an individual; JAN DOUMA, an individual,

Counterclaimants,

vs.

MEINEKE FRANCHISOR SPV LLC, a Delaware limited liability company; MEINEKE REALTY, INC., a North Carolina Corporation; and ECONO LUBE AND TUNE, INC., an unknown entity,

Counterdefendants.

Case No. 2:23-cv-00374-SPG-JC

DEFENDANTS AND COUNTERCLAIMANTS' DISCLOSURE OF EXPERT TESTIMONY [DAVID HOLMES]

[FED. R. CIV. P. 26(A)(2)]

Complaint: January 18, 2023
Answer/Counterclaim: March 15, 2023

Trial Date: June 18, 2024

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Defendants and Counterclaimants CJGL, Inc. and Carl and Jan Douma, by and through their undersigned counsel of record, makes the following disclosure of expert testimony:

David Holmes, Franchise Expert Witness Services, to be contacted through counsel for Defendants and Counterclaimants.  A copy of the expert report of Mr. Holmes is attached hereto as Exhibit A.

Dated: February 26, 2024

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN

By:   /s/ Jessica Rosen
Jessica W. Rosen
Heidy Nurinda
Attorneys for Defendants and
Counterclaimants

# EXHIBIT "A"

**David E. Holmes, Esq.**
**Franchise Expert Witness Services**
**3911 Mesa Drive, Unit 103**
**Oceanside, California 92056**

davidholmes@macservices.net
805-550-9323

February 26, 2024

Jessica Rosen, Esq.
Lewitt, Hackman, Shapiro, Marshall & Harlan

Sent by Email:   jrosen@lewitthackman.com

Re: Report – Meineke v CJGL; United States District Court - Central District of California - Case No. 2:23-cv-00374-SPG-JC

Dear Ms. Rosen:

This letter is in response to your request for a report relative to the above-referenced matter.

Specifically, I was asked to provide my opinion(s) regarding custom and practice in the franchise industry with respect to possible renewal, etc. of a franchise agreement and related real property leases and/or subleases regarding a business franchised to, and owned and operated by, a franchise, as well as the extent to which various events, actions or otherwise in this matter were or were not consistent with such custom and practice.

My opinions relating thereto are set forth in the Conclusions, as well as at numerous other points as they arise in the attached Report.

In forming my opinions, I've reviewed the documents set forth in the attached List of Materials Received and/or Reviewed, as forwarded to me by your firm or otherwise, as well as having drawn on my general experience in the domestic and international franchising field since 1975.

My biography, setting forth my qualifications and professional experience, is attached.  My compensation for expert witness services in this matter is at a rate of $500 per hour (plus expenses), will remain so for the balance of this year and is not contingent on the outcome of this case or other proceedings between the parties.

I respectfully reserve the right to amend, revise or supplement this Report, including but not limited to my conclusions and opinions, as additional relevant documentation, deposition transcripts or otherwise become available.

1

Sincerely yours,


David E. Holmes

## Report

## Contents

I. Franchising and Real Estate - Overview ...................................................... 4

II. Counterclaim Allegations and Franchise Industry Custom and Practice ..... 6

   A.  Meineke Franchise Agreement ............................................ 12

   B.  2020 Meineke Franchise Disclosure Document ................................. 14

   C.  Fed. R. Civ. P. 30(6)(B) Witness Joseph Robinson Deposition .......... 16

   D.  Fed. R. Civ. P. 30(6)(B) Witness Darrin Krader Deposition................. 17

III. Conclusions ......................................................................... 18


List of Materials Received and/or Reviewed ................................................ 19

*Curriculum Vitae* ..................................................................... 21

List of Publications ..................................................................... 26

Expert Witness Information .......................................................... 31

_____

# I.
## Franchising and Real Estate - Overview

Franchising involves a wide range of business models and the importance of real estate in the possible success of a franchised unit varies accordingly. A real estate or travel agency franchise may be placed in almost any office park or building, while a fast-food franchise may require a location to meet several very specific criteria. Alternatively, a plumbing or mobile pet grooming business may not require a retail location at all and may be successfully operated from a home office. Where a franchised unit has specific technical needs and/or square footage requirements, site selection and build-out requirements may reduce the number of available locations and increase the costs of build-out and rent accordingly.

Additionally, the franchisor's own "system," may impose requirements related to the site selection, build-out and operation of the franchise, including the physical elements in and around the franchised. These requirements can also substantially reduce the number of available locations for operation of the franchised business.

[Note that, in franchising terminology, "system" has two distinct but related meanings; (a) the group of franchised and/or franchisor-owned/managed retail-level units operating under a particular brand ("The ABC system consists of 1,452 franchised and 23 company-owned outlets in North America, together with 256 units operating internationally"), and (b) the detailed policies and procedures for designing, constructing,[1] operating, marketing, administering, etc. those units ("The XYZ system requires a minimum of 1200 square feet for each center, automotive lift equipment of a designated capacity, and special environmental equipment and processing for used oil or other disposables.")]

In this Report, either meaning may be applicable, depending on the context.

Where the franchised business model is dependent for its success on real estate meeting highly selective criteria, the loss of access to such sites may impose challenges regarding finding appropriate replacement locations.

Therefore, the franchisee and the franchisor have a shared interest in securing and maintaining access to appropriate locations.

Typically, franchisors will undertake the primary role in identifying appropriate locations meeting the franchisor's requirements, researching criteria such as local demographics, traffic count, etc., comparison of rental and

---

[1] Often referred to in the franchising of retail units as "build-out."

related costs and negotiating a lease with the landlord, as well as managing the build-out process.  In effect, the franchisee is presented with a "turn-key" location.

In many (perhaps most) cases, the franchisor will sign a master lease with the property owner/lessor and the franchisee signs a sublease with the franchisor.  Landlords may require that the franchisor execute a guarantee or similar undertaking regarding the franchisee's obligations regarding the property.

If the master lease contains a renewal provision, the sublease will normally contain a similar provision.  Generally, the terms of the master lease, sublease and Franchise Agreement and related documents will be coterminous.

In most cases, the Franchise Agreement, sublease and master lease will provide for potential renewal and have terms and provisions allowing and coordinating such renewals.

Standard custom and practice in the franchise industry is that once the franchise has indicated his or her desire to remain in place and continue the franchise relationship, the franchisor will take the lead role in managing this process, using its standard renewal procedures and policies and directly interfacing with the lessor (and/or the lessor's legal counsel), with the objective of securing continued occupancy and operations for an extended period.

Therefore, standard custom and practice in the franchise industry is that the franchisor take the lead in the renewal processes.  This reflects the facts that: (a) the franchisor has a shared interest with the franchisee in continuing the operation of the unit in question (and the related cash flows) and (b) normally, the franchisor has greater experience, knowledge, procedures and real estate-specific staff in place to effect the renewal. Franchisors with many locations will often have an in-house staff of real estate professionals skilled and experienced in site location and lease and sublease management and coordination, including renewals.

Typically, the franchisee is almost entirely dependent on the franchisor in this regard and standard franchise industry custom and practice is to have the franchisor as the entity primarily responsible for managing the successful completion of the renewal process.  Not only does the franchisor have more "leverage" with the landlord or lessor since it's the company often paying the rent to the landlord, the franchisor is more likely than the franchisee to be a much larger entity with a greater net worth.

Put most simply, a franchisor's primary interest may be in having large numbers of units "on the street," and in recognition of that interest it will take an active role in the renewal process.

Finally, the franchisor may be interested in leasing additional properties in that market from the same lessor in the future, as additional franchised or company-owned locations enter the specific geographic market.  That may provide leverage with the landlord that the franchisee may lack.

## II.
## Counterclaim Allegations and Franchise Industry Custom and Practice

I reviewed the January 18, 2023, Counterclaims filed by the franchisees and/or related entities in this case.  In that document, the franchisees present several instances in which they claim that the franchisor and/or its related/affiliated entities committed inappropriate acts or failed to perform properly.

I express no opinion as to whether those alleged acts or omissions were, in fact, committed or took place; that is, of course, an issue for trial.

However, below I analyze and present my opinions as to whether, if such acts or omissions were committed or took place, would they be or not be consistent with custom and practice in the franchising industry. References are to pages and lines of the Counterclaims document.

Page 4; Lines 14 – 17:

". . . Meineke Realty and/or Econo Lube did not exercise the first option to renew prior to expiration of the Master Lease . . . "

Standard franchise industry custom and practice is that, in a master lease/sublease arrangement, the franchisor, as master lessee/sublessor, will arrange with the lessor/owner for any renewal or extension of the master lease, so as to preserve the franchisee's rights to continue operations at the franchised location.  As franchisor, the franchisor will also coordinate this process with respect to renewal or extension of the franchise agreement.

Almost always, the franchisor and the franchisee have a shared interest in continuing operations at the the-current location.

Since the franchisor is often also the master lessee and:

- Has a direct financial and other relationship with the landlord.
- Has on staff experienced real estate professionals with an in-depth knowledge of the franchisor's system and the renewal process.

6

- Can access input from and coordinate with the operations department as needed,
- May retain more "leverage" with the landlord.
- Can coordinate legal and other requirements relating to the renewal of the franchise agreement (including disclosure compliance) and related documents;

the franchisor generally takes the lead role in securing an extension or renewal on behalf of the franchisee.

To fail to execute such functions and preserve the franchisee's rights to continue operations at the subleased premises could expose the franchisee to significant adverse financial consequences, which might be increased in the event of a pandemic, and would not be consistent with standard franchise industry custom and practice.

As noted before, the franchisor itself has a strong interest in the franchisee being able to continue operations at its current location.

Page 4; Lines 18 – 19:

"Counterclaimants learned of Counterdefendants failure to renew the Master Lease the year after expiration/termination of the Master Lease."

Standard franchise industry custom and practice is that the franchisor will keep the franchisee fully informed, and will not withhold any relevant information, regarding the status of the Master Lease and any pending or potential renewal/extension. Since the rights of the franchisee to continue to occupy the premises and operate the franchised business from the current premises are dependent on the status of the Master Lease, such information is clearly of great importance to the franchisee.

A failure by the franchisor to keep the franchisee fully informed of the status of the Master Lease and any pending or potential renewal/extension would be inconsistent with standard franchise industry custom and practice. This would be particularly true with respect to a potential or actual expiration or termination of the Master Lease, any of which could be highly serious matters for the franchisee.

Page 4; Lines 20 – 22:

"Counterdefendants represented to Counterclaimants that they would ensure Counterclaimants obtained a new lease for the Franchise Premises, including signing a guaranty for Counterclaimants if needed."

7

Efforts by the franchisor to ensure that the franchisee "obtained a new lease for the Franchise Premises" would be consistent with standard franchise industry custom and practice.

Page 4; Lines 22 – 25.

"Based on Counterdefendants' representations, Counterclaimants did not at that time pursue possible legal claims against Counterdefendants and instead made reasonable efforts to enter into a new lease agreement directly with the Landlord."

Standard franchise industry custom and practice is for the franchisee to rely on representations made by the franchisor.  Although the relationship between the franchisor and franchisee is structured by a franchise agreement, franchise disclosure document, sublease, often multiple manuals, directives and various other documents — often covering hundreds of pages — the relationship is ultimately one of trust, including the franchisee's trust in the franchisor and its representatives.  Absent that trust, the franchisee probably would never enter into or remain in the relationship. Therefore, reliance by the franchisee on representations made by representatives of the franchisor or its affiliates would be consistent with standard franchise industry custom and practice.

Pages 4 and 5; Lines 26 through 6.

"Counterclaimants attempted to secure a lease directly from the Landlord but were told there would be no new lease until <u>Meineke</u> completed all needed repairs. As part of lease negotiations, the Landlord ordered an inspection of the Franchise Premises to assess needed repairs, which occurred on or around late 2019. The inspection report disclosed several items which were supposed to be but were not repaired by Counterdefendants including but not limited to roof repair and/or replacement, patio cover repair and/or replacement, and electrical repairs and/or updates. The Landlord required all repairs identified in the inspection report be completed prior to execution of any lease agreement for the Franchise Premises."  (Underlining added.)

Where a landlord requires repairs, etc. to be made by the franchisor/master lessee as provided in a master lease, a failure by the franchisor/master lessee to arrange for and complete such repairs would be inconsistent with standard franchise industry custom and practice.

Pages 5 and 6; Lines 19 – 7 (excerpts).

"By mid-2021, Counterdefendants still had not completed the repairs."

8

Where execution of a new lease between the franchisee and landlord is dependent on completion of repairs to leased premises (or replacement in some instances), standard franchise industry custom and practice would be to promptly arrange for and complete such repairs/replacement by the franchisor/master lessee and treat such as a high priority. Here, it's alleged that repairs had not been completed from late 2019 to mid-2021. The longer repairs are delayed, the greater is the risk that the landlord my declare a default and terminate the master lease, with follow-on adverse consequences for both the franchisor and franchisee.

It's also standard franchise industry custom and practice for the franchisor to regularly communicate with the franchisee regarding progress with respect to such repairs/replacement and failure to do so would be inconsistent with standard franchise industry custom and practice.

Page 6; Lines 8 – 15.

"Prior to, at the time of, and after Counterdefendant's receipt of Landlord's Aug. 25, 2021 Form Demand and Notice of Default, agents, representatives, and/or managers and/or directors of Counterdefendants repeatedly told Counterclaimants that Meineke will make sure Counterclaimants have a lease to continue operations of the Franchise Premises at renewal and through though the renewal period, including agreeing to sign as guaranty for the Counterclaimants. However, while making these repeated representations they refused to perform their obligations of tenant to Landlord."

It would be inconsistent with standard franchise industry custom and practice for franchisor representatives to make representations inconsistent with actual performance of related obligations or their current status. As noted elsewhere, it's standard franchise industry custom and practice for a franchisee to rely on its franchisor's representations.

As noted above, franchisee reliance on the franchisor's (or its affiliate's) representations is consistent with standard franchise industry custom and practice.

Page 6; Lines 16 – 5.

"Counterclaimants relied on Counterdefendant's representations concerning the Franchise Premises to their detriment:

    a. Instead of allowing expiration of the 2014 franchise agreement in 2021, the CJGL agreed to renew for an additional term of eight years based on Counterdefendants assurances there would be a commercial lease for the Franchise Premises covering the renewal period. On or around

9

September 21, 2021, CJGL executed the then current franchise
agreement and related addenda on or around September 21, 2021.

b.  Based on the renewal, Mr. and Mrs. Douma executed personal
guarantees for the renewal period, required by the franchise
agreement and addenda.

c.  Based on the renewal, Counterclaimants each signed general
releases, purporting to release all claims that Counterclaimants had
against Counterdefendants, whether known or unknown, also required
by the franchise agreement and addenda at renewal.

d.  Prior to and after renewal, Counterclaimants applied for and received
Small Business Administration ("SBA") loans intended for use in
updating and maintaining the Meineke Car Care Center, as required by
the franchise agreement and addenda at renewal."

Such actions and reliance by franchisees, based on franchisor
representations such as those alleged here, would be consistent with
standard franchise industry custom and practice. The steps taken by these
franchisees would also be typical in the case of a renewal of the franchise
agreement, etc.

Page 7; Lines 6 – 9.

"Counterdefendants' assurances and representations were not true.
Counterdefendants refused to make the promised repairs, refused to provide
to Counterclaimants the monies Meineke Realty held for such repairs so that
Counterclaimants could make the repairs, and refused to guaranty the lease."

If a franchisor made untrue assurances and representations and/or failed
to perform consistent with such representations, that would be inconsistent
with standard franchise industry custom and practice.

Page 7; Lines 10 – 12.

"Counterclaimants continued to negotiate with the Landlord for a lease
agreement, but the Landlord would not enter into a lease agreement
without a guaranty from Meineke Franchisor."

It is not unusual in the franchise industry that landlords require guaranties
from franchisors (and/or have the franchisor as the direct tenant) or make
other arrangements regarding payment of rent, etc. and that franchisors
supply such guaranties or other arrangements and/or the franchisees are
direct tenants under the lease.

[Note that in the deposition of Ms. Douma dated January 30, 2024, at
page 44, line 17, she alleges that "Meineke withdrew its guarantee." In

10

that same deposition at page 46, lines 24 and 25, there is an allegation that "Meineke decided it would not guarantee the 7900 a month lease."]

Page 7; Lines 13 – 19.

"In or around early June 2022, the Landlord put a large sign up that informed the public at large that the Franchise Premises was [*sic*] for lease.  Counterclaimants are informed and believe, and thereupon allege that the Landlord was no longer interested in dealing with Meineke Realty and/or Econo Lube (the party to lease agreement)."

Assuming the circumstances and occurrences described are accurate, the Counterclaimant's belief would be consistent with standard franchise industry custom and practice.

"After placement of the "For Lease" sign, Counterclaimant's operations declined, forcing the closure of Counterclaimant's Meineke Car Care Center."

After a For Lease sign is put up by the landlord at a franchisee's retail location, a decline in business would be expected.  Customers will conclude that they will no longer be able receive the goods and services they need from this location and will begin to consider alternative locations/competitors to provide what they need.  As they transfer their patronage to those locations/competitors, patronage will often decline and possibly force closure.

Page 8; Lines 23 – 26.

"In the Sublease and by incorporation, the Master Lease is an implied promise by Counterdefendants of good faith and fair dealing that no party will do anything to unfairly interfere with the right of any other party to receive the benefits of the Sublease and, by incorporation, the Master Lease."

Without expressing any opinion as to applicable California or other law, standard franchise industry custom and practice is that the franchisor, which is normally in the power position in the relationship, will deal with the franchisee in good faith and a spirit of fair dealing.

In essence and from a <u>business</u> standpoint, the franchisor/franchisee relationship is based on trust.  The franchisor trusts the franchisee to follow the system and provide customers with a consistent, positive retail-level experience.  The franchisee trusts the franchisor to enable the franchisee to do so,

This would be particularly true in the setting of a possible renewal or extension of a lease, where non-renewal might have severe financial consequences for the franchisee but perhaps only relatively minor financial consequences for the franchisor.  The unit affected may be the only one operated by the franchisee and perhaps his or her sole or primary source of income, while the franchisor may have hundreds or even thousands of other franchised/company-owned or operated units contributing to its cash flow.  [Wikipedia reports 966 Meineke locations.]  Additionally, a franchisor's real estate department would generally have far more experience and expertise in lease renewals and related procedures than the typical franchisee.

## A.  <u>Meineke Franchise Agreement</u>

I examined the Meineke Car Care Centers, LLC Franchise Agreement (MCC 5/2014).  In general, it is similar to other franchise agreements which I've reviewed during my career, with some exceptions as noted below.  References are to page and/or section numbers in that document.

1.2  "You and we further acknowledge that the success of achieving these common goals is dependent on us and Meineke Dealers <u>working together in a spirit of mutual respect and cooperation.</u>" [Underlining added.]

"The provisions of this Agreement are based on the guiding principles that: (a) <u>we should respect your interest in the going-concern value of your business</u> . . . "  [Underlining added.]

While those philosophies and principles are consistent with management practices customary in franchising, it's unusual to see them expressly acknowledged in a franchise agreement or other foundational document.

Obviously, any failure to renew a lease for the franchised premises could (and most likely would) negatively affect the going-concern value of the franchised business.

4.1  "We have the right to approve the terms of any lease, sublease or purchase contract for the Premises, <u>which approval will not be unreasonably withheld.</u>"  [Underlining added.]

This provision is consistent with standard custom and practice in the franchise industry, in that a franchisor will not unreasonably withhold consent to or approval of any lease or sublease for the franchised premises.

Perhaps more significantly, a failure on the part of a franchisor to facilitate the renewal of a lease for the franchised premises would not only be inconsistent with standard custom and practice in the franchise industry, it would be inconsistent with the primary missions of nearly all franchisors;

(a) Supporting and maintaining the franchisee in successfully operating his/her business, including staying open for business;

(b) The franchisee continuing to pay royalties, rent and other amounts to the franchisor and/or its affiliates; and

(c) The franchisee validating his/her satisfaction with the performance of the franchisor when prospective franchisees make inquiries, as contemplated under the FTC-mandated Franchise Disclosure Document (FDD) [Pursuant to FTC/FDD requirements, franchisors are required to include contact information regarding current and former franchisees in the system.]

Item (c) above is an important point, especially regarding an area as critical (for most franchised business models) as real estate.

Prospective franchisees are encouraged by the FTC, state franchise regulators and experienced franchise counsel to contact and speak with current franchisees of the franchisor prior to making any commitments or investments.

[See California Franchise Law and Practice – 2011; CEB – D. Holmes Exec. Ed.; Chap. 6 - § 6.6 .  (Holmes also chapter author.)]

"Although it is unlikely that a client will contact everyone on the list, the client should contact a relevant sample, *not* limited to the names suggested by the franchisor, including recent entrants to the system, more experienced franchisees, some franchisees who have left the system, and, if possible, franchisees operating in markets similar to that planned for the prospective franchisee." [Italics present in original.]

To similar effect, see the Federal Trade Commission's recommendations in A Consumer's Guide to Buying a Franchise [https://www.ftc.gov/business-guidance/resources/consumers-guide-buying-franchise]

"Look for the required disclosure of contact information for current franchisees and franchisees who have left the system during the franchisor's last fiscal year. Talking to these people may be the most reliable way to verify the franchisor's claims. Visit or phone as many of

13

them as possible to chat about their experiences. Some current franchisees may be reluctant to talk to you if they're having problems. If that's the case, try contacting others on the list."

Obviously, negative evaluations by current or former franchisees can hurt franchise sales.  Therefore, a franchisor is incentivized to respect its franchisees' interests and concerns and standard franchise industry custom and practice is to do so.  Again, this is an area where the interests of the franchisor and franchisee are aligned.

**B.  2020 Meineke Franchise Disclosure Document**

[Note: See my comments, etc. elsewhere regarding the below or similar provisions.]

I noted that Item 1 of the above FDD provides as follows:

" . . . as the franchisor, we will be responsible and accountable to you to make sure that all services we promise to perform under your Franchise Agreement or other agreement you sign with us are performed in compliance with the applicable agreement, regardless of who performs these services on our behalf."

Such a statement is consistent with standard franchise industry custom and practice.

Item 8 of the above FDD provides as follows:

"We have the right to approve the terms of any lease, sublease or purchase contract for the premises of your center, <u>which approval will not be unreasonably withheld</u>." [Underlining added.]

Such approvals not being unreasonably withheld is consistent with standard franchise industry custom and practice.

<u>Renewal Addendum to Franchise and Trademark Agreement with Franchise and Trademark Agreement</u> [2021]

<u>Section 1.2</u>

"You and we further acknowledge that the success of achieving these common goals is dependent upon us and Meineke Dealers <u>working together in a spirit of mutual respect and cooperation</u>."  [Underlining added.]

14

"The provisions of this Agreement are based on the guiding principles that: (a) we should respect your interest in the going-concern value of your business . . . "." [Underlining added.]

The language underlined above reflects a philosophy common in franchising and is consistent with standard custom and practice in the franchise industry.

The franchise relationship, as acknowledged here, embodies trust on both sides – the franchisor trusts the franchisee to properly represent the brand and the franchisee trusts the franchisor to protect the franchisee's long-term interests — together with an awareness and reasonable accommodation of the other party's legitimate interests and concerns.

That's why both franchisors and franchisees (and their representatives) participate jointly in national and state-level bodies, such as the International Franchise Association and the CLA Franchise Law Committee, as well as Franchisee Advisory Councils, Dealer Association Advisory Council (DAAC), Advertising Committees and similar bodies.

Acts or omissions inconsistent with that philosophy would not be consistent with standard custom and practice in the franchise industry.

Section 4.1

"We have the right to approve the terms of any lease, sublease or purchase contract for the Premises, which approval will not be unreasonably withheld. . .  You may not execute a lease, sublease or purchase contract for the Premises or any modification, amendment or assignment thereof before we have approved it."  [Underlining added.]

The underlined language appears to reflect a commitment to apply a reasonableness standard to a critically important part of the franchise relationship; the premises from which the franchisee will operate his or her business. [Note that for a few franchised business models, such as those operated from a mobile vehicle, like plumbing or pet grooming, or from a home office, real estate considerations may be largely absent or of lesser importance.]

Where the franchised business is operated from a typical retail location, application of a reasonableness standard to real estate-related approvals or otherwise would be consistent with standard custom and practice in the franchise industry.

## C. Fed. R. Civ. P. 30(6)(B) Witness Joseph Robinson Deposition

Page 84; Lines 8-21.

Testimony to the effect that a franchisee having "a lease in hand" for the same time period as the renewal of the franchise agreement was "good business . . . you want everything to match . . . to match your franchise agreement."

Such a policy or practice is consistent with standard custom and practice in the franchise industry.

Page 111; Lines 5 – 21.

Testimony to the effect that Driven Brands has other franchise systems (branded other than Meineke) that enter into master leases that "secure the lease."

Page 129; Lines 2 – 8.

Testimony to the effect that if a franchisee could not relocate despite their best efforts, they would be "on the hook for eight years" under the franchise agreement. [Underlining added.]  Such a policy would be inconsistent with standard custom and practice in the franchise industry,

Pages 134 and 135; Lines 25 and 1 – 10.

Testimony to the effect that the witness did not have any knowledge as to the reason for Meineke not exercising its option to renew the master lease. "I don't know the reason they made for not renewing this – this center."

As discussed elsewhere, standard custom and practice in the franchise industry would have been for the franchisor to assist a franchisee to remain open for business.  Having open and operating retail locations is tremendously important in almost any franchise system.

Page 135; Lines 5 – 10.

Testimony to the effect that the witness did not, to the best of his knowledge, know if Meineke did "ever inadvertently fail to renew a master lease . . . "

Page 138; Lines 13 – 16.

Testimony to the effect that the witness did not know what actions "Meineke took from – in relation to the several months to assist the Doumas in securing a lease directly with the Sourmanys?"

As discussed elsewhere, standard custom and practice in the franchise industry is for the franchisor to assist a franchisee to remain open for business, including (as one alternative) securing a direct lease for the franchised premises.

### D. Fed. R. Civ. P. 30(6)(B) Witness Darrin Krader Deposition

Page 14; Lines 7 – 8.

Testimony by witness, after being asked to describe his duties, "So the main objective is to try to keep stores open at any cost, whatever that may be."

That objective is consistent with standard custom and practice in the franchise industry.

Page 41; Lines 5 – 10.

The witness was asked if there were any communications to the franchisees in relation to the transition to a month-to-month tenancy between the franchisees pursuant to the sublease.

The witness responded "not to my knowledge."

Standard custom and practice in the franchise industry is to keep a franchisee informed on matters related to the master lease and sublease for the franchised premises, including communications between the franchisor and the landlord.

/ / /

/ / /

17

**III.**
**Conclusions**

   1.   At various points throughout this Report, I've referenced various allegations by the franchisees with respect to specific acts or omissions, etc. of the franchisor and/or its affiliates and expressed my opinion as to whether such acts or omissions, etc. were or were not consistent with standard franchise industry custom and practice.  In many instances, as indicated, my conclusions were that such acts or omissions, etc. (if committed or omitted) would be inconsistent with standard franchise industry custom and practice. To recite each of those specific instances here would be unnecessary surplusage.

   2. At other points in this report, I examined various expressions of policy/philosophy of the franchisor and/or its affiliates as contained in certain documents with respect to (a) not unreasonably withholding approvals, (b) working together in a spirit of mutual respect and cooperation and (c) respecting the franchisee's interest in the going-concern value of their business, etc.  In those instances, as indicated, my conclusions were that those expressions of policy/philosophy were consistent with standard franchise industry custom and practice.


*David E. Holmes*
David E. Holmes (Feb 26, 2024 18:54 PST)
_____
David E. Holmes

18

## List of Materials Received and/or Reviewed

1.   Franchising for Dummies, Seid and Thomas, 2nd Ed  (2006)
2.   A Consumer's Guide to Buying a Franchise, Federal Trade Commission
3.   California Franchise Law and Practice (CEB - 2009 & 2011); D. Holmes - Exec. Ed.
4.   Response to Requests for Production of Documents (Set One)
5.   Response to Requests for Production of Documents (Set One)
6.    Response to Requests for Production of Documents (Set One)
7.   Plaintiffs Updated Itemized Statement of Damages
8.   Objections and Supplemental Responses
9.   Defendant CJGL's Objections and Supplemental Responses
10.  Responses and Objections to Plaintiff's Request
11.  Defendant CJGL's Objections and Supplemental Responses
12.  Responses and Objections to Plaintiff's Request
13.  Defendant CJGL Objections and Responses
14.  Meineke Franchisor SVP LLC Responses
15.  Meineke Franchisor SVP LLC Responses
16.  Meineke Realty Response to Interrogatories
17.  FRCP 26(a) Disclosures of Defendants
18.  Meineke Franchisor and Meineke Realty Responses
19.  Meineke Realty Response to RFP
20.  FRCP 26(a) Disclosures of Defendants
21.  Responses and Objections to Plaintiff's Request
22.  Rule 26(a) Disclosures
23.  Depo-Notice to Robinson
24.  Franchise Agmnt. 2014 FDD
25.  Master Lease
26.  Sublease
27.  Drew Simmons Email re Property Issues
28.  Drew Simmons Email re Guaranty
29.  Douma Email re 4118 Construction
30.  Douma Email re 4118
31.  Douma Email re 4118 Construction
32.  Douma Email re 4118
33.  Douma Email re 4118
34.  Robinson Email re Extension
35.  Ex. 1 - Notice of Deposition
36.  Ex. 2 - Notice of Deposition
37.  Ex. 3 - Robinson/Douma Email re Extension
38.  Ex. 4 – Bryne/Krader Email re Repairs
39.  Ex. 5 – Douma/Pfeiffer Email re Construction
40.  Ex. 6 - Robinson/Douma Email re Renewal
41.  Ex. 7 – Krader/Douma Emal re 4118 Santa Barbara
42.  Ex. 8 – Unreadable
43.  Ex. 9 – Fillman Bulletin re Covid, Release of Funds

19

44.   #1 – Complaint
45.   #19 – Answer
46.   #20 – Defendant Counterclaims
47.   #31 – Meineke Answer to Counterclaims
48.   Douma Email  - 6/27/14
49.   Franchisee Addresses
50.   Table re FA 13.2
51.   Thornton Opinion
52.   Recorded Phone Message re Square Footage
53.   CJGL 001060 – Unreadable
54.   Douma Settlement Statement
55.   Holmes Engagement Letter
56.   Jan Douma Deposition (1/30/24)
57.   Brief In Support of Plaintiffs Motion for Summary Judgment
58.   Complaint
59.   May 7, 2014 Belko Email
60.   Exhibits-Meineke Depos. – Multiple items
61.   Meineke 2020 FDD
62.   Meineke Renewal FTA 2021
63.   Proposed Lease and Meineke Guaranty
64.   Joseph Robinson Deposition (2/6/24)
65.   Darrin Krader Deposition (2/5/24)

**David E. Holmes**
***Curriculum Vitae***
February 1, 2024

<u>Executive Summary</u>

- Practiced domestic and international franchise law from 1975 until his retirement in 2008.

- Associate General Counsel - International House of Pancakes.

- Vice President and Counsel - Century 21 Real Estate Corporation.

- Partner - Holmes Lofstrom, LLP, specializing exclusively in domestic and international franchise law. (Retired - 2008)

- Three Times Co-Chair, State Bar Franchise Law Committee

- Past Member and Secretary, State Bar Business Law Section Executive Committee.

- Past Chair, State Bar Franchise and Distribution Law Advisory Commission.

- Past Chair, State Bar Board of Legal Specialization

- Certified Specialist Franchise and Distribution Law - The State Bar of California Board of Legal Specialization. (2009 - 2014)

- Executive Editor (all editions), CEB practice book: <u>California Franchise Law and Practice</u>.

- Adviser to the California Franchise Law Committee (FLC) of the California Lawyers Association for many years, including current assistance to the FLC and CEB in connection with a new franchise practice guide scheduled for release in 2023 or shortly thereafter.


<u>Detailed CV</u>

David E. Holmes practiced law in the domestic and international franchising area beginning in 1975, having graduated from the University of Southern California in 1966 and its Law School in 1969.

From 1969 to 1975, he was in-house counsel at Southern California Edison and Cordura Corporation, both in Los Angeles.  His responsibilities in

21

the legal departments of those companies involved public securities offerings and general business law matters.

From 1975 to 1980 David was Associate General Counsel for International House of Pancakes, where his responsibilities included legal aspects of multi-brand franchise operations (including franchise matters), related training of marketing and operations personnel, real estate matters, and acquisitions/dispositions of various units.

From 1980 through 1983 David was Vice President and Counsel for Century 21 Real Estate Corporation, where his duties covered franchise and other legal compliance matters and related training, governmental relations, litigation supervision, acquisitions, and system-wide legal training programs.

David and a partner owned and operated a subfranchise company in Southern California, Fantastic Sam's, from approximately 1983 to 1984, and he was in private practice as a solo attorney from 1985 to 2001, specializing in franchise law.

From 2002 to 2008, David was a Partner with Holmes Lofstrom, LLP, which represented businesses in a wide range of industries and professions and with a concentration in franchising. During David's tenure, the firm's clients were located throughout North America and abroad and included mature franchise systems, as well as new and beginning franchise companies.

From 1985 to 2008, David was in private practice, specializing exclusively in franchising, including structuring and development of new and established franchise systems, system design, drafting of documents for registration and legal compliance, management of litigation, franchise system negotiations and legal aspects of system compliance, along with related training.

He has been involved in the structuring and negotiation of international expansion activities for American franchisors in a number of foreign markets, as well as entry by foreign-based franchise systems into North America.

David has actively contributed to the International Franchise Association (the "IFA", the primary trade group representing franchising in the United States) by serving on its Legal/Legislative and Franchise Relations committees, including as a senior liaison, has spoken and presented papers at IFA Annual Conventions, Legal Symposia and other events, has been a member of the IFA Legal Symposium Task Force (which determines the content and speakers for each year's Legal Symposium), and has authored various IFA publications (or portions of such publications), including being a co-author of the A Dispute Resolution Handbook for Franchisees and Franchisors. David moderated a panel discussion at the 2005 IFA Legal Symposium on

Franchise Disclosure and was a member of the IFA Supplier Forum Advisory Board and in 2007 assisted the IFA's Franchise Relations Committee and its Best Practices Product Review Task Force in updating their materials.

Shortly after adoption of the revised FTC Franchise Rule, he presented, as part of an IFA panel, an educational program on the (then) most recent revisions to the Federal Trade Commission Franchise Rule and its disclosure requirements.  He has led various roundtables at IFA events, including at IFA Conventions and Legal Symposia.  He was also a chapter Editor for an American Bar Association monograph on Earnings Claims and, at the request of the IFA, prepared revisions to the IFA's Handbooks on Best Practices in Transfers and Succession Planning.

David has presented papers and seminars at various IFA and other meetings and seminars, in the United States and abroad, as well as conducting franchise law training sessions for domestic and foreign franchise systems.

He has appeared at meetings with, and hearings before, legislative and administrative bodies in connection with franchising matters and has testified on the business and legal aspects of franchising and the possible effects of proposed legislation and regulations.

David has been a guest speaker on various shows relating to franchising, conducted numerous training sessions for franchisor personnel and franchisees, and has been a regular speaker at educational seminars for franchisors and franchise attorneys.  In addition, David has often spoken on franchising and related matters at IFA quarterly regional meetings.

He has been designated, and testified, as an expert witness on franchising and franchise-related matters in both federal and state courts.

During 2003-2004, David served his second term as Co-Chair of the California State Bar Franchise Law Committee (the "FLC"), where he helped to draft (and oversaw the drafting of) the most extensive changes to the California Franchise Investment Law since its original enactment.  During that time, David was the primary liaison between the Franchise Law Committee and senior staff of the Department of Corporations, including working with the Department on new legislation and revisions to the Department's policies and procedures with respect to franchise registration, disclosure, and enforcement matters, as well as negotiating the final form of the bill with state legislative staff.

In the Summer of 2010, David was invited to serve on the State Bar Franchise Law Committee once again.  In that capacity, he primarily focused on regulatory and statutory matters.

For the 2013-2014 State Bar year, David was again appointed as Co-

23

Chair of the State Bar Franchise Law Committee matters and, after completion of his term as Co-Chair, continues to sit on various subcommittees of the FLC and its successor in an advisory (non-voting) capacity.

David has been involved in other projects for the FLC, including the formulation of new legislation, the drafting of affirmative legislative and regulatory proposals and related discussions with regulatory officials, including those involving the regulation of franchise area developers. He served on a subcommittee of the Franchise Law Committee in a proposed general re-writing and modernization of substantial portions of the California Franchise Investment Law, as well as possible revisions to the California Franchise Relations Act and the California Seller Assisted Marketing Plan law.

In October of 2004, David was selected to serve on the Executive Committee of the Business Law Section of the State Bar and served, among other duties, as the primary liaison between the Franchise Law Committee and the Executive Committee, and as Secretary of the Executive Committee.

In October of 2006, David was appointed to the newly formed State Bar Franchise and Distribution Law Advisory Commission as its Vice-Chair. That Commission was charged with developing and administering standards and procedures for certifying California lawyers as franchise and distribution law specialists, the first bar association in the country to do so. In 2007 he became that Commission's Chair and had overall responsibility for the accomplishment of its objectives, and into September of 2009 served that Commission as its former Chair. In those capacities, he participated in the preparation, grading and/or evaluation of examination questions for the franchise and distribution law specialty and served as a pre-tester and evaluator of proposed exam questions in that area. He was also a member of the State Bar's Board of Legal Specialization, to which the Commission reports, and served on the New Specialties Subcommittee of the Board of Legal Specialization.

Effective in September of 2009, David was appointed to the State Bar's Board of Legal Specialization, which administers all certified legal specialties in California, including franchise and distribution law, and also served as Chair of its Examination Committee. He was the Chair of the Board of Legal Specialization for the 2012-2013 State Bar year, having previously been its Vice Chair, and in 2013-2014 served as Immediate Past Chair and Advisor to that body.

David was certified as a Franchise and Distribution Law Specialist by the State Bar of California's Board of Legal Specialization; since he is retired, his certification ended on December 31, 2014.

He is also the Executive Editor of the California Continuing Education of the Bar (CEB) publication: <u>California Franchise Law and Practice</u>, published in 2009, 2011, and 2013. CEB is a joint University of California - State Bar program, founded in 1947.

In addition, David has been a member of the State Bar-CEB Business & Intellectual Property Law Advisory Committee, which advised CEB with respect to publications, continuing legal education programs and other matters.

David was a member for many years of the American Bar Association's Franchising Forum, served on the American Association of Franchisees and Dealers (AAFD) Fair Franchising Standards Committee and assisted that committee in the drafting of portions of their Fair Franchising Standards.

He has also been a member of the American Arbitration Association's (AAA) Franchise Advisory Panel, which advised the AAA regarding arbitration policies and personnel and has taught upper division and graduate level classes on business law at The California State University, Long Beach.

David has been selected by his peers as a "legal eagle" in the franchising community, as part of Franchise Times' Annual Legal Eagle recognition program, and has also been listed in The International Who's Who of Franchise Lawyers.

David is a widower, has two adult sons, and resides in San Luis Obispo, California.

He has served for 15 years as a volunteer at French Hospital Medical Center in San Luis Obispo, where he has been a team captain.  He has been the volunteer photographer for the Cal Poly San Luis Obispo women's basketball team.  In addition, David has served on the Educational Outreach Committee of the History Center of San Luis Obispo County, as well as providing historical photographic documentation services for that and other not-for-profit organizations.  He also serves as a volunteer photographer for the American Red Cross.

In response to inquiries from the CLA Franchise Law Committee, he is considering possibly re-joining that committee as a full voting member.

In retirement, his interests include photography, fresh and saltwater fly fishing, historical and other non-fiction reading and spending time with his family.

**David E. Holmes**
**List of Publications**

1.  California Franchise Law and Practice, 2009, 2011, and 2013 editions.  Executive Editor and author of various chapters.  – A CEB publication.  Copies may be obtained at http://www.ceb.com/CEBSite/product.asp?catalog%5Fname=CEB&menu%5Fcategory=Bookstore&main%5Fcategory=Practice+Books&sub%5Fcategory=Practice+Books+Business+Law&product%5Fid=BU33822&Page=1

2.  Co-author of the International Franchise Association ("IFA") publication <u>A Dispute Resolution Handbook for Franchisees and Franchisors.</u> – An International Franchise Association publication.  A copy may be obtained at http://www.franchise.org/IndustrySecondary.aspx?id=3466

3.  Author or co-author (as identified) of various papers posted on the website of the successor to Mr. Holmes' former law firm (see http://www.holmeslofstrom.com/res.htm).

4.  Chapter Editor for an American Bar Association monograph on Earnings Claims. – An ABA publication.  Copies may be obtained at http://shop.americanbar.org/eBus/Store/ProductDetails.aspx?productId=215725

5.  Mr. Holmes also, at the request of the IFA, prepared revisions to the IFA's Handbooks on Best Practices in Transfers and Succession Planning.  This is an IFA publication.  A copy may be available from them.  See http://www.franchise.org/IndustrySecondary.aspx?id=3466

6.  Article: *California Plans Move to "Risk-Based Review" of Franchise Filings* published in *The Franchise Lawyer* Volume 6 Number 4, Spring 2003 a publication of the American Bar Association – Forum on Franchising.

7.  4th Annual Spring Meeting, Corporate Governance and Ethics, April 4, 2003 in Century City, California.  *So Your Client Is Thinking of Becoming a Franchisee – A Business Overview and Some Practical Considerations* presented on behalf of the Business Law Section of the California State Bar Association.

8.	State Bar of California Education Institute, January 17, 2003 in Berkeley, California. *Is My Client's Business Really Franchiseable? or Business Considerations in Deciding Whether or Not to Franchise* presented on behalf of the Business Law Section of the State Bar of California.

9.	Best Practices - A Seminar for Franchisors, Co-Sponsored by Singer Lewak Greenbaum & Goldstein, LLP and Legal Offices of David E. Holmes. January 29, 1998, in Orange, California. *Legal Techniques*. Co-authored with David Krajanowski, CPA.

10.	State Bar of California Annual Meeting, September 12, 1997 in San Diego, California. Franchising: 1) *A Business Overview and Practice Considerations - An Introduction* and 2) *Representing Franchisors - Business and Legal Considerations*. Presented on behalf of the Business Law Section of the Franchise Law Committee of the State Bar of California.

*11.*	American Franchise Exhibition (put on by CII [Careers in Industry]), September 12-14, 1997 in Long Beach, California. *International Franchising Structure and Negotiations - A Practical Overview*.

12.	International Franchise Association, International Franchise Exposition,  April 26, 1996 in Washington, DC and September 5-7, 1997, in Long Beach, California. *How to Negotiate a Master Franchise Agreement*. Presented as a member of a panel.

13.	International Franchise Association, 30th Annual Legal Symposium, May 5-6, 1997 in Washington, DC. *Advertising Issues in Franchise Relationships.* Co-authored with John Baer, Esq. and Wayne Mack, Esq.

14.	State Bar of California Annual Meeting, October 11, 1996, in Long Beach, California. *Representing Franchisors - An Introduction*. Presented on behalf of the Business Law Section of the Franchise Law Committee of the State Bar of California.

15.	Small Business Development Center Program in partnership with the State of California and the U.S. Small Business Administration. Workshop presented on July 12, 1995, Los Angeles, California. *Is Your Business Franchiseable?  Business Consideration in Deciding Whether or Not to Franchise*.

16.	International Franchise Association, Expofranchise Chile '95, June 22-23, 1995, in Santiago, Chile. *International Franchising &*

27

*NAFTA, A Practical Overview.* Co-presented with Nancy Womack, Director of Affairs of the International Franchise Association.

17. Business Law News, Vol. 16, No. 2, Spring 1994. (Official publications of the Business Law Section - State Bar of California.) *Crises Management in Franchising.* Co-authored with Charles E. Rumbaugh, Esq.

18. International Franchise Association, 26th Annual Legal Symposium, May 24-25, 1993 in Washington, DC. *Master Franchising/Subfranchising.* Co-authored with David Beyer, Esq.

19. International Franchise Association, 33rd Annual Franchise Convention, February 7-10, 1993 in San Francisco, California. *Basic Aspects of Negotiating International Agreements.*

20. International Franchise Association, 25th Annual Legal Symposium, May 11-12, 1992 in Washington DC. *Registration and Disclosure Laws - Beyond the Basics.* Co-authored with Kim A. Lambert, Esq.

California Franchise Law and Practice, 2009, 2011, and 2013 editions. Executive Editor and author of various chapters. – A CEB publication. Copies may be obtained at http://www.ceb.com/CEBSite/product.asp?catalog%5Fname=CEB&menu%5Fcategory=Bookstore&main%5Fcategory=Practice+Books&sub%5Fcategory=Practice+Books+Business+Law&product%5Fid=BU33822&Page=1

21. Co-author of the International Franchise Association ("IFA") publication A Dispute Resolution Handbook for Franchisees and Franchisors. – An International Franchise Association publication. A copy may be obtained at http://www.franchise.org/IndustrySecondary.aspx?id=3466

22. Author or co-author (as identified) of various (but not necessarily all) papers posted on the website of the successor to Mr. Holmes' former law firm (see http://www.holmeslofstrom.com/res.htm).

23. Chapter Editor for an American Bar Association monograph on Earnings Claims. – An ABA publication. Copies may be obtained at http://shop.americanbar.org/eBus/Store/ProductDetails.aspx?productId=215725

24. Mr. Holmes also, at the request of the IFA, prepared revisions to the IFA's Handbooks on Best Practices in Transfers and Succession Planning. This is an IFA publication. A copy may be

available from them.  See
http://www.franchise.org/IndustrySecondary.aspx?id=3466

25.  Article: *California Plans Move to "Risk-Based Review" of Franchise Filings* published in *The Franchise Lawyer* Volume 6 Number 4, Spring 2003 a publication of the American Bar Association – Forum on Franchising.

26.  4th Annual Spring Meeting, Corporate Governance and Ethics, April 4, 2003 in Century City, California.  *So Your Client Is Thinking of Becoming a Franchisee – A Business Overview and Some Practical Considerations* presented on behalf of the Business Law Section of the California State Bar Association.

27.  State Bar of California Education Institute, January 17, 2003 in Berkeley, California.  *Is My Client's Business Really Franchiseable? or Business Considerations in Deciding Whether or Not to Franchise* presented on behalf of the Business Law Section of the State Bar of California.

28.  Best Practices - A Seminar for Franchisors, Co-Sponsored by Singer Lewak Greenbaum & Goldstein, LLP and Legal Offices of David E. Holmes.  January 29, 1998, in Orange, California.  *Legal Techniques*.  Co-authored with David Krajanowski, CPA.

29.  State Bar of California Annual Meeting, September 12, 1997 in San Diego, California.  Franchising: 1) *A Business Overview and Practice Considerations - An Introduction* and 2) *Representing Franchisors - Business and Legal Considerations*.  Presented on behalf of the Business Law Section of the Franchise Law Committee of the State Bar of California.

*30.*  American Franchise Exhibition (put on by CII [Careers in Industry]), September 12-14, 1997 in Long Beach, California.  *International Franchising Structure and Negotiations - A Practical Overview.*

31.  International Franchise Association, International Franchise Exposition,  April 26, 1996 in Washington, DC and September 5-7, 1997, in Long Beach, California.  *How to Negotiate a Master Franchise Agreement*.  Presented as a member of a panel.

32.  International Franchise Association, 30th Annual Legal Symposium, May 5-6, 1997 in Washington, DC.  *Advertising Issues in Franchise*

*Relationships*.  Co-authored with John Baer, Esq. and Wayne Mack, Esq.

33. State Bar of California Annual Meeting, October 11, 1996, in Long Beach, California. *Representing Franchisors - An Introduction*. Presented on behalf of the Business Law Section of the Franchise Law Committee of the State Bar of California.

34. Small Business Development Center Program in partnership with the State of California and the U.S. Small Business Administration. Workshop presented on July 12, 1995, Los Angeles, California.  *Is Your Business Franchiseable?  Business Consideration in Deciding Whether or Not to Franchise*.

35. International Franchise Association, Expofranchise Chile '95, June 22-23, 1995, in Santiago, Chile.  *International Franchising & NAFTA, A Practical Overview.*  Co-presented with Nancy Womack, Director of Affairs of the International Franchise Association.

36. Business Law News, Vol. 16, No. 2, Spring 1994. (Official publications of the Business Law Section - State Bar of California.) *Crises Management in Franchising.*  Co-authored with Charles E. Rumbaugh, Esq.

37. International Franchise Association, 26th Annual Legal Symposium, May 24-25, 1993 in Washington, DC.  *Master Franchising/Subfranchising.*  Co-authored with David Beyer, Esq.

38. International Franchise Association, 33rd Annual Franchise Convention, February 7-10, 1993 in San Francisco, California. *Basic Aspects of Negotiating International Agreements.*

39. International Franchise Association, 25th Annual Legal Symposium, May 11-12, 1992 in Washington DC.  *Registration and Disclosure Laws - Beyond the Basics*.  Co-authored with Kim A. Lambert, Esq.

**David E. Holmes, Esq.**

**Expert Witness Information**

**as of**

**February 12, 2024**

---

<u>2023 - 2024</u>

<u>Landin, et. al v. Glendale 14 LLC, Kahala Brands, LTD (Cold Stone Creamery) et. al</u>; Superior Court No. 13 for Marion County, State of Indiana; Case No. 49D13-2204-CT-013505

<u>Meineke v CJGL; United States District Court - Central District of California - Case No. 2:23-cv-00374-SPG-JC</u>

<u>Endo Fitness LL, LLC v F-19 Holdings, LLC and F19 Franchising LLC, Case No. 22-CV-3124-MEMF-JC</u>

<u>Ryan Suavet, Laetitia Suavet Vinciguerra, I Think I Got It, LLC v DRNK Coffee + Tea Franchising, LLC</u> <u>*et al.*</u> Superior Court, County of Los Angeles Case No. 20STCV03704

<u>Motaz Abdallah; v SuperShuttle of Los Angeles, Inc., SuperShuttle International, Inc.;</u> AAA Case No. 01-20-0015-7848 [Testimony given it some but not all SuperShuttle cases.]

<u>Jemal Berhan v SuperShuttle of Los Angeles, Inc., SuperShuttle International, Inc.; American Arbitration Association;</u>  AAA Case No.: 01-20-0015-1947

<u>Ahuja v. SuperShuttle of Los Angeles, Inc,; SuperShuttle International, Inc.;</u> American Arbitration Association; AAA Case No.:   01-20-0015-1941

<u>Gad v SuperShuttle of Los Angeles, Inc., SuperShuttle International, Inc.;</u> American Arbitration Association Case No. 01-20-0015-1945 Testimony given at deposition (6/30/22) and arbitration (7/29/22.)

<u>Nabil Fahmy v. SuperShuttle of Los Angeles, Inc,; SuperShuttle International, Inc.;</u> American Arbitration Association - Case No. 01-20-0015-1944

Testimony given at deposition (3/29/22) and arbitration (May 3-6/22 and 10-13/22.)

Mohammad Rafique v. SuperShuttle of Los Angeles, Inc., SuperShuttle International, Inc.; American Arbitration Association - Case No. 01-20-0015-1943 Testimony given at deposition (5/18/22) and arbitration (June 7-10 and 14-17/22.)

Meliton Cruz v. SuperShuttle of Los Angeles, Inc. et al.; AAA Case No. 01-20-0015-1942.

Great Food and Friends, LLC v. Simpli.Fresh.Concepts, LLC, et al;  AAA Case No. 01-19-0000-0287

James Bruce Rouse and Lana Lee Rouse v. RE/MAX, LLC; Mark Sadek Bastorous a/k/a Mamdoh Sadek Bastorous; Citi Investments Group, Inc.; RE/MAX Professional Realty; MB Capital Group, LLC; and Professional Investments Capital Group, LLC  Case No. RIC1717600 - Superior Court of the State of California, County of Riverside  Deposition testimony only


SEVA Beauty v. Davis, AAA Case No. 01-17-0003-1341
(Now designated as Zurich American v Anita Enterprises, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 2021CH01064.)

2019
In the Matter of Kaunang v. SuperShuttle Los Angeles. Inc.; American Arbitration Association Case No. 01-15-0003-6003.

2018
In the Matter of the Arbitration Between Garegin Olagov v. SuperShuttle International. Inc.; Case No. 01-14-0002-2413

2016
SuperShuttle International et al. v. Henning, et al.; Sacramento Superior Court - Case No. 34-2014-80001841-CU-MC-GDS


Bennion & Deville Fine Homes et al. v. Windermere Real Estate Services Company; U. S. District Court – Central District of California; Case No. 5:15-CV-1921 R (KKx)

32

<u>Comey v. State Farm, *et al.*; Superior Court Orange County; Case No. 30-2014-00745930-CU-IC-CJC</u>


<u>Ahmed v. SuperShuttle Los Angeles; Superior Court – County of Orange Case No. 30-2014-00756967 – CU-OE-CJC</u>


<u>2014</u>

<u>Viking Associates, Inc. v. TD, Inc, *et al*.</u>, United States District Court – Central District of California – Southern Division – Case No. 8:14-cv-0472 AG (RNB)x)


<u>Shaffie, et al. v. Cell Phone Repair, LLC, et al.</u>, American Arbitration Association – San Francisco; Case No. 74 114 00275


<u>Hahn v. Massage Envy Franchising, LLC</u>, U. S. District Court, Southern District of California, Case No. 3:12-CV-00153-DMS-BGS


<u>2013</u>

<u>Pat & Oscar's Concepts, Inc. v. Tim Foley, *et al*.</u> – Superior Court, San Diego County, Central Division, Case No.: 37-2012-00100956 CU-BC-CTLConsolidated with Case No. 37-2013-704703-CU-BT-CTL

<u>Welch, *et al.* v. The American Insurance Company, *et al.*</u> – King County Superior Court, Case Number 09-2-32462-0 SEA *aka* <u>Sarah Gosney v. Fireman's Fund Insurance Company, *et al.*</u>, King County Superior Court Case No. 09-2-32462-0 SEA

<u>2012</u>

<u>Meersand v. Duffy, *et al.* – Superior Court of New Jersey, Gloucester County Division, Docket No. GLO-1624-10</u>

<u>Coalson v. Pellegrino, *et al.*</u>, Superior Court of New Jersey Law Division – Camden County Docket No. L-2019-11


<u>2011</u>
Newport v. Burger King Corporation

U.S. District Court – No. Dist. Of Calif.
No. CV 10-4511 WHA


<u>Chandran v. Simoneau, et al.</u>
Santa Clara Superior Court Case No. 109CV143839


<u>Robert R. Carlson, *et al*. v. Thumann Incorporated</u>, San Joaquin County Superior Court Case No. 39-2009-00229856-CU-FR-STK


<u>2009</u>
<u>Stillwell, et al. v. Radioshack Corporation, USDCt. So. District Calif. – Case No. CV 0607 JM(CAB)</u>


<u>2002-2004</u>
<u>R.D.R. Enterprises, Inc. v. Copy Club, Inc., et al</u>
<u>Case No. GIC 774596</u>


<u>2002-2003</u>

<u>Temen v. SIG 5, et al</u>


<u>1999</u>
American Arbitration Case Number 72Y1400460-99
<u>Guess?, Inc. v. Pour le Bebe, Inc. and Pour La Maison, Inc</u>.


<u>1999</u>
<u>Foodmaker, Inc.</u>
<u>Foodmaker, Inc. vs. Harris Food Products</u>


<u>1999</u>
U.S. District Court Case No. 98-1086 JSL (RCx)
<u>Jeanne Piaubert Cosmetics vs</u>
<u>G. Thomas MacIntosh; Mackall, Crounse & Moore, PLC</u>


34

1

# PROOF OF SERVICE

2

3
STATE OF CALIFORNIA          )
                             ) ss.
4
COUNTY OF LOS ANGELES )

5

6
  I am employed in the County of Los Angeles, State of California.  I am over 18 years of age and am not a party to the within action or proceeding.  My business address is 16633 Ventura Boulevard, 11th Floor, Encino, California 91436-1865.

7

8
  On **February 26, 2024**, I served the foregoing document(s) described as: **DEFENDANTS AND COUNTERCLAIMANTS' DISCLOSURE OF EXPERT TESTIMONY [DAVID HOLMES]** on the interested party(ies) in this action at the following address, fax number or email address:

9

10

11
Lawrence J. Hilton
ONE LLP
12
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
13
Email: lhilton@onellp.com

14

15
Attorneys for Plaintiffs and
Counterdefendants
16

17
☒ **(BY EMAIL)**   I caused the documents to be sent to the persons at the email addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.
18

19

20
☒ **(FEDERAL)**   I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

21

22
       /s/ Jessica Rosen
       ————————————————
23
       Jessica Rosen

24

25

26

27

28

Lewitt, Hackman, Shapiro, Marshall & Harlan
A Law Corporation